# EXHIBIT A

Case 1:13-cv-05929-SMG Document 118-2 Filed 12/21/16 Page 2 of 958 PageID #: 1092

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------x

13-CV-5929(SMG)

MOSTAFA R. AHSAN,

Plaintiff,

-against-

United States Courthouse
Brooklyn, New York

November 14, 2016
11:30 a.m.

STAPLES, INC. STAPLES THE OFFICE SUPERSTORE EAST INC.,

Defendants.

---------------------------------x

TRANSCRIPT OF CIVIL CAUSE FOR TRIAL
BEFORE THE HONORABLE STEVEN M. GOLD
UNITED STATES MAGISTRATE JUDGE
BEFORE A JURY

APPEARANCES

Attorney for Plaintiff: BHURTEL LAW FIRM PLLC
3749 75th Street
Jackson Heights, New York 11372
BY: DURGA P. BHURTEL, ESQ.

Attorney for Defendant: LeClairRyan
One Riverfront Plaza
1037 Raymond Boulevard 16th Floor
Newark, New Jersey 07102
BY: JEFFREY L. O'HARA, ESQ.
LAURA BREITENBACH, ESQ.

Court Reporter: Georgette K. Betts, RPR, CSR, OCR
Phone: (718)804-2777
Fax: (718)804-2795
Email: Georgetteb25@gmail.com

Proceedings recorded by mechanical stenography. Transcript produced by computer-aided transcription.

(Jury selection held on the record; not transcribed.)

(In open court; jury not present.)

THE COURT: Folks, are we ready for the jury come out?

MR. O'HARA: Yes, Your Honor.

THE COURT: Okay, great.

(Jury enters.)

THE COURT: Ladies and gentlemen, I know you took an oath as prospective jurors, but now I will ask my clerk to administer the oath of jurors to you.

(Jury sworn.)

THE COURT: Please be seated. Before we hear from the lawyers, I am going to take a few minutes to provide you with a brief outline of your duties as jurors and some preliminary instructions to guide you as you begin to listen to the evidence and the arguments in the case. Once the evidence is over, I will give you more detailed instructions that will guide your deliberations.

So, as I may have already mentioned, it is the duty of each juror to decide from the evidence what the facts are. You, and you alone, are the judges of the facts. You are going to hear the evidence, decide the facts, and then apply the legal principles that I instruct you in to the facts that you find and that's how you get to a verdict. When you do

this, you have to follow the legal instructions I give you whether you agree with them or not.

Don't take anything that I may say or do during the trial as any indication of what your verdict should be and don't be influenced by my taking notes from time to time. What I'm writing down may not even have anything to do with this case because I'm trying to keep on top of my other cases at the same time. So the fact that I'm making notes doesn't mean that something important is happening and the fact that I'm not taking notes doesn't mean that nothing important is happening.

When I conclude these remarks to you, each side, the plaintiff and the defendant, are going to have the opportunity to make what we call an opening statement. An opening statement is a presentation by an attorney and it isn't evidence. It is simply an outline from each side about what they expect to prove and it's offered to give you an overview so that when the evidence begins you can put it in context and understand why it's relevant or important.

Once the opening statements have been given, the plaintiff will present his witnesses and the defendant will have the opportunity to cross examine them and then of course the defendant will present its witnesses and the plaintiff will have the opportunity to cross examine them. Then each side will have the opportunity to make a closing argument in

which they will summarize the evidence and interpret it for you and then I will give you the instructions on the law, then you will retire to deliberate on your verdict.

You must decide the facts from the evidence presented in court. You may hear testimony of witnesses, there may be deposition testimony. A deposition is an opportunity that the lawyers have to place a witness under oath before the trial and ask the witness questions. The witness could be the plaintiff or the defendant, by the way, and a court reporter, just like we have here, is present at a deposition recording everything. So a transcript is available and we may hear from deposition transcripts during this trial.

There may be documents and physical things offered as evidence and those, if I accept -- if I admit them into in evidence can be relied upon by the jury just like witness testimony in deciding the facts.

There are a lot of things that are not evidence and you may not consider them when you decide the facts. One of them is what I'm saying right now. This isn't evidence. The arguments of the lawyers and the statements that the lawyers make during the trial are not evidence. Their questions, their objections are not evidence. If I instruct you to disregard the testimony and I strike it from the record, it is no longer evidence and you may not use it. And anything that you may see or hear when Court is not in session, even if it

is done by one of the lawyers of the parties, is not evidence. Only what happens in this room while we are formally assembled is evidence.

In this regard, I instruct you that you shouldn't discuss this case with anyone, even your fellow jurors, until you begin deliberating. I know that many of you have cell phones and other ways of accessing the Internet, but you can't talk about this on Facebook, you can't look up facts on the Internet, and you can't text or Twitter or blog about this case while you are serving as a juror. If any of you are chatting about this outside of the courtroom, it's inappropriate and it doesn't matter whether you are doing it by voice, by text, by Tweet, by Facebook post. So please leave the Internet and this case in two separate spheres until your jury service over.

When we talk about evidence there are two kinds, or at least lawyers like to categorize two different kinds of evidence as a direct evidence and circumstantial evidence. You may have heard the expression that, oh, it's just circumstantial. Well, in law, direct and circumstantial evidence may both be considered by a jury in deciding the facts. There is no limitation on the use that a jury may make of circumstantial evidence. A jury may give equal weight to direct and circumstantial evidence or more weight to one or the other. It's really up to you. But let me make sure you

understand the difference so that as you think about it you can make a conscious decision about whether something is direct or circumstantial as you decide how much weight to give it.

Direct witness is testimony by a witness about what the witness personally saw or heard or did. Direct evidence is testimony by a witness about what the witness saw or heard or did. Circumstantial evidence is another way of saying indirect evidence. It's proof of one thing from which you infer something else.

I want to give you a little example, it's a little trite because lawyers use it all the time, but I am going to give it to you anyway.

Let's assume there was no window in this courtroom and let's assume you came to court today and it was sunny and bright. Let's also assume that someone walked through the doors in the back of the courtroom while we were sitting here together shaking a wet umbrella and taking off a raincoat. You would not have any direct evidence that it was raining because you would not have had the opportunity to look out the window when it began to rain and yet you would be pretty confident it starred to rain because you would see somebody walk into the courtroom with a wet umbrella and raincoat. That's all we mean by circumstantial or indirect evidence. We figure out one fact, whether it's raining or not, from another

fact, somebody is wearing a wet raincoat and shaking out an umbrella.

As I said, the jury may rely on both direct and circumstantial evidence. The law does not give preference to one or the other.

There are a lot of rules of evidence that control what can be presented to a jury according to the rules. When a lawyer asks a question or offers an exhibit into evidence, and the lawyer for the other side thinks that the rules of evidence don't permit that, the lawyer who thinks it's not permitted objects. I am sure you have heard a lawyer say objection on television or in the movies before, that's what it's about. The rules don't permit the other side to do that, Judge. That's what objection means.

If I sustain the objection, then in my view the rules do not permit it and the question cannot be answered or the exhibit, the thing, cannot be received in evidence. When I sustain an objection, ignore the question, try not to guess what the answer would have been.

On the other hand, if I overrule the objection, then what I'm saying is that I'm going to allow the evidence to be admitted. Sustained, can't. Overruled, can hear the evidence. The question may be answered and the exhibit may be received. But don't give evidence any special weight or focus or attention just because the other side objected to it, and

don't be prejudiced for or against one side or the other simply because that side's lawyer makes objections or because I sustain objections made by the other side. If I do order that you disregard evidence, then you have to follow the instruction and not consider it when you decide upon your verdict.

Sometimes evidence is admitted for only a limited purpose. What do I mean by that? When I admit evidence for a limited purpose I will say, you may consider this evidence with respect to the following question but only that question. And so if I give you an instruction like that, I know it's hard but you have to try to follow it. So if I say that this is only being offered, say, with respect to the credibility of the witness but not as independent evidence of what happened in the store, then you can use it to decide whether to believe the witness or not, but not to decide what happened in the store directly.

When you decide the facts you may have to decide what witnesses to believe and which ones not to believe. It's up to you as jurors to believe everything a witness says, part of what a witness says or none of what a witness says.

When you decide what to believe, you may take into account a number of factors, you can include among the factors you consider whether the witness had the ability to see, or hear, or know the things that the witness testified about; you

may consider the quality of the memory of the witness; what was the witness' manner when he or she testified? Did he or she carry him or herself in a way that gives you confidence in his or her credibility? Does the witness have an interest in the outcome of the case? Will the witness be helped or hurt about how the case comes out? Does the witness have any other motive or bias or prejudice? Is what the witness testifying to contradicted or inconsistent with something the witness said, or wrote, or did before the trial? Or is it inconsistent with other evidence that you find especially believable that may be coming from other witness. How reasonable does the witness' testimony seem to you especially when you consider it in light of the other evidence in the case?

Typically witnesses are not permitted to offer opinions. Witnesses can only testify about facts, about what happened, but where a witness has specialized knowledge about a particular subject matter and that specialized knowledge might help the jury understand a complex or technical field, then we call the witness an expert and the witness is permitted to share his or her opinions with you. We're going to hear from a lot of experts in this case I think. Their expertise will be in the medical fields and I will permit them to offer opinions about medical things because of their expertise. I know it's challenging, but it's your

responsibility as jurors to evaluate expert testimony just as you would the testimony of any other witness and you can use the factors I have already described. In addition, when you consider whether to believe or rely upon the opinions or testimony of an expert, you may consider how much training the expert has and the expert's qualifications and experience and knowledge of the subject matter generally that the expert is testifying about.

During the trial, as you've already seen during the jury selection, I will undoubtedly required to call the lawyers up to the side bar or they may ask to approach me at the side bar to discuss legal matters. I need their help deciding how to apply the rules of evidence and procedure as the case goes forward so I hope you will forgive us while I seek that help.

Please don't feel like we are treating you rudely, even though we will turn our backs to you and have a private conversation. Feel free to stand up and stretch if you'd like to while we are having those conversations, but try not to speak because I'd like the court reporter to be able to hear us while we are talking at the side bar so we have a complete and accurate record of everything that's being said there.

If I ever need to have a longer meeting with the lawyers, I will let you retire to the jury room where you have already been, and I hope you found it a comfortable place to

rest while we are in between sessions.

Sometimes I have to admonish a lawyer who, out of zeal for his or her client, may do something that I think is contrary to the way courtroom proceedings should be conducted. Don't permit my interactions with the lawyers to influence your judgment about your verdict. It has nothing to do with the merits or strength of the plaintiff's case or the defendant's position in the case. It has to do with my interactions with the lawyers and my desires to see the rules followed carefully.

I don't believe we will have a transcript for your consideration while you deliberate, so please pay close attention to the evidence as it comes before you. When we get to the point of the case where we are hearing evidence, which will be after lunch, I will invite you to bring a legal pad and pen with you or pencil with you if you'd like to do so, but you don't have to. If you want to, you can jot down any notes. Sometimes it can be helpful just to keep a list of the witnesses who testified and that will be all you will need to jog your memory. But please play close attention during the trial and don't assume that we will be in a position to give you a transcript of the testimony to consult when you deliberate.

If you do take notes, don't share your notes with your fellow jurors until you begin your deliberations and

don't take your notes home at night. You will leave them in the jury room and we will take care of them for you, because we don't want you thinking about or talking about the case except when you are in the jury room. To keep your notes private, don't take notes on the first page of your pad. Just write your juror number on the first page of the pad and that way your notes will be private from us as well because we won't turn that first page over and see what you are writing.

It's difficult to take detailed notes and to pay attention to the testimony. So if you do take notes, don't get so involved in writing one thing down that you miss what happens next. Your notes will only be used by you as an aid to your memory. Your memory is what controls and if what you remember later is different from what you wrote down, rely on what you remember not on what you wrote down. And if you don't take notes, rely upon your own memories of what happened in the Court. Each juror, whether he or she takes notes or not, has an independent, individual responsibility to listen carefully to and evaluate the evidence, to share your recollections of the evidence during deliberations and to share your perspective on the case with your fellow jurors. So don't be unduly influenced by the notes of other jurors. One juror's notes are not entitled to any greater weight than the recollections of another juror who did not take notes. We depend upon the judgment of each and every one of you so you

all must try independently to remember and think about what happens.

Generally, only the lawyers and occasionally I will ask questions of the witnesses. The jury is generally not permitted to question the witness. That's because there are so many rules about the evidence and procedures that are appropriately followed in the courtroom. But if you feel strongly that a question has not been asked, you may, during a recess, write it down on a note and give it to my clerk, I'll share it with the attorneys and at least they will be advised that that is something that you wish had been asked.

If you ever need to take a break, for restroom purposes or otherwise, and it doesn't look like I'm about to take a recess, let me know, maybe I will change my mind, maybe I won't but maybe I will. So, also raise your hand right away if you cannot see or hear what's going on and we will stop and we will go slower or make it louder. If you have any other reason to communicate with me, write it down, put it on a note and give it to one of my clerks and they will see to it that it comes to my attention.

Don't talk to each other about the case on trial or anyone who has anything to do with it until the end of the case when you go to begin your deliberations. Don't talk with anyone else about the case on trial or anyone who has anything to do with it until the trial is over and you have been

discharged as jurors. This includes your family and your friends. You can tell them you are a juror in a case, you can tell them the schedule we're following, but don't talk about the case. You know, sometimes it can be tempting to say, well, I really can't talk about the case, but I will just tell you a little bit about what it's about. The reason we urge you not to do that is and once you start it's hard to stop. They will ask a question, whoever you are talking to, you will not want to be rude, you will answer that question and before you know it you are starting to characterize and think about the testimony in a setting other than deliberating with your fellow jurors and that undoes the very purpose of jury deliberations.

Don't let anyone talk to you about this case and don't let anyone try to talk to you about any of the people involved in the case. If that happens, let me know immediately by giving a note to my clerk.

I don't know if there will be any media attention paid to this case, but if there is and you come across it, divert your attention from it right away. There are plenty of other things to read or listen to.

Don't research the case on your own. Don't go on the Internet or on the web about personal injury cases or figure out what kinds of injuries may or may not have happened or how juries value injuries like that in other cases. This

is your decision based on what happens in this courtroom, not to be compared with or informed by what happened in other cases to other people.

Don't make up your mind about anything until you've deliberated with your fellow jurors and shared your perspectives with each other.

In a couple of moments I am going to invite the attorneys to give their opening statements. I remind you that the opening statements of the lawyers are not evidence. If they refer to facts that are not subsequently presented to you and evidence that you decide to believe, then you cannot rely upon their statement as proving those facts or suggesting that those facts are true. Rather, these opening statements are just designed to give you an overview so you can better follow what will occur during the case.

Mr. Bhurtel, are you ready to make your opening statement to the jury?

MR. BHURTEL: Yes, Your Honor.

THE COURT: Please proceed.

MR. BHURTEL: May it please the Court. Talented and experienced defendant's lawyer, Jeff O'Hara, his assistant Laura Breitenbach, my client, Mostafa Ahsan, the defendant Staples, Inc. and Staples The Office Superstore, Inc. and most importantly you, members of the jury.

I am Durga Prasad Bhurtel, I'm attorney for the

plaintiff. This is just, as the judge told you, that this is just the opening statement. It's a preview. I want to give you a sample. This is maybe the table of content of the book. The book is a book that's going to come from the witnesses and the medical records and other things. But this I just want to give you the preview.

THE COURT: Mr. Bhurtel, just one moment. Counsel, if you'd like to sit elsewhere --

MR. O'HARA: Thank you, Judge.

THE COURT: -- you can move.

THE COURT REPORTER: May I?

THE COURT: Absolutely. Let's give the court reporter a moment to move. Thank you.

MR. BHURTEL: Ready to proceed?

THE COURT: Yes, please.

MR. BHURTEL: Thank you, Your Honor.

Before I go to the table of contents, I want to warn you that the evidence, the case it's going to be like, you know, the jigsaw puzzle. You may have to bring from here and there and then put it together and at end of this case. I may not be able to put it like sequence number one, number two, number three because of the witnesses and other things.

So, ladies and gentlemen of the jury, this is a simple case, I just want to tell you. So you will decide how much damages Mostafa Ahsan is entitled based on the evidence

presented to you. So we -- the defendant already admitted that it is their negligence to cause fall of the boxes, whose boxes hit his head, neck and shoulder.

So our version of what happened. Mostafa, this happened in -- Mostafa is a father of the three children, husband, he was going to Staples stores to buy some stuff, some stationery.

THE COURT: Some what?

MR. BHURTEL: Stationery.

THE COURT: Stationery. Thank you.

MR. BHURTEL: When he was in the process of doing that one, all of a sudden two heavy boxes fell from the top shelves, hit his head, neck and left shoulder.

Since then -- since then he has been receiving the medical treatment.

So when did it happen? It was September 2nd, 2011 it happened. It's about five years and two months. So my client is waiting five years and two months until now to come before you and find out the truth what happened. What extensively he suffered injuries and what damages, what compensation Mostafa is entitled from the defendant Staples in this -- because of this incident happened.

To my client at least you are the healers. After we present all evidence we'll ask you to heal Mr. Mostafa Ahsan in the only way the law can heal anyone, which the judge

already told you that. The Honorable Judge will give you the law at the end before you go to the deliberation.

So I don't go through the detail, I already said this one how the accident happened. The Staples, one of the employee was working, arranging the boxes on the top shelves. When he was doing that he caused to fall the boxes which hit -- two heavy boxes which hit Mostafa in his head, neck and left shoulder. So as I told you earlier, the defendant admits they are negligent to cause the fall of the boxes.

You will hear from the doctors, treating doctors from the day one Mostafa went to treatment for the doctors until now he is receiving from the doctors, so about his head, neck, left shoulder. And you will learn from the medical records how extensively he was injured, what was his injuries during the process of this trial.

And at the same time you will also learn during this trial process how much the medical costs he incurred. How much medical costs is there because he needed medical treatment for his neck, head and left shoulder. And the brain injury. And at the same time you will learn in this trial that how much medical bill, how much medical care he will need in the future and then how much cost will be that. So during the trial you will learn those things.

So in this matter, September 2nd, 2011 incident changed Mostafa's life. So what injuries he suffered? The

evidence will show that Mostafa suffered post-traumatic left frontal subdural hygroma. Ladies and gentlemen, this is a medical term I understand. The doctor will explain to you in detail but I can tell you in the simple form it is something in his head that is inside the head. So it is called cerebrospinal fluid. That cerebrospinal fluid is collected there and it is still inside his head. So the evidence will show that what happened to that one either he has to take it out or it will go away. The doctor will come and will explain you the detail about that.

And at the same time Mostafa has suffered traumatic brain injury. Again, what is the traumatic brain injury? The doctor will come and explain it, but in simple term I can tell you, the evidence will show that he had headaches, dizziness, and short-term loss of memory.

THE COURT: Could you just repeat that one more time please, he had what?

MR. BHURTEL: Headaches.

THE COURT: Headaches. That's the word I missed. Thank you.

MR. BHURTEL: Thank you, Your Honor. I apologize, Your Honor.

THE COURT: No apology.

MR. BHURTEL: So what his brain injury, traumatic brain injury and how he suffered and what is his condition you

will learn from the doctor.

Mr. Mostafa also suffered his neck injury because of this heavy box fell and hit his neck. He suffered -- it's called cervical herniation. I will say neck, neck herniation. What is neck herniation and how it occurred? The doctor will explain to you during this trial process, but I will tell you that so it is here, there is some damage inside his disk. So that he has been suffering. And the evidence will show that he received treatment including various epidural steroid injection, which is the doctor will tell you how it was done, what was done and why it was done, later during the trial.

So -- and you will also learn during this trial the treating doctor will come and he will explain that those injections are not working for him so he will need surgery in his neck. So this part of it, the evidence, you will learn during the trial.

Another body part Mr. Ahsan Mostafa suffered injury is left shoulder. What injury he suffered, there is a technical word that the doctor will come and explain but I will tell you that inside his shoulder there is a tear. It's called lateral tear, but the doctor will explain the technical matters. But I will tell you just that he had a tear, he tried other treatment and you will learn that he went already one surgery on his left shoulder and also treating doctor also come and he will give medical opinion during this trial that

he may need another surgery.

So in this matter during the trial we will present you evidence that how much medical cost he suffered in the past medical cost, how much he had to pay the doctors. And at the same time and during this trial we will present the evidence that how much future medical services, medicine, including charges, hospital expenses, diagnosis, test, MRI and other of these things, how much he will need. Ladies and gentlemen of the jury, the doctor will come, the treating doctor will come and he will testify in this matter.

How much is the number in the past medical cost already he suffered? I'll give you probably during the closing because we're going to come back again after you heard all the evidence, and then I will have opportunity and my defendant's counsel also will have opportunity to come back and give you closing argument.

So these are the things. And what kind of pain he is suffering? What kind of pain he suffered already the last five years and two months? You will hear from the witness and then what kind of suffering he went through last over five years you will hear from Mostafa.

See, there are two words, pain and suffering. These are two different things. Just I want to let you know. So the pain, it's immediately you feel it, which is that electrical impulses that travels from the body part where you

have injury to your brain and you feel the pain.

What is the suffering? The suffering it is not the same thing that electrical impulses go to the brain, it is not that. It is something different. What is that? It's the suffering is what Mostafa was able to do before the accident when these heavy boxes fell in his head, neck and shoulder and head, and after that what he cannot do.

Ladies and gentlemen of the jury, so what kind of suffering he was suffering in this one? He had limitation of use of his neck, he cannot freely move his neck. He can't freely use his left shoulder, so that is one part. And then another part is there is headache, dizziness and short-term -- loss of short-term memory. So you will learn during the trial from the doctors and the medical records.

So Mostafa was 56 years old at the time of the accident. Now he's 61 and so he has a further life expectancy. And most likely the judge will give you the instruction what is the life expectancy he has and you will decide, based on the judge's instruction, as to what his life he will live next, how many years.

So before the accident he used to do the graphic design, event management. He used to cook, cleaning inside house, used to do laundry, grocery, and remove snow or ice in front of the house. This kind of work he usually used to do it.

After the accident, he cannot -- he can't do particularly cleaning inside the house, laundry and heavy grocery.

MR. O'HARA: Objection, Your Honor. There's a Limine ruling on this topic.

THE COURT: Overruled.

MR. BHURTEL: Grocery and obviously removing the snow and ice during the season.

What he tried to do with difficulties now is he tried to cook still with his wife. He still tried to do painting with difficulties and he has, evidence will show, he has a problem sleeping on one side of the body and he will -- he has been suffering to use fully his left hand to even do the shower, and using the computer. He's a graphic designer.

Ladies and gentlemen of the jury, I want to clarify very clearly up front, Mostafa is not claiming loss of wages, because he was doing those activities but he is claiming that he was doing those activities and now after the accident some of the activities he cannot do it and some of the activities he has been doing with difficulties.

And I want to tell you one more thing is, ladies and gentlemen of the jury, this -- the date of the accident, Mostafa Ahsan went to the doctor for the treatment. He did not go to the emergency or hospital, but he went to the doctor. From then, same day, since then he has been receiving

treatment. And I also just want to tell you clearly that he had one or two times his neck complaint in 2008 and one therapy it go away. And sometime in February 2009 he had another complaint one time and one therapy went away. There was no complaint neck and left shoulder before -- sorry, after the February 2009, until the heavy boxes fell on his head, neck and shoulder. So the doctors -- the doctor will, or evidence will show and the doctor will come and testify, the treating doctor will come and testify that his shoulder and neck injury is caused by these heavy boxes or not, so you will learn during the trial.

At the same time I just want to inform you that he had a headache complaint in October 3rd, 2011, which is about a month before, but the doctor will come --

THE COURT: Could you go over those dates again, please. When was the headache complaint?

MR. BHURTEL: It was March 2008.

THE COURT: The headache?

MR. BHURTEL: No. The neck and left shoulder.

THE COURT: And the headache?

MR. BHURTEL: The headache was August 3rd, 2011.

THE COURT: Thank you. I misheard you.

MR. BHURTEL: So in this trial you will learn from the plaintiff's treating doctors that what is the plaintiff's condition caused by these two boxes, two heavy boxes fall on

his head, neck and shoulder?

So, ladies and gentlemen of the jury, I intend to -- we intend to prove that his head injury, which is subdural hygroma in his head, his traumatic brain injury and his left shoulder injury and the neck injury is caused by falling of those heavy boxes in his head, neck and shoulder.

Thank you very much.

THE COURT: Thank you, Mr. Bhurtel. If you leave the microphone up there.

All right. Now we will hear the opening statement from the defendant.

MR. O'HARA: Is it okay if I leave this on the podium? I'll be loud.

THE COURT: Sure. I can hear you fine.

MR. O'HARA: Good afternoon, ladies and gentlemen. As you now know, my name is Jeffrey O'Hara and with my colleague Laura Breitenbach, we represent Staples in this case. You will see me throughout the trial, but for personal reasons Laura may not be here for the entire trial.

So what is this? What are we here for? An opening statement, as you now heard from the plaintiff's counsel and as the judge identified for in the preliminary discussion, he said it's an outline of what the evidence is going to show. Very important though, it's an outline that's a pact between the lawyers and what they intend to prove to you about their

particular case. So every single thing that I tell you now I guarantee you that I'm going to prove. Everything that I tell you about the plaintiff's case that I suggest to you you should call into question, I'm going to ask you to pay particular attention because I am going to prove to you, during the course of this case, every inconsistency that I am about to outline for you, every single one. And that is my pact with you. That is my guarantee, that's my promise.

So what are we here for? We know now there was an incident, allegedly, on September 2nd, 2011 where the plaintiff was shopping in a Staples store. And during the course of his shopping, and you will learn that it's an aisle 8, there was an employee of Staples, who no longer works for the company, who was engaged in some task. And at some point the plaintiff came and said that there were box -- a box or boxes on the floor and that he claimed they had fallen from the shelf. We weren't there. And there was no other information other than what the plaintiff was telling us and so we accepted that as being true. And if it is true, as a lawyer, our job is to only defend facts that are untrue or are in question. And if those boxes, which could not have moved off the shelf by themselves, had fallen off the shelf because an employee was working in another aisle, then we're responsible for that. And that's the position that we've taken in this case and that will always be the position that

we've taken in this case, because it is honest. But there is a significant question as to whether or not it hit this man and if it hit his man, what it exactly did to him.

The evidence is going to show that after the alleged incident, Mr. Ahsan I believe -- and I believe his name is Mr. Ahsan, I'm not sure if it's first name or last name, based upon the opening statement. Mr. Ahsan walked over to a Staples employee and told the employee, in English, that he had been involved in an incident and that he alleged that he been hit by one or two boxes. The boxes contained -- this is September 2nd, just before the school year is starting, and the boxes contained folders that kids take to school to put papers in.

And you're going to hear testimony from the general manager of the store, he will actually be called in our case, who came to the scene when there was a report of the incident to take information from the plaintiff, what happened, who are you, are you hurt and do you need medical attention? And there's no question whatsoever, none, that every single question that Mr. Ahsan was asked, he answered without any difficulty. He provided his name, his address, his telephone number, a description of what had happened to him and very important, you will learn that throughout the course of the evidence that you hear during this trial, different times that Mr. Ahsan describes his incident differently. The first time

when he talked to the people in the Staples store you will learn that they wrote down, the customer said that two boxes fell on his left shoulder. He never once says that it strikes him in the head. He never once says that it strikes him in the neck. And if you think about the physiologic possibility, it could not have physiologically hit him in the head and also hit him in the neck. It's not possible.

After engaging in this discussion with the Staples employee, the evidence is going to show that he was asked, do you need medical attention? Because you will learn that any time there's a claimed incident, and anybody works in the retail industry understands, that when there is a customer complaint, we want to make sure that they're okay, we want to make sure if they need medical attention get the medical attention and if there is something about a particular condition we want to take steps to make sure nobody else is involved in the incident.

The general manager interacts with Mr. Ahsan and there are no visible signs of injury whatsoever. He doesn't have a bump, he doesn't have a bruise, he doesn't have a cut. All he says is the box or boxes that are on the floor fell, hit my left shoulder, but, no, I don't need medical attention.

The evidence is going to show that he walked to the store. The evidence is going to show that he walked out of the store. So what does that tell us? Well, the evidence is

going to show that when he leaves the Staples store, he then proceeds to go to Dr. Guha. And you will actually hear from Dr. Guha, he's going to come and testify. And what Dr. Guha is going to tell you that he had no prior complaints of head or neck or back injury.

But here's the thing, the evidence is going to show that throughout the course of discovery in this case, we went and got his medical records. We got his medical records and we know he had prior head complaints, we know he had prior neck complaints, we know he had prior left shoulder complaints. In fact, we know he had a condition that the expert will come and talk to you about called left lower trapezius myofaschial pain syndrome in this shoulder. We also know that he had cervicalgia. The doctors will come and pronounce it properly. I'm a lawyer, not a doctor. They'll explain to you what these conditions are.

You will also learn Mr. Ahsan was diagnosed with hypertension. He also had what's called small vessel ischemic disease, which is in his brain. And a result of these conditions, both the hypertension and the vessel condition, he was on a number of medications. The evidence is going to show that both pre and post incident the list of medications that you will hear from the experts that he was on, all have normal side effects and just about every one has headaches. And guess what? Despite the fact Dr. Guha's records indicate that

the man came in for complaints of his shoulder and that he had no prior history based upon his deposition testimony, Dr. Guha's records actually show that he was complaining of headaches, as Mr. Bhurtel just pointed out for you, one month prior to this accident.

So when I said to you that while Staples is going to accept that it is responsible, if those boxes fell down and hit him, whatever they did we own. We are responsible for it and you will never hear anything other than that from me. But the key question is going to be, did it actually hit him where it hit him and what did it do to him?

You're going to learn directly from Mr. Ahsan that he doesn't suggest that he had a bump, a bruise or a cut from the boxes. He's going to tell you that it didn't knock him down. That he actually, after gathering himself because of the incident, actually talked to not one but two employees, after giving the personal information, walked out of the store and then took steps to get himself to Dr. Guha as opposed to going to the emergency room or a hospital. He chose to go to Dr. Guha from the store.

Well, after seeing Dr. Guha, you know, one of the things you will hear from the medical providers -- and you're going to be used to this from your every day life, they ask you questions. Why are you here? What happened? And have you ever had these problems in the past? It's called a

history. Initially you're going to hear the history given at that point to Dr. Guha about the incident, is heavy boxes fell and that he had, quote, neck pain. That's the first complaints that he gives to Dr. Guha. He gives it on the first office visit, he gives it on the second office visit. On the second office visit in addition to neck pain he talks about headaches. Never once does he suggest that anything struck him in the head. Never once does any doctor suggest that there was a quote/unquote traumatic brain injury that resulted in posttraumatic left frontal hygroma. You're going to hear a lot of about what this condition is and whether or not it is caused by what is suggested to be, if you believe the plaintiff's story, a grazing blow from a box that is about three or four inches wide, about eight or nine inches long and weighs about four pounds that had no damage to it when it hit Mr. Ahsan, assuming it hit him. That it caused no physical damage to him that could be seen by the human eye and that after the incident, because of the manner in which it was described to the store personnel, it was put back on the shelf.

Now as I outlined for you the evidence that is key for purposes of what we are going to be asking you is Mr. Ahsan is entitled to damages, if you believe this incident caused him harm. He's entitled to be fully compensated for whatever harm you believe, based upon credible evidence, is

proven as a result of this accident.

You are going to hear that he has extensive, not a big surprise, right, as you get older things change in your body, our hair changes, our joints change. You're going to finds that he has extensive degenerative changes in his shoulder, in his cervical spine. You're going to learn about a number of these medicals conditions, which have nothing to do with this alleged incident, and ultimately I'm going to bring three experts before you, that are not treating physicians. Why? Because that's the way the plaintiff is bringing these doctors before you, those doctors are going to give their version as to what they did and why, and the defense has independent people that it has asked to evaluate. You're going to be asked to judge the opinions of the medical providers, because they may not exactly agree, okay.

And ultimately it's going to be your determination as to whether or not this incident caused any change whatsoever to what are otherwise chronic conditions due to the natural aging process in his man's shoulder, neck and head. And I submit to you when evaluating the evidence -- and I need to you keep an open mind as the Court has indicated you must do. You need to wait for all of the evidence to come in -- you will, as I do, question whether this claim has been stated with complete accuracy. And that's going to be the key. Do you buy it? Do you believe this story? And I submit to you

Case 1:13-cv-05929-SMG Document 118-2 Filed 12/21/16 Page 34 of 958 PageID #: 1124

when all of the evidence is presented and I stand back up in front of you, I will use these same three pieces of paper and I promise you you are going to evaluate the evidence and what you're going to conclude is the answer is no. Thank you.

THE COURT: Thank you, Counsel.

Ladies and gentlemen, now you've heard the opening statements. I told you I promised you lunch before I made you listen to any evidence, right?

Please return to the jury room. Ms. Gillespie, my clerk, will give you some instructions about how to get back and forth into and out of the building and how to get back up here to the jury room.

Be back by about five to two, please, and don't count on such a generous lunch break from me in the future, but I know that for many of you it will be your first day in Brooklyn Heights. There is a cafeteria on 3. There are a lot of restaurants in the immediate vicinity, particularly if you walk across the park in front of the building and one block more you will be on Henry Street. There are lots of places to eat on Henry Street. So enjoy your lunch recess, be back in the jury room by five to 2 and Ms. Gillespie will take you out there now and get you some pass cards for you to gain access to and from the room.

Don't discuss the case with anyone and don't feel like you are being treated rudely if the people involved in

the case ignore you in the elevator, on the sidewalk or wherever, okay? You may return to the jury room.

(Jury exits.)

(In open court; jury not present.)

THE COURT: A couple of things, Counsel. Mr. Bhurtel, during Mr. O'Hara's opening remarks you started to raise a finger like, hold on a minute, but you didn't say objection. I can't rule on a finger wave. If you have an objection, even if you are interrupting, stand up and say objection and I'm sure Mr. O'Hara will stop at that point and give me an opportunity to rule. Okay?

MR. BHURTEL: Okay.

THE COURT: I noticed your client -- or the gentleman I believe to be your client's son peaking his head through the glass. I hope you understand and that he understands that assuming he's not going to testify, he's welcome to be in the courtroom now that the jury selection is over. My concern was that he was talking to a juror when he walked into the courtroom. That's why I so quickly and brusquely asked him to leave. Now, of course, he's welcome to come here as long as he's not going to be a witness. As long as he's not making facial gestures or comments from the back of the courtroom.

Ms. Kral, I didn't realize that these screens -- are these screens yours? No. I touched them inadvertently and I

created a little purple swipe on everybody's screen. I'm sorry I don't know how to clear it. I take it at some point when someone intends to use this equipment we will be able to figure that out.

Anything further, Mr. Bhurtel?

MR. BHURTEL: No, Your Honor.

THE COURT: Mr. O'Hara?

MR. O'HARA: Just a question, Judge. Mr. Bhurtel opened and he called this man Ahsan Mostafa on three or four occasions. I just want to make sure that this man's first name is Mostafa and last name is Ahsan. Because the entire opening he actually reverses the names. That may be inadvertent, but that confused me, if we can.

MR. BHURTEL: His first name is Mostafa.

THE COURT: His surname is Ahsan?

MR. BHURTEL: Ahsan.

THE COURT: Family name is Ahsan?

MR. BHURTEL: Ahsan.

THE COURT: Okay. You made an objection, Mr. O'Hara, to the references to some of the household tasks Mr. Ahsan claims he can no longer do. I ruled on it for the moment, but I want counsel to understand my recollection and why ruled that way lest it come up again.

My recollection was that the concern about testimony like that came up not in the context of an in Limine motion,

but in the context of a request to charge. And that Mr. Bhurtel's proposed verdict sheet included loss of household services. And at that time I ruled that Mr. Ahsan's inability to be as helpful as he used to be might properly be considered by a jury in connection with pain and suffering that he's experienced as a result of the accident that he feels he can no longer be as helpful as he'd like to be, but it cannot be used as a back door for loss of services claims a spouse would ordinarily have and it cannot be used for a specific compensatory claim for the value of the services unless there was competent proof that the family hired someone to perform services that Mr. Ahsan used to perform.

But I never meant to, and I don't think I did, exclude the plaintiff from proving that his pain and suffering includes his frustration or sadness at not being able to do some of the things he used to do.

MR. O'HARA: The basis of my objection was, Judge, he identified it as, quote, services in the way he presented it. He then listed a series of household services, hence my objection.

THE COURT: Yes. Well, I think my ruling is now clear enough --

MR. O'HARA: Yes.

THE COURT: -- but if somebody wants to say something else I will hear it.

All right. Enjoy your lunch. Let's plan on being back here at 1:45 and hopefully your doctor will be here promptly, if not early, and we will be ready to get going. Okay?

MR. BHURTEL: Yes, Your Honor.

MR. O'HARA: Yes, Your Honor.

THE COURT: Thanks everybody. See you in a little over an hour.

(Luncheon recess: 12:31 p.m.)

(Continued on the next page.)

A F T E R N O O N S E S S I O N

(In open court; outside the presence of the jury.)

THE COURT: I infer, Mr. Bhurtel, that your witness is present.

MR. BHURTEL: Yes, Your Honor.

THE COURT: Very well. You can all have a seat.

Are we ready, counsel?

MR. O'HARA: Judge, one of the things you had asked during the logistical telephone conferences is that we have copies of the exhibits for the Court so I have them here.

For purposes of cross examination, as the questioning moves along, all of these documents have been uploaded and so they'll be displayed on the screen. But if the Court wants, we've got six trial binders here. I just didn't want to be presumptuous.

THE COURT: Oh, goodness.

No, I don't think I want so many unless and until I see how things go. Maybe I'll rely on the screen after all.

MR. O'HARA: Okay.

THE COURT: Let's see if the jury is ready. Thank you, though, Mr. O'Hara.

Let the record reflect I've given a proposed set of jury instructions to counsel, and I'll be happy to find the time with you as early in the trial as you're ready to go over them.

(Jury enters the courtroom.)

THE COURT: Good afternoon, everybody. I hope you found someplace to eat that was satisfying, that maybe you even got a little fresh air and that you're ready to begin the evidentiary portion of the case.

So as I've said, I see you all with your pads and pens. Please don't make any notes on the first page. And if you put your juror number on that first page, we'll be able to keep whose pad is whose separate. Nobody wants to be looking at your notes, and even you shouldn't be sharing your notes with your fellow jurors at this point. And don't take some so many notes that you lose track of the testimony.

Mr. Bhurtel, is plaintiff ready to call his first witness?

MR. BHURTEL: Yes, Your Honor.

THE COURT: Please do so.

MR. BHURTEL: Plaintiff calls plaintiff's treating doctor, Ranga Krishna.

THE COURT: Dr. Krishna, please come forward and be sworn.

RANGA KRISHNA, called as a witness, having been duly sworn, was examined and testified as follows:

THE COURT: Can you state and spell your name for us, please.

THE WITNESS: R-a-n-g-a K-r-i-s-h-n-a, Ranga

Krishna.

THE COURT: Thank you, sir.

You may inquire, Mr. Bhurtel.

MR. BHURTEL: Yes, Your Honor. I'm just trying to fix the computer, the monitor.

THE COURT: Fix the monitor. Okay.

MR. BHURTEL: The connect with the system.

THE COURT: Are you having some difficulty doing that?

MR. BHURTEL: I connected, but I didn't see my screen there.

THE COURT: I see.

MS. KRAL: Would you like me to assist?

THE COURT: If you're able. If not we'll call our systems people.

Perhaps you can get started on the questioning that doesn't rely upon it while we're waiting for that problem. We'll get somebody from systems up.

(Brief pause.)

THE COURT: We'll get somebody from systems up here. Mr. Bhurtel, are you able to begin your examination while we wait for that to be fixed?

MR. BHURTEL: Yes, Your Honor.

THE COURT: Super.

I think I just took it off. I just pressed the

button called clear on my screen.

Does that take care of it everywhere?

(Brief pause.)

THE COURT: Mr. Bhurtel, why don't you get started while we get some help up here. If you want to use the smaller podium, you can do that.

MR. BHURTEL: I'm okay with this, Your Honor. Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. BHURTEL:

Q Good afternoon, Dr. Krishna.

A Good afternoon.

Q What is your address for now?

A 1513 Voorhies Avenue, Brooklyn, New York.

Q And what is your office name?

A Total Neuro Care.

Q And, Dr. Krishna, can you explain to the jury what is your educational background.

A I'm a board certified neurologist. I completed my training in neurology at the Mount Sinai Medical School and Medical Center. And I'm also fellowship trained in the field of neurophysiology, neuromuscular diseases, epilepsy and epilepsy surgery at the Hospital for Joint Diseases, at the NYU Medical Center. And I'm an attending physician at the New York Cornell Methodist Hospital, the Brooklyn Hospital. And

I'm the chief of neurology and the director of the stroke center at the New York Presbyterian Community Hospital in Brooklyn. And I have a practice in Brooklyn and in the Bronx.

Q And how long you have been practicing medicine?

A About 26 years.

Q And are you licensed to practice medicine in the State of New York?

A In New York, yes.

THE COURT: Is everyone able to hear all right? It's amplified all right? Good. I have my own little speaker up here so I can't be quite sure.

Q Are you licensed to practice in any other states?

A Yes.

Q Which other state are you licensed to practice?

A New Jersey, Pennsylvania and West Virginia and Michigan.

Q And have you before testified in the court?

A Yes.

Q How often -- withdrawn that.

How many times you have been testified?

A This year I think I've testified once or twice this year.

Q Before approximately last, you know, four years or five years, how many times you testified?

A A couple of times a year. I just don't remember the exact number, but it's a few times a year. Two or three times a year.

Q Did you involve to provide medical treatment to Mostafa Ahsan?

A Yes, I saw Mr. Ahsan for the first time on June 13, 2014 for his complaints.

Q And you have been providing him medical treatment continuously since then?

A Yes, I see him about every six-to-eight weeks since then, and I've been seeing him regularly. And most recently I saw him on November 10, 2016.

MR. BHURTEL: Your Honor, at this time the plaintiff offers Dr. R.C. Krishna as a treating physician expert witness.

THE COURT: Any objection?

MR. O'HARA: No, Your Honor.

I'm assuming it's in the field of neurology?

MR. BHURTEL: Yes, in the field of neurology.

MR. O'HARA: No objection.

THE COURT: Great. He's received.

We have some tech support here if you need it, okay. When you're ready, tell Mr. Norville what the problem is and he'll try to help you.

(Brief pause.)

THE COURT: Mr. Bhurtel, do you have other questions before you get to the documents?

MR. BHURTEL: Your Honor, I just wanted to go over

his résumé and to offer as evidence. That's the Exhibit 10.

THE COURT: You're offering Exhibit 10, his résumé?

Are you going to show it to him before you show it to the jury?

MR. BHURTEL: Yes, I'm going to show it to him before.

THE COURT: Okay. How are you going to do that?

MR. BHURTEL: If possible from there. If not, I'll show it.

THE COURT: Well, then the jury will see it at the same time, right?

MR. BHURTEL: Right.

THE COURT: So why don't you show it to him and move it into evidence first, and then you can show it to the jury.

Go ahead. Ask him a question. Time is awasting.

Q Dr. Krishna?

A Yes.

Q Is this your résumé?

A Yes.

Q Is this a complete résumé about your medical history?

A Yes.

Q And your education and treatment and your affiliation with the hospitals?

A Yes, it's my résumé.

THE COURT: Sir, the document that you're showing

him, is it marked?

MR. BHURTEL: No, Your Honor.

THE COURT: It's not marked? Remember I told you I wanted all the exhibits premarked?

MR. BHURTEL: Right.

THE COURT: What exhibit are you showing him? You just said is this your résumé, but I don't know what you're showing him.

MR. BHURTEL: This is exhibit -- Joint Exhibit 10.

THE COURT: Joint Exhibit Number 10.

MR. O'HARA: Judge, there are Bates stamp numbers. I believe he's using page 532 through 538. There are a number of appendages to it.

But no objection to 532 to 538.

THE COURT: And 532 to 538, Plaintiff's 10, is in evidence, or Joint 10 is in evidence.

(Joint Exhibit 10, was received in evidence.)

THE COURT: Please proceed.

Q Doctor, how many times you treated Mostafa?

A Approximately, since my initial visit to my most recent visit, which is November of this year, about every six-to-eight weeks.

THE COURT: From June '14 to November 2016?

THE WITNESS: Yes, sir.

THE COURT: All right.

Now, when you say "Mostafa," Mr. Bhurtel, you're referring to the plaintiff, Mostafa Ahsan?

MR. BHURTEL: Yes, Your Honor.

THE COURT: Okay. Please proceed.

Q What was Mostafa Ahsan's complaints?

MR. O'HARA: Objection.

At what point in time?

THE COURT: Sustained.

The objection was that you should specify a time for your question.

Q Dr. Krishna, did you prepare neurological narrative reports with respect to Mostafa Ahsan?

A Yes, I prepared several reports. The one which is the more, most comprehensive was on February 19, 2015.

Q And when -- did you examine Mostafa Ahsan on February 19, 2015 also?

A Yes, I did.

Q And what was Mostafa Ahsan's complaints?

A He had developed, after an injury at -- on September 2, 2011 when a box had fallen on top of his shoulder and neck, he had developed some headaches, neck pain and shoulder pain, arm and arm and leg complaints. He ultimately was treated by his primary care physician at -- right after the accident, and then was referred to me about two years after this event by the primary care physician, a little over two years, because

the symptoms were not getting better. And the patient continued to have multiple complaints with regards to the head and neck.

And when I saw the patient, the patient was also complaining of difficulty focusing and concentration. The patient also had headaches, dizziness and had difficulty with repetitive tasks such as bending, pushing and pulling.

THE COURT: Doctor, I'm sorry. You used the word "focusing." I didn't mean to interrupt your train of thought.

Do you mean visually focusing or attention-wise focusing?

THE WITNESS: Attention-wise.

THE COURT: I'm sorry. Please continue.

A So these were the pertinent positive findings, pertinent positive complaints the patient had. And I sort of documented these and then continued to perform an exam.

Q And what kind of exam you did in February 19, 2015?

A A neurological exam which basically tests the nervous system from the head all the way down, and I came up with certain positive findings.

Q What are those positive findings you found?

THE COURT: Tell us first what a positive finding is, doctor, please.

THE WITNESS: Right. There are two types of findings on a doctor's examination; one is a subjective

finding, is what the patient tells you. So when the patient comes in, they say I have headaches, neck pain, dizziness. It's all the symptoms that a patient, like all of you may do when you go to your doctor's office.

The positive findings are -- those are abnormal based on an examination, on exam. And this patient, from a neurological perspective, had a couple of positive findings. One was that in the realm of thinking, the patient had difficulty with short-term memory. The patient was only able to remember two out of three objects when tested over and over again.

The patient also had a positive Hall, H-a-l-l, Pike, P-i-k-e, maneuver. The patient also had some difficulty with smell and was not able to test -- was not able to accurately discern the various smells, especially things like coffee. The patient also was complaining during the course of the exam of having a dull, chronic, daily headache. That was one part of the positive findings.

With regards to the next component of the exam, the patient had some muscle weakness which were, with regards to the neck, they were in the nerves that are innervated by the neck at the C5-C6 levels in the middle of the neck. The nerves that come out of there, the muscles around the shoulder girdles were weak. The patient was also having some weakness of the biceps, triceps and shoulder girdle muscles.

The range of motion of the neck was also decreased. The normal range of motion is based on standardized norms for every human being. This patient's range of motion was about 30-to-50 percent below the normal as depicted in my report.

The patient also had some positive findings in the realm of sensation. All of us are able to perceive our environment through our nerves in the skin. This patient had decreased sensation in the left upper extremity as it relates to the neck where the patient's nerves that go into the neck from the left upper extremity were not apparently functioning as well as the one on the right side and the patient has diminished sensation in that upper extremity.

The patient's reflexes were also diminished on the left upper extremity. The reflexes basically attest where you tap a tendon and you expect the muscle to jerk. Like when you go to your doctor's office and they tap your knee and your neck kicks out. And that reflex was abnormal in the left elbow as compared to the right side.

These were the pertinent positive findings that were identified on my exam on that day.

THE COURT: Thank you, doctor.

I think we need to take a minute while Mr. Bhurtel acquaints himself with the technology.

(Jury exits the courtroom.)

(Recess taken.) (Continued on the following page.)

MR. O'HARA: Your Honor, whatever he's using to frame the examination can't be presented to the jury.

THE COURT: I know that. Are the jurors' screens on? Are they looking at this document?

THE TECHNOLOGY PERSON: No.

THE COURTROOM DEPUTY: They can't see it.

THE COURT: Why don't we take a recess until we figure this out.

Ladies and gentlemen, I'm sorry, but I'm going to have to send you back to the jury room for a few minutes.

(Jury exits.)

THE COURT: All right. Now, I'm not familiar with this equipment. Who's supposed to be able to decide when the jury gets to see it and how.

THE TECHNOLOGY PERSON: The case manager?

THE COURT: All right. And did you ever work this equipment before?

MR. O'HARA: If it's helpful, you can utilize the assistance of our tech support. She knows these things cold.

THE COURT: Mr. Bhurtel, what do you want to do? I really wish you had told us you wanted to use this equipment beforehand so that we could have geared it up.

I mean I knew the defendant did, I didn't know you were.

Why don't we take five minutes and we'll -- if the

Ms. Gillespie can get the hang of it in that time, that's great, otherwise, we'll have to figure out some other approach.

THE TECHNOLOGY PERSON: I need at least five to ten minutes.

(Discussion was had off the record.)

(Jury enters.)

THE COURT: Folks, I'm sorry for the interruption.

I think what we're going to do for Mr. Bhurtel's presentation, we're going to proceed with paper. That's why the lights are back on, the screen is gone.

And if Mr. Bhurtel feels more well acquainted with some of the courtroom technology later in the trial, he may switch back. But for this afternoon to move things along he's agreed to use paper documents, and we'll make sure that you get the material you need either in paper or on the screen as we go forward.

So, Mr. Bhurtel, I think what's in evidence so far is Dr. Krishna's résumé, and I'd like you to proceed now with the remainder of your examination. Thank you.

MR. BHURTEL: Thank you, Your Honor.

May I approach the witness, Your Honor?

THE COURT: Yes, you may approach without asking permission during the trial.

DIRECT EXAMINATION

BY MR. BHURTEL:

Q Dr. Krishna, is this the report --

THE COURT: When you say "this," please use an exhibit number, Mr. Bhurtel, so we know what you're referring to.

MR. BHURTEL: Exhibit 10.

THE COURT: If everything is one long exhibit, because we already had Exhibit 10 and now you're saying this is Exhibit 10, then give us the Bates number range.

MR. BHURTEL: Page number 556 to --

MR. O'HARA: Say that, again, please?

MR. BHURTEL: Page number 556 to 569.

THE COURT: 556 to 569 is what's being shown to the witness.

Go ahead, ask your question now.

MR. BHURTEL: 561. Up to 561.

THE COURT: Up to 561. 556 to 561.

MR. BHURTEL: Yes.

THE COURT: Show it to the witness. What's your question?

BY MR. BHURTEL:

Q Do you recognize that report, Dr. Krishna?

A Yes, this is the report that I just testified about.

Q You prepared this report, right?

A Yes, sir.

Q And then there is another addendum report.

Can you tell the jury what is that about?

A That was prepared on April 3rd, 2015 to define what is the meaning of traumatic brain injury.

THE COURT: And what's the page range of that one, Mr. Bhurtel.

MR. BHURTEL: That is the page 561.

THE COURT: Okay. So that's part of what you've already seen. Okay.

BY MR. BHURTEL:

Q Dr. Krishna, do you have a copy of this report?

A Yes.

Q When you prepared this February 19th, 2015 report, did you review any other type of records?

A Yes, I had several records that I did review. Those are -- those are delineated on page 2 of my report under the review of records.

Q And can you tell the jury what records you reviewed?

A Records -- treatment records from Dr. Guha, the primary care physician. Dr. Santiago. Dr. Morgenstern. Reports from Health Max Pharmacy, Radiological Services of Astoria. Reports of Dr. Sinha, S-I-N-H-A, who performed the left shoulder surgery on this patient.

The operative report from Dr. Sinha for the left

shoulder surgery. The reports from Dr. Jalal Prakash. And reports from Fidelity Physical Therapy. The patient's MRI studies of the head and brain and neck by Omega Diagnostics. Treatment records from Dr. Lattuga and Mikelis, M-I-K-E-L-I-S. A report from Dr. Chacko and Dr. Portugal.

Q And what was your objective findings of Mr. Mostafa -- sorry, we done that.

What was your objective findings of Mostafa when you did the examination February 19th, 2015?

A As I mentioned earlier, the objective findings were decreased short-term memory. There was a weakness of muscle groups in the upper extremities as it relates to the neck. Range of motion deficits in the neck where the range of motion was about 30 to 50 percent below the normal.

There was also diminished sensation in the left upper extremity. There was also abnormal reflexes in the left upper extremity.

These were objective medical findings on examination.

THE COURT: Doctor, you've referenced the "left upper extremity" a few times. Why don't you tell us in terms that people like I use what part of the body you're referring to.

THE WITNESS: Yes, the upper extremity is the arm and the lower extremity is the legs.

So this patient hand diminished sensation in the outer aspect of the left arm.

THE COURT: And "outer" is by the hand or by the shoulder?

THE WITNESS: By the shoulder and up to the elbow.

BY MR. BHURTEL:

Q What was the range of motion of the cervical spine by Mostafa?

A The cervical spine was -- flexion was 30 degrees. Extension was approximately 10 to 20 degrees.

Flexion normal is about 45 degrees plus. The extension normal is 45 degrees.

With regards to right and left lateral flexion, the patient's range of motion was 20 to 30 degrees. And the normal is about 45 degrees.

Q Can you describe, in general terms, what flexion means?

A The forward motion of the head as it touches the -- as the chin touches the chest. That is flexion of the neck.

Q And what about extension?

A Extension is the backward motion of the head as the back of the head tries to touch the back of the shoulder blades.

Q And what is the lateral flexion?

A Lateral flexion is when you try to move your ear towards your shoulder. So the right ear towards the right shoulder and the left ear towards the left shoulder.

Q And what is rotation?

A Rotation is where the chin is rotated to the right or to the left as close to each shoulder.

THE COURT: As if you were shaking your head "no".

THE WITNESS: That's correct, sir.

BY MR. BHURTEL:

Q And did you rely on any other tests regard finding his neck injury?

A Yes, I performed a -- I had recommended the patient have imaging studies of the neck. The patient had imaging studies in the past and currently.

The MRI of the cervical spine and EMG nerve conduction studies of upper extremities were important because they allow us to look at the anatomy of the spine and the function of the spine.

Q Can you describe what is the EMG test?

A Yes. The EMG and nerve conduction study is an electrical test which is, unfortunately, painful, and it tests with electrical impulses.

In this case from the neck, we test with electrical impulses the arms to see how it conducts the electricity from the arm up to the spine and back. And it has is certain time span.

The second part of the test is we test with tiny acupuncture-like needles in the muscle groups around the neck

and around the arms to see if there's any signs of nerve damage.

This patient had an abnormal EMG and nerve conduction study in the neck, and this was consistent with a radiculopathy in the neck where the nerves -- radiculopathy is Latin term for nerve damage.

Q And what is the relevance of the EMG test with respect to his neck injury?

A Well, the patient was experiencing, based on my review of the records from Dr. Guha, and based on my own treatment of this patient had been experiencing persistent neck pain, headaches, radiating pain, as I mentioned in my history, since the beginning when I saw the patient in 2014. And prior to that, the patient had these symptoms with Dr. Guha. And my concern was what was the cause of these persistent symptoms.

The EMG study confirmed that it was due to a damaged nerve in the cervical spine or the neck.

Q And what was your finding of the EMG test about Mostafa?

A The finding was that there was a damaged nerve in the neck.

MR. BHURTEL: Your Honor, I would like to show the witness Joint Exhibit 58.

THE COURT: 58?

MR. BHURTEL: 58.

THE COURT: Yes.

MR. BHURTEL: Page 23 to -- 23952.

MR. O'HARA: Wait. Wait. Wait. 23952?

THE COURT: No, by "to" he means through.

MR. O'HARA: 23.

THE COURT: 95.

MR. BHURTEL: Through 2505.

THE COURT: 2505. Thank you.

(Whereupon, the witness is reviewing the document.)

BY MR. BHURTEL:

Q Dr. Krishna, can you tell what is this?

A These are my office records.

Q Is that the medical records you prepared?

A Yes, sir.

Q And with respect to Mostafa Ahsan?

A Yes, sir.

Q And when you were talking earlier about the EMG test, do you have a copy of this one here also?

A Yes, sir.

MR. BHURTEL: Your Honor, page 2491.

THE COURT: Thank you.

BY MR. BHURTEL:

Q So this is the EMG test you were talking about earlier?

A No, this is a test of 2016. There was one in 2014 also.

Q So you did two times?

A Yes, sir.

Q Page 2399.

THE COURT: 2399, you said?

MR. BHURTEL: Yes, Your Honor.

THE COURT: Thank you.

Q The EMG test dated 6/30/2014.

THE COURT: Are you asking the doctor, or are you telling us?

MR. BHURTEL: Yes, Judge. Sorry.

Q What was the date you did the first test, Doctor?

A Yes, that is on 6/13/2014, the records that you just mentioned.

MR. BHURTEL: And, Your Honor, plaintiff offers into evidence --

THE COURT: 2395 to 2505, or 2399?

MR. BHURTEL: Offering all in evidence, Your Honor, all the complete set, Joint Exhibit 58.

MR. O'HARA: Judge, I'm going to object. I think he needs to work through each page to determine what is the doctor's record as opposed to what is hearsay from other sources.

THE COURT: Is there a stipulation about the admissibility of any of this, Mr. Bhurtel?

MR. O'HARA: No, sir. They've been identified as authentic, but there's been no stipulation on admissibility.

THE COURT: So your objection is hearsay.

MR. O'HARA: Yes, sir.

THE COURT: I have to sustain that, Mr. Bhurtel.

If you want to offer a specific page or two or more as the doctor's own records under the business records exception, I'll consider that. Consider it even if they incorporate your client's statements under the statement for purposes of medical diagnosis exception.

But otherwise I can't admit wholesale large blocks of documents that include records of other medical offices, which I think is the grounds for the objection.

MR. O'HARA: Yes.

MR. BHURTEL: Is this plaintiffs -- sorry, Your Honor, Exhibit 58 -- Joint Exhibit 58 I'm, again, asking the doctor about those records.

BY MR. BHURTEL:

Q Doctor, is this your records, or do you have other records from some other doctors there?

A No, these are just my records.

Q This is all your records?

A Yes, all these pages are just my records.

THE COURT: Are you renewing your offer?

MR. BHURTEL: Yes, Your Honor.

THE COURT: And that's for 2395 through 2505?

MR. BHURTEL: Yes, Your Honor, 2395 to 2505.

THE COURT: Those are all your records, Doctor?

THE WITNESS: Yes, sir.

MR. O'HARA: If given the opportunity during the break to look at --

THE COURT: Absolutely. They're admitted subject to objection upon further inspection by defendants on the grounds discussed. But they're in evidence for now. Go ahead.

(Joint Exhibit 58, was received in evidence.)

THE COURT: By the way, I want to make sure you know, Mr. Bhurtel, you did not offer 556 to 561.

You offered the résumé and asked him questions about 556 to 561 of Joint Exhibit 10, but you didn't offer those five pages into evidence. Those six pages into evidence, excuse me.

MR. BHURTEL: Your Honor.

THE COURT: Are you offering them now?

MR. BHURTEL: Yes, Your Honor.

MR. O'HARA: May I approach, please?

(Continued on the next page.)

(Sidebar conference.)

MR. O'HARA: Fundamentally we have no objection to office records or reports prepared by the doctor. They're business records, they're going to come in.

What he is now asking is for narrative reports that were prepared in connection with litigation. Those are different. Those are, by definition, hearsay.

There's been no foundation and so I have to object to them. They do not come in.

THE COURT: So you're not going to be offering your expert's report of that nature either?

MR. O'HARA: No, they are going to testify.

THE COURT: Okay. Then I'm sustaining the objection, unless you want to have an argument that responds to that that you want me to hear.

MR. BHURTEL: No.

THE COURT: You understand what he's saying?

MR. BHURTEL: So not the narrative report.

THE COURT: Not because it's a narrative report, per se, but Mr. O'Hara is trying to draw a distinction between those records Dr. Krishna created during the course of his treatment for the purposes of providing that treatment, and those records that the doctor prepared for the purposes of the litigation.

The treatment records fall within the business records exception because they're regularly-conducted activity

that was part of the doctor's business of seeing and helping his patients.

The narrative reports prepared for the trial are different, they're adversarial documents and, therefore, they're hearsay.

The testimony, subject to cross-examination, is admissible, of course, but the records where he created what appear to be documentary support for his own testimony is somewhat bootstrapping, and it is hearsay because it's not a business record, it's an adversarial document.

Do I understand your objection?

MR. O'HARA: Yes, sir.

MR. BHURTEL: These are business records, but this narrative report is prepared by the treating doctor based on these records and his examination, and they're relying on the treating doctor's records.

THE COURT: But, Mr. Bhurtel, once again, the objection is not even that they may rely as an expert under 703 as permitted to on data collected from other sources.

The problem is that Mr. O'Hara's argument is that the record was prepared, 556 and 561, for purposes of the case, not for purposes of the treatment, therefore, it's not regularly-conducted business activity.

I won't preclude you from laying the proper foundation, if you think you can. In other words, if 556 to

561 are the kind of records that this doctor prepares on behalf of patients, even when they are not involved in litigation as part of his regular practice of treating them, then I'll reconsider my ruling. But if they were prepared because of this case, then I'll sustain the objection. Okay?

Thank you, everybody.

MR. BHURTEL: So then I'll continue the questioning with that report.

THE COURT: I'm sorry, but you started to speak after Mr. O'Hara and I walked away.

MR. BHURTEL: So then I need to ask all the questions about that report so that --

THE COURT: Well, I don't know what the truth is. Mr. O'Hara's review of the document indicates to him, I take it or he wouldn't have objected, that it was prepared for purposes of the lawsuit, not as part of the doctor's regular treatment of patients, regardless of whether they have a lawsuit or not, that he would create that document even if Mr. Ahsan fell in his own driveway because he was drunk. In other words, even if the accident were his own fault and he had nobody to blame for it.

If that's a treatment record that he would prepare outside of litigation, you can lay that foundation, I'll reconsider my ruling. If it's not that kind of document, though, don't waste our time. Okay.

MR. O'HARA: Just connect it because -- and I think this is very important, that can't be a medical record because it contains the allegations associated with the life care plan, which was prepared specifically for this lawsuit.

So I just want to make sure that my objection is clear, because I don't think even if he tries to lay a foundation, it is going to be appropriate for this to be admitted as a medical record. There is no reasonable --

THE COURT: If the foundation is offered, the documents offered and you want to voir dire the witness, you may do so.

MR. O'HARA: Thank you.

THE COURT: Okay.

(End of sidebar conference.)

(Continued on the next page.)

(In open court; Jury present.)

THE COURT: Sorry, ladies and gentlemen of the jury, now we can get back to the real world.

BY MR. BHURTEL:

Q Dr. Krishna, when you were providing treatment to Mostafa, did you rely on any other tests?

A Yes, I relied on the MRI of the head and neck that I had ordered, and also the EMG studies, and also relied on my own diagnostic testing.

Q And when you refer to Mostafa for MRI tests regarding his head and neck, and do you do regularly in your practice?

A Yes, I -- I usually, as a part of any specialty, we utilize the services of MRIs for the head, neck, very common.

Q And when those MRI reports come, do you rely on those reports?

A Yes, I do rely on the reports. I also am given the copy of the films on a CD.

Q And is this your regular practice of relying on those MRI films?

A This is my normal practice.

Q And did you rely on those any MRI tests with respect to Mr. Mostafa's neck injuries?

A Yes, I had received an MRI of the cervical spine that I ordered on this patient.

Q And what did you do --

(Interruption.)

THE COURT: All right, go ahead.

Please use the regular entrance to the courtroom in the future.

BY MR. BHURTEL:

Q And what were the findings of the MRI of the neck?

A The MRI of the neck --

MR. O'HARA: Objection. The foundation is when are we talking about these multiple studies in this case?

Q Did you receive the --

THE COURT: Mr. Bhurtel, are you looking for the doctor's report? Because he has it with him already on the stand.

MR. BHURTEL: Oh.

Q What was your impression or diagnosis of Mostafa Ahsan on September -- sorry, February 19th, 2015?

A The impression, based on my findings, was head injury resulting from his accident causing a traumatic brain injury, and a concussion, and a neck injury with multiple disc herniations in the neck, clinically, and a radiculopathy.

THE COURT: Meaning nerve damage.

THE WITNESS: Meaning nerve damage.

THE COURT: And that was in the arm?

THE WITNESS: That was in the arm, sir.

BY MR. BHURTEL:

Q And can you explain what --

THE COURT REPORTER: I'm sorry, can you explain?

THE COURT: Ask the question again more slowly, please.

Q Can you explain to the jury what is traumatic cervical disc radiation resulting in cervical radiculopathy?

THE COURT: Do you understand the question?

THE WITNESS: Yes, sir.

THE COURT: Did you use such terminology in describing Mr. Ahsan's injuries?

THE WITNESS: I believe so.

THE COURT: Can you explain what you meant by that?

THE WITNESS: A disc herniation is a slipped disc in the neck, in this case, especially.

A disc is basically like a jelly doughnut which sits in between the bones of the spine as a cushion, and the jelly inside squeezes out, and that's called a disc herniation.

Because the nerves that go from the neck to the arms are very close to that disc, the jelly that slips out can cause damage to that nerve. When that nerve gets damaged, it can cause pain down the arm, tingling and numbness down the arm, and that's called a disc herniation with radiculopathy.

And then because it's secondary to his trauma based on our history and review of his records from Dr. Guha, it is

called a posttraumatic disc herniations resulting in a radiculopathy.

THE COURT: When you say secondary to a trauma, you mean it occurred after physical injury as opposed to from the process of aging, for example?

THE WITNESS: That's correct, sir.

BY MR. BHURTEL:

Q And those injuries -- can those injuries cause -- what was the cause of those injuries?

A The injuries were caused, based on my history from this patient and review of the prior treatment records by Dr. Guha, and the other physicians, the neck injury was related to the accident in question.

THE COURT: And just to be clear, when you say based on history, you mean based upon what the patient, Mr. Ahsan, described?

THE WITNESS: Yes.

THE COURT: You yourself don't know what kind of accident he may have had. You didn't witness it. You don't have any video of it. You're relying on what Mr. Ahsan described.

THE WITNESS: Yes, sir.

BY MR. BHURTEL:

Q Did you make another diagnosis, neuropathic brain syndrome diagnosis as well?

A Yes, that's just a follow-on diagnosis with regards to the chronicity of these symptoms.

Because I saw this person almost for two-and-a-half years, and the patient had, through the course of my treatment, and prior to my treatment, had symptoms that are consistent with a radiculopathy or nerve-damage related pains and weakness and sensory disturbance.

The pain component, if it's present for more than six months, is classified in medicine as a chronic neuropathic pain syndrome when there's nerve damage causing a problem.

Q And what other diagnosis you turned to with respect to Mostafa?

A Well, with regards to his head, because he was explaining -- as I explained earlier with regards to his headaches, dizziness, difficulty focusing and concentration, and on his exam he had some short-term memory complaints and a positive Hallpike maneuver, I subsequently performed an MRI of the brain on 5/23/2015, which revealed findings of a subdural hygroma, and signs of a traumatic brain injury on the MI of the brain with diffusion intense imaging.

Q What is subdural hygroma, can you explain?

A It's just basically a collection of fluid between the brain and the skull. When the brain sort of shrinks as -- as it has less neurons in it on a particular area.

So if a part of the brain has had trauma and the

scar tissue sets in, like in this case there was identified earlier an MRI done on 5/23/2015, that area of the brain shrinks, but actually the fluids surrounding the brain increases in the space that is created, and that's called a subdural hygroma.

Q And what is a traumatic brain injury, can you explain that?

A When you have trauma to the head, or a whiplash injury to the head, parts of the brain can get traumatized because the brain is sort of suspended within the skull surrounded by fluid and it moves forwards and backwards. The fluid around the brain is -- is to cushion the brain from -- from some sudden movements.

If that sudden movement is strong enough, it can cause a shearing affect within the brain itself causing signs of scar tissue, and that scar tissue is identified on an MRI and DTI, and that can ultimately result in symptoms of headaches, dizziness, lightheadedness, as this patient has, and all of those in confluence in the context of a whiplash injury or head injury is considered a posttraumatic brain injury.

Q Doctor, when you say whiplash injury, can you explain that, what is it?

A Any time a sudden activity occurs, such as in this case when a box falls on top of your head or neck or one side of

your body, the natural response for us is to move fast and furious to the other side to try to evade the problem with our head. It's an innate vegetative response for us to protect our head. And that movement is usually a forward and backward movement. So it moves to one side and, unfortunately, it also moves backwards. That movement results in the brain, which is encased by the skull, to move in the exact opposite direction.

So that if you move your head to the right, the brain moves to the left against the skull, and then when the head moves back, the brain moves to the opposite direction because it's sort of free-floating in a bag of water.

That possible -- that process is, essentially, a whiplash or a coup/contrecoup-type of injury to the head.

Q Did you have any MRI finding of the brain?

A Yes, as I just mentioned earlier, the MRI of the brain dated 5/23/2015, revealed, primarily, some white matter changes, a subdural hygroma, and atrophy, and also findings within the diffusion intense imaging component of the MRI, consistent with traumatic brain injury.

Q And is it your regular practice to rely on the MRI to provide treatment for the brain injury?

A Yes.

Q And do you regularly rely on DTI to examine or finding the injury of the -- strike that.

Do you rely on the DTI findings to find the brain

injury?

A Yes, when the DTI images are available, then we rely on it because it's very sensitive in identifying abnormalities that are subtle within the brain substance.

Q Doctor, the diagnosis you came to involving Mr. Ahsan's injuries, do you have opinion about the causal relationship?

A Yes.

Q So what was the causal relationship to his head injury?

A Based on the history that was given to me by reviewing his records and my treatment of this patient, it's consistent to be causally related to the accident in question.

Q And what is the causal relation to his neck injuries?

A Similarly, based on the history that was given to me, the review of the patient's prior treatment record by Dr. Guha were documented the neck complaints from the initial treatments and my MRI studies that I ordered on this patient, the EMG studies, and my own followup of this patient for about two years, it's my opinion that the patient's neck complaints and the neck diagnosis -- neck-related diagnosis, the disc herniations and the radiculopathy, are causally related to the accident in question, which is September 2nd, 2011.

Q And, Doctor, do you have opinion about the permanency of the head injury?

A Yes. The patient has permanent -- permanent injuries to the head and neck. The patient has had treatment with me for

those, and has found some periodic improvements.

The treatment had included medications, physical therapy, and has had epidural injections to the cervical spine by Dr. Billy Ford and Dr. Lattuga. And all of this has not given any sustainable improvement, therefore, it is my opinion that the head-injury-related diagnosis and the neck-injury-related diagnosis are permanent.

Q And, Doctor, do you have an opinion about whether Mr. Mostafa would need further treatment?

A Yes, in my report of February 19th, 2015, I suggested, based on my treatment of this patient, I felt that he would require future treatment, both from conservative aspects that include routine followups for his medication refills, and also blood tests to make sure there are no side effects. And also some interventional procedures such as epidural injections and/or spine surgery.

Q And, Doctor, can you tell the jury what was your recommendation?

THE COURT: Recommendation about what?

MR. BHURTEL: Recommendation about the use of treatment.

A Yes, I felt that the patient would need some symptomatic chronic physical therapy. The cost, as I mentioned, was based on today's dollars, which is approximately 5 to $10,000 a year, depending on the amount of visits that the patient uses

in a year.

The patient also would require annual cerebral vascular ultrasounds, and a vestibular evaluation for his balance testing. The cost of this is approximately $2,500 annually.

The patient would also need some symptomatic care for his -- for his neurological complaints, physiological medical complaints.

The patient would also need symptomatic care for his -- some of his brain-injury-related symptoms. I felt that that cost would range as $40,000 a year or more, based on the frequency of the visits that are used based on all the specialties.

The patient also required a spine surgical consultation and spine surgical intervention. The patient has seen Dr. Lattuga, who has recommended spine surgery intervention. And the cost of that can range from approximately $100,000 or more.

The patient would require radiological and hematological studies, that is blood tests and x-rays and MRIs for his head, neck and shoulder. And those costs could, including the blood tests, would range about 6 -- $7,000 on an annual basis or more, based on the number of imaging studies that are expected, approximately.

Q And, Doctor, is still Mostafa's condition is the same you

would treat it -- withdrawn. Strike that.

Is Mostafa's condition, has it changed, or the same, or something else since February 19th, 2015?

A It's essentially the same. He's able to perform personal hygiene activities.

He is on medications. He's able to manage some of his own activities of daily living, such as dressing, et cetera. But he is -- he is -- he's still the epidural injections that he had to his neck. He had a series of three by Dr. Lattuga and Dr. Ford. Now Dr. Lattuga is considering spine surgery.

Q Doctor, did you prescribe any medication to Mostafa?

A Yes. He's been on numerous medications through the two years that I saw him. He's currently on a combination of Gabapentin and Nabumetone and cyclobenzaprine.

Q And can you tell the jury what is the purpose of those medications?

A One is a muscle relaxant, the cyclobenzaprine, for the neck spams.

The Nabumetone is an antiinflammatory painkiller.

And the Gabapentin is a centrally active in the brain pain modulating agent that allows the symptoms to be perceived as less than they are.

MR. BHURTEL: Your Honor, I would like to show the witness pages from 3332 through 3576.

THE COURT: 3332 to 3576. This is part of exhibit?

MR. BHURTEL: Joint Exhibit --

THE COURT: You can't read it? What number is it? All right, we'll figure it out later. Let's go.

MR. BHURTEL: This is attached to the -- his narrative report.

THE COURT: 3332 to 3576.

BY MR. BHURTEL:

Q Do you recognize this, Dr. Krishna?

A Yes, these are achievement records from a variety of physicians.

Q And did you review these records?

A Yes, these are records that are in my possession, which I have reviewed from time to time.

Q And you have reviewed these also?

A Yes.

Q And do you rely regularly other treating physician's medical records when you provide the treatment?

A Yes.

Q And do you rely with other doctor's records when you prepare your report?

A Yes, as I mentioned, I reviewed the records in this case.

MR. BHURTEL: Your Honor, plaintiff would like to offer into evidence page 3332 to page 3576.

MR. O'HARA: I think we need to discuss it at

sidebar.

THE COURT: Not at sidebar. It's sustained, unless you can show that they're the doctor's own records.

If they are the records of other doctors you're calling later in the case and they lay a foundation that they are the records of those doctors, you may offer them into evidence at that time.

Remind me and we will go over, again, Rule 703 before the night is over but outside the presence of jury, okay?

And, Mr. Bhurtel, I would just urge you to watch the time to make sure that we protect the right to finish the witness for both sides.

MR. BHURTEL: Yes, Your Honor.

THE COURT: Thank you, sir.

BY MR. BHURTEL:

Q Dr. Krishna, when you were providing the treatment to Mostafa, you earlier testified that you have been providing various tests.

Did you have the same -- do you have the same diagnosis or a different diagnosis in the different days?

A Essentially it's a similar diagnosis to the head and neck.

Q And do you aware of -- withdraw that.

Do you know that what is the treatment concerning

his shoulder?

A Yes, as I mentioned in my direct -- earlier, he had had left shoulder surgery.

Q And did you recommend or refer Mostafa for other doctors for other tests?

A The MRIs I recommended, that I mentioned earlier.

I also recommended, in addition to see Dr. Mikelis and Lattuga, who performed the epidural injections and are now considering spine surgery.

Those are the main recommendations I made.

Q Can you explain to the jury what is epidural injection?

A It's an injection given in the spine with a long needle with steroids. It's usually given to woman as they're about to deliver but in the low back to reduce the pain of the delivery.

But in the case of this patient, it's given in the neck to reduce the pain from the neck into the arm and some of the weakness, because of the swelling that has accumulated around the nerves from the disc herniations from this accident.

Q And Mostafa has complained somewhere in March 2008 about the neck complaints, and one or two times he had therapy, and then around February 9th 2009 he had --

MR. O'HARA: Objection.

THE COURT: Sustained.

You're leading the witness. You have to ask him questions not tell him facts.

If he's an expert and you want him to answer a hypothetical question, you can ask him to assume facts that I will assume you'll have a good faith belief you can prove in another way.

BY MR. BHURTEL:

Q Are you aware of his prior history of his neck pain and shoulder pain?

A Yes, I saw it in Dr. Guha's reports that in 2008 and 2009 he had some neck pains. And a few -- a few weeks prior to this accident, he had some headaches from his high blood pressure. But those are transient, and from my review of the records, he never sustained the treatment for that.

Q And can you explain to the jury if that neck pain sometimes and before two-and-a-half years before that neck pain -- withdraw that.

Okay, can you explain to the jury if that one time in 2008 and 2009 with physical therapy in his neck or shoulder that could be connected to his current disability?

MR. O'HARA: Objection, Your Honor.

THE COURT: Sustained.

What correlation, if any -- let me rephrase that.

How does your knowledge of Mr. Ahsan's prior history of neck and shoulder pain, if there is any, affect the opinion

you have about the cause of the injuries you've treated?

THE WITNESS: It doesn't because the neck pain was several years prior. The neck pain was several years prior. It was not -- based on my review of the records, it was just transient and occurred on and off for some time in 2008, and then there was a period where there was nothing else complained of with regards to the neck from 'til the accident of 2011.

(Continued on next page.)

BY MR. BHURTEL:

Q What is the correlation, if anything, you can find with his headache complaint, sometime in August 4, 2011 and after the accident, September 2nd, 2011 with the boxes?

A From what I saw in the reports from Dr. Guha, the headaches was related to hypertension so -- but then after this accident, the patient had neck pain and then persistent headaches and that became a progressive problem which ultimately was evaluated through our offices.

Q When was the last time you saw him?

A November 10th of this year.

Q What was your diagnosis on that date?

A Similarly the same. Consistent signs of a head injury, posttraumatic concussion and traumatic brain injury. Neck injury resulting in multiple cervical disc herniations and radiculopathy which had failed the epidural injections and a -- with the status post left shoulder surgery from this accident.

Q Dr. Krishna, do you have medical bills that you provided service to Mostafa?

A Yes.

MR. BHURTEL: Your Honor, Joint Exhibit 70, page 2628 through 2673.

THE COURT: 2628 to 2673.

MR. BHURTEL: Yes, Your Honor.

THE COURT: Mr. Bhurtel, please watch the clock. I don't want to make you sit down in the middle. You have a few minutes left, so ask your most important questions.

BY MR. BHURTEL:

Q How much is your service, total of the bill that you provided until now?

A The total was $11,957 from my initial visit to now about two and a half years.

THE COURT: 11,957?

THE WITNESS: Yes.

MR. BHURTEL: And, Your Honor, plaintiff would like to offer Joint Exhibit 70.

THE COURT: Have you shown it to the witness?

You want to represent that those are his bills, 2628 to 2673? They are not.

MR. O'HARA: For purposes of collateral source evaluations, among other reasons, I think these need to be redacted. I think it's something we can do during the break after the day is over.

THE COURT: That's your only objection?

MR. O'HARA: There are materials in here besides medical records, so I'm going to object to subject to the opportunity to redact it so that it is an admissible document.

THE COURT: All right. Did you hear that Mr. Bhurtel?

MR. BHURTEL: Yes, Your Honor.

THE COURT: So you're offering them and I am going to admit those portions, even without foundation, I will infer the foundation from the last question in the interest of time, but I am only going to admit those portions that the parties agree are Dr. Krishna's bills, all right?

Can we assume that counsel will be able to agree on that?

MR. BHURTEL: Yes, Your Honor.

MR. O'HARA: Yes, sir.

(Joint Exhibit 70, was received in evidence.)

THE COURT: Mr. Bhurtel, are you completing your examination soon?

MR. BHURTEL: Yes, Your Honor, about.

Q Dr. Krishna, so today are you testifying and your opinion is within the reasonable degree of medical certainty?

A Yes.

Q And did you rely on the MRI reports or findings of the Dr. Harold Parnes?

A Yes.

THE COURT: I'm sorry.

MR. BHURTEL: Yes, Your Honor, I'm completed.

THE COURT: Great. Ladies and gentlemen, why don't you take five minutes and just five minutes so that defense counsel can get prepared for cross-examination and then we

will bring you right back out. Thank you.

(Jury exits.)

(Open court; jury not present.)

THE COURT: So I just want the record to reflect that the reason I was pressing you so hard, Mr. Bhurtel, is your representation that this witness was only available to us this afternoon, throughout the whole trial this was the only time he could be here and it is now 3:30. You began at two and I don't think it's fair to keep the jury past five and I wanted the defense to have at least half of the time with the witness so that it would be fair for due process reasons. I am not trying to press you or make you feel nervous at the podium, I just feel we have to afford the defendant time to cross examine. All right. You can get ready.

MR. O'HARA: Thank you.

(Jury enters.)

THE COURT: Mr. O'Hara, you may inquire.

Dr. Krishna, I remind you remain under oath.

THE WITNESS: Yes, sir.

MR. O'HARA: Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. O'HARA:

Q Doctor, you would agree with me, would you not, that a history, the basis for a patient coming into your office is of critical importance in understanding what happened to them and

why they are there?

A Yes, sir.

Q You would agree with me that you rely upon the history as being true when a patient walks into the office and tells you about a given incident, correct?

A Yes, sir.

Q In this case one of the first things that you testified to was historical information set forth in your February 19th, 2015 report, which is at page 545 that's been marked as an exhibit. Do you recall that testimony?

A Yes, sir.

Q And when you testified you said, quote, the box fell on his shoulder and neck. Do you remember that?

A Yes.

Q Doctor, I want you to read -- tell me if I'm reading this correctly. The first full sentence of your history in your February 19th, 2015 report, quote, the patient has been seen at our office numerous times for injuries sustained in the accident on September 2, 2011 when boxes fell on his shoulder, period.

Did I read that correctly?

A Yes, sir.

THE COURT: What is Bates number that you read from?

MR. O'HARA: Yes, sir, 545.

THE COURT: Thank you.

BY MR. O'HARA:

Q This is not the first report you wrote in connection with this litigation, is it?

A No, sir.

Q In fact, you wrote an earlier report on July 25th, 2014. Your Honor, Bates number 527.

You wrote a report seven months earlier, correct?

A I believe so.

Q And in that report, in the second full sentence you said, quote, the patient states that on September 2nd, 2011, box, boxes, fell on him on the left shoulder. Correct?

A Yes, sir.

Q At no point when Mr. Ahsan walked into your office and provided you a history about the happening of this accident, did he tell you anything other than what you've recorded in your first and second report; isn't that true?

A Yes, sir.

Q And the history that you were able to glean -- there was a stack of materials that were given to you from other providers in this case. Other providers in securing historical information from Mr. Ahsan also recorded that the incident at the Staples store was as a result of boxes striking his shoulder, correct?

A Yes, sir.

Q And that's what you saw -- you've reviewed the Staples

incident report, haven't you?
A I believe so, sir.
Q You've reviewed Dr. Guha's records, haven't you?
A Yes, sir.
Q You reviewed Dr. Lattuga's records, haven't you?
A Yes.
Q And consistently, every single time that the plaintiff reported this incident, he has described the impact to his shoulder, true?
A Yes.
Q He has never once in any medical record where there's been a recorded history said it hit him in the neck, has he?
A I don't believe so, sir.
Q He's never once in any medical record that recorded contemporaneous, meaning at the time that he's in with the provider, he's never once said to a medical provider that the boxes hit him in the head, did he?
A No, sir.
Q And that's not what he told you either. He simply told you, as recorded in your first report and as recorded in your second report, the boxes struck his left shoulder only. Fair statement?
A Fair statement.
Q Now independent of what all of the medical records that you've seen that record contemporaneous historical

information, there are records in this case where Mr. Ahsan has actually written down what has happened -- what happened to him on September 2nd. True?

A Yes, sir.

Q You've reviewed the intake patient history form from Dr. Lattuga as part of the materials that you have, correct?

A Yes, sir.

MR. O'HARA: Bates number 1985, Your Honor.

THE COURT: Thank you.

BY MR. O'HARA:

Q And in that document, when he is speaking to Dr. Lattuga, he describes that the boxes fell on my shoulder, left. Not once, Bates stamp 1989, but twice. Two successive office visits he described the impact with his left shoulder, correct?

A Yes, sir.

Q Now Dr. Guha was the first doctor to see Mr. Ahsan after the incident at the Staples store, correct?

A Yes, sir.

Q And, thereafter, much like other providers, including yourself, one of the questions that doctors routinely ask is, have you ever been involved in an accident before where the same body part has been involved? Do you have any prior problems seeking prior historical information, correct?

A Yes, sir.

Q And as a medical provider that is significant to you because if you're going to come before this jury and tell them that it's caused by one event versus another event, in order to evaluate the two events he has to tell you about them, doesn't he?

A That's correct, sir.

Q In this case the plaintiff when you asked him questions as whether he had any prior history -- let's stay with the left shoulder first -- he told he had none; isn't that true?

A That's correct.

Q That's incorrect, isn't it, based upon the review of the records?

A There is some prior history, yes.

Q You would agree with me that left lower trapezius myofaschial pain syndrome is a prior history?

A That's correct, sir.

Q And that is not within your area of expertise, right? That's a pain management specialist and/or orthopedist, correct?

A Yes. The patient is under the care of an orthopedist for that.

Q That is a condition in his left shoulder, a pain syndrome that preexisted this incident that when you asked him questions he didn't tell you one thing about, did he?

A No, I didn't have that history, sir.

Q Additionally, when you asked him questions about his neck, whether he had any prior problem with his cervical spine, he denied any prior history, correct?

A Yes, sir.

Q And when we took your deposition, Bates number 579, we asked you that question and you told us he never described any prior problems with his cervical spine, correct?

A That is correct, sir.

Q But we know based upon the review of the records that were presented to you after the deposition that, in fact, he does have a cervical history, correct?

A Yes, sir, as I mentioned earlier.

Q You would agree with me, would you not, that the diagnostic films that you reviewed and the diagnostic reports that reviewed relating to his cervical spine are replete, have quite a few, many degenerative changes unrelated to trauma. Do you agree with that?

A That is correct, sir.

Q Just so the jury understands, the difference between chronic or degenerative changes, those are occurring over a long period of time, correct?

A Yes, sir.

Q It's part of the natural aging process that unfortunately all of us go through, correct?

A Yes, sir.

Q And in the cervical spine where there are positive findings that you have seen in this case, what are the discs that are most commonly degenerated in the human cervical spine?

A The middle cervical spine, that's C-4 to C-7 levels.

Q What are the levels in this case that Mr. Ahsan has cervical disc bulges or herniations?

A He has herniations from the C-4 -- C-3 to C-7.

Q The same area that is the highest degenerative change area in the cervical spine, fair statement?

A That's a fair statement.

Q Now there's testimony about headaches and whether or not Mr. Ahsan had headaches prior to the event that occurred on September 2nd, 2011 in Staples. Do you recall that testimony?

A Yes, sir.

Q Once again, when you asked him questions when he first came into your office, that first office visit, he denied having any prior headaches, correct?

A That is correct, sir.

Q And you have since learned that that historical information was inaccurate, untrue, mistaken. Fair statement?

A Yes, that was not accurate.

Q Now, Doctor, just so we can time this, the incident happens on September 2nd, 2011, you don't actually see him for almost three years after the accident, correct?

A Yes, in June of 2014.

Q I want you to listen carefully to this question. The plateau for the recovery of a mild or moderate traumatic brain injury, based upon the literature, suggests that the improvement period is over the course of two years; isn't that true?

A It's possible, that's correct.

Q Not possible, Doctor, that's the medical consensus in the neurosurgical field, in the neuroscience field that a traumatic brain injury, mild or moderate, recovery period post trauma is two years, correct?

A Yes. That's the most common.

Q And there's actually some commentators currently that are suggesting because of the micro changes that you might have to actually expand that out to three, four, maybe even five years, but the medical consensus still is two years plateau for the recovery from traumatic brain injury, correct?

A To plateau.

Q So what I've said is correct?

A Yes.

Q When you first saw this patient three years after this incident, the first time you saw the patient is June 13th, 2014, Bates numbers 2395 and 2398, the mental status evaluation, the neurologic mental status evaluation was normal, wasn't it?

A Yes. Sir.
Q The second time you saw this patient, over three years after the accident on June 24th, 2014, Bates numbers 2404 through 2406, the neuro mental status examination was normal, true statement?
A Yes, sir.
Q The third time you saw this patient, July 8th, 2014, Bates numbers 2418 to 2420, once again, the mental status or the neuro mental status evaluation was normal, correct?
A Yes.
Q You next saw the patient July 25, 2014, which is the first report you wrote in this case, which was specifically for this litigation for purposes of the lawyers on both sides to get an understanding of what not only your evaluation was but what you felt the future might hold for him, correct?
A Yes, sir.
Q So just so we're clear, your July 25th, 2014 report, your February 19th, 2015 report, your April 3rd, 2015 report those three reports, Bates number 527, 545, 561, those were all prepared in connection with this lawsuit to outline what your positions were, correct?
A Yes, sir.
Q Your mental status evaluation in the report that you wrote July 25th, 2014 was normal, wasn't it?
A Yes, sir.

Q Doctor, after that report you continued to see this patient: August 15th, 2014; September 5th, 2014; October 3rd, 2014; November 21st, 2014; February 19th, 2015. Up to that time, your neuro status evaluation was normal, correct?

A The mental status?

Q Yes, sir.

A Yes, sir.

Q And just so the jury understands, the mental status evaluation is something that you not only engage in questions with the patient, but you also ask him to respond to certain verbal stimuli, you evaluate whether he responds to physical or painful stimuli to evaluate whether there is any neurologic damage that you can glean from either subjective or objective responses. Fair?

A Yes, sir.

Q And as of that time all of that history, all of those office visits each time that you saw him, each time that you interacted with him, each time that you ran him through subjective or objective tests, his mental status evaluation was normal?

A Yes, sir.

Q There was testimony on direct examination about the nature of his cognitive complaints in terms of difficulty engaging in certain tasks.

A Yes, sir.

                    Q Processing of information, correct?
A Yes, sir.
Q There is no mention whatsoever in your July 25th, 2014 report, the first report you wrote in this case, of any problems with cognitive function, is there?
A No, sir.
Q There is no complaints of dizziness in that report, is there?
A I don't believe so, sir.
Q If I represent to you and I would give you the opportunity if you'd like -- I'm trying to move along quickly.
A Yes.
Q If you look at the Bates number --
A Yes, I agree.

MR. BHURTEL: Your Honor, objection.

THE COURT: Sustained.

BY MR. O'HARA:

Q When is the first time that Mr. Ahsan begins to complain of cognitive complaints?
A He noticed -- I noticed that on my February visit --

THE COURT: February of what year?

THE WITNESS: February 19th, 2015. I'd seen him after about almost three and a half months. And I started noticing that he had developed some complaints of dizziness, cognitive complaints at that time.

Q In terms of headaches, dizziness, other sequelae associated with things above the neck, was he taking any medications, whether prescribed by you or for other physicians, that the side effects included dizziness, headaches, forgetfulness?

A He's been on a medications since my first visit which can have side effects that can cause those problems, but they never caused those side effects in 2014. And in 2015, I noticed these complaints, which were sort of disturbing to me.

Q Four years post incident?

A Yes, sir.

Q Just so we have -- we're all on the same page. He was taking Metoprolol for hypertension, correct?

A Yes, sir.

Q And one of the side effects from that medication is dizziness and shortness of breath, correct?

A That is correct, sir.

Q And in terms of just so -- there's a treatise, the Physician's Desk Reference for those that are unfamiliar with the given medication such as yourself, you have the opportunity to go to the PDR to look at why medications may be prescribed, and what their common side effects are, correct?

A Yes, sir, you're right.

Q In addition to Metoprolol for hypertension, he was also taking Losartan for hypertension, correct?

A Yes, sir.

Q One of the side effects for that medication is dizziness, correct?

A That is correct, sir.

Q He was also taking -- and I apologize if I botch these, you can correct me. Simvastatin?

A Simvastatin.

Q That's for hyperlipidemia?

A Increased cholesterol.

Q The side effects include headache, insomnia, vertigo?

A That's correct.

Q Vertigo means vestibular problems that effect one's ability for balance, for gait, correct?

A And dizziness, yes.

Q He was taking Flonase for rhinitis, correct?

A Yes, sir.

Q One of the side effects of Flonase for problems with one's nasal passage is headache, correct?

A That is correct.

Q He was taking Zantac for reflux, correct?

A Yes, sir.

Q One of the problems associated -- or one of the side effects associated with that medication is headaches, correct?

A Yes, sir.

Q Now you prescribed him Meloxicam, correct?

A Yes, sir.
Q That medication is for prescribed for osteoarthritis, isn't it?
A It can be.
Q You are aware, in reviewing the medical records in this case, that Mr. Ahsan has been diagnosed with osteoarthritic changes in his cervical spine and in his joints including his left shoulder, correct?
A That is correct.
Q In fact, the osteoarthritic changes in his shoulder were visualized during the surgical procedure, correct?
A That's correct.
Q But that's not an area of your expertise. That's not a field of neurology, that's more in the field of orthopedic surgery, fair?
A Yes, sir.
Q You're aware that Meloxicam when prescribed for osteoarthritis, some of the side effects include headache and dizziness, correct?
A Yes.
Q You talked about Gabapentin?
A Yes, sir.
Q You prescribed that, correct?
A Yes.
Q Dizziness, fatigue, two of the common side effects of

                    that medication, correct?

A Yes, sir.

Q You prescribed Nabumetone?

A Yes, sir.

Q Can you show me how to say that?

A Nabumetone.

Q Perfect.

That's a nonsteroidal antiinflammatory for osteoarthritis, correct?

A Yes, sir.

Q Side effects include headaches and dizziness, correct?

A Yes, sir.

Q He was prescribed Pentitol, correct?

A Yes, sir.

Q Side effects include dizziness?

A That's correct, sir.

Q Aricept. Just so we're all on the same page, Aricept is an early onset of Alzheimer's medication to assist patients with memory loss; isn't it?

A Yes, sir.

Q One of the side effects of that medication, headache and dizziness, correct?

A Yes, sir.

Q Flomax. He was prescribed Flomax, correct?

A Yes.

Q One of the side effects of that medication, headache and dizziness, correct?

A That is correct, sir.

Q And he was also prescribed most recently Namenda, which is a different medication from Aricept intended to address the early onset of Alzheimer's to deal with memory problems, correct?

A Yes, sir.

Q And Alzheimer's, as a general condition, effects short-term memory, correct?

A Yes, sir.

Q And one of the side effects from Namenda is headaches, dizziness, confusion and anxiety, correct?

A Yes, sir.

Q You would agree with me, would you not, that to the extent those medications are to address medical conditions unrelated to the Staples event, that in order for to you tell this jury his headaches or any of the other -- his dizziness, his confusion is caused by the incident as opposed to the medication, you have to at least be told about them to evaluate it, correct?

A Yes, sir.

Q In other words, you can't do it in a vacuum. If the patient doesn't tell you the history, you don't have the benefit of that information to weigh it before you write in a

report that something is caused by an incident that you are now here testifying about, correct?

A That is correct.

MR. O'HARA: One moment please, Your Honor.

THE COURT: That's all right.

Q Now, we've established that you had no history of any head trauma based upon your interaction with the patient, correct?

A That's correct.

Q And you had looked at medical records of a wide array of physicians including the physician that saw him on the day of the incident and their history did not include any history of head trauma, correct?

A That's correct.

Q And when you first saw the patient in June of 2014, he denied, or in your records you note no LOC, correct?

A That's correct, sir.

Q Tell what the jury what no LOC means.

A No loss of consciousness.

Q That means whatever the event was that brought about the impact to the shoulder, he described that there was no loss of consciousness, correct?

A That's correct, sir.

Q From a medical condition perspective, Mr. Ahsan suffers from hypertension, you mentioned hyperlipidemia, increased

cholesterol, correct?

A That's correct.

Q Those are issues associated with the cardiovascular system?

A Yes, sir.

Q Those conditions cause, among other things, headaches, true?

A Yes, sir.

Q He also suffers from small vessel ischemic disease, correct?

A Yes, sir.

Q That's a condition unrelated to trauma that causes headaches and dizziness, correct?

A It can, sir.

Q It can also cause blurry vision?

A Sometimes.

Q It can also cause confusion?

A That's possible.

Q Doctor, you went into great detail in describing to the jury the concept of a whiplash, coup contrecoup?

A Yes, sir.

Q Do you remember that?

A Yes.

Q Just so we're all on the same page, the coup contrecoup movement is like a hand waving with the wrist being the neck

and the hand being the skull and it's moving in response to forces, correct?

A Yes, sir.

Q It's not exact. In other words, there's movement of the body in different directions depending on the movement of the physical structures of the body as compared to the forces being applied, correct?

A That is correct, sir.

Q Are you aware in any medical study of there being a description of impact to the shoulder only, no touch to the head, no touch above the neck, are you aware of any study that has suggested that there are patients that have suffered traumatic brain injury and in particular what you've described as diffuse axonal injury?

A I have not sort of searched that out to be aware of it yet.

Q So as we sit here today ready for trial in a case that's five years later, if you assume for purposes of my question that there was nothing other than shoulder trauma, you are unaware of any medical study that suggests or any medical report that suggests that impact to shoulder can cause traumatic brain injury; is that fair statement?

A I'm not aware of that type of study.

Q Just so the jury understands, right, the diffuse axonal injury is a highly complex micro shearing of soft tissue

structures all throughout the brain based upon the way the head moves, correct?

A That's correct.

Q He had a series of brain MRIs -- let me take a step back. And so the micro shearing that occurs is because, if the skull, which is almost like a blender in terms of a hard case, and the brain, almost like a scoop of ice cream in the blender, and the cerebral fluid around the brain much like milk when you make a milkshake for your child, the brain, when there are external forces that cause the coup contrecoup movement, depending on the direction, the brain doesn't necessarily move straight, sometimes it rotates, sometimes it moves up and down which causes micro shear or bleeds in different locations in the brain, correct?

A That's correct.

Q And in this case, the brain MRI studies that were conducted did not show diffuse axonal injury based upon the review any neuroradiologist, did it?

A That's correct.

THE COURT: Could you repeat the very last question and break down the terminology just a bit.

MR. O'HARA: Yes.

Q And let me take a step back.

So the brain MRI studies in this case, all of the studies that were conducted that you had a chance to review,

none of those studies, which were performed by radiologists or neuroradiologists, confirmed the existence of diffuse axonal injury; is that correct?

A That's correct.

Q And so for purposes of the jury to understand, as well as me, without diffuse axonal injury, that micro shearing that occurs from the coup contrecoup movement does not exist on the brain MRIs, correct?

A That's correct.

Q In other words, the brain MRI has to be positive for diffuse axonal injury if there is a coup contrecoup movement which causes the traumatic brain injury, correct?

A That's correct.

Q But it doesn't exist in this case?

A We don't have an MRI of the brain at that time.

Q We don't have -- and you would agree with me, would you not, that the standard of care requires a brain injury -- excuse me, a brain MRI when a physician is presented with a patient that claims a coup contrecoup movement followed by headaches, vision disturbances, disturbance of smell, processing information, if a physician is presented with a history that includes those complaints and a claim of trauma that caused the body to move suddenly back and forth, the standard of care requires, among other things, a brain MRI, correct?

A That's correct.

Q And it wasn't done in this case, was it?

A No.

Q And in reviewing Dr. Guha's records, which were produced in discovery in this case, the reason why it wasn't ordered is because the patient didn't complain of anything other than impact to his left shoulder. True?

A Possible.

Q Not possible, Doctor. Bates number 2159, you reviewed Dr. Guha's records --

A Sure.

Q -- correct?

And his records say, quote, reason for visit: Shoulder pain. The patient presents to the office complaining of left shoulder pain. The pain radiates to the left arm. The patient reports that the pain has been present since one year and is severe in intensity.

That's what the record showed, didn't it?

A Yes.

MR. O'HARA: That's all I have, Your Honor.

THE COURT: Are you finished with the witness? Did I hear you say --

MR. O'HARA: I'm sorry, Your Honor?

THE COURT: -- you finished your examination?

MR. O'HARA: My apologies. My examination is

complete.

THE COURT: Would you like redirect, Mr. Bhurtel?

MR. BHURTEL: Yes, Your Honor.

THE COURT: I think the microphone on the podium is actually active, you should be fine with that if you are using the podium.

REDIRECT EXAMINATION

BY MR. BHURTEL:

Q Doctor Krishna, didn't Mostafa had headaches and dizziness complain on June 13th, 2014?

A Just one second.

MR. BHURTEL: Your Honor, Joint Exhibit 58, page 2396.

THE COURT: Thank you.

A Yes.

Q This is the June 13, 2014, the first time you saw him?

A Yes.

Q What was his complaint the first time?

A He was having neck pain, left shoulder pain, and having difficulty with activities of daily living. He also had complaints of neck pain, left shoulder pain, left wrist weakness, loss of grip, headaches and dizziness and range of motion.

Q And when was the next time did you see him June 24, 2014?

A Yes.

MR. BHURTEL: Your Honor page -- this is Joint Exhibit 58, page 2404 to 2406.

Q And what was his complaint at that time?

A He had tingling and numbness in the arm and legs. He had left arm, left leg was progressively worse. He had headaches, episodic headaches, dizziness, lightheadedness, shortness of breath and prolonged sitting and standing.

Q Counsel asked about the other medication they might have side effects such as headache and dizziness. And now earlier you also testified that his head injury, headache and dizziness is caused by September 2nd 2011's --

MR. O'HARA: Objection.

Q -- when the boxes fell.

MR. O'HARA: Objection.

Q Can you explain to the jury what was the cause of his head injury?

THE COURT: I'm sorry, but I need you to rephrase the question. I just didn't follow it clearly, Mr. Bhurtel. I apologize. Could you try it one more time for me.

MR. BHURTEL: Yes, Your Honor.

THE COURT: Thank you.

BY MR. BHURTEL:

Q Doctor, can you explain that is there any different kind of injuries Mostafa has in head, the neck -- sorry, in the head -- strike that one.

Earlier the counsel, defendant's counsel asked you about the various medication that may have side effect. So in this condition, Mostafa had his head injury because of those medications, or because of the accident happening September 2nd, 2011? Can you explain that one?

A Yes, medications don't cause head injury. The patient, based on the history that the boxes fell on the left side of the shoulder -- left shoulder and based on the mechanics that are described, I believe that he sort of turned, moved his head almost like the hand moving back and forth on the fulcrum of the wrist that resulted in some trauma to the head. And that is based on our history that he gave to us. And, therefore, resulting in the head injury complaints, what I see with headaches and dizziness on my -- on June of 2014.

THE COURT: So I think the question was actually asking for a little bit more than that, if I may, Mr. Bhurtel.

MR. BHURTEL: Yes.

THE COURT: I think Plaintiff's counsel is asking, is there a way for you to reach the conclusion that the symptoms we've been talking about are the result of the sharp movement of the head and a resulting injury to the brain as opposed to the side effects of the medication, medications that were listed and talked about during your cross-examination.

THE WITNESS: Only in so far as my follow up with

the patient. Because the patient has been on medications with me and those have not sort of instigated any worsening of the dizziness or caused dizziness during the course of my -- or the headaches or during the course of my follow up with the patient. Prior to this, I didn't treat the patient so I can't really comment.

BY MR. BHURTEL:

Q Doctor, Krishna, to have a traumatic brain injury, do you have to have a cut, bump or bruise in the head?

A No. That's the -- that's the classic coup contrecoup injury where the head moves forwards and backwards or in different directions with the brain inside the head moving in the opposite direction like the blender analogy that your counsel -- the defendant counsel used.

Q Do you have an opinion within reasonable degree of medical certainty that Mostafa Ahsan's head injury, headache, dizziness and those kind of things is caused by the September 2, 2011 accident?

A Yes. This is based on the history that he had given us, my examination and follow up with this patient and noticing that these symptoms were present and persistent throughout the time that I followed the patient.

Q Dr. Krishna, to have a traumatic brain injury, is it requirement that the patient has to have loss of consciousness?

A No. Loss of consciousness is not required.

Q Dr. Krishna, to have a brain injury in the head, does it require particular weight of the boxes or the particular weight of the material or even a four-pound box can cause the head injury?

MR. O'HARA: Objection. Exceeds the scope of cross.

THE COURT: Overruled.

A Well, the case -- in this case there's no issue of the box hitting the head. It's only the box hit the shoulder. So the issue is that -- the idea is that the patient moved his head away from the offending agent in a sudden way, like a whiplash injury that I mentioned earlier, that resulted in the coup contrecoup type of head injury.

THE COURT: So is it your testimony that you believe that the head injury was caused by Mr. Ahsan's reaction to the falling item and, theoretically, if he reacted in the same frightening way and shook his head back and forth even if it never hit him at all, he could have had this injury?

THE WITNESS: That's correct. There is no direct event of a box hitting him directly on the head.

THE COURT: So it's not the box striking the shoulder that caused what the head injury you believe he sustained, it's the movement of his head in reaction to the falling box.

THE WITNESS: Right, with the neck being fixed.

BY MR. BHURTEL:

Q Doctor, can you explain what is the difference between hypertension causes some headache and the traumatic brain injury causes headache?

A The hypertension headache is usually a dull headache that's present chronically and it's because the blood pressure is slightly elevated.

A headache after a traumatic brain injury is usually a gradual onset symptom that slowly increases over time and then stays at a higher plateau, than what is a hypertension related headaches which is at a lower level of dull ache.

Q Doctor, can you explain how soon the patient like Mostafa should have complained of headache or brain injury after the accident?

THE COURT: What do you mean by should have?

MR. BHURTEL: Yes, he should have.

THE COURT: No, I understood the words, I don't understand what you mean by them.

MR. BHURTEL: I'll rephrase, Your Honor.

THE COURT: Okay.

Q Okay. The patient like Mostafa's condition, how soon they should have complained with the doctors about their headaches and head injuries?

THE COURT: I'm sorry, let me see if I can rephrase it to see if I understand what you mean.

Are you asking the doctor how soon it's reasonable to expect a patient who sustained what Mr. Ahsan describes to complain of headaches --

MR. BHURTEL: Yes, Your Honor.

THE COURT: -- head injury?

MR. BHURTEL: Yes.

THE COURT: Do you understand the question?

THE WITNESS: Yes. It has a wide range. I mean, it can be as soon as from the day of occurrence to several weeks after also.

BY MR. BHURTEL:

Q Dr. Krishna, can you give the synopsis of what injury Mostafa Ahsan had suffered because of the September 2, 2011 accident?

MR. O'HARA: I'm going to object. This was covered on direct.

THE COURT: Sustained. Yes, it's not a second opportunity.

If there is something else you want to ask that is provoked by the cross-examination, you may.

BY MR. BHURTEL:

Q Doctor, this the first report, you have a narrative report on June 13, 2014, is that the report you prepared for the purpose of treatment --

A Yes.

Q -- or something else?

A Treatment.

Q And then you prepared regularly this kind of narrative report when you provide the treatment to the patient?

THE COURT: I think you better show him the specific pages you have in mind.

MR. BHURTEL: Yes, 2395.

THE COURT: 2395 to 2505 are in evidence already.

MR. BHURTEL: Yes.

THE COURT: The problem you were having before or the objection I sustained earlier, excuse me, was to 556 to 561 and 3332 to 3576, at least according to my notes.

BY MR. BHURTEL:

Q Doctor, what is your opinion about Mostafa's head injury?

MR. O'HARA: Objection, Your Honor. This was covered on direct.

THE COURT: If there's a more specific question you want to ask that was provoked by the cross you may, but that's too general for redirect.

BY MR. BHURTEL:

Q Dr. Krishna, so you were asked a series of questions by the defendant's counsel about other medication and then other how the accident happened, and based on those questions and your answer, do you have your opinion about Mostafa Ahsan's head injury?

THE COURT: I think, in other words, did anything that came up on cross-examination change your opinion that you offered on direct examination?

THE WITNESS: No, sir.

BY MR. BHURTEL:

Q So it is still your opinion that his injuries to the head, neck is caused by the September 2nd, 2011 accident?

A Yes.

Q And it is still your opinion within a reasonable degree of medical certainty that he needs the future treatment?

MR. O'HARA: Objection.

THE COURT: Overruled.

A Yes. Sir.

MR. BHURTEL: I have nothing further, Your Honor.

MR. O'HARA: Very briefly, Your Honor.

THE COURT: Go ahead.

You can do it from counsel table if you prefer, but I won't make you. Take your time.

RECROSS EXAMINATION

BY MR. O'HARA:

Q I'm going to cover two very discrete areas. You were asked questions about your June 24th, 2014 report which was the second office visit that you saw this patient, correct?

A Yes, sir.

Q And for the first time in any medical records that you

have seen, from either your office, any of the doctors that saw Mr. Ahsan, after the Staples incident or even any doctors that saw Mr. Ahsan before the incident, you noted complaints in both arms and both legs, didn't you?

A Yes, sir.

Q And he had no trauma whatsoever to his lower extremities, did he?

A That's correct, sir.

Q Just so -- since we talked about upper extremities, we're talking about your legs are your lower extremities?

A Yes, sir.

Q He had tingling and numbness in both arms and both legs, correct?

A Yes, sir.

Q And his left leg was getting progressively worse?

A Yes, sir.

Q Why?

MR. BHURTEL: Objection, Your Honor, I didn't redirect with respect to the lower extremities and I didn't ask those questions.

MR. O'HARA: Yes, he did.

THE COURT: Overruled. Overruled.

Go ahead.

BY MR. O'HARA:

Q Why?

A Why was he having those symptoms?
Q Yes. What's the problem with his lower extremities, in particular his left leg?
A I wasn't sure at that time. We had to evaluate whether there was something else going on in the back.
Q Has that evaluation been done?
A I believe so. We obtained some x-rays of his back.
Q What is the medical reason for the lower extremity problems that's causing tingling and numbness and in particular in his left leg getting progressively worse?
A I believe it's a degenerative condition of his back causing pain in his left leg.
Q By degenerative condition, you're talking about disc changes in his lumbar or lumbosacral spine that affect both legs, correct?
A Yes.
Q And in terms of his upper extremities, when he's describing numbness and tingling in his right arm, that's the first time in any medical record that you've seen that, correct?
A Yes.
Q And that's a result, based upon your evaluation, of degenerative changes that are progressively getting worse and the nerves that innervate the upper and lower arm are becoming compromised by the disc herniation, correct?

A That's possible.
Q It's more likely than not, isn't it?
A More likely.
Q And I want to make sure I understand this. It is your testimony that this man suffered a traumatic brain injury by turning his head?
A It's a sudden movement of the head and neck, yes.
Q He turned his head away or towards the impact?
A From what I was -- what I was told it was away.
Q And can you cite for us any medical study from any neurologic, neurosurgical, neuroscience publication that evaluates and confirms that there is such a thing of a patient turning away from stimuli, whether it be something hitting them in the shoulder, whether it be some noise that they hear, whether they be startled, can you point to one medical study that has evaluated and confirmed that, in fact, a patient can have a traumatic brain injury, under the CDC definition, from that event, can you point to one?
A Not from that description, but from a coup contrecoup there are many.
Q I understand that. A coup contrecoup is whiplash and the literature is replete --
A Yes.
Q -- with sudden acceleration/deceleration forces. And the sudden acceleration is not self-induced, is it? It's induced

120
KRISHNA - RECROSS - O'HARA

by another force-producing event, isn't that true?

A Usually.

(Continued on the next page.)

GEORGETTE K. BETTS, RPR, CSR
Official Court Reporter

BY MR. O'HARA:

Q Usually? There isn't one study that you can point to to indicate any series of patients that were evaluated with a traumatic brain injury resulting from the external force was self-imposed; isn't that true?

A I don't have any today, that's correct.

Q That's all I need to hear. Thank you, Doctor.

THE COURT: Mr. Bhurtel, are we finished with the witness?

MR. BHURTEL: Yes.

THE COURT: You're excused, Doctor, thank you very much.

Counsel, may I see you at the sidebar for just one moment.

(Continued on the next page.)

(Sidebar conference.)

THE COURT: I understand, Mr. Bhurtel, that this was your only witness for today; is that right?

MR. BHURTEL: Yes, sir.

THE COURT: But I saw the gentleman come into the back of the room and I just wasn't sure that before I excused the jury, I wanted to make sure there was nothing else we could accomplish today, because I will work another half hour, if there is.

No?

MR. BHURTEL: No, he's my assistant.

THE COURT: Okay. Then I'll excuse the jury for the evening, but I'll ask you folks to wait. Okay?

MR. BHURTEL: Thank you.

MR. O'HARA: Thank you.

(End of sidebar conference.)

(Continued on the next page.)

(In open court; Jury present.)

THE COURT: All right, ladies and gentlemen, we're at a convenient breaking point, as you can imagine, so we will call it a day and the lawyers and I will do some homework and try to be ready to be as efficient as possible with your time tomorrow.

I'd like to start at 9:30 sharp. I don't like to treat you like anything other than very responsible, independent adults, so please be in the jury room at 9:30. But as a practical matter, commuting around New York that probably means giving us a little bit of a cushion.

If everybody else is here at 9:30 and you're not and the other seven are sitting in the jury room waiting for you, you'll feel embarrassed, so don't put yourself in that position. Give yourself a little extra time for getting around New York. I think it's even supposed to rain overnight, so that will make it a little harder to get around in the morning. And so, please, be in the jury room, say, by 9:15 or 9:20. If you plan for that, hopefully, everybody will be ready to go at 9:30 sharp, okay?

Don't discuss the case. Don't think about the case. Don't talk about the case. Go home and entertain yourself with something completely different and enjoy your evening. Safe home.

Leave your notepads in the jury room flopped over

with only your jury number visible to the passerby.

And by the way, I don't like to see you drinking sodas and coffees during the trial in the courtroom and I don't want folks from the building services to yell at me that I let you spill stuff. But if you want to bring water out, that's fine.

JUROR: Water's good?

THE COURT: Water's good.

JUROR: Goodnight.

THE COURT: Goodnight.

(Jury exits.)

THE COURT: So here's my agenda for this evening, folks. I want to make sure that we know exactly what is in evidence by page number.

I want to suggest that this numbering system where we have very large documents with one exhibit number, I understand we're going to have to live with that because that's where we are right now, but I would suggest that as we admit subgroups of Bates pages within each exhibit, we call them 10-1 and 10-2 and the like, because otherwise we may have a debate later about which Bates-numbered pages are in evidence and which are not. So I'd like you to work on that.

I'd like to know who's coming tomorrow. And I'd like you to work on what the exhibits are going to be so that maybe we can work through which pages have to be redacted

tonight and we don't have to waste any jury time tomorrow.

And I would like to have our tech people come up and give Mr. Bhurtel 10 or 15 minutes of instruction with the equipment.

Now ordinarily I wouldn't impose upon Mr. O'Hara to wait for that to happen, but I have a choice now between imposing on the LeClairRyan team, or imposing on my tech support staff, and I'm going to impose on the LeClairRyan team.

So I'm going to call for that assistance now, and while you're waiting for that assistance, perhaps you can begin the process of identifying these exhibits more precisely and we will go back later tonight.

I won't ask the court reporters to work late. Do we have access to ESR in this courtroom?

THE COURTROOM DEPUTY: Yes.

THE COURT: We'll make a brief electronic stenographic record, but we'll call the court reporter first, if you're still around when we're ready, that's fine, but please don't wait for us. All right?

We're going to close the record.

If you leave us a number to call so that if you're still around we'll bring you back, but otherwise if it's just administerial, we'll put it on ESR. I don't think anybody will object.

Okay, fair enough?

(Proceedings adjourned at 4:37 p.m. to resume on November 15, 2016 at 9:30 a.m.)

Case 1:13-cv-05929-SMG Document 118-2 Filed 12/21/16 Page 128 of 958 PageID #: 1218

I N D E X

| | | PAGE |
|---|---|---|
| OPENING STATEMENT - BHURTEL | | 15 |
| OPENING STATEMENT - O'HARA | | 25 |
| WITNESS | | PAGE |
| RANGA KRISHNA, M.D. | | |
| DIRECT EXAMINATION | BY MR. BHURTEL | 41 |
| CROSS-EXAMINATION | BY MR. O'HARA | 85 |
| REDIRECT EXAMINATION | BY MR. BHURTEL | 108 |
| RECROSS EXAMINATION | BY MR. O'HARA | 116 |

E X H I B I T S

| JOINT | PAGE |
|---|---|
| 10 | 45 |
| 58 | 61 |
| 70 | 84 |

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - X

MOSTAFA R. ASHAN, : 13-CV-05929 (SMG)

Plaintiff,

-against- : United States Courthouse : Brooklyn, New York

: November 15, 2016 : 9:30 a.m.

STAPLES, INC., STAPLES THE OFFICE SUPERSTORE EAST, INC.,

Defendants.

- - - - - - - - - - - - - - - - X

TRANSCRIPT OF CIVIL CAUSE FOR TRIAL
BEFORE THE HONORABLE STEVEN M. GOLD
UNITED STATES MAGISTRATE JUDGE, and a jury.

A P P E A R A N C E S:

For the Plaintiff: BHURTEL LAW FIRM PLLC
3749 75th Street, 2nd Floor
Jackson Heights, New York 11372
BY: DURGA P. BHURTEL, ESQ.

For the Defendant: LeCLAIR RYAN
1037 Raymond Boulevard, 16th Floor
Newark, New Jersey 07102
BY: JEFFREY O'HARA, ESQ.
LAURA BREITENBACH, ESQ.

(In open court; outside the presence of the jury.)

(Judge STEVEN M. GOLD enters the courtroom.)

THE COURT: Good morning, everybody.

MR. O'HARA: Good morning.

THE COURT: Mr. Bhurtel, is your witness here?

MR. BHURTEL: Not yet. He just called.

THE COURT: The jury is here and they are ready to go.

MR. BHURTEL: He called me and then he said -- may I call the witness, Your Honor?

THE COURT: Yes, please.

Have a seat, everybody. Good morning.

MR. O'HARA: Good morning.

THE COURT: Mr. Bhurtel, what is going on?

MR. BHURTEL: He is parking the car.

THE COURT: I don't believe this. I impose on eight jurors to get here on time and they are all here and your witness is not. It is outrageous. Do you have any other witnesses available to you here to testify? Is your client's wife supposed to testify?

MR. BHURTEL: Yes.

THE COURT: Is the wife being sworn in also?

MR. BHURTEL: No.

THE COURT: Why don't we get her up here so we can use the time?

Is he parking right here? I could hear you telling him the building address. I am confused.

MR. BHURTEL: He said started morning and because of the rain and other things, he is stuck in the traffic, he is parking across the building.

THE COURT: I warned everybody last night it was going to rain overnight and they needed to leave extra time.

Are you still on the phone with him?

MR. BHURTEL: Yes.

THE COURT: Get him here as soon as you can. It is really very rude to the jurors. Is he in the building yet, do you know?

MR. BHURTEL: He said he parked and then he says he is walking.

THE COURT: Where did he park?

MR. BHURTEL: Across the parking lot. At the same time maybe, Your Honor, we can mark the exhibits of the administrative evidence that I have?

THE COURT: Yes. Whatever you can accomplish and now. Let's do it. I thought that was done already. I thought you said last night these were simply blow-ups of documents or things that were already agreed upon.

I want your witness here tomorrow at 9:15.

MR. BHURTEL: Yes.

THE COURT: If the witness is late, I want the

defense ready to make a call to begin the defense's case. I am very upset about this. I cannot ask civilians to serve as jurors and then to keep them sitting in a room after they get here on time.

Do you have the exhibits ready?

MR. BHURTEL: In five minutes.

THE COURT: Get them ready and I will call the jury in. These are all matters that could have been done beforehand. You don't do this while the jury is waiting.

MR. O'HARA: Judge, we will have the general manager of the store, who is listed on the defense side, tomorrow morning at 8:30. We will have him stay for the day so that if there is a gap.

THE COURT: Thank you. You can have him at 8:30 but that is a little overkill.

Mr. Bhurtel, are you ready?

MR. BHURTEL: Yes, your Honor.

THE COURT: Who is at counsel's table with you today so I can tell the jury?

MR. BHURTEL: She is my assistant, Prasanna Mahat. She completed the law school and she's waiting for the bar.

THE COURT: Where is the interpreter? Didn't you say you would have an interpreter here today so that your client could testify here today if we had a gap in time?

MR. BHURTEL: Yes, your Honor. That was in the

afternoon.

THE COURT: Let's bring out the jury so that we are ready to go as soon as the doctor arrives.

You say that he should be in the building right now? He was parking across from the park.

MR. BHURTEL: Yes.

THE COURT: Could I have co-counsel's full name, please?

MS. MAHAT: Prasanna Mahat.

THE COURT: Could you spell it for me, please.

MS. MAHAT: P-R-A-S-A-N-N-A, and the last name is M-A-H-A-T.

THE COURT: P-R-A-S-A-N-N-A, M-A-H-A-T?

MS. MAHAT: Yes.

THE COURT: And you are an attorney assisting Mr. Bhurtel?

MS. MAHAT: Yes.

THE COURT: Are you admitted to our court?

MS. MAHAT: No, I am not an attorney yet.

THE COURT: I see. So we will introduce you as a paraprofessional.

Are we in the circumstance that you expected, yes or no?

MR. BHURTEL: He is in security right now.

(Jury enters the courtroom.)

THE COURT: Ladies and gentleman, good morning.

THE JURY: Good morning.

THE COURT: Thank you for getting here on time. Unfortunately, the person we need to get on with the case is delayed. I sincerely apologize for that. I did everything in my power to prevent it. I wanted to get you out here to be ready to start as soon as the individual was ready. I also wanted to let you know that Mr. Bhurtel today has a paraprofessional assisting him named Prasanna Mahat, and that is the young lady to Mr. Bhurtel's right. So I wanted you to know who that is. Hopefully, we will be able to get started momentarily.

Mr. Bhurtel, why don't you get your exhibits and notes organized at the podium so that we are ready to start as soon as we can.

MR. BHURTEL: Yes, your Honor.

THE COURT: Mr. Bhurtel, is this your doctor?

MR. BHURTEL: Yes, your Honor.

THE COURT: Please come forward and be sworn.

THE COURTROOM DEPUTY: Please raise your right hand.

(The witness was sworn by the Clerk.)

**HAROLD S. PARNES**,

called by the Government, having been duly sworn, was examined and testified as follows:

THE COURT: Please state and spell your name for us.

THE WITNESS: Harold S. Parnes, P-A-R-N-E-S, M.D.

THE COURT: Thank you.

Mr. Bhurtel, you may inquire.

MR. BHURTEL: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. BHURTEL:

Q Dr. Parnes, what is your address?

A 1525 Voorhies, V-o-o-r-h-i-e-s, Avenue, Brooklyn, New York, 11235.

Q Dr. Parnes, what is your education?

A I'm sorry?

Q What is your medical degree?

A Medical education?

Q Yes.

A I went to SUNY Downstate Medical Center Medical School. I was in the seven-year bio-med program and then after that, I did my residency at Stony Brook Medical Center.

Q And how many years --

A I mean residency at Long Island College Hospital and a fellowship at Stony Brook Medical Center in neuroradiology and after that I was the director of radiology at Queens Hospital.

Q How long have you been director of Queens Hospital?
A For four years.
Q After that, did you work?
A Yes, I went into private practice in 1996.
Q And what is the name of your practice?
A Omega Diagnostic Imaging, PC.
Q And what is the address of your business?
A It is the same, 1525 Voorhies Avenue, Brooklyn, New York 11235.
Q And when you went to medical school, what area of subject you studied?
A I specialized in diagnostic radiology. I'm board certified in diagnostic radiology, and I'm board certified in neuroradiology, and I maintain my certifications through the maintenance certification program, which means that we have to take a test every ten years.
Q And when you say you completed residency, what area of the practice you completed the residency?
A It was basically residency. They trained you in all different areas and then you do your fellowship to get subspecialization. So I did a two-year fellowship in Stony Brook from 1990 to 1992.
Q Do you have any fellowship?
A Well, that was the fellowship, two-year fellowship.
Q When did you receive your certification?

A Diagnostic radiology, I was board certified in 1990, right after my residency. And my fellowship, the certification didn't start until 1995, and that's when I was certified, in 1995.
Q When you -- you also said that you are neuroradiology board certification?
A Yes, that's the neuroradiology board certification.
Q And you are licensed to practice medicine?
A Yes.
Q In which state?
A New York, California, Florida, Pennsylvania, and New Jersey.
Q When did you receive your license to practice in New York?
A 1987.
Q Since then until now, you have been -- do you -- strike that.
Since 1987 until now, you have been practicing?
A Yes.
Q In which area of medical you are practicing?
A Well, mainly neuroradiology.
THE COURT: Can you describe what neuroradiology is for us, Doctor?
THE WITNESS: Yes. Neuroradiology is basically the evaluation of patients who have neurological problems, whether

it be like a brain tumor or a stroke or any kind of like symptoms of dizziness, and also problems with the spine, the cervical, the thoracic and lumbar spine, and also peripheral nerves. So, basically any type of nervous system disorder that patients may have is what I'm involved with basically diagnosing, and in some aspects, you know, with the treatment as far as collaborating with the doctors who treat.

THE COURT: So you don't treat the patients yourself? You do the radiological studies that help the treating doctors?

THE WITNESS: Right. So I do the radiological studies that basically diagnosis and basically evaluate effects of therapy.

THE COURT: And radiological studies would be X-rays, MRIs, and CAT scans?

THE WITNESS: X-ray, MRI, CAT scans, CT, PET, which is positron emission tomography and nuclear medicine.

Q Do you have any honors?

A I'm sorry?

Q Do you have any, you know, scholarship or honors?

A Yeah. I had gotten honors in medical school in dermatology, radiology, cardiology, and also I'm very involved with -- I've gotten honors from the medical school for Master Teacher Award from Downstate. I'm also very involved with medical education of Downstate. I'm chairman of the board of

trustees for the Alumni Association.

Q Did you receive any awards?

A For?

Q Like master of teaching awards in radiology.

A Yeah. I received my teaching award for radiology from Downstate. I have gotten some awards from the medical society, proclamation for my activity, for my work that I do for the medical society in the State of New York.

Q Can you describe what kind of awards?

A Well, I was past president of the Kings County Medical Society and I think I mentioned that I was past president of the Alumni Association of Downstate and now I'm the chairman of the board of trustees, which is basically we give out scholarships and grants to medical students who need financial aid for medical education for research projects that they're doing.

MR. BHURTEL: Your Honor, page 836 to the joint exhibit.

THE COURT: Page 836 of joint exhibit number?

MR. BHURTEL: 840.

THE COURT: I'm sorry. I am going to have to ask you to say that again. 836 of?

MR. BHURTEL: The page number 836 to 840.

THE COURT: Of which joint exhibit? Or are all of the documents consecutively Bates numbered?

MR. O'HARA: Yes, your Honor.

THE COURT: Or are they Bates numbered within the exhibits.

MR. O'HARA: They are consecutively Bates numbered. This is part of exhibit tab No. 14.

THE COURT: Thank you.

836 to 840, you said?

MR. BHURTEL: Yes, your Honor.

THE COURT: Thank you. What about them?

Q And you have been involving for activity?

A I'm sorry?

Q You have been teaching medical school?

A I give basically board review; in other words, if the residents, the radiology residents need some additional assistance with cases that they may be questioned on for the radiology board, so I do some teaching, voluntary teaching.

Q Are you involved with professional society?

A Well, for the Kings County Medical Society is the main one that I am involved with.

Q Do you have any publication about your area of practice?

A I have several publications, but, you know, when you are in private practice basically it is a full-time job, so it is -- I stay very focused on basically running the practice.

Q And how did you involve -- sorry. Withdrawn that.

Did you involve to provide radiology test to Mostafa

Ashan?

A Yes.

Q When did you first time you involved?

MR. O'HARA: I don't object. I assuming that he is going to offer him in some subspecialty as opposed to going into --

THE COURT: The formal proffer of expert status is no longer strictly required. But do you intend to offer Dr. Parnes as an expert in neuroradiology?

MR. BHURTEL: Yes, your Honor.

THE COURT: Is there going to be an objection to that proffer?

MR. O'HARA: No objection. No voir dire.

THE COURT: The witness may offer opinion testimony in that field. You may proceed.

A I believe that the first time he had come to the office was September 22, 2014 for an MRI of the left shoulder.

Wait.

Q The second time, when did you --

A Wait. There was one in June. I'm sorry. It was an MRI of the cervical spine on June 19, 2014.

THE COURT: So I just want to focus on that for one second. I think you first reported that you saw Mr. Ahsan in September of 2014 to conduct an MRI on his left shoulder. Is that still accurate, it just isn't the first time you saw him?

THE WITNESS: No, we saw him -- I saw him on June 19, 2014. He came in for an MRI of the cervical spine, and then he came in in September 22, 2014 -- I'm sorry, September 16, 2014 for an MRI of the brain with and without intravenous gadolinium, which is the contrast agent.

And then he came on September 22, 2014 for MRI of the shoulder, and he also had an MRI of the with diffusion tensor imaging on 5/23/15.

THE COURT: So you conducted four radiographic studies of the plaintiff in total?

THE WITNESS: Correct.

THE COURT: A cervical spine MRI in June of 2014, a brain MRI with contrast in September of 2014 and without contrast?

THE WITNESS: Right.

THE COURT: A left shoulder MRI in September 2014?

THE WITNESS: Right.

THE COURT: And an MRI with diffuse tensor imaging, or DTI, in May of 2015?

THE WITNESS: Right.

THE COURT: Thank you.

Q Doctor, who recommended you to perform those tests?

A The patient was referred by Dr. Krishna.

Q And those MRI tests you did, what was the purpose of doing?

Let me withdraw the question. It is okay.

When you did the MRI of the head, what was the purpose of the test?

THE COURT: When you say his head, do you mean the brain or the cervical spine?

MR. BHURTEL: The brain, Your Honor.

THE COURT: Thank you.

A Well, at that time, I mean, I didn't examine the patient, but I would imagine that Dr. Krishna felt that the patient was having symptoms that required evaluation. Most of the time patients come in if they have a headache or if he has a suspicion of something going on in the head that needs to be, you know, either an initial study or a follow-up study to see if there is some type of emergency or non-emergency situation refer doctor.

Q And can you describe how the MRI will find those kinds of findings in the brain?

A From May 23, 2015?

Q No, as a general.

A So usually patient gets referred, you know, because we only take patients if they have a referral that we verify, and the patient comes in and basically we make sure there is no metal in the patients, like surgical clips. We have had some correction officers come in, if you go in with a gun, you get sucked right into the machine. It's a very, very strong

magnet. So the patient has to be screened, evaluated. And as long as there is no metal and everything is okay, the patient goes into the MRI unit. The MRI machine is a very high field. It is a Siemens unit. It is a new scanner. It's relatively knew. It's from 2012.

The patient basically lays down on the table. We put the patient into this, you know, in the magnet MRI machine. It is what is called a short board. It is very short. It's supposed to be less claustrophobic. What happens is that the patient's protons, which is mainly the water in the body, all the protons, all the water molecules line up with the magnetic field. You know, like when you have filings, you put the magnet next to it and it lines up. We shoot in a radio frequency, like a radio wave. Imagine Channel 4. We shoot that radio wave in and it displaces the protons a certain distance. Then what we do is we shut off the radio wave and we listen. And then when the molecules come back, because it's -- the patient is still in the magnetic field, we can generate a signal from each part of the body as far as spatial resolution, as far as like, you know, soft tissues and bone, and the computer puts this altogether as an advanced image.

Q And when you do the MRI, what kind of things you can find inside the brain?

A Well, basically the brain is -- has a lot of protons.

Because it's mainly water, except for the skull, which protects the brain. So the brain has a lot of protons. We do a lot of imaging as far as that goes, not just the port and surface; in other words, the gray matter, but also the light matter. We can look at the brain stem, the back of the brain, the posterior fossa, the base of the skull, the surfaces covering the brain.

And like I said, the brain mainly has gray matter, white matter. The white matter connects the brain matter to the brain stem, which helps us, you know, do our actions and think. It's basically the to-do center, everything that we need to do, it basically coordinates everything.

THE COURT: I think maybe the question had to do with whether you could see from an MRI if there is something wrong or abnormal about a brain. What do you look for when you get the result?

THE WITNESS: So the MRI of the brain has certain limitations. We can see brain tumors. We can see strokes. This machine can detect a stroke within like 30 seconds. We can see the blood vessels. Some things we can't see with a regular MRI of the brain.

On this patient, we did diffusion tensor imaging, which is basically like a color map of the white matter tracts that gives us information that sometimes may or may not be present on the MRI of the brain. Back a long time ago --

not a long time ago. 15, 20 years ago we knew that there was a white matter skeleton that basically connected the brain stem to the cortical brain matter. We were never really able to image it. Now we have a new technique called diffusion tensor imaging, which basically uses like color maps and we can basically image that part of the brain.

And sometimes patients complain of symptoms. The MRI could be normal but the DTI could be abnormal.

Q Can you explain what is the diffusion tensor imaging, which is the DTI you said?

A Diffusion tensor imaging basically is -- it's basically a technique that, like I said, uses -- it looks at the protons, the water molecules, and the motion of the water molecules. We basically can test diffusion, in other words, what's going outside membranes, what's traveling -- inside membranes and it creates a map of the brain.

I actually have a model. I would like to present it.

THE COURT: That would be up to Mr. Bhurtel to ask you to do that.

A I have a simple model if you'd like me to show it.

I just came up with this model yesterday.

MR. O'HARA: Judge, the defense hasn't seen it. We would need to have an opportunity to see it and have a proffer as to how it relates to the issues in this case.

THE COURT: Is this something that has already been produced to the defendant or shown to the defendant this morning while we were waiting, Mr. Bhurtel?

THE WITNESS: No, this is nothing that --

THE COURT: No, no. Have you seen it, Mr. Bhurtel?

MR. BHURTEL: No.

THE COURT: You can't offer it. You can only offer things that the lawyers have looked at. Thank you, though.

Q How long you have been using this DTI?

A We've been using it for several years and it's basically a technique -- it is sort of an evolution that's continually being improved.

It basically is a tool that is used in conjunction or in addition to the other studies that we do on the patient, not just the MRI but also the other studies that the neurologist or whatever other doctor sees the patient may use this in conjunction with that. Sometimes the results sort of match. They say, you know what, I see this and I see this and it matches; sometimes it doesn't match. It may be an incidental finding. It may or may not be symptomatic. It is basically a technique that we've been using for several years and, like I said, it is a technique that's being evolved.

Q And is this DTI that is used for the purpose of treatment?

A I think mainly it is being used for the purpose of

diagnosis now. Probably in the future it may be used for some type of treatment, in other words, to see if we are doing X, Y, and Z, let's repeat the DTI and see if there's any kind of improvement. Basically, I don't think it's going to be that sort of function until it's sort of in line with what's called functional MRI, where we actually, you know, image the brain as it's doing whatever it's doing. It's sort of superimposed over it.

Q And did you use the DTI technology to do the diagnosis of Mostafa Ashan?

A Yes. We did do the DTI study.

Q And when did you do that?

A That was on May 23, 2015.

Q And before that, did you do any MRI of his brain?

A I don't believe we had an MRI of the brain before that.

Wait. I'm sorry. We had an MRI of the brain on 9/16/2014.

THE COURT: September 16th?

THE WITNESS: Yes, September 16, 2014.

MR. BHURTEL: Exhibit 543.

THE WITNESS: I'm sorry, 9/16/14.

MR. BHURTEL: Your Honor, pages from 2070 to 2072.

THE COURT: Are you offering this or is this what you want to show on the computer? I am not understanding why you are telling me the page numbers.

MR. BHURTEL: Your Honor, I am going to ask the witness first about the findings.

THE COURT: That's fine. I'm sorry. I misunderstood you. Go ahead.

MR. BHURTEL: And Exhibit 54, that is the Omega Diagnostic Imaging, PC film.

MR. O'HARA: For the record, what you please identify the Bates numbers?

THE COURT: Mr. Bhurtel, did you hear Mr. O'Hara and you are trying to get that?

MR. BHURTEL: Yes, your Honor.

THE COURT: I just wasn't sure that you heard him because he spoke softly.

MR. O'HARA: For purposes of the record, the documents are 2066 to 2078.

Q And, Doctor, what was your finding of the MRI of the brain dated September 16, 2014 related to Mostafa Ashan?

A That study from 9/16/2014, he had no mass effect towards one side or the other. There was a couple of white matter changes.

As we get older, the white matter sort of like gets what we call white matter ischemic disease or from high blood pressure. It changes -- what we call white matter ischemic changes. It is sort of like if you want to call it little, tiny -- in a way it is a stroke and it is not a stroke. It is

sort of like the blood vessels, you know, can contribute to dementia if it gets very severe.

And he also had a left-sided frontal subdural hygroma, which is a fluid collection in the subdural space. It measured 6.3 centimeters by 0.6 by 3.1 centimeters, and there was a little bit of mass effect on the adjacent left frontal lobe. It was just pushing it.

And there was a little bit of a meningeal enhancement. In other words, the meninges are the coverings. It is sort of like a cellophane that covers the brain itself, and it probably was from some irritation of the meninges. That's why is it enhanced a little bit.

THE COURT: Enhanced, meaning like inflamed?

THE WITNESS: Yeah, like it got a little brighter on the post contrast images, which is why we do it. And that was the main finding, was the left frontal subdural hygroma, which is basically a collection that could either be from a tear in the meninges and these coverings where fluid can actually accumulate in that area or the patient may have had a prior hemorrhage or bleed that subsequently resolved and now we have what's left as a hygroma. That's sort of the body's way of healing or dealing with blood that is left in the space.

Other than that, there was nothing really acute at the time. I mean, that is not acute. That is just something that Dr. Krishna was told about because basically whenever we

see a collection of that we notify them of the collection.

THE COURT: A collection of fluid, you mean?

THE WITNESS: A collection of fluid, yes.

THE COURT: And that is what you referred to as a hygroma?

THE WITNESS: Yes.

That he may want to have evaluated by a neurosurgeon just in case to see if the patient is symptomatic, or just to keep an eye on him or sometimes the patient goes to the hospital if he feels it is necessary.

Q And, Doctor, what was the cause of subdural hygroma to Mostafa Ashan?

MR. O'HARA: Objection.

Sidebar, please.

THE COURT: All right.

(Sidebar held outside the hearing of the jury.)

(Continued on the following page.)

(The following sidebar held outside of the hearing of the jury.)

MR. O'HARA: There was a motion in limine to bar this doctor from offering in retrospective opinions relating to the diffusion tensor imaging. The plaintiff was given an opportunity to supplement the one report that this doctor wrote for purposes of doing -- he was going to be constrained to testimony as a treater unless he amended and provided a supplemental report and that was the subject of the oral argument. Counsel did not provide an amended report. He has provided what is, in the State Court system, a 3101-D disclosure. That is not a report; therefore, he hasn't complied with the order. Therefore, asking him this retrospective opinion is an expert opinion for which there has not been a medical report, and the Court has ruled that absent an amendment to that report it is barred.

THE COURT: Mr. Bhurtel, do you have a medical report, a disclosed expert report that provides --

MR. BHURTEL: Yes.

THE COURT: Can I see it, please?

MR. BHURTEL: This one -- this, I'm asking right now, is September 16, 2014.

THE COURT: No, no. But the question on the table that you asked him is what caused the hygroma.

MR. BHURTEL: Right.

THE COURT: Does the report that you changed include the doctor's opinion of the cause of the hygroma?

MR. BHURTEL: Yes.

THE COURT: Show me that.

MR. BHURTEL: This, Your Honor.

THE COURT: For the record, Counsel is referring to a letter addressed to his law firm dated February 19, 2015 and what portion of the report. Are you directing my attention to? It is two single-spaced pages, sir.

MR. BHURTEL: For the record, the page 833 to 834.

THE COURT: You're looking at the first line of the third paragraph, I take it?

MR. BHURTEL: Your Honor, we can go to the second page.

THE COURT: Yes, I am there.

MR. BHURTEL: Third paragraph, yes.

THE COURT: Why isn't that adequate to sustain counsel's --

MR. O'HARA: Where is the evidence that is before this jury that there was a, quote, direct impact traumatic events? There is none.

THE COURT: Right. I understand that the evidence may be inconsistent with the doctor's attribution of what could have caused it, but I don't think it is a reason to keep it out of evidence. It is a reason to argue that it is

irrelevant.

MR. O'HARA: I would respectfully suggest that there was no actual record on which this doctor's opinion can be based upon. There are no facts to suggest that a direct traumatic event occurred. Quite the contrary, the only evidence is that it was not direct.

THE COURT: I am going to overrule your objection because that opinion was disclosed and you can argue about whether it is relevant or not.

MR. O'HARA: Thank you.

THE COURT: The objection is overruled.

(Continued on following page.)

(Continuing)

THE COURT: The objection is overruled, you may press your question, Mr. Bhurtel.

MR. BHURTEL: Thank you, Your Honor.

EXAMINATION CONTINUING

BY MR. BHURTEL:

Q Doctor, within a reasonable degree of medical certainty do you have an opinion about Mostafa Ahsan's left frontal subdural hygroma, how it's caused?

A Most of the time it's caused by some type of traumatic event. Like I mentioned, the most common cause that I've seen has been where there's been a subdural hemorrhage or there was blood there and it resolved over time and now you have this fluid collection.

But like I mentioned, the other alternative is there is a tear or what they call like a rent or a tear in the dura, the meninges and there is a leak of cerebral spinal fluid that's accumulated in this area. And the main concern is that should it get bigger because if it gets bigger, then it's a problem.

Q And, Doctor, did you perform another diagnostic test for Mostafa Ahsan's brain?

A We did a follow-up MRI, I believe, in May 23rd, May 23rd, 2015 that was the MRI of the brain with the DTI.

Q And do you have that report with you?

A Yes, I do.

Q What kind of test you did May 23rd, 2015 to Mostafa Ahsan?

A We did the MRI of the brain with the DTI on that date. And --

Q And who referred you to do MRI with the DTI?

A Dr. Krishna.

Q And can you explain to the jury what was the reason this MRI with the DTI was done?

A It was done mainly as a follow-up study, and I don't believe that we were using DTI in 2014. Like I mentioned, we've only been doing it for like the past couple of years, so at that time we had DTIN and so we did an MRI of the brain. We used DTI software and sequences for that study.

THE COURT: Just so that I and the jury can understand, is the procedure that the patient is put through for an MRI and an MRI with DTI the same?

THE WITNESS: It's the same. It's, basically, just an additional sequence or number of sequences for the DTI.

THE COURT: So you take more pictures, but you take them with the same machine?

THE WITNESS: The same machine, basically, does certain types of -- it uses different software and a program to, basically, perform the diffusion tensor imaging.

THE COURT: From the patient's point of view it

feels the same, except it might take longer?

THE WITNESS: Yes, just a couple minutes longer.

THE COURT: Please go ahead.

MR. BHURTEL: Thank you, Your Honor.

THE COURT: Thank you.

BY MR. BHURTEL:

Q What is the purpose of the DTI, the MRI with the DTI with respect to Mostafa Ahsan?

A Well, in this case we've been doing DTI for patients with brain tumors and patients with some strokes and patients with trauma. Basically, this allows us to look at the white matter pathways and see if there is any type of abnormality present. And then that abnormality may or may not be present on the imaging, on the studies that Dr. Krishna performed, I don't know. Like he may have done EEG and done some other studies. So he wanted to do it to see if there way any abnormality or issue with the white matter tracts in the brain.

Q And what was your finding on May 23rd, 2015's MRI with the DTI?

A On the DTI there was a little bit of a decrease with a lower signal intensity or density of the white matter pathways at the left frontal lobe region on the DTI images.

THE COURT: Lower than what?

THE WITNESS: Lower than when you compared it to the opposite site.

THE COURT: So the left side and the right side?

THE WITNESS: Yes. So what we look like to do is when we have the picture, the image, we always look at the symmetry because most people are, just about 99 percent of people are the same on one side as on the other side. So we look at the white matter pathways and we look at the signal, the brightness, because we have a color map and we also have some black-and-white maps and, basically, we look at the color map to see if there is any discrepancy or difference between the left area, left frontal area, and the right frontal area.

And in this patient there was a little bit of a decrease in the left frontal white matter. The only thing is that there is -- there is an issue because if you have a subdural collection, this collection that pushes the brain away, obviously you would also have some decrease in the white matter because it is -- if it's pushing the brain away from the skull, it's not going to also look so bright. So that's the compounding issue.

THE COURT: So I just want to make sure I understand what you are saying and, hopefully, my question can help the jury make sure they are understanding what you are saying.

Are you saying that the DTI reveals a signal color or level of brightness --

THE WITNESS: Correct.

THE COURT: -- that is correlated with the

functioning of the brain?

THE WITNESS: Right.

THE COURT: That is what scientists in your field believe?

THE WITNESS: Right, correct.

THE COURT: And that on the left side of Mr. Ahsan's brain --

THE WITNESS: The left frontal.

THE COURT: -- the left frontal side, which is I guess what it sounds like, the front part of the brain --

THE WITNESS: The front part.

THE COURT: -- on his left side, the brightness of the signal was somewhat lower so it indicated some impairment to you?

THE WITNESS: Some impairment, correct.

THE COURT: But one of the things that you are also saying is that the hygroma or collection of fluid that you had already observed in 2014 could have pushed the brain's shape or put pressure on the brain in such a way that maybe that was causing the diminished signal?

THE WITNESS: It's contributing to it.

THE COURT: And does that affect the likelihood that the diminished signal is or is not symptomatic?

THE WITNESS: It doesn't really -- it does and it doesn't. The issue is it's hard to tell because, obviously,

if you want to look at the white matter, it has to be in a certain area to look symmetric.

So if the brain is pushed away by the hygroma, it's gonna look less intense. So the thing is, it's like what came first, the chicken or the egg, you know. It's hard to tell. You know, if the patient had a traumatic event, is the -- did the patient have, you know, the DTI abnormality first and then a subdural hemorrhage or hygroma or did the patient have the subdural hygroma with the hemorrhage and then that pushed, you know, the brain away. And it's hard in some ways to tell the contributory effect from the DTI abnormality to the patient itself, to the patient's function.

I guess the only way that you would be able to really tell would be to drain the subdural hygroma and probably do a repeat study after the patient healed and see if the symmetry came back.

THE COURT: Thank you.

BY MR. BHURTEL:

Q And did you have any other findings on May 23rd, 2015's MRI of the brain?

A I believe that there was -- again, the subdural hygroma, which at that time when I did the measurements it measured slightly smaller. But it's pretty much, I would call it pretty much the same. Before it was 6.3 centimeters by 0.6 by 3.1; and on this one it was 6.3, but instead of 0.6, it was

0.5, by -- instead of 3.1 -- 3.0. So it was a little bit of -- it was a little bit of discrepancy, but that's within, you know, the margins of error. It just could be the way it was measured. It's pretty close.

Q And did you have any other findings on your May 23rd, 2016 report?

A No.

THE COURT: No, I think you meant 2015, Mr. Bhurtel?

MR. BHURTEL: Yes, Your Honor, 2015.

THE COURT: Could you ask the question again because I lost it in making sure we had the right date together?

BY MR. BHURTEL:

Q Did you have any other findings on May 23rd, 2015's brain MRI?

A I had the same findings that were pretty much the same and unchanged from the previous one, the rest of the findings. There was no DTI that was performed on the 2014 -- 2014 study. So there was nothing really to compare.

Q Can you explain to the jury about your report dated May 23rd, 2015, you said mild decrease in the white matter pathway density is noted at the level of the left frontal lobe region on the diffusion tensor images?

MR. O'HARA: Objection.

A Well, that was --

MR. O'HARA: Judge, may I ask that he identify for

the record what he's reading from, the page?

MR. BHURTEL: Exhibit 54.5.

MR. O'HARA: The Bates stamp number.

MR. BHURTEL: Page 2076 through 2078. I am reading page 2077.

MR. O'HARA: Thank you.

BY MR. BHURTEL:

Q Do you remember the question, Doctor?

A Yeah, basically, it was --

THE COURT: Could you repeat the finding in your report that you are explaining because I think maybe we all lost track of it while we had that exchange?

A There was a reference to the mild decrease in the white matter pathway density at the level of the left frontal lobe region on the diffusion tensor images.

Again, from the May 23rd, 2015 report, which basically had explained as far as, you know, that there was -- it could be, you know, from the trauma, itself; it could be, you know, from the displacement from the subdural hygroma; it could be a combination of the two. It is a little bit difficult to sort of tweeze out which is which. And like I mentioned, it may be that the only way that we could tell would be to drain it, if the patient would want that, and then repeat the study. But then if you drain it, you may also have some scar tissue that could affect it too and could affect

those findings.

So, again, this is a tool that's used, basically, in conjunction with the other diagnostic tests that the doctor has available to his disposal, to his use as far as determining what's wrong with the patient.

Q Do you have films with you on the 9/16/2014's brain MRI?

A That was the -- yeah, that was the pre and post contrast study.

THE COURT: Pre and post?

A Pre and post intravenous gadolinium study.

Q Can you explain what is that?

A That's, basically, a study that's done to see if there is any abnormal conic enhancement or anything that lights up. It could be a tumor. It could be a stroke. It could be meninges, you know, coverings of the brain. It could be, you know -- so, basically, again, look at if there is anything abnormal that enhances or if we look at one side to the other and see if there is any discrepancy.

(Pause.)

MR. BHURTEL: Your Honor, for purposes of identification I would like to mark just this Omega Diagnostic Imaging dated 9/16/2014, time 16:00:14.

THE COURT: Do you have an exhibit number for that, sir?

MR. BHURTEL: I believe it's going to be -- it is on

the joint exhibit, it is Trial Exhibit 110.

THE COURT: Okay, Exhibit 110.

MR. O'HARA: Judge, Exhibit 110 in the pretrial order is the blow-up. The actual medical record is in the passage that I cited before which is, 2066 through 2078.

THE COURT: Thank you.

MR. O'HARA: It's identified as part of the pretrial as 54.1.

THE COURT: Thank you.

You may proceed, Mr. Bhurtel.

MR. BHURTEL: Thank you, Your Honor.

We may have to mark, Your Honor, additionally A, B, C, D or in some way because it's 110 is going to be the 110 blow-up for the brain, so I have a multiple blow-up.

THE COURT: Okay. However you want to mark it you can mark it and we will move forward from there. If you want to call the first one 110-A --

MR. BHURTEL: Yes.

THE COURT: fine with me.

As I explained to you, Mr. Bhurtel, you mark your own exhibits. That's fine, you can write it on the back.

MR. O'HARA: Judge, may we have a five-minute break?

I think he is going to have more than this. There is a whole series of these.

THE COURT: Is that right?

MR. BHURTEL: Yes, Your Honor.

THE COURT: All right, we will take a five-minute recess, ladies and gentlemen.

(Jury exits.)

THE COURT: Now that the jury is absent, Mr. Bhurtel, I am really a little frustrated because I am sure we discussed the importance of pre-marking the exhibits before the jury comes in in the morning.

MR. BHURTEL: I'm sorry.

THE COURT: And we had extra time this morning because we did not have a witness available when the jury was ready. So the notion to take a break so that you can mark the exhibits is frustrating, as I am sure you can imagine.

I will see you in five minutes. Do not let it happen again, please. The idea is to mark them before the Court day starts so that they are marked when we get here. Okay?

MR. BHURTEL: Yes, Your Honor.

THE COURT: Is that hard?

MR. BHURTEL: No, Your Honor, I apologize.

THE COURT: Okay.

(Recess taken.)

(Continued on the following page.)

(In open court.)

(The following occurs outside the presence of the jury.)

(Judge STEVEN M. GOLD enters the courtroom.)

MR. O'HARA: Judge, I would ask that the witness step out, I have to make an application and I don't want it done in the presence of the witness.

THE COURT: Yes. Please step out. Thank you.

(Witness exits courtroom.)

THE COURT: Yes, sir?

MR. O'HARA: So, as part of the blow-up exhibits -- and Mr. Bhurtel and I have spoken about this -- these were E-mailed to the Defense last Thursday evening. There are two that Mr. Bhurtel has identified as 110-G and 110-F. If I display them to the Court, what you will see is they are blow-ups of CT films where there are color enhancements that have been done.

I have asked on multiple occasions whether or not these are enhancements that were done to the medical record or whether this is the original medical record because in my experience this is not a medical record. This is a medical illustration that is affected. And I've asked; he's not in a position to answer the question even now with the witness on the stand.

So, I am going to object since he's proposed these

as being blow-ups of the records, which I understand he's going to put the CD into evidence, I just don't want there to be any confusion.

THE COURT: Let's get the witness in the room and ask him under oath.

MR. O'HARA: Well...

THE COURT: Let's voir dire him. I do not mean in front of the jury, I mean before we bring the jury out.

MR. O'HARA: Fair.

THE COURT: Okay?

MR. O'HARA: Thank you, Your Honor.

THE COURT: Would you please get Dr. Parnes.

MR. BHURTEL: Yes, Your Honor.

(Witness enters and resumes stand.)

THE COURT: Would you please resume the witness stand, Doctor.

Mr. Bhurtel, do you have the two Exhibits Mr. O'Hara was referencing.

MR. BHURTEL: Yes, Your Honor.

THE COURT: They are marked as what?

MR. BHURTEL: 110-G and F.

THE COURT: Dr. Parnes, please take a look at 110-G and F that Mr. Bhurtel is showing you right now. I remind you, you are still under oath.

We have some question about whether these are the

kinds of diagnostic images you see in your regular medical practice or whether they have been enhanced in any way for illustrative purposes for the case.

THE WITNESS: They have not been enhanced, but they've been enlarged.

THE COURT: Well, I understand that they are larger, that is not what we are asking about.

When you do diagnosis --

THE WITNESS: Yes.

THE COURT: -- and radiographic studies --

THE WITNESS: Right.

THE COURT: -- for a case that is not in litigation but just in connection with helping a doctor diagnose a patient's brain challenges or difficulties, do you see images that look like this in terms of how bright they are, in terms of the way the colors are illustrated or has the coloring been enhanced for demonstrative purposes to a fact-finder in court?

THE WITNESS: It has not been enhanced. But the resolution is a little less than it would be on a monitor. On a computer monitor.

THE COURT: So, in other words, you would be looking at a computer screen.

THE WITNESS: Right.

THE COURT: You would be seeing an image just like this one, except even sharper.

THE WITNESS: Sharper, yes.

THE COURT: No duller, no more ambiguous.

THE WITNESS: No, it would be sharper as far as the image itself.

THE COURT: All right.

THE WITNESS: I think there is some degradation of the image quality.

THE COURT: By the blow-up.

THE WITNESS: Yes.

THE COURT: Thank you.

MR. O'HARA: Thank you.

THE COURT: Are we ready for the jury?

MR. O'HARA: Yes, Your Honor.

MR. BHURTEL: Yes, Your Honor.

THE COURT: Mr. Bhurtel, I feel obliged to say two things.

One is, I hope you understand that unless you move something in evidence, merely referring to page numbers is not moving anything into evidence.

MR. BHURTEL: Yes, Your Honor.

THE COURT: The other thing I want to say is, you seem to me to be a very nice man and I do not mean my sternness towards you to suggest otherwise. My frustration is that the jury's time is of paramount importance and when it is not used efficiently, I do get a little frustrated.

So, I am urging you to please anticipate as much as you possibly can and be prepared to present your case without interruption for purposes like these to the jury.

MR. BHURTEL: Yes.

THE COURT: May we have the jury back, please.

MR. O'HARA: Judge, when the witness is testifying about the poster board, is it okay if I stand so I can see it?

THE COURT: Absolutely. Obviously, you will not communicate anything with facial expression or otherwise to the jury.

(Pause in the proceedings.)

(Jury enters.)

THE COURT: Thank you for your patience, everybody. I think we are almost ready to proceed.

Mr. Bhurtel, you may inquire.

MR. BHURTEL: Thank you, Your Honor.

Before that, Your Honor, I would like plaintiff would like to offer the evidence 54.3?

THE COURT: Which Bates Number is that, please?

MR. BHURTEL: 2070 to 2072. This is MRI of the brain dated 9/16/2014.

THE COURT: Is there any objection?

MR. O'HARA: Provided it is the medical record, no objection.

THE COURT: It is received subject to Counsel's

confirming his understanding.

(Plaintiff's Exhibit 54.3 received in evidence.)

THE COURT: Please, proceed.

MR. BHURTEL: And, Your Honor, the plaintiff also offers Document 54.5 Exhibit, page number 2076 through 2078.

THE COURT: Is that the May 23rd, 2015, report?

MR. BHURTEL: Yes, Your Honor.

THE COURT: Is there any objection, assuming that it is accurately described?

MR. O'HARA: No objection, Your Honor.

THE COURT: It is received.

(Plaintiff's Exhibit 54 .5 received in evidence.)

THE COURT: Your question, Mr. Bhurtel?

MR. BHURTEL: Yes, Your Honor.

Plaintiff also offers Exhibit 54.1, which is CD films of the 6/19/14, 9/22/14 and 5/23/2015 diagnostic imaging films.

THE COURT: Is there any objection?

MR. O'HARA: Provided the witness ties in the films that he has not testified to, I will have no objection. But this is a multi-study CD.

THE COURT: Understood.

So, subject to further foundation.

(Plaintiff's Exhibit 54.1 received in evidence.)

THE COURT: They are admitted subject to your tying

them in, all right? So, let's get to it.

MR. BHURTEL: Now, plaintiff is showing Exhibit 110-A to the expert witness.

THE COURT: 110-A, okay.

(Exhibit published to jury.)

THE COURT: Do you want to step down?

THE WITNESS: Yes.

THE COURT: Sure.

Maybe you want to twist the podium just a little bit so the jury can see it better, Mr. Bhurtel. There you go.

THE WITNESS: So, this is an MRI.

THE COURT: There is no question yet. I am sorry, the lawyer has to ask you a question.

What is your question, Mr. Bhurtel?

DIRECT EXAMINATION

BY MR. BHURTEL: (Continuing)

Q Dr. Parnes, can you describe what is this, the plaintiff's Exhibit 110-A?

A So, this is a single slice or single image from the MRI of the brain that we did on 9/16/14. It's like the patient's laying down in the machine, we're slicing him like a salami, like this, axially. It is one of the sequences that we do.

The image has a little bit of blurriness just because it's a blow-up image and I can see that, I don't know if you can see that, but this is with the contrast. And we

can see over here, there's a little bit of enhancement of the meninges; this is the right side; this is the left side. So, if you are looking up at the patient from the feet up, this would be the right side, this is the left side.

And you can see that this is the frontal lobes, part of the frontal lobes and what we call the sylvian fissure on either side, see how symmetric it is, and the temporal occipital lobes and these are normal structures enhanced. There is a little bit of enhancement of these meninges over here on the left side adjacent to the left temporal lobe. A little bit more than normal. So, and that was the purpose of that.

That's basically part of the -- it appears to be part of the hygroma or collection that we're going to be seeing on the images higher up.

Q Does this picture show true and accurate representation of the MRI films?

A Yes, this is the MRI image from our study.

Q And did you see the hygroma there?

A We don't really see -- we see part of it. You can see there's a little bit of a space here, but it's not really seen until you get higher up.

MR. BHURTEL: Your Honor, plaintiffs offer...

THE COURT: I take it all these images were reviewed with Counsel before the jury was brought out in the room.

Your representation is that each and every one that you will be showing Dr. Parnes comes from his various radiographic studies; is that correct?

MR. BHURTEL: Yes, Your Honor.

THE COURT: On that ground, they are all admitted in evidence.

Mr. O'Hara, is there any objection you wish to preserve?

MR. O'HARA: No, sir.

(Plaintiff's Exhibits 110 received in evidence.)

THE COURT: So, you can leave out your technical foundation questions and just focus on the merits, Mr. Bhurtel.

MR. BHURTEL: Dr. Parnes, Plaintiff's Exhibit 110-B.

(Exhibit published to jury.)

Q Can you describe what is this one?

A Well, this is also an axial image. Again, it's higher up. This part of the hygroma that's here, but I think it's too high. We are missing one slice or two slices in between.

I don't know if you have that image. Because it doesn't really project here very well.

THE COURT: Dr. Parnes, when you say higher up, you mean closer to the top of the head?

THE WITNESS: Closer to the top of the head, yeah.

A So, if you, I mean it doesn't really project it well.

There's a little bit of meningeal enhancement, but comparing to the other side, it's within normal limits.

THE WITNESS: Do you have the other image that I can take a look at?

MR. BHURTEL: Yes.

THE WITNESS: This one doesn't show that well.

MR. BHURTEL: You want to take a look at these?

THE COURT: Which one is the Doctor looking at now?

MR. BHURTEL: 110-C.

THE COURT: C as in cowboy?

MR. BHURTEL: Yes.

A So, this is the axial, the same slice but without the contrast, before we gave the contrast. And there is a collection that you can see part of over here. The gray matter should come all the way out to the periphery, all the way out to the edge like it does here. But you can see it's sort of like pushed away from here by this collection. And this collection, you're only seeing in two dimensions. This collection also extends into the scan itself. So, there's a vertical, there's a horizontal, you know, there's a lengthwise and a width-wise orientation to this collection. So, there's no shift of the mid-line. There's just mass effect on the left frontal lobe.

Let me just see the other.

Q What do you see on the left frontal lobe there?

A This is just part of the collection, again.

THE COURT: The collection of fluid that you've described as a hygroma.

THE WITNESS: As a subdural hygroma, yes.

A This is not the, this is what we call a T-1 weighted image where the spinal fluid is black and you can see the gray matter sort of like, darker and the white matter is sort of whitish or like, opaque gray. This is mainly used for anatomy.

In other words, you can see the anatomy of the brain. But the pathology, the disease itself, we use what's called a T-2 for where the spinal fluid gets bright and then we can identify what's pathology; what's abnormal compared to what's normal. So, we'll take a look and we'll see that, all right?

MR. BHURTEL: Now, Plaintiff's Exhibit 110-D.

(Exhibit published to jury.)

A This is part of the scan, this is part of what we call part of the diffusion weighted images sequence. It's just an image that actually showed part of the collection really nicely on the left frontal lobe pushing the brain away. And you can see it here as compared to what you're supposed to see. And you can see again, the gray matter and the white matter sort of right below the gray matter and the gray matter of the cortex of the frontal lobe being pushed away from the

skull.

MR. O'HARA: Judge, can we ask the witness to clarify whether this is a study from September 2014 or the May 2015?

THE WITNESS: It's from 9/16/14.

MR. O'HARA: Okay, thank you.

Q And Doctor, can you explain the difference between left and right side?

A This is the right side, this is the left side.

Q Okay.

A So, and it basically just shows part of the collection.

Q So, that is the, that part of the collection, what do you call -- that is the one you call?

A The left frontal subdural hygroma. Let me show the T-2, because that shows it better.

THE COURT: Mr. Bhurtel, do you want the Doctor to pick the photo that he would like to show?

MR. BHURTEL: Yes.

(Exhibit published to jury.)

THE WITNESS: This is the T-2.

MR. BHURTEL: Hold on, Doctor.

This is Plaintiff's Exhibit 110-E.

THE COURT: E as in everything.

MR. BHURTEL: Everything, yes.

Q And Doctor, can you explain about this MRI films?

A So, this is the axial, the same slice what we call T-2, from 9/16/14. And we can see this is the right and this is the left. You can see the frontal hygroma pushing away the brain from the skull. You can see the mass effect pushing it away.

As compared to this side, the reason why this is a little bit of space here, is he has a little bit of atrophy.

Q When you say this side?

A On the right side and the left side he's got a little bit of atrophy. That's what happens when you get older, so. See he's got some atrophy and you know it's not really that, you know, abnormal. It's just there and we just describe it as mild atrophy. And he's got this collection over here.

The thing with this collection is it extends this way, this way and then going into the plane of the scan. So then, that's a little worrisome, is the mass effect on the left frontal lobe because obviously, if at some point this gets bigger or if there's a rebleed or -- I would advise him not to play volleyball, you know, he could have a problem. So, if this shifted to this side, you can die. So, that's the problem.

And don't forget, this, the brain is occupied, it's contained in the skull in the calvarium, the skull itself. So, the problem is there's only a certain amount of space there.

Q And could you describe what was the condition in your report in that left side?
A As far as, what do you mean condition?
Q The subdural hygroma.
A The subdural hygroma, yeah.
Q This is what you are saying is subdural hygroma?
A Yes. Right, mm-hmm.

The thing is, I can only show you in two dimensions. I can't show you the third dimension. So, that's, you know, one of the things it would be nice to show, would be a 3-D image to see the extent of it. Because that would give neurosurgeons more information.
Q Doctor, you said that if that hygroma moves right and then he -- what happens? You said something.
A If it moves, if it gets bigger --

MR. O'HARA: Judge, objection. We're now going well beyond anything that is in his report.

THE COURT: Sustained.

If you want to show me something in the report, if you want to come to side-bar and show me that this is in the report, I will reconsider.

(Side-bar conference held on the record out of the hearing of the jury.)

(Side-bar.)

MR. BHURTEL: Your Honor, this is: "The hygroma may become larger, may resolve or may require neurosurgical intervention. These patients require evaluation and monitoring."

THE COURT: Okay, that is a little different than saying he might die from it.

MR. O'HARA: That's right.

THE COURT: So, what I am going to let you do is lead the witness by saying did you issue a report that says. Then you can read from the report and then you can ask him to explain how he reached the finding. But what he is reporting now does go beyond the four corners of this document.

So, I will sustain the objection with the ability to bring out what is in the report in the manner I have suggested, okay?

MR. BHURTEL: Okay.

THE COURT: Thank you.

(Side-bar end.)

(In open court.)

BY MR. BHURTEL:

MR. BHURTEL: Jury trial page number 833 through 834. That is February 19th, 2015, Dr. Parnes's report.

Q Doctor, did you prepare your report?

A Yes.

Q And what is the date? Is February 19th, 2015 the date of the report you prepared?

A Yes.

MR. BHURTEL: This is Plaintiff's Joint Trial Exhibit 14.

THE COURT: Okay.

Q Did you describe in your report, Doctor, what were the condition of this hygroma, subdural hygroma?

A Yes, I had mentioned in the report that one of the concerns was that if it had gotten larger, you know, it may stay the same, it may get larger, it may get smaller. If it does get larger it may require neurosurgical intervention.

One of the things that's important is that the patient should be aware of the condition. You want the patient to know that he has this just in case, you know, there's an issue. So, that's what I had mentioned in the report.

Q And did you have your medical opinion within the reasonable degree of medical certainty that this subdural hygroma was caused by?

A It would appear to be trauma. Trauma-related.

Q Can you explain to the jury when you say it is trauma-related?

A Many of these subdural collections are trauma-related and relative to when this patient had trauma until now, this may

have been blood that may have resolved to a hygroma or it may have been a hygroma to begin with. It is not bilateral, it's unilateral, which is a little worrisome.

THE COURT: You mean it is on one side, not both.

THE WITNESS: Yes it's on one side only.

A And so that's a little bit, you know, that's the concern.

MR. BHURTEL: This is Plaintiff's Exhibit 110-I.

(Exhibit published to jury.)

Q Doctor, can you explain what is this Exhibit is 110-A?

A This is the coronal. This is the cut if the patient is laying down, we're cutting this way, like from the head to the feet. It's a coronal image through the brain, through the frontal lobes. It's a T-2 weighted image again, to show the pathology, the abnormality. And this is the right side and this is the left side.

And here on the left side, we can see this collection. And here you actually see the denting of the brain. So, on the other images you saw it being pushed away, but here it's not only being pushed away, it's also being compressed by this collection. And so it goes from here to like, about here.

And you don't see it on the opposite side. He just has a component of atrophy.

MR. BHURTEL: Now, I am showing the witness Plaintiff's Exhibit 110-J.

(Exhibit published to jury.)

Q Doctor, can you explain what we can see or what we are seeing in this image 110-J?

A All right, so this is again an axial image through the brain, through the frontal lobes over here and this is what we call a dark fluid pulse sequence. This is very good for looking for white matter lesions, like I mentioned before, white matter ischemic changes. So, you can see these little dots here. These are the white matter ischemic changes in the white matter that could be caused from a number of causes. It could be, you know, it could actually be trauma, it could be small vessel disease, it could be migraine headaches, high blood pressure. In a younger person, like a woman, it could be Multiple Sclerosis. So, these are the lesions that we look for.

And again, this is the ventricles and the gray matter. You can see it really nicely and the white matter just up beneath it. And on the left side you see part of the hygroma there. You see that instead of having the gray matter go all the way out, the gray matter and the white matter are being pushed away by this collection at the left frontal lobes.

(Continued on following page.)

MR. BHURTEL: I am showing the witness again one more time 110-I, Plaintiff's exhibit, and that is the May 23, 2015 date of examination.

A This is the coronal image, the T2 image of the brain. Again, we see that same collection on the left side pushing the brain away. You can actually see some artifact because he probably moved or swallowed.

It looks pretty much the same as it did on the prior study. It didn't change.

Q Doctor, when you say T2 image, can you explain that?

A Well, this is the T2 image, so the spinal fluid is white, and it shows the pathology. And, again, you can see the collection fairly well again and I don't see anything in the white matter at this level.

Q And did you see subdural hygroma?

A That's the subdural hygroma on the left side, right here (indicating). This gives you the vertical extent of it. It didn't really change much between 2014 and 2015.

Q I am going to show you again 110-J. This is the image of May 23, 2015, Mostafa Ashan's brain image.

A Right. On this one, this is the dark fluid pulse sequence. It shows the white matter disease that we showed before and again this collection, the left frontal subdural hygroma.

Q And 110-C, this is 9/16/2014?

A We did that already.
Q Yes. I just want to ask you, Doctor, you saw the subdural hygroma in this picture as well; right?
A Yes.
Q Okay. Since you took the -- this MRI, 9/16/2014 and accident happened on September 2, 2011, can you explain what is the, you know, subdural hygroma, the situation?

MR. O'HARA: Object to the form of the question.

THE COURT: I'm not sure I understand what you mean.

MR. BHURTEL: I will withdraw the question, Your Honor.

Q Can you explain to the jury -- so, at the time of the accident which happened September 2, 2011, this MRI was taken September 2014. So if it was taken at the beginning, it could have been different or now it could have been the same thing?

MR. O'HARA: Objection.

Objection.

THE COURT: Say that part again. If this. . . ?

Q If this MRI was taken near to time of the accident, if this was -- if this picture would have saw different or it going to be same? Just trying to make clarification.

THE COURT: Well, I will sustain the objection.

Doctor, would you expect, based upon your experience, the way the hygroma looks to change over time absent another intervening event?

THE WITNESS: I'm not sure I understand.

THE COURT: You testified that you believed the hygroma may be trauma induced; right?

THE WITNESS: Yes. Uh-hum.

THE COURT: If the hygroma was trauma induced in one year, would it look the same in MRI studies conducted one year post event, two-year post event, three-year post event, or does it change over time?

THE WITNESS: Well, it may have started out as a bleed. It may have been a hemorrhage and now it has resolved to hygroma, which is spinal fluid. So I don't know without having some type of scan in that intervening time interval. There may have been blood products that would be residual. I don't see any on here. I just see the collection.

THE COURT: And there is no way to tell -- well, if we cut ourselves and have a scar, a doctor might be able to tell by looking at the scar whether it is fresh or old.

THE WITNESS: Yes.

THE COURT: Is there any way to tell by looking at a hygroma on an MRI whether the trauma that may have induced it was recent or long past?

THE WITNESS: I think it would be very difficult to tell.

MR. O'HARA: Based on that, I am going to move to strike this entire line of questioning, he has used may on

multiple occasions and that is not the standard.

THE COURT: Overruled.

Q Now, Plaintiff's Exhibit 110-F, for Frank, this is image of May 23, 2015.

A Yes.

Q Doctor, can you explain what this is?

A This is one slice image from the DTI image and this is the color fluid map that will show, again, all the white matter pathways coursing through the brain and it basically shows us molecular motion, molecular motion inside the white matter that's occurring, and we want to compare one side to the other to make sure it's symmetric. I just need to see the -- do you have the T2? I need to see the T2 image.

Q Which one? You can pick.

A So what you want to do is -- first of all, you want to compare them because sometimes if you have like -- if you have gray matter that comes in, you can get this type of appearance. So this is approximately the same level. The thing is that there is this little darker area here and some suggestion of darker area here, but mainly over here. I don't see any gray matter coming in.

This was a little worrisome that there was some decreased concentration of the white matter at this location (indicating), which would correspond to about this area (indicating). And that would be a little -- just deep to the

subdural hygroma.

But, again, like I mentioned before, the subdural hygroma by pushing the brain away, since we don't have the white matter going all the way out, it may also decrease the signal, so I also take that into account too just to make sure that giving an accurate interpretation.

THE COURT: So is what you're saying is that the lack of illumination, if you will, in the frontal left lobe in the DTI image that Mr. Bhurtel is holding, on the one hand it might reflect some injury or damage and, therefore, it is not lighting up? On the other hand, it might reflect the absolute lack of presence of any white matter because of the hygroma pressing it out of the way?

THE WITNESS: Correct. Correct.

To be fair, I'd like to say it probably may be a combination of the two. I think it is a little difficult to tell, you know, how much of this is contributed to by the subdural hygroma. That's just external to this. So, you know, it is there. You know, it is a little concerning, and it was mentioned in the report. That's pretty much, you know....

And when I teach the residents, I always like to compare this to -- do you ever see these lamps? They have like a lamp and it has fiberoptic strands coming out and the light is lit all the way at the end, so you got like, you

know, 1,000 of these strands coming out that's lit. So that would be the -- the normal brain would be those little lights lighting up where the gray matter is and you can see the light going to the middle to the brain stem. But if you hit it, if you damage it, several of those lights may go out, right, and they may just project light maybe part of the way along several of those tubes, those fiberoptic cables instead of completely. That's what I like to use as an analogy as far as the DTI.

Q Now, I am going to show you Plaintiff's Exhibit 110-G, for girl. Doctor, can you explain what this picture is?

A This is a DTI color flow map, a little bit higher. It doesn't really show it as well as the other one, but there is a little bit of decrease in the signal on the left side over here (indicating). I mean, you know, this looks gray. Usually you don't see it as gray, so I don't know how accurate it is relative to the original. It is not as clear. It's a little blurry, because when you look at it on the computer, it is a lot sharper.

If you compare this white matter compared to this (indicating), this is less, what we call arborization, or less, you know, coming out compared to this one. So, you know, that would be a little concerning as far as the effect of the subdural hygroma.

MR. BHURTEL: Your Honor, I have another image from

another facility that I can do here or I can have the witness sit and then I can come back here for the illustrative evidence.

THE COURT: Bring it up. Let's go.

MR. BHURTEL: Again, joint pages, the report February 19, 2015, pages 833 through 834. That's the report.

Q Doctor, did you review MRI films of Mostafa Ashan's brain that was done in Apollo Imaging Diagnostic Radiology?

A Yes.

Q Did you prepare the report based on that study you conducted?

A Yes.

Q And what is your findings of the Apollo Imaging Diagnostic radiologist's report?

A At that time he also had a left frontal subdural hygroma that was essentially pretty much the same size as it was on the ones that we did.

THE COURT: Doctor, could you give us a date of that study again?

THE WITNESS: That date was performed on 2/4/14.

THE COURT: So it was before your first brain MRI?

THE WITNESS: Yes.

Q And, Doctor, do you have a CD or films with you that Apollo Imaging that the brain MRI was conducted?

A I have I believe one or two CD's. I don't know exactly

what they are.

MR. BHURTEL: Your Honor, this is Exhibit 39-1.

THE COURT: What do you represent 39-1 to be?

MR. BHURTEL: Apollo Imaging Radiology.

THE COURT: And you are offering it in evidence?

MR. BHURTEL: Yes, your Honor.

THE COURT: Is there any objection?

MR. O'HARA: Subject to the same prior reservation of the witness tying in other things on this CD besides the 2014 brain film, no objection.

MR. BHURTEL: I am offering, Your Honor, only for the brain MRI.

THE COURT: Only for the brain MRI portion.

MR. O'HARA: Okay.

THE COURT: All right. So you are going to have to figure out how we present that later in the case.

MR. BHURTEL: Okay.

THE COURT: But right now you only refer to the brain MRI portions of the CD.

MR. BHURTEL: Okay.

THE COURT: Please go ahead.

MR. BHURTEL: Thank you, Your Honor.

This is Plaintiff's Exhibit 110-H, for house.

THE COURT: 110-H?

MR. BHURTEL: Yes.

Q And Doctor, can you explain to the jury what this picture is?

A So this was an MRI axial slice T2 image because the spinal fluid is white. It was performed on 2/4/14 at Apollo Imaging, and you can see the subdural collection here on the left frontal area pushing on the adjacent brain.

On the opposite side, the cortical tissue comes all the way out. Here it is being pressed by this collection (indicating) and here's it's not. So it is being pushed in this area over here (indicating), and pretty much -- I think it measures pretty much around same size.

Q This is also subdural hygroma?

A Subdural hygroma, yeah.

Q And do you have your medical opinion what caused that subdural hygroma?

A Well, I would be concerned about trauma and this could have been a bleed before that resolved and now is a hygroma spinal fluid, CSF cerebral spinal fluid, or it could have been a posttraumatic hygroma.

Q So now Plaintiff's Exhibit 110-L. Doctor, can you look at it and explain what Exhibit 110-L is?

A This appears to be a little higher up on the same sequence. Again, we can see -- this is the right side, the left side, the T2 image, you can see the left frontal subdural hygroma pressing on the brain. On this side, there is a

little bit of cortical loss from atrophy, but it comes all of the way out to the periphery. These pegs of tissues. It comes out, but here it's being pushed away.

MR. O'HARA: For the record, can we identify the date of this film? Is that part of the February 4, 2014 study?

THE WITNESS: Yes.

MR. O'HARA: I believe so.

MR. BHURTEL: Yes.

MR. O'HARA: Thank you.

Q This is Plaintiff's Exhibit 110-K for King.

Doctor, can you explain what Plaintiff's Exhibit 110-K?

A Again, this is part of that same sequence. This is an axial image, T2 image because the spinal fluid is white. We can see the subdural hygroma at this level pushing the brain away from the calvaria, from the skull. Again, this is a little bit of atrophy.

Again, don't forget that the problem is, you know, that the skull -- the brain only has limited space to go anywhere. Actually, one of the things is that as patients get older and get more atrophy, you know, there is hopefully less of a risk of having an issue because there is more space. If you have less brain, then you have more room to move things around. But be that as it may, it is still something that

needs to be followed up, it needs to be monitored.

MR. BHURTEL: Your Honor, I offer this exhibit in evidence.

THE COURT: All of the images that you have shown the doctor. Any objection?

MR. O'HARA: No, Your Honor.

THE COURT: They are received. I think it is 110-A through L?

MR. BHURTEL: Yes.

THE COURT: Thank you.

(Plaintiff's Exhibit 110-A through 110-L were received in evidence.)

THE COURT: Are you finished showing him things on the easel?

MR. BHURTEL: Yes, on the brain part.

THE COURT: We still have other parts of the body to go?

MR. BHURTEL: Yes. The neck and the shoulder.

THE COURT: Your next witness I have seen is poking his head into the courtroom. If you want to have him excused for lunch, that is fine, or have your assistant do that.

MR. BHURTEL: Sidebar, Your Honor, please.

(Sidebar held outside the hearing of the jury.)

(Continued on the following page.)

(The following sidebar held outside of the hearing of the jury.)

MR. BHURTEL: I just see the wife.

THE COURT: No. What I am saying is I saw the other doctor, I think, through the door.

MR. O'HARA: What he is raising is the plaintiff's wife is in the courtroom. I haven't said anything because this isn't factual testimony. I don't have a problem with her sitting in here.

THE COURT: Thank you. If you want to send your assistant out, because I think the doctor is confused as to what to do, he could wait outside or have lunch. I am concerned about the time.

Obviously Mr. O'Hara has a right to cross-examine. I am not concerned about rushing you. I'm only concerned if the doctor is only available this afternoon and you don't get to him, you won't be able to have the other doctor in your case.

MR. BHURTEL: I have the whole day, up to five o'clock?

THE COURT: Well, but you have to give Mr. O'Hara time to cross-examine.

MR. O'HARA: I told you however long you go, that's how long I will go. This is going to be a long period.

THE COURT: You expected him to be done by noon.

(Sidebar concluded.)

MR. BHURTEL: Joint Trial Exhibit 112.

THE COURT: 112.

MR. BHURTEL: Yes, your Honor. These are blow-ups of neck MRI.

MR. O'HARA: Judge, no objection to either the usage or admissibility of 112-A through 112-E. They are all diagnostic films of the cervical spine, June 19th.

THE COURT: Thank you, Mr. O'Hara.

(Joint Trial Exhibits 112-A through 112-E were received in evidence.)

MR. BHURTEL: And Trial Exhibit 54, page number 2066 through 2078, I'm offering the cervical spine MRI films as evidence. That's the Exhibit 54.

MR. O'HARA: Right. Much like -- I have no objection to that CD, what's on there, provided the witness ties it in.

THE COURT: Then it is received.

(Joint Trial Exhibit 54 was received in evidence.)

MR. BHURTEL: Now I am showing the witness Plaintiff's Exhibit 112-A.

Q Doctor, can you explain what this is, Plaintiff's Exhibit 112-A?

A So this is an MRI of the cervical spine. Patient again is laying down in the machine and cutting like a salami. We

have the sagittal T2 because the spinal fluid is white, an axial T2 image of what looks like a component of fatty depression only because the fat is a little decreased.

Basically you want to look at the curvature. There is some straightening. The spinal cord looks pretty okay. Again, you have to sort of look at the images adjacent to each other to make sure everything is okay.

He's got some multilevel degenerative disc disease which is not unusual for his age. He's got posterior osteophytes.

MR. O'HARA: I'm sorry, I didn't hear what he said.

THE WITNESS: He has some posterior osteophytic changes.

MR. O'HARA: Thank you.

A He's got some mild to moderate narrowing. We start counting from here, two, three, four, five, six, seven, and C1 is over here (indicating). So he's got a little bit of narrowing of this canal, which is mild to moderate from C4/C5 to here, so this segment is narrow as opposed to this, which it is open and down here it is open (indicating.

And you also had a -- I don't know -- it is difficult to sort of look at one image, but this is through the C6 to 7 level. At C6/C7, this is again right and left, he had a central disc herniation and it was pushing on the thecal sac, you know, the meninges, the sac itself that contains the

cord, and it was also off toward the left.

So this is the right side, left side. Here is foramen, where the nerves come out. This side is narrow. You can see there is only like a little white coming out here. The left side was compressed at C6/C7, so that would give you left-sided arm pain, shoulder, arm.

Do you have the next one?

Q This is Plaintiff's Exhibit 112-B, B for boy, and this is an MRI of the cervical spine dated 6/19/2014.

Doctor, can you explain what this is, Plaintiff's Exhibit 112-B?

A So this is the sagittal. Again, we are cutting this way, T2. We can see the face would be here, the back of the head would be here, with the spinal cord. The spinal fluid is white. We can see, you know, he's got some degenerative changes, again, not unusual for his age. We took a cut through the C7/T1 level. This is the right and left. Here you can see the foramen open, but here it's compressed by this disc herniation on the left side C7/T1, so, again, that would give you left shoulder, left arm pain.

He does have a little bit of scoliosis. We take that into account. We mentioned the disc herniation. And that's pretty much that.

MR. O'HARA: Judge, I need to raise arguably a late objection. These films, these blow-ups have enhancements that

are demonstrative. You can see the notation C3 through C7, so I don't object to the actual records going in, but I will object to -- it is a modified record.

THE COURT: I'm overruling your objection.

If you want to bring out on your cross the difference between the originals and how they have been modified, you are certainly free to do so.

MR. O'HARA: Thank you.

(Continued on following page.)

EXAMINATION CONTINUING
BY MR. BHURTEL:
Q And, Doctor, what is -- what is your findings about Mostafa Ahsan's cervical MRI on this?
A Well, again he's got the lift sided disk herniation at C7/T1.
Q And do you have an opinion to a reasonable degree of medical certainty that what caused that disk herniation?
A Well, I mean if it was acute, then we would be concerned about some type of traumatic event. I mean he does have some degenerative changes, so depending on when the trauma was, these could be resulting from whatever happened to him previously.
If the patient was not symptomatic at the time or didn't complain about anything, and then, you know, it takes time, some time for these things to come out. It could be like a couple months sometimes. Sometimes they may have one disk that gets aggravated doing something, and so that's -- depends on the patient's clinical findings and symptoms and the doctor that is examining the patient makes the determination whether he thinks, you know, what the causality is.
THE COURT: Can you tell from looking at the image whether the damage you see in the herniation is the result of trauma or aging?

THE WITNESS: There is a combination of two. I mean he's got aging. He's just an older gentleman, and -- but I can't tell you if it's caused by trauma. It would be difficult to say.

And the other thing is I think he had a left shoulder, so sometimes when the patient -- when the patient -- they can't tell sometimes, well, is it coming from the neck or is it coming from the shoulder? So -- and that's where we come in because, you know, it may be a combination of the two.

MR. BHURTEL: Now, I am showing Exhibit 112-E, that is the MRI of the cervical spine dated 6/19/2014.

BY MR. BHURTEL:

Q Doctor, do you see any difference other than previously you described in other exhibits with respect to his cervical spine MRI?

THE COURT: Is there any difference or anything new that this one shows, is that the question?

MR. BHURTEL: Yes.

A This is as C5/C6 level. We looked at C6/C7, I believe, and C7/T1. This is C5/C6, and here he has a central disk herniation that is pushing on the cord. You can see that right here (indicating) and over here (indicating). And also it is pushing on the left foramen. If you look at this foramen, see how wide it is here (indicating) it looks slightly narrower than over here (indicating). So -- and the

only concern that I have is the disk herniation and there is also some osteophytic changes, some degenerative changes pushing on the cord at C5/C6.

Q Doctor, can you look if anything in this exhibit, there is a new thing to describe?

A No, this one we did. This -- we did this one, yes, these two.

THE COURT: No, hold on. Can you hang on one second?

All right, Mr. Bhurtel, we are going to have to take a brief recess right now. Okay?

MR. BHURTEL: Okay.

(Jury exits.)

THE COURT: Counsel, why don't I see you at sidebar?

(Sidebar held.)

(Continued on the following page.)

(The following sidebar was held outside the hearing of the jury.)

MR. O'HARA: I did not respond, but Juror No. 2 just asked me a question as I was walking away, Do we stay? So I just wanted you to know because I don't want there to be a perception that I am having contact with the jury.

THE COURT: How much more do you think you have?

MR. BHURTEL: I'll go quickly, Your Honor, 10, 15 minutes, Your Honor, left shoulder.

THE COURT: I am not rushing you. I am just do not understand how you are going to accomplish everything you planned for today during today and then you will be stuck. I cannot help that.

Do you have any idea how long your cross is because I am trying to figure out whether to do it before or after lunch?

MR. O'HARA: I think it has to be after lunch. I mean he's covered soup to nuts.

THE COURT: All right. Then we will take a lunch break as soon as you are done and hopefully this doctor can come back this afternoon and the other doctor will either be much faster than you expected or can come back tomorrow.

MR. BHURTEL: I think I'll see because he's only for the shoulder.

THE COURT: Well, again, I am not telling you how to

allocate your time or trying to press you, but I know doctors are expensive and their schedules, and I also know that when you are in the middle of your presentation it can be hard to keep track of how long it is taking, that is why I am pointing this out to you.

But now that you are aware, finish your direct as soon as possible. We will take an early lunch break and then we will have cross right after lunch. Okay.

(Sidebar concluded.)

(Continued on the following page.)

(In open court - jury present.)

THE COURT: Juror No. 6, I am pleased you had the comfort level to speak up. And for the rest of you, we are going to take an early lunch recess today. So if you can hang with me for another 20 minutes or so, I think we are going to be good. Thank you.

(Pause. )

BY MR. BHURTEL:

Q Doctor, are you ready?

A Uh-hum.

Q Okay. Could you explain what you see in this plaintiff's Exhibit 112-E -- withdraw that question.

A We did this one already.

Q Yes.

THE WITNESS: Not that one, the next one.

Q Plaintiff's Exhibit 112-D, D for David. And this is neck MRI, MRI dated 6/19/14.

Doctor, did you see any new things already you told the jury in this 112-D exhibit?

A Yes. So this is the sagittal T1 -- sagittal T2 because the spinal fluid is white, image of the spine and at the C3/C4 level this is a central disk herniation. You see it should be flat like that, it's pushing out. And we can see it here pushing out on the thecal sac, that's this -- this sac that covers the spinal cord.

Other than that, the foramina look good, they look pretty much the same size. So it looks pretty good at that level.

MR. BHURTEL: I believe, Your Honor, I offer in evidence already this 112-A?

THE COURT: Yes, 112-A through E are in evidence.

BY MR. BHURTEL:

Q Doctor, did you also review the Mostafa Ahsan's left shoulder MRI?

A Yes, we did an MRI on 9/22/14.

Q It was done by you?

A Yes.

MR. BHURTEL: These are --

MR. O'HARA: Judge, before this --

MR. BHURTEL: -- Exhibit 111 blow-up of the left shoulder MRI, 111-A, B and C.

THE COURT: Is there any objection to these exhibits, Mr. O'Hara?

MR. O'HARA: One second, please.

(Pause.)

MR. O'HARA: No, Your Honor.

THE COURT: 111-A through C are in evidence.

(Plaintiff's Exhibits 111-A, 111-B and 111-C were received in evidence.)

BY MR. BHURTEL:

Q Doctor, can you explain to the jury this plaintiff's Exhibit 111-B, what it is?
A So this is a -- one image from a shoulder MRI. The patient gets scanned at the same way like a coronal, like you know, from head to toe, but we sort of oblique it because the shoulder is sort of off -- off at the side. So we oblique it so that we can get the humeral head and the AC joint, acromioclavicular joint, the distal clavicle and the coracoid process and we can see the tendons, the rotator cuff tendons and muscles.

And on this patient he had a partial -- this is the supraspinatus tendon and there is a partial tear through it. And there was also a partial tear through the glenoid, which is part of the joint. You could see there's increase signal in here. It should be nice and black. So the superior part of the glenoid was torn, it should be nice and black like that (indicating) and it's got this increased signal here (indicating). So that's that one.
Q Now, I am showing the witness 111-A, Plaintiff's Exhibit 111-A.

Doctor, can you explain what is this Plaintiff's Exhibit 111-A?
A So this is the same shoulder and, again, instead of looking at it in that coronal oblique, we're looking at it like a salami. We're cutting the patient this way

(indicating). And we are looking through the humeral head, the bicipital tendon and the subscapular tendon and the glenoid, and this shows the other dimension of the tear in the mid, anterior/posterior glenoid. This is the glenoid labrum. So he had a problem over there, too.

And you can see the subscapularis tendon looks really nice. You can see right here (indicating) it's really nice and black. That's that.

THE WITNESS: The other one is the same, we don't need that.

BY MR. BHURTEL:

Q Did you write the report about the left shoulder MRI results?

A Yes, I did.

Q And what was were the findings?

A Again, he had a partial tear of the glenoid and also of the supraspinatus musculotendinous junction where the tendon and the muscle meet.

Q And, Doctor, can you give those injuries you describe in his left shoulder, what caused?

A I would think there would be significant for traumatic event.

Q And?

MR. BHURTEL: Your Honor, now, again the plaintiff is offering Trial Exhibit 54, 2066 to 2078.

THE COURT: 2066 to 2078 is already in evidence subject to being connected through the witness' testimony those portions that were not about the brain. Now, I believe he has --

MR. O'HARA: The cervical spine and the shoulder, so I have no objection.

THE COURT: So all five pages or excuse me, all twelve pages are in evidence? My arithmetic is suggesting that I need a lunch break, too.

MR. BHURTEL: And that is including the blow-ups, too, Your Honor, right?

THE COURT: The blow-ups are in evidence 110-A through L, 111-A through C and 112-A through E. You have put in the underlying CDs, but Mr. O'Hara has reserved objection until he reviews the pages that they contain to make sure that they are limited to the radiographic studies and not anything other than what we expect to find on them.

Correct, Mr. O'Hara?

MR. O'HARA: Yes, sir.

MR. BHURTEL: Take a seat now.

BY MR. BHURTEL:

Q Dr. Parnes, the medical opinion you gave today is within the reasonable degree of the medical certainty?

A Yes.

Q And can you give to the jury a synopsis of the -- your

MRI finding in the head?

THE COURT: A synopsis do you mean?

MR. BHURTEL: Yes.

THE COURT: Is that the word you used?

MR. BHURTEL: Yes.

A Well, he has, again, a left subdural hygroma. You know, I would be worried about that the fact that like we mentioned that this could have been a hygroma per trauma that occurred, you know, at the traumatic -- at the time of trauma, at the time of injury or trauma, and/or a bleed that resolved and now it's a subdural hygroma. And the main concern is the mass effect on the adjacent left frontal lobe, and just monitoring it and getting an evaluation from a neurosurgeon to make sure that at some point there is no problem with it enlarging. Because, again, it can stay the same, it can enlarge, it can re-bleed. And that would be the issue that I would be concerned about.

Q And can you give the jury your finding of the cervical spine?

A Again, the cervical spine, he had a number of disk herniations and he had underlying degenerative changes. Again, they would be specific for -- if there were some type of traumatic event that occurred, you know, a while ago there would be disk herniation that would appear and osteophyte formation.

It's interesting that the patient also had a left shoulder MRI because the disk herniations that we saw were off to the left. And like I mentioned before, sometimes it's difficult for clinicians to tell, well, is the pain coming from the shoulder or from the neck? So they do both studies. And sometimes it's clearcut just from the shoulder and sometimes it's not clearcut where he's got a neck problem and a shoulder problem. So that's -- that's an issue.

Q And can you describe what is your findings with respect to his left shoulder?

A Again, the left shoulder he had a partial tear of the -- it was supraspinatus musculotendinous junction and also the glenoid labrum. And actually, his shoulder didn't -- was -- was -- although his neck showed some arthritic changes, some degenerative changes, the shoulder was pretty good. You know, it was interesting.

MR. BHURTEL: Your Honor, the Trial Exhibit 68 that is Page 2569, this is doctor's bill.

MR. O'HARA: Bates Number please.

THE COURT: 2569.

MR. BHURTEL: 2569.

BY MR. BHURTEL:

Q Doctor, did you provide the invoices with respect to the service you provided in this -- with respect to Mostafa Ahsan's matter?

A You mean as far as the MRI studies?
Q Yes.
A Yeah. Well, the billing is -- I'm a sole practitioner, so I, basically, send out my billing to a billing company because I am not a biller. So they do the billing.
Q And how much is the amount you billed Mr. Mostafa's MRI for his head -- I mean brain, neck and left shoulder?
A The neck was $879.73; the brain was with and without contrast was 1207; and the -- or the shoulder was looks like 878.67, which I think is pretty much a standard fee that is charged.
Q So how much you have the total there?
A It says here $3,302.71.

MR. BHURTEL: Your Honor, plaintiff offers Exhibit 68.

MR. O'HARA: Just one second.

(Pause.)

MR. O'HARA: Judge, subject to a redaction for items that should not come in, I have no objection to the medical bill.

THE COURT: It is received in evidence with the instruction that counsel make the redaction discussed.

(Plaintiff's Exhibit 68 was received in evidence.)

MR. BHURTEL: Thank you.

I am complete my examination, Your Honor.

THE COURT: All right.

So, ladies and gentlemen, given the hour I do not think it is appropriate to begin the cross-examination of the doctor, so we will take our lunch break. I promised you a little bit shorter. We will go until 1:30 today.

I know the weather is inclement, so I will remind you that there is a cafeteria on the third floor. And I think a little word of advice from somebody who spent a long time in this courthouse, if you move you should be able to beat the lines, but if you get down there after 12:30 you may have more of a problem.

All right, so do not discuss the case with anybody, do not think about anything involving the case, and I will see you back in the jury room sharp 1:30.

(Jury exits.)

THE COURT: I will ask counsel and the court reporter to wait just a minute with me.

All right, Mr. Bhurtel, when you come back from lunch we will meet here at 1:20. I would like you to have the exhibits for this afternoon's doctor ready to go.

MR. BHURTEL: Yes, Your Honor.

THE COURT: I also am going to ask you whether the doctor will confirm that he will come back tomorrow if we do not finish with him today. If he says no and you have no other way to get him here tomorrow, then I will take the time

that is left in the afternoon and cut it in half, like I was prepared to do yesterday.

Now, fortunately that worked out, but I cannot predict. You anticipated this doctor would be done by noon. It is now 12:20 and you have just completed your direct. So I am hoping that you can correlate your expectations with the amount of time things take more precisely as we go forward.

All right?

MR. BHURTEL: Yes, Your Honor.

THE COURT: All right, so I will see everybody here in an hour.

MR. O'HARA: Thank you, Your Honor.

MR. BHURTEL: Thank you, Your Honor.

(Luncheon recess taken.)

(Continued on the following page.)

AFTERNOON SESSION

(In open court.) (Witness resumes stand.)

(The following occurs outside the presence of the jury.)

(Judge STEVEN M. GOLD enters the courtroom.)

THE COURT: Mr. Bhurtel.

MR. BHURTEL: Yes, Your Honor.

THE COURT: Do we know, who is the witness after Dr. Parnes?

MR. BHURTEL: Ajoy Sinha.

THE COURT: Do we know if Dr. Sinha can come back tomorrow or not?

MR. BHURTEL: He is here, I'm going to have to talk to him. Tomorrow I cannot bring him.

THE COURT: I asked you to find this out over the lunch hour. I told you, unless he commits to being available later in the trial -- I understand maybe not tomorrow, but later in the trial -- then I have to cut the time in half.

So, what is the answer? Is he committed to a later date in the trial if we do not finish him today?

You do not know.

MR. BHURTEL: No.

THE COURT: Didn't we have this conversation before we broke for lunch?

MR. BHURTEL: Yes.

THE COURT: So, how come we do not know? I feel like we are not communicating.

All right, Mr. Bhurtel, if you do not tell me that he is available on a specific date committed to come back, then I will cut your time in half. The burden is on you. I have tried my best here.

Do we know if we have the jury ready?

MR. O'HARA: Judge, you asked during the break that we mark whatever Exhibits that we intended to use with Dr. Sinha. He has marked one item, which is 17-A. It is actually in the, this is a copy of two records that has been placed on the same document, Bates stamped number 976 and 977.

I raised this with Counsel both Pre-Trial and throughout the course of the trial. This is a photocopy of an Exhibit that was used at the discovery deposition of the doctor and it has a series of handwritten notations. As I said to him privately and off the record, I don't have a problem with the Exhibit the being used, but they cannot contain handwriting from another source, they have to be redacted.

THE COURT: Do we have a pristine copy of the Exhibit?

MR. BHURTEL: That, Your Honor, the doctor he said he has it. So, if he has it, I will produce that one as evidence. I believe this one he wrote it during the

deposition, I believe, yeah.

MR. O'HARA: I understand that.

THE COURT: All right.

Well, what does it say? Is there anything prejudicial in the language or is it purely descriptive?

MR. BHURTEL: Descriptive.

MR. O'HARA: It is medical opinions based on his review and interpretation of the studies.

MR. BHURTEL: At the deposition he was asked questions, where is what.

THE COURT: They are all in the margins of the photos. Cover them up with Post-Its. Easy enough.

MR. BHURTEL: Okay.

THE COURT: Do we have the jury? Let's bring the jury out.

Mr. Bhurtel, I note you have a paraprofessional with you; that is two people and you still did not find out over lunch the one question I asked you to answer. Maybe you can ask your assistant to help you find out now.

(Pause in the proceedings.)

(Jury enters.)

THE COURT: Good afternoon, everybody. I hope you found something you enjoyed eating and that you had a pleasant break during the lunch hour.

Doctor, I remind you, you remain under oath.

THE WITNESS: Yes, Your Honor.

THE COURT: Mr. O'Hara, you may conduct your cross-examination.

MR. O'HARA: Thank you, Your Honor.

THE COURT: Mr. Bhurtel, we are in session now.

CROSS-EXAMINATION

BY MR. O'HARA:

Q Doctor, you were asked a series of questions about a number of topics. I am going to try to work in reverse order; start with the shoulder then move to the neck and move to the head.

Before I get into your testimony you actually, at the request of Mr. Bhurtel, wrote a report for this litigation which is dated February 19th, 2015; correct?

A Yes.

Q And it's a two-page report that I will put up on the screen in a minute that was intended to identify all of the information that you felt was important in your review of the medical information in this case for purposes of setting forth the opinions that you hold; correct?

A Well, it was basically a comparison, I believe, between the prior study and the new studies.

Q Well, actually, it specifically said what you were asked to do and the materials that you were asked to review; correct?

A I believe so, yeah.

Q And in doing so, that was intended to allow you, for purposes of this litigation, to offer opinions as an expert.

In other words, this is not a treatment record, this is your narrative for this lawsuit; correct?

A Correct.

Q And in the report that --

MR. O'HARA: Would you pull up page 826, please?

(Exhibit published to jury.)

THE COURT: 826 is in evidence, right?

MR. O'HARA: 826 is his report, it's been identified. I can't tell you whether it's been admitted into evidence.

THE COURT: Mr. Bhurtel, is it in evidence?

MR. O'HARA: Actually, I don't believe he offered it.

THE COURT: Are you offering it now?

MR. O'HARA: No, sir.

THE COURT: Are you asking to show it to the jury?

MR. O'HARA: No, sir. I will work through the progression.

Q Doctor, in connection with your evaluation you were asked to review only the five MRI studies that were generated in this case; correct?

A I don't have the report in front of me.

Q Well, if I were to represent to you that the first line in the report that's addressed to Mr. Bhurtel says, quote, as per your request, I am reviewing five MRI studies on patient Mostafa R. Ahsan, date of birth, and then you blacked out the date of birth.

Would that refresh your recollection as to whether or not when you were first asked to serve as an expert in this case, you were asked to review five different MRI studies?

A Yes. Why was the date of birth blacked out?

Q I can't answer that, I didn't black it out.

A Okay.

THE COURT: It is to protect, to prevent identifying information from being in the public record.

THE WITNESS: Oh.

Q And the next line in your report you recounted historical information relating to the incident at the Staples that you felt was important to the opinions that you held in this case.

Fair statement?

A Yes.

Q And the information --

THE COURT: Excuse me.

If the gentleman with you is a witness in the trial, he should be waiting outside.

I'm sorry, Mr. O'Hara, please continue.

THE WITNESS: Is it possible to get a copy of the

report because it's very hard for me to...

MR. O'HARA: Sure.

Judge, I will hand the witness both Ahsan 826 and Ahsan 827.

THE COURT: Thank you.

MR. O'HARA: Sure.

Q And Doctor, I'm drawing your attention to the second line in the report. You recounted the significant historical information about the incident at the Staples that you felt was important to the opinions that you held in this case; correct?

A Yeah, just says blunt trauma, doesn't say Staples.

Q Listen to my question, Doctor.

You were asked to review the medical issues in this case as you understood it, arising from an incident at a Staples store. That's the subject of this lawsuit; correct?

A It just says blunt trauma to the left side, but not specifically where it was.

Q Doctor, did you talk to the lawyer that picked up the phone that called you to ask you to write the report and did he tell you why he was asking you to write a report?

A He basically just wanted me to compare, you know, prior studies to the new studies.

Q Listen to my questions Doctor, I'm going to ask you a series of yes or no questions because it's cross-examination.

If I ask you one that you can't answer yes or no, just tell me and I will ask you another question, okay?

Okay?

A Okay.

Q So, when the lawyer picked up the phone and called you and asked you to review this case, did you have an understanding that it was in connection with an incident at a retail location where there was an allegation that something had happened that had caused him harm; yes or no?

A Yes.

Q And in agreeing to review this case and write a report, you recorded what you felt were the significant incident facts that were important in your medical evaluation so that you could offer opinions.

They were the medical foundation and the factual foundation, true?

A True.

Q And Doctor, I want you to read to the jury what you wrote that was, in your opinion, significant historical information relating to the incident that's the subject of this lawsuit.

A It says: According to the history the patient sustained blunt trauma to the left side of the body, especially to the head, neck and left shoulder on September 2nd, 2011.

Q Now, you would agree with me that the five MRI studies that you reviewed have no historical information.

They are diagnostic films, correct?
A Correct.
Q And you had a conversation with Counsel about the nature of the incident; correct?
A Correct.
MR. BHURTEL: Objection.
Q And you had a conversation with Mr. Ahsan about the nature of the incident; correct?
A I never spoke to Mr. Ahsan.
Q So the only person that you talked to about the happening of the accident was the plaintiff's lawyer; correct?
A Correct.
Q And the plaintiff's lawyer told you that the incident arose from, quote, blunt trauma to the left side of the body --
MR. BHURTEL: Objection.
THE COURT: What is the objection based on?
MR. BHURTEL: The communication between the lawyer and the expert witness.
THE COURT: You are asserting privilege? Is that what you are asserting? A privileged communication or a work-product?
MR. BHURTEL: A work-product, yes, Your Honor.
THE COURT: But Mr. O'Hara is reviewing a document that was produced to him in discovery; am I correct?

MR. BHURTEL: Yes.

THE COURT: Then your privilege objection is overruled.

Q Doctor, to finish that question. The historical information that you recounted relating to blunt trauma to the left side of the body, especially to the head, came from Mr. Bhurtel; correct?

A Correct.

Q Did you ask to review any other medical records from any other source in this case to determine whether what Mr. Bhurtel as a lawyer was telling you, whether it was accurate?

A I was given the history, that's the pertinent history --

Q No, no, no, listen to my question.

Were you given any medical records, did you ask for any other records that might exist in this lawsuit to determine whether what the lawyer was telling you about the event was true; yes or no?

A I'd asked if there were any other studies other than these.

Q Doctor, I'm not asking about studies. I'm asking about the historical information, about the incident itself.

A No.

Q The only source of information that you had when you wrote this report for this lawsuit was what the lawyer told

you.

We've established that; correct?

A Yes.

Q Did you ask for any other documentation, any of the materials that were generated in this case, to determine whether what the lawyer told you about the incident was true?

A I don't understand your question.

Q Doctor, if I represent to you that there is a wealth of records relating to the history of the incident in this case that specifically says that the blunt trauma did not include the head, you would agree with me that's significant historical information, would you not?

A Yes.

Q And you would agree with me, would you not, that if it's in medical records separate and apart from what I just represented to you, as an expert reviewing a case coming before a jury and talking about your opinions, including the historical information about the incident, you would want to know that before I'm asking you right now in front of these folks, fair?

A Yes, but you wouldn't do an MRI of the brain.

Q Doctor, I appreciate the extra information. But what I am asking you point-blank, yes or no, if there is historical information that suggests there was no blunt trauma to the head, you would at least concede to me that is very important

information that you would have liked to have known back in February of 2015 when you recorded significant information about the incident; yes or no?

A It's not correct, what you're saying.

Q So, Doctor, if there is information in the record that tells you point-blank there was no blunt force trauma to the head, you don't find that to be significant medical information?

A Why would they do an MRI of the brain at Apollo Imaging?

Q Doctor, listen to my questions, please. I appreciate you may have other reasons or other sources.

If there is historical information in this case that says there was no blunt force trauma to the head -- no blunt force trauma to the head -- you would agree with me that is important information that you would want to know before I'm asking you this question.

THE COURT: If it existed. He is not asking you to acknowledge that it existed.

THE WITNESS: The question doesn't make any sense because basically, I'm given a study, several studies to evaluate. Why would you do an MRI of the brain if there was no blunt trauma to the brain, to the head?

I mean, you're twisting the words around. I mean, you know, why include a retail store. I mean, I have no idea what happened.

Q I'm not asking about that.
A You asked this before.
Q Okay. Doctor, let's talk about the next to last paragraph in your report. Turn to the second page, which is 827. Do you see the paragraph that I am going to read out loud?

The findings described on the cervical spine MRI and left shoulder MRI would be consistent with the traumatic history, especially if the symptomatology described by the patient was not present previous to the trauma itself.

Correct? Did I read that correctly?
A Correct.
Q Doctor, am I understanding this passage to mean that you are relying upon the truth of the history evaluating the medical information in front of you to determine whether the medical condition is caused by the historical trauma?

Am I understanding that correctly?
A This report basically is used in conjunction with the other doctors' findings.
Q Doctor, did you write this report for purposes of this litigation to identify the opinions that you had medically that were based on the event that brings us to this lawsuit, thereby writing a litigation report?
A I wrote a report based on medical evidence on the imaging findings.

Q And you wrote a report based on historical information that was provided to you by Mr. Bhurtel?

A Correct.

Q And you noted at the end of report that it was important for the medical conclusions that you held, it was important to the finding that they were caused by the event when you talked about consistent with the traumatic history.

That's what that passage means; correct?

A Correct.

Q And if the traumatic history that was given to you is wrong, is inaccurate, is mistaken, then it is fair for us to assume that your opinion might be different if you learn other information; isn't that true?

A It's based on what the, you know, what information I was supplied.

Q I understand that.

And if the information that you were supplied is inaccurate, mistaken or just flat-out wrong, that has the ability to affect the opinions that you've offered as to whether or not the incident that's the subject of this lawsuit caused the harm to this man; isn't that true?

A Well, why would it be wrong if the patient had an MRI of the brain?

Q Doctor, Doctor, are there medical reasons to have an MRI of the brain other than trauma?

A In this specific case --

Q Doctor, I'm asking you generally. Are there medical reasons other than trauma for a patient to have an MRI of the brain?

A Yes.

Q They include what?

A Headache, you know, migraine, you know, if you're papilledema, if you have swelling behind the eyes. The list is huge.

Q Correct. Vision disturbances, gait problems, problems with smell, problems with taste, problems associated with cognitive function or processing of information. A wide array of reasons why a medical doctor would order, among other things, an MRI of the brain if there was a suspected brain cause of those symptoms; correct?

A Yes.

Q Now, Doctor, were you provided with the Staples incident report with the description of history that was given by the plaintiff about what happened on the day of the accident?

A No. I just looked at the history. There was blunt trauma.

Q Were you provided with the office records of Dr. Guha, the doctor that saw Mr. Ahsan the day of the incident with respect to your review in this case?

A No.

Q Do you know whether or not Dr. Krishna agrees with what you said in this report as to whether or not blunt trauma to the left side of the body, especially to the head, actually occurred in this case?

A Could I -- I'm sorry, what did you say?

Q Sure, I'll ask it differently.

Do you know whether Dr. Krishna agrees with what you've written in that passage?

A I don't know.

Q So, if I were to represent to you that on that witness stand yesterday Dr. Krishna specifically said that there was no blunt trauma to the head, you wouldn't know one way or the other whether that was accurate?

A I don't know.

Q Doctor, did you have occasion to be provided with the information about what the plaintiff actually said to Dr. Lattuga, a treater in this case with respect to the history of the event?

A No.

Q So, if I were to represent to you that the plaintiff specifically says that the boxes hit his shoulder but no other body part, you won't know one way or the other -- you're not in a position one way or the other to comment on that, is that a fair statement?

A No.

THE COURT: No, it is not a fair statement or no, you are not in a position to comment?

THE WITNESS: No, not in a position to comment.

Q Doctor, the brain MRI that was ordered in this case that was the first medical record that you reviewed relating to the plaintiff's brain, that was ordered how many years after the incident?

A The first MRI of the brain that was done at the other imaging facility?

Q Yes, sir.

A It was performed on 2/4/14.

Q Two-and-a-half years?

A When was the incident, '11? Yeah, two-and-a-half, three years.

Q And Doctor, you were asked a series of questions and I recall that you were shown a number of blow-ups of that February 4th, 2014, study.

Do you remember that line of questioning?

A Yes.

Q Doctor, do you agree that the radiologist that read those films disagreed with your opinion as to whether or not there was a left subdural hygroma on those films?

A I am not aware of that.

MR. O'HARA: 1769. This is in evidence, Your Honor.

THE COURT: Is that correct, Mr. Bhurtel, 1769 is in

evidence?

You can show it to Counsel and the witness.

Q Do you have the February 4th, 2014 report in front of you, Doctor?

A No.

MR. O'HARA: May I approach, Your Honor?

THE COURT: You may.

THE WITNESS: It just came on.

THE COURT: You have it?

THE WITNESS: I have it.

THE COURT: Jurors, your screens should be blank, am I right?

THE JURY: Yes.

Q Doctor, have you ever seen that record before I presented it to you today in court?

A No.

Q Doctor, please read to the jury what the impression was of the treating radiologist when he reviewed the MRI films that were conducted on February 4th, 2014.

A It says: No acute intracranial pathology or mass.

Q And in his findings section he also repeats that no, there is no intracranial mass or hemorrhage; correct?

A Correct.

Q You may have already done this. Hemorrhage is bleeding; correct?

A Correct.
Q And there is no mass and there is no sign of blood in the man's MRI study that's conducted on February 4th, 2014, at least according to that radiologist.
A Would you raise this so I can see who read it? If it was read in this country.
Q I'm sorry?
A If it was read in this country or if it was farmed out to another country to be read.
Q And Doctor, before we get to that, just read the address where it was performed.
A The address doesn't matter. It depends who's reading it. Was the person a radiologist? Is he Board certified in radiology?

THE COURT: All right, I'm sorry, Doctor, but you do not get to ask the questions. I know that may seem odd to you, but that is the way courtrooms, work.

But you are entitled to see the full document.

MR. O'HARA: Sure.

THE COURT: So, can we scroll down to the bottom if there is a signature. I assume there is a signature at the bottom.

MR. O'HARA: If helpful, Judge, I will.

If you could, scroll up to the top of the document, please.

Q Doctor, where is the facility located that was asked to perform and review the diagnostic study that was the subject of the February 4th, 2014, film?

A Elmhurst, New York.

Q Apollo Imaging.

And Doctor Prakash is identified as the medical doctor who was asked to review the diagnostic film; correct?

A Correct.

Q Doctor, you would agree with me that the Defense has had nothing to do with this particular order of the film, where the study was conducted or who reviewed it; correct?

A I guess, yeah.

Q If I represent to you, Doctor, that this comes out of the man's medical treatment, that he actually was referred by Dr. Sayed, you will see the referring physician, Dr. Jalal Sayed, you understand from the review of the materials in this case, Dr. Jalal Sayed is a treating physician; correct?

A I assume so.

Q And the treating physician in this case that reviewed the patient for this diagnostic film reviewed the report that specifically said: No acute intracranial pathology or mass; correct?

A That's what it says.

Q Well, it says more than that, doesn't it? It says: There was no extra axial fluid collection; correct?

A Correct.

Q No intracranial -- the normal intracranial flow voids are identified.

Correct?

A Correct.

Q The posterior fossae structures are normal; correct?

A Right.

Q The internal auditory canals are normal.

A Correct.

Q The orbits are grossly within normal limits.

A Correct.

Q The visualized paranasal sinuses and mastoid air cells are patent?

A Patent.

Q Patent?

A Correct.

Q Tell the jury what that means?

A It means they're open.

I'm glad he's not reading my MRI.

THE COURT: Say that again.

THE WITNESS: I said I'm glad he's not reading my MRI because I disagree with him.

MR. O'HARA: Judge, I would move to strike that as being unresponsive to the question.

THE COURT: Denied.

Q Doctor, let's talk about the other findings of Dr. Prakash, a treating physician in this case.

The mid-line sagittal images demonstrate normal appearing corpus collosum and pituitary gland; correct?

A Correct.

Q There is no evidence for any inferior cerebral tonsilar herniation.

A Correct.

Q Coronal images demonstrate normal appearing internal auditory canals.

A Correct.

Q The optic -- can you pronounce that word for me, Doctor? The optic -- chiasm?

A Chiasm.

Q Did I say it directly?

A Chiasm.

Q It is identified as intact; correct?

A Correct.

Q So, with respect to the treating physician that reviewed this diagnostic study and wrote the February 4th, 2014 report that you've never seen before I just put it up there, every single finding is normal, isn't it?

A According to him.

Q According to this doctor, every single finding is normal; correct?

A Correct.

Q And it identifies a different doctor that's referring physician in this case; correct?

A Correct.

Q That you've never heard his name before we stepped into this courtroom, have you?

A No.

Q And to your knowledge, there was no medical change in the course of treatment that Dr. Sayed was prescribing as a result of the brain MRI that was obtained on February 4th, 2014.

Is that a fair understanding?

A I don't know.

Q You don't know because no one's ever told you the name or given you the records.

A No. But excuse me, this report is generated as an unbiased independent report --

THE COURT: Doctor, Doctor, I'm sorry, but you can only answer the questions that are asked.

If Mr. Bhurtel thinks on redirect that there are questions you should be asked, he can ask them of you.

Q Doctor, turning to the report that you were just describing.

A Yes.

Q The paragraph above on the second page where you talk about your findings.

A Correct.
Q Do you see where it says -- can you read out that sentence? The findings described above would be consistent with what?
A I don't see that sentence. Oh.
Q Sure, I'll show you.
A Yes.
Q That.
A The findings described above would be consistent with a direct impact, traumatic event.
Q Direct impact with what?
THE COURT: Body part or external object, Mr. O'Hara? When you say direct impact, what?
MR. O'HARA: Let's do both, Judge.
Q Doctor direct impact with what body part?
A With whatever we imaged. What was specified in the first paragraph.
Q Okay. So when you're making reference to your findings above are consistent with a direct traumatic impact, you're talking about a direct traumatic impact to the head?
Correct?
A Yes.
Q And a direct traumatic impact to the neck?
A Correct.
Q And a direct traumatic impact to the left shoulder?

A Correct.

Q And that's based upon what Mr. Bhurtel told you?

A That and, yeah, the history.

Q I didn't hear you.

A The history.

Q The history that was provided to you by the lawyer?

A Correct.

Q Doctor, you were asked questions about your medical bill in this case and you indicated the total charges for your medical care were $3,300; correct?

A That was the bill for the studies, I believe.

Q Okay.

A That was billed as office.

Q Can you tell the jury for your appearance today, you've stepped away from your medical practice, what you are charging as your fee to appear in court?

A It's $6,500.

Q Doctor, did you have or do you have any information -- and I'm going to now work back the direct testimony, I'm going to start with the left shoulder.

Do you have any historical information from any source as to whether or not this patient had a pre-existing left shoulder injury of any sort?

A No.

Q Do you have any history from any source that he received

treatment for a particular condition?

A No.

Q Doctor, as a radiologist, are you called upon to treat a condition called left lower traps myofascial pain syndrome?

A No.

Q Are you called upon to treat cervicalgia?

A Cervicalgia? No.

Q That's something that falls into a specialty other than a radiologist; correct?

A Correct.

Q And in this case you have no information one way or the other as to whether or not the plaintiff suffered from any of those conditions prior to September 2nd, 2011; correct?

A Right.

Q You would agree with me, could you not, in order to offer this jury opinions as to the cause of the shoulder injury, you would want to know whether there was any other pathology in his shoulder?

A May or may not be important.

Q But if it is important, one thing's for sure, you would want to know?

A Maybe.

Q Maybe?

A Yeah. I mean, it depends.

Q Okay.

A It's a general statement that you're saying. It's not really...

Q Go ahead, finish.

A Basically, the conditions you're describing are not radiological conditions or findings. You are describing something from a clinical standpoint that a neurologist or orthopedic surgeon would want, that would be able to better testify or supply information relative to that. I basically describe findings and make a diagnosis.

Q But I am asking you questions about the opinions that you offered literally an hour ago in this courtroom where you said the shoulder injury was caused by the incident. That's what I'm focused upon. You specifically said, quote, the trauma caused it.

In coming to that opinion, you would agree with me, would you not, that it is important to have the history of the left shoulder separate from the trauma?

A If you look at the report it says if the patient didn't have symptoms before that.

Q That's based upon a history that was told to you by a lawyer. If I represent to you in a hypothetical setting that there are records in this case that had been identified and produced that show a left shoulder history, pathology in the left shoulder, would you agree with me that you would want to though that before you were offering an opinion as to what

caused the underlying problem in the shoulder that required surgery; yes or no?

MR. BHURTEL: Objection, Your Honor.

THE COURT: Overruled.

You can answer.

A I would say yes, but I'm not a treating physician. I basically, and like my report says, if the patient was asymptomatic prior and symptomatic after, I would have to make the assumption that to the best of my medical knowledge, that it would be secondary to or caused by whatever happened to him.

Q Thank you.

Doctor, with respect to the left shoulder pathology, you indicated that you conducted an MRI on September 22nd, 2014; correct?

A Correct.

Q Were you provided with any information about the MRI study done on the left shoulder before your MRI study?

A Yes, because I supplied a report. At the second paragraph.

(Continued on following page.)

EXAMINATION (Continuing)

BY MR. O'HARA:

Q And in your report you make reference to the November 3, 2012 diagnostic films; correct?

A Yes.

Q And you compared them?

A Yes.

Q And there were opinions rendered by Dr. Choy from Advanced Radiologic Imaging that were different from your opinions in the review of those films; correct?

A I don't know Dr. Choy or his report.

Q Did you review Dr. Choy's report in connection with your evaluation in this case, which has been marked, for the record, Your Honor, on 1764 and 1765?

A No, because that would bias my opinion on this report.

Q Doctor, as a general matter in the medical field, do doctors consult with each other when there is a difference of opinion to evaluate the respective opinions of their peers to determine what's in the best interest of the patient?

A Yes.

Q And in doing so, is the goal ultimately to cure the patient?

A Yes.

Q And in this case there is a doctor who authored a report about findings in the diagnostic study that if you assume is

different from yours, in order for Dr. Choy and you to confer to determine what's in the best interest of the patient wouldn't you have to talk?

A I was not treating the patient.

Q Doctor, you were asked in connection with the patient's medical treatment to obtain an MRI of the left shoulder on September 22, 2014; correct?

A Correct.

Q And that was in connection with the care and treatment being prescribed by the doctors who were managing his care; correct?

A Right.

Q And there was a study of the same body part against which there was a review by a different doctor who had different conclusions from you. If you accept that as true, don't you think it would be in the best interest of the patient for you and Dr. Choy to talk about your differences of opinion so that you came to a collective view of what was wrong with the man?

A I usually render my own opinion because I don't review all of the films, films from other facilities, and most of the time the reports I find to be garbage. Garbage. So, basically, I render my own opinion and comparison.

Q I just want to make sure that I understand that comment. So you do not rely upon the medical opinions set forth in medical reports of other licensed radiologists in the State of

New York or any other state because of, in your view, the view that those reports and those opinions are, quote, garbage?

A I would say they are not helpful to me because I don't find that the opinions expressed in them sort of reflect the findings on the film. I mean, I don't know -- and if you think that -- I mean, all the studies that come through, patients come through, I don't believe that doctors will call another doctor, another facility and confer other findings from two years previously to say hey, you know, what's going on with this guy, what's going on with the patient's shoulder. Most doctors render their own opinions and that's independent.

A lot of times I don't know even know who's reading all the films from other facilities. I read all the films, all the studies, so I know that I'm doing all the work.

I don't know if they're reading it, or a nurse practitioner, or a radiologist someplace else in the world. I don't know. I have no idea. That's why basically I like to look at the images myself. I look at the reports but I don't find reports from other facilities helpful and I compare them to my studies.

I meant garbage as far as to whether it was useful or useless. I don't find them useful.

Q Doctor, would you agree with me as a general matter that if there are medical reports that were generated in this case that had a doctor's signature electronically on the bottom of

them but they weren't actually reviewed and authored by that doctor that that is actually a crime in New York State?

A I'm just expressing my opinion as far as who's is reading them. I don't know who they are.

Q But I'm asking follow-up questions about the opinion that you have just advanced because you have now questioned the authenticity and who reviewed two --

THE COURT: Maybe we can focus on what's most directly relevant.

MR. O'HARA: Certainly.

Q Doctor, were there differences in your evaluation in the MRI report about the left shoulder as compared to what you have before you in Dr. Choy's report?

A I don't know. I don't have Dr. Choy's report.

MR. O'HARA: Would you pull up 17634, 1765 for the doctor, please?

THE COURT: Not for the jury?

MR. O'HARA: Just the doctor.

Q Take your time, Doctor, and read it to yourself.

A Can I see the next page?

Okay.

Q Have you had a chance to review that?

A I read it.

Q You and Dr. Choy had a difference of opinion as to what that study showed with respect to the --

A Actually, the report was not too dissimilar.

Q I appreciate that, that it is not too dissimilar, but I am going to ask you about the dissimilarity.

A This is the first time that I'm looking at the report.

Q I appreciate that, Doctor, but I am permitted to ask you questions --

THE COURT: Why don't you ask the question.

Q Doctor, would you agree with me that your finding about the deltoid muscle and Dr. Choy's finding about the deltoid muscle are different?

A What did I say about the deltoid muscle?

Q You found a sprain or strain within the deltoid muscle; yes?

A Yeah. I think it was a mild sprain or strain.

Q Does it said mild strain or sprain in your report, Doctor?

A It says a sprain or strain of the deltoid muscle.

Q You found a strain or sprain of the deltoid muscle, Dr. Choy found the deltoid muscle was what?

A I don't see the deltoid muscle mentioned.

Q The second paragraph directly under findings, the deltoid muscle --

THE COURT: You need to go back to page 1. Thank you.

Q -- the deltoid muscle is normal?

A It says the deltoid muscle is normal. That's a very minor finding.
Q Is what I said correct, sir, that your finding on the deltoid muscle and Dr. Choy's deltoid muscle finding were different? Whether it is minor or not, was it different?
A That's what you read from his study, yeah.
Q So what I said is true; right?
A We had a difference of opinion. That's what makes this country great, a difference of opinion.
Q Do you have a difference of opinion with respect to the supersized tendon --
A Supraspinatus.
Q Supraspinatus tendon and the supraspinatus musculotendinous junction?
A Yes.
Q And you found a partial tear; correct?
A Yeah, there's a partial tear.
Q And Dr. Choy found mild tendinopathy?
A Right. That means there is some increase signal intensity in that area. Sometimes it is very hard to tell between tendinosis, which is almost like an aging of the tendon. There is some increase synovial fluid in it versus it could be like a small partial tear, you know. So, again, you know, there's basically very conservative treatment for that.
Q Just so we are all on the same page, when you are talking

about tendinosis being something from aging, you can actually tear soft tissues and structures in the body?

A Yes.

Q Such as the supraspinatus tendon based on just normal everyday life as your body gets older; right?

A True.

Q In this case you found a tear and he found tendinopathy, which you would agree suggests a degenerative finding; correct?

A Well, I described a partial tear.

Q And he described a degenerative finding?

A Okay, he describing a degenerative finding.

Again, sometimes it may be difficult to distinguish between those two. A lot of times that has to be determined clinically; in other words, the referring doctor or the orthopedic surgeon has to evaluate the patient, say, keep an eye on this, maybe rescan the patient. Sometimes they give a shot of cortisone, whatever.

Q Dr. Choy, in his review, found subacromial-subdeltoid bursitis; correct?

It is No. 4 in his impression.

A Okay. Yes.

Q Just so we are all on the same page, that bursitis in two separate physiologic locations, those are degenerative changes; correct? That's what bursitis is?

A It means there is fluid that is leaking into the bursa. Subacromial-subdeltoid bursa is under the deltoid muscle, and what happens is that when you have a problem -- when you have a tear of the supraspinatus tendon, that's when you get the fluid that leaks into that bursa. So that would make me actually think that it is more of a partial tear problem because, you know, that's why that fluid gets there. That's one of the things that we look for.

I've never heard the term bursitis for that. I usually just call it subacromial-subdeltoid bursa fluid, because I don't think there is a bursa located there. It is a potential space. It's not really a space that we usually see bursitis in, like hip bursitis or an elbow bursitis. And, you know, it is sort it make it sounds like it's inflammatory. I disagree with that.

Q I appreciate that you disagree, Doctor. That's okay. I really need you to focus on the question. I asked you whether bursitis is a degenerative finding, whether it is consistent with chronic inflammation? Yes or no?

A I'm not sure what he means by that. You could probably ask him, call him up and ask him.

Q But I am asking you, Doctor. You are the expert that has come here.

Do you agree with what I have said, that bursitis is a degenerative chronic change caused by inflammation of the

bursa?

A Correct.

Q How about physiologic glenohumeral joint fluid, there is fluid in that space; correct?

A Yes.

Q That's different from the findings that you have on your report; correct?

A Physiologic glenohumeral joint fluid just means like normal joint fluid, which everybody has.

Q Can you look back anywhere in the man's impression where he uses the word normal as opposed to describing things that are significant findings?

A Well, why would you say physiologic? You mean a normal amount of joint fluid.

Q Doctor, this will go a lot faster if you would just answer my question.

Is there any reference in this impression about any condition other than a condition that he is finding as abnormal?

A Yes. He says intra labral signal intensity within the posterior superior labrum suspicious; in other words, he is not committing himself, for a labral tear. Images two -- images 9 and 11, series 2, images 9 and 11.

Q That would be an abnormal finding; right, Doctor?

A I would say so, but he is not committing himself.

THE COURT: Counsel, I am assuming your questioning is based on your reading of the document, but I direct your attention to the first phrase of paragraph two and the second phrase of paragraph five before I press that point.

Q Doctor, are there findings with respect to other portions of his shoulder that the reviewing radiologist identifies as normal?

A He said that the long head of the biceps tendon and the bicipital and the....

THE COURT: Does he say the normal long head of the biceps tendon in the report?

THE WITNESS: Yes.

THE COURT: Does he say normal acromioclavicular joint in the report?

THE WITNESS: Yeah.

THE COURT: Does he use the word "normal" anywhere else in his findings one through five?

THE WITNESS: No.

Q Doctor, with respect to the bicipital tendon, he makes reference to normal findings that in your report you indicate are abnormal; correct?

A Well, I also said the biceps tendon was normal.

Q You say the fluid -- there is fluid surrounding the bicipital tendon within the bicipital groove?

A Yes, but the biceps tendon was normal.

Q The fluid finding in connection with the bicipital tendon within the bicipital grove is an abnormal finding, that's why you put it on your report; right?

A I put it there because it's there and I mentioned it.

Q And it is not supposed to be there in a healthy shoulder, that's a positive finding? That's the reason why you note it in your report?

A I noted it because it is there, but the biceps tendon was intact.

Q I am not talking about the tendon. I'm talking about the fluid.

A But you're referring that the biceps tendon is abnormal. That's why I mentioned the fluid.

I mentioned it because it's there and I mentioned it because it's on the film. It is an anatomic description.

Q I appreciate that. I will move on.

Doctor, do you agree with me that diffusion tensor imaging studies as a diagnostic tool have been around now for 20 or 30 years?

A Correct.

Q And the usage of diffusion tensor imaging studies to identify traumatic brain injury is something that is relatively recent in the neuroscience community; correct?

A Correct.

Q And you would agree with me that there is dispute in the

neuroscience community as to the significance of DTI findings based on the opinions of different physicians in the field; correct?

A Correct.

Q And you would also agree with me, would you not, that a positive DTI study means, as you have described, and please tell me if I am describing it -- because I'm trying to do it in a non-medical way -- there's abnormality in fluid that is perfusing brain tissue; correct?

A There is an abnormality in the molecular motion in the white matter tracts significant for possible abnormality.

Q And you agree, do you not, that diffusion tensor imaging technology is inadequate today when you look at a film that you see a positive finding to date the onset of whatever the cause is of that positive finding? Do you agree with that?

A No. That would be difficult to tell.

Q That is actually, from a medical perspective, within reasonable medical probability, the neuroscience community says it can't be done today; correct?

A Correct.

Q And you agree with that opinion, do you not?

A Correct.

Q In this case, there is one diffusion tensor imaging study that was conducted on May 23, 2015 by you; correct?

A Correct.

Q And that study cannot, in your opinion, date when the positive findings arose? Fair statement?
A Correct.
Q And we talked a little bit before about --
THE COURT: I don't mean to nitpick, but when you say when the positive findings arose, I think what you mean to say is when the condition giving rise to the positive finding on the May 23rd investigation arose.
Q With that clarification, what the Judge and I have now asked is accurate?
A I'm sorry?
Q Let me ask it a little bit differently. In other words, there is a positive -- strike that.
You looked at a diagnostic diffusion tensor imaging study on May 23, 2015. It demonstrates white mass abnormalities. Let's start with that fundamental premise. When you see that, you cannot look at that study to determine when those abnormalities began, can you?
A No, I cannot.
Q That's called dating, isn't it?
A Dating.
Q And the only way to date whatever that underlying condition is is to have an earlier study to be able to compare it to; correct?
A The only way really to date is if it happens acutely.

The patient gets hit by a bus and comes to the office to do a scan, then I can tell you it happened right away. Other than that, I think that it would be pretty difficult.

Q In fact, within reasonable medical probability, it cannot be done, can it?

A No. I mean, no, not really. It would be hard to tell.

Q Doctor, is that why when you wrote your litigation report to Mr. Bhurtel in the end of that paragraph where I was talking about that starts with the sentence impact, you used the phrase possibility as opposed to probability?

A Where do you see that?

Q Right here (indicating). That's why you used that phrase, right, Doctor?

A Correct. Uh-hum.

Q And it may have predated the September 2, 2011 incident that gives rise to this lawsuit; correct?

A It's possible.

Q Now, you mentioned earlier during your testimony about the cervical -- the findings on cervical MRI that a left subdural hygroma can arise from a number of causes; correct?

A Yes.

Q Tell the jury what the causes of subdural hygromas are besides trauma. Please list them for the jury.

A Mainly the cause that we have seen is trauma.

Q Doctor, I asked for other causes.

A You can get a subdural from like infection, inflammation, you know, status post meningitis.

The problem with that is this is unilateral and a lot of the other conditions are bilateral or in other areas. The only thing is that since it is unilateral that's why it was sort of striking it would be secondary to some type of traumatic event. You can get it from cancer. There is a whole list of, you know....

Q Just so we understand, the hygroma is essentially a space that gets created that thereafter gets filled with fluid and the question is what causes the space; correct?

A Correct. Well, it is a potential space, so the space gets filled with fluid. And what's inside there, it could be blood, it could be infection, pus, you know. In this case, it looked like it was fluid. It could be resolved hemorrhage.

Q And the space in the brain with an advanced aged patient, a patient that is getting older, can be caused by normal atrophy of the brain; correct?

A The problem with that is, like I showed you on the opposite side, that the brain comes out all the way to the -- you get those sorts of pegs of gray/white matter that come out that project into it. They're not really pushed aside like that. That's what -- when you get that mass effect where it is pushed aside, that would be more indicative of a subdural collection of hygroma.

Q I appreciate that, but my question is can you have asymmetrical brain atrophy in an advanced patient such that one side has atrophy greater than the other, therefore, one side begins to have the hygroma?

A No. It's just atrophy within prominences of sub-spaces.

Q Let's talk about some of the other causes of hygroma. You mentioned that you can have a tear in the subdural -- in the dura, which is the sheathing around the brain; is that right?

A You would get a tear that would almost act like a valve sometimes. It could allow fluid in but not allow fluid out.

Q So we all have an understanding, when you're talking about dura, you're talking about the sheathing around the brain having some sort of disruption that allows the central nervous system into the brain?

A It allows the fluid. There is like three membranes, the pia, the arachnoid, and the dura.

Q And one of the causes of dura tear can be as a result of a prolonged hypertensive patient; correct?

A Hypotensive.

Q I'm sorry. You corrected me. What I said is now correct?

A And it would be a drop in blood pressure and you can get it from that, yeah, but -- because blood pressure drops all of a sudden, it would usually be bilateral, not unilateral.

Q So with the change and all of the extra information, what I said is true?
A Correct.
Q Doctor, what is small vessel ischemic disease?
A That's what you get like if you have high blood pressure, migraine headaches, Lyme disease. And just sometimes just getting old, a lot of these patients don't drink and they get dehydrated and they can get more white matter changes.
Q Does Mr. Ahsan have small vessel ischemic changes?
A Yeah, probably mild to a degree.
Q Were they diagnosed on your diagnostic film?
A Yes.
Q Were they diagnosed on the diagnostic films of the brain conducted by the other radiologist?
A I don't know.
Q Let's talk about does the atrophy condition -- strike that.

Does the likelihood of developing a hygroma based upon a tear in the dura increase when a patient has multiple conditions like we've talked about? So the patient is hypotensive. The patient does have small vessel ischemic disease.

In other words, if you add one on top of the other, does that make you more susceptible to the dura tear?
A I don't see that as increasing the risk of getting that.

The only one is the hypotension, which, again, you would see on both sides, not just one side.

Q In this case, Doctor, you talked a little bit about the condition that he has, the hygroma, and I want to make sure that I understand this. With no medical attention at all, that may stay the same as it exists today; correct?

A Correct.

Q And with no medical attention at all, that may actually get smaller; correct?

A Yeah. Uh-hum.

Q In this case, if I remember correctly, when you compared --

A You forgot the third option; it may get bigger.

MR. O'HARA: Judge, I would ask that this witness be directed to answer the question.

THE COURT: Please answer the questions that you are asked.

THE WITNESS: Okay.

Q In this case, based upon the diagnostic studies that you performed in September of 2014 and May of 2015, the hygroma got smaller?

A It may have gotten a touch smaller, but it was pretty much the same size, I believe.

Q You actually used the phrase it got slightly smaller; correct?

A I -- let me see.

Q If I represent to you that's what you testified to on direct, would you disagree?

THE COURT: He's not reading from your report. He is reading from his notes of your testimony.

A The measurements?

Q Yes, sir.

A It was like .01, it was like .1. It was like very insignificant. It is so slight -- it depends on where you're measuring it.

Q But you're the one that measured it. In your measurements, the hygroma got smaller?

A Very slight.

Q Based upon the individual characteristics of the patient, that decrease in size, even if microscopic, may continue without medical attention, hence the reason why you tell the patient they need to be followed; correct?

A Not because of that. Because of the finding of the hygroma is why I tell the patient that they need to be followed.

Q But if there are changes in the hygroma, you're going to want the patient to receive medical care just to be safe; right?

A I would want them to be followed up.

Q Doctor, you are aware that in this case plaintiff's

primary care physician, his general practitioner was the first person that he went to see after the trauma; correct?

A I don't know.

Q Do you have any information about the treatment provided by Dr. Guha either before or after this accident?

A No.

Q Do you have any information as to whether Dr. Guha treated this patient before or after the accident for problems with his head?

A No.

MR. O'HARA: Judge, I am going to use some of these blow-ups. I'm going to put them up alongside the jury.

Q If you need to step down, by all means. You were shown what I have put before you one of the brain MRIs, which is marked as Exhibit 110-E. Do you remember being asked questions about that document?

A Yes.

Q In doing so, you described the mass, as well as bilateral atrophy in that brain study; correct?

A Correct.

Q Can you point out to the jury where -- when you see that there is brain atrophy in this study, could you point out to the jury where you are talking about?

A Basically it's just an -- it's basically looking at a lot of brains, I can tell that his sulci, and the number of them

and the prominence of them basically is mild atrophy.

Q Okay. And is one side in that film based on your visualization showing different paces of atrophy than the other side?

A I would say they're the same.

Q Are they identical? To someone who is trained as you are, are there micro differences in the atrophy to the right side versus the left side of that brain?

A It's about the same. The space here, let's say, the right side at the front here, is pretty much the same as the space over here on the left. The sulci is pretty much the same depth. I would say it is pretty comparable.

(Continued on following page.)

(Continuing)

THE COURT: Doctor, you keep using the term the sulci and I think that has got me and the reporters a little confused, maybe the jurors too. Spell it and then tell us what it is.

THE WITNESS: Sulci, S-U-L-C-I, and those are the -- those are the spaces between the gyri, G-Y-R-I, and they are basically how deep, you know, how deep these clefs go. You know, the brain is sort of like convoluted. It's sort of -- it's sort of like lots of -- lots of ridges and folds. So it's very complicated. It's all kind of different neural connections and networks.

EXAMINATION CONTINUING

BY MR. O'HARA:

Q And while you are that topic the, two sulci that you are comparing are these two marks at the top portion of this, correct?

A Yeah, I was looking at that and the space --

Q But I want to focus on this white line (indicating) and this white line (indicating) when you're talking about the sulci, which has atrophy, you are talking about those two lines there, correct?

A Yeah, the thing is if you look at this -- you're disappointed I can see --

Q I just want you to answer --

A Okay, look. If you look at this, it's a little tilted. You see that, because this one is a little bit bigger than that. So this one is a little bit deeper than that.

Q That's subject to dispute based upon the view of other radiologists, would you agree with that statement?

A Yeah, a little bit.

Q Okay, thank you.

A Don't try and read MRIs.

Q I'm sorry?

A I said don't try and read MRIs.

MR. O'HARA: Judge, now that I've shown this to the witness, may I publish this to the jury?

THE COURT: Yes, sure. And, once again, that's 110-E I think?

MR. O'HARA: 110-E, yes, sir.

(Exhibit published.)

BY MR. O'HARA:

Q Doctor, when you were testifying earlier I wrote down that the original cause of the hygroma, you noted it might have been blood or it might have been a hygroma to begin with.

Do you remember that testimony?

A Correct.

Q And when you say it might have been a hygroma to begin with, does that mean that there may have been a hygroma that existed on September 1st, 2011, the day before this accident?

A Correct, it could be.

Q And there might have been one that lasted for a number of years that had either stayed at that same size or been on a slightly decreasing scale in terms of getting smaller?

A It's possible.

Q When a patient, and this may be outside your expertise so tell me and I will ask it to another doctor, when a patient has a hygroma where there is fluid that is accumulating in whatever that space is, what are the types of symptoms that you expect a patient to see in a clinical setting?

Before you answer that, is that within your area of expertise?

A That would be outside my area.

MR. O'HARA: Okay, then I will withdraw the question, Your Honor.

BY MR. O'HARA:

Q Doctor, we talked before about the diffusion sensor imaging studies and whether or not in a single study you could date a particular white matter change.

Does that also apply to non-DTI related MRI studies; in other words, if you have one MRI study that shows a particular condition, that study is not sufficient to identify when that condition occurred, is that generally speaking accurate?

A Correct.

Q Doctor, let me show you one of the films that you were asked about before, which you identified as 110-H.

Doctor, if I remember your testimony correctly, this is also the brain MRI from February 4th, 2014, correct?

A Yes.

Q And in that film you testified, if I wrote my notes correctly, that you can see the left subdural hygroma, correct?

A Right.

Q And the doctor who reviewed that film that wrote the report on February 4, 2014 from Apollo Imaging did not see what you see, you agree with me, correct?

A I guess so, yeah.

Q Well, let's not guess, let's make sure. Here is the report.

A Yes, he didn't see it.

Q Okay.

Show us exactly what you're talking about when you're telling us that you see something on the film that another physician didn't see?

A This collection here (indicating).

THE COURT: Pointing to the upper right-hand side of the exhibit, upper right-hand quadrant of the photo.

THE WITNESS: Yes.

BY MR. O'HARA:

Q So you are talking about the white kind of outline --
A Yeah.
Q -- on the outside the brain?
A Yeah.
Q That runs for -- literally from an inch at the top of the exhibit all the way down, and it differs in size --
A Right.
Q -- all the way to the mid-portion or back portion of the left-hand side of this man's brain?
A Right.
Q Doctor, in terms of anatomically so the jury understands, how long a distance is this on a man's skull? Is this six inches, eight inches, where does it go from?
A It's about -- it goes from here (indicating) to about, I would say, over here (indicating).
Q Okay, so we are talking about if you can turn and show the jury on your head, where would we be looking --
A We'll do it on your head.
Q Sure.
A Go down over here. So let's say over here, it would be like it would go from here (indicating) in the frontal to about over here (indicating).
Q So you are talking about somewhere from above my eyebrow?
A Yeah.
Q All the way to the middle portion of my head?

A Yeah.

THE COURT: By your ear?

BY MR. O'HARA:

Q By my ear?

A Yes.

Q Thank you.

Doctor, I am going to shift gears and move to the cervical spine, okay?

A No problem.

Q So you were asked a series of questions about the diagnostic studies that you ordered at the request of Dr. Krishna in which you then wrote your report on June 19th, 2014, correct?

A Correct.

Q And in that report, what I want to do is -- do you have that report in front of you, Doctor?

A I have this report (indicating).

MR. O'HARA: May I have a moment, Your Honor?

THE COURT: Yes.

(Pause.)

BY MR. O'HARA:

Q Doctor, I am going to hand you the three-page report so you have it in front of you.

A Thank you.

Q Doctor, let's work through the evaluation that you did to

identify first abnormal changes in his cervical spine.

Working your way down, is straightening as well as reversal of the normal curvature of the cervical spine an abnormal finding?

A It's basically a description of what I see on the film. It may or may not be abnormal.

Q And in order to determine whether it is or is not abnormal, you have to look at earlier studies if they were performed?

A The doctor would have to determine whether the patient has a neck spasm. I mean it's just a description.

Q Can you have straightening and reversal of the normal curvature based upon chronic problems with your neck?

A You may.

Q Next, you talk, two sentences down from that, desiccation of all visualized disk space was noted. Tell the jury what desiccation is.

A It's basically an alteration. The disk spaces are comprised of what we call glycoproteins. It's a combination of a protein and a glucose, and so as we get older they usually say, you know, oh, it's drying out. It's not really drying out, it's basically the glycoprotein content of the disk is being altered and changed so that it gives you this desiccation appearance. The dark appearance on T2.

Q Just from a non-medical perspective, so what that means

desiccation is actually getting smaller?

A It may stay the same size, it may get smaller.

Q And that is a chronic condition arising out of the normal aging process in every human being, just happens at different paces; fair statement?

A I've seen it after acupuncture and I've seen it after trauma.

Q And you've seen it predominantly in patients that are advanced age --

A Yeah.

Q -- With no trauma and no acupuncture, correct, that's the majority of patients who have desiccation in their cervical spine?

A And I've seen it in young patients too, but I've seen it mainly in older patients.

Q Older patients that are presenting with the desiccation, among other things, that's just the product of being an older person?

A Correct.

Q The next section of your report you note posterior osteophytes are seen at C4/5, C5/6 and C6/7.

First, what are osteophytes?

A It's basically a bone that's formed behind the disk. It's like a healing process for usually a problem with a disk, but it could also be part of just degeneration. Most of the

time there's a disk problem and you get these osteophytes.
Q The overwhelming majority of cases that you've seen in your career where there are findings of osteophytes are in patients of advanced age with no trauma, correct?
A I -- I think it's more of a disk problem because I always see them at the disk spaces or at the foramina, and it seems to be associated with the disk.
Q And in those cases when it's associated with the disk, the majority of the patients that you are seeing with osteophytes are of advanced age; fair?
A That doesn't mean they don't have a problem with the disk, but --
Q I didn't say that, Doctor, I'm just asking you whether what I said is true that the majority of your patients in your radiologic career when you have findings of osteophytes at C4/5, 5/6 and 6/7, the majority of those patients are presenting with osteophytes as a result independent of any trauma is because of their natural aging, is that a true statement?
A Who may or may not have a problem with the disk.
Q So with that additional information what I have said is true?
A Correct.
Q Thank you.
You note mild to moderate scoliosis in the cervical

spine. Can you tell the jury what that is?

A Basically, the head -- the spinal curvature is a little like an S like, and that just could be because the technician positioned the head like that or maybe the patient needs to -- has a scoliosis. So sometimes it's difficult to tell if that's significant.

Q That is not a trauma-induced condition?

A It's a description. Again, the doctor that sends the patient has to determine whether there are symptoms related to whatever happened to the patient from muscle spasm or whatever.

THE COURT: Maybe put differently, you could not infer that a trauma occurred because you made a finding of scoliosis on a film, is that accurate?

THE WITNESS: No, I wouldn't be able to.

MR. O'HARA: Thank you.

BY MR. O'HARA:

Q Now, you note left-sided posterior lateral disk herniation at C7/T1.

In terms of where we're talking about, Doctor, we're now talking about down out of the cervical spine and into the thoracic spine, correct?

A You are talking about the junction between the neck and the thoracic spine.

Q And in terms of anatomically, where does that occur in

the human body in relation to the shoulders, is it above or below the shoulders?
A It would be pretty much at the level, it's where the neck is really.
Q Okay.
A Where the neck meets the body.
Q So it would be right around the shoulder level?
A About the shoulder level, like the last -- you ever see people have this bone that sticks out? That's usually sometimes C7, like in the back of the neck.
Q And you note directly below that C7/T1 reference with the disk herniation, then again you have a degenerative or chronic finding of desiccation, correct?
A Correct.
Q Onto the next page, Doctor, 2068, you talk about mild to moderate narrowing of the spinal canal from C4 through C7. All four levels, correct?
A Three levels.
Q I'm sorry, my apology. I don't add that well either.

Three levels you have narrowing in the cervical spine, correct?
A Narrowing of the AB diameter.
Q Does that narrowing occur as a result of chronic and or degenerative changes in the cervical spine?
A It's a combination of disk pathology, osteophytes,

degenerative changes of the facet joints. It's a combination of everything. It's basically just a description and it gives the doctor an indication of how much spinal canal stenosis there is.

Q The fact that that exists, you cannot infer it was caused by trauma, can you?

A Well, if he has -- no, I can't.

Q The same with respect to mild narrowing of the disk spaces at C4/5, C5/6, C6/7, you cannot infer that he has that narrowing based upon trauma; fair statement?

A That's fair.

Q You note a posterior central disk herniation at C3/4, which also shows ventral impingement on the thecal sac. First, what is that?

A It's basically the spinal cord is surrounded by like a cellophane, like a thecal sac, and it protects the spinal components from infection and trauma. And so it's pushing on that thecal sac. It's not pushing on the cord, it's pushing on the sac.

Q And that is posterior central, correct?

A Yeah, uh-hum.

Q The C3/4 central disk space, the nerve that innervates the upper extremities, where does that C3/4 nerve help the body to move and feel?

Do you understand what I'm saying?

A It usually comes down under the pedicle.
Q Okay. And when the cervical, the nerves in the cervical spine innervate the upper and lower arm depending on the level of the disk, correct?
A Correct.
Q If there is a problem at the C3/4 level such that there is narrowing that is impinging on the thecal sac, both sides, where does the patient have symptoms?
A Usually both sides, but it's hard to tell because the patient's laying down. So when a patient stands up there may be more impingement, and sometimes it may impinge more on one side than the other. And it looks like it was central on that level.
Q And I appreciate that, what I'm trying to get at is if there is a central disk impingement impinging on the thecal sac at C3/4, where is the patient going to feel it if they feel it in both arms? Are they going to feel it in upper arm, their mid arm, their lower arm, their hands and fingers, where anatomically?
A It would go along the brachial plexus, so, you know, it depends.
Q But they feel it in both arms?
A Probably both arms.
Q The next line you talk about mild to moderate hypertrophic degenerative changes were noted to involve the

facet joint in the mid and lower cervical spine region.

Do you see that?

A Yep.

Q So first, when you're talking about mild to moderate degenerative changes, can you describe for the jury the difference between mild and moderate changes?

A It's basically just an eyeball, you know, assessment based on the patient's age and just from looking at a lot of spines that there are some degenerative changes involving the posterior part of the spinal canal. It's outside of the spinal cord and thecal sac, posterior to it.

Q And these degenerative changes you would agree with me arise from a chronic aging process as opposed to you cannot infer they are from a trauma; fair statement?

A Correct.

Q Next line, and I want to take the next two together. You note that this patient has a right-sided disk herniation at C4/5, and a left-sided disk herniation at C5/6 and C6/7.

Do you see that?

A Yes.

Q The disk herniation at C4/5, which is right-sided, affects what upper extremity in terms of symptoms that he would exhibit?

A It may be the shoulder.

Q Right shoulder?

A Yeah.
Q Or his right arm?
A Right arm, yeah.
Q Or his right hand?
A Right hand, yeah.
Q And he also has disk herniations on the left side at two levels, C5/6 and C6/7, correct?
A Yes, correct.
Q And those disk herniations, because they are left-sided, you would expect him to have symptomatology in his left arm, left shoulder and left hand, correct?
A Correct.
Q Doctor, I may have asked you this, and if I did I apologize, were you given any information about any neck pathology this patient had prior to the time that he saw you?
A No.
Q Were you given any information about any care or treatment that he had from any prior medical provider?
A No.

THE COURT: Go ahead.

MR. O'HARA: Keep going?

THE COURT: Yes, yes, yes, I'm stretching.

MR. O'HARA: Okay.

THE COURT: All this talk of desiccation is making me want to stretch my back.

BY MR. O'HARA:

Q Doctor, just one final area.

Disk herniations that are traumatic, that occur as a direct result of trauma, is there an expectation that you will have the immediate onset of severe symptoms depending on the disk?

A It depends. I mean sometimes we see it right away, sometimes it takes time.

Q And if you have one disk, and tell me if this is an inaccurate description, I've heard the phrase slipping a disk, okay?

A Uh-hum.

Q Slipping a disk as you understand it means what medically?

A A disk herniation.

Q And when you have a disk herniation at one level, depending on the patient and how significant that disk has slipped, if it is a significant herniation you expect that patient to have immediate onset of symptoms, correct?

A It really depends on the person.

Q Fair. And in a person that has symptoms from one slipped disk, you would expect that those symptoms would be more profound and, therefore, there would be greater complaints if there were two disks that were herniated in an event; fair?

A It depends. It depends. You could have one disk if it's

pushing, if it's compressing the cord, the patient has to go for surgery because he could become paralyzed, quadriplegic.

Q I appreciate that, but try and stay with my question.

Right, so if the patient has symptoms from one herniated disk that has slipped as a result of some bending over, picking up a box, carrying a suitcase in an airport, reaching up and turning in a funny -- in an awkward position, lifting with inappropriate ergonomics, if a disk slips and the patient experiences the immediate onset of symptoms, they don't go away, do they?

A Sometimes.

Q They go away with care, treatment, and if there is the immediate onset of symptoms they require medical attention, don't they?

A Sometimes. Again, it depends on what it's doing. It depends on the level, too.

Q How about when it's two disks, does it go away without there being immediate medical attention and care and treatment?

A Again, it depends on how -- what it's doing. Is it like extruded? Is it like -- is it like a piece of fragment that's off?

You know, I mean your question is not really accurate. It's a very general statement. It does not reflect the reality of the situation. In general, patients that have

a back problem, and I could tell you from my personal -- my personal experience, that is -- it's not going away. It just is, you know, chronic. You know, like a day like today is not that great.

Q And I am going to end that pain for you.

And when you have a chronic back problem that doesn't go away, the greater the disks that are involved, the greater the persistent problem; in other words, when you've got it at C3/4, C4/5, C5/6, C6/7, C7/T1, you have five herniated disks, that if you are experiencing pain and discomfort in your experience that ain't going away, is it?

A Most of the times, no.

MR. O'HARA: Thank you, Doctor.

THE COURT: Mr. Bhurtel, do you have redirect?

MR. BHURTEL: Just a little bit, Your Honor.

THE COURT: Is it brief or is it extensive?

MR. BHURTEL: It's going to be brief.

THE COURT: I'm sorry?

MR. BHURTEL: It is going to be brief.

THE COURT: Okay, if you want to do it from your table, you may. It's up to you. All right, then let's go.

MR. BHURTEL: Before, Your Honor, I just want to offer the evidence. I believe I may not have heard evidence before, the Plaintiff's -- Joint Exhibit 14.

THE COURT: I don't know what it is. We will take

care of it tonight after the jury is gone, if that's okay, or do you need it for your redirect?

MR. BHURTEL: Yes, one is I need it for the redirect.

THE COURT: Then you will have to offer it and make a reference to the Bates Number, but let's move.

MR. BHURTEL: Bates number 1763.

MR. O'HARA: Say again.

MR. BHURTEL: 1763. That's the Exhibit 38.1, Advanced Radiology's film.

(Continued on the following page.)

(Continuing)

THE COURT: Any objection?

MR. O'HARA: I need to find it.

THE COURT: I'm sorry, I thought you had it. Take your time.

MR. O'HARA: You are simply offering the film?

MR. BHURTEL: Yes.

MR. O'HARA: Judge, if we're talking about the film from November 3rd, 2012, no objection.

THE COURT: I assume that is what it is.

Mr. Bhurtel?

MR. BHURTEL: Yes.

THE COURT: Okay, then it is received.

(Plaintiff's Exhibit 38.1 received in evidence.)

REDIRECT EXAMINATION

BY MR. BHURTEL:

Q Doctor, I just want to, I want you to assume that Mr. Mostafa Ahsan had neck complaint in March 2008 one or two times and then he had a second time neck and the left shoulder pain complaint on February 9, 2009. After that, until the September 2nd, 2011, he did not have a complaint about neck pain or left shoulder pain. And his neck pain and left shoulder pain, about two-and-a-half years before, one or two therapy and then it's gone.

So, based on these facts, would the report you

prepared that February 9th, 2015, does it change your finding of that report?

A As far as what? I don't understand the question.

THE COURT: If you found out that he had that history from 2008 and 2009.

THE WITNESS: Yes.

THE COURT: And it went away as described by Mr. Bhurtel, would it change your conclusion that the positive findings in your 2015 report could be attributed to a 2011 trauma?

THE WITNESS: No. I don't believe so.

THE COURT: Did I hear your question right, Mr. Bhurtel?

MR. BHURTEL: Yes, Your Honor.

THE WITNESS: I mean, it's good that it went away --

THE COURT: A yes or no answer is sufficient.

What is your next question?

Q After this long cross-examination --

MR. O'HARA: Judge, objection.

THE COURT: Sustained.

After the cross-examination. Ask your question.

MR. BHURTEL: Okay.

Q After the cross-examination, do you have any changes of your finding relative to the February 19th, 2015, report?

A No.

Q And when you prepared your report, February 19th, 2015, you reviewed Apollo Imaging's films yourself, right?
A Yes.
Q And then you made a finding?
A Correct.
Q And the same thing with respect to the Advanced Radiology's images.

Did you review the film and you made a finding, right?
A Correct.

MR. BHURTEL: My examination is complete, Your Honor.

MR. O'HARA: No further questions.

THE COURT: You are excused, Doctor.

THE WITNESS: Thank you.

THE COURT: Take your afternoon recess and enjoy it. I will see you in about ten minutes.

THE COURTROOM DEPUTY: All rise.

(Jury exits.)

(In open court; outside the presence of the jury.)

THE COURT: Thank you for your patience, Doctor.

THE WITNESS: Okay, thank you.

(Witness excused.)

THE COURT: Counselors, a couple of things.

First of all, sometimes when I stand up and walk

around, I am noticing that the jury's attention is flagging. I may even perceive one or two to be nodding off a little bit and I am trying to create a little bit of a stir to make sure that they are with us. On this occasion I was able to see that someone who I thought was nodding off was taking notes. I thought they were just looking down and falling asleep. They were, in fact, writing, so I was relieved.

Second, do you have a commitment from the Doctor to return on another day?

MR. BHURTEL: Yes.

THE COURT: When?

MR. BHURTEL: Friday.

THE COURT: He is coming back on Friday.

MR. BHURTEL: Friday morning.

THE COURT: Okay. So, you will get your direct in today and we will have the cross on Friday morning?

MR. O'HARA: You are going to get whose direct in tonight?

THE COURT: The remaining doctor.

MR. O'HARA: Okay. The one thing. We, Pre-Trial in August, talked about the fact that I was going to bring Dr. Basos here on Friday and I paid the fee to reserve him, so. We have Head coming in the morning and Basos coming in the afternoon. I can change it.

MR. BHURTEL: No, that was it, we did it.

THE COURT: So, what about Thursday?

MR. BHURTEL: Thursday.

THE COURT: With Dr. Sinha.

MR. BHURTEL: He has surgery Thursday.

THE COURT: How long is your direct going to be?

MR. BHURTEL: I will try.

THE COURT: Can you get it done in an hour?

MR. BHURTEL: Try to do it.

THE COURT: Let's try to do it. Let's get him in here right now. Get him up on the stand, get your Exhibits ready, let's go.

MR. BHURTEL: Your Honor, the plaintiff offers Exhibit 14, that is.

THE COURT: You are moving Exhibits into evidence now?

MR. BHURTEL: Yes, Your Honor.

THE COURT: If you do not need a witness for it, then we will do it after the jury is gone. Focus right now on being ready to ask your first question as soon as the jury is in the box. I will stay late with you tonight, but not waste the jury's time, please.

(Witness enters and takes stand.)

THE COURT: Come on up and have a seat, Doctor.

THE WITNESS: Thank you.

THE COURT: Let me know as soon as you are ready to

ask your first question. I will be right back.

(Recess taken.)

(In open court; Judge STEVEN M. GOLD enters the courtroom.)

THE COURT: Are you ready to go?

MR. BHURTEL: Yes, Your Honor.

THE COURT: Everything is pre-marked?

MR. BHURTEL: Yes, except this one, Your Honor.

THE COURT: I told you, you could put Post-Its over the handwriting if you want to use it.

MR. O'HARA: The Doctor has the unaltered one.

THE COURT: Whichever you prefer, Mr. Bhurtel.

Are you ready?

MR. BHURTEL: Yes, sir.

THE COURT: Let's see if the jury is ready.

(Pause in the proceedings.)

(Jury enters.)

THE COURT: I hope I did not rush your break too much. I need to get one more witness in today if we possibly can.

Please, swear the witness.

Please, rise and raise your right hand.

THE COURTROOM DEPUTY: Please, stand and raise your right hand.

(Continued on following page.)

**A J O Y S I N H A**,

called as a witness having been first duly sworn/affirmed, was examined and testified as follows:

THE COURT: Please, state and spell your name for us.

THE WITNESS: Ajoy -- A like April, J-O-Y. Last name Sinha -- S-I-N-H, like Harry, A like apple.

THE COURT: Sinha.

THE WITNESS: Yes.

THE COURT: Please, be seated.

THE WITNESS: Thank you.

THE COURT: Please, inquire.

MR. BHURTEL: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. BHURTEL:

Q Good afternoon, Dr. Sinha.

A Good afternoon.

Q What is your medical education?

A Well, I went to medical school in India and subsequent to that I did internship. And then residency, what is called house doctor in India. Then a diploma in orthopedic surgery.

Subsequently, I went to Nigeria, North Africa, I practiced as an orthopedic surgeon. And for three-and-a-half years.

Then, I did a research fellowship as a visiting clinician at Mayo Clinic, Rochester, Minnesota. Subsequent to that, I took my exam for training in America or Canada. And one year I did general surgery residency at Booth Memorial Hospital, Queens. And four years of orthopedic training at City of Ottawa, Canada.

Subsequently I did a year of fellowship at Johns Hopkins, Baltimore. In 1996 I came back to New York and then started working in hospital in the City. And after two years or three years later, I had, I became the chief of arthritis and arthral reconstruction at North Shore Forrest Hills.

THE COURT: In what kind of reconstruction?

THE WITNESS: Reconstruction of joints.

THE COURT: Joints.

THE WITNESS: Yes, sir.

A Subsequent to that, I was practicing at the same time at New York Hospital, Queens and after a while, I got administrative position, acting chairman of Department of Orthopedics and rehabilitation at New York Hospital, Queens.

Subsequently, after three -- two-and-a-half years, I had an offer to be chief of orthopedics at Mount Sinai Hospital, Queens, which I did for three years and subsequently, I started my own practice. Now I have surgery centers for, depending on where my block times are, that's where I operate. I have an office in Flushing since 1997.

That is my story.

THE COURT: So, you would be considered an expert.

You consider yourself an expert, well-trained in orthopedic surgery.

THE WITNESS: Correct.

THE COURT: Do you tender him as such?

MR. BHURTEL: Yes, Your Honor.

THE COURT: Is there any objection?

MR. O'HARA: No objection, no voir dire.

THE COURT: The witness is received as such an expert.

Please, inquire.

MR. BHURTEL: Thank you, Your Honor.

Q Doctor, did you provide treatment to Mr. Mostafa Ahsan?

When was the first time you started providing the medical treatment to Mr. Ahsan?

A I just need a moment so that I go through the paper. There are a lot of papers.

I have a report made sometime couple months ago.

THE WITNESS: So, Your Honor, you like me to read line per line?

THE COURT: No, sir. Please, answer the questions.

Does your narrative report remind you of when you first saw Mr. Ahsan?

THE WITNESS: Yes. January 3rd, 2013.

THE COURT: January 3rd of 2013.

THE WITNESS: Correct.

MR. BHURTEL: Your Honor, may I, Exhibit 46, Bates number 1941.

THE COURT: Exhibit 46, 1941.

MR. BHURTEL: Through 1953.

THE COURT: 1953.

MR. BHURTEL: Right.

Q Doctor, can you look at it, this report?

MR. O'HARA: Judge, I'm sorry. Can we just make sure that we're talking about the same thing?

THE COURT: Sure.

MR. O'HARA: You're talking about his office records or his report?

MR. BHURTEL: His office records.

MR. O'HARA: Okay, you just said his report.

MR. BHURTEL: Oh.

MR. O'HARA: Okay.

THE COURT: Ask your question.

Q Doctor, is this the first report you prepared for Mostafa?

A I see here report dated, I think, 9/2/2011. No, that was date of accident.

Date of visit was 1/3/12.

Q Okay. All right. This is the first time you saw Mostafa

Ahsan?

A I think that's, yes, that's the time I was working for the hospital and that's one of the reasons that -- this is why I don't have probably update from the hospital because I was a full-time employee of the hospital at that time.

Q All right. So, this is the first time you saw Mostafa Ahsan?

A Correct.

Q All right. And who referred you?

A I don't see on my first report the name of the referral, but on second report I see it was referred by Dr. David Guha.

Q And what body part you were involved to provide the medical treatment to Mostafa?

A Left shoulder injury.

Q And in the first visit, what was Mr. Mostafa's complaints to you?

A This is the initial visit of 56 years old man, was involved in accident on 9/2/11 at Staples. Went to his PCP for left shoulder pain. Pain medication, physical therapy, keep getting worse. On zero to ten his pain level is seven. History --

THE COURT: Doctor, the point here is not to read your records. We can probably do that without you. The point is to answer the questions.

THE WITNESS: Okay.

THE COURT: Can you tell from your notes, what was Mr. Ahsan complaining about when you saw him?

THE WITNESS: Left shoulder pain.

THE COURT: Thank you.

Q And did you provide any treatment that day?

A Yes.

Q What was the treatment you provided to him?

A Naproxen 500 milligrams, 30 tablets, one tablet PO daily. And he was given referral for physical therapy of the left shoulder. Moist heat, electrical stimulation, ultrasound, range of motion therapeutic exercise, massage to reduce pain, increase his strength, increase mobility, reduce swelling. Frequency, three times for eight weeks.

THE COURT: Question?

Q And how often, how many times you provided treatment to him?

A Several times.

THE COURT: Over what period of time? When did you begin seeing him and when was your last visit? I think we said you started seeing him in January of 2012.

THE WITNESS: Correct.

THE COURT: When did you see him last?

THE WITNESS: Few months ago.

Q And Doctor, did you do any particular treatment to his left shoulder?

A Yes. First he went through the conservative treatment. He failed conservative treatment, which includes physical therapy and antiinflammatories and, as I stated before, all of those modalities in physical therapy, and subsequently it continue to get worse and his clinical examination culminated with an MRI, correlated with an MRI and was my impression that he has internal dearrangement of the left shoulder.

Subsequently he underwent, we discussed about the risks and benefits of the options, and he consented for left shoulder arthroscopy as an option. And he had arthroscopic surgery, which is a minimally invasive surgery where you make three holes in the shoulder and from one hole you put a camera inside and see what you find, your intraoperative finding. We get picture and thereafter, what needs to be done we complete doing with another hole and with a drainage from third hole. Because water flow and it has to come out from the shoulder.

And the intraoperative shows that he has labral tear, subacromial impingement and -- I need one second. What we in medical terms call superior anterior labral tear which means in the front and on the top. Also, there was synovitis. Means, the inside of the shoulder joint, there is synovium and this synovium gets irritated. That also causes pain.

And then, we cleared that bone, which was pushing on his muscle. That bone is called acromion sitting right here on the top. So, we cleaned that. That is called

acromioplasty. That is shaving of that bone. So, in a nutshell, operative procedure including arthroscopy of the left shoulder, debridement of the flap region, means debriding, is shaving, cleaning of uneven surface to make his surface smooth.

Then, what we call subacromion decompression which just now I explained, this bone right here. And Mumford procedure is excision of the distal end of the clavicle where two bones comes and joins together, one is the front collar bone and one is the back, the scapula, which is called an acromion comes here and joins together. And total synovectomy. That synovium, which was any synovium, inflamed synovium. So, we cleaned that synovium.

THE COURT: Was this all one surgical procedure or were there more than one?

THE WITNESS: Yes, it's one.

THE COURT: When was it conducted?

THE WITNESS: The date of surgery is 12/18/14.

THE COURT: 12/18/14.

THE WITNESS: Correct.

THE COURT: So, that is almost two years after he first came to see you; correct?

THE WITNESS: Yes, sir.

THE COURT: So, there was a period of time where he was treated with painkillers, physical therapy, electrical

stimulation and other conservative modalities.

THE WITNESS: Yes, sir.

THE COURT: After some period of time he continued his pain complaints.

THE WITNESS: Yes, sir.

THE COURT: Then you recommended this surgical procedure to him.

THE WITNESS: Correct.

THE COURT: And it was performed, as you said, in a minimally invasive way.

THE WITNESS: Yes, sir.

THE COURT: Was he admitted to a hospital for the surgery?

THE WITNESS: He was in surgical center. Usually these procedures are done on a same-day procedure. The patient comes and then he goes back home after surgery and approximately, two hours of -- in recovery room. And sometime it becomes four hours of the recovery room, depending on the arrangement. And then they go home.

THE COURT: So he, he came in for the surgery in the morning and he went home by the late afternoon; correct?

THE WITNESS: I don't recall the time, but yes, that's how it happens in the same-day surgery.

MR. O'HARA: Judge, may we see you for five seconds?

THE COURT: Yes.

(Side-bar conference held on the record out of the hearing of the jury.)

(Side-bar.)

MR. O'HARA: The only reason I'm doing this is because the Court just asked a question.

The date of the initial office visit is not January 3rd, 2012. It's January 3rd, 2013. There's multiple occasions in the transcript. It's ultimately corrected by the reader, so I don't want there to be wrong perception.

THE COURT: Just so the record is clear because it will not show from the transcript, the reason I did the summation is because I can see from the looks on the jury's faces that the witness's accent is making it hard for them to capture the subtleties of his testimony. I am not trying to lead him or emphasize it, but I do not think they got it the first time.

MR. O'HARA: I just need to cross him.

THE COURT: Right.

(Side-bar end.)

(In open court.)

THE COURT: Doctor, the lawyers together pointed me to some documents that suggested that I misspoke when I said that your first visit was January 2012.

Can you check your notes and tell me if it was 2012 or 2013 January when you first saw him?

THE WITNESS: The date of visit is 1/3/12. That is a hospital note.

THE COURT: What does your office file say is the first office visit?

THE WITNESS: My office files say 1/3/2013.

THE COURT: So, your records show a 2013 January visit.

THE WITNESS: Correct.

THE COURT: Okay.

And, of course, January 3rd is right after the new year; correct?

THE WITNESS: Correct.

THE COURT: All right.

Mr. Bhurtel, I will leave you to your next question.

BY MR. BHURTEL:

Q Doctor, when you say you saw him in hospital, it's a different place you saw or the same place in your office?

A It's a different place. Those days I was working for the hospital and hospital has given a space to see the patients. That was, the address is right on top of it: 23-34 30th Avenue, Long Island City, New York, 11102.

MR. O'HARA: Your Honor, someone just entered the courtroom, I just want to make sure they are not a witness.

THE COURT: Mr. Bhurtel, is the gentleman in the back of the courtroom going to be a witness in your case?

MR. BHURTEL: No, Your Honor. He is the interpreter.

THE COURT: Thank you.

You may proceed.

Q Doctor, when you did operation or surgery to Mostafa, did you prepare a report?

A Yes.

MR. BHURTEL: Your Honor, the Bates Number 875.

THE COURT: 875?

MR. BHURTEL: Yes, to 879.

THE COURT: 879.

MR. BHURTEL: Actually, it is together. 872 is including with his report.

THE COURT: 872 or 870?

MR. BHURTEL: 870.

THE COURT: To 879.

MR. BHURTEL: 879, yes.

THE COURT: Are you offering it in evidence or just directing us to it?

MR. BHURTEL: The report, yes, Your Honor. I am offering that.

THE COURT: Is there any objection?

MR. O'HARA: I have no objection to the operative

report.

But the summary that was prepared, if it's prepared in connection with litigation, it's the same position that we've had from the outset.

THE COURT: So, the operative report is what pages?

MR. BHURTEL: From 875 to 879.

THE COURT: Can we agree that no foundation issue is raised with respect to 870 to 874?

MR. O'HARA: There is.

THE COURT: We can debate it after the witness is gone, assuming he would authenticate it?

MR. O'HARA: I'm sorry, Judge?

THE COURT: Can we argue about 870 to 874, assuming the witness would authenticate the documents, after the jury and the witness are excused for the evening?

MR. O'HARA: Yes.

And we can also, I would ask for the opportunity to do that with respect to the photocopy of 879 for the issue raised outside the presence of the jury.

THE COURT: All right.

So, 875 to 878 are in evidence.

(Plaintiff's Exhibits 875 to 878 received in evidence.)

THE COURT: 879 is in evidence subject to redaction.

(Plaintiff's Exhibit 879 received in evidence.)

THE COURT: And 870 to 874, Mr. Bhurtel, we will bring it up after the jury leaves.

MR. BHURTEL: Okay.

THE COURT: Next question.

(Continued on following page.)

EXAMINATION (Continuing)

BY MR. BHURTEL:

Q Now, 17-A --

THE COURT: 17-A.

MR. BHURTEL: Yes.

THE COURT: You may have to get up to look at that, if you don't mind.

THE WITNESS: Okay. Not at all. So, you want me to explain it. Move it here and don't interrupt me because it is medicine. I have to explain you and the Judge can see.

THE COURT: We can't hear what you're saying and I don't think that you have been asked a question yet.

Mr. Bhurtel, what's your question of the witness?

Q Doctor, the Plaintiff's Exhibit 17-A, can you describe?

THE COURT: It is not a laser. It is a microphone. If you point it at something, it won't illuminate.

A So here is the camera. This is the camera, whether it is focused or not.

So this is here, we are adjusting our camera before the surgery. The camera is put from behind, from like here, inside the joint, and then we start seeing the joint. This is the synovial and this is the labral tear.

Then what you do, still we are coming from the front now. The camera is from behind. This is coming from the front. This is coming from the front. This is a shaver. We

are trying to shave this smooth.

Here is some bursitis and lesion. Lesion means when the tissue inside the joint stick together. When it stick together, it restrict range of motion and it causes pain. So we cleaned that up. Then we are going to see the humeral head, which is here (indicating). Nice and smooth. No sign of degenerative changes.

Here, again, we see not much sign of degenerative changes. No break in cartilage. Degeneration happens to all of us. It is like having the gray hair. This is called wear and tear of the cartilage. That's what we discussed. So, here, I don't see any wear and tear of the cartilage on the humeral side, that is this side (indicating), and this is called the scapula.

THE COURT: These are all photographs taken by the camera that you put in through the first hole?

THE WITNESS: Correct.

THE COURT: And these photographs are taken whenever you perform surgery like this, whether it is for a lawsuit or for regular care of a patient?

THE WITNESS: So 100 percent time we take pictures, but there are times that after surgery is complete, you are not -- the nurse circulating nurse who is inside the operating room, gee, Doctor, the machine is not printing, something has gone wrong, so we try to retrieve that. But 100 percent of

the time our intention is to take picture.

THE COURT: And these are the pictures that you took in the regular course?

THE WITNESS: Regular course.

THE COURT: Without regard to there being a lawsuit or not?

THE WITNESS: It doesn't matter.

THE COURT: This is from the first or one of the three holes that you put into his body?

THE WITNESS: Correct, sir.

A Now, we have to go in subacromial space. There are two spaces, one in the joint, and then after the joint, there is a rotator cuff, and then in between the cuff and the acromion, the bone, which is hanging here. So see that the bone has gone down to the impinging. This is called impingement and then we do the shaving here. This is synovitis. Subacromial impingement. Synovitis, and that is called vapor. This is a micro frequency device which makes it smooth. Here made it smooth to -- to the labrum.

At this point in time our camera is from back but not in the joint. It is on top of the rotator cuff. But this here will be cleaned from the inside incision with a burr, just like shaving, like this.

Q When you are say impinging, can you explain in general terms what you mean by that?

A It's like pushing. It is like pushing. That is called impingement.

Q Inside there in that Exhibit 17-A, so can you describe that?

A You are talking about?

Q Yes.

A This is the bone. This is the soft tissue. This bone is impinging on the soft tissue. Here you see we have shaved the bone. So now there's much more space here so you will be able to do this.

Q Where do you see the tear there?

A You are repeating. I told you. Here (indicating).

THE COURT: Are you done with the chart?

MR. BHURTEL: Yes, your Honor.

THE COURT: Why don't you take it down and let the witness resume to his seat.

Thank you, Doctor.

THE WITNESS: My pleasure, sir.

MR. BHURTEL: Your Honor, plaintiff offers 17-A for evidence.

THE COURT: But we will receive it with the Post-its on it.

(Plaintiff's Exhibit 17-A was received in evidence.)

THE COURT: Ladies and gentleman, there has been some material added to the document. That's what the Post-its

are covering in order to make certain that you are only seeing the appropriate part of the document. We are using those yellow Post-its to cover up some handwriting descriptions that are not for you. Okay.

Can you resume your questioning of the witness now?

MR. BHURTEL: Yes, your Honor.

Q Doctor, what is your postoperative findings?

A It is pretty regular protocol.

THE COURT: Pretty what?

THE WITNESS: Pretty regular protocol.

Sorry about my accent. I grew up in India.

THE COURT: It is nothing to apologize for. I am just sorry that I don't understand you more readily. I hope you are not disturbed when I interrupt.

THE WITNESS: Not at all. My pleasure.

A So immediately postoperative, when tissues are closed, we put dressing and his arm is put into a sling. After being two or three days, it is advised to the patient that you take off the sling and start the range of motion as tolerated. At the same time, they are given some codeine or what kind of medication they are taking or what they tolerate, it depends on different patient, and some anti-inflammatory. Then they go home.

After two weeks, we see in the office. We take out the stitches if necessary. I mean, not necessary. If the

wound has healed well. And there are times we have to give some antibiotics depending on different patients, which is why generally I'm saying. And the stitches are taken off and then they get a physical therapy script with anti-inflammatory. They go back to physical therapy for four weeks, six weeks or eight weeks, depending on what patient -- how soon -- usually four to six weeks is good time to see again how wound is healing, how range of motion is going. And healing depends on everyone's individual DNA. Someone heals faster than the other. Someone have one pain medication and it don't work, then they call us. We change the medication. We try to see patient is balancing, don't get too much medication, and at the same time remain regularly pain-free to have the physical therapy, otherwise it is painful and they won't be able to do range of motion. That's how the follow-up goes.

According to the Workers' Compensation rule --

Q Doctor --

THE COURT: We are not talking about that in this case.

THE WITNESS: Because of follow up, I'm mentioning that some of the insurance requires that they are seen in four weeks --

Q Doctor, the other thing -- besides other things, let's focus on the surgery for now.

A Okay. I mean, you asked post-op. That's what I was

explaining.

Q Before you put him the surgery procedure, what was the procedure you were required to do him?

In other words, what you did at the beginning before you were doing the surgery? Can you start from the beginning?

THE COURT: Are we going back to the physical therapy and the conservative treatment?

MR. BHURTEL: No, Your Honor. I'm talking about the day after surgery.

THE COURT: You are talking about the three holes?

MR. BHURTEL: Yes.

THE COURT: You can lead him a little bit.

Did you make three holes in his body before you performed the surgery?

THE WITNESS: That's how we performed the surgery.

Q Before that, did you use anesthesia or anything? Can you describe how the surgery is done to Mr. Mostafa Ahsan's left shoulder?

THE COURT: The question is whether he used anesthesia?

MR. BHURTEL: Yes.

THE WITNESS: Just ask what anesthesia he gave. Right.

General anesthesia with a regional block. They block some of the nerve so that postoperative there will be

less pain, and then they get anesthesia whatever the way anesthesiologist does, but basically sleepy. Then they are placed in a beach chair position.

Q And when you were preparing for the surgery, did you have to drill his left shoulder?

A What is that?

Q Did you have to make a hole there?

A We just talked about that. We made three holes.

THE COURT: Yes.

Q How did you do that one?

THE COURT: What tool do you use to make the holes?

THE WITNESS: Of course with a knife, not with a nail.

Q Bear with me, Doctor. We want to know exactly how the surgery --

THE WITNESS: He can ask anything he want. This is what I do.

THE COURT: Okay.

THE WITNESS: Day in and day out.

THE COURT: I think what he is asking is when you make the three holes, do you use a drill to drill into the bone or do you just use a knife to cut into the skin and tissue?

THE WITNESS: For soft tissue, only knife or various other instruments are there to dilate the soft tissue hole.

There is a camera and there is a cover of the camera, which goes through, and then you go into the joint.

THE COURT: So you didn't have to drill into any bones to do this procedure?

THE WITNESS: This is a part of the procedure when we have to shave the bone, then we need a burr, not a drill. Drill is to make a hole.

THE COURT: To make the three holes, the holes don't go into the bone, they just go through soft tissue?

THE WITNESS: Soft tissue.

Q When you looked at it inside from the camera, what was your findings?

A All those findings we just talked about on the picture, labral tear, subacromial bursitis, SLAP tear, superior, anterior labral tear. Acromion means the bone that I showed a while ago. It is pushing on the soft tissue, so we made more space so that the patient can abduct more.

Q Doctor, do you have an opinion that what was the cause of Mr. Mostafa Ahsan's left shoulder jury?

A Seeing him for two years and looking at his history, within a reasonable medical degree of certainty, it is my opinion that it happened because he got jury on his left shoulder.

THE COURT: Because he had?

THE WITNESS: Injury to his left shoulder.

THE COURT: A traumatic injury?

THE WITNESS: A traumatic injury, some box fell on his left shoulder.

Q And do you have a history that Mr. Mostafa told you that where did those boxes fell on him?

A Yes. Staples store, which is my favorite store because I go for the office all the time supply.

Q When was that? Withdraw that.

THE COURT: When was what?

Q When was the date of the accident?

THE COURT: Did he tell you when he had the accident in the Staples store?

THE WITNESS: Yes. We just read it. We are kind of on delay here. Right in the first time note I said it. It is date of accident 9/2/11. Accident happened in the Staples.

THE COURT: Okay.

THE WITNESS: I'm reading the same thing.

THE COURT: Thank you.

Mr. Bhurtel, your next question.

MR. BHURTEL: Yes, your Honor.

Q Doctor, when you -- did you review the other doctor's report when you prepared that report, when you prepared your report, the narrative report?

A So, to be very honest, I did read some and glanced almost every page to see that I am familiar with that, but I didn't

read line by line. Yes, I read my narrative report so that I refreshed --

THE COURT: Just a little further away from the microphone. It is distorting.

THE WITNESS: I'm sorry.

THE COURT: That's okay.

THE WITNESS: It is better now.

THE COURT: Yes.

Q Doctor, what was your recommendation to Mr. Mostafa Ahsan?

A At what point?

Q At the time that you prepared the report.

THE COURT: Which report are we on now?

MR. BHURTEL: The narrative report, the Bates 872 through --

THE COURT: Just give me the date. Mr. Bhurtel, what's the date of the report that you are looking at?

THE WITNESS: I can answer.

THE COURT: It won't be meaningful to the jury if we don't know when we are talking about.

Do you know the date of the report, Doctor?

THE WITNESS: Actually, we have not given a date on top of it. So this is a narrative report.

THE COURT: So let's relate it to the surgery for the accident, Mr. Bhurtel.

Q Doctor, what is your recommendation with respect to your last visit?

A So give me a few seconds to see when I saw him the last time. By chance I have it.

THE COURT: Yes.

MR. O'HARA: Your Honor, I will stipulate there is a disclosure plaintiff served in this case that his report was issued on June 22, 2015.

THE COURT: I think he still needs to see it.

Do you want to show it to him?

MR. BHURTEL: Yes.

THE COURT: Do you want to show Mr. O'Hara to make sure that we are looking at the same document.

A Your Honor, I apologize, I don't have the last --

THE COURT: We are going to get it to you in a minute.

Q Can you look at this one? Doctor, can you look at page 5 of your report?

THE COURT: Bates number?

MR. BHURTEL: Page 5 of his report.

THE COURT: Bates number?

MR. BHURTEL: For the joint trial exhibits, it is 874.

THE COURT: 874?

MR. BHURTEL: Yes.

THE COURT: And counsel stipulates this is a June 2015 report?

MR. O'HARA: It is a June 22, 2015 report prepared in conjunction with litigation, Your Honor.

THE COURT: Thank you. That is agreed, Mr. Bhurtel?

MR. BHURTEL: Yes.

THE COURT: Are you looking at page 5?

THE WITNESS: Yes, sir.

THE COURT: What is your question, Mr. Bhurtel?

Q Doctor, what was your recommendation based on that report?

A Number one, recommendation physical therapy two to three times per week for six to eight weeks for left shoulder.

THE COURT: Did you recommend anti-inflammatory drugs for 30 days?

THE WITNESS: Yes, sir.

THE COURT: Do you want to take it from here, Mr. Bhurtel?

MR. BHURTEL: Yes.

THE COURT: Go ahead. You can lead the witness.

Q So in future he will develop arthritis of the left shoulder with chronic pain, which will need total left shoulder replacement surgery, and that reports --

THE COURT: Hold it.

Do you have an opinion about whether Mr. Ahsan will

develop arthritis of his left shoulder with chronic pain?

THE WITNESS: Yes, the left shoulder, higher chance of developing than his right shoulder.

THE COURT: And do you expect that he will need a total left shoulder replacement operation?

THE WITNESS: May. Maybe. May not be.

THE COURT: If he does need it, how much would it cost?

THE WITNESS: I give here an approximate because this is a hospital changing environment, as you all know, it changes. But I just give a vague number around that much it cost.

THE COURT: About $65,000?

THE WITNESS: Yes, sir. And I also advise the patient to follow up with a neurologist and a spine surgeon for cervical injury and head and brain injury.

THE COURT: But that is not your area of expertise?

THE WITNESS: No. Not at all.

THE COURT: Do you have anything else, Mr. Bhurtel.

MR. BHURTEL: Just quickly, Your Honor.

THE COURT: Go ahead.

Q And, doctor, is this your recommendation within a reasonable degree of medical certainty?

A Yes.

Q And is this recommendation still -- strike that.

When you saw him last time, does Mr. Ahsan need this -- strike that.

When you saw Mr. Ahsan last time, still this recommendation applies to him?

A Correct.

Q And when you provided the service, medical service to him, did you invoice or bill him for the medical costs?

A That part is all in my office, people do it, but certainly there is some invoices. Prior to coming here, I brought it. I request the judge to pay me something, to sign the lien. I have to pay my bills, too, Judge.

MR. BHURTEL: Now, Your Honor --

MR. O'HARA: Judge, may we have what the doctor is talking about. He just made reference to in his file.

THE COURT: Do you have the documents here?

THE WITNESS: The bill.

THE COURT: Come around and look at them.

MR. O'HARA: Thank you, sir.

THE WITNESS: And they may not be correct.

THE COURT: Let's not talk about it until there is a question that has been asked of you, Doctor. Thank you so much.

MR. O'HARA: So that I have an opportunity to look at this, please allow him to continue his examination.

MR. BHURTEL: This is Exhibit 65, trial exhibit.

THE COURT: Okay.

MR. BHURTEL: Page number 2561 to 2563.

THE COURT: Ask your question.

MR. BHURTEL: Yes, your Honor.

Q Doctor, do you recognize this document?

A Yes.

Q So can you describe what is that document?

A This is a bill, I don't know from where, but it came from my office, Imaging Orthopedics.

THE COURT: This is a bill from your office to Mr. Ahsan?

THE WITNESS: Yes, your Honor.

THE COURT: Does that cover the surgery and other care that you provided for him?

THE WITNESS: Yes, sir.

THE COURT: How much did you bill him for all of that work?

THE WITNESS: 32. That includes the surgery and different follow-ups and X-rays, injections.

THE COURT: Yes.

THE WITNESS: It is $32,451.28.

THE COURT: Say the number again more slowly, please.

THE WITNESS: $32,451.28.

(Continued on following page.)

(Continuing)

MR. BHURTEL: Now, I would like to show the witness plaintiff's -- sorry, Joint Trial Exhibit 68 -- 67, Page 2567 to Page 2568.

THE COURT: 2567 to 2568. Are you offering 65 in evidence first?

MR. BHURTEL: Yes, Your Honor. Plaintiff offers.

THE COURT: Any objection?

MR. O'HARA: No objection, Your Honor.

THE COURT: 65 is received.

(Plaintiff's Exhibit 65 was received in evidence.)

THE COURT: Now, you want to show us pages 2567 to 2568?

MR. BHURTEL: Yes, Your Honor.

THE COURT: All right.

EXAMINATION CONTINUES

BY MR. BHURTEL:

Q Doctor, do you recognize this document?

A I do.

Q Can you describe what is that document is?

MR. O'HARA: Judge, I'm sorry. Objection, we have to go sidebar. My apologies.

(Sidebar held outside the hearing of the jury.)

(Continued on the following page.)

(The following sidebar took place outside the hearing of the jury.)

MR. O'HARA: It's the same thing. December 18th, December 18th. Look at all the charges. You've already put this in. This is an Explanation of Benefits that he is submitting to and getting response back from the insurance company. This is his bill. That's what he's owed. It's not two separate bills, this is an EOB. Okay?

The EOB, here is what he charged, description of services. You just put it into evidence. Arthroscopy, arthroscopy, arthroscopy, 7200, 8500, 7220, all of these charges for the same date.

MR. BHURTEL: I believe this one is the hospital bill. This is the second page I wanted to offer. There is one bill from the first his service and another bill from the hospital where he received the surgery. It's Queens.

MR. O'HARA: My objection, Your Honor, is the exhibit that he has just identified is duplicative to 2561 and 2562 as it relates to this doctor's charges and what he's identifying is an insurance company, health insurance claim form. It's not admissible.

MR. BHURTEL: I agree with you. This is the first place. This is the bill. The second bill has the second number. I am going to introduce one of the second bills.

THE COURT: Well, I do not understand how we are

going to tell how they came to be stapled together and why we should think that this is different from that. But if you just show him the second page and you establish a foundation, you can offer it then. You cannot show him the first page.

MR. BHURTEL: Okay.

THE COURT: Okay.

(Side-bar concluded.)

(Continued on the following page.)

(In open court - jury present.)

THE COURT: Mr. Bhurtel, do you have a specific question to ask the witness?

MR. BHURTEL: Yes, Your Honor.

Now, I am asking -- I am showing the witness one of the page, Exhibit 67, Page 2568.

THE COURT: Thank you.

BY MR. BHURTEL:

Q Doctor, do you recognize this document?

A Well, I am seeing for the first time, but I do understand what this is.

Q So what is that?

A This is a bill from the surgery center where surgery was performed and they have billed to Mr. Mostafa.

Q And this is the surgery you performed, his left shoulder?

A Correct, but my bill is separate bill and surgery center bill is separate.

Q Okay.

A And that's what their bill is.

Q And how much is the hospital or surgery center's bill amount is?

A It is I think 40,000.

THE COURT: 40?

THE WITNESS: 40,000.

THE COURT: And that is Bates 2568?

MR. BHURTEL: Yes, Your Honor.

THE COURT: Are you offering it in evidence?

MR. BHURTEL: Yes, Your Honor.

THE COURT: With respect to that page is there any objection?

MR. O'HARA: Subject to redactions of information that is on the bottom of this, no, Your Honor, I will have no objection.

THE COURT: Okay, 2568 is in evidence subject to redaction or argument against it.

(Plaintiff's Exhibit 67 was received in evidence.)

THE COURT: Do you have anything else for this witness?

MR. BHURTEL: Just one second, Your Honor.

BY MR. BHURTEL:

Q Doctor, I want you to assume that Mostafa Ahsan had left shoulder complaint in March 2008 and one or two therapy he received; and then February 9, 2009 he had another complaint and one therapy he received. After that until September 2nd, 2011 he did not have a complaint on the left shoulder. So in that two-and-a-half years he did not have complaint.

So do you have a medical opinion that whether he had a prior -- do you have opinion that whether he had a prior pre-existing condition that he has a continuous or he had in September 2nd, 2011 where the box fell and hit him that caused

the injury in his left shoulder?

A Well, I assume that probably he had some sprain, muscle sprain, and that's why he got better in two, three times of physical therapy or whatever and he might have got it, but the first time I didn't treat. So he went somewhere and time to time we get aches and pain here and there, sometimes you are lifting something, you can sprain a muscle. So I really -- I am presuming that that is what he had.

Q Based on the information I provided you that one, does it change your findings and recommendation of your report?

A No.

MR. BHURTEL: No further questions.

THE COURT: All right. I am ready to hear the witness cross-examined.

Jurors, are you with me or do you want another five minutes? No? Good to go.

MR. O'HARA: Judge, I don't have a copy of this because it just came out of the doctor's file. I am going to ask him some questions, can we make a copy and mark it as an exhibit afterwards?

THE COURT: Yes.

CROSS-EXAMINATION

BY MR. O'HARA:

Q Doctor, I am just going to show you a document that I just took out of your file that is entitled Musculoskeletal

and Arthritis Joint Replacement of Queens.

Did I read that correctly?

A Correct.

Q And this is a document that is prepared by your office when you have patients that have come to you that are involved in lawsuits, correct?

A Anyone.

Q But in particular, the reason why you had not only Mr. Ahsan, but Mr. Bhurtel sign this is because you were engaging in treatment that was going to incur medical expenses that you wanted to protect against whatever monies he recovered in a lawsuit, correct?

A This is not particularly for him, for Mostafa. Anyone who comes, we get a lien signed because there are times after six months we come to know that this was an accident. The patient forgot to tell and we don't get money. So person signs and then we send it to the authorities and there are times they probably sign it and send it back, sometimes they don't sign it and send it, but we continue to take care of the patient.

Q I am not questioning that, I just want to make sure that I understand.

When you were seeing this patient, there is no question that there is a lawsuit and you are going to be trying to protect the medical bills from the value of the

lawsuit because not only do you have Mr. Ahsan sign it, but it actually has Mr. Bhurtel's name, address --

A Yes.

Q -- telephone number and signature?

A Yes, correct. I want be protected so that whatever services are provided are paid up.

THE COURT: I think the only relevant part of the question is when you treated Mr. Ahsan, did you know that he had a lawsuit pending?

THE WITNESS: Yeah, because he said that here.

THE COURT: Thank you.

MR. O'HARA: Thank you.

Judge, I'll mark it afterwards.

THE COURT: That will be fine.

BY MR. O'HARA:

Q Doctor, you were asked a series of questions about the narrative report, your June 22nd, 2015 report that you prepared that outlined the care and treatment that you provided, as well as your recommendations.

Do you remember that line of questioning?

A Correct.

Q And in describing Staples as your favorite store, which I will tell you I appreciate, you later in that sentence you describe the box as a, quote, heavy box.

Do you see that?

A Which page, please?
Q Sure. First page.
A Okay.
Q Here?
A Okay.
Q First sentence, history of significant injury, after the word Staples store you describe the box as heavy box.

Do you see that?
A Yes, the Staples store with heavy box, fell on head, neck and shoulder.
Q Okay, let's stay first with heavy box. Mr. Ahsan told you about the weight and size of the box, which is how you concluded that it was heavy, correct?
A Sir, whatever the patient say, I am a doctor. I am not a lawyer. So we just want to know that whether there are traumatic injury or if there is nontraumatic injury, how the injury started.

So if you go particular word by word that heavy and how heavy, that question I can't answer it. If the patient said heavy box, I'm not there to litigate.

THE COURT: No, no, Doctor, please just listen to the question. Mr. O'Hara is basically asking you if you wrote down that the box was heavy, the only way you would know that is if Mr. Ahsan told you, is that correct?

THE WITNESS: Correct.

BY MR. O'HARA:

Q When he told you that it was a heavy box in evaluating his orthopedic needs to his shoulder, did you ask follow-up questions about the dimensions of the box, how heavy or how big it was?

A No.

Q Did you ask him questions about whether or not the trauma that resulted from the box striking his shoulder, whether he had received prior treatment for that shoulder?

A You are twisting too much. Because I am a doctor. I am not there to how heavy, what is the diameter of box and what is the width of the damages, that is not for me. All I need to know that, oh, okay, you had an injury. You had an injury and you are telling me that prior to this injury you were asymptomatic, I believe you, you are telling the truth. I am a physician.

THE COURT: But the question, Doctor, was whether you asked Mr. Ahsan if he had had any prior injury to his shoulder or prior shoulder treatment.

Did you ask him that?

THE WITNESS: In past medical history we do ask that what you have. So past medical history and past surgical history is what he is telling us, which I -- from the narrative report of June 22nd because he had been seen prior to that. And this is a narrative report, we are trying to put

everything together. So he is seen and this is a follow-up because he was seen in the past and we were writing this report later, so we are trying to summarize that whatever he is saying. So he did complain about headache, neck pain, pain in the left shoulder.

In his past medical history complained about hypercholesterolemia, hyper cholesterol, cholesterol is high, and hypertensive, blood pressure, and neck pain, headache, left shoulder pain on zero to ten, seven my test.

BY MR. O'HARA:

Q Doctor, in his past medical history you asked him questions, did he tell you that he had any prior history with his left shoulder?

A That I have come to know from one of the pages somewhere.

THE COURT: But, Doctor, the question is not whether you know it, the question is whether when you took Mr. Ahsan's medical history he told you that his shoulder had a problem before the incident at Staples; did he or did he not?

THE WITNESS: No, no.

Q Did he tell you that he had received medical treatment for any condition --

A According to my notes, no.

Q He told you his prior history for his left shoulder was nothing, correct?

A Yes, he was asymptomatic prior to this injury.

Q And, Doctor, forgive me, but I am not a physician, as part of the normal medical evaluation when a patient comes into a doctor's office and complains of pain and symptoms in a particular body part, one of the questions a physician asks is have you had any prior problems with that body part, true?
A Yes.
Q And also asks whether if you've had any prior problems with that body part, was --
A Yes.
Q -- there any treatment?
A Yes.
Q And if there was prior treatment, how did the treatment address the problem to determine whether it's the same problem, a different problem, and whether the treatment might need to change?
A Correct.
Q Now, Doctor, that report that you were looking at that's in front of you where there's a description of the heavy box, where you reference where it fell on his body, do you see that?

You note in your history that Mr. Ahsan told you that the box fell on his head, correct?
A Head, neck and left shoulder.
Q So he is the one that told you that the box hit him in the head?

A Yeah.
Q The box hit him in the neck?
A Yes.
Q And the box hit him in the shoulder?
A Right.
Q As part of your evaluation in this case, have you reviewed any medical records or reports from any other providers or any other sources to evaluate whether what he told you about that history was true?
A At that point of time when he is here and I am seeing him, I have mentioned last we talked about that for neck he had gone to see a spine doctor and for his head he is going to see a neurologist, but that's all.

THE COURT: Doctor, the question is about how the box hit him and the question is whether you ever saw records that said something different than what Mr. Ahsan told you about how the box hit him?

THE WITNESS: I don't recall. I don't --

BY MR. O'HARA:

Q And just so we're clear, Doctor, this is not your first office note, this is actually a report that you wrote on June 22nd, 2015?
A Correct.
Q Which is two-and-a-half years after you first started treating the patient?

A Correct.

Q Which is a year and three months into the treatment when you know he has a lawyer, correct?

A I don't know what you are trying to say, a lawyer or not. What do I have to do? This is my office staff that -- I don't do that. I take care of the patient and whatever the patient tells me, that's what I write.

Q I appreciate that.

Doctor, my question is the timing that I've just outlined in terms of when you saw the patient first --

A We don't practice medicine like that.

MR. BHURTEL: Your Honor.

A And we don't presume that there is going to be a lawsuit and I am here sitting doing what I'm doing. That's what I do. Now this twisting of the language and all these things. It's not my what the patient gave me, what papers I'm signing, what paper are not signing. I wrote my previous note. I've meet the patient. Fine, okay, how are you doing? How are your things going on? If necessary, something to add, subtract, arrange a post-op exam, those are kind of things I do, but I don't go and get the sign -- oh, have you signed the lien? What do I know? One of my staff do it in the office. So if you are asking this date, that date, I won't be able to tell you, Judge. I don't do all those things.

THE COURT: You did not keep track as you treated

Mr. --

THE WITNESS: My office --

THE COURT: Excuse me.

Did you keep track, yes or no, of whether Mr. Ahsan was involved in a lawsuit or not as you continued to treat him?

THE WITNESS: Yeah, he told me that he had accident in Staples and he is suing. That's his business whatever he is suing or not suing.

THE COURT: And it didn't affect your treatment at all?

THE WITNESS: Not at all.

THE COURT: Okay.

Next question, Mr. O'Hara.

MR. O'HARA: Thank you, Your Honor.

BY MR. O'HARA:

Q And separate from what Mr. Ahsan told you, Mr. Bhurtel never gave you any historical information from any source in the litigation relating to actually what happened on September 2nd, 2011, did he?

A I have lot of papers from his office.

THE COURT: Do you know if Mr. Bhurtel ever told you in writing or orally or electronically about the facts of what happened on September 2nd, 2011 in the Staples store to Mr. Ahsan?

THE WITNESS: No.

THE COURT: Did he ever tell you what was in Mr. Ahsan's deposition?

THE WITNESS: There is a paper here, he came me the deposition.

THE COURT: He gave you Mr. Ahsan's deposition?

THE WITNESS: No, not his deposition.

THE COURT: That is what I'm asking you.

THE WITNESS: No, not Mr. Ahsan. He gave a copy of my deposition to the lawyer came with him and they had some like that.

THE COURT: Other than your deposition, did Mr. Bhurtel give you any other documents from the lawsuit where the facts of what happened in the Staples store are described?

THE WITNESS: I didn't read that, but I have some of the other doctors' report, which is -- I see report from the neurologist and spine guy.

THE COURT: Do you remember learning any of the facts of what happened in the Staples store from the other doctors' reports?

THE WITNESS: No, I don't know that what happened in the Staples store. The only thing I know --

THE COURT: Thank you.

Mr. Bhurtel, do you have an objection?

MR. BHURTEL: Your Honor, I think that when the doctor is mentioning the report, the record I sent is probably he is referring the medical record of the other doctors' medical records.

THE COURT: Yes, he just said that.

MR. BHURTEL: Yes, that's what I want to clarify for the record.

THE COURT: Thank you so much.

Mr. O'Hara.

MR. O'HARA: Thank you, Your Honor.

BY MR. O'HARA:

Q Doctor, separate from incident information, historical information about what actually happened in the Staples, did Mr. Bhurtel or Mr. Ahsan give you any information about the treatment that he received after being struck by the box, but before he came to see you?

A I think he was seeing some medical doctor and that doctor had referred him to me. And we talked about that in the last time when we were talking about this is Dr. David Guha.

THE COURT: Guha?

THE WITNESS: Yes.

Q And, Doctor, you were aware, were you not, that he had a diagnosis of a condition called left lower traps myofascial pain syndrome, you were aware of that?

A I didn't.

Q You did not know that?
A No.
Q Do you know that in the medical records in this case after the Staples incident there is actually a reference, Ahsan 2118, in Mr. Ahsan's records that talks about diagnosed with left shoulder MPS, did you know that?
A Can you show me the paper? Because I don't --
Q I will be happy to do so. I am not permitted to put evidence in in the plaintiff's case.

I will represent to you that there is a medical record, which is at Bates Number 2118, that confirms a prior diagnosis of left shoulder MPS.

First, what is that? Tell us.
A What is MPS? I don't know myself.
Q Myofascial pain syndrome. What is myofascial pain syndrome?
A You ask a neurologist, I don't know about all of this stuff.
Q How about diagnoses relating to the left shoulder that were specific to the joint, like osteoarthritis, were you aware that there was a diagnosis of that prior to you seeing him in January of 2013?
A What osteoarthritis is, we talked a while ago about the wear and tear of the cartilage and osteophyte is the body try to repair it. So report from the MRI and report from clinical

examination, there are number of times out of ten, probably two times, three times, it differs because it's an invalid exam. But when you put the camera you see the cartilage intact and I don't see any sign of arthritis. So it is like very simple example, if I see -- show you a photograph that we might have got and then but you said no, I want to see that first. So seeing it is a better evidence than all these indirect tests of CT or MRI.

THE COURT: Well, Doctor, forgive me, but our question in this room is not only what is the best treatment for Mr. Ahsan, but how his medical story unfolded and the history of it, and that is also a question at issue here.

So please try to focus on the question that is being asked, not from the point of view of somebody trying to treat Mr. Ahsan as best you can, but as somebody to try and help us understand the history of Mr. Ahsan's medical concerns.

So I will rephrase the question, if I may.

Were you aware when you saw Mr. Ahsan that any other doctor had diagnosed him with osteoarthritis of the left shoulder predating the incident in the Staples store?

THE WITNESS: I don't recall.

THE COURT: You do not remember that?

THE WITNESS: No. I don't see in my report, so I just don't want to presume.

(Continued on the following page.)

(Continuing)

Q I appreciate that.

Doctor, osteoarthritis. You talked about degeneration happens to all of us, it's like our hair turning gray and I know what you're talking about.

Osteoarthritis is a degenerative, chronic condition that occurs over time in joints; correct?

A Correct.

Q And in addition to which, in this patient, intraoperatively you saw acromioclavicular joint hypertrophy; correct?

A Correct.

Q And that can be an age-related chronic or degenerative change, check?

A Can be.

Q You also admit or --

MR. O'HARA: Strike that.

Q You also agree with me that arthritis in a joint can cause impingement; correct?

A Yes. It can.

Q And in this case impingement was seen not only on the diagnostic study, but you saw it when you performed the arthroscopic procedure; correct?

A Correct.

Q And the slap lesion first, so we all, what is a slap

lesion? What are we talking about?

A This is superior anterior labral, it's called slap.

Q Superior anterior labral tear?

A Or slap, yeah, that we talked about a while ago.

Q And I appreciate, this is my first time asking you questions.

So, slap tears can arise from aging chronic degeneration in the soft tissue structures in the shoulder; correct?

A Correct.

Q And, in fact, it's not uncommon for a patient 60 years of age to have chronic changes in the shoulder joint?

A Correct.

Q And it's not uncommon to have impingement in the shoulder joint?

A Correct.

Q Okay. And it's not uncommon to have a tear that arises from prolonged use of the joint?

A Correct.

Q You also mentioned that intraoperatively you visualized synovitis?

A Correct.

Q Tell the jury, what is synovitis?

A Synovium is a structure which is there in between the joint and some kind of irritation causes synovitis. It can be

traumatic, it can be nontraumatic, inflammatory, rheumatoid arthritis. All these can give synovitis.

Q Osteoarthritis?

A Osteoarthritis you don't see that profound synovitis. That what you see is rheumatoid arthritis.

Q It is fair to describe synovitis as an age-related or chronic condition in some patients; correct?

A Some patients, yes.

Q Bursitis, can you tell the jury what bursitis is?

A Synovitis, synovium is inside the joint and bursa is in between acromion and rotator cuff, that's covered by bursa.

Q And inflammation of the bursa, which is referred to as bursitis, can arise from chronic or natural degeneration in the soft tissue structures in the shoulder; correct?

A Yes. It can.

Q Doctor, as of June 9th, 2015, and feel free to look at your office records if you'd like, the patient you describe under your history of present illness is feeling much better; correct?

A What date you are talking about, sir?

Q Sure.

MR. O'HARA: Judge, it's Bates stamped 1923 to 1924.

Q I'm talking about your office note of June 9, 2015.

A It says he's feeling much better.

Q Okay.

A Better and better. Yeah, better.

Q Thank you.

THE COURT: How long after the surgery was that? Do you remember the date of the surgery, Doctor?

THE WITNESS: Date of surgery, yes. Date of surgery is 12/18/14.

THE COURT: So, this is about six months post-surgery. June 2015 was the note, right?

A Correct.

THE COURT: Thank you.

Q And Doctor, in terms of that being a patient description of how they're improving, that was the whole reason why you took him to surgery, was to give him a relief from his symptoms; correct?

A Yes.

Q And you knew that it would take time after the surgery for him to recover, for him to participate in physical therapy and the surgery to take the effect that you intended; correct?

A Correct.

Q And based on the description that he gave to you, not what you palpated or saw on physical examination, he described himself as getting much better; correct?

A Correct.

MR. O'HARA: One moment, please, Your Honor.

THE COURT: Yes.

(Pause in the proceedings.)

MR. O'HARA: No further questions, Your Honor.

THE COURT: Would you like any redirect, Mr. Bhurtel?

MR. BHURTEL: Yes. One second, Your Honor.

(Pause in the proceedings.)

MR. O'HARA: Judge, if I may? I apologize. I have one. I'm trying to flip through this quickly.

THE COURT: I understand and I appreciate it. Go ahead.

Q Just very quickly, Doctor.

At the end of your testimony you were talking about what the future might hold for Mr. Ahsan and the progression of arthritis in his joints.

Do you remember that testimony?

A Correct.

Q And I just want to make sure that I understand what you mean.

You expect as he gets older that the ongoing chronic or degenerative process in his joints is going to continue; correct?

A Continue considering that he got a trauma, also. And trauma accelerates the progression of arthritis faster. That's why I mentioned that compared to the other side he had more chance of developing arthritis.

THE COURT: Arthritis accelerates?

THE WITNESS: Trauma accelerates arthritis.

THE COURT: Trauma accelerates arthritis, okay.

Q So, tell me if I am correct.

Then you are going to expect that his arthritic changes in his both shoulders are going to continue, you just are of the opinion that his left shoulder arthritis will be at a faster rate than his right shoulder arthritis; correct?

A Yes.

Q But the need for total replacement surgery and whether or not he, in fact, is going to need that procedure, you testified maybe, maybe not.

Do you remember that?

A Correct.

Q And is it fair to say that as we sit here today no doctor within reasonable medical certainty can say that the man's going to need his shoulder relayed?

A Correct.

Q We have to wait to see how life progresses for him.

A Absolutely.

MR. O'HARA: Super. Thank you, Doctor, I have nothing further.

MR. BHURTEL: I have nothing further.

THE COURT: Nothing?

MR. BHURTEL: Except that we can admit these

documents later on, right? So, his medical record.

THE COURT: Do you want to do it in front of the jury or after the jury is gone?

Do you want to make sure that while he is here we can do that?

MR. BHURTEL: Yes.

THE COURT: Show what you want to offer to Mr. O'Hara and we will see if we can work it out right now.

MR. BHURTEL: That's the Exhibit 45.

MR. O'HARA: Just give me one second.

MR. BHURTEL: Page 1907.

THE COURT: Mr. O'Hara is looking at it. Give him another minute.

MR. O'HARA: Your Honor, subject to the removal of some pages in here that are not part of the doctor's chart, I will have no objection once he lays the foundation.

THE COURT: Hold those pages aside so he can see him and ask the Doctor, see if he disagrees with your characterization.

MR. O'HARA: Sure.

REDIRECT EXAMINATION

BY MR. BHURTEL:

Q This is Exhibit 45, page 1907 through 1940.

Doctor, can you look at this one?

A Yes.

Q Can you describe what you just looked at?
A This is a copy from the e-clinical, the EMR system we use, and this is a printout of that EMR.

THE COURT: EMR meaning electronic medical records?

THE WITNESS: Yes, sir.

THE COURT: And it all has to do with your office's and in particular your treatment of Mr. Ahsan?

THE WITNESS: Correct.

THE COURT: You are offering it?

MR. BHURTEL: Yes, Your Honor, plaintiff offers.

MR. O'HARA: No objection, subject to the redactions that I just mentioned.

THE COURT: Do you need to inquire further about the pages Mr. O'Hara showed you or do you agree that they should be taken out, Mr. Bhurtel?

MR. BHURTEL: Yeah, I have no problem taking out those pages.

THE COURT: Okay.

Are you done with the witness?

MR. BHURTEL: Yes, sir.

THE COURT: Okay.

Doctor, you are excused with the thanks of the Court.

THE WITNESS: Thank you, very much.

THE COURT: Ladies and gentlemen, that concludes our

trial day. We will try, hopefully with a little greater success, to start at 9:30 sharp tomorrow. Do not discuss the case, do not talk about the case with each other or anyone else. Leave your notebooks here. You know the drill by now.

Have a pleasant evening. Get home safe and dry please, as best you can. And I so appreciate that you were ready at 9:30 sharp; I do not take it for granted. I am very sorry that we were not able to use your time as efficiently as you deserve to have it used and we will try harder tomorrow.

Have a good night.

THE WITNESS: Thank you, Judge and good-bye, good-bye everybody.

THE COURTROOM DEPUTY: All rise.

(Jury exits.) (Witness excused.)

(In open court; outside the presence of the jury.)

THE COURT: Counselors, we have a lot of work to do. I will tell what you I am most concerned about and we will accomplish what we can in the following order of priority. I do not mean to dictate to you, you have cases to try, too. If you have a different suggestion, maybe you can tell me.

Number one, I am very concerned that Exhibits are being received subject to redaction. We do not have them marked, but only referenced by Bates Number and if we try to re-create this when it is time for the jury to receive the Exhibits, it will be too daunting a task.

So, what I would like you to do right now, after I leave you and you take five minutes to refresh yourself after a grueling day, is to come up with a witness list, it may be handwritten, and the physical Exhibits that you agree are in evidence and with the redactions made. We will make copies for you, we will provide you with Post-Its, we will do whatever we can to help you with office administrative help. I want you to think about what we would do right now if we got a note from the jury to send in the Exhibits. That is what I want. I want the list and I want the physical Exhibits. That is your first task, if I may impose it upon you.

Number two, I want to make sure that we know who is testifying tomorrow, which Exhibits will be offered and I want both sides to be looking at those Exhibits tonight. I want to make sure that they are marked. I want to make sure that we know what they are and we are not fumbling around in front of the jury looking at them together for the first time.

Number three, if there is time left -- and I can only be with you until about 6:40 today, it is 4:45 now so I am optimistic -- if there is time left, I would like to go over the jury charge. I have a very early commitment tomorrow, I teach a 6:00 o'clock class on Wednesdays, so I can only be with you until about 5:40.

If we do not do the jury charge conference tonight, we will have to do it Thursday night and I would rather you

know and I know of any discrepancies or challenges in the charge that we need to confront before the weekend. The sooner you know the better.

I do not think there is any controversy in the charge. I think there may be some wording issues you may want to raise, but not controversy about what the law is. So, I do not think it is too big a deal.

But, Mr. Bhurtel, I know that I have been pressing you to your limits with witnesses and Exhibits and if you are not ready to discuss the charge, just tell me. But you must be ready on Thursday evening if you are not ready tonight, okay?

MR. BHURTEL: Okay, Your Honor.

THE COURT: My chambers number is 2560. I would like you to call me when you are ready to show me the Exhibits and that you can confirm for me that we know who is testifying tomorrow and what will be offered during that testimony.

Now Mr. Bhurtel, I do not mean to say that if you overlook a page or an Exhibit tonight that you are precluded from offering it tomorrow. I do not mean to say that if in the witness's testimony tomorrow something comes up that triggers you to want to offer something additional, that you are precluded if you do not identify it tonight. But I want your best effort to pre-mark and anticipate and to show Mr. O'Hara.

And Mr. O'Hara, I want your best effort to identify what you object to.

MR. O'HARA: Yes, sir.

THE COURT: Okay?

So, please call me at 2560 when you are ready for me to come back and we will at least make a record of what is in evidence and we will make a record of what is anticipated for tomorrow.

If our court reporter would prefer not to be included in that, we have the capacity to record it on ESR, I do not want to keep you later than your evening plans involve. But if you are available, we would love to have you back here. Just give us your extension so we can find you.

All right. Get to work, folks. Take five and relax first.

(Recess taken.)

(In open court; outside the presence of the jury.)

THE COURT: Let the record reflect we broke a little before 5:00 and now it is a little bit after six o'clock. Counsel have presented me with a pile of documents that they have agreed are the entire set of exhibits that have been received in evidence. They do not have any dispute over that. They have also agreed that there are certain redactions to be made to these exhibits and those redactions are marked with Post-its or other indicia on the Sticky notes attached to the documents themselves. The parties have told me that Mr. Bhurtel will undertake to make the appropriate redactions.

I'm also told that the plaintiff has offered three DVD's of medical records and images in his case. It is agreed that two of the three are in evidence in toto but that the third is only partly in evidence. That is to say it contains images that have been received in evidence and images that have not. The parties will work at either agreeing that we have a record in the event of an appeal or post trial motion of what is in evidence with respect to the DVD's but do not have to create an additional physical exhibit because no one contemplates these DVD's, which haven't been played during the trial in any event, of going into the jury room or being presented to the jury during deliberations, but if Mr. Bhurtel thinks that he will be asking for that to occur, then we will have to create the DVD or other manifestation or

representation of the material on that third DVD that is limited to that which everyone agrees is in evidence.

Is everything that I have said correct so far, Mr. Bhurtel?

MR. BHURTEL: Yes.

THE COURT: And Mr. O'Hara.

MR. O'HARA: Yes, sir.

MR. BHURTEL: I have a separate DVD if Mr. O'Hara wants to take it and look at it that I can give him now.

THE COURT: Like I said, there could be two reasons for making a complete evidentiary record, one would be in the event of litigation before this court or another higher court on review, but another reason would be so the jury can look at it. I don't think that you have used the DVD's to present anything to the jury, am I right?

MR. BHURTEL: Yes.

THE COURT: So you moved them in so the experts would have a foundation upon which to testify and so that you could offer the charts that are blow-ups of certain images contained on the DVD's, but you haven't played the DVD's themselves or even used them as the source of anything that you have shown to the jury; correct?

MR. BHURTEL: Yes.

THE COURT: It is agreed that in addition to the documents that are in front of me, all of the blow-ups that

were used today and the 110 series and 111 series and 112 series are received in evidence and may be examined by the jury with the exception that Dr. Sinha used one blow-up chart on which we are certain handwritten addition that is we covered up with Post-its during the trial, instead of using that below up, we will use and eight-and-a-half by eleven copy that doesn't have the handwritten entries. Is that also agreed, Mr. Bhurtel? Did I get that right?

MR. BHURTEL: Yes, your Honor. That we can do or I can whiteout the blow-up one.

THE COURT: If you want to try to white that out, that is fine and then we will take a look at it. Otherwise, we are in agreement?

MR. BHURTEL: Yes, your Honor.

THE COURT: Mr. O'Hara.

MR. O'HARA: Yes, your Honor.

THE COURT: Counsel had asked any discussion of the charge until Thursday evening, especially Mr. Bhurtel wanted some additional time to review the charge; is that correct?

MR. BHURTEL: Yes, your Honor.

THE COURT: That's fine.

I am going to leave the exhibits that are agreed upon here at the sidebar, unless you want to take them home and start the redaction process tonight.

MR. BHURTEL: Some of them I think I need to take

it.

THE COURT: Let's keep this as an integrated set.

MR. O'HARA: Judge, I will give you a Redwell so that it can be closed since it is in evidence.

MR. BHURTEL: I can do weekend.

THE COURT: You want to do it over the weekend? Whatever you want. Or you can bring your redacted material, however you are going to do it, here in the courtroom tomorrow night. Whatever you want to do. Okay?

MR. BHURTEL: Okay.

THE COURT: We will leave it right here for now. We are understood that tomorrow we will hear from the last two doctors in plaintiff's case and plaintiff and an interpreter will be here ready throughout the day, from 9:15 throughout the day to fill in any gaps if the doctors are late or going faster than we expect. Okay.

MR. BHURTEL: Yes.

THE COURT: On Thursday we will have the plaintiff and his wife and then the plaintiff intends to rest; correct?

MR. BHURTEL: Yes.

THE COURT: On Friday, we will hear two out of three defense doctors and on Monday morning we will hear from the third.

MR. O'HARA: Correct.

THE COURT: And there is a fact witness that the

defendant intends to offer at some point when the doctors aren't on the stand and that witness is available. Certainly the defense expects to rest by lunchtime on Monday; correct?

MR. O'HARA: Yes, your Honor.

THE COURT: We will then have to be ready for summations after lunch on Monday. I am not going to entertain an application unless it is 3:30, 4 o'clock to defer summations until Tuesday. I won't do that because I want to give the jury the Wednesday before Thanksgiving off, and the only way to do that is to get them deliberating as early as possible on Tuesday.

MR. BHURTEL: Yes, Your Honor, but I may have the two witnesses, the witness during the IME doctor. So after the defendant completes their IME doctor, I may have to bring the two -- my witness for rebuttal purposes.

THE COURT: Who is that going to be?

MR. BHURTEL: That's the White and --

THE COURT: The paraprofessionals.

MR. O'HARA: A suggestion. Because I don't anticipate that Dr. Head and Dr. Bazos will take the entirety of Friday, I will ask that both of those rebuttal witnesses be in the courtroom on Friday. After Dr. Head testifies, I will not being offering any additional neuropsychiatrist testimony. So if there is a question with respect to the way the doctors testify with respect about the IME, I will consent to that

rebuttal witness being taken out of time right then and right there, and then I will deal with Dr. Bazos and be willing to do the same with the rebuttal witness Friday afternoon so we get this done by Monday midday.

THE COURT: Does that sound reasonable to you, Mr. Bhurtel?

MR. BHURTEL: Yes, I will try.

THE COURT: Those are not new doctors. Those are just the fact witnesses who observed the defense medical evaluations for plaintiff.

MR. O'HARA: They are not doctors. They are independent witnesses that were sent by counsel to sit in the room.

THE COURT: Right, to talk about whether the doctor accurately described what occurred during the exam, not to offer additional medical testimony. So they could be 15, 20 minutes.

MR. BHURTEL: Yes.

MR. O'HARA: Let me clarify, Judge, because when I said in the courtroom, I meant in the courthouse.

THE COURT: I got it. Thank you.

The federal practice -- I don't know what your, and I say this to everybody, what your experience is in litigating cases in federal court as opposed to state court. Federal practice on summation is a little different than state

practice. I don't want to alarm anybody. If there is an agreement to do it the traditional way for state court, I won't even stand in the way, with one caveat. Ordinarily, in federal court, we follow the rule where the plaintiff sums up first and has a brief rebuttal, unlike the state court procedure where the defendant sums up first and then the plaintiff sums up. Some plaintiff's lawyers who are not experienced in federal court don't feel comfortable summing up first.

Mr. Bhurtel, I want you to have the best opportunity to present your case and I won't put you in a position that you have never been in before if you are uncomfortable about it but with one caveat. The Second Circuit has a series of cases that talk about whether counsel may refer to specific dollar amounts for pain and suffering. And generally the courts frown on it but don't prohibit it. But the Federal Courts that permit the plaintiff's lawyer to ask for a specific dollar amount for pain and suffering always require that the plaintiff goes first and mentions the dollar amount sought in the opening summation so that the defendant has an opportunity to respond. You can't mention the dollar amount you are seeking first in your rebuttal summation or if you want to go second altogether.

Are you following what I am saying?

MR. BHURTEL: Yes.

THE COURT: So do you have a strong feeling one way or the other about how you want to proceed?

MR. BHURTEL: Can I have until tomorrow, Your Honor?

THE COURT: You may.

Do you want to be heard on any of that?

MR. O'HARA: No, Your Honor. Subject to counsel -- I will be amenable to either procedure provided if the plaintiff's lawyer goes first the limitation on -- excuse me, he has the opportunity to set forth his damages' request. If he does not go first, he is going to affirmatively waive that.

THE COURT: Only as to the pain and suffering component.

MR. O'HARA: I understand. In any circumstances, I would agree those economic numbers are boarded and they're properly presented.

THE COURT: Then I think we are all on the same page on that.

MR. O'HARA: Yes, sir.

THE COURT: Anything else for tonight?

MR. O'HARA: Thank you and to your staff for your indulgence. We appreciate you staying late.

MR. BHURTEL: Thank you. I apologize.

THE COURT: We can go off the record.

(Matter adjourned to November 16, 2016 at 9:30 at a.m.)

# I N D E X

| WITNESS | PAGE |
|---|---|
| **HAROLD S. PARNES** | |
| DIRECT EXAMINATION BY MR. BHURTEL | 134 |
| CROSS-EXAMINATION BY MR. O'HARA | 217 |
| REDIRECT EXAMINATION BY MR. BHURTEL | 282 |
| **AJOY SINHA** | |
| DIRECT EXAMINATION BY MR. BHURTEL | 288 |
| CROSS-EXAMINATION BY MR. O'HARA | 323 |
| REDIRECT EXAMINATION BY MR. BHURTEL | 343 |

**E X H I B I T S**

Plaintiff's Exhibit 54.3 170

Plaintiff's Exhibit 54 .5 170

Plaintiff's Exhibit 54.1 170

Plaintiff's Exhibits 110 173

Plaintiff's Exhibit 110-A through 110-L 193

Joint Trial Exhibits 112-A through 112-E 195

Joint Trial Exhibit 54 195

Plaintiff's Exhibits 111-A, 111-B and 111-C 205

Plaintiff's Exhibit 68 211

Plaintiff's Exhibit 38.1 282

Plaintiff's Exhibits 875 to 878 300

Plaintiff's Exhibit 879 300

Plaintiff's Exhibit 17-A 305

Plaintiff's Exhibit 65 318

Plaintiff's Exhibit 67 322

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - X

MOSTAFA R. ASHAN, Plaintiff,

-against-

STAPLES, INC., STAPLES THE OFFICE SUPERSTORE EAST, INC., Defendants.

: 13-CV-05929 (SMG)

: United States Courthouse
: Brooklyn, New York

: November 16, 2016
: 9:30 a.m.

- - - - - - - - - - - - - - - - X

TRANSCRIPT OF CIVIL CAUSE FOR TRIAL
BEFORE THE HONORABLE STEVEN M. GOLD
UNITED STATES MAGISTRATE JUDGE, and a jury.

A P P E A R A N C E S:

For the Plaintiff: BHURTEL LAW FIRM PLLC
3749 75th Street, 2nd Floor
Jackson Heights, New York 11372
BY: DURGA P. BHURTEL, ESQ.

For the Defendant: LeCLAIR RYAN
1037 Raymond Boulevard, 16th Floor
Newark, New Jersey 07102
BY: JEFFREY O'HARA, ESQ.
LAURA BREITENBACH, ESQ.

(In open court; jury not present.)

(Honorable Steven M. Gold enters the courtroom.)

THE COURT: Good morning, everyone.

MR. O'HARA: Good morning.

MR. BHURTEL: Good morning.

THE COURT: How are we doing today?

MR. O'HARA: Very well.

THE COURT: Good. Have a seat. Be comfortable. I don't know if all of the jurors are here yet or not. We will know in a moment. If they are, are we ready to go?

MR. BHURTEL: Yes.

THE COURT: Super.

MR. BHURTEL: The doctor is here.

THE COURT: Which doctor are we hearing from again this morning?

MR. BHURTEL: Sebastian Lattuga.

MR. O'HARA: Judge, two things that I want to bring to the Court's attention.

THE COURT: Yes, sir.

MR. O'HARA: Just so there is not a surprise. As the Court is aware from visual observation, Ms. Breitenbach is eight-plus months' pregnant.

THE COURT: I didn't know the schedule, but it couldn't be far.

MR. O'HARA: One of the things that we have been

talking about is, and I understand the Court is moving this case along, it is in her best medical interest that she periodically get up at a greater pace than the breaks that we are taking. So what I've asked her to do is in anticipation of breaks, maybe 10 or 15 minutes before, she may get up and leave the courtroom. I didn't want that to be a surprise to the Court.

THE COURT: Thank you for pointing it out. Of course feel free to address any comfort needs any of you have as long as someone else is here to carry on.

MR. O'HARA: Second, there is another lawyer from my office who will be coming in to court today to watch the comings and goings. He is going to sit in the galley. Again, I know that we have had people come into the courtroom to determine whether they are witnesses. If it is not him when he comes in, I will let you know.

THE COURT: Thank you. Thank you for the heads up on both counts.

We are bringing out the jury, if that's all right.

MR. O'HARA: Yes, sir.

MR. BHURTEL: Yes, your Honor.

(Jury enters the courtroom.)

THE COURT: Good morning, everybody. I really do appreciate how punctual everybody has been. Today we have matched you and today we are ready to beginning on time.

Mr. Bhurtel, is the plaintiff ready to call its next witness?

MR. BHURTEL: Yes.

THE COURT: Please do so.

(Witness takes the witness stand.)

THE COURTROOM DEPUTY: Please stand and raise your right hand.

(The witness was sworn by the Clerk.)

THE COURT: Please be seated. Then you can state and spell your name for us.

THE WITNESS: Sebastian Lattuga, L-A-T-T-U-G-A.

THE COURT: Thank you.

**SEBASTIAN LATTUGA**,

called by the Plaintiff, having been duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. BHURTEL:

Q Good morning, Dr. Lattuga.

A Good morning.

Q Where did you receive your medical degree?

THE COURT: Mr. Bhurtel, I think maybe the microphone is not on. Is the green light lit?

MR. BHURTEL: Yes. It is lighted.

A I went to SUNY Stony Brook of Medicine. I graduated in 1989.

Q And where did you do or completed your residency?
A I did an orthopedic residency also at Stony Brook, completed it in 1995.
Q And how many years you did residency?
A It was continuous, my education. It was five years of orthopedic residency.
Q And after that, did you receive any board certification?
A Yes. I'm board certified orthopedic spinal surgeon. I received my certification originally in 1988 and I was recertified in 2008.
Q Are you affiliated with any other medical service provider offices?
A Well, I'm a --
Q Withdrawn the question.
So do you provide medical service for people?
A Yes, I'm a practicing orthopedic spine surgeon in the New York Metropolitan area.
Q And when did you receive your license to practice medicine?
A 1991.
Q And which state?
A New York State.
Q Are you licensed to practice in any other state?
A In New Jersey as well.
Q And your license to practice medicine in New York and New

Jersey is in good standing since you received until now?

A Yes, sir.

Q Do you have any privileges with the hospitals?

A Yes.

Q Which hospitals do you have?

A Well, I've academic appointment to Weill Cornell Medical Center and I'm an attending surgeon at New York Presbyterian Hospital.

Q At Cornell, what do you do there?

A In layman's terms, I'm a practicing orthopedic spinal surgeon. The surgeries that I perform are done at New York Presbyterian Hospital. I obviously do surgery in a hospital. I'm in private practice, but I've an academic appointment to the university as a clinical professor of orthopedic surgery. You know, part of that involves teaching obligation.

And then I practice spinal surgery. I've an office, people come visit me for opinions about spine problems in general. Yes, that's what I do.

Q And did you do the fellowship as well?

A Yes. So, again, by way of explanation, I'm an orthopedic spine surgeon trained in orthopedic surgery, but part of education is to do subspecialty training. I've subspecialty training in adult and pediatric spinal surgery. I did that at University of Miami, Jackson Memorial Medical Center. I did that immediately following my residency. That's typically how

it happens. It was approximately 1996 through 1998.

Once I completed that fellowship -- it's called a fellowship in spinal surgery -- in Florida, I came back to New York, and that's when I went into practice. And ever since 1988, I've been in practice here in the New York Metropolitan area as a spinal surgeon.

Q When you say orthopedic spinal surgeon, can you explain what that means?

A Yes. So, I mean, you know, orthopedics in general is the discipline of medicine that takes care of bone and joint problems. You may be most familiar with if you break your leg, that's the doctor that puts you in a cast.

Orthopedics is divided into different subspecialties. My subspecialty is spinal surgery, which includes care and treatment of people who have -- for example, children with scoliosis, right, if they need surgery. People that have accident-related injuries to the neck and back, as well as age-related conditions of the neck and back.

And my role in the whole picture of medicine is I'm the surgeon. When someone needs surgery, they get sent to me. Although most people don't need surgery, but still people need an opinion of whether or not surgery would be of benefit, would be of value, and what are the alternatives to surgery. I spend a lot of time talking about that as well.

Q Do you have societal affiliation?

A Yes. I'm affiliated with the -- so my board certification is with the American Board of Orthopedic Surgery. I'm also a member of North American Spine Society. Those are the two most important -- I'd say most important affiliations that I maintain.

Q Did you involve to provide medical treatment to Mr. Mostafa Ashan?

A Yes. Mostafa Ashan is a patient of my practice, yes. He is, yes.

Q And when was the first time you involved to provide medical treatment?

A So the first time he came to my office, he actually saw my associate, Dr. Mikelis. He came on 9/11 2014. That was the first day that he came to my office.

Q Since then, after that, he is still coming to your office?

A He's, I believe, most recently been seen January of 2016. I believe that's the last date.

THE COURT: And, Doctor, just so we know what you're looking at, is that the file of your records of treatment of Mr. Ahsan, files from your office?

THE WITNESS: Yes, sir.

THE COURT: Thank you, Doctor.

MR. BHURTEL: Your Honor, plaintiff moves for the doctor as an expert treating physician --

MR. O'HARA: No objection.

MR. BHURTEL: -- in orthopedic spinal surgeon.

THE COURT: Your proffer is accepted and you may ask the doctor to render opinions in that field.

MR. BHURTEL: Thank you.

Q When Mostafa came in the first time, what was his complaint?

A His complaint on that date was neck pain on and off -- if it's okay, I will refer to my note to respond to this -- predominantly neck pain with radiation into the left upper extremity, with numbness, tingling and dysesthesia, which is the doctor word for altered sensation. He said it was six out of ten, on and off, sharp shooting, worsened with lifting, carrying, bending, lying on the side, and aggravated by sleeping as well. That was his predominant complaint and this obviously happened after an accident, 9/2/11, when boxes fell on his neck and shoulder.

THE COURT: Doctor, it might help us if you try to keep a mental note of what page it is that you are referring to as you answers these questions. I'm even going to give you some Post-its if that might be useful to you because I suspect that you will be asked to refer back to the very same pages as the questioning continues.

MR. O'HARA: For the record, could you ask the doctor just to identify the date of the note that he is

looking at right now?

THE WITNESS: That was 9/11/14.

MR. O'HARA: Thank you.

MR. BHURTEL: Your Honor, this is Exhibit 24.

THE COURT: Yes, sir.

MR. BHURTEL: Page 1111 through 1131.

THE COURT: What was the exhibit number again?

MR. BHURTEL: 24.

THE COURT: Exhibit 24. Are you offering it in evidence or just identifying it for now?

MR. BHURTEL: For now I give it to the doctor also and we can be on the same page.

MR. O'HARA: Just so the record is clear, he is referring to the doctor's January 22, 2016 narrative report and January 22, 2016 future medical care's report. The doctor's note is marked differently, with a Bates stamp number, than what he has just identified.

THE COURT: Thank you for the clarification. You may proceed.

THE WITNESS: Now the witness has a question. Is that okay, that I ask a question?

THE COURT: Why don't you ask it and then I will see if --

THE WITNESS: I'm using these notes to refresh my recollection. I'm not meaning to read verbatim. Are you

asking me now to use this document so that I can refer to a page? Do you see what I'm saying? Generally, I'm asked to testify based on my recollection.

THE COURT: You can have the documents in front of you. I don't believe there is any objection to that, but I'm not sure exactly what the next question is going to be. So we will see and we will take it one step at a time.

THE WITNESS: I'm sorry, Your Honor.

THE COURT: Thank you for seeking the clarification of the Court, though.

Mr. Bhurtel.

MR. BHURTEL: Yes, your Honor.

Q On first visit, so what was -- what kind of treatment he was provided?

A I think to be more precise we were offering consultation, not a specific treatment on that visit. Based on that visit, we were recommending that he continue his therapy, chiropractic and physical therapy, and we were also, you know, continuing conservative management, non-surgical.

Also, we would discuss with him what was called an epidural steroid injection, which, for the jury, is an injection that is meant to alleviate pain and symptoms related to problems in the spine. That's what we discussed with the patient. It is also part of our recommendation, discussion/recommendation for the patient.

Q And what was the first diagnosis for Mostafa?

A Our diagnosis was herniated disc with radiculopathy. Again, that was based on the history, the physical exam, the review of a diagnostic study that was presented to us on that day, and then we rendered a diagnosis, which is what the doctor -- our opinion as to what's wrong with the patient. Based on that, then we made our suggestions.

THE COURT: You just referenced a diagnostic study. Would that be an MRI film?

THE WITNESS: Yes, sir.

THE COURT: Do you remember which imaging center it was from?

THE WITNESS: I don't recall specifically. I would have to refer to a document.

THE COURT: That's okay.

Go ahead, Mr. Bhurtel.

MR. BHURTEL: Thank you.

Q What was your objective findings in the first visit?

A So the objective findings, which are meant, again, for the jury, to suggest what our exam findings were as follows: He had a neck complaint, so we examined his neck on that date. We noticed tenderness and spasm. Spasm is an involuntary muscle contraction in the neck. We did a range of motion examination, which is typical for a neck exam, where we ask the patient to flex or bring his chin to his chest, look up

all the way and turn left and right.

Now, I will convey to you what the numbers were on that day. Flexion was 40 degrees, with normal being about 70 of degrees.

Extension, which is looking up all the way, was 25, with normal being about approximately 45 degrees.

And Lateral rotation, or turning from left to right, was 40 degrees, and normal is approximately 80 degrees. There was objective loss of range of motion of the cervical spine.

Also, as part of your exam, we do a neurological exam of the upper extremities, which showed the following abnormalities: He had a weakness of left-sided tricep function. So the muscles are examined for strength and they are graded based on the standardized grading system doctor to doctor, with five out of five being normal. His finding of the left tricep was four out of five.

Also, finger abductors. It is the muscle that opens and closes your fingers like this (indicating). That is abduction, when you open and close. That was abnormal as well. It was found to be four to five on the left hand side.

Also, in addition to motor testing or strength testing of an upper extremity, part of an neurological exam, includes sensory testing or sensation. Does the patient feel normally? The abnormality noted on the chart that day was left-sided C6 and left C7 and left C8. What that means, to

the jury, is that the body is actually mapped. There is a uniform mapping of the body so that one doctor can communicate with another doctor. When I say the patient has a loss of sensation in C6, that represents a very specific geographic pattern that another doctor would easily recognize represents the thumb area and the forearm area. Rather than me having to say he's numb around the thumb and forearm, I just say he has dysesthesia in C6 and he understands. That's the way we communicate with each other. And those were the abnormalities that Dr. Mikelis noted on the first day when he examined him.

THE COURT: Doctor, we have heard some references before to C6 in connection with a cervical vertebra. Is this mapping correlated to the vertebra?

THE WITNESS: Precisely.

THE COURT: Can you explain to the jury how that works?

THE WITNESS: So to take it a step back, the same mapping that exists in the upper extremities, it is actually a picture of different areas called dermatomes that are labeled by this geographic designation, C5, C6, C7, C8. It is not random. C stands for cervical. C5, for example, that's where the nerve that comes out under the C5 vertebra goes to. Almost like an electrical cable.

For example, if you press the switch by the door, those lights turn on. We know if the C5 nerve root is

damaged, we get a specific abnormality that correlates specifically to that. That's what the judge was suggesting and that's exactly how it works in the body. And it is very precise. You know, it is very precise. We use that as a way to try, you know, to make diagnosis, look for corroboration in an MRI, like we discussed. We will look for damage at around C5, C6 for those nerve roots, and that also helps to corroborate what the patient may be saying by looking for something objective that we see is actually damaged that is consistent with what the patient is saying, and then that translates into our ability to make a suggestion that is specific for that area of the body and make remedies or therapies that might help the patient. That's why it is very, very relevant, what the Judge was suggesting.

Q Did Mr. Mostafa told your office how the accident happened? Withdrawn that one.

What people knew in your office that caused his neck injury?

A Well, I can be very specific because we asked him to write it down. I will just read what he wrote if that's okay with everyone.

MR. O'HARA: Just for purposes of the record, can we make sure we identify the document because that is in a different packet of materials.

THE COURT: Would you like to come up and see what

the witness is looking at?

MR. O'HARA: Sure.

THE COURT: If both of you want to look at it and give a particular description of the page on the record, it might be helpful.

THE WITNESS: It is part of the patient history form.

MR. O'HARA: Judge, for purposes of the record, we are talking about Ahsan 1958 through 1987, and then also Ahsan 1989.

THE COURT: Correct, Mr. Bhurtel?

MR. BHURTEL: Yes, your Honor.

THE COURT: Yes. You may read it for us. Thank you. And he wrote this in your office, Doctor?

THE WITNESS: He wrote this.

THE COURT: In your office? This was not something that was given to you by the lawyer?

THE WITNESS: No. He filled this out at the time of the first visit, on that date.

THE COURT: Thank you.

THE WITNESS: On September 2, 2011, I was in Staples store located on Northern Boulevard. When I was looking some products to buy, one guy was working with ladder behind me and suddenly two boxes fell on my shoulder (left). That's his description of what happened on that day.

Q And, Doctor, who recommended you to provide medical treatment for Mostafa?
A Dr. Krishna.
Q And which body part your office and you have been providing medical treatment for Mostafa?
A Neck.
Q I want to go again back to the first visit.
A Yes, sir.
Q You refer there that you or your office or Dr. Mikelis reviewed the MRI C-spine. Withdrawn.
Did you review the MRI on that date or --
A Not on that date but on the subsequent visit I had the opportunity to review the MRI, yes.
Q And what was the plan, if anything, on the first visit of Mostafa in your office?
A Again, we made -- we discussed with the patient all of the treatment options that were available, which included surgical and non-surgical treatment options. The surgical option briefly, because we weren't recommending surgery, but, more importantly, the non-surgical options, which included continued therapy, continued chiropractic care and anti-inflammatories, and then, most importantly, the epidural steroid injections, which we were recommending as -- Dr. Mikelis was thinking was the next best option for him, is the best way to say it.

Q So and the first time, if I understand correctly, so your office recommended therapy; right?
A Well, he was getting therapy all along, but we recommended that he continue doing that therapy, but in addition, we recommended that he do the injections.
Q Can you describe what injection you or your office recommended?
A Yes. So I mentioned several times that we were recommending epidural steroid injections. For the jury's sake, if you can imagine there was a problem in your spine and that problem relates to an injured nerve, an inflamed nerve, whatever the reason, say in this case it might be a herniated disc, hypothetical, one of the best strategic interventions that we have for diminishing the pain or dysfunction from a nerve that's irritated would be an injection of steroids in and about that area. So much of the dysfunction of the nerve, which the word is, you're may hear it, it is radiculopathy. That's the doctor word for dysfunctional nerve. It comes from not only a pinched nerve, meaning actually compressed, but the pinch and then the subsequent inflammatory response that is created because of the insult. We will use that word, insult.

So by injecting a steroid into the area much of the symptoms are improved. It can be permanently or temporarily, depending on severity and the circumstances. So very, very often we -- especially as a surgeon in a surgical practice, we

very aggressively recommend the epidurals. You know, it is case specific. In this type of case, many, many people get better or better enough that they don't need surgery. Before we want to discuss surgery, we want to see how they respond to other interventions that quite frankly are much easier to go through. That was our conversation, our discussion/recommendation on that date.

Q And did he follow up on another date in your office?

A Yes. So in November of this year --

THE COURT: Not this year. November of 2014?

THE WITNESS: Yes, Your Honor.

A On 11/3/2014, I saw him in the office for the first time, after there Dr. Mikelis saw him, and examined him.

He had, in the interim, I believe seen the pain management doctor. Let me check the date. He had seen the epidural doctor or the pain management doctor in September. He had visited with the doctor but hadn't yet received the injection. On that date he came to me with similar complaints two months prior, complaining of neck and arm pain radiating into the left upper extremity, numbness, tingling, and dysesthesia, continued to have pain.

His physical finding were substantially similar. That's how I like to characterize it. It was about the same as it was before, with loss of range of motion and neurologic changes in terms of both motor and sensory findings consistent

with the prior visit. My diagnosis was essentially the same, meaning herniated disc with radiculopathy. The word that I described to you before. My recommendation was similar, you know. I was recommending that the patient receive epidurals. That's what I told him he should try.

THE COURT: And as far as you understand, he had not had one, an epidural, that is, between the original visit of September 11th and the follow-up visit in November?

THE WITNESS: Correct, Your Honor.

THE COURT: Thank you.

Q Doctor, can you describe how the disc functions in the neck?

A To be as brief as possible, because this could be a long lecture. The spine is a column of bones separated by intervertebral disc. Everyone here has heard of a herniated disc. It is a pretty common injury that everyone gets. The disc plays an important role in maintaining spinal function.

The spine isn't just a structure. It has actually a function. There are two main functions. One is to provide support for the upper body. If you remember, not like a worm, which has no spine, it can just curl into a little ball. The spine provides support with vertebras. It supports the lung and the heart. It helps us run, move through space without collapsing into a ball. More importantly, it provides stability for its main companion, which is the spinal cord and

the nerves. And so if you have dysfunction of the spine in general, you can have simultaneously dysfunction in the nerve and spinal cord. And you are all aware of how somebody could get paralyzed by having a spinal injury. That's why, because of the close proximity of the spinal cord and the nerves.

Actually, the spine is a conduit. It's like a tunnel. The spinal cord and the nerve run in the middle of the spinal canal. That's how intimately they are related. Disfunction of the spine can create dysfunction of the spinal cord and the nerves.

The disc, which is the question that he asked me, is an integral component of the spine. It is a column of bones separated by the intervertebral disc. The disc allows for some flexibility. Not as much as you think. It actually provides more stability.

A normal spine, in layman's terms, functions like a bamboo fishing pole. There is certainly give in it but it is very, very stable. It is not like a loose bicycle chain. It's not loose. If it did, the spinal cord and the nerves would be damaged. So it has to provide a rigid tunnel for these structures to come through.

The bone is one part of the vertebra. And the intervertebral disc is the other part. One is hard, like a rock, right. And one is sort of like the inside of a bicycle seat. It is like the gel on the inside of a bicycle seat. As

you can imagine, because it is softer, it is more susceptible to injury and other processes. There are other processes. That's why it's so common, when you hear about injuries to people's spine, you will hear about an injury to the intervertebral disc. So that's basically the function and structure of the disc in a nutshell.

THE COURT: Thank you, Doctor.

Q And, Doctor, can you describe how the nerve travel through the canal to the brain and how the patient feels the pain?

A Sure. So, as I described to you that the spinal canal is a conduit or a tunnel for the spinal cord and the nerves, right. It is actually spinal cord, a solid structure that comes out of the brain, right. It comes out of the brain, out of the skull and it travels through the upper -- from C1 -- just to be brief. There are seven cervical vertebras. There is C7 and then there are 12 thoracic vertebra and then there's five lumbar. So it travels from C1 down to around L2, a solid spinal cord. At each level, at each vertebra, C1, two nerves comes off, right and left; C2 two nerves come off, right and left, and so on and so on. Each nerve is tagged with a number, like I described. It goes to a specific body part that I talked to you about before, dermatomes and myotomes. These are doctor words that are used to convey exactly where these nerves go and they attend to very specific functions.

Just like I told you before, that C6 controls the sensation over the thumb and forearm, C6 also controls opening and closing your hand and moving your wrist up and down, in general, without being exactly too specific.

So that a dysfunction of a specific nerve root can lead to the dysfunction of what a doctor sees and a patient complains of, a dysfunction of part of their arm if it is a problem in their neck or in their legs, hypothetically -- or, actually, it's a problem in their low back.

The question he asked is how do they relate to each other, it's that the spinal nerves come out of the -- travel down the spinal canal, two come out at every level left and right, corresponds to a very specific area of the spine which corresponds to a very specific area of the body. If it working, it works. If it doesn't work, you will see things like loss -- radiculopathy, which I will explain the components of radiculopathy. You'll see sensory dysfunction, which I described before. You'll see motor dysfunction, where the muscle isn't as strong.

Do you remember I said the tricep is four out of five. So we will see weakness of the motor. We'll also see loss of a reflex sometimes, because the reflex is -- that's when the doctor hits your knee and the knee jumps. So that could be dysfunctional in a nerve that has an injury.

Finally and most commonly, pain. The word pain is

part of radiculopathy. Sometimes the muscle works fine and sometimes the patient feels totally fine, right, but the patient has severe pain.

A different exam that you all are aware of and that you will understand right away is shingles. Now, shingles, the motor works fine, everything works, but the patient is screaming in pain, right. That's because the nerve itself is dysfunctional for a different reason, not related to spine. Just as way of education, if you irritate the nerve, it hurts like hell. Sorry, Your Honor. You need to understand that pain is part of radiculopathy. It is one of the four components and it's an important thing that we listen for and one of the most important things that we have to treat. Even if they don't have motor dysfunction, it's the pain that we have to take care of, and that's usually, as I described to you, made better with therapy, anti-inflammatories, injections. Injections is the most common form of therapy that I prescribed that makes people better. That's how it ties together.

(Continued on following page.)

EXAMINATION CONTINUES

BY MR. BHURTEL:

Q In second visit, what was the plan you or your office other doctor recommended?

A I recommended on 11/3/2014 I saw the patient and continued to make the same recommendation that the patient get treated with therapy, anti-inflammatories and injections.

Q And what was the -- Mostafa he elected to do?

A Well, I know at some point he had injections. Do you want me to go through and tell you when he had them?

Q No. I mean in this time, what he said to you this time?

A I mean I didn't record specifically what he said, but I didn't record something specific that he -- that he said to me. Let me doublecheck a second.

Q Doctor, all right, so that will go in the record.

I think you wrote it in your record, right, in your --

A No, on 11/3 I saw him. I made those recommendations. That's all -- that's all that's contained in my note. I don't really write what the patient told me other than he had -- you've already asked me about he had complaints of neck pain on that day. Yeah, that was all the same as before.

Q And did you recommend him anything that he should not do?

A Yes. So it's my custom and practice, that means I do it routine with everybody, and in this particular case if someone

has a spinal injury or a complaint of radiculopathy, then I ask them to refrain from, as you can imagine, heavy lifting, heavy carrying, heavy bending, using their upper extremities excessively. Anything that requires them to move their head about excessively, all can exacerbate the radiculopathy. That's what I recommended for him to avoid.

Q And just for the clarification, you were providing the medical treatment, which body part?

A Neck.

Q Neck.

A Related to his cervical spine.

Q Not the left shoulder?

A No.

Q And not the head?

A No, sir.

Q And when did next time Mostafa came to your office for the medical treatment?

A Next office visit was January 29th, 2015.

Q And what was his complaint on that day visit?

A Continued to complain of neck pain. He did convey to us that day he had some shoulder surgery in December 2014. He was receiving therapy twice a week, home exercise program, but he continued to have similar complaints to before of neck pain with radiation to the left upper extremity, numbness, tingling and dysesthesia.

The remainder of his exam was consistent, substantially similar to the prior exams. And we were still recommending conservative treatment, therapy, medicine and we were recommending he continue up with his pain management doctor.

THE COURT: Had he had injections by that point? You cannot tell?

THE WITNESS: You know, I can go through the record I'll find it, a date when documenting his injection, Your Honor. Just give me a second. I know he had one on 7/31.

THE COURT: Of?

THE WITNESS: That's subsequent to that visit.

THE COURT: So that would be 2015?

THE WITNESS: 2015, yes, Your Honor. He had one in 8/28/2015. So that's the -- those are the records I've, so as far as I know he didn't have any epidurals up until that time.

THE COURT: And would those epidurals be something your office would administer?

THE WITNESS: One of the doctors, yes, sir.

THE COURT: Is there a reason you did not administer one of them at the visit of January 29th?

THE WITNESS: Well, my role again, I -- well, he saw Dr. Mikelis my associate on that day. He is also not a pain management interventionalist, so there are specialists in my practice who just do injections. I just do the surgeries,

Dr. Mikelis does the evaluations, steer them in one direction or the other.

BY MR. BHURTEL:

Q And how many doctors you have in office, your office?

A At the time?

Q Yes.

A We had four physicians at the time.

Q And I don't think I asked this question, I want to ask you, what is the name of your business or the medical office?

A New York Spine Specialists.

Q And what is the address for that one?

A Well, the main office -- I've more than one office. But the main office is in Marcus Avenue, 2001 Marcus Avenue, Lake Success.

Q And do you have office in Manhattan also?

A Yes.

Q And can you tell the other doctors' name you have that time?

A So at the time we had Mr. Mikelis.

MR. O'HARA: Objection, relevance. Only doctors that treated the patient.

MR. BHURTEL: Yes, I'm coming to that.

BY MR. BHURTEL:

Q The other doctor who was involved to provide treatment to Mostafa?

A Dr. Mikelis and Dr. Chacko, I believe. Yes, Dr. Chacko.

THE COURT: C-H-A-C-O? Gotcha.

THE WITNESS: C-H-A-C-K-O.

THE COURT: Thank you.

BY MR. BHURTEL:

Q Dr. Jeffrey K. Chacko?

A Yes.

Q And how about the Dr. Billy Ford?

A Dr. Ford also is a doctor in my practice.

THE COURT: But is that a doctor that --

THE WITNESS: Yes. Dr. Ford also saw the patient, yes.

A So subsequent to that date, you asked me about that date, Dr. Chacko has moved on and Dr. Ford replaced him and then Dr. Ford did see him.

Q And what is the speciality of Dr. Chacko?

A Both Dr. Chacko and Dr. Ford were interventional pain management physicians. So their role is they, basically, give injections. They're doctors that are specialists that give injections usually under X-ray into different body parts. Predominantly that's what we do in our practice. We don't do a lot of medicine treatment, mostly interventional pain, meaning that give injections and other treatments like that related to spine problems.

MR. BHURTEL: Can I've the doctor this exhibit, I

want to talk to?

THE COURT: Yes, of course. Make sure Mr. O'Hara sees what you are using before the jury or the doctor sees it, that's all.

MR. O'HARA: Were they used before, counsel?

MR. BHURTEL: Yes.

MR. O'HARA: There is no objection.

THE COURT: If it is already in evidence, you do not need anybody's permission to use it again, just make reference to the number on the back.

And, Doctor, if you want to go down into the well, that is fine.

(Witness steps down.)

THE WITNESS: For what purpose, you want me to show the jury what a herniated disk is?

MR. BHURTEL: Yes.

THE WITNESS: They're all good. This one is fine. I'll take this one, too.

THE COURT: So let's talk about, there are numbers on the back.

THE WITNESS: Yes, I'll give you the numbers. 112-C and 112-E.

THE COURT: C and E, Charlie and Edward.

MR. BHURTEL: This is Plaintiff's Exhibit 112-C. 112-C.

THE COURT: What is your question of the doctor, Mr. Bhurtel?

MR. BHURTEL: Yes, Your Honor.

BY MR. BHURTEL:

Q Doctor, can you describe what you see this one in this Plaintiff's Exhibit 112-C?

A Yes, sir.

So this is a image of a -- a reproduction of an MRI image. So for the jury, MRI is a diagnostic study, like an X-ray or a CAT scan that's done. It's a very specialized test, great test for imaging the spine. It gives us great visualization of both soft tissues, which is different than X-rays and CAT scans. Much better definition of soft tissues like herniated disks and in contrast to hard -- hard structures like bone. So this is the -- and it comes as series of images.

This is just one of a series of images, but the most -- easiest way for me to explain to you, and this is an MRI of Mr. Ahsan's neck, right? And so just to orient you a little bit, here is the brain (indicating), part of the lower part of the brain. This long strap is the spinal cord (indicating), okay. It's numbered, so you have vertebrae C2, it looks a little bit like a pyramid, the rest of them look square, 3, 4, 5, 6 and 7. The vertebrae are square and the structures between each one are called the intervertebral

disk.

There are parts of this that are more normal than not, and I'll try to orient you a little bit, but normally what happens is the spinal cord runs -- and this image, it shows the middle of the spinal canal. There are other images that show more one side than the other that look completely different, but this best illustrates the concept of a disk and a herniated disk.

So generally speaking, in a more normal area of the spine you will see the spinal cord travel down the middle. You will see white on front of and behind, we use those words for here (indicating), and that represents cerebral spinal cord fluid or CSF, and so normally there is not contact with the spinal cord, okay. So the spinal cord floats freely down the spinal canal and it's a tunnel. It's a bony tunnel. You know, it's held in place so it doesn't move back and forth, but generally there is nothing pinching the spinal cord. Okay, let's just say that.

So as you follow down, I'm sure your eyes have already drifted to these other areas where you will see protrusions. I'm going to use that word because it's a very generic word of this intervertebral disk towards the spinal canal, impinging on the spinal canal. These are words that we use. And so that is not normal. Okay, it's not normal. And so patients that have those protrusions, herniations in this

particular case, you know, I agree with the report. I've read it myself, that these are herniated disks.

Can -- you know, it doesn't just -- it doesn't just look that way, there is also an implication that that happens. If the herniated disk -- two things. Number one is that the disk is -- because the disk material is no longer between the two vertebrae, one vertebrae relative to the other moves more than it ought to because it's a stabilizer of that segment, the vertebral segment. The second thing is as it protrudes out, it pinches the spinal cord and creates an inflammatory response around the spinal cord and the nerves. We don't see the nerves in this particular image, I'll show it to you, I hope, on the next one if I could show it to you.

Just one second with that.

And then that creates symptoms, that compression, that impingement, that inflammatory response can then alter the way the spinal cord works. Okay, for some reasons I can get into if somebody asks me about it, but in general that's the problem that everyone is talking about.

So in this case he has a herniated disk at C4/5, and that's an important thing because that the herniated disk, the name of the disk is actually two numbers. It's named by the vertebrae above and below. So the intervertebral disk between C4 and C5 is called a C4/5 disk. So every disk has two numbers, right, and the disk between C5 and 6 is the C5/6

disk. Okay? So that's how it's numbered.

This is the midline (indicating). I'll show you the other views to make you -- hope clarify it further not confuse you more. And this is 11 -- this is 112-E. And so this is -- this is --

BY MR. BHURTEL:

Q Doctor, can you explain to the jury this plaintiff's Exhibit 112-E, what is it?

A Yes, sir.

And so remember I told you it was a series of images, so it actually is slices taken all along the way. And so what specialists do is we actually create this 3-D in our mind. You can actually have this done 3-D, but we kind of see it that way. So do you see the image I showed you before and then there is a line drawn across, right? And so the corresponding alternative image is actually that slice, that slice re-formatted. They take this picture and the computer does it and it gives you the cross-section. So I'll describe the cross-section.

So this is a cross-section through the neck at exactly the level between C5 and C6. All right? And it's meant to demonstrate for us as follows:

This is what the vertebrae -- this is what a vertebrae looks like. You have a vertebral body. You have an arch, it's called a posterior arch, and then the space between

is called the spinal canal. What generally resides in the spinal canal -- you guys are all experts now -- is the spinal cord. That's right, good answer. And so what we see here is a protrusion (indicating). We don't see a normal, we only show the herniated disk, pushing the spinal cord back up against the posterior arch. That's not normal.

What we see also, it just looks like almost a horseshoe shape. We see like a white tunnel that runs out in each direction. Well, that's where the nerve is exiting out from the spinal canal, it's called an intervertebral foramen. That's the word, foramen. And the nerve travels out and not only do you often get herniated disks that pinch the spinal cord, but as often you'll get a herniated disk that could be more to one side than the other and begin to impinge on just the nerve, not the spinal cord alone, and that can yield symptoms. And in this particular case it looks like, and you may or may not be able to see this, do you see that space is a certain diameter and that one looks more narrow (indicating), do you see that that one is a little more narrow? Well, that's the left side and so he has more herniation to one side.

And typically, not always, but typically that causes patients will say, Well, the pain is in my neck, but it goes more to the left side. And that's why, because there is more irritation or compression on the left side.

You can also get symptoms on the other side, not to confuse you, but in this particular case it's consistent with what the patient is saying.

And that's how we -- that's what the doctor does is he listens to the patient, you examine the patient, and then you look for the MRI. You see, do I see anything wrong at that level where the patient is complaining? And the answer is yes, I see something. And so you say, well, this is real. He's got an objective test that -- that correlates, is a doctor word, with what the patient's complaints, you know, subjective complaints are. And then based on that we can make a recommendation. And that's it in a nutshell.

Q Okay.

THE COURT: Do you have another question about the chart?

MR. BHURTEL: Yes.

BY MR. BHURTEL:

Q So, Doctor, you rely on this MRI report or films if you have to do surgery or other treatment recommendations?

A Absolutely.

Q This is one of the tests for the -- the objective test, like you neurosurgeon?

A This is an objective test, yes.

Q -- neurosurgeon rely for the further treatment?

A Absolutely. I mean, obviously, as a spine surgeon, if

that's the question. As a spine surgeon that's what I look for because I want to know that when I operate on people, and I operate on people every day, when I go in there I'm going to find something that I could do, remove the pressure, that's gonna make a meaningful change in the circumstance and hopefully the patient will then get relief of his symptoms.

It's very complicated, but that's kind of what we're looking for as correlation as surgeons. In this case he didn't have surgery.

Q So you just don't recommend -- you don't just recommend surgery just relying on the patient what they say, Oh, I've a pain in the neck?

A Obviously, we look for -- for -- it's called clinical correlation. You will see that word often. We look for other things that correlate what the patient is saying objectively for making recommendations, nonsurgical and surgical.

Q Thank you.

(Witness resumes the stand.)

Q Doctor, when was your office, yourself or other doctor provided medical treatment to Mostafa next time?

THE COURT: The last visit we had discussed, I believe, was January 29th, 2015.

A 4/1/15.

THE COURT: So April 1st is the next visit?

THE WITNESS: Yes, sir.

BY MR. BHURTEL:

Q And what was that time Mostafa's complaint?

A It was, essentially, the same as the prior visit.

Q Did -- you recommended him to physical therapy. The physical therapy was helping him?

A Yes. It was helping him, but obviously, you know, five months had lapsed and it was, essentially, the same. He still came in saying six to nine out of ten pain. Actually, he stated on that day it hurt a little worse. But he got -- he got some relief, but obviously it didn't cure him. I mean still his symptoms were persistent on that date.

Q I think my question was bad, so I should -- did physical therapy help him to cure his neck pain?

A I'm sorry I didn't make myself understood.

No. I mean I think it does -- it gives -- it gives temporary symptomatic relief, meaning that they get benefit, it feels better, but within a few hours the pain returned. I mean, obviously, I don't have a documentation in between visits, but on this date for one, essentially, he has all the same complaints. So that I would say, in general, it was not curing it. Specifically -- not in general, I would say specifically it didn't cure him.

Q And what was the recommendation on that date?

A Get the injections.

Q Yes.

Case 1:13-cv-05929-SMG Document 118-2 Filed 12/21/16 Page 399 of 958 PageID #: 1489

A That was my recommendation again.

THE COURT: Did you have any understanding as to why he had not done that yet?

THE WITNESS: I don't -- I -- no, Your Honor.

BY MR. BHURTEL:

Q To your knowledge, do you know that he received epidural injection in his cervical?

A Yes. I believe I answered that question to His Honor before. The patient did receive an epidural in July of 2015, July 31st. And that was by Dr. Ford, and then also on 8/28/2015 he received an epidural.

Q And can you describe for the jury what is the epidural injection is?

THE COURT: I think we have been over that already, Mr. Bhurtel, unless your question was focused on the specific, something specific as opposed to general about the injections to Mr. Ahsan.

MR. BHURTEL: Yes, Your Honor. I'll actually use these same -- may I use, Your Honor?

THE COURT: Yes, go ahead. Mr. Bhurtel, just show him a document and ask him a question.

THE WITNESS: If you want to put it up, I'd be happy to.

THE COURT: Just show him a document and ask him a question.

MR. BHURTEL: Okay. Again, Plaintiff's Exhibit 112-E.

THE COURT: And what is your question about it?

BY MR. BHURTEL:

Q Doctor, can you describe to the jury how the epidural injection is given?

THE COURT: Go ahead.

(Witness steps down.)

A Well, it's a medical procedure, right? It's done in a facility or, you know, a special room. It's given -- you don't have to do it under X-ray, often it can be done and it's done under X-ray.

The epidural is just -- is a space. It's called the epidural space and that -- what that -- it's not -- what it means to convey is that it's an area in the spine where we inject medicine. For delivering a baby what's injected into the epidural space in your low back is -- is numbing medicine so you don't feel pain. In this case we don't inject numbing medicine, in this case we inject a medicine called Depo-Medrol or Etoposide or one of the steroids. And basically what it is you lie on your side, an X-ray machine is brought in. The doctor feels for those little bumps between -- if you see these little spikes that go out. If you run your fingers up and down your spine you feel those little bumps, right? It's called the spinous process. He'll take a needle the needle.

The needle has to be long enough to get to this space, and it's different for everybody. You know, if you're really skinny, it's a small needle; if you're a big person, it's a long -- it's the same size needle. It's always the same size needle, that's what people don't understand, but you only put it in -- it has to go into the space between where the cerebral spinal fluid is and the bone. That space is called the epidural space. Not in the cerebral spinal fluid, that's a spinal.

When you do a spinal tap, they push it just a little further to retrieve fluid for diagnostic purposes. This is an epidural, so it goes just past the bone into the space, but not into the cerebral spinal fluid. There are ways to know, obviously it's a technique-driven procedure, and once the doctor knows he's in the right spot, he'll inject the medicine. And then the medicine diffuses. You know, I get this question a lot, Oh, Doctor, my herniated disk was C5/6, but I got the shot here (indicating), but it actually diffuses up and down the spine. So you don't have to be in the exact spot for an epidural, and that is at the way it's given.

Yes?

Q Yes.

Can you describe to the jury what are the risks when is the taking of the epidural injection?

A So, you know, I'm on the record as saying it's not risky

or dangerous in general, but with any medical procedure, you know, there are risks. There obviously are risks and dangers to any medical procedure.

So, first is that you could get a spinal, you know. And so the spine headache, I don't know if you've ever heard of it. You know, it's a very severe headache because there's been a puncture of the dura, which is the cover the spinal canal and then the fluid leaks out. It can be very painful. You can get a headache for several days. In general, it's not a life-threatening complication, but, you know, if you had a terrible headache for three days you would not be happy, right? So that's one. That's one risk.

Number two is there is always a risk of hitting one of the blood vessels, creating a bleed, you know, a bleeding.

THE WITNESS: Do you want me to tell all of the risks, Your Honor?

THE COURT: No.

THE WITNESS: Okay.

THE COURT: Just the main risk.

A And then the other main risk would be -- and then the other main risk is like an infection. Infections, you cannot prevent infection, okay. A doctor will do his best to minimize the risk of infection, but there is no way in the world you can make infection zero. Let me just dispel that notion now. So an infection is a risk of a procedure like

this. It's very rare. It doesn't happen often, but it can happen.

So the most common adverse outcome is a spinal headache or an adverse reaction to the steroid that we give. You know, those are the common things. You know, yes, you could die from any medical procedure, but it's not a common complication of this procedure.

Q Okay.

A Any other questions?

Q No, no. Thank you.

A You're welcome.

(Witness resumes the stand.)

BY MR. BHURTEL:

Q And this epidural injection was performed by whom in your office?

A Dr. Ford.

Q Did Ford, right?

A Yes.

MR. BHURTEL: Your Honor, plaintiff offers Exhibit 49 from 1990 through 2001.

MR. O'HARA: No objection, Your Honor.

THE COURT: 1990 through 2001 are received in evidence.

(Exhibit 49, Bates pages 1990 through 2001, was received in evidence.)

MR. BHURTEL: And, Your Honor, plaintiff offers Trial Exhibit 50, Bates Number 2002.

THE COURT: 2002.

MR. BHURTEL: 2009.

THE COURT: Through 2009.

MR. O'HARA: Judge, subject to being sure that the entire office record, both from the doctor's orthopedic treatment, as well as the pain management records, are the exhibits that are being identified and offered I've no objection, but I would ask that the entirety of both records be what's presented to the jury.

THE COURT: Mr. Bhurtel, is that acceptable to plaintiff?

MR. BHURTEL: Yes, Your Honor.

THE COURT: Please turn the microphone back on.

I'll receive the entire office notes then without objection.

MR. BHURTEL: Yes.

(Trial Exhibit 50, Bates pages 2002 through 2009, was received in evidence.)

THE COURT: Please ask your next question.

MR. BHURTEL: And, Your Honor, plaintiff offers the Trial Exhibit 52.

THE COURT: Is that also part of the office notes?

MR. BHURTEL: Yes, Your Honor.

THE COURT: Then we have already agreed that the entire set of office notes will be received in evidence, and they are. And you and Mr. O'Hara will work tonight like you did last night to collect those documents and agree on exactly which Bates numbers they are, but you may ask the witness questions about them as if they are in evidence, because they are.

(Trial Exhibit 52 was received in evidence.)

BY MR. BHURTEL:

Q Doctor, after Mostafa received the first injection, did you see him?

A Well, the next time I saw him -- I saw him was 11/11/15, which was, I believe, subsequent to both injections based on what I said before.

THE COURT: So you did not see him between early July and late August?

THE WITNESS: No, Your Honor.

BY MR. BHURTEL:

Q And when you saw after he received the epidural injection and what was his complaint at that time?

A He continued -- I mean his complaints didn't change. That's the -- that's the sum and substance of the entire visit. He continued to have complaints. You know, on that date it was 5 out of 10, 6 out of 10 was his pain, but waxing and waning, but in general he still had persistent symptoms of

numbness, tingling, weakness. His physical exam was the same. His neurological exam was the same.

So the answer is he didn't receive any substantial improvement in his symptoms or relief of his radiculopathy as a consequence of his two cervical epidural injections.

Q When you say physical exam is same, can you explain?

A Okay. So the neuro -- his physical exam on 11/11/2015 showed, you know, I'll repeat the exam. Flexion was 40 degrees, with normal being 70 degrees; the extension was 20 degrees, with normal 45 degrees. Left and right turning 45 degrees, with normal was 80 degrees. And I would say it's substantially similar to before. Still had tenderness and spasm. He still had weakness of the motor strength deltoid 4 out of 5. Left-hand side, he still had weakness of finger abduction, 4 out of 5; and decreased sensation in the left C6, C7, C9 dermatome.

So those were his findings, which was substantially similar with the prior findings.

Q And what was the neurological findings that day?

A I just described them.

Q That is for both physical and neurological?

A Yeah, the motor strength of his triceps, that's neurological, it was 4 out of 5. Do you want me to repeat it?

THE COURT: No.

BY MR. BHURTEL:

Q And when did your office saw him again next time after this?

A January of 2016.

Q And what was Mostafa's complaint then?

A Substantially similar to the prior visit and all the other prior visits with continued complaints of neck and arm pain, loss of sensation, with less sensation he complained of subjectively. Objectively I noticed the same, but the physical exam was substantially similar. With loss of range of motion in all three planes; flexion, extension, lateral rotation, that was the same as the prior visit. And the neurological exam; triceps function, finger abduction was diminished on the left-hand side, 4 out of 5; and his sensation was diminished C6, 7 and 8 on the left-hand side, which was substantially similar to the prior visit.

MR. O'HARA: Your Honor, could you ask him to clarify that the date of that office visit is January 13th, 2016? I just heard January.

THE WITNESS: Yes, sir.

THE COURT: So, Doctor, if I'm following the timeline correctly, you first saw the gentleman in November of 2014 and now we're up to January of 2016, and the only thing is that he received injections from which he received temporary relief?

THE WITNESS: Yes, sir.

THE COURT: And is there a purpose in bringing him back to your office every couple of months or was that by your suggestion that he returned in 60 days --

THE WITNESS: Yes, sir.

THE COURT: -- or at his initiative?

THE WITNESS: No, no, I recommended he follow up to see how the patient was doing. Especially since I had recommended the injections, I wanted to see how he did, if he responded or didn't respond.

THE COURT: Do you know if he had additional epidurals between the November and January visit?

THE WITNESS: I'm only aware of those two that he had.

(Continued on the following page.)

(Continuing)

Q And what was your recommendation or plan for the further plan to Mr. Mostafa in that time?

A So, once the patient fails epidurals and they say they have persistent symptoms, that's when I'll begin to engage in a conversation about surgery.

So, we did have a more thorough discussion with the implications of surgery and his condition. And I think on both occasions, which was the 11/11 date, which was subsequent to his -- he had to two injections, and then in January, we talked about surgery as an option.

Q When you say surgery, what kind of surgery was discussed and recommended to him?

A The surgery for this problem, a herniated disc in the neck, is called a cervical discectomy and fusion. I describe to the patient it's an operation I do every day for this kind of problem, it's an operation done under anesthesia in a hospital, New York Presbyterian Hospital, where I do the surgery on the patient.

I make an incision on their neck and, using microscopic guidance, I remove the herniated disc, I visualize the spinal cord and the nerve roots. As you saw in that MRI, the herniated disc was protruding the pushing the spinal cord, so I go in, actually remove the whole disc. You can't put it back into place, it's broken. There's no way of repairing it

in that way. So, you take the whole disc out and then you rebuild a segment using implants. You use a titanium plate with a sort of -- reconstruct the normal anatomy of the spine. It's done as an inpatient, he stays overnight and then they go home the next day.

He didn't have surgery but this is the kind of conversation that I've with the patients. It requires, you know, a recovery period of three months or more sometimes. There is therapy involved. Obviously, there are risks involved, on which we spent some time. I document the risks and benefits of an operation like this. And that's the conversation I've with my patients.

MR. BHURTEL: Your Honor, I just want to use...

THE COURT: Go ahead. If it is in evidence, just go ahead.

Q Doctor, could you come here and show, explain to the jury about the surgery.

A But he didn't have surgery.

Q Right. But what is the process and what --

THE COURT: Is there anything that you would add with the use of the chart that you have not already told us?

THE WITNESS: I mean, I just can point to the structures that I'm going to, you know, I mean...

THE COURT: Is that what you want him to do?

MR. BHURTEL: Yes, Your Honor.

MR. O'HARA: Judge, I'm going to object on relevance grounds. There's been no surgery and there's been no suggestion that he's going to have it.

THE COURT: But it was recommended to him?

THE WITNESS: It's an option.

THE COURT: You discussed it with him.

THE WITNESS: Yes.

THE COURT: And you told him about the risks.

THE WITNESS: Yes.

THE COURT: Overruled.

(Witness steps down.)

Q This is Plaintiff's Exhibit 1122-E.

Doctor, can you describe to the jury about how the surgery will be performed, the fusion surgery you just talked about it.

A Yes.

So, it's an operation done on under general anesthesia, done in the hospital. The patient's brought into the operating room and he's put to sleep. Once the patient's put to sleep, I prepare him on the table, I position him accordingly, bring in X-ray machines which are required and then the area of the neck is prepped and draped in the usual sterile fashion like you see on TV.

Then I, as a surgeon, make an incision in the neck transversely across the front on the left-hand side and then I

use a series of instruments to gain exposure to the front of the neck. I've to move to one side the breathing tube and the swallowing tube, the esophagus, the larynx and the pharynx. And the other side I've to move the carotid artery, the jugular vein. I put a protractor in, it's called a self-retaining retractor, it kind of keeps everything out of the way. Then I take an X-ray. The X-ray will then document, I can document that I'm operating on the correct disc.

Once I know I'm at the correct disc, then what I will do is I will remove the disc. My viewpoint actually, my vantage point is straight down. I'm looking this way. I don't see it from the side. I'm looking actually, between the vertebrae. And this is again, magnified under a microscope so it looks very large for me to aid in my visualization. I'm going straight down this line. We actually put a distractor in the vertebrae spreading them apart. And then I slowly remove all of that damaged disc all the way down the spinal cord until I see, you know, the gleaming blue cover of the spinal cord. It's called the dura.

Once I know that I'm at the right level and that there's no disc left up against the spinal cord, then I will move the position of my magnification so I'm looking to the left and the right to make sure that I'm cleaning out that tunnel, called the neural foramina because sometimes the disc will tuck itself into that area. I use special probes to make

sure that the foramen is patent. That's the way we describe it, that there's no disc in there. Once I'm convinced that that there's no more pressure on the spinal cord and either nerve, then I reconstruct the segment or I reconstruct the disc space.

Now, in this particular case, there's as many different implants in the spine as there are cars, okay? But they all essentially work the same way; steering wheel and tires, all right? In this particular case I would put in a piece of a graft material, it comes from transplant patients, it's made of bone and then a titanium clip that would clip in place or screw into place over that segment.

For the jury's sake, why do we do that? It's very important that we maintain stability. Remember we used that word stability? If the bone's moved too much, the patient still has pain with or without a disc. So, by fusing the vertebrae together, we really give the maximum chance that we can alleviate the patient's neck pain and nerve pain. That's, just take it as face value, that's what we do.

So, that's the operation. Then I would just close the skin, sew the skin together, et cetera, et cetera. If the patient needs a second disc, that would be performed at the same time, same exact operation, same decompression, same reconstruction with implants.

THE COURT: Thank you, Doctor.

MR. BHURTEL: Thank you.

(Witness resumes stand.)

THE COURT: Mr. Bhurtel, are you getting near the end?

MR. BHURTEL: Yes, Your Honor.

THE COURT: All right.

MR. BHURTEL: Your Honor, plaintiff offers Exhibit 24, page 1130.

THE COURT: Are those part of the office notes?

MR. O'HARA: One moment, Your Honor, please.

(Pause in the proceedings.)

MR. O'HARA: Judge, I believe what Counsel is going to do, he's identified the Doctor's narrative report which outlines the care and treatment and that the doctor's been using to refresh his recollection. I think there needs to be a foundation as to whether or not that's a medical record or a report that's been prepared in connection with litigation.

THE COURT: Do you understand the objection?

Do you understand the objection?

MR. BHURTEL: I didn't hear, Your Honor.

THE COURT: Mr. O'Hara suggests that it is not clear whether this is a litigation-generated document or an office record of treatment summary. If you lay a proper foundation, you may offer the Exhibit again, but there is an objection based on that ground, so I will wait to hear your foundation.

Q Doctor, so did you prepare the report 1/20/2016, the report?

A Yes.

Q And this report you generally prepare for every patient or just the like Mostafa's case?

A So, this document is prepared in preparation for, usually for litigation. It's requested by attorneys as a -- generally, my custom is to restate the basic facts that have been provided for me and this is where I'm often asked to opine on causality. So, generally speaking, in my notes we don't talk about causality in office practice but if someone asked me to opine on causality, then I will make it in a document like this.

THE COURT: So, this document would not be created if this were not the result of trauma; if it was degenerative and there were no litigation about it.

THE WITNESS: I'm sorry, I don't understand the question exactly. I only formulate this document if I'm asked to opine on causality.

THE COURT: And that would typically arise in a litigation context.

THE WITNESS: And an attorney would request that information, yes.

THE COURT: Do you object to the admission of the document?

MR. O'HARA: Yes, Your Honor.

THE COURT: Sustained.

Q Doctor, do you have --

MR. BHURTEL: Strike that.

Q Doctor, when you prepared this report January 22, 2016, did you review other medical records?

A Yes, and it's listed in this document that, generally speaking, when I make this document I ask for a copy of other medical records to help me make an assessment on causality. And it's listed in the document, which ones I had at the time that I made this.

Q Can you tell us which doctors or notes you reviewed to prepare this report?

A So, I had at the time medical records from Dr. Guha, Dr. Parnes; an MRI report, Diagnostic Imaging; Apollo Imaging; Dr. Krishna's notes; Dr. Jalal's notes; Fidelity Physical Therapy; Dr. Sinha; New York Surgery, Queens records. Obviously, my office is included in that, Mount Sinai Queens records, Bazos, Lishi and Dr. Head's notes.

Q All right. Doctor, what is the medical condition as of now --

MR. BHURTEL: Withdrawn.

Q When you saw the last time Mostafa Ahsan, what is his disability he was suffering?

MR. O'HARA: Judge, I'm going to object to the form

of that question.

THE COURT: Sustained.

Was January 13th, 2016 your last visit with the plaintiff?

THE WITNESS: Just double-check that for you, Your Honor.

January 13th, yes, sir.

THE COURT: What was his condition at that time with respect to his neck?

THE WITNESS: So, I mean, I think the answer the short answer is he had a chronic neck condition, obviously from 2011, that he'd been treated. The diagnosis he carried is left cervical radiculopathy, which we discussed. He had an MRI, he has a herniated disc. Obviously, it's chronic. It's my position to say it, but, you know, I don't think it's going to get better with just time. Doing some other alternative treatment, it's not all going to go away. I do believe that those symptoms are permanent, you know, as of that date that I saw him.

MR. BHURTEL: Exhibit 49, page 199 to 9001.

THE COURT: That has already been received in evidence.

MR. BHURTEL: Yes, I just want to show him.

THE COURT: Go ahead. If it is in evidence, just do it.

Q This is page 2000 to 2001.

Doctor, can you look at it, this page?

A Yes.

Q Can you describe what is this one?

A Okay. These are also notes from my office 8/26/16, by Dr. Ford, of an injection. It's called a medial branch block, which is another type of injection like we described for patients that have neck problems.

Q And Doctor, this is page 1999.

Doctor, can you describe what is this page?

A The date of this is 7/15/2016, so it was right before that. And basically says, it's Dr. Ford's note that says continues to have symptoms from his radiculopathy, pain score seven to eight out of ten. He's on Naprosyn, he's doing physical therapy. You know, he's recommended continual home exercise program, continue the Naprosyn and that he still has the same diagnosis.

Q Thank you, Doctor.

Doctor, can you explain that the last injection, what is that injection about, medial branch block?

A It's another injection in the spine very similar to the other one except instead of being injected right into the area of the spinal canal or the epidural space, it's given over the area of the facet. It's called the facet, it's part of the spine. The medial branch block to be specific, it's blocking

one of the pain fibers that goes to the facet joint called the medial branch but, you know, that's, I think, overly complicated. More specifically it's meant to help reduce the patient's pain that's related to this spine problem.

Q And Doctor, do you have opinion that what caused Mr. Ahsan's neck injury?

A Yes.

Q And can you describe that to the jury?

A You know, if the history given to me is accurate and I believe it to be accurate, that it related to this box falling on his shoulder back in 2011.

Q And that is within reasonable degree of --

MR. BHURTEL: Withdrawn.

Q Doctor, all opinions you give today or you testified today is within reasonable degree of medical certainty?

A Yes.

Q And Doctor, do you have your natural opinion with respect to his future treatment?

A You mean the document that I provided to you?

Q Yes.

A Is that what you're asking me?

Q Yes.

THE COURT: I do not think he means the document. I think Mr. Bhurtel is asking, do you have an opinion about what his future medical care will likely entail.

THE WITNESS: Yes.

THE COURT: Am I right, Mr. Bhurtel?

MR. BHURTEL: Yes, Your Honor.

THE COURT: Would you share that opinion with us?

THE WITNESS: Yes.

I don't think he's going to get better, to a substantial degree having experience with this kind of injury. I mean, patients that have cervical radiculopathy, they have it on and off for years. They have good days and bad days but in general, it doesn't really get better. I think we've seen through the course of treatment that he's had no substantial improvement, so my prognosis is poor. I don't think he's going to get better. I think he's going to stay the same or get worse. I'm very confident saying that that's the circumstance here.

Q And do you recommend other treatment?

A Again, to the degree that he's symptomatic. And that's how I'm going to frame my answer.

So, for example, if -- I mean, you don't just keep giving injection after injection after injection, right? So if the injections are helping, they helped. Albeit temporarily. That would be to his satisfaction and mine. If he needed it more frequently than was medically reasonable, then the only alternative would be surgery.

And you know, I did discuss surgery with him because

I do believe him to be a surgical candidate. You know, this is the classic patient that has sort of chronic pain and he has chronic pain. He's tried everything, isn't better. He has an MRI that shows a pinched nerve and so these are the people that generally do have surgery for relief of their radiculopathy.

Q And what would be the cost for the surgery, Doctor, for his treatment?

A I'll go right to the document. One second, please.

So, these are approximate costs related to care of a patient with spinal problems. So, approximate cost of the surgery like this, and this includes the hospitalization, preoperative testing, implant costs, anesthesia costs, hospital stay is about $80,000, that's what I estimate it. Surgical fees all-inclusive in that.

I also discuss the potential need for further injections. As you've seen, they did provide some relief for the patient, so I said one to three times a year going forward, it's not unusual that people would, rather than do surgery, sometimes they just do injections for many years until it gets so bad. So, one to three years, not unreasonable, at cost of $5,000, and that would be all-inclusive of facility, you know, the actual medicines, doctor fees, et cetera.

THE COURT: Let me stop you there for a second.

That would be $5,000 a year.

THE WITNESS: Yes. A year, a year.

THE COURT: Fine.

The surgery would be a one-time expense.

THE WITNESS: One-time expense.

THE COURT: And those are alternative costs.

In other words, if you have the surgery, if you have a good result, you don't have the injections.

THE WITNESS: Usually, Your Honor. But not necessarily. It depends.

The physical therapy, it seems to be helping maintain his status, so it's not unusual that patients like this would be in therapy on and off for years. You know, what would be best in an ideal world would be three times a week to support his condition. The average cost of a therapy visit is about $100. I wrote $125 a visit here. Medicines like Motrin. I'm not a big medicine doctor, so Advil, Motrin, these are things that we would recommend. $50 a month, you know to a -- $600 a year is what I wrote. Nerve tests, we didn't really talk too much about it, but frequently we will monitor nerve dysfunction by what's called an EMG test. Once every two years is not unreasonable, $1,500 a test.

An X-ray, $300 once a year. An MRI once every three years. Again, I think it's a very reasonable estimate. A thousand dollars for cost. And then I wrote pain management

visits. Usually you see a pain management doctor once a month to help monitor the medicines that you're on. There's also testing if you're going to be on Motrin and even medicines like antiinflammatories, if you take them every day forever, they need to be monitored by a physician. So, that's why he would need to see a doctor regularly. And then I wrote an orthopedic visit five times a year, which is less than once every two months. I would say that is not unreasonable, $200 per visit.

And that's, you know, my best estimate of what this might cost over the next, for the ensuing years.

MR. BHURTEL: Your Honor, Exhibit 66.

THE COURT: Are you almost done, Mr. Bhurtel? Because we are really at a point where we need to take a break very soon.

Are you about to finish up?

MR. BHURTEL: Yes, Your Honor.

THE COURT: Okay.

MR. BHURTEL: Exhibit 66, 2564.

THE COURT: 2564.

MR. BHURTEL: To 2566.

THE COURT: 2566.

MR. O'HARA: A moment please, Judge.

(Pause in the proceedings.)

MR. O'HARA: Okay, thank you.

THE COURT: Are you offering them in evidence or just now identifying them and now you are going to build a foundation?

MR. BHURTEL: Yes, I'm offering.

THE COURT: You are offering them.

MR. O'HARA: Subject to the foundation he is about to lay out, I've no objection.

Q Doctor, can you look at this?

A These are bills from my office.

THE COURT: From your office?

THE WITNESS: Yes, sir.

THE COURT: Received in evidence.

(Plaintiff's Exhibit 66 received in evidence.)

Q And total, how much you have here?

A $11,000.

THE COURT: And that covers not only you, but Dr. Ford and the other physicians from your office?

THE WITNESS: Yes, total bill from my office.

THE COURT: As far as you know, is he scheduled to see anybody in your office?

THE WITNESS: I saw Dr. Ford. He's in our pain management service, so he's seeing Dr. Ford regularly.

Q Doctor, those appointments which Mr. Mostafa came to your office is given by your office?

A Yeah, we, you know, we -- obviously, we've been treating

him and whenever you treat a patient you always provide them a follow-up visit to see how they're doing. And so, he still has active pain and active issues. And for that reason, we are providing him with follow-up visits, yes. Yes.

MR. BHURTEL: I'm...

THE COURT: That completes your examination?

MR. BHURTEL: Yes, Your Honor.

THE COURT: Ladies and gentlemen, let's take ten minutes and then we will have the Doctor's cross-examination.

Do not discuss the case on trial.

THE COURTROOM DEPUTY: All rise.

(Jury exits.)

(In open court; outside the presence of the jury.)

THE COURT: Is everything good, Counselors?

MR. O'HARA: Yes, Your Honor.

MR. BHURTEL: Yes, Your Honor.

THE COURT: Take your ten minutes. 11:20. Thank you.

THE WITNESS: Thank you, Your Honor.

(Recess taken.)

(Continued on following page.)

(In open court - jury not present.)

THE COURT: Have a seat everybody.

Are you ready to proceed?

MR. O'HARA: Yes.

THE COURT: Do you need another minute?

MR. O'HARA: No.

THE COURT: Okay, we will bring out the jury.

(Jury enters the courtroom.)

THE COURT: Hello again, everybody.

Dr. Lattuga, I will remind you that you remain under oath.

Mr. O'Hara, I invite you to begin your cross-examination.

MR. O'HARA: Thank you, Your Honor.

CROSS EXAMINATION

BY MR. O'HARA:

Q Doctor, I'm going to work backwards from the topics that were covered at the end of your testimony so the progression you can follow.

A Yes, sir.

Q One of the last questions that you were asked was about the causation opinion that you held in this case and you noted that if the history was accurate, then you have a foundation off of which you base your causation opinion; is that a fair statement?

A Yes, sir.

Q And what you mean by that is you don't have any direct knowledge about this patient's history both related to the incident or his medical history prior to that for the 55 years that he lived; fair?

A That's correct.

Q And one of the things that as a treating physician as opposed to a physician involved in litigation providing consultation services to testify in front of a jury is you rely upon whatever the patient tells you or whatever the medical records that are provided to you by other providers tells you; correct?

A Yes.

Q And you don't do any independent investigation? You trust the people are going to tell you the truth?

A Yes, sir.

Q And if they don't tell you the truth or leave out key information, that affects the strength or the foundation of the opinion that you offer on that question in terms of what you're talking to a jury about; fair?

A Yes.

Q Now, in this case, not only did you serve as a treating physician, there is a separate role that you were asked to play which resulted in the issuance of your narrative report and that is associated with this lawsuit; fair?

A Yes.

Q In the initial portion of your testimony, you talked about the happening of this accident. You actually made note of the fact that Mr. Ahsan filled out two forms for your office describing the incident; correct?

A Yes.

Q In both of those forms --

MR. O'HARA: And I will identify them for the record, Your Honor.

Q -- the September 11, 2014, three-page document, which is Ahsan 1985 through Ahsan 1987, as well as in a subsequent document dated July -- excuse me, September 19, 2014, which is identified as Ahsan 1989, in both of documents, which were in your chart, he described the happening of this accident; correct?

A Yes.

Q And in both of these documents prepared by Mr. Ahsan, he described exactly where the boxes at the Staples store made contact with his body; correct?

A Yes.

Q And in both documents that he filled out, the language is in English; correct?

A Yes, sir.

Q And he gives a narrative in terms of a detailed description of exactly what happened; correct?

A Yes, sir.

Q And in both descriptions, the plaintiff in this case says the box hit him on his left shoulder; correct?

A Yes.

Q It does not say in either document that is prepared for his office, which is historical information that you and your colleagues reply upon, anything other than contact with his left shoulder; correct?

A Yes.

Q In addition to which, in that same document, there is a review of systems that is identified; correct?

A Yes, sir.

Q And there is actually a body part that he is asked to circle and there is a signature that's on the document talking about shade in areas where you have pain; correct?

A Yes, sir.

Q And where does he identify that he is experiencing pain?

A The line here starts sort of by his wrist and goes up in the back of his arm to the back of the shoulder blade and then, you know, respectfully, that's kind of the shoulder/neck area with a circle around the trapezial area, which is between there.

Q Fair. And the way that he has identified this diagram, that's consisted with pain that is radiating from the neck down through the arm; correct?

A Yes, sir.

Q And that radiating pain is something that you would expect based upon the disc herniations that are located in his cervical spine; fair?

A Yes.

Q If there is nerve root irritation, if there is impingement from the discs that are herniated when he comes in, depending on which disc is herniated, that pain will radiate to different locations in the arm; correct?

A Yes, sir.

Q And can you explain to the jury -- I talked a little bit earlier with one of the witnesses. Can you explain to the jury, you noted that it is a precise map. Which cervical discs innervate which portions of the arm in terms of sensation or feeling?

Do you understand the question?

A Yes, I do.

Q Can you please explain to the jury that?

A Can I use myself? I will point to myself?

Q Yes.

A Do you mind if I stand?

THE COURT: Not at all.

A So with my hand open like this, you'll see -- Google it.

THE COURT: No, don't Google it.

A It's a map like this. It's an overlap. In general, C5

is the top of the arm, the outside. With the hand open, you're talking about the outside of the arm, the inside of the arm.

C5 is the shoulder and arm. C6 goes down the side of the arm to the thumb. C7 is sort of the back of the arm to the middle finger. And then C8 are the two medial fingers. C8 will be the ring and the small fingers, and then the heel side of the hand. I'm pointing to this part of the hand (indicating). It's called the ulnar side of the hand. And then it goes up the medial or the inside of the arm. That would be C8. That's typically the pattern of -- the dermatomal pattern of the upper extremities.

There's a little bit of change but, in general, that applies to most people.

Q Thank you.

A Did I answer your question?

Q Yes. So for purposes of understanding, depending on the level of the disc affected, where you have a herniation that impinges, that causes nerve root irritation, it will affect different portions of the arm because of the way the arm is innervated; is that a fair statement?

A Yes.

Q In this case, after being given that historical information, you were given the benefit of a number of diagnostic studies that were performed on this patient;

correct?

A Yes.

Q Not only were you given the MRI of the cervical spine that you mentioned before from Dr. Krishna, you were also given the diagnostic films and reports from Apollo Imaging, the cervical X-rays that were taken in this case; correct?

A I believe so.

Q And you will recall that the cervical X-rays that were taken before the MRI noted degenerative disc disease with degenerative spurs throughout his cervical spine; correct?

A Yes.

Q And that's consistent with degenerative findings on a more specialized finding, which is the MRI study; fair?

A Yes.

Q Can you explain to the jury, in terms of what you saw on the diagnostic films that you reviewed as someone that specializes in this area, how pervasive, from what portion of the cervical spine in the C2/3 area until down into his thoracic spine were these degenerative changes?

A And, so, the way that I answer this, and I'm very consistent of how I answer this question. So, imaging studies they look in the body, look at specific structures. In this case, the spine. The same way on the outside you could tell that I'm 50 something. You know, if you take an MRI of me on the inside, you'll see changes that reflect that I'm 50

something.

Typically, the way I like to convey it is our age-related changes to the spine. Mr. Ahsan has obviously age-related changes to the spine. Radiologists will frequently, almost always use the word degenerative changes associated with those age-related changes, okay, because as you can imagine, you know, as we get older, we colloquially will express that as we are degenerating over time.

In reality, I think it's more fitting to describe it as age-related changes. So, yes. The instant question is Mr. Ahsan has age-related changes across his entire spine consistent with his age of a 55-year-old man. The specific radiographic findings that the question was about has to do with something called osteophytes or desiccation of the discs. These are things that a radiologist will see on an X-ray and on an MRI that are consistent with degenerative changes or I like to convey it as age-related changes. It isn't necessarily a disease. We have to be very specific. Getting older isn't a disease. It is a natural process. That's what you're referring to. It is present in his spine. There is no question about it. It is also present at the areas where he has herniations. That can be very confusing.

So an area what I could say it appears to be a traumatic herniation, let's just say, hypothetically. You also have age-related changes. So it can be very difficult to

make a distinction between an age-related change and a herniated disc and, you know, chicken and the egg. There is -- is it the herniated disc or the degenerative changes. There is no one answer to your question: Yes, he does have age-related changes, but I -- I believe my reading is consistent with the radiologist's reading there is also herniated discs at those levels.

Q And in terms of the ability to review a diagnostic study, in particular an MRI film, and we have used 112-C and 112-E. I want to focus on 112-C.

When you visualized these discs on MRI study, just looking at this alone, there are no acute tears in the disc. There's nothing that you can look at and say this is specifically related to the trauma as opposed to the natural degeneration that's ongoing in his cervical spine; fair statement?

A I mean --

Q Is that a fair statement?

A I think that's a fair statement in this particular case.

Q And because of that, one of the things that you looked to to identify, especially in litigation, what's the cause of the man's problem, you rely upon the veracity or the truthfulness of the history that's been given to you?

A Yes.

Q And if it's not true, then it affects your ability to

offer an opinion that is caused by an incident as opposed to what we have just described, the natural process that's been ongoing in his life?

A Yes.

Q And as a general matter, degeneration in the cervical spine or any other portion of the spine, is there a consensus as to when that process starts in the human body?

A Not specifically.

Q Is it generally accepted that it begins about 18 or 20 years of age? Once a human body matures to the point of adulthood, the aging process starts?

A Along those lines. They are very general concepts. It is very difficult to apply to this particular case. But, in general, we start to look older when we start to look older. For some people, they look young for much longer.

You know, usually when I'm sitting here I like to give very precise answers, and I can't really answer that question in any precise way.

Q Then I will ask it differently. I want you to answer questions that are fair questions.

You'd agree with me that in addition to the natural aging process, a series of factors associated with a person's lifestyle also affect that ongoing degenerative process; fair?

A Yes, sir.

Q That includes things such as work history?

A Yes.

Q Social history?

A Yes.

Q In particular, with social history, is there a propensity for people that are smokers to have degeneration in the soft tissue or bony structures of their body at a different accelerated rate than those who are not smokers?

A Yes.

Q In this case, do you know whether Mr. Ahsan is a smoker? Let me ask it differently. If I were to represent to you --

A Yes, he's a smoker.

Q If I were to represent to you that there are records in this case to suggest that he is a smoker and there are similarly records in addition that specifically say he's never been a smoker, that's the kind of historical information that is inconsistent that you would want to know about before you are asked to offer an answer about causation; fair?

A Obviously, all information is valuable. Yes, he is a smoker.

Q With respect to his professional history, his work history, what did he tell you about what he does for a living?

A I'm sorry?

Q All of your office notes and your narrative report all indicate that he was not working; correct?

A I don't believe he was working, no.

Q Did he talk with you about his activity outside of this incident? Because there are notations throughout your records, as well as your narrative report, about an effect on his daily normal function. Did he talk --
A As it is contained in my narrative. Those things that I've already testified to with respect to lifting, carrying, bending, lying, his activity of daily living were, he stated, were affected by this pain. To that extent, I'm aware of. But other than that, I'm not aware.
Q And you accept that as; true?
A Yes.
Q In other words, you don't do an independent investigation in terms of the information that's given to you in this case for purpose of your narrative report, that all comes from Mr. Bhurtel; correct?
A Yes, sir. And those records that I reviewed that I listed.
Q Fair. Just so the jury understands, there are some materials in your file that come to you as a matter of normal practice from other physicians; correct?
A Yes, sir.
Q And then separately, there are materials that came to you in this case from Mr. Bhurtel as part of this litigation; correct?
A Yes, sir.

Q Part of the records that were sent to you were Dr. Guha's records; correct?

A Yes.

Q You listed a series of records that are Dr. Guha?

A Yes.

Q Were those sent to you by counsel or by the doctor?

A Counsel.

Q Did those records contain any reference to any care and treatment prior to Staples incident on September 2, 2011?

A Yes.

Q And those records indicated that this patient had a prior history of neck pain; correct?

A There was an office visit reflecting that he had neck -- a neck problem.

Q And there are office visits that reflected that he had shoulder problems; correct?

A Yes.

Q And there are office records that confirm that he had prior headache-related or head problems?

A Yes. He has a neurological issue which is separate from here, but, yes.

Q Now, Doctor, can the degenerative changes that are occurring in Mr. Ahsan's spine remain on the same course independent of the event that gives rise to this lawsuit; in other words, can someone have an event where a box hits them

in the shoulder, they have an ongoing degenerative disc disease or an aging process in their spine and the impact to the shoulder doesn't affect the ongoing changes in that person's cervical spine?

A It can be an independent event.

Q And in order to determine radiographically whether there has been an appreciable change, ideally you would have prior records and prior studies that you can compare during the course of the patient's aging process; correct?

A Yes.

THE COURT: When you say prior, you mean before the alleged accident and after the alleged accident?

THE WITNESS: That's how I understood it. There were some prior objective studies that I could compare against to make an assessment on.

Q And the ability to review that is based on somebody actually identifying medical providers that existed prior to September 2nd of 2011; correct?

A Well, somebody has to give me those records.

Q Whether it is the patient?

A Correct.

Q One of the other treating physicians or the lawyer, you would rely upon the information that those folks provided to you; correct?

A Yes, sir.

Q Do you have any information about Mr. Ahsan's medical treatment other than the one or two notes that we just talked about with Dr. Guha related to his medical profession in his 30s, in his 40s and going into 50s?

A No, sir.

Q Did you ask him questions about whether he received treatment to his cervical spine which he had come to see you for besides the one or two visits that we talked about with Dr. Guha?

A I've asked the question. There was no significant treatment history according to the patient with respect to his neck.

Q Now --

A No surgery, no injections prior. I mean, real things.

Q Now, Doctor, it might be helpful if you follow along with your report, the narrative report.

A Yes, sir.

Q In the January 22, 2016 report, the description from when the patient first comes into your office about the incident changed. Can we agree to that?

A Can you be more specific with the question?

Q Sure. We've talked about when he first came into the office and filled out that form he wrote that the box struck his shoulder?

A He wrote, yes.

Q And then subsequently in your report there are a number of office visits where the history has changed and now he is talking about it striking his head; correct?
A Correct.
Q And that is, would you agree with me, inconsistent with what he actually wrote down in both the first time he came into the office and the second time that he came into the office?
A I would say not necessarily.
Q Well, let me ask a different question. If anything that I ask you is unfair or inaccurate, just tell me and I will ask you another question.
You would agree with me that the first time he writes down what happens he only says it struck my left shoulder; correct?
A Yes.
Q He doesn't in any way, shape or form suggests that it hit him in the head on the document that he filled out; did he?
A He did not write that.
Q And on the diagram of that he circled and colored in, we have already established that he colored in in the area of his trapezius muscles down from his shoulder into his arm; correct?
A But also a little bit back up the neck.
Q I'm not talking about the neck, Doctor. I'm talking

about the head. You have two different references in your report; right?
A He does not reference the head.
Q Did he reference at all any prior medical condition that he had with respect to radiating pain into his left shoulder separate from the description with Dr. Guha?
A I'm not sure I understand the question.
Q At any point were you given any information from Mr. Ahsan that this patient was suffering from myofascial pain syndrome on the left side? It's been described as MPS.
A Other than Dr. Guha's records?
Q Yes.
A No, I'm not aware other than Dr. Guha's records.
Q Now, Doctor, near the end of your testimony there was a discussion about whether this patient may ultimately need surgery. That has not been pursued during the course of the treatment with you; correct?
A Correct.
Q In fact, it's not scheduled, there is no discussion about scheduling it. It is something that he may choose to do in the future, but as of today, he has not done so; correct?
A Correct.
Q Doctor, the last two office notes -- strike that.
Let me back up. If you could turn to your November 11, 2015 reference in your report. It is Ahsan 1124, is the

page.

A Yes, sir.

Q You'll see on the November 11th, the patient is not currently working and his problem interferes with his daily normal function; correct?

A Yes, sir.

Q He says that on November 11, 2015; correct?

A Yes, sir.

Q And then the next office visit, January 13, 2016, which is Ahsan 1126. It is the same notation, not working and the problem is interfering with his normal function?

A Yes, sir.

Q And as of the last time that you see him, January 22, 2016, which is 1127, the same notation, he is not working and it is affecting his daily function; correct?

A Yes, sir.

Q Did he talk to you about what his daily function was during those two time periods?

A Not specifically, no.

Q Did he talk to you about his career in painting?

A I mean, I don't have a recollection, no.

Q Did he talk to you at all about a solo painting exhibition to display his 35 works from November 7th through November 20, 2015 from 10:00 a.m. to 9:00 a.m.?

A I mean --

Q Yes or no? Did he talk with you --

A I don't have an independent recollection of having a conversation about his career as a painter.

Q And he didn't talk to you about an affect on that aspect of his daily function when describing, which is recorded in the notes, things that he could no longer do as being a normal activity; fair?

A I mean, I don't have a specific recollection, no.

Q One of the things about your office notes and your report, as a general matter, you record significant historical information relating to the care and treatment; correct?

A What I think is relevant, yes, sir.

Q When you create a narrative report for litigation, you record significant information, it may not be relevant to the medical treatment, but it is important to you in the opinions that you are going to offer in front of a jury; correct?

A Yes, sir.

Q And, so, if there was information that had been provided to you prior to me asking you this question about this gentleman being involved in painting and then in solo art exhibition that he is the exhibitor from 10 o'clock in the morning until 9 o'clock at night over the 13-day period that includes your November 11, 2015 office visit, that would be in your report; wouldn't it?

A I mean, not necessarily. Not necessarily.

Q How about if thereafter he participated in a different art exhibition on January 23rd through February 7, 2016 where he was one of the artists exhibiting for the public work that he had prepared, would that be information associated with daily activities that would be recorded in your narrative report if he told you about it?
A I mean, it's the same answer, not necessarily.
Q It would depend on whether or not the activities that he was doing had any involvement with the cervical spine, which is the expert area that you have been retained to speak to; correct?
A I mean, most probably, yes.
Q In other words, if he is using his arms in some fashion in these art exhibits, if he is using his hands in some respect in some other activity that is inconsistent with the history that he has been giving you for purposes of your litigation opinions, you would record that in your report; fair?
A I would record a relevant restriction of a specific activity if it came up in a conversation.
Q Understood. And that also applies not only to his daily living activities, that applies to work too, doesn't it?
A I would, if I was aware of it, number one, specifically, and if I thought it was relevant to the office visit itself.
Q And if he was working at a given time, your notes and

your report would not say patient is not working; correct?

A I mean, for the most part we try to be accurate. My understanding was that he was not working. It could be a misprint. But from my understanding is that he wasn't working.

Q And if it's not a misprint, if the recitations in your report are accurate, that accuracy is based on what Mr. Ahsan is telling you; correct?

A That's correct.

MR. O'HARA: That's all that I've, Judge.

THE COURT: Any redirect?

MR. BHURTEL: Just quick.

THE COURT: You may proceed.

REDIRECT EXAMINATION

BY MR. BHURTEL:

Q Dr. Lattuga, if the people have general wear and tear which you say is age-related wear and tear, what is the condition of the peoples generally who have it? Do they feel pain there or they don't feel the pain? How does it work?

A It really varies. Some people have degenerative changes and it goes on unrecognized and in other people it becomes symptomatic. It can be either situation.

Q And if they have this kind of age-related wear and tear or -- yeah, age-related wear and tear, if they have some outside force or some kind of impact or in this case like, you

know, accident, that makes the difference or something, you know?

A Yeah. I mean, obviously, this occurs all the time. You have 60-year-old, 70-year-old, 50-year-old people that would have age-related changes to their spine consistent with their age and they are fine and they are walking around and they can be involved in an accident and as a function of that accident, their life changes forever. Certainly that can happen. The opposite can happen as well, which you where you could have age-related changes and need surgery independent of an accident. Both circumstances occur. But absolutely, you know, just because you have age-related changes doesn't mean that you are going to have surgery. In fact, that's not common. Most people are treated conservatively.

Q You did not provide medical treatment about his head or brain injury; right?

A No, sir.

Q And you are aware that the neurologist is providing him with the medical treatment --

A Yes, sir.

Q -- for the brain injury?

A Yes, sir.

MR. BHURTEL: I complete the redirect.

THE COURT: You are completed?

MR. BHURTEL: Yes.

MR. O'HARA: Nothing further.

THE COURT: You are excused, Doctor. Thank you very much.

THE WITNESS: Thank you.

THE COURT: Counsel, can I see you at the sidebar, please.

(Sidebar held outside the hearing of the jury.)

(Continued on the following page.)

(The following sidebar held outside of the hearing of the jury.)

THE COURT: So I'm wondering, that it is very early for lunch. Do we have someone else that we can present? I don't see the interpreter and I haven't seen the other doctor.

MR. BHURTEL: The interpreter is here, but the doctor is --

THE COURT: What time is the doctor supposed to be here?

MR. BHURTEL: 11:30, but he says he is on his way.

THE COURT: Well, do you think it would be efficient to have a segment of your client's direct examination now, break for lunch and then go to the doctor and you could pick up your client later? Would that be efficient or are we going to have to start where we left off?

MR. BHURTEL: It would be better if I could start the doctor.

THE COURT: Find out how close he is right now because I've to tell the jury what to do.

MR. BHURTEL: Yes, sir.

THE COURT: I'm just trying to figure out our schedule based on when we expect our next witness to be here.

Do you have any information for us?

MR. BHURTEL: It is going to take a little bit of time. Can we have a lunch break and start at 1 o'clock?

THE COURT: Will he be here at 1:00? I don't want to rush the jury back.

MR. O'HARA: He's here.

THE COURT: Is this the doctor?

MR. BHURTEL: Yes.

THE COURT: Let's get started. We will do a little bit before lunch.

MR. O'HARA: What time for lunch?

THE COURT: In about 30 to 40 minutes and then a break for lunch.

(Sidebar concluded.)

(Continued on following page.)

(In open court - jury present.)

THE COURT: Ladies and gentlemen, can you go another 30, 40 minutes without making anybody uncomfortable?

THE JURY: (Collectively) Yes.

THE COURT: All right, let's do it.

Is this your next witness, Mr. Bhurtel?

MR. BHURTEL: Yes.

THE COURT: Please come forward, take the witness chair. Sir, I'm sorry, but this is the witness chair over here. (Indicating.)

THE WITNESS: Oh, thank you.

THE COURT: Thank you.

THE COURTROOM DEPUTY: Please raise your right hand.

(Witness sworn/affirmed.)

THE WITNESS: Yes.

THE COURT: Could you please tell us your name and then spell it for us?

THE WITNESS: My name is David, D-A-V-I-D, and last name is Guha, G-U-H-A.

THE COURT: G-U-H-A.

Please be seated.

Mr. Bhurtel, as soon as you are ready, you may begin your examination.

MR. BHURTEL: Thank you, Your Honor.

THE COURT: Sure.

**D A V I D G U H A, M. D.,**

called as a witness by the Plaintiff, having been first duly sworn/affirmed, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. BHURTEL:

Q Good afternoon, Dr. David Guha.

A Good afternoon, sir.

Q Where did you receive your medical degree?

A In India, Calcutta.

Q What was the name of the medical school?

A Calcutta National Medical.

Q When did you receive?

A 1988.

Q And then did you have any other medical degree?

A Yeah, I did a residency in Brooklyn Hospital.

Q When did you do the residency in Brooklyn Hospital?

A I finished in 1996.

Q And which area of the medical you did the residency?

A I finished residency 1996.

THE COURT: Which area of medicine was the question?

THE WITNESS: Oh, internal medicine.

Q And did you have a license to practice in New York?

A Yes, sir.

Q When did you receive?

A 1996.

Q And how many years you were doing the residency in Brooklyn Hospital Center?

A Three-and-a-half.

Q And are you licensed to practice in any other state?

A No, only New York.

Q And since you received your license to practice in the State of New York, is your license in good standing since then until now?

A Yes, sir.

Q And after the residency, where did you work?

A I work in a -- in a Park Avenue Extended Care Nursing Home and also in some other private places. And also I was doing the simultaneous private practice at the same time.

Q And when you say private practice, what is the name of your business?

A Queens Medical Services.

Q And what is the address of this Queens Medical Services?

A It was in 41-42 Elbertson Street, Elmhurst, New York 11373.

THE COURT: A-L-B-E-R-T-S-O-N?

THE WITNESS: E-L-B-E-R-T-S-O-N.

THE COURT: Elbertson; thank you.

BY MR. BHURTEL:

Q And how long you had office there?

A 'Til last year. I moved after that.

Q Okay. What is your new address now?

A 8735 Britton Avenue, B-R-I-T-T-O-N, Britton Avenue, Elmhurst, New York.

Q And did you involve to provide medical treatment with respect to Mostafa Ahsan's September 2nd, 2011 accident?

A Yes, sir.

Q And when did you started to provide medical treatment to Mostafa Ahsan?

A As a primary care physician, I was treating him since year 2008, March 2008 'til now.

Q And with respect to the -- with respect to his accident-related matter, which is the September 2nd, 2011, when did you started to provide him medical treatment?

A September 2nd he came to me and told me that he has neck pain or shoulder pain and some boxes fell down when he was shopping in -- in Staples. And then I gave pain medicine and referred him for the rehab for physical therapy.

THE COURT: This was on September 2nd, you said?

THE WITNESS: Yeah.

THE COURT: The same day?

THE WITNESS: Yeah.

THE COURT: So when he saw you, he told you he had the accident earlier in the day?

THE WITNESS: Yeah.

BY MR. BHURTEL:

Q And you have been providing the treatment until now?

A Yes, sir.

MR. BHURTEL: Your Honor, plaintiff moves the doctor as a treating physician expert?

THE COURT: Any objection?

MR. O'HARA: To?

THE COURT: To testify --

MR. O'HARA: No objection to him as a general practitioner.

THE COURT: -- as an internal medicine general practitioner and overall primary care physician?

MR. O'HARA: No objection.

BY MR. BHURTEL:

Q On September 2nd, 2011 when Mostafa Ahsan came, what was his complaint?

A He had some neck pain and shoulder pain and that's it.

Q And when he said those pains related -- strike that.

Did he give you why those pain came out?

A Yes, he told me a short history that he was shopping in Staples and some box -- heavy boxes fell down on his head and after that he -- he felt some headache, you know, and neck pain.

Q And what was your recommendation then?

A Oh, I examined him and -- and referred him to a

specialist, rehab doctor.

Q And who did you refer him?

A Dr. Ricardo Santiago.

Q And what kind of doctor is Ricardo Santiago?

A He is rehab and pain medicine.

Q And did you prescribe any other treatment that day?

A I give some pain medicine.

Q What medication you give him?

A As I recall, it's Naprosyn, 500 milligram.

Q And what is the purpose of the immediate Naprosyn?

A Yes, this is anti-inflammatory for the pain relief.

THE COURT: Is that an over-th-counter drug or a prescription?

THE WITNESS: No, it's prescribed.

THE COURT: It's a prescription drug?

THE WITNESS: Yeah.

BY MR. BHURTEL:

Q Did you give any other drugs that day?

A No.

Q And what was his medical condition that day with respect to the blood pressure?

A Pressure was little elevated, you know, and he was taking the medicine for that.

And can I check the chart because I don't totally remember?

THE COURT: Yes, Doctor, you can use your notes to refresh your recollection.

MR. BHURTEL: Yes.

(Pause.)

A Yes, I gave him some blood pressure medicine also to relieve the pressure.

Q Okay.

THE COURT: Had you been, and I'm not clear from the way you expressed it, whether you are saying that Mr. Ahsan was already suffering from high blood pressure before September 2nd --

THE WITNESS: Yes.

THE COURT: -- 2011? Yes?

THE WITNESS: Yes, before that.

THE COURT: And you had prescribed blood pressure medication --

THE WITNESS: Yes.

THE COURT: -- before the accident?

THE WITNESS: Yes. Yes, sir.

THE COURT: And did you change the prescription because of the accident?

THE WITNESS: No.

THE COURT: Okay, I misunderstood before. I'm glad it came out.

MR. BHURTEL: This is Exhibit 56, Your Honor.

THE COURT: Exhibit 56.

MR. O'HARA: Bates number please.

MR. BHURTEL: Page number 2100.

THE COURT: 2100.

MR. O'HARA: No objection, Your Honor.

THE COURT: Okay, 2100 is in evidence then.

(Exhibit 56, Bates page 2100, was received in evidence.)

BY MR. BHURTEL:

Q And when did you give him to come back in your office next time?

A In a few days he saw Dr. Ricardo Santiago and he prescribed the physical therapy for his condition.

THE COURT: And did there come a time when he came back to see you?

THE WITNESS: Yes.

THE COURT: When was the next time you saw him after September 2nd, 2011?

THE WITNESS: I don't exactly recollect, but a few days, a few days.

THE COURT: I see.

MR. BHURTEL: Page 2101.

MR. O'HARA: No objection.

THE COURT: 2101?

MR. BHURTEL: Yes. Same exhibit, Your Honor.

THE COURT: 2101 is in evidence.

(Exhibit 56, Bates page 2101, was received in evidence.)

THE COURT: Mr. Bhurtel, if it's easier for you to question from standing next to the witness chair, if that will move it along, that is fine with the Court.

BY MR. BHURTEL:

Q Do you recognize this document?

A Yes.

Q Is this your record?

A Yeah.

Q Okay. Do you see the date here when he came next time?

A September 9th.

Q And what were the complaint on that September 9, 2011?

A He still continues have chest pain -- neck pain and shoulder pain, and his pressure was also elevated much more.

Q And what was your recommendation?

A Oh, I increased the dose for the -- for the blood pressure medicine and sent him for physical therapy.

Q And when you say you sent for physical therapy, where did you send, same Dr. Santiago or somebody else?

A No, Santiago he used to rent a place in my office for physical therapy, same location.

Q And Dr. Santiago is within the Queens Medical Services?

A He is an employee of the Queens Medical Service.

Q That is your office?
A Yeah.
Q Then after that, when did you see him?
A In the same -- same month, you know, after few days, you know, five, six days.
Q And what did you do on that third visit?

MR. O'HARA: Can we have a date, please?

THE COURT: The doctor gave his best recollection, which was about five days later.

Correct, Doctor?

THE WITNESS: Yes.

A I just continued the same, same treatment, you know, continue the -- checking him for his conditions, it's getting worse or not, and I order some MRIs for the neck and shoulder.
Q And where did you send to perform the MRI?
A No, because as a primary care we have to authorize, we have to get permission from the insurance company. We send a process and the insurance denied it later on.

THE COURT: But the question is what radiology laboratory did you recommend, if any?

THE WITNESS: No, first we send -- no.

THE COURT: Forget about that part. Did there come a time when Mr. Ahsan had a neck and shoulder MRI?

THE WITNESS: (No response.)

THE COURT: Yes?

THE WITNESS: But they didn't give me authorization.

THE COURT: I understand. Did there come a time when he did have the MRI?

THE WITNESS: Yeah, I sent it to Advanced Radiology.

THE COURT: Advanced Radiology?

THE WITNESS: Uh-hum.

BY MR. BHURTEL:

Q And did you -- how long after that you sent to him for the -- to the MRI office body to Advanced Radiology?

A It was a few times it was denied, you know, insurance authorization.

THE COURT: We are asking about the amount of time.

THE WITNESS: I think it's 2014 -- '14. September 2014.

BY MR. BHURTEL:

Q Doctor, what was the reason Mostafa Ahsan could not receive MRI in early?

MR. O'HARA: Objection.

A Because --

MR. O'HARA: Objection. You just --

THE COURT: What was the question? He could not receive an MRI in?

MR. BHURTEL: MRI diagnostics in early.

THE COURT: Earlier?

MR. BHURTEL: Yes, earlier.

MR. O'HARA: My concern is the basis.

THE COURT: I understand.

MR. O'HARA: My objection is the basis for the Court stopping the doctor from commenting earlier.

THE COURT: I understand. I'm going to ask the doctor a couple of questions in a leading way.

Please answer the questions I ask you.

THE WITNESS: Sure.

THE COURT: When you saw Mr. Ahsan for the third time in September of 2011, was it your opinion that it was medically appropriate to refer him for an MRI?

THE WITNESS: Yes.

THE COURT: Is the gap in time between 2011 and 2014 between when you first thought it was medically appropriate for him to have an MRI and when he actually had one, was that because of administrative issues --

THE WITNESS: Yes.

THE COURT: -- rather than medical issues?

THE WITNESS: Yes, sir.

THE COURT: Did Mr. Ahsan refuse to get an MRI during that time period?

THE WITNESS: No, sir.

THE COURT: Did you believe he merited an MRI and that his treatment would be helped by an MRI if he had it sooner?

THE WITNESS: Yes, sir.

THE COURT: Was he cooperative as a patient?

THE WITNESS: Yes, sir.

THE COURT: You may move on, Mr. Bhurtel.

MR. BHURTEL: Thank you, Your Honor. This is Plaintiff's Exhibit 56 with other pages.

BY MR. BHURTEL:

Q Doctor, can you look at it?

MR. O'HARA: Judge, we've been through this.

THE COURT: I understand.

Direct him to a specific page that your question relates to or have him identify the entire exhibit as a whole. And if you have not worked it out with Mr. O'Hara last night that the entire document should be admitted, then you will have to do it tonight, but you lay your foundation now and we will have debate about what portions are admissible after the jury goes.

MR. O'HARA: As he is doing this, Judge, can I just look over his shoulder?

THE COURT: Sure. Or you can just point to specific pages, if you are not going to offer the whole thing. It is your decision, Mr. Bhurtel. I'm not trying to restrict how you proceed.

BY MR. BHURTEL:

Q Can you look at this document, Doctor?

A Yes.

THE COURT: What is the final page, 2100 to what?

MR. BHURTEL: 2100 to 2316.

THE COURT: 2100 through 2316.

(Pause.)

THE COURT: Doctor, you would be more comfortable seeing every page before you answer?

THE WITNESS: (Nodding.)

THE COURT: That's 216 pages, the doctor can look at it over lunch. You can ask your next question and you may direct him to a specific page within the document if you prefer.

BY MR. BHURTEL:

Q Is this your office medical record?

A Yes.

THE COURT: The pages that you saw so far, right, Doctor, because you did not get a chance to look at everything?

THE WITNESS: Yeah, I know.

THE COURT: The pages that you saw so far are your office medical record?

THE WITNESS: (Nodding.)

THE COURT: Yes?

THE WITNESS: A few pages in the front.

THE COURT: You can look at the rest of the document

during the luncheon recess. Mr. Bhurtel will show it to you.

What is your next question, Mr. Bhurtel?

BY MR. BHURTEL:

Q When you referred to the therapy, how often Mostafa was receiving therapy?

A Three times a week.

Q And which body part of the -- which body part he was receiving the physical therapy?

A Neck and left shoulder.

Q And that is the body part you referred?

A Yes.

Q And did that therapy help Mostafa -- I strike that one.

Did that therapy cure Mostafa's neck?

A No. After a few months his condition remains unchanged, so I sent him to the specialist.

Q And how are his left shoulder after the therapy?

A It's not getting better either.

Q And when you say you sent to the specialist, which specialist you sent?

A Orthopedic surgeon and spine surgeon.

Q And what orthopedic surgeon you send?

A Dr. Sinha, Ajoy Sinha.

THE COURT: S-I-N-H-A?

THE WITNESS: Yes.

BY MR. BHURTEL:

Q And any other doctor you referred to him?
A I referred to him Dr. Krishna, the neurologist, and Dr. Jalal, the neurologist also; and Dr. Lattuga, the spine surgeon for his neck.
Q What was the reason you referred to Dr. Jalal -- withdraw that question.
What kind of doctor is Dr. Jalal?
A He's a neurologist.
Q And what purpose you recommended Mostafa to Dr. Jalal?
A Because he was found to have radiculopathy of the neck, so --
THE COURT: He was found to have what of the neck?
THE WITNESS: Cervical radiculopathy.
THE COURT: Cervical radiculopathy?
THE WITNESS: Yeah, so that's why I referred to Dr. Jalal.
BY MR. BHURTEL:
Q And then you also referred Dr. Krishna, what was the reason you referred to him?
A Because the patient wanted a second opinion from another neurologist, so I gave it to him another name.
Q And did you come to know that you received the MRI of his left shoulder?
A Yes, we found the MRI of the left shoulder.
Q And did you receive the MRI of his neck?

A Yeah, we also received MRI, a copy of the MRI of the neck.

Q And is this your regular practice that once you -- once you examine the patient then you refer to the special doctor?

A No, unless -- we try to treat them first, you know, if he doesn't get better we send it to the specialist.

(Continued on the following page.)

(Continuing)

Q With respect to the pain medication in the second visit --

MR. BHURTEL: Strike that.

Q With respect to the pain medication, did you continuously prescribe the pain medication or you stopped sometimes?

A Yeah, on and off because the pain medication causes kidney problems, too. I told him, unless you have a lot of pain, don't take these medicines.

Q Are you aware of any treatment provided by the doctor Dr. Ajoy Sinha?

A Yes.

Q So, what kind of treatment he provided?

A The first he gave --

THE COURT: Whoa, whoa, I'm a little lost.

Are you aware of treatment provided by?

Q Dr. Ajoy Sinha.

THE COURT: Dr. Sinha.

MR. BHURTEL: Yes.

THE WITNESS: The orthopedic surgeon.

THE COURT: Yes, thank you.

And the question is, what kind of treatment did Dr. Sinha provide?

MR. BHURTEL: Yes, Your Honor.

THE COURT: We've heard from Dr. Sinha already in

this trial, he was one of the doctors who testified already?

MR. BHURTEL: Yes, Your Honor.

THE COURT: Did you receive a report from Dr. Sinha's office about the treatment that Mr. Ahsan received from Dr. Sinha?

THE WITNESS: Yes, sir.

THE COURT: Did you use that report to decide how to continue your treatment of Mr. Ahsan?

THE WITNESS: Yes, sir.

THE COURT: What did you learn from Dr. Sinha's treatment that guided you as you decided how to treat Mr. Ahsan?

THE WITNESS: First, he gave the injection of the shoulder and he send a letter prescription, continue physical therapy.

THE COURT: How did at that help you in your treatment of Mr. Ahsan?

THE WITNESS: We have physical therapy in my office, so I recommended physical therapy after the injection, three times a week.

THE COURT: Mr. Bhurtel, I don't mean to cut off any of your questioning that you want to do. So, if I have not covered what you intended to, please feel free to go back over that general area with the questions you intended to ask.

MR. BHURTEL: No problem, Your Honor.

Q And did you learn any other treatment the practitioner provided Mostafa?

A He was following up and then finally, after physical therapy, his pain is not getting better, neither range of motion. So, he went back to him. He did a surgery of the left shoulder on September 2014, mostly debridement of the shoulder.

Q When he did the surgery of left shoulder, did that help you to further treatment him or anything helps you to make assessment of Mostafa's treatment?

A He send the patient to continue therapy after the surgery and he was getting little bit better range of motion, but he didn't get completely better.

THE COURT: When you say range of motion --

THE WITNESS: Shoulder.

THE COURT: -- which joint are we talking about?

THE WITNESS: Left shoulder.

THE COURT: Left shoulder. So, this would be the ability to lift his arm and move it around that we are talking about now.

THE WITNESS: Yes. Yes, sir.

Q So, Doctor, did you see the record from Dr. Jalal, neurologist?

A Yes, sir.

Q And did those records -- another way that you used to

further Mostafa Ahsan's treatment?

A No, it didn't help me.

Q So, you did that treatment yourself?

A I used, I checked his report, but he didn't recommend to do anything. So, you know, I -- you know, Dr. Krishna also wrote that he needs the neurological testing for further evaluation.

THE COURT: Dr. Krishna, but not Dr. Jalal.

THE WITNESS: Jalal, no.

Q Okay. Did you receive Dr. Krishna's report?

A Yes, sir.

Q And did you rely his reports to make a determination of Mostafa Ahsan's treatment?

A Yes.

Q And Doctor, did you prepare report dated February 9th, 2016?

A Yes, sir.

Q And when you prepare that record?

A February 9, 2016.

Q Thank you.

When you prepared that record, did you review any other medical records?

A Yes, I review all the medical records.

Q All right. Do you have a copy of that report with you today?

A Yes, yes, I have.

Q And can you go third page?

MR. BHURTEL: Your Honor, this is that's number 1012.

THE COURT: 1012.

MR. BHURTEL: Through 1015.

THE COURT: January 16th, 2016?

MR. O'HARA: February 9th.

MR. BHURTEL: February 9th.

THE COURT: Oh, I'm sorry.

MR. BHURTEL: Yes.

Q Doctor, can you look at the report date?

A Yes.

Q Yes. Can you tell the jury what other doctors are provided medical records that you reviewed?

A My report is first. Then Dr. Ricardo Santiago. Then Dr. Neil Morgenstern. Dr. Sayed Jalal.

MR. O'HARA: If the witness is reading from the report, I would ask him to read everything that's in the report.

THE COURT: Well, certainly on cross you may.

Q Please, continue.

A And Dr. Krishna and Dr. Sebastian Lattuga. And Sayed Prakash, MD. Dr. Andre Bazos and Fidelity Physical Therapy Rehab. Then Mikelis, Behar, Junior, Jeffrey Chacko and

Salvatore Portugal.

THE COURT: Those are all the medical records you reviewed.

THE WITNESS: Yes.

MR. O'HARA: Before we move on, may I look at what he is reading from?

THE COURT: Sure.

MR. O'HARA: Thank you.

THE COURT: What is your next question, Mr. Bhurtel?

MR. BHURTEL: Yes, Your Honor.

Q Did you review the record of Omega Diagnostic Imaging, also?

A Yes.

Q Did you review the record of Advanced Radiology Imaging also?

A Yes, sir.

Q And did you --

MR. BHURTEL: Strike that.

Q When you saw February 9, 2016, Mostafa Ahsan, what was his complaint?

A His neck. Neck and shoulder pain.

Q And any other he had complaint?

A Only headache. Headache, neck pain and shoulder pain. The same.

Q And what was his diagnosis?

A My impression?

Q Yes.

A Headache secondary to left frontal subdural hygroma, neck pain secondary to disc herniation and internal derangement of the left shoulder.

Q And Doctor, did you do any physical examination of his neck?

A Yes.

Q And what kind of examination you did?

A I did the range of motion and also, the physical exam that was swelling on the left side of the neck and the restricted neck motion, range of motion.

Q And what was the range of motion at that time?

A Normal flexion normal was 50, it was 40. And extension normal 60, he was 30. And right lateral flexion, it was 35 and left lateral flexion, normal is 45, I found 30.

Q And did you do the physical examination of his left shoulder?

A Yes, sir.

Q And what was the your findings?

A The muscle strength decreased four out of five, and tenderness is noted around the joint, and impingement test is also positive, and the range of motion flexion was 140. Normal is 180. Extension is 40, normal is 60. Abduction is 130, normal is 150. And adduction normal is 30 -- 45 and he

had 30.

Q Can you describe the jury what is flexion?

A Flexion is the range of motion from the front, you know, like this, you know.

Q And he had a limited on that one?

A Yes.

Q And what is the extension range of motion?

A Normal was 180, I got 140.

Q Can you describe the jury what is the extension?

A Extension in the back, you know, and it was -- normal is 60, I got 40.

Q And what is the abduction test?

A Abduction is this way. Normal is 150, I got 130. And adduction is this way. Normal is 45, I got 30.

Q And what is the internal rotation?

A Internal rotation is like this way. In the internal rotation, this is external rotation.

Q And what was your findings that day?

A It was little less than normal.

Q Doctor, on September 2nd, 2011 did you do the physical examination also?

A Yes.

Q When you provided the treatment, Doctor, did his condition to the head or neck change or not?

A No change. Still patient stayed from time to time

physical therapy and the pain medication off and on.

Q I'm talking about the headache, head.

THE COURT: Are you talking about Mr. Ahsan's headaches?

MR. BHURTEL: Yes.

THE COURT: What is your question about them?

Q Is his headache is becoming going up, not making, I mean --

MR. BHURTEL: Strike that.

THE COURT: Is there any change in his complaints about headache pain over time?

Is that your question?

MR. BHURTEL: Yes, Your Honor.

THE WITNESS: No, his headache is constant. It's still the same. It never change.

Q And did his neck pain or neck condition change during the time you were providing the treatment?

A No, is the same. The same. He didn't change.

Q And when you, Doctor, Mostafa Ahsan complained headache on August 4, 2011, to your office.

Are you aware of that?

A Yes.

THE COURT: What date was that?

THE WITNESS: August.

MR. BHURTEL: August 3rd, 2011.

THE COURT: So, about a month before the accident at Staples.

MR. BHURTEL: Yes, Your Honor.

THE COURT: Thank you.

Q And can you describe what kind of headache he had that one?

A It was the headache mostly on the back of the head, you know. Then there was like continuous, so I thought maybe it's from the muscle spasm from something, from the lack of sleeping or maybe bad posturing and also, it could be coming from the eye, also. He has eye problem. So, I sent him to the ophthalmologist to check it out.

Q And did you prescribe any medication on that day on August 3rd, 2011?

A I just gave him antiinflammatory. You know, pain medicine.

Q And when Mostafa Ahsan complains headache after the September 2nd, 2011 accident?

A After the 2nd, he continues to have headache all the time. And it stays, it didn't get better.

Q So, do you have opinion with respect to his headache whether his headache was caused by September 2nd, 2011's accident or something else after the September 2nd, 2011?

A That's why when he's not getting better after the accident I send him to the specialist, why his headache is not

getting better and Dr. Lattuga check his spine and Krishna, you know, find out that he has some other problems, so.

Q And Doctor, do you --

MR. BHURTEL: Withdrawn.

Q Are you aware of that Mostafa Ahsan came in your office March 26, 2008 about his neck complaints?

A Yes, sir, first time. He came to me in 2008, March and he complain of neck pain.

Q And any other body part he complained that day?

A No, only neck pain.

Q And did you, what did you do that day?

A I give antiinflammatory and send him to our rehab doctor on staff, Dr. Santiago to check him out.

Q And then what happened?

A And he prescribed some physical therapy. And patient took couple of physical therapy and, you know, pain get resolved.

Q And are you aware of that he had another complaint in February 9, 2009 about the neck complaint?

A Yes, also, February 9th. He had one episode of neck pain.

Q And what did you do that day?

A I just give antiinflammatory. I didn't do anything else.

Q And after that, did he complain his neck or shoulder until the September 2nd, 2011?

A He, no, no.

Q And when you saw February 9, 2016, what was his complaint with respect to his head or brain?

MR. O'HARA: Objection; asked and answered.

THE COURT: Overruled.

A He continues, he says, his pain is not getting better, you know, and it's very irritating for him to work or do something and he's also losing concentration and the neck is also not getting better and the shoulder pain continues.

MR. BHURTEL: Your Honor, page 1012.

THE COURT: 1012.

Q Can you explain the second paragraph?

MR. O'HARA: First, can we identify what this is so the jury can understand?

THE COURT: This is the February 2016 report of the Doctor?

MR. BHURTEL: Yes.

THE WITNESS: Yes.

MR. O'HARA: Prepared in connection with the litigation?

THE COURT: Doctor, did you prepare this report of February 9th, 2016?

THE WITNESS: Yes, sir.

THE COURT: At Mr. Bhurtel's request to summarize the medical history for purposes of the case here in court?

THE WITNESS: Yes, sir.

THE COURT: So, this was not prepared as part of your medical treatment of Mr. Ahsan. This was prepared for the lawsuit; correct?

THE WITNESS: The narrative, yes.

THE COURT: Yes. Okay.

Now, you can use it to refresh your recollection and I think Mr. Bhurtel has a question pending directing you to a particular paragraph and asking you if there is anything you want to add about your examination on February 9th, 2016.

THE WITNESS: Okay.

Q Can you tell us, what was his complaints?

A His complaints was neck pain and headache and dizziness and light-headedness, and difficulty focusing and concentration, and severe neck pain and left shoulder pain.

Q Can you continue?

MR. O'HARA: Judge, I didn't hear the question.

THE COURT: Can you continue, please.

And the Doctor's attention is directed to a particular portion of the document.

A Okay. Patient was ordered MRI of the cervical spine, brain and left shoulder which showed abnormal findings and --

MR. O'HARA: Your Honor, I'm going to object. All he's doing is reading the report.

THE WITNESS: Yes, that's what he said.

THE COURT: I know, we have funny rules of evidence, Doctor, and they may not make sense to us in this particular moment, but there is a reason for them and what those rules say is that you can read this and use it to help you remember, but you have to testify in your own words about what you actually remember, not just what your report says.

THE WITNESS: Oh, okay.

THE COURT: The idea is that, among other things, that simply because you wrote it down in the past, we are interested in what you can recall. If this helps jog your memory, that is fine but you are really supposed to be testifying about what you remember today.

THE WITNESS: Oh, okay.

THE COURT: Okay? You see the difference?

THE WITNESS: Yes.

THE COURT: So, take your time, take a look at the page and then tell us as best you can what you remember about anything about Mr. Ahsan that is responsive to Mr. Bhurtel's question.

THE WITNESS: Yes.

When the patient came to me on February, he continues to have headache, light-headedness and dizziness, and loss of concentration, you know. But although left shoulder pain is not getting better and that's all I recall, you know.

THE COURT: Thank you, Doctor.

You can ask him to read any other portion of it to refresh his recollection. I am not trying to undermine your examination.

Q Does it refresh your recollection? Can you look at it here?

A Yes.

THE COURT: Do you have anything to add after reviewing more of your report?

THE WITNESS: No, it's always the same.

THE COURT: Okay.

Q In this paragraph --

MR. O'HARA: Judge.

THE COURT: I am going to allow it.

What paragraph are you showing him? Let me see.

MR. BHURTEL: This one.

THE COURT: Directing your attention to the portion of the document that Mr. Bhurtel has just pointed to, please read it to yourself and then tell us if there is anything in addition about what you remember concerning the complaints that Mr. Ahsan made in February of 2016 or if you stand by your answer as complete.

THE WITNESS: Okay.

You know, after few months of physical therapy and conservative treatment, his condition didn't improve. So, the

patient was sent to the orthopedic surgeon and the surgery was done in September 2016, and after the surgery his shoulder pain mildly improved.

THE COURT: Mildly improved.

THE WITNESS: Mildly improved, but his condition remained the same like, headache and dizziness, like that.

THE COURT: Okay.

Are you coming to the end of your examination or would you rather have a break?

MR. BHURTEL: Maybe, Your Honor, have a break.

THE COURT: You still have more than five or ten minutes to go?

MR. BHURTEL: Yes.

THE COURT: Is this a convenient stopping point for you, where you will remember where we stopped and it will be easy to pick up?

MR. BHURTEL: Yes, Your Honor.

THE COURT: Ladies and gentlemen, let's take our luncheon recess and let's be back in the jury room by 2:00 o'clock. All right?

(Jury exits.)

(In open court; outside the presence of the jury.)

THE COURT: Doctor, you can step down.

THE WITNESS: Thank you, sir.

THE COURT: You can work out with Mr. Bhurtel if you

would like to leave the records here.

Counselors, if you want to take a shorter lunch and work on the Exhibits now to save time this evening, that's certainly acceptable to me, whatever the two of you agree.

Mr. Bhurtel, I am assuming, given how much we have covered chronologically, that even if you have more than five or ten minutes, you probably do not have more than another half-hour.

MR. BHURTEL: Yeah, not more.

THE COURT: Not more.

MR. BHURTEL: Yeah.

THE COURT: So, obviously, we will reach your client this afternoon because if Mr. O'Hara's history is an indication, his cross-examination will probably be less than 30 minutes at this point.

MR. O'HARA: Yes, Your Honor.

THE COURT: So, we can be finished with this witness by 3:00 o'clock and I certainly do not want to break for the day at 3:00. So, I hope you will be ready to call your client this afternoon.

Tomorrow is the day we have planned for the plaintiff and his wife anyway, right?

MR. BHURTEL: Yes, yes.

THE COURT: So it would not even interrupt the flow if we start this afternoon.

So, I hope you are ready to do that. I know the interpreter is here, I am pleased to see him, I know you have been ready and waiting to help us for a long time. I think this afternoon you may finally get your cue.

Is there anything else before we break?

ALL: No, Your Honor.

THE COURT: All right, especially joy your lunch.

(Recess taken.)

(Continued on following page with AFTERNOON SESSION.)

(In open court; jury not present.)

THE COURT: Is everybody ready for the jury?

MR. BHURTEL: Just one small change, Your Honor, I have.

THE COURT: A small change, you said?

MR. BHURTEL: With respect to the exhibits.

THE COURT: Is it something that you need to do now?

MR. BHURTEL: Yes.

MR. O'HARA: If you are going to use the exhibits, I would respectfully request that do it now.

THE COURT: What do you want to do?

MR. BHURTEL: This is 56. I have selected pages. Earlier I said to the Court that it runs from 2100 to 2316.

THE COURT: Yes.

MR. BHURTEL: Instead of that, that was a mistake from my side. I just want to correct that. I am offering only 2100 through 2103.

THE COURT: 2100 to 2103.

MR. BHURTEL: And then 2111 through 2118.

THE COURT: 2111 through 2118.

MR. BHURTEL: And then 2121 to 2150.

THE COURT: 2121 through 2150.

MR. BHURTEL: And then 2152 through 2153.

THE COURT: And 2152 and 2153.

MR. BHURTEL: Then 2157 through 2181.

THE COURT: 2157 through 2181.

MR. BHURTEL: And 2298 through 2300.

THE COURT: 2298 through 2300.

MR. BHURTEL: And 2309 through 2316.

THE COURT: 2309 to 2316. So limited. Is there still an objection?

MR. O'HARA: Yes, because the line of questioning was a representation that it was the doctor's office chart and he identified the Bates numbers. He's now handpicking portions, but portions of it that he is not putting in. If he is going to segregate out the chart, I think he needs to lay a foundation for the individual records because the chart is one-third the size of what he held up in front of the jury, number one. Number two, this doctor has been asked questions about a progression in his care and treatment. He is not going to put into evidence the records. It is either he puts them all in or he doesn't.

THE COURT: I misunderstood the nature of your objection. That's why I want to start over again. You are not objecting that the pages that he is offering are improper; you are saying they are incomplete?

MR. O'HARA: Exactly.

THE COURT: You want the whole record in?

MR. O'HARA: Exactly.

THE COURT: Is there any objection to putting in the

whole record?

MR. BHURTEL: Your Honor, from my side, as a plaintiff, I want to put only the number of the pages because these are directly related to his neck, head and shoulder treatment and the therapy records.

THE COURT: All right. If the defendant offers the rest of the record, do you object?

MR. BHURTEL: Yes.

THE COURT: Is this on the basis of the in limine motion that you made before trial about evidence concerning his 2008 and 2009 shoulder and neck injury?

MR. BHURTEL: Right.

THE COURT: I have already ruled. There was a motion in limine where, if I recall correctly, Mr. Bhurtel wanted there to be no reference to those injuries. First of all, I denied plaintiff's application. Second of all, we've had a lot of testimony about that. So if the grounds for objecting to the entire chart going in as an integrated whole are that it includes references to those other injuries, the objection is overruled and the entire chart will go into evidence.

Now, if you want to call the doctor's attention to some portion of the chart and not others, of course you may do that. If you want to designate certain pages of the chart as plaintiff's exhibit with a special number to draw attention to

your use of that document, I have no objection to that. But I have already ruled against you as far as admissibility of the other information about the plaintiff's medical history. If those are the grounds of the objection, then I will stand and keep in place the earlier ruling admitting 2100 to 2316 as an integrated exhibit.

MR. O'HARA: Judge, as directed earlier, we will put it with the other exhibits that are in evidence.

THE COURT: Is there anything further that you need before the jury is brought out?

MR. BHURTEL: No, Your Honor.

THE COURT: Okay. Let's bring out the jury.

(Jury enters the courtroom.)

THE COURT: Good afternoon, everyone. Dr. Guha, I remind you that you are still under oath.

Mr. Bhurtel, continue your examination.

DIRECT EXAMINATION (continuing)

BY MR. BHURTEL:

Q Good afternoon, Dr. Guha.

A Good afternoon.

Q What was your impression on February 9, 2016 with respect to Mr. Mostafa?

A Well, his headache looks like secondary to left frontal subdural and neck pain secondary to disc herniation and internal derangement of the left shoulder. That's my

impression.

Q And do you have the opinion of what was the cause of the injuries?

A It looks like from the boxes that fell down on his head.

Q And what was his condition with respect to the permanent of the injuries?

A Well, after long term of treatment, like physical therapy, his condition only mildly improved because due to the ligament damage and degeneration of the spine, that is restriction of his movement further of the joints and that, in my opinion, is permanent in nature, unless he can go for surgery of his head and total replacement of the shoulder.

Q Doctor, before I didn't ask you. Have you before testified in any court?

MR. O'HARA: Judge, objection.

Relevancy. He has been offered and the Court has accepted him as an expert.

THE COURT: Is there any relevance other than his qualifications to testify?

MR. BHURTEL: Not related to the qualification, Your Honor.

THE COURT: It is not related to his qualification. What is it related to?

MR. BHURTEL: Whether he usually testify in the court or he just treat the patients.

THE COURT: Overruled.

You can answer. Have you ever testified a courtroom before?

THE WITNESS: No, first time.

Q And mostly your work is providing the treatment to the patient?

A Yes, sir.

Q And how often -- strike that one.

How much of the percentage of practice that you have with respect to the trauma-related patients you are providing the treatment?

A 10 or 15 percent.

THE COURT: 10 to 15 percent, you said?

THE WITNESS: 10 to 15 percent.

THE COURT: Thank you.

Q And your impression is within a reasonable degree of medical certainty?

A Yes, it is within a reasonable degree of medical certainty that his condition is permanent.

MR. BHURTEL: Your Honor, may I approach?

THE COURT: Yes.

Q Dr. Guha, can you look at this document?

A They are September 2, 2011, yes.

Q Is this -- can you look at this entire document? Is this your office medical record?

A Yes, it is my record.

THE COURT: And that is 2100 to 2116 from Exhibit 56?

MR. BHURTEL: Yes.

THE COURT: Are you moving it in evidence?

MR. BHURTEL: Yes.

THE COURT: As the doctor's medical records?

MR. BHURTEL: Yes.

THE COURT: Any objection?

MR. O'HARA: No, Your Honor.

THE COURT: Received.

(Plaintiff's Exhibit 56 Bates numbers 2100 to 2116 was received in evidence.)

MR. BHURTEL: Your Honor, may I approach?

THE COURT: Yes, you don't have to ask. You are free to move about the well as you chose.

Q Doctor, can you look at this document?

A This is the bill.

THE COURT: This is the billing?

THE WITNESS: Billing record.

THE COURT: Do you have Bates numbers for those, Mr. Bhurtel?

MR. BHURTEL: Yes, your Honor. 2570 through 2617.

THE COURT: 2570 through 2617. Are you offering those.

MR. BHURTEL: Yes, your Honor.

THE COURT: Are those your billing records?

THE WITNESS: Yes.

THE COURT: Any objection?

MR. O'HARA: Subject to the same requirement redaction.

THE COURT: Subject to redaction, they are received in evidence. Counsel, will be expected to work together to do the redaction.

Q And then these bills are related to Mostafa Ashan?

A Yes, sir.

THE COURT: Doctor, you are his primary care physician?

THE WITNESS: Yes.

THE COURT: You saw Mr. Ahsan for things related to the accident, did you also see him for conditions that did not involve the accident?

THE WITNESS: Yes, sir, everything.

THE COURT: Do those medical bills include both, all of your billing over time or just the billing for the complaints he had about the accident?

THE WITNESS: He showed me the billing from only one page, you know.

THE COURT: You only looked at one page?

THE WITNESS: Yeah.

THE COURT: I see. Take a quick look at it and tell me if it includes billing for his general care or just his care for the complaints he attributed to his accident.

THE WITNESS: It's everything.

THE COURT: Everything?

THE WITNESS: Yes.

THE COURT: So some of it relates to the trauma and some of it relates to being his primary care physician regardless of the trauma?

THE WITNESS: Yeah.

THE COURT: Thank you.

Q Doctor, when was the last time you saw Mostafa Ashan?

A About two weeks ago.

Q And what was his complaint?

A The same neck pain, shoulder pain and a headache.

Q And what kind of examination, if anything, you did?

A The same: The range of motion and I order physical therapy.

Q When you say range of motion, for neck?

A For neck and left shoulder.

Q And any other treatment you recommended him?

A No. I don't know any other treatment. It is up to the specialist.

Q And does it change your opinion based on the -- strike that.

Is his condition same or different than he appeared on February 9, 2016, when you saw him the last?

A He is having little bit loss of memory, forgetfulness in the head, a little bit loss of memory, but his headache is constant. It didn't get better.

Q How about the neck?

A Neck is also same and the shoulder is same.

MR. BHURTEL: Your Honor, I complete my examination.

THE COURT: Thank you, Mr. Bhurtel.

Mr. O'Hara, you may inquire when you are ready, when the podium is cleared.

MR. O'HARA: Thank you, Your Honor.

CROSS EXAMINATION

BY MR. O'HARA:

Q Good afternoon, Doctor.

A Good afternoon.

Q I am going to go slow since I know this is the first time that you are testifying.

A Thank you.

Q If I ask you a question that you don't understand, tell me and I will ask you another one.

A Thank you.

Q The questions that I am going to ask you for the most part are going to simply require a yes-or-no answer. If you can't answer yes or no, just tell me and I will ask you a

different question.

A Thank you.

Q And during the questioning, I might ask you to explain something that you have said. Okay?

A Thank you.

Q So the first time that you saw Mr. Ahsan in your office was March 26, 2008; correct?

A Correct.

Q That first office visit he came in with specific complaints about his neck; correct?

A Correct.

Q And do you recall what ultimately was the cause of the pain that he was suffering in his neck when he first came to see you in March of 2008? Do you remember?

A Yeah. I think it's a muscle spasm.

Q And in terms of the history that he gave you, that was a pain that had persisted for a period of time? He wasn't sure what was causing it, and so he came to see you; correct?

A Correct.

Q He next came to your office two days later; correct? He came to your office on March 28, 2008; correct?

A Correct.

Q And according to your office records, at that time he has a different complaint of pain in his left shoulder; correct?

A He didn't tell me that. He told the rehab doctor. He

didn't mention to me.

Q Okay. But your office records indicate that on March 28, 2008 -- strike that.

The pain management person that you are speaking about, that's an employee of Queens Medical Center; correct?

A Correct.

Q And the medical records that you have brought with you today that you have been using to help refresh your memory include these records from when Mr. Ahsan first became your patient; correct?

A Yes.

Q And when he first became your patient, first he presented with problems persisting in his neck; correct?

A Yes.

Q Then, two days later he came and complained of problems relating to his left shoulder, which had been how long in duration? Do you remember?

A He didn't mention it to me, left shoulder, but he gave the history to my rehab doctor.

Q My mistake. I will change the question.

Do you remember how long he said his left shoulder had been bothering him when he described the pain on March 28, 2008?

A No, he didn't mention the time.

Q If I were to tell you that the record indicates that it

was more than one month in duration and that he had muscle spasm and he was also complaining of cervicalgia, would that refresh your memory as to whether or not he complained about the time that he had problems with his left shoulder?

A I'm telling you again this is not my record.

Q I understand.

A This is the rehab doctor. I don't read his record.

Q Then let's change the question just a little bit.

I am going to show you the entry that I am talking about.

A Oh, this is the rehab doctor. Not me.

Q I understand. So read the rehab doctor's to the jury.

THE COURT: Bates numbers?

MR. BHURTEL: Bates numbers 2085.

A Left shoulder pain for one month duration.

Q See where it says present complaints, read this entire passage so that the jury knows what was written down by the pain doctor that works for you.

A Left shoulder pain for one month duration. It is very hard handwriting.

Q Imagine if you were a lawyer.

A Because of long muscle spasm and also complains of bilateral cervicalgia. That means neck pain, you know. Denies any accident or any kind of injury, you know.

Q What else does it say? Keep going.

A Denies -- well, I can't read it.
Q That's okay. You are not sure what the other notations that are made in your chart; correct?
A Correct.
Q Let's go back to the first time you saw him and read your entire note Bates numbered 2080.
A Neck pain with swelling.
Q Continue.
A AND difficulty urination.
Q I don't need you to read that last part.
A Patient came to the office for first time, complains of neck pain and difficulty with urination.
Q I just want you to focus on the neck, the shoulder and the head, the part of this case.
MR. BHURTEL: What were the page numbers?
MR. O'HARA: 2080, 2085.
Q Did the pain doctor in your office render a diagnosis as a result of an evaluation on the 28th of March 2008?
A I think he does neck pain and left shoulder pain.
Q And he diagnosed something called lower trapezius MPS?
A That's myofascial pain syndrome.
Q Tell the jury what that is. What is myofascial pain syndrome?
A This is the muscle pain due to spasm, maybe any virus disease or something. Vague.

Q Tell me if I am correct. So the muscles are sheathed in fascia, and when that fascia gets inflamed or irritated from some source, it causes pain?
A You're right.
Q And that pain is radiating in through his shoulder down to his arm; correct?
A Correct.
Q He also has a problem called cervicalgia. You mentioned before. That's a problem that is persisting with an agitation in his neck; correct?
A Yes.
Q And it is also causing, based on the records in your chart, muscle spasm that requires actual care and treatment; correct?
A Sure. Sure.
Q At that point, in March of 2008, was he sent for any diagnostic evaluation to determine whether there was a disc-related cause in his cervical spine that was the reason why he had this radiating pain down into his shoulder and into his arm?
A No.
Q Now, the problem with his shoulder and his arm continued from March of 2008 into April -- excuse me, February of 2009, when he came back to your office; correct?
A Yeah.

Q And he saw the pain doctor in your office for an evaluation relating to the same problem, his neck and his shoulder; correct?

A Yes.

Q What I'd like you to do is --

MR. BHURTEL: What is the page number?

MR. O'HARA: I will give it to you in a second.

Q I would like you to read and translate for us the diagnosis that was rendered by a physician in your office that is at page 2093. To help us, because I think I know what these acronyms mean, but just tell us what the word means. For example, DX means diagnosis; correct?

A Diagnosis, yeah.

Q Read through the end of this page as to what the doctor in your office diagnoses this patient with now, almost a year later?

A He has cervicalgia and left lower trapezius, and MPS, myofascial pain syndrome, and difficulty --

Q Let me stop you. Let me lead you along. Okay.

So he is diagnosed with cervicalgia?

A Uh-hum.

Q You have to say yes or no.

A Yes.

Q Which is the pain in his neck. A year later he's diagnosed with left lower trapezius myofascial pain syndrome?

A Yes.

Q So that condition has also persisted for a year. Read that for me. He is diagnosed with difficulty with range of motion?

A Range of motion, yes.

Q So not only does he have pain that's in his neck that's radiating into his shoulder down into his arm --

A But he didn't mention about the shoulder.

Q But we know that lower trapezius MPS radiates through the trapezius muscle into the shoulder; correct? Yes?

A Shoulder is supraspinatus, mostly, you know, but the trapezius is down on the neck side.

Q And when he is talking about the history of recurrent left trapezius tightness, that's the same body part that he had come to see your office in March of 2008; right? He came for his neck and he came for his left shoulder?

A Yes.

THE COURT: What is the date of that note, Doctor?

THE WITNESS: 2/9/2009. February 9, 2009.

THE COURT: Thank you.

Q Just for progression, the first time he comes to your office is March 26, 2008; correct?

A Yeah.

Q He comes back and he sees the pain specialist March 28, 2008; correct?

A Yes.
Q Now he is back in the office to see the pain specialist again on February 9, 2009; correct?
A Correct.
Q In addition to having the same persistent problems and the left trapezius myofascial pain syndrome, now there is a notation that he has difficulty with range of motion; correct?
A Correct.
Q The range of motion that he's having difficulty with is his neck; correct?
A Yes, neck.
Q Now, later in this record there's a recommendation for a particular type of treatment.
A Yes, physical therapy treatment.
Q And this is called a myofascial pain syndrome release?
A Myofascial pain syndrome release.
Q Tell the jury what that is.
A Massage, the massage and the electric stimulation.
Q When you are talking about electric stimulation, right below that it says --
A TENS unit.
Q Explain to the jury what TENS unit is?
A TENS unit. That's what we call it.
THE COURT: Is that a device?
THE WITNESS: A small device.

THE COURT: That you wear and it provides an electrical charge?

THE WITNESS: Yes.

THE COURT: Into the muscle in an effort to relax it and stimulate it in a way that will relieve pain?

THE WITNESS: Yes. Yes. That's the one.

Q And there is also a reference to cervical stretch, normal traction. And then at the bottom there is a referral for physical therapy and how long he should continue to do the things --

A Yeah.

Q -- to get him better for these conditions?

A Yes. Four weeks.

THE COURT: Four weeks, you said?

THE WITNESS: Uh-hum.

(Continued on following page.)

EXAMINATION CONTINUES

BY MR. O'HARA:

Q Now, he returns -- your office chart doesn't contain any records from the physical therapy that he is going to receive as a result of this prescription in February of 2009, does it?

A Everything should be in the chart, but I cannot recall, you know, it's so long ago.

Q We actually have the entire chart that's been marked as an exhibit.

Are you aware of any physical therapy records that exist that aren't in your chart?

A No.

Q So if there are no physical therapy records in your chart, that means one of two things, right?

A Yeah.

Q Either they never got to you or he didn't go get the physical therapy, right?

A No, he might go for one day and then didn't come back.

Q And if he went for one day and didn't come back that would be contrary to the medical recommendation that said go for physical therapy two to three times per week for four weeks, correct?

A Yes.

Q And when a patient comes to you with a complaint of problems in their neck persisting into or causing problems in

their shoulder, and they first come to you in the first office visit and then twelve months later they come back with the same complaints, you expect that the patient is going to follow your medical recommendation to get better, right?

A Yes.

Q And the whole purpose of you making the recommendation is because you are the doctor trying to cure or make the patient feel better, correct?

A Yeah.

Q And if the patient doesn't follow that recommendation, that's called being non-compliant, right?

A Yes.

Q Now, according to the medical records that we -- and I will walk up so it will be easier, the next time you see this patient for any reason is on August 17th, 2010, Ahsan 3882. Correct?

A Yes.

Q And he is now complaining of headache persisting for how long?

A Two months.

Q And there is a diagnosis that's new, in that he is now being diagnosed as --

A Hypertension.

Q Okay, and so we all understand hypertension is high blood pressure?

A Yes.
Q And high blood pressure causes, among other things, persistent headaches?
A Sure.
Q And one of the reasons why a physician prescribes medication is to bring the blood pressure down?
A That's correct.
Q And part of the side effects of that medication is you still get headaches from it, yes?
A Sometimes.
Q Sometimes. And in this case, Mr. Ahsan has been on blood pressure medication since August 17th of 2010, correct?
A Correct.
Q And Mr. Ahsan has been complaining, at least according to your office records, of a persistent headache each time he's come into the office?
A True.
Q Okay. And so the next time that he comes into your office, and this is August 3, 2011, correct?
A Correct.

MR. O'HARA: And for the record, Judge, it's 2099, Ahsan, the trial exhibit.

BY MR. O'HARA:
Q He continues to complain of headaches, correct?
A Hum.

Q Yes?

THE COURT: Doctor, if you will say, and I know it is a little more challenging when you are having this kind of questioning, but you need to say yes or no loud and clear so the court reporter knows whether you are just uh-huh, like you understand the question or you are saying yes, you agree with what the question is asking you.

Do you understand the difference?

THE WITNESS: Sure.

THE COURT: So please ask your question again.

MR. O'HARA: Sure.

THE COURT: And give the doctor a little more space.

MR. O'HARA: Sure.

THE COURT: Thank you.

MR. O'HARA: I'm trying.

THE COURT: I know you are trying.

THE WITNESS: No, he's okay.

THE COURT: Mr. O'Hara, I just want to make sure that the record is clear.

MR. O'HARA: Sure.

BY MR. O'HARA:

Q So on August 3rd, 2011 your office records indicate that the patient comes back into the office with a persistent headache, meaning it's continuing during the treatment, correct?

A Correct.

Q And as part of your -- as part of the notation in your chart you indicate whether or not he's actually taking the medication that's been prescribed for his blood pressure, don't you?

A Correct.

Q Tell the jury what you write in this note as to whether or not Mr. Ahsan is taking the medication that's been prescribed for his blood pressure.

A He was not taking it.

Q So at least as of August 3, 2011 the headache that he's complaining of isn't coming from the medication because he is not taking it; is that a fair statement?

A Yes.

Q Now, in the diagnosis that's in the center part of this page, you have the phrase HTN, is that hypertension?

A Correct.

Q And then directly below it, what is that word?

A Dermatitis, skin disease.

THE COURT: So is it correct then that the hypertension or high blood pressure was first noted in your records in August of 2010?

THE WITNESS: Correct.

THE COURT: He wasn't receiving treatment for that beforehand?

THE WITNESS: No, no.

BY MR. O'HARA:

Q Okay, I am going to move past, from August 3rd, 2011, the next time you see the patient is the day of the accident that brought about this lawsuit, correct?

A Correct.

Q And you testified, and I want to make sure I wrote down my notes correctly before I ask you these questions, that when he came into your office he complained of pain in the neck and -- I'm sorry?

THE COURT: He didn't say anything, somebody hit their microphone by accident.

MR. O'HARA: Oh, okay.

THE COURT: Ask your question again.

MR. O'HARA: Sure.

BY MR. O'HARA:

Q That he came in and complained of pain in the neck and shoulder and had a history of boxes that fell on his head.

Do you remember testifying to that?

A Yes, sir.

Q Now, in order to offer that testimony, you don't have a specific recollection as we sit here today about the office visit of September 2nd, 2011, do you?

A Not too much.

Q And so in order to do that, you read the record and that

reminds you because your office practice is to write down important information, what happened that day, correct?

A Yes.

Q I am going to show you the chief complaints and present complaints section of your office note from September 2nd, 2011.

Do you see where it says chief complaints and present complaints?

A Yes.

THE COURT: Which is Bates 2100.

BY MR. O'HARA:

Q I am going to read it out loud and tell me if I read it correctly.

Patient came to the office, complains of pain in neck after heavy boxes fell down while shopping at Staples. He complains of neck pain.

A Correct.

Q Do you see anywhere in there where he complains of pain in any other portion of his body besides his neck?

A Well, I didn't write it down, you know.

Q I am asking you whether you see anywhere in this record a reference to pain anywhere in his body other than his neck?

A No, that's okay. That's right.

Q Okay. And then even lower in the document you talk about the neurological examination?

A Uh-hum.

Q You have to say yes or no.

A Yes.

Q And in doing so, you check off all of the boxes that are the subject of the neuro examination that you do in the office, correct?

A Correct.

Q And every time you check that box it's because your findings are within normal limits, correct?

A Correct.

Q And every single neurologic finding that you tried to elicit during your examination the day of this accident was normal?

A Normal.

Q And the only notation that you have on your chart is neck pain and hypertension, again, correct?

A Correct.

Q The next time that you see Mr. Ahsan is seven days later, correct?

A Correct.

Q And forgive me, but you testified on direct examination that you referred Mr. Ahsan to Dr. Santiago --

A Correct.

Q -- in about that timeframe?

A Correct.

Q If I were to represent to you that the first time that Dr. Santiago, according to the records that we have, sees the patient on January 13, 2012, so not a couple days, but a couple months, would that be consistent with your memory?
A Yes, sir.
Q So on direct examination there was just a mistake; fair?
A I don't understand that question.
Q I'll continue.

When Mr. Ahsan comes into the office seven days later before you referred him to see anyone, again you create an office note that writes down the important information, correct?
A Correct.
Q I want to make sure I understand this and my notes are correct.

You testified on direct examination that the patient was experiencing neck and shoulder pain?
A Correct.
Q Both in the first office visit and the second office visit?
A Correct.
Q And the shoulder pain was elevated, you used the phrase much more; is my recollection correct?
A Correct.

MR. O'HARA: 2101, Your Honor.

BY MR. O'HARA:

Q Please read -- tell me whether I read to the jury correctly what you actually wrote in the office record when the patient was in the office, quote:

Patient came to the office for -- you are going to help me.

A Follow-up.

Q -- follow-up --

A Visit.

Q -- visit. He complained of headache. He continues to have neck pain.

Do you see that?

A Yes.

Q And then, once again, your neuro examination, all of the boxes are checked meaning it's within normal limits, correct?

A Correct.

Q And you write, uncontrolled hypertension and neck pain, correct?

A Correct.

Q So there is nothing in your first record about a problem with his shoulder and there is nothing in your second note about a problem with his shoulder, correct?

A Correct.

Q And he told you that when he came into the office the boxes hit him in the head, correct?

A Correct.

Q When he came into the office and you evaluated him first on September 2nd, 2011, you didn't see any injury to his head, did you?

A No.

Q No bump?

A No.

Q No bruise?

A No.

Q No bleeding?

A No.

Q When he came back seven days later on the 9th of September still no bump?

A No.

Q Still no bruise?

A No.

Q Still no bleeding or any sign that he had actually been hit in the head, correct?

A No.

Q Let me ask it differently because you are saying no when I know you mean yes.

So every single thing I just said is true, yes?

A Yes.

Q Thank you.

And the headache that he had in August, August 3rd,

2011, was still present on September 9th, 2011, correct?
A I don't know that because I didn't see him in between.
Q Fair, but according to your office records the physician who saw him in August, a month before the incident, had the same notation about a persistent headache when you saw him on the 9th of September, correct?
A Correct.
Q And the condition for which you had initially diagnosed him, hypertension, in 2010 he wasn't taking the medications that had been prescribed, correct?
A Correct.
Q Now, according to your office notes, the first time that Mr. Ahsan starts to complain about shoulder pain is October 31, 2011, correct?
A Correct.
Q And in your office records you note that the patient has been diagnosed with left shoulder myofascial pain syndrome, correct?
A Correct.
Q And it's at that point you refer him to Dr. Santiago and a diagnosis is rendered of left shoulder osteoarthritis, correct?
A I don't know. I didn't read his note, so I don't know.
Q Okay, let's take a step back.
Tell the jury what, as a general practitioner,

osteoarthritis is. Tell them.

A Osteoarthritis is old age degenerative disease. You know, people lose their cartilage and they get osteoarthritis.

THE COURT: And lose their cartilage and -- say the same thing again.

THE WITNESS: The old age degenerative joint disease at that time they lose the cartilage and the bone rubbing each other and making the osteophytes and give the osteoarthritis.

THE COURT: So as you get older, the cartilage deteriorates?

THE WITNESS: Yes.

THE COURT: There is less to cushion the bones --

THE WITNESS: Yes.

THE COURT: -- as they interact with each other --

THE WITNESS: Yes, sir.

THE COURT: -- and so you feel pain?

THE WITNESS: Yes, sir. You know more than me.

THE COURT: I am sure that is not true. You are under oath, though.

BY MR. O'HARA:

Q And just so we come full circle with this:

That condition, based upon the history in your records which doesn't show any impact to the shoulder, we've already talked about your understanding was the box hit him in the head.

As of October 31, 2011 that was as a result of the condition that had been diagnosed earlier, left --

THE COURT: Wait a minute, Mr. O'Hara. This witness has never acknowledged that there is a medical note with that diagnosis.

BY MR. O'HARA:

Q Doctor, is there a medical record that you are aware of in this case that has indicated this patient suffers from left trapezius myofascial pain syndrome?

A Yes.

THE COURT: I'm sorry, I misunderstood.

A Yes.

Q And that was the diagnosis that was rendered in March of 2008 when the patient first came to see first you, and then the pain management specialist in your practice, correct?

A Correct.

Q And that is the same diagnosis that was reaffirmed at the time of the October 31st, 2011 office visit, correct?

A Correct.

Q And you referred that patient to a medical doctor in your practice, Dr. Santiago?

A Yes, sir.

Q Pain management specialist?

A (No response.)

Q Yes?

A Yes.

Q And the diagnosis of osteoarthritis or a degeneration in the shoulder was now made, correct?

A Correct, correct.

Q And that diagnosis was made January 13, 2012, correct?

A Correct.

Q Now, you would agree with me, would you not, Doctor, that from March 26th -- strike that -- March 28th, 2008 through January 13th of 2012 it is reasonable as a general practitioner to expect that as Mr. Ahsan is getting older, whatever the problem is relating to degeneration or arthritis is getting progressively worse, correct?

A Unless we do the X-ray or something, we cannot assume something, you know. We didn't do any X-ray, so we don't know, you know.

Q But the complaints are the same in the same body part and the man is now four years older, correct?

A Correct.

Q Now, you didn't refer Mr. Ahsan to Dr. Sinha to review his left shoulder until October 19th, 2012?

A Correct.

Q Nine months later, correct?

A Correct.

Q And you didn't refer Mr. Ahsan to see a neurologist, and, in particular Dr. Syed, until December 11th, 2013, correct?

A Correct.

Q So just so we understand the timing, we are now talking about a year after the accident when you first sent him to an orthopedist, correct?

A Correct.

Q And two years three months after the accident before you send him to a neurologist, correct?

A Correct.

Q Now, Dr. Syed was the first neurologist -- excuse me, yes, Dr. Syed was the first neurologist that you referred this patient to, he performed an evaluation based on that referral, correct?

A Correct.

Q He sent the patient for diagnostic studies in connection with that evaluation, correct?

A Correct.

Q You would agree with me, would you not, Doctor, I am going to ask you a hypothetical question, let me just -- do you need to read something?

If you do, just tell me, it's okay.

A No, it's fine.

Q You would agree with me that any medical doctor that has a patient that complains of blunt force trauma to the head where that patient is exhibiting sequelae, symptoms, a reaction to the blunt force trauma that affects the headache,

vision, smell, taste, balance, gait, or there is appreciable injury to the head and the patient complains of some disruption in consciousness, the standard of care requires a referral immediately, correct?

A Correct.

Q And the reason for that is if that patient has, in fact, sustained blunt force trauma, it's not even open to discussion, it is an automatic you send the patient for a head study to be evaluated by a specialist because there is a concern that there may be a subdural hematoma, correct?

A Correct.

Q And so that the jury understands, that is an active bleed in the brain that is causing all of this?

A Yes.

Q And in this case that was not done, correct?

A Correct.

Q And there was no medical provider that saw Mr. Ahsan that concluded that he had any need for medical attention for a specialist relating to blunt force trauma to the head, is that a fair statement?

MR. BHURTEL: Objection to the question, Your Honor.

THE COURT: On what ground?

MR. BHURTEL: The question -- the question says no doctor says that, so there is --

THE COURT: No, I think the question was that he was

not referred to any doctor in connection with a finding of blunt force trauma to the head. But why don't you ask the question again.

MR. O'HARA: Sure.

THE COURT: Or if you want the reporter to read it back, we can do that.

MR. O'HARA: I'll do it again.

BY MR. O'HARA:

Q Doctor, just so everybody understands, there was no referral for a head workup by a specialist at any point within twelve months of the alleged incident at the Staples store on September 2nd, 2011, is that correct?

A Correct.

Q Now, Dr. Syed sent the patient to Apollo Imaging for an MRI of his brain and an MRI of his neck, his cervical spine, correct?

A Well, I don't know about that. His Dr. Jalal knows it, the report goes to him.

Q Well, you said in your February 9th, 2016 report all of the items that you reviewed to serve as an expert in this case, right?

A Right. I saw him, but he had that report.

Q Just let me ask the question.

And in --

MR. BHURTEL: Which page?

MR. O'HARA: His report? Page 1014.

BY MR. O'HARA:

Q Did you review the diagnostic studies that Dr. Syed obtained based upon your referral to him to evaluate your patient?

A Yeah.

Q Yes?

A Yes, but it was not Apollo there.

Q But you have reviewed these?

A Yeah.

Q Are you familiar with Apollo Imaging?

A Yeah.

Q Is it a facility that you use?

A Sometimes.

Q Is it a facility that have radiologists that review diagnostic studies for you?

A Yes.

Q That you rely upon their views?

A I use sometimes.

Q Sometimes you use them and sometimes you don't?

A No.

Q Sometimes you use other radiologic facilities?

A Sure, sure.

Q And in this case when Dr. Syed, who was seeing your patient, referred Mr. Ahsan for two studies on February 4th,

2004 his brain --

THE COURT: Did you just misspeak? February --

MR. O'HARA: I'm sorry, February 4th, 2014. My mistake.

A 2014.

Q I'll say it again.

And Dr. Syed, seeing your patient based upon the referral, sent Mr. Ahsan for two diagnostic studies on February 4, 2014, one of his brain and one of his spine, correct?

A Correct.

Q And the brain study was normal based on your understanding of the report that was read by the doctors at Apollo Imaging, correct?

A Correct.

Q And the cervical spine study showed degenerative changes and nothing else, isn't that true?

A Right.

Q And just so we're clear, the degenerative changes in the cervical spine, much like what you talked about in the shoulder, same thing happens in your neck, the structures break down as you get older?

A Sure.

Q Yes?

A Yes.

THE COURT: Now, when you are testifying about what these Apollo Imaging results are about the brain and the cervical spine, are you telling us what you, yourself, see in the films or are you telling us what the radiologist reports that come back from the imaging center show?

THE WITNESS: Radiology report come back from the there.

THE COURT: So it is not like you looked at the films --

THE WITNESS: No.

THE COURT: -- and made your own conclusions because that is not your expertise?

THE WITNESS: No, you're right.

THE COURT: So you got a report from a radiology doctor --

THE WITNESS: Yes, sir.

THE COURT: -- who may never even have met Mr. Ahsan, right?

THE WITNESS: No, I never -- no.

THE COURT: The radiology doctor gets the result of the MRI --

THE WITNESS: Uh-hum.

THE COURT: -- looks at it on a computer screen, and decides if there is an abnormality or not, and then writes a report so that you and the other treating doctors can decide

what to do for the patient next?

THE WITNESS: Correct.

THE COURT: Is that the way it works?

THE WITNESS: Yes; correct, sir.

THE COURT: Thank you.

BY MR. O'HARA:

Q And that's customary in your practice, right; you refer patients for radiologic studies, those doctors simply have the studies conducted and then give their expert view in terms of their specialized view as to what those films show, correct?

A Correct.

Q And you trust their medical evaluation and rely upon what they write in the report, correct?

A Correct. They have the license, the radiologist, they should be okay.

Q Right, and just so we're clear, in this case both reports are read by two different radiologists, a Dr. Allan Keil, K-E-I-L, and a Dr. Sid Prakash, and what you're telling us is these are licensed practitioners with specialized medical training and experience in the field of radiology, correct?

A Correct.

Q And that's why they work at a place called Apollo Imaging, a division of Middle Village Diagnostic Imaging, correct?

A Correct.

Q And that's why you sent him?
A Yes.
Q Now, Doctor, did there come a point in time when you were asked to produce your medical records in this case?
A Yes.
Q And the way that worked was an authorization came from a lawyer, signed by Mr. Ahsan?
A Correct.
Q It was mailed to your office and a staff member of yours reproduced the chart and sent it to whomever asked for it, correct?
A Correct.
Q And there is a customary practice where when the request is made, there is a fee for the reproduction of the chart, they send you the check and you send them the chart, correct?
A Correct.
Q And when you do that, you send a photocopy of the actual office chart that you have on a given patient, correct?
A Correct.
Q And you've actually been advised that once you treated a patient, and you testified to this in your deposition, so if you need it I will show you, that you don't amend or change those medical records after the treatment, correct?
A Correct.
Q So I am going to show you what has been produced in

discovery.

MR. O'HARA: Judge, I am going to identify them by Bates number, and then I will work through each office record.

BY MR. O'HARA:

Q First, I am going to identify five different office records, okay?

MR. BHURTEL: Page number?

THE COURT: You are going to get them.

Q The first one is dated January 2nd, 2012 and the Bates numbers are 2159, 2560. Okay?

The second one that I will talk to you about is dated February 22nd, 2013; Bates number 2172 through 2174.

The third office note, October 7th, 2013, Bates number 2230 versus 2232.

MR. BHURTEL: What was the last one, 22?

THE COURT: 2230 --

MR. O'HARA: Through 2232.

THE COURT: -- through 2232.

BY MR. O'HARA:

Q The fourth is dated May 14, 2014, Bates number 2257 through 2258.

And then the last one that I want to talk with you about is dated June 24, 2014; Bates number 2265 through 2267. Okay?

THE COURT: And these are all part of Exhibit 56

already in evidence.

MR. O'HARA: Yes.

THE COURT: I am saying so, I am not asking.

(Continued on the following page.)

(Continuing)

Q Okay, now, Doctor, first I want you to just look at these and tell us whether these are medical records that come out of your office chart for the patient, the five separate items that I've identified.

A Yes.

Q Okay. Doctor, did you ever change any of the entries in any of those five records that I've just presented to you?

A It could be corrected because sometimes I don't fill up the whole chart because I don't have time, I have thousands of patients. I write it later on.

Q And if you --

THE COURT: Let him finish.

Did you finish what you were saying?

THE WITNESS: Yeah.

THE COURT: Okay.

I'm sorry, go ahead.

MR. O'HARA: That's okay.

Q If you write it later on, you're talking about an addendum to your prior note; correct?

A Yeah, but sometimes that, my staff, they don't go through. They just send it, you know, without asking me, you know.

Q Okay. Let me ask you some questions and I will allow you to explain if there are differences, okay?

If you are going to make a change to your record, you have a practice of formally amending your record; correct?

A Correct.

Q And the reason why you do that is because you have been advised that you should not change it otherwise; correct?

A Sure. Sure.

Q So let me ask again. Did you change any of the information in those five packets of medical records that I've identified for those five days; yes or no?

A Let me explain --

MR. O'HARA: I would ask that the witness first answer. I said I would give him a chance to explain.

A This to maybe add to the problem he had because I write it down in small piece of paper. Then when I have time, I do it, you know.

Q Okay.

A But we have a very busy practice, I have staff and so many records going out. So, they might send the old one and they forget the new one, you know.

Q Thank you.

So, there are times when your office records get amended. Despite the fact you've been advised that you should not do so without a formal amendment, you do it anyway; correct?

A Yeah, I change, I write it later on when all the charts

when I go home, I put it in the nighttime, you know, when I get time. But the staff might give you the old one and the new one also, they give it to you, you know.

Q And when you do that, is there any way for us to tell what changes you've made and why?

A No, this is the complaint. Patient complaint, I gave it to them.

Q Let's just work through a couple of these and I'll let you explain why you changed your records, okay?

I'm going to show you the same five medical records on the same five dates that have five different Bates Numbers that were produced as your litigation file at your discovery deposition in this case, okay?

You have to say yes or no.

A Yes.

MR. O'HARA: Judge, can you explain what a discovery deposition is?

THE COURT: Yes.

You may remember I even mentioned it in your preliminary instructions. Before the trial there is a period called discovery and discovery is what it sounds like in that it gives each side the right to discover or learn about information that the other side has. I infer from Mr. O'Hara's remark that among the ways that the defendant tried to discover information from the plaintiff was that

Mr. O'Hara's law firm or another law firm working for Staples took the deposition of Dr. Guha.

A deposition is an opportunity to require somebody to come into a law office generally or a court reporter's office, and be asked questions under oath, and it helps the lawyers anticipate and prepare for what the testimony will be at trial.

Q Okay. I'm going to first focus on the January 2nd, 2013 record, which is the amended record.

MR. BHURTEL: Your Honor, can I have a page number?

MR. O'HARA: I am about to give that you.

MR. BHURTEL: Okay.

MR. O'HARA: 3791 to 3792, okay? So let's first compare. 3791 through 3792. It's a two-page document, okay?

Q Let's compare the reason for the visit.

A No, this is different.

Q Okay, you're right. You changed the date; correct?

A I don't change the date, how can I change the date from the computer?

Q Somebody changed the date from January 2nd, 2012, to January 2nd, 2013; correct?

A There might be another chart, 2012. We cannot change the date in the computer.

Q Okay. So, then --

A We might have another one.

Q So you are suggesting that there is -- actually, you saw him -- you testified on direct examination all of the days that you saw this patient.

You do remember that, yes?

A 2012.

Q Listen. You testified on direct examination all of the office visits that you had with this patient; correct?

A Yeah.

Q Yes?

THE COURT: Do you understand the question?

THE WITNESS: Yes.

THE COURT: Do you remember whether or not on direct you got to talk about each and every office visit with Mr. Ahsan or only some of them?

THE WITNESS: Some of them.

Q Okay.

A I saw him maybe a hundred times, you know.

THE COURT: A hundred times.

THE WITNESS: More than that, you know. In five, six years.

THE COURT: Okay.

Q And of the hundred times, I only want to focus on the ones that deal with head, neck and back injury, okay?

A But he doesn't come for that only. He comes for his blood pressure, cholesterol.

THE COURT: Okay, we do not need to hear about Mr. Ahsan's other medical --

THE WITNESS: That's what it is, you know.

THE COURT: Okay.

THE WITNESS: I am not only the, I do everything.

THE COURT: We understand that, thank you.

Q Okay. So, now tell me if I read this correctly. The Document 2159 indicates that the reason for the visit is shoulder pain. The patient presents to the office complaining of left shoulder pain. The pain radiates to the left arm. The patient reports that the pain has been present since one year and is severe in intensity.

Did I read that correctly?

A Yeah.

Q And the day of this record is January 2nd, 2012. And if we back it up one year, that puts us to January 2nd, 2011?

A Eleven.

Q And that's eight months before the incident at Staples; correct?

A Right.

Q Now, January 2nd, 2013, which is Bates Number 3791, you indicate for reason of visit shoulder pain. The patient presents to the office complaining of left shoulder pain. The pain radiates to the left arm.

You then add, headache with dizziness, neck pain

persists; correct?
A Correct.
Q So, either whatever he had when he came in that's in this record on January 2nd, 2012 existed nine months before the Staples incident or, if this and this are on the same date, you changed the record.
A No.
Q So, these are two different dates?
A Two different dates.
Q And that means this record from January 2nd, 2012 states that this man had shoulder pain that has been present for how long?
A One year.
Q I'm sorry, you have to speak up.
A One year.
Q And describe its intensity.
A Severe.
Q In terms of the jury's understanding when a patient describes pain -- I'll step away.

MR. BHURTEL: Can I have a page number of that, please?

MR. O'HARA: Sure. 2159, 3791.

Q When a patient describes pain, medical providers write it down with three terms: Mild, moderate, severe; correct?
A Correct.

Q Severe being the highest?
A Sure.
Q And on a scale of one to ten -- I'm not good at math because it's more than three ways to divide it -- it's around three to four is mild?
A Yes.
Q Six to seven is moderate?
A Sure.
Q And eight, nine, ten is severe?
A Sure.
Q So, the pain that he's describing that's persisted for a year as of January of 2012 is severe in intensity; correct?
A Correct.

MR. O'HARA: I'm sorry, Judge, I have to sit next to him.

THE COURT: Give him enough room that he understands to speak out loud.

MR. O'HARA: Yes.

It's real important you keep your voice up, they have to hear you and she has to type.

Q The next office record that I want to show you, remember we talked about the February 22nd, 2013 office visit; correct?
A Yeah, yeah.
Q Okay.

MR. O'HARA: And for the record, that's 2172 through

2174.

Q This came from your office chart; correct?

A Correct.

Q And 3754 through 3757, this was attached to your discovery deposition; correct?

A Correct.

Q Okay. Do you see on the original record where it talks about reason for visit, neck pain follow-up.

Do you see that?

A Yeah.

Q Do you see that the patient, can you see the change in the addition of complaints in the litigation record as compared to the office chart that was produced?

A Reason for visit is the same. No change.

Q Take your time.

A Neck pain follow-up. Neck pain follow-up.

Q Here, let me do this. Read the musculoskeletal section. On first your office chart, what does it say about musculoskeletal?

A Negative.

Q What does it say in the litigation file that you produced?

A Positive.

Q So, negative to positive.

A This is old one, I corrected it.

Q Hold on, Doctor, I haven't asked that question.
A Okay.
Q The musculoskeletal reference in the first office record that was produced when a letter came to your office indicated that the musculoskeletal findings on examination with the review of systems was negative; correct?
A Correct.
Q Then, when it came time for your discovery deposition, you produced a document that changed that medical record and you added the words: Positive neck pain, shoulder pain; correct?
A Correct. Because I, I change, because this is the preliminary. After that, I correct. Then we correct it later on because we have a handwritten notes.
Q Okay.
A I put it in the computer.
Q Okay. Did you make any more changes, Doctor, to update it or make it accurate?
A Yeah, this is more accurate.
Q So, the one that you prepared prior to the production of your discovery deposition is the actual record that's accurate?
A Yes.
Q And just so we're all clear, that discovery deposition was taken on April 20th, 2016; correct?

I'll help you. You sat in the discovery deposition with a lawyer from my office and were asked questions under oath on April 20th, 2016?

A Yeah.

Q And before April 20th, 2016, your musculoskeletal finding was negative. And then, seven months ago, it was changed to positive; correct?

A Because we, with, this is the different kind of computer system. When you put it in click, click, click and then, then you go home and you have whatever, you know, positive finding, you change it later.

Q Okay.

THE COURT: The two Bates Numbers you are comparing again?

MR. O'HARA: 2173 to 3755.

Q But what I said is correct; the first record and the second record are different.

A Yeah, little bit different.

Q Well, a lot of it different. One says negative, the other says positive. One says no pain and now you are suggesting that he has neck pain and shoulder pain.

You would agree that's a big difference.

You have to say yes out loud.

A Yes.

Q Okay. Let's talk about the neurologic examination.

Did you change the notation for your neurologic examination from the time that you produced your office record to the time you produced a file at your discovery deposition?
A Yeah, this is more correct for the discovery.
Q Okay. And just so, I'll read. The neurologic examination you indicated was negative. He had headaches, poor balance and sensation of a room spinning. And this time you changed it to positive; correct?
A Yeah.
Q Okay. Let's go to the next one.
MR. BHURTEL: Can I have those?
MR. O'HARA: You can have them all during a break. They've all been produced. You're the one that produced them.
THE COURT: Okay. Let's not have that exchange in front of the jury.
You can follow along if you would like to, Mr. Bhurtel.
Q Same thing, Doctor. Take a look at your June 24th, 2014 record.
MR. O'HARA: Strike that.
Q Take a look at your October 7th, 2013 record for the record Bates Number 2230 through 2232. This was produced in response to the written request for your chart. And then 3713 through 3716, this was produced at your discovery deposition in April of 2016.

Take a look and tell us what changes have been made to that record?

Do you want me to help you? I will help you.

A Okay.

Q In the reason for a visit, you see where it stops? Pain is six out of ten. And in the document that you produced -- the note stops in 2230. Six out of ten. And you've added another sentence in 3713.

Do you see that?

A Yeah.

Q You've added: Headache and left shoulder pain persists; correct?

A Right.

Q And again, you've changed the musculoskeletal findings in your record. You note negative; correct? In the file chart that was produced in written form; correct?

A Correct.

Q And then in the discovery deposition it's been changed to positive and you've added complaints of pain in the neck and the shoulder; correct?

A Correct.

Q And then also in the neurologic examination you initially note that it's negative, and now you've changed it to positive; correct?

A Yeah, positive headache.

Q Okay. There has been a -- you've gone from negative to positive, yes?
A No, these are the generic charts, these just generic. These are not the real. This is the real chart. My staff does it, then I correct those.
Q So, I'm going to ask it just basically.
So, when a lawyer writes you a letter where there's a patient that's been that is involved in a lawsuit, they give a signed authorization, which is required, right?
A Yes.
Q We all know that the Federal law HIPAA requires us to secure a signed authorization. We send it to your office. Is it common practice for a chart to be produced that's wrong?
Let me ask it differently. It's not common practice, is it?
A It's a lot of charts, you know. A lot of paper.
Q Try yes or no.
A Yes.
Q Is it common practice to send out charts that are wrong when a lawyer sends you an executed --
A Yeah, it's wrong, yeah.
Q Okay. Next office visit, May 14, 2014. Let's look at the document that was produced in discovery as opposed to what was produced at your discovery deposition. Bates Number 2257 through 2258 compared to 3681 through 3685. Okay?

Reason for visit, again there's been an addition; correct?

A Yeah, addition.

Q Okay. Review of systems -- actually, what's been produced for this date doesn't have anything, does it, the May 14th. It's just a two-page document.

THE COURT: I don't understand the question, Counsel.

MR. O'HARA: Okay, I will rephrase it.

Q When you ordinarily keep your medical records, they have an entire review of systems, yes?

A Yes.

Q And there has actually been a copy of a record produced for May 14th, 2014 that doesn't have any of the review of systems?

A Yeah, middle page is not there. Missing.

Q Many pages are missing.

THE COURT: Many pages are missing or middle page?

THE WITNESS: Middle page, review of systems.

Q Well, let's make sure.

A This is a review of systems.

Q Okay. It's more than just the review of system, right? It's missing the review of systems and the physical examination; correct?

A You have two pages. Review of systems and that.

Q Okay. And then let's go to the last record, which is June 24, 2014, Bates Number 2265 through 2267 as compared to the discovery Deposition Exhibit 3676 through 3680, okay?

The original record indicates the neck is negative and the revised record indicates the neck is positive; correct?

A Yeah, revised.

Q And the musculoskeletal, the neurologic examination indicates negative at the time that the chart is produced, and it's been changed to positive at the time of your discovery deposition; correct?

A Correct.

Q Thank you.

THE COURT: Can you give me an estimate of how much longer you have with the witness?

MR. O'HARA: It's hard. I have to go through the notes.

I will take a break any time you want, Judge.

THE COURT: Are you about ready? Or do you want to keep going?

THE JURY: I don't know. It's okay.

THE COURT: You're good to keep going? I saw you leaning forward.

THE JURY: It's fine. Stretching.

MR. BHURTEL: I would like a break.

THE COURT: You want a break.

Okay, we will take a ten-minute recess. We will take our mid-afternoon recess now.

MR. O'HARA: Thank you.

THE COURTROOM DEPUTY: All rise.

(Jury exits.)

(Recess taken.)

(Continued on following page.)

THE COURT: We are ready for the jury.

(Jury enters the courtroom.)

THE COURT: Thank you, everybody.

You may inquire.

CROSS EXAMINATION (continuing)

BY MR. O'HARA:

Q Doctor, just briefly, you were shown a packet of documents during your direct examination that are the medical bills in connection with your care and treatment for Mr. Ahsan.

A Sure.

Q Is there any way for us in actually looking at these to determine what care related to the gentleman's head, neck or back as opposed to other conditions?

THE COURT: You said head, neck or back.

Q I'm sorry, head, neck or shoulder. Is there any way to go through these and pick out these are charges for his head, neck or shoulder?

A No.

Q Is there any way for your office do that, to summarize it so that we don't -- part of what we are trying to determine is exactly what the costs are associated with your care and treatment for the injuries in this case as opposed to other stuff. Is there any way for us to do that?

A Because this is the computation by -- I don't get paid --

THE COURT: Can you try to answer the question precisely as it is asked? If you can't, tell me.

I think the question is from looking at the billing records that were shown before, could you or someone from your office use a highlighter or another indicator to show which billing relates to, in your mind, the results of the accident in Staples and which does not? Or is that just not possible to segregate?

THE WITNESS: We can, only physical therapy is related to the accident.

Q So someone in your office -- because this is all coded. There are no medical descriptions in these documents. Someone in your office can go through --

A I can do it.

Q We don't want you to do it now. We are trying to get out of here. You have the ability to go through this and identify what relates to the treatment in this case as opposed to --

A No problem.

Q Thank you.

I have one last line of questioning for you. In terms of as a treating physician, when a patient comes into your office, there is a general procedure that all doctors follow that is taught in medical school on how to assess the patient on initial?

A Correct.

Q And the acronym is called SOAP, S-O-A-P; correct?
A Correct.
Q The first thing S stands for is subject. You get subjective information from the patient?
A Correct.
Q That includes history from the patient?
A Correct.
Q Why they are there?
A Uh-hum.
Q O is objective. You then perform a physical evaluation. To the extent that you can get objective information, you secure that; correct?
A Correct.
Q Then you take that to create the A. You assess the patient based upon the subjective information and then the objective information?
A Correct.
Q And then the last part of the SOAP is P. You then establish a plan on how to treat the patient for whatever reason you concluded that patient has?
A Correct.
Q And you would agree with me, would you not, it is very important to understand the subjective information that comes from the patient?
A Yes.

Q And that includes the history that is given to you from a particular patient of what happened to them that brings them into your office?
A Correct.
Q In this case you were given a history that you described in your February 9, 2016 report, Ahsan -- or the trial binder 1012, Bates number, patient sustained significant injury at Staples store where heavy boxes fell on his head, his neck and his shoulder; correct?
A Correct.
Q We've already talked about what your office records say on that particular day about the actual complaint. Do you recall that?
A Correct.
Q My question to you is at the time that you wrote down heavy boxes, you assumed that those boxes that hit him weighed between 50 and 100 pounds? That's what you testified to in your discovery deposition?
A Could be, yes.
Q And you would agree with me that is a significant fact in terms of the incident that produced the harm, how heavy were the items that hit him; correct?
A Correct.
Q And as part of your review in this case, you listed for us all of the items that you were given to review?

A Yes.
Q 1 through 16?
A Sure.
Q Two of the items that you were not given was the deposition testimony of the Staples personnel that were produced in discovery that described the box or boxes that they found on the ground? That was not given to you, was it?
A No, nothing.
Q And you would agree with me that if that subjective fact that you assumed the box was between 50 and 100 pounds was wrong, that is a big deal to you, that's a significant fact; true?
A True.
MR. O'HARA: That's all I have, Judge.

REDIRECT EXAMINATION

BY MR. BHURTEL:

Q Doctor, with respect to your report February 9, 2009, page 2092 and page 2093, can you read the jury -- can you read your last -- second last line?
A This is not my note, but it is Dr. Santiago.
Q What it say there?
A This last line?
Q Yes.
A No test or MRI/EMG needed at present.
Q This is a February 9, 2009 report; right?

A Yeah.
Q Doctor, Mostafa Ashan, first time he visited March 26, 2008; right?
A Correct.
Q And then after March 26, 2008, he visited March 28th, 2008?
A Yes.
Q So after that, until February 9, 2009, did he came to your office and complain about the neck or head ache or left shoulder?
A He complained to Dr. Santiago, but he didn't explain to me anything about the shoulder as far as I remember. But the headache he complained one time, actually, two times. With the physical therapy, I didn't hear anything after that, that he got better or not. He didn't complain anything to me.
Q So first year of treatment, March 26, 2008 or March 28, 2008, after that, did he come back to you complaining his neck or --
A No. He had one session of physical therapy after that and he got better and he didn't come back with the neck pain or headache anymore.
Q And generally this can happen, you know, the patient can have one-time therapy and then they can cure?
A Yes. If it is a muscle spasm, simple muscle spasm, they get better.

Q And in March 2008, did you requested to do further test, like MRI, EMG?

A No, it is a simple headache and neck pain, I didn't order anything like that.

Q You mean neck pain, not the headache at that time?

A Neck pain, I didn't order anything.

Q As a doctor you made an assessment or decision not to order further test --

A Yes.

Q -- for his pain?

A Yeah, I made a decision not to order any more tests and Dr. Santiago also agreed with me that we shouldn't do any test for the simple neck pain.

Q With respect to February 9, 2009, did you -- strike that.

So sometimes patients, they go one or two times therapy and then they cure, so they don't come back your office?

A No. Once they get better, they don't come back.

Q It happens to other patients also?

A Yes. Many, many times, all the patients.

Q To your knowledge, does Mostafa Ashan have seen in that time other PCP?

A No. PCP should only be one, unless they choose a different PCP.

THE COURT: PCP is primary care physician?

THE WITNESS: Yes, sir.

Q Earlier you were trying to explain during the cross-examination, can you show the jury what is the lower trapezius?

A Trapezius, yes, trapezius muscle.

Q Thank you.

A Trapezius muscle is in the back by the spine.

Q It is nothing to do with his shoulder?

A No, not really.

THE COURT: Is it by the shoulder blade, the part of the back that sticks out?

THE WITNESS: Yeah. From the back, supraspinal, the muscle goes in the shoulder. The trapezius are the main two muscles in the back.

Q When you say the left lower trapezius, where is it located, that one?

A Way down in the thoracic region. Way down, from the neck downward.

Q Can you show the jury?

A Here (indicating).

THE COURT: Pointing to the mid back section of the witness.

THE WITNESS: Yes.

Q Earlier counsel asked you with respect to the box, the 50-pound or 100-pound. Do you remember you testified that you

corrected that testimony in your deposition saying 10 to 12 pounds?

A Yeah. If it is an unexpected fall, he didn't expect, then 10 to 12 pound can damage the head and neck also, unexpected fall.

THE COURT: What difference does it make if it's expected or unexpected?

THE WITNESS: People expected that there's something falling down and all of a sudden he doesn't see anything and something fell down and his head move to the different direction and there is the muscle pull and that can result in injury too.

Q Can you explain, when you say unexpected, is there a difference between the expected fall --

A And unexpected?

Q Yes. What is the difference?

A Because if you see a ball is falling to you, you know, you have the force of the neck and shoulder, you tighten up, so if something fell down, you don't feel it. But if everything loose and something fell down, you know, for the reflex, the head moves to the different direction and can give you the neck spasm.

Q Actually, I said the box is 10 to 20 pounds approximately. So you testified 10 to 20 pounds approximately boxes also can have --

A That can do injury also.
Q How about four-pound boxes also, can cause?

THE COURT: Can a four-pound box injury cause the jury, is that what you're saying?

MR. BHURTEL: Yes, your Honor.

A I can't tell that, but could be, you know. I don't know.
Q Doctor, do you have any changes to your impression at this time?
A No.
Q And do you -- Doctor, do you have an opinion with respect to what caused Mostafa Ashan's injury with respect to his head, neck and left shoulder?
A In my opinion, with a reasonable degree of medical certainty, the injury caused his damage of the head, neck, and shoulder.
Q And that was caused by --
A Caused by the boxes fell down.
Q On September 2, 2011?
A Yes.

MR. BHURTEL: I complete, Your Honor, my exam, my redirect.

THE COURT: You are excused, Doctor. Thank you.

THE WITNESS: Thank you.

THE COURT: Mr. Bhurtel, are you ready to call your next witness?

MR. BHURTEL: Can I have some recess?

THE COURT: We just had a recess. Take a couple of minutes and we will wait.

THE WITNESS: So we are done?

THE COURT: We are done.

THE WITNESS: Can I --

THE COURT: You can shake my hand.

THE WITNESS: Thank you, sir.

THE COURT: Mr. Bhurtel, are you ready to call your next witness?

MR. BHURTEL: Yes, your Honor. Just...

THE COURT: Who are you calling at this time?

MR. BHURTEL: Plaintiff, Mr. Mostafa Ashan.

THE COURT: Mr. Ahsan, please come forward. Do I understand that he will be aided in his testimony?

MR. BHURTEL: Yes, your Honor.

THE COURT: Will the interpreter please come forward.

THE INTERPRETER: Good afternoon, Your Honor.

THE COURT: Please raise your right hand.

(The interpreter was sworn by the Clerk.)

THE COURT: And what language, please?

THE INTERPRETER: Bengali.

THE COURT: Please state your name for the record.

THE INTERPRETER: Badal Hasib, B-A-D-A-L H-A-S-I-B.

Bengali language.

THE COURT: Are you a certified Bengali interpreter?

THE INTERPRETER: Yes, sir.

THE COURT: Please be seated or if you prefer to stand next to the witness, stand. That is fine.

THE LAW CLERK: Will the witness please stand and raise his right hand.

(The witness was sworn by the Clerk.)

THE COURT: Mr. Bhurtel, you may inquire.

MR. BHURTEL: Thank you, Your Honor.

**MOSTAFA ASHAN**,

called by the Plaintiff, having been duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. BHURTEL:

Q Good afternoon, Mr. Ahsan.

A Good afternoon to you.

Q I will be asking you a series of questions. If you do not understand, please let me know.

A Yes.

Q What is your highest education?

A High school.

(Continued on following page.)

EXAMINATION CONTINUES

BY MR. BHURTEL:

Q And what is your address?

A 2569 45 Street, Astoria, New York 11103.

Q And how long you have been living there?

A Since 2007.

Q Are you married or single?

A I'm married.

Q What is your wife's name?

A Sahana Parvin, S-A-H-A-N-A, P-A-R-V-I-N, V as in Victor.

Q How long you have been married?

A Since 1985.

Q And do you have children?

A Yes.

Q And what is their name?

A One Nahiyan Ahsan -- Nahiyan Ahsan. And the second one is Rajit Ahsan. And the third one is Rubaiyat Tasneem.

THE COURT: Can you spell the names for us?

THE WITNESS: The first one is Nahiyan Ahsan, N-A-H-I, as in ice cream, Y-A-N. Ahsan, A-H-S-A-N.

Second one Rajit, R-A-J-I-T, Ahsan is the last name, A-H-S-A-N.

The third one is Rubaiyat Tasneem, R-U-B, as in boy, I-A-Y-A-T, Tasneem, T-A-S-N-E-E-M.

BY MR. BHURTEL:

Q And how old are they?

THE INTERPRETER: Okay, there is correction on the third name, Rubaiyat, R-U-B-A-I-Y-A-T. Rubaiyat.

BY MR. BHURTEL:

Q And how old are they?

A My first child was born in 1987, and the second one is 1990.

Q I don't need a date of birth, I just need the age.

A I have to count and tell you.

Q Please.

A My eldest son is 29-plus. And second one is little more or less than 26. And the third one is close to 24.

Q And what they do now?

A First two children they are working part-time time, they are doing their part-time jobs. Third one is a student.

Q And what does your wife do?

A She works.

Q Where does she works?

A Boston Market.

Q And what is her job, position?

A She's a shift manager.

Q And how long she have been working there?

A Since 2007.

Q Since 2007 until -- withdraw that.

In 2008 what kind of activities you were doing?

A I wasn't doing anything full-time, I was doing some free-lance work at that time.
Q What kind of work free-lance you were doing at that time?
A I used to do graphic design.
Q Can you describe what kind of graphic design work you doing -- you did in 2008?
A It's printing related.
Q And when you do that kind of -- when you were doing that kind of work in 2008, you work for somebody else or you do yourself?
A I used to do it for myself.
Q And any other thing you used to do?
A Sometime I used to draw.
Q What do you mean by you used to draw, can you explain that?
A I used to do some paintings.
Q And the painting, I am talking 2008, the painting you were doing is something for business or hobby or something else?
A It was my hobby.
Q And how long you have been doing that -- strike that.
Before 2008 -- strike that. Before 2010 -- strike that.
Before 2008 how long you have been doing painting work?

A Okay, I been doing this art work since from -- from my school days.

THE COURT: For income or for entertainment?

THE WITNESS: Entertainment.

THE COURT: And just to be a hundred percent clear, we are talking about painting pictures, not houses, right?

THE WITNESS: Yes, it's painting art work.

BY MR. BHURTEL:

Q And how long you had been doing before 2008 about the graphic works?

A I used to do with hands before 1994, and after 1994 I started doing that in the computer.

Q And can you describe what kind of graphic design work you were doing?

A When I was in involved in this I was involved in doing it, I used to do like for advertisement, I used to do it for business cards, I used to do it for the pads and I used to do it for labeling fliers and brochures.

Q Anything else?

A These are all part of graphic design.

Q And how about in 2009, what kind of activities you were doing?

THE COURT: Before you answer, I would like to see counsel at the sidebar for just a minute. Excuse me, jury.

(Sidebar held outside the hearing of the jury.)

(The following sidebar took place outside the hearing of the jury.)

THE COURT: The reason I called you over is that my recollection is that there was no lost wage claim in this case.

MR. BHURTEL: Yes.

THE COURT: I am a little bit concerned that if you go too much further, you might open the door to whether the income that was earned was not reported. I do not want to have that issue in this case. So please focus your questions, if I am understanding where you are going correctly, and please tell me if I am wrong.

If you want to bring out that he lost the ability to enjoy going to work from his injury, just be careful not to suggest that he also lost any income because I really do not want to have to deal with an application from the defendant that this opens the door to whether he reported income that he earned or not.

MR. BHURTEL: I can say clearly that before the jury we are not claiming loss of wages and not claiming loss of business also.

THE COURT: I know, but if the questions start to suggest and put that idea in the jury's head, we may have an issue, so just be careful. And if I think you are getting too close to the line, I hope you will object rather than

Mr. O'Hara, I am counting on you to object when you think something is inappropriate rather than tactically waiting and then arguing that the door is opened.

MR. O'HARA: Fair.

THE COURT: The other thing I wanted to mention while you were up here, so I do not have to call you up again, is one of the jurors asked my clerk, apparently, whether court is open on Friday after Thanksgiving.

I would like to tell them that we are on schedule and we expect to finish up the proof by Monday and for them to be able to be deliberating on Tuesday.

Now, I know somebody could get sick or there could be an emergency, but that is still what we are planning and it is appropriate for me to say that to the jury in your mind?

MR. BHURTEL: Yes, sir.

MR. O'HARA: I am comfortable telling this jury we may actually have them deliberating on Monday because Dr. Kolb may not be long and I am prepared to close immediately after Dr. Kolb.

THE COURT: So you have to be ready for summation on Monday. Okay?

MR. BHURTEL: Okay.

THE COURT: Thank you.

MR. BHURTEL: Your Honor, so how far I wanted to go the daily activities, what he was enjoying, and that's the

part of the line of the things.

THE COURT: You have a right to do that. Just do not start asking him how much money he was making.

MR. BHURTEL: No.

THE COURT: Do not start asking him if his ability to make money for his family makes him feel less important or anything like that. Do not ask him who his clients were, that kind of thing.

You can ask him did you enjoy your work? Did you still work after the accident? How did it make you feel not to be able to go to work? You can ask him about that, but not about how much money he makes.

MR. O'HARA: And I just want to be candid, just the fact that he has broached this topic and is going to suggest that he has lost the enjoyment of life based upon the ability to do so allows me to cross-examine him, not on the substance of the value, but on the credibility of the testimony.

In other words, if he testifies that he is unable to do this any longer, my intent is to cross him on that and undermine the credibility of that testimony.

THE COURT: That is absolutely fine, you just cannot ask him you did not produce any tax returns.

MR. O'HARA: I won't go anywhere near there.

THE COURT: Great, thank you. Sorry for the interruption. (Side-bar concluded.)

(In open court - jury present.)

BY MR. BHURTEL:

Q What was the reason you choose to do the painting work?

A It was -- it was my passion since my childhood, and I started doing it and later it became my hobby.

Q And what was the reason you choose to do the graphic design work?

A To make a living.

Q Did you enjoy doing the graphic work, graphic design work?

A Certainly, yes.

Q And in 2009, what kind of activity you were doing?

A In 2009 I was doing some free-lance work. I used to do it for myself and sometime my friends used to request me to do something for them. So I used to do that.

Q When you say free-lance work, what kind of work you were doing?

A To me free-lance is something that I do from home because I was never employed anywhere, I was never employed and I never worked for anybody here. I'm talking about 2009.

Q Yes. And did you do the graphic design work also in 2009?

A Same thing that I just mentioned.

Q And how about the painting work?

A Well, painting it is completely depends on my mood. If I

feel like doing it, I do it. It doesn't happen all the time.

Q And when you do the painting work, what kind of painting work you do?

A I use like oil painting and acrylic paint on the canvas. Whenever I see something good, I just kind of memorize it and come home and do it.

Q And what kind of activities you did in 2010?

A The same thing, exactly like 2009.

Q And did you enjoy doing those activities?

A I used to have lot of fun and I was also forced to do it.

Q And what kind of activities you were doing before September 2nd, 2011?

A I -- before September 2nd, 2011 I was in Bangladesh for a long time. I left -- I went to Bangladesh the latter part of 2010.

Q And what was the reason you went in Bangladesh?

A So the work up 2011, cricket tournament was going on in Bangladesh at that time, so I got some assignments to do there.

Q Did you enjoy doing that one?

A Yes. Yes, I enjoyed a lot and these kinds of work I enjoy doing.

Q And -- withdrawn. Who used to do -- withdraw that. Strike that.

(Pause.)

BY MR. BHURTEL:

Q In 2010 what kind of activities your children were doing?

MR. O'HARA: Objection, relevance.

THE COURT: Mr. Bhurtel.

MR. BHURTEL: Yes, I will withdraw, Your Honor.

THE COURT: If that line has some bearing, certainly you could ask about after 2011 if there was a change in that circumstance because of what he claims is his accident, but right now it does not seem connected.

MR. BHURTEL: I am going to, Your Honor.

BY MR. BHURTEL:

Q What kind of work your wife was doing before September 2nd, 2011?

MR. O'HARA: Judge, objection.

THE COURT: Overruled.

A As I said before, she was working in Boston Market since 2007 'til now.

Q In 2007 who used to do at home household work?

A I used to do the most of -- I used to do most of the work because I used to stay at home more than anybody else.

Q So what kind of work you were doing at home?

A I used to do -- literally I used to do all the household works like cleaning, cooking, cleaning the bathroom, cleaning the snow during the wintertime. It was like I used to do everything literally.

Q In 2007?
A I used to do same thing in 2007 as well.
Q And how about in 2008?
A The same thing.
Q And who used to do it in 2009?
A That's me again.
Q And who used to do the household work in 2010?
A It's me. I used to do all the household works before I left for Bangladesh. And after I came back from Bangladesh, I used to do the same thing.
Q And before September 2nd, 2011 who used to do the household work?
A When I stayed home, I used to do everything.
Q Did you involve in an accident?

THE COURT: Is that the end of the question?

MR. BHURTEL: Yes, Your Honor.

THE COURT: Why don't you ask him about a particular point in time whether he was involved in an accident, okay?

MR. BHURTEL: Oh, okay.

BY MR. BHURTEL:

Q Did you involve in an accident September 2nd, 2011?
A Yes, I did.
Q Where did it happen?
A Staples store in Northern Boulevard.

THE COURT: In what town?

THE WITNESS: New York.

THE COURT: Do you know what part of New York?

THE WITNESS: Northern Boulevard, Woodside.

BY MR. BHURTEL:

Q And what was the reason you were going -- withdraw that.

MR. BHURTEL: Did he say it happened in Staples?

THE COURT: He did, Mr. Bhurtel.

MR. BHURTEL: Sorry.

THE COURT: I know, it is a long day.

MR. BHURTEL: Yes.

Q What was the reason you went to Staples store on September 2nd, 2011?

A I wanted to purchase some stationery from there.

Q And what were the purpose of those stationery?

A I wanted to buy some papers, pencils, inks and pens which are necessary for my graphic work.

(Continued on the following page.)

(Continuing)

Q And when you went to there, did you able to buy those things and come home?

A No, I couldn't buy anything.

Q What was the reason you could not buy it?

A As I mentioned earlier, there was an accident and due to that accident, I couldn't purchase anything.

Q So, what happened?

A Thing is, that I was like, looking around to purchase things that I wanted to buy. Then I was standing in an aisle and looking at the things that I was hoping to buy and then, there was a shelf behind me and two heavy boxes fell on my head suddenly, okay. And they were quite heavy as well. And they hurt my neck and head. And shoulder as well.

Q Before these boxes fell on you, what you were doing within the five seconds before?

A I was standing and looking at the products and I was wondering what to buy and what not.

Q And how many boxes fell on you?

A Two.

Q And those boxes, where did they hit in your body part?

A First, it hit, they hit on the left side of my head and then, on my neck and then, on my shoulder.

Q And when it hit --

MR. BHURTEL: Strike that.

Q And did you come to know how these boxes fell on you?

A After I fell down and couple of seconds -- after the boxes fell on my head and I looked up, and I was wondering what fell on me, I saw a man working on a ladder. He was arranging some boxes on the shelves. He may have dropped two boxes on me. That's what I thought.

Q When boxes hit on you, what was the hit? Was it heavy, light or medium?

A When I was hit, it seemed very heavy to me.

THE WITNESS: So, I would like to ask Your Honorable Court if I could use some English word when I answer sometimes.

THE COURT: Is there any objection?

MR. O'HARA: I'm not sure how that works. Either he has to testify through a translator, because I can't tell when he's -- the response is being translated, but he is actually interrupting the translator to correct the translator. I'm not sure how that works.

THE COURT: So, you are objecting?

MR. O'HARA: Yes.

THE COURT: No, you can either answer in English without the interpreter at all or you can speak in Bengali.

THE WITNESS: There are some words that don't exist in Bengali. Like cop, heavy, chair. These are not common in Bengali.

THE COURT: If you cannot find the right Bengali word, you can use the English word and explain why you are doing it.

THE WITNESS: Yes, I'll do that, thank you.

Q So, when the box hit on your head, what happened to your head?

A When they fall on me, suddenly my head moved towards the right side and then, the boxes hit my neck and then, hit my shoulder and the boxes fell on the ground.

Q And did you see the boxes?

A Yes, I did.

Q You saw the box after it hit you or before you hit it?

A After they fell on the ground, then I saw them.

Q And can you describe how big were the boxes in the sense of the measurement?

A I can make a guess.

Q Okay, how big were they?

MR. O'HARA: Judge, I'm going to object.

THE COURT: Sustained.

When you say you are making a guess, do you mean literally that you are making it up or that you will be giving us an estimate that is based upon a real recollection?

THE WITNESS: It happened long time ago, so all I can do, I will try to recollect something from the past.

THE COURT: Well, here are the rules. If you cannot

be specifically certain about the number of inches but do remember the size of the boxes and can estimate for us, you can give an estimate. But you cannot just make a guess. If you do not recall the size of the boxes, you can just say that you do not recall.

THE WITNESS: What I can recollect, I can tell you an estimated size of the boxes.

THE COURT: Then go ahead.

A By lengthwise, it could have been like, 16 to 17 inches and on the height side it was ten to twelve, it should be. And the width should be like, eight to ten inches.

Q And when the box hit you, did you feel any pain, any body part of the --

MR. BHURTEL: Strike that.

Q Did you feel pain when the box hit you?

A Yes.

Q Where did you feel the pain?

A At that exact moment, I felt like most pain in my neck and shoulder. It also hit my head, but most of the pains were in my neck and in shoulder.

MR. BHURTEL: I don't know how much time.

THE COURT: All right. Well, are you at a good breaking point now? You have finished the event in the store.

MR. BHURTEL: Tomorrow I will start with pictures.

THE COURT: All right.

MR. BHURTEL: So.

THE COURT: So, ladies and gentlemen, I think we are at a good breaking point and we will call it an evening.

MR. BHURTEL: Yes.

THE COURT: We will start again at 9:30 tomorrow.

Before you leave --

It is up to you whether you translate this or not.

THE BENGALI INTERPRETER: Sure.

THE COURT: I understand from one of the folks on my staff, one of my clerks, that somebody asked if we were working the Friday after Thanksgiving and I want to assure you that the lawyers are very confident that we are right on schedule and because we are right on schedule and where we expected to be, our best prediction is that you will begin deliberating on Monday or Tuesday of next week. So, I do not think the question of Friday become important. But if it does, we will not sit on Friday. If you are not finished deliberating, we will come back on Monday after Thanksgiving.

It does mean, though, that you may wish to have flexibility to stay later on Monday or Tuesday because once a jury begins to deliberate, sometimes the jurors will ask if they can stay late to continue deliberating past the 5:00 o'clock hour, so just think about that. I will accommodate your request in that regard. Any time it is after 5:00, if you want to go home to come back the next day, I will

let you do it, but if you want to work later than 5:00, that is fine, too.

But obviously, if you think about it now for Monday and Tuesday evening, you can make sure that you have enough flexibility so that you can make a group decision and one of you does not say, oh, if only I had known this might have come up, I could be free to work later but I did not know. So, that is why I am telling you now.

Do not worry about the Friday after Thanksgiving, you will have that to recover from having eaten too much and whatever else you do on Thursday. You will begin deliberating possibly on Monday, confidently by Tuesday. Try to have flexible evening schedules on those days if you can. If you cannot, we will respect it.

Have a good evening. Do not discuss the case with anybody. See you tomorrow at 9:30.

(Jury exits.)

(In open court; outside the presence of the jury.)

THE BENGALI INTERPRETER: Thank you, Your Honor.

THE COURT: You will be here, too.

THE BENGALI INTERPRETER: Yes.

THE COURT: So, a couple of things, Counsel.

First of all, I would like to follow the same practice, make sure we know what Exhibits went in today, add them to the pile. We do not want any last-minute disputes

about what goes in to the jury.

Mr. O'Hara, you referenced impeachment before, which is, of course, your absolute right on cross-examination. We will not be seeing anything that has not been produced in discovery tomorrow during the impeachment phase of the case, I take it.

MR. O'HARA: Well, there will be no evidence introduced that has not been the subject of amendments to discovery. I will ask the witness questions about his practices and if the witness tells the truth, there will be no need to refresh his recollection with any item.

THE COURT: Well, I guess, let me be more specific.

The surveillance video.

MR. O'HARA: This is not about surveillance video.

THE COURT: I know that Counsel sometimes debate exactly when the duty to produce that arises, but as long as we are not talking about that --

MR. O'HARA: We are not.

THE COURT: Or photographs. I know you well enough to know that you would not --

MR. O'HARA: That's correct. I will represent to the Court this is nothing that has been obtained by way of covert efforts, whether it be videotape or still-photographs.

THE COURT: Okay.

Tomorrow you finish Mr. Ahsan, you bring Ms. Ahsan,

and then you rest subject to rebuttal; correct?

MR. BHURTEL: Yes.

MR. O'HARA: Are you calling the wife?

MR. BHURTEL: Yes.

MR. O'HARA: You are, okay.

THE COURT: She will use the interpreter well.

MR. BHURTEL: Yes, Your Honor.

THE COURT: The interpreter is free with us all day tomorrow?

MR. BHURTEL: That is what I am trying to work out with the two interpreters.

THE COURT: I see. You may have somebody else?

MR. BHURTEL: Yes. He is a court certified interpreter and he came yesterday and today. And now, I'm trying to work with another interpreter which Counsel used in the deposition.

MR. O'HARA: As long as it's a New York State certified, I don't care who is here.

THE COURT: Right. Okay, we will finish up in two seconds.

Tomorrow, the only other witness you might have is Urena.

MR. O'HARA: I will have Urena available. We were actually going to bring him here because I have a strong suspicion that the direct examination of the plaintiff is not

going to take that long. And the wife is going to be even shorter. So, I want to have Urena here by the lunch break. If he goes long, I mean, we're working pretty late into the evening. I don't expect Urena is going to be more than, both direct and cross, 60 minutes max. There's just not that much that's in dispute that he has to testify to.

THE COURT: Right.

Mr. Bhurtel, just in terms of us anticipating the time, I am not trying to control what you are going to do. Do you intend to bring Mr. Ahsan through every medical visit and procedure or are you questioning him more from a helicopter bird's-eye view, if you know what I mean.

MR. BHURTEL: Your Honor, I will try to see because he has a short-term memory loss, also. I have to work on that one. If it is he going to remember everything, I may try. Not every detail, but some of them.

THE COURT: Okay.

MR. BHURTEL: Yeah.

THE COURT: Well, do you know how long you expect to take with him?

You do not know.

MR. BHURTEL: No.

THE COURT: Please, tonight or very early tomorrow morning, lay out the Exhibits you are going to use to refresh his recollection, if you have to, so we do not wait many

minutes while you look for a document that might refresh his recollection, okay?

MR. BHURTEL: Okay.

THE COURT: Okay?

MR. BHURTEL: Yes, Your Honor.

THE COURT: All right.

(Discussion held off the record.)

MR. BHURTEL: Your Honor, I have other things about the medical records with respect to the medical records, doctors medical records.

THE COURT: Yes.

MR. BHURTEL: And bills.

THE COURT: Yes.

MR. BHURTEL: They are not here to testify, but as per our joint Exhibits, these all records are authenticated.

THE COURT: Yes.

MR. BHURTEL: And once it is authenticated, under the business records exception, those records should be admitted in evidence.

THE COURT: Well, we talked about this already, right?

So in other words, somebody has to describe them as the business records. They are authenticated as the genuine records from the office, but nobody has laid the technical 8036 magic words that these were kept in the regular course of

business, it was the regular course of business to keep these records.

So, for example, to explain myself to you, if we had one of these litigation opinion narratives, right? We would agree that that is not a business record, right?

MR. BHURTEL: Yes.

THE COURT: But if it was delivered to the courthouse with a seal, it would be accurately described as an authentic record from the doctor's file, right?

MR. BHURTEL: Yes.

THE COURT: So somebody, I think Mr. O'Hara's point is, that somebody has got to describe the document as a business record for the proffer to be complete.

Now, if I recall yesterday -- and I do not want to speak on Mr. O'Hara's behalf without his permission and put words in his mouth -- what Mr. O'Hara said yesterday, if I recall correctly, is if you showed him which records you were talking about, he might agree to their admission without a foundation witness. If he does not agree and you can get a records custodian from the medical office to come in and testify for five minutes and say these are the treatment records of our medical office, I will let you do that. Even if it is out of turn.

MR. BHURTEL: Your Honor, I understand that part, that is why specifically I ask during the joint Exhibits when

we were preparing the joint Exhibits with Mr. Bower.

I said do you want me to subpoena these records, all other medical records. He says, we are doing this thing exactly, that is why I don't want you to subpoena those records, so you don't have to.

THE COURT: The records or the office?

MR. BHURTEL: Right, doctor's medical records.

THE COURT: Doctor's medical records.

MR. BHURTEL: Yes, hospital.

THE COURT: But this is not about the completeness of the records. It is not about the fact that the records were not subpoenaed. It is about the fact that nobody from the office is under subpoena to tell us what the records are, as I understand it.

MR. O'HARA: A suggestion.

MR. BHURTEL: Your Honor, I just want to say clearly because I was under impression that -- not impression -- it was very clear from my side that I, with the certification, with the certification from the custodian.

THE COURT: Yes.

MR. BHURTEL: That record I wanted to subpoena in the court and I was told you don't have to do that one. That's why we are going to do this joint Exhibit.

THE COURT: Okay.

What is your suggestion, Mr. O'Hara?

MR. O'HARA: So, as we talked about at side-bar, we do not, will not and have never contested the authenticity of any of these records.

If Counsel will give me the list that we talked about and show me what medical provider that he is talking about that he wants to introduce these records, as long as one of the five doctors that he's called has noted that in the care and treatment of this patient these are treatment records relating to the progression of the medical course, coupled with any of these five experts we now have thousands of pages of medical records, as long as there is some reference to these doctors being people from whom they obtained medical information to direct their course and treatment, I do not anticipate having a problem.

But in a vacuum, I have no idea what he's talking about. I'm not sure what medical provider, which records or which bills.

THE COURT: So, tomorrow morning come in with the Bates Number list of the records we are talking about so we can have a more concrete discussion, okay?

MR. BHURTEL: Okay.

THE COURT: Can you do that?

MR. BHURTEL: Yes.

MR. O'HARA: Can I make just a little slate?

If you are going to bring the Bates Numbers and you

are going to pull the records out for purposes of using them, just make a copy of them and I will literally do what we've been doing. Sit here after hours for as long as it takes to go page, by page, by page so we can work this out. I am happy to do so, happy being a relative term.

THE COURT: You are going to get the records in by hook or crook because I will even, I do not want you to be unfairly surprised. I do not want you to be fairly surprised. I will let you call somebody from the office by phone and take their testimony over the phone if Mr. O'Hara wants to question somebody about these records.

But I want you to know for your next case that in Federal Court if you have an agreement and it is not written down in the stipulation, you do not have an agreement. And I learned that in my very first trial in this building. I went to introduce an undercover tape recording in a criminal case that the Defense lawyer and I had agreed was acceptable even though it was not the original. We all listened to it and it was a copy. I got up and it was objected to on the grounds that it wasn't the original tape recording. I told the Judge I had an agreement with Defense Counsel and he said show me where the agreement is in writing.

That is the expectation in Federal Court if you reach a Pre-Trial stipulation. So next time, if you are relying on something your adversary has promised you, put it

in writing, get your adversary to countersign it and then, we would not be having this issue, okay?

MR. BHURTEL: Yes, Your Honor.

THE COURT: Just a word of advice for your next case.

Have a good evening.

ALL: Thank you.

(Matter concluded.)

oooOooo

# I N D E X

**WITNESS** **PAGE**

**SEBASTIAN LATTUGA**

DIRECT EXAMINATION BY MR. BHURTEL 363

CROSS EXAMINATION BY MR. O'HARA 425

REDIRECT EXAMINATION BY MR. BHURTEL 445

DAVID GUHA, M.D.

DIRECT EXAMINATION BY MR. BHURTEL 451

CROSS EXAMINATION BY MR. O'HARA 494

REDIRECT EXAMINATION BY MR. BHURTEL 550

**MOSTAFA ASHAN**

DIRECT EXAMINATION BY MR. BHURTEL 557

**E X H I B I T S**

Exhibit 49, Bates pages 1990 through 2001, 402

Trial Exhibit 50, Bates pages 2002 through 2009, 403

Trial Exhibit 52 404

Plaintiff's Exhibit 66 423

Exhibit 56, Bates page 2100 457

Exhibit 56, Bates page 2101 458

Plaintiff's Exhibit 56 Bates numbers 2100 to 2116 491

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - X

MOSTAFA R. AHSAN, : 13-CV-05929 (SMG)

Plaintiff,

-against- : United States Courthouse, Brooklyn, New York

STAPLES, INC., STAPLES THE OFFICE SUPERSTORE EAST, INC., : November 17, 2016, 9:30 a.m.

Defendants.

- - - - - - - - - - - - - - - - X

TRANSCRIPT OF CIVIL CAUSE FOR TRIAL
BEFORE THE HONORABLE STEVEN M. GOLD
UNITED STATES MAGISTRATE JUDGE

A P P E A R A N C E S:

For the Plaintiff: BHURTEL LAW FIRM PLLC
3749 75th Street, 2nd Floor
Jackson Heights, New York 11372
BY: DURGA P. BHURTEL, ESQ.

For the Defendant: LeCLAIR RYAN
1037 Raymond Boulevard, 16th Floor
Newark, New Jersey 07102
BY: JEFFREY O'HARA, ESQ.
LAURA BREITENBACH, ESQ.

Court Reporter: Angela Grant, RPR, CRR
Official Court Reporter

Proceedings recorded by computerized stenography. Transcript produced by Computer-aided Transcription.

(In open court.)

THE COURT: Good morning, everyone. Have a seat, please.

Is everything in order for today?

MR. O'HARA: Yes, sir.

MR. BHURTEL: Yes, sir.

THE COURT: Did you work that issue out about the exhibits?

MR. O'HARA: Yes.

THE COURT: The medical record problem is resolved?

MR. O'HARA: Yes. There are three things. One, Mr. Durga and I met this morning.

THE COURT: Mr. Bhurtel.

MR. O'HARA: I'm sorry. Mr. Bhurtel.

THE COURT: I know you know.

MR. O'HARA: Mr. Bhurtel. I've been calling him Durga.

THE COURT: I know.

MR. O'HARA: Mr. Bhurtel and I met this morning. He has given me a wealth of medical bills that he is confirming that the names of those providers was identified by the various doctors as providing care and treatment relating to head, neck or shoulder. Once he represents that to me, I will have no objection to those medical bills. He

does not need to lay a foundation.

He's also given me a list of medications that he's going to confirm on direct examination with his client were all prescribed, and he's taken them based upon head, neck or shoulder injuries. Based on that representation, I'm not going to have an objection to the pharmacy bills.

We talked about yesterday, Judge, you'll recall there was a lot of dialog about Dr. Guha's chart.

THE COURT: Yes, I do.

MR. O'HARA: Having an opportunity overnight to look, that chart actually starts earlier than 2100 on the Bates numbers. It starts at 2079. The 2079 are from the March 26, 2008, March 28, 2008, the February of 2009 and the 2010 treatment.

So my request, since it was proffered as Dr. Guha's chart which Dr. Guha had before him and testified ad nauseam about, is that we be permitted to amend that exhibit which is now in evidence, to back up to 2079 so it is, in fact, Dr. Guha's chart.

I've spoken with counsel. And I am uncertain whether he is in support of or objects to that concept.

MR. BHURTEL: I think there is two exhibits, right? There is one exhibit was offered in evidence that is 55, and then the second one is -- sorry. One is the 56 and 55.

THE COURT: Yes.

MR. BHURTEL: 55 was not offered evidence yet, Your Honor yesterday also.

THE COURT: I have, according to my records, 2100 through 2316 were put in evidence.

MR. BHURTEL: Yes.

MR. O'HARA: Yes.

THE COURT: And 2570 through 2617, which are the billing records, were put in evidence.

MR. BHURTEL: Yes.

MR. O'HARA: These are actually, if you recall, these are the medical records of Dr. Guha's chart that were part of the original materials.

When counsel broke up, when created this pretrial order, he broke up Dr. Guha's records into an Exhibit 55 and Exhibit 56.

THE COURT: Okay.

MR. O'HARA: For purposes -- and if there's an issue as to who offers it, then I will offer it. I can't offer it in plaintiff's case. But for purposes of accuracy and completeness, there's no question these records are part of his chart.

MR. BHURTEL: Your Honor, as long as counsel agrees with other -- my other records, the other evidence I'm offering with respect to I gave you, if you agree that

one and I have no objection on this one. If counsel has objection on that one, then I did not offer this one so therefore.

THE COURT: All right. So let's get realistic here. Okay.

The defendant, I think, is agreeing to the admissibility even of the records that you didn't specifically reference in your case provided that you can find places in the trial record or even represent that you have reviewed them and that they are related to the testimony that was offered and the injuries that are at issue, right, Mr. O'Hara?

MR. O'HARA: Yes, sir.

THE COURT: What defense is asking and you are saying you will agree to provided that, I think what all you're asking, is that the defendants stand by that representation, not that they change it.

MR. BHURTEL: Yes.

THE COURT: Is to the inclusion of Dr. Guha's entire chart?

MR. BHURTEL: Yes.

THE COURT: Right?

MR. BHURTEL: Yes, sir.

THE COURT: And, frankly, you kind of have to agree to that because if you didn't, Mr. O'Hara I think

would have the right to call Dr. Guha back, show him the rest of the records as a fact witness. He wouldn't get paid for his time. And all he would do is come up, say yes, this is part of my chart, sit down and they'd be in evidence.

So let's not put form over substance either side. I think you can work this through, right?

MR. BHURTEL: Yes, Your Honor.

THE COURT: Okay. Great.

MR. O'HARA: Then I'm going to put this as part of this exhibit so up with the exhibits that you had.

THE COURT: All right. And, obviously, if you raise a new objection to the other records, Mr. Bhurtel can raise an objection to that inclusion.

MR. O'HARA: Understood.

Judge, as I mentioned yesterday, Ms. Breitenbach has a personal matter that takes her out of the courtroom today. Stephanie Martin is a paraprofessional in my office. She is sitting at counsel table.

THE COURT: All right. I will introduce her to the jury when they arrive.

MR. O'HARA: Thank you.

Carlos Urena.

THE COURT: Just let me have the name again. I'm sorry to interrupt you.

MR. O'HARA: Stephanie Martin.

THE COURT: How do you do, Ms. Martin?

MS. MARTIN: Good morning.

MR. O'HARA: Carlos Urena who is the Staples general manager on the date of incident, he is scheduled to be here this morning. We have instructed him to stay in the hallway. If that instruction is not followed, I will bring it to the Court's attention.

And there was one more thing I just can't remember.

THE COURT: Did you decide on order of summation?

MR. O'HARA: I asked counsel that question this morning. He has not yet made his judgment determination. My request, since it effects the presentation of the defense, is that we get that decision.

THE COURT: By the time the charge conference this evening, we'll have your decision, okay, Mr. Bhurtel?

MR. BHURTEL: Yes, Your Honor.

THE COURT: Otherwise I'll decide for you. I don't want to do that for you.

All right. Are we ready for the jury?

MR. O'HARA: Yes.

MR. BHURTEL: Yes.

THE COURT: Do you want to bring your client back up?

I take it we'll be continuing with the plaintiff's

testimony.

MR. BHURTEL: Your Honor, just one more thing I wanted to bring in attention.

THE COURT: Yes, sir.

MR. BHURTEL: Sometimes Mr. Ahsan Mostafa may need a break so he may request a recess or anything.

THE COURT: Sure. Sure.

MR. O'HARA: There was a question raised yesterday by, actually, Mr. Ahsan, and I've had a chance to actually speak in counsel's presence with Mr. Ahsan last night. His name is pronounced Ahsan.

THE COURT: Ahsan not Ahsan.

MR. O'HARA: Yes. Correct.

And he -- one of the things about our -- I don't speak Bengali, and I have met and been in his presence on a number of occasions. He has the ability to understood basic English and communicate in basic English.

We spoke about the time that it's going to take for the four steps for a question and answer, and I'm willing to allow him to testify in part in English if there are parts of his answer that just are easy to come out. He also mentioned in counsel's presence, that there are some phrases or terms that when you say them in English they don't translate to Bengali or when you say them in Bengali, they don't come out in the same English. So to make sure

that the record is clear, I'm going to withdraw the objection that I raised earlier, and if Mr. Ahsan wants to speak in English in response to a given question, I'm fine with that.

THE COURT: Thank you.

Let's bring out the jury assuming they're here and ready to go.

In the meantime, maybe Mr. Ahsan can come back to the stand, if you want.

Do we have a new interpreter for today?

MR. BHURTEL: Yes, Your Honor.

THE INTERPRETER: Yes. Good morning, Your Honor.

THE COURT: And you've been following this last bit of discussion I'm sure?

THE INTERPRETER: Yes, Your Honor.

THE COURT: All right. Let's get Mr. Ahsan and the interpreter up before the jury by the witness chair. You can get to the podium and have your first question ready by the time the jury is in their seat, unless you want to tell your client with the aid of the interpreter about the understanding that's been reached, if you haven't already.

Does either side object if I explain to the jury what we've decided about English?

MR. O'HARA: No objection.

MR. BHURTEL: No objection.

THE COURT: How are you today, sir?

THE INTERPRETER: Good morning.

THE COURT: I'd like to wait for the jury to be here before you're sworn.

THE INTERPRETER: Oh, all right.

(Jury enters the courtroom.)

THE COURT: Well, good morning, everybody.

Have a seat, counsel.

Before we get started, just a couple of small matters. Ms. Breitenbach is unable to be with us today. I was going to say in her stead, but I'm not sure that's exactly accurate. But assisting Mr. O'Hara today is a paraprofessional from the LeClairRyan law firm named Stephanie Martin. So that's whose joined Mr. O'Hara at counsel table.

Overnight and this morning counsel have conferred and reached an agreement with respect to Mr. Ahsan's testimony that is something -- that I will try to summarize now, which is that Mr. Ahsan's level of English is apparently sufficient for him to understand and answer some questions without the aid of the interpreter, but it's not so complete that he can testify fully and accurately without some assistance from an interpreter. And so you may be hearing Mr. Ahsan answer some questions in English even after they're asked in English. You may be seeing him ask

for the interpreter's assistance.

I bring this out to you not because it's material or important in and of itself, but because if you get used to just listening to the interpreter and not paying attention to Mr. Ahsan's expression of words because you assume they will be in Bengali, you may miss some of his testimony. So I'll ask you to be alert to Mr. Ahsan's remarks as well because they might be in English and not be translated.

All right. Let's swear our new interpreter, please.

(Interpreter sworn.)

THE INTERPRETER: Mohammed A. Rahman.

Good morning, Your Honor.

THE COURT: Good morning.

And you will be translating in Bengali?

THE INTERPRETER: In Bengali.

COURT CLERK: R-a-h --

THE INTERPRETER: R-a-h-m-a-n.

THE COURT: Thank you, Mr. Rahman.

Mr. Ahsan, and I'm told that you pronounce it Ahsan, not Ahsan, correct?

THE WITNESS: Ahsan. Exactly, Ahsan.

THE COURT: Ahsan.

Mr. Ahsan, I have to remind you that you remain

under oath. Remember the oath you took yesterday?

THE WITNESS: Yes.

THE COURT: Mr. Bhurtel, you may continue your examination.

MR. BHURTEL: Thank you, Your Honor.

Can I call the witness here, Your Honor?

THE COURT: Yes, of course.

DIRECT EXAMINATION

BY MR. BHURTEL:

Q (Through the Interpreter) Mr. Ahsan, can you come here.

This is Plaintiff's Joint Trial Exhibit 117-B.

Do you recognize this picture?

A Yes.

Q Do you know what is this picture is?

Strike that question.

Can you tell the location of this picture?

A Inside the Staples store.

THE COURT: Mr. Rahman, I think perhaps if you just pause one second before you translate. If Mr. Ahsan understands the question and wants to answer in English, he'll have the opportunity and we'll move more quickly. But, obviously, if there's even a slight hesitation, then please go ahead and interpret the question.

Is that acceptable to you, Mr. Bhurtel?

MR. BHURTEL: Yes, Your Honor.

THE INTERPRETER: Can I go on that side?

THE COURT: Yes.

Q When you said inside the Staples store, which Staples store you are referring?

A Northern Boulevard Staples store.

Q And what is the city?

A Woodside.

Q And is this the place where the accident happened?

A Yes.

Q And who took this picture?

A Myself.

Q And when did you take this picture?

A About one year now. More than a year now.

THE COURT: More than a year ago or more than a year from the accident?

THE WITNESS: After one year after the accident about.

Q And why were you going Staples store that time?

A I went to buy papers.

Q And what was the reason you took this picture?

A Well, first I thought the incident occurred over there, then I decided take a picture. Maybe it's going to help me in the future. Yeah, most of for my satisfaction I took the picture. As I said, for myself and for my record that

incident happened over there. So for my satisfaction I took the picture.

Q And does this picture shows -- withdraw that.

Does this picture -- can you describe this -- strike that.

Does this picture shows the similar situation at the time of the accident?

A Almost similar like this.

Q And do you know which aisle is this one?

A At that time it was number eight.

Q When you say "at that time," at the time of the accident?

A No. When I took picture at that time.

Q And do you see the boxes on the top shelf there?

A Yes.

Q Are those boxes were similar boxes at the day of the accident?

A Yeah, similar like this. Yes.

Q And the color of the box was similar or the same?

A Yes, like this.

Q And size of the boxes are same or different?

A Similar.

Q So when you were in the Staples store, September 2, 2011, two boxes fell and hit on you?

A Yes.

Q So you yesterday testified that you saw those two boxes in the floor, right?

A Yes.

Q Those two boxes which hit you and went down to the floor are the similar boxes you are seeing on the top of this shelf?

A Yes, almost like that.

THE COURT: Mr. Bhurtel, I'm giving you a fair amount of leeway on leading questions because of the translation and the nature of the circumstances in general, but when you deal with the heart of the case, I'd like you to try to avoid leading quite so much if you can.

MR. BHURTEL: Yes, Your Honor.

Q Can you describe to the jury that is the similar boxes -- strike that one.

THE COURT: That's all right. Go ahead.

Q Can you describe to the jury that similar boxes fell on you?

A Yes.

Q Can you tell the jury what you were doing in this aisle?

A Yes, I can describe. Yes.

Q Please, can you describe.

A I came to the store and came around here. About I was here (indicating). I was checking some products like here

(indicating). When I was checking, when the box, boxes fell, I was right over here. Almost here (indicating).

Q And when those boxes fell, where did it hit on you?

I'm not talking about the floor. I'm talking about the -- where on your body part.

A First I felt hit on my head, left side of head. Then, you know, hit my neck. Yeah, then in the neck, the back, and shoulder.

MR. BHURTEL: I think, Your Honor, I have to have a recess with the interpreter and my client.

MR. O'HARA: Judge, that's inappropriate.

THE COURT: I'm not going to allow that now.

You can reask the question. And you can ask your client to answer in English if you're concerned about the translation, but I'm not going to have you consult in the middle of your examination about substance.

You can even refresh his recollection with something else if you think that would help.

Q Which body -- the boxes hit on your head -- withdrawn that.

Which body part the boxes hit to you on September 2, 2011?

A Yeah, touch first left side of my head. Then I moved my head, then touch my neck, then hit my shoulder.

Q Which shoulder?

A Left shoulder.

Q And after the box hit, did you see those boxes after it hit?

A Yes.

Q Where did you see those boxes?

A On floor.

Q And those boxes you saw the day of the accident, September 2, 2011, are similar boxes you see in this picture?

A Yes. Like this.

MR. BHURTEL: Your Honor, plaintiff offers 117-B as in evidence.

THE COURT: 117-B is received in evidence.

(Plaintiff Exhibit 117-B received in evidence.)

Q Now I'm showing the witness 117-A.

THE COURT: A as in apple?

MR. BHURTEL: Yes.

THE COURT: Thank you.

MR. O'HARA: Judge, I will stipulate that the witness is going to provide the same factual basis for --

THE COURT: 117-A is received in evidence.

(Plaintiff Exhibit 117-A received in evidence.)

MR. O'HARA: Thank you.

MR. BHURTEL: Thank you, counsel.

Q Mr. Ahsan, can you describe what you see in this

picture.

MR. BHURTEL: I'll withdraw the question.

Q What was the reason you took this picture?

A To September 2, 2011 the way I saw this aisle and when I took the picture I saw exactly like that so I took the picture.

Q And what did you see in September 2, 2011 in this aisle?

A Okay. September 2, 2011 when the accident occurred I saw exactly like ladder man working over there. And when I took the picture I saw similar like that. So for my satisfaction I took the picture.

Q When you say somebody was working on this ladder, can you describe where that individual was working on the day of accident.

A I saw from opposite side of the aisle and one person was fixing the upper shelf all the boxes. He was fixing the boxes on the upper shelf. Yeah, I saw that things, the man who was fixing the box. So I saw same way a man was fixing the box, standing on the ladder fixing the top shelf so I saw took a picture.

MR. O'HARA: Judge, there's no question pending.

THE COURT: Sustained.

Excuse me, Mr. Ahsan.

THE WITNESS: Yes.

THE COURT: You need to wait until there's a question asked before you answer it.

THE WITNESS: Okay.

THE COURT: Is the last answer you gave complete and accurate or are you adding more information in response to the last question?

THE WITNESS: Okay. I want to change something the correct way.

THE COURT: Go ahead.

THE WITNESS: This picture is not for the day of the accident. This picture I took year after of the accident.

Why I took the picture, because at the day of the accident exactly there was a ladder like this here near that aisle. Yes.

THE COURT: And, Mr. Bhurtel, I'm assuming you're going to focus on the issues that are in dispute in this case?

MR. BHURTEL: Right.

THE COURT: And not dwell on the ones that are not.

Q And then the -- on the day of the accident -- withdrawn that.

MR. BHURTEL: Your Honor, so I'll -- yeah.

THE COURT: Are you ready to move along?

MR. BHURTEL: Yeah. I'll put this one up.

THE COURT: You're finished with the charts?

MR. BHURTEL: Yes, Your Honor.

THE COURT: Please go back to the witness chair, Mr. Ahsan.

Q On September 2, 2011, the day of the accident, you went to the Staples store that -- you went to the Staples store alone, yourself, or you had somebody with you?

A My daughter was with me.

Q And at the time of the accident when the boxes fell, was your daughter was with you or somewhere else?

A Yeah, my daughter was little far from me.

Q When you say "little far," she could see when the boxes fell or no?

MR. O'HARA: I'm sorry. I didn't hear the question, Your Honor.

THE COURT: When you say a "little far," was she able to see when the boxes fell or not?

MR. O'HARA: Objection. Calls for speculation.

THE COURT: Overruled.

A No. My daughter did not see.

Q After the box fell and hit on you and you saw the boxes on the floor, what did you do next?

A I was standing for a while, then I call my daughter.

THE COURT: When you say call her, do you mean on

a telephone or by saying her name out loud?

THE WITNESS: I called by phone.

Q When the box hit you, what did you feel, if anything?

A At that moment I could not understand anything. Little later I felt pain.

Q When did you feel pain?

A Yeah, my neck and shoulder.

Q Any other body part you felt pain at that time?

A At that time I could not remember anything else.

Q And then after that -- after that what did you do?

A I spoke with the manager, then I went to a doctor.

Q Which doctor did you go?

A My primary care physician, Dr. Guha.

Q That is Dr. David Guha?

A Yes, David Guha.

Q So when you call your daughter, did she come any time to you?

A Yes.

Q And did you speak with her?

A Yes, I spoke with her.

Q Did you tell anything to her?

A Yes.

MR. BHURTEL: I'll withdraw, Your Honor.

Q When the accident happened, did there a time come you notified the Staples store employee?

A Can you repeat the question, please.

MR. BHURTEL: All right. I'll rephrase the question.

Q After the accident, did Staples employees, they came to know that the box fell and hit you?

MR. O'HARA: Judge, objection. I'm not sure where he's going with this.

THE COURT: I understand, but I'm going to give him a little bit of room.

MR. O'HARA: Okay. The concern that I have is the timing and then the response being responsive to the question so it's hard for me to object, but I understand.

THE COURT: I did not hear the answer because of the objection which is not to say that it was wrong to interpose one.

Did the witness answer the question?

THE INTERPRETER: No, not yet.

A Yes, the Staples employee came to know. Yes.

Q How they came to know, if you know?

A The person who was working, he knew first.

Q When you say person working, is the same guy who was handling the boxes or somebody else?

A Yeah, the person who was fixing the boxes, he knew first.

Q Did any other employee also knew about your accident in

the Staples store?

A The manager.

Q Do you know the manager's name?

A I don't remember.

Q When the manager -- did you go to the manager or the manager came to you?

A Manager came to me.

Q And when the manager came to you, did you have conversation between you and manager?

A Yes, I did.

Q What was the conversation?

MR. BHURTEL: Withdrawn that.

Q Did you say anything to manager?

A Yes.

Q What did you say to the manager?

A Yeah, I explained how the boxes fell on me.

Q And what did the manager say to you?

A I don't remember what the manager said, but and manager gave me his name and address in a piece of paper. But I lost the paper now.

MR. BHURTEL: May I, Your Honor?

Q Earlier -- this is --

MR. O'HARA: I want to be able to see what you're doing.

MR. BHURTEL: This is 117-B.

Q Did you show the similar kind of these boxes to the manager on the day of the accident?
A Yeah, I showed the manager the place where the boxes fell on me.
Q And the similar boxes?
A Yes, similar.
Q And after you showed boxes to the manager, what did he do, if you know?
A I told the manager give your name and address. The manager give me his name, address and telephone number in a piece of paper.
THE COURT: Again, Mr. Bhurtel, I don't want to dwell too much on the parts of the case that we're not disputing.
MR. BHURTEL: Your Honor, I'm going to move --
Q You said you went to the Dr. David Guha, right?
A Yes.
Q How long after did you go to the Dr. Guha, directly from the Staples store or something else?
A Yes, I talked to the manager then went to Dr. Guha.
Q When you reached to Dr. Guha's office, did you tell your complaints to the David Guha?
A Yeah, I explained the incident.
Q What did you tell him?
A I told him I went to the Staples for shopping and two

boxes from the shelf fell on me and hit my head, my left side of my head, the neck and shoulder.

Q What did Dr. David Guha did to you that day?

A Doctor gave me painkiller pills and advised me to go for therapy.

Q Did you go to the therapy?

A Yes.

Q Where did you go to the therapy?

A Queens Medical Service.

Q And did you take the pain medication also?

A Yes.

Q Where did you buy the pain medication?

A Over the counter.

Q And therapy, how often you were going therapy with Queens Medical Service Center?

A Three times in a week. Sometimes two times in a week.

Q And what did they do to you in therapy?

A Electrical stimulation, hot pad, ultrasound, massage and some massage with the medication. Applying medication and massage and exercise.

Q And which body part they did this physical therapy at the beginning?

A My neck and shoulder.

Q And did you go back to see the Dr. David Guha again?

A Yes.

Q Approximately how many times you went in 2011?
A For -- before accident or after the accident?
MR. BHURTEL: Very good. It's a bad question. I'll withdraw. Okay.
Q After the accident, September 2, 2011, how many times you went to see David Guha with respect to your head, neck, and left shoulder?
THE COURT: During 2011 or forever?
MR. BHURTEL: 2011.
A About four, four-to-five times about.
Q And in 2012, how many times you went to see him?
A I cannot tell you how many times, but went many times. I do not remember.
Q Until now -- withdrawn that.
2013 also did you go to the Dr. David Guha?
A Yes.
Q With respect to your head, neck and shoulder, left shoulder?
A Yes.
Q 2014 also you went to see the Dr. David Guha?
A Yes.
Q When you saw the Dr. David Guha, is there any time he referred you for any other treatment, other doctor?
A Yeah, he send me someplace else.
Q Where did he send to you?

A He send me for MRI.
Q Which place he send you to MRI?
A First time or?
Q First time?
A Advance Radiology.

THE COURT: And for which, an MRI of which part of your body?

THE WITNESS: Neck and shoulder.

MR. O'HARA: I'm sorry. I didn't hear the name of the facility, Your Honor.

THE COURT: Which facility was that, Mr. Ahsan?

THE WITNESS: Advanced Radiology.

THE COURT: Ladies and gentlemen, give me a nod. Are you able to understand the witness when he answers in English?

So if the witness answers in English, it may be hard for you as the interpreter to keep straight, but you don't have to repeat the English answers unless it's harder for you to.

THE WITNESS: Yes.

THE INTERPRETER: Yes, Your Honor.

Q Did you do the MRI of your body, neck and shoulder, in Advanced Radiology?
A (In English) Yes, I did.
Q After that, what did you do? Did you go back to the

doctor again?

A After that I went to doctor and doctor send me to doctor, send to other doctor.

Q Which doctor did you go?

A At that time he send me to Dr. Ajoy Sinha, A-j-o-y S-i-n-h-a.

Q And do you know what kind of doctor is Ajoy Sinha?

A I come to know from Dr. Guha that he is an orthopedic surgeon.

THE COURT: He is a what?

THE WITNESS: Orthopedic surgeon.

Q Did you go to Dr. Ajoy Sinha?

A Yes, I did.

Q And when did you go first time?

A First time beginning of 2012, I think.

Q And when you went to see Dr. Ajoy Sinha, what did he did to you, if anything?

A First time when he see me and he see that MRI, and he send me for injection, and he put injection on my back, lower part of my neck and shoulder. He post an injection on that day.

THE COURT: Puts radiation?

THE WITNESS: Injection.

Q I just want you to speak slow and loud.

A Okay. Okay. Thank you.

THE COURT: And, of course, Mr. Ahsan, if you feel you want the Interpreter's help, either to understand the question or express your answer, I don't mean to keep you from using him. That's why he's right here.

THE WITNESS: Okay. Thank you very much.

Q Did Dr. Sinha explain you what is the purpose of that injection?

A No.

Q Did that injection help to you for any -- for your neck or shoulder?

A I didn't feel any improvement with the injection.

Q Did Ajoy Sinha refer or withdrawn.

MR. BHURTEL: Strike that.

Q Did Ajoy Sinha advise you any other medical treatment?

A He advised me for therapy.

Q And when you say "therapy," therapy for the left shoulder?

A Yes. Left shoulder and neck.

THE COURT: When you talk about therapy, you mean going back to the physical therapist like you had been?

THE WITNESS: Yes, sir.

Q And did you go to the physical therapist?

A I was -- at that time I was continuing with the therapist.

Q And which physical therapy you were continuing that

one? That's the Queens Medical Center?

A Yes.

Q Did Ajoy Sinha prescribe you any pain medication that day?

A Ajoy Sinha, I do not remember at that time. I cannot say.

Q After how long you were receiving the --

MR. BHURTEL: Withdrawn that one.

Q Once Ajoy Sinha sent you to physical therapy, how long you were receiving the physical therapy at that time?

MR. BHURTEL: Withdraw the question. It's a bad question.

Q Did you go any other doctor after that?

A After that doctor I went to neurologist.

Q Who referred you to the neurologist?

A Yeah, Dr. Ajoy Sinha advised me to go the neurologist, Dr. Bikash Verma.

Q Did you go to the Dr. Bikash Verma?

A No.

Q What was the reason you did not go?

A I tried many times to make an appointment with that doctor, but I could not make an appointment. Could not get one.

Q And what happened next?

A I have told Dr. Guha and Dr. Guha referred me to

Dr. Jalal.
Q When you say Dr. Jalal, it's Syed Jalal?
A Yes. Syed Jalal, yes.
Q Did you go to see the Dr. Syed Jalal?
A Yes.
Q When was the first time did you go to see Dr. Syed Jalal?
A (In English) 2014.
Q And how many times did you go to him to see?
A (In English) Three, four times.
Q When you went to see him, what did he did to you, if anything?
A Doctor gave a lot of tests.
Q Can you describe, if you remember, what tests he did?
A I cannot tell the name of the it, but I saw doctor examine my head, my neck. And my neck, check my shoulder, the bottom of my feet, check bottom of my feet.
Q Did Dr. Jalal refer you to any other test outside of his office?
A Yes.
Q Where did he send to you?
A For MRI.
Q And MRI for which body part he send you to MRI?
A Head and neck.
Q Did you do the MRI?

A Yes.
Q Where did you go to do the MRI for your head and...
A Apollo Imaging Center.
Q Which body part they did MRI of you?
A Brain and neck.
Q When was that?
A 2014.
Q Do you know what was the reason Dr. Jalal send you for the MRI of your brain at that time?
A Doctor -- no, I do not know the reason.
Q Did you tell the Dr. Jalal what was your complaint about your head or brain?
A Yes.
Q What was the complaint you told him?
A Headache in left side of my head and headache and pain in my neck.
Q And did Dr. Syed Jalal prescribe you any medication?
A Yes, he did.
Q Do you know what kind of medication he prescribed you?
A Doctor gave some medication, but I don't know for what.
Q You don't know the name of the medication or you don't know the medication for what?
A I know doctor gave the medication for treatment, but I don't know for what reason.
Q Is that medication related to your head, neck and left

shoulder or something else?

A I went to the doctor for my problem, for this problem. So I think for this problem doctor gave me medication.

Q After -- strike that.

Did you go any other doctor -- withdrawn. Strike that.

You were doing that time, you were doing that time therapy or you were not doing that the therapy at that time when you were seeing the doctor?

Strike that.

Did Syed Jalal send you any other referral?

A Yes.

Q Where did he send to you?

A He send me back to physical therapy for head and neck and shoulder. Not head, but neck and shoulder.

Q Where did he send you to go for therapy?

A Fidelity Physical Therapy.

Q Did you go there to receive the therapy?

A Yes, I did.

Q And how often you were going there?

A First two weeks at the beginning three times in a week and then twice a week.

Q Which body part you were receiving the physical therapy?

A Neck and shoulder.

Q What was your complaint at that time in your shoulder, left shoulder?
A Constant pain, constant pain. Sometimes too much; sometimes little less. So that in that condition I took physical therapy.
Q And what were you complaint about your neck at that time?
A Yeah, I had pain in my neck. I could not move around my neck.
Q Did physical therapy from the Fidelity help for your left shoulder?
A Yeah. When I used to take therapy in my left shoulder, I used to get little relief for 10-to-15 minutes. After that same pain come back.
Q And how about your neck?
A No change in my neck.
Q Did you go any other doctor after Fidelity Physical Therapy?
A For what?
MR. BHURTEL: Withdraw that, please.
Q When did you do the physical therapy in Fidelity?
A 2014.
Q Did you go to see any other doctor?
A Yes.
Q Which doctor did you go?

A Dr. R.C. Krishna.
Q So who referred you to Dr. R.C. Krishna?
A Dr. Guha. David Guha.
Q When was the first time you saw Dr. Krishna?
A 2014.
Q What was the reason you went to see Dr. Krishna?
A Brain, head, neck and shoulder. I had head, brain, shoulder and neck. I had pain in my brain, pain in neck and shoulder.
Q What did Dr. Krishna did to you?
A He examined me and I don't remember everything, but he examined me.
Q Did he send you any referral for -- withdrawn that.
Did he send you to -- for any tests outside of his office?
A Yes, he did.
Q Where did he send to you test?
A He send me to Omega Diagnostic Center for MRI in the brain and neck. Omega Diagnostic Center for brain and neck MRI.
Q Did you go to Omega Diagnostic Imaging Center?
A Yes.
Q And did you do the MRI, brain MRI?
A Yes.
Q Did you do the neck MRI?

Case 1:13-cv-05929-SMG Document 118-2 Filed 12/21/16 Page 623 of 958 PageID #: 1713

A Yes.

(The following answers were in English.)

Q And how many times, approximately, you saw Dr. Krishna?

A Sometimes after six weeks, sometimes after eight weeks. Like that.

Q When did you start to see him to receive medical treatment?

A 2014 I mentioned you.

Q So if I tell you June 13, 2014 is first day, that refresh your recollection?

A Maybe. Exact date I cannot say, but maybe like that.

MR. O'HARA: Judge, I will tell stipulate that if counsel represents any date that this man saw any of these doctors, that it will refresh the witness's recollection on the date of these office visits.

MR. BHURTEL: Thank you.

Q So after June 13, 2014, that's the first time you saw him based on the medical record. So after that you are seeing, as you said earlier, every six week, every eight weeks, that's what you are saying?

A Yes.

Q Did Dr. Krishna prescribe you any medication?

A Some pain medication he prescribed for me.

Q Do you know the name?

A Some of them maybe I can't. The Tramadol, Meloxicam,

Naproxen, I believe. This type of medicine.
Q Do you know what was the purpose of this kind of medication for you?
A This is for pain, for pain medication.
Q When you saw the Dr. Krishna, what was your complaint to him?
A Head pain, neck pain, shoulder pain.
Q Did you have any complaint related to your brain?
A Yes, I told you I had pain.
Q Did you go back to see Dr. Ajoy Sinha?
A Yes.
Q When did you go back?
A I was visiting him almost 12 weeks, every 12 weeks. 10, 12 weeks, like that.
Q And what kind of treatment he provided you, if anything?
A He did surgery on my neck for left shoulder.
Q And do you recall when was that surgery?
A It was in 2014, December.
Q So when did doctor advise you -- withdraw that.
What was the reason the doctor advised you to do the surgery?
A Doctor found a partial tear on my left shoulder, then he decided do an MRI. Then he decided to do the surgery and it is needed. At that time he told me that it is needed

very much. And I agree to do that.

THE COURT: He told you that you what?

THE WITNESS: To do that. I had to go for the surgery.

THE COURT: That you had to go for the surgery?

THE WITNESS: Yes, I agree to go.

THE COURT: You elected to go?

THE WITNESS: I agreed to go for surgery.

(Through the Interpreter.) He told me I needed to have surgery and I was agreed to do it.

THE COURT: He told me I needed to have it and I agreed to have it?

THE WITNESS: I agreed to do the surgery as for the advice of the doctor.

Q Did Dr. Ajoy Sinha explain you that what are the risk about the surgery?

A Yes, he explained.

Q Do you remember what were the risks he told you?

A Yes, he told me if you do not do it now, then later on this tear may be more and more. And some -- after, after some days you may disabled to work with my left hand.

THE COURT: You'll be disabled from working with your left hand?

THE WITNESS: Yes.

Q And did he say any other thing?

A Exactly I do not remember all these things, but he told me this I can say. He told me that if you do not do the surgery, then it may happen bad.

Q When doctor said you need to go surgery --

A After the MRI. After checking the MRI.

Q After the doctor advised you to go surgery, how did you feel at that time?

A I feel scared. Surgery is not good. I feel scared. Surgery will do, but I'm not -- I feel very scared on surgery.

THE COURT: Everybody still understanding him?

Q When you say you feel scared, can you describe what that means?

A When doctor told me, he told me that you need surgery, at that time I was in fear, scared, whatever you say. I don't know.

Q But and they -- and you anyway you elected or you agreed to -- withdrawn that.

A Yes.

MR. BHURTEL: Hold on.

Q At the end you decided to follow the doctor's recommendation?

A Of course.

Q So before surgery you went to the surgery room, did the doctor advise you to do anything like to preparation of the

surgery?

A Please do it again.

Q Did doctor told you -- withdrawn that.

So when you go to surgery, do you remember what they did before they started the surgery?

A They push saline, first I don't know what is. I don't know. They push on my vein and I waited for two, three hours for the surgery. And after two, three hours somebody came to take me to the surgery room after procedure. I went there and two nurse said doctors are right there. A push in my vein and I don't know after that what happened.

Q And what did you remember after that?

A I was -- it was, I was unconscious at that time.

THE COURT: When you woke up, where were you?

THE WITNESS: When I wake up, when I wake?

THE COURT: Yes. Where were you when you woke up?

THE WITNESS: Oh, oh, after approximately three hours, approximately three hours I wake up.

Q And the question is: Where were you at that time when you wake up after the surgery?

A I was in a recovery room after surgery when I wake up. I was in the recovery room at that time.

Q How did you feel that time?

A I feel drowsy. I feel thirsty. I was feeling pain on the arm and shoulder at that time after surgery. It was

painful.

Q How long you stayed in the hospital on that day on the surgery day?

A Almost all day.

Q And then?

A From 8:00 in the morning to maybe 5:00, 6:00 in the evening.

Q After that what happened?

A After that I go home.

Q So the doctor -- hospital discharged you or doctor advised you to go home?

A Hospital discharged me.

Q And how did you go home?

A Taxi.

Q And did you have with you anybody?

A My wife was with me.

Q And when you went to the home, how did you feel with respect to your left shoulder?

A Left shoulder was not working at that time. After the following day I could not do anything with the left shoulder, anything. I could not do anything.

Q Did doctor prescribe you medication at that time?

A That time doctor gave me some medication after the surgery. After my recovery, he gave me some medication and I took it. And at that time he also prescribe me pain

medication.

Q Do you have any scar in your shoulder because of the surgery?

A Yes.

Q And after this surgery, did your left shoulder completely heal?

A No, it's not completely healed. Partly is. I can say partly.

Q When you say "partly," what are you saying?

A It has partly healed. I can -- I -- still I cannot work properly with my left hand. I can do little with difficulties, but not properly what I was doing before.

THE COURT: What's the last thing you said?

THE WITNESS: What was said?

THE COURT: The last thing you said was?

(Question translated.)

THE WITNESS: What I was doing before my accident, after the surgery I cannot do like that.

THE COURT: You can't do it like that?

THE WITNESS: Yes. But I can do it with the difficulties.

Q When you say before, before means before the date of accident or before the surgery?

A Before the accident.

Q Did you go to see Dr. Ajoy Sinha after surgery also?

A Yes. There was a followup times I had to go.

Q Did you tell the Dr. Sinha your condition?

A Yes, I explained.

Q And what was his advice?

A I had -- at that time I had so many pains and I explained to doctor that I had pain. I cannot do any work, I cannot take my shower, I cannot take anything.

Doctor give me some medication, something like that. Doctor I wanted to give me, because the pain medication, he advised not to take pain medication. He advised that you live with some pain. Don't take medications. It will do -- slowly it will be okay for you.

THE COURT: Slowly it will...

THE WITNESS: Okay. After some times maybe the pain will go.

Q Did Dr. Ajoy Sinha tell you what was the reason you should not take the pain medication?

A Yes, he explained that it is harmful for the kidneys.

Q When did you last time you saw Dr. Sinha?

A Eight, ten weeks before.

THE COURT: Before from now?

THE WITNESS: Yes, before from time. Ten, ten or twelve weeks maybe.

THE COURT: So you think you saw him in September or August?

THE WITNESS: September maybe. Exactly like that. But last visit was like that.

Q And what was your complaint then?

A Problem on my neck, shoulder. About the shoulder. I had some pain. It was increasing at that time I went to doctor.

Q Did Dr. Sinha give you any advice that what is, you know, the condition about your left shoulder at that time in the last visit?

A Again, he recommended me for therapy, physical therapy.

Q Did Dr. Guha also prescribe you pain medication or he did not?

Withdrawn that.

A Sometimes he did.

Q I think you testified already he prescribed at the beginning.

A Yes.

Q Did Dr. Krishna referred you any other doctors?

A Yes. Yes.

Q Which doctor he referred?

A He referred me Dr. Lattuga.

Q And, if you know, what kind of doctor is Dr. Lattuga?

A He is a spine surgeon.

Q And did Dr. Krishna told you that what was the reason he's referring you to Dr. Lattuga?

A Yeah, Dr. Krishna told me that the pain is not -- the pain is not getting off, so you have to -- say I have to send you to some other doctor, specialist doctor that he send me.

Q And did you go to the Dr. Lattuga's office?

A Yes, I went to Dr. Lattuga's office.

Q And what was your complaint about the -- at that time?

A I had the same complaint, neck pain.

Dr. Lattuga is spine specialist so that I speak to him about my spine only.

(Continued on the following page.)

BY MR. BHURTEL:

Q So Dr. Krishna send you there one for the neck?

A Yes.

Q And to clarify that, for the left shoulder is Dr. Ajoy Sinha?

A That is Dr. Ajoy Sinha for the left shoulder.

THE COURT: Dr. Ajoy Sinha?

THE WITNESS: Yes.

A And for neck Dr. Lattuga.

THE COURT: Folks, why don't we take just a minute and stretch, because I'm going to try to push through a little more this morning than I might otherwise, because I have to take a longer lunch recess than usual because of another matter. So I want to work you hard this morning, so take a minute and just take a breather. We've had a lot of testimony.

(Pause.)

THE COURT: All right, let's take -- we'll take five. Go ahead.

THE PLAINTIFF: Thank you very much.

THE COURT: All right, take five.

(Jury exits.)

(Whereupon, a recess was taken at 10:56 a.m.)

THE COURT: Are we ready for the jury.

MR. BHURTEL: Yes.

MR. O'HARA: Yes.

THE COURT: Let's see if the jury is ready for us.

(Jury enters.)

THE COURT: Go ahead. Thank you. Mr. Bhurtel.

MR. BHURTEL: Yes, Your Honor. Thank you.

BY MR. BHURTEL:

Q When you went to see Dr. Lattuga's office, what body part of the treatment for you for Dr. Lattuga's office?

A When?

MR. BHURTEL: Okay, withdraw that question.

Q Why Dr. Krishna send you in Dr. Lattuga's office?

A For the neck part, the spine.

Q And what was your complaint when you went to Dr. Lattuga's office with respect to your neck?

A I had a complaint pain. I was complaining of pain in my neck. I had a complaint for headache. I had a complaint for -- later I had for shoulder pain also.

Q And did any doctor examine you or provided medical treatment the first time when you went to Dr. Lattuga's office?

A One doctor see me. One doctor saw me. First day, that day I have not taken the steroid, which I believe he had not prescribed me medication, the pain medication.

Q Did he recommended you anything?

A He recommended me to see -- that first doctor I see

first time that was Dr. Lattuga. I thought he is Dr. Lattuga, but he is Dr. Mikelis. He was Dr. Mikelis.

THE COURT: Dr. Mikelis.

THE WITNESS: Yes.

A And he referred me to see Dr. Lattuga in that other building of the same office.

Q Did you go to his other office?

A Yes, I go to the other office that is located in Long Island.

Q Did you see same day or another day?

A What do you mean by same day? Dr. Mikelis?

Q Yes, the day, the first time --

A No, Dr. Mikelis made an appointment for me to see other day.

Q And did you go that other day?

A Yes, I did.

Q And which doctor did you see that time?

A That time -- that time the other doctor I think Dr. Chacko was there.

Q And what was your complaint that time?

A That time I had complained my neck pain. Neck pain, is the headaches and shoulder pain.

Q And Dr. Chacko did anything to you?

A Dr. Chacko, he advise me for an epidural injection and he gave me some medication, pain medication. Prescribed me

some pain medication.

Q And did you take those pain medications?

A Yes, I took the pain medications.

Q So where did you buy those pain medication?

A From Jamaica Pharmacy located in Jamaica.

Q And did you go to receive -- did you have a steroid injection?

A Yes, I went.

Q So when first time doctor refer you to receive epidural steroid injection?

A Dr. Chacko refer me for the epidural medication. Then Dr. Lattuga also sent me for an epidural medication. And, again, Dr. Chacko, he advised me it is important to take this injections. Then Dr. Billy Ford, he did this initially last year.

Q When Dr. Lattuga, Billy Ford and Chacko advise you to take epidural steroid injection?

A After my second visit to Dr. Lattuga's office.

Q Did you decide to take right away?

A No.

Q And what was the reason you did not -- did doctor describe you what is the risk of those injections?

A Yes, that was described, risks.

Q And what was the reason you did not decide to take immediately?

A Because I -- I talked to my PCP, that's primary care physician, he told me the --

MR. O'HARA: I'm sorry, talked to whom?

THE COURT: I talked to me PCP, my primary care physician.

A He told me that this is a very painful and riskful injection. If you can avoid this, if you can avoid this, you do that. If you cannot avoid, then you go for the injection. And he said a very risky injection. That's why I have not take this right away.

THE COURT: It was a very risky injection?

THE WITNESS: Yes, he told me that it's very painful and risky.

THE COURT: And this is Dr. Guha who told you this?

THE WITNESS: Dr. Guha.

BY MR. BHURTEL:

Q And when Dr. Guha told you that this is a risky injection, how did you feel?

A I was scared that time. And then I follow Google how it done, how this can be performed, how this injection can be done. I can take.

I follow Google. I saw it's a very, very -- I thought it's a painful injection that I'm more scared.

THE COURT: I remind the jury: Don't do any

internet research. Your decision is based on what happens here. We don't want you confused with things that aren't put into context by the parties.

BY MR. BHURTEL:

Q And how long after you decided to take first epidural injection, approximately?

A Approximately, after getting the decision from Dr. Chacko, maybe eight, nine months after I took the injection.

Q And when was the first time you took the epidural steroid injection?

A It was in July 2015, I think is the first time.

Q And when you went to receive this injection, do you remember how it was applied?

A They took me to a room that is for injection only, and they put me on a bed, my head down. And I could not see anything what happened. I could not see anything. But I feel pain when they push it.

Q When you say they're pushing, where were they pushing?

A In my spine.

THE COURT: Nearest your head or close to your waist?

THE WITNESS: It's close to my neck. Close to my neck.

BY MR. BHURTEL:

Q When you say "pain," can you describe what kind of pains you were feeling that time when the doctor was giving you injection?

A The pain was -- the pain was unbearable pain. The pain was, I think, definitely unbearable for me. But that time I had to take it, that pain I took.

Q And how long it took to take that injection?

A Twenty, 25 minutes, I cannot say. That I am not sure what it was, but I can guess that it was 20, 25 minutes.

THE COURT: When you say it took 20 to 25 minutes to get, the injection --

THE WITNESS: Yes.

THE COURT: -- do you mean that's how long you were in the injection room?

THE WITNESS: It's injection room.

THE COURT: How long was the needle giving you the injection?

THE WITNESS: I have not seen the needle size because I was --

THE COURT: I didn't ask about the size of the needle. I think maybe you leave the impression that the needle was in your body for 20 to 25 minutes.

THE WITNESS: No.

THE COURT: How long was the needle in your neck, if you remember?

THE WITNESS: I think maybe one minute, plus/minus.

THE COURT: One minute, plus/minus?

THE WITNESS: Right. Yes.

BY MR. BHURTEL:

Q After you received the first epidural injection and -- strike that.

So once you received the first epidural injection, what did the doctor do to you?

Withdraw that one.

When you received the first epidural injection in your neck, how long after that you went to home?

A After initial? When I get up from the bed, then I feel dizzy that time. And I sit on the bed for a while. Then I move to the reception room of the doctor.

Up to that time I was feeling that dizziness, I was waiting in the waiting room. When I feel good that I can move, then I moved.

The first injection when I took it, I took it that time my wife was with me that if I feel any bad then she can take me home. That's why she was with me.

Q Is there any other procedure that after they give you injection that day?

A The follow-up. After that injection, then follow-up was done.

Q So when you arrived at home, how did you feel?
A On that injection, after injection, I feel -- that time I feel good. There was no pain. But there was no pain. I can say no pain. But injection pain was there.
Q And how long that injection made you in your neck no pain?
A Thirty, 40 days is -- approximately 30, 40 days was good.
Q And then after 30, 40 days, what happened?
A The pain come back. Slowly.
Q The pain was same level, more, or less?
A Level, same level -- not same level, it was a little bit less. Not same level.
Q And when did you -- after this first injection, did you have another appointment with Dr. Lattuga's office?
A The follow-up appointment was there.
THE COURT: Say again?
Q Second injection?
A Yes, I had second injection, Dr. Lattuga.
Q No, the question is: Did you have another appointment with the Dr. Lattuga's office after the first injection?
A First injection, after the first injection I had appointment with Dr. Lattuga's office for follow-up visit.
Q Did you go to the follow-up?
A Yes, I did the follow-up.

Q And when did you take the next injection, if you took it?

A It was maybe after three months. Maybe after three months, second injection, yes, sir. Or maybe less. Exactly I don't remember, but it was taken.

Q If I tell you that August 28th, 2015 you received the second injection, does that refresh your recollection?

A August?

Q 28th? 2015?

A Maybe. I told you that maybe three months plus/minus I had injection. You're saying that -- it may be after eight weeks or something.

Q Okay. Where did you -- did you receive the second injection?

A Yes, I received second injection.

Q Okay. And where did you receive, the same place or a different place?

A Same place, same doctor.

Q And the procedure was same or different?

A Same.

Q And how was the pain at that time when you were receiving?

A After receiving same, 30, 40 days it was fine. It was fine. I was feeling very good after receiving the injection. And, again, pain come back slowly.

Q And at the time after when you receive the injection, did you have the same level of pain or different pain?
A Second time it was different level of the pain.
Q And when you say "different," what would you report? Withdrawn.
And you said after 20 -- how many days after you came back again in the pain?
A Thirty, 40, approximate.
Q All right, this injection is only for the neck, right?
A Only for the neck, spine. The neck, spine.
Q Can you describe how was your pain after 30 or 40 days after the second injection?
A You mean the level of the pain?
THE COURT: Yes.
MR. BHURTEL: Yes.
A So it varies, six, seven, eight, like that. Sometimes six, sometimes eight, sometimes nine. Sorry, not nine, seven. Six, seven, eight, it varies. It depends. But regular, like six to eight, I would say.
Q And did you have other follow-up visit, or did the doctor give you another appointment?
A Yes, I asked for so many follow-up visits with Dr. Billy Ford. It's the regular available. I don't miss any visits with Dr. Billy Ford.
Q And how often you going to receive treatment from

Dr. Lattuga's office from various doctors, including Billy Ford?

A After the initial follow-up visit after 15 days, 30 days, some follow-up visit is after 15 days, some follow-up visit after 30 days, they made the appointment, I used to go for the follow-up appointment.

Q Did Dr. Lattuga's office or any other doctor prescribe you pain medication also?

A Dr. Chacko, I said he prescribed medication before, the initial.

THE COURT: And did they continue those pain medication prescriptions after the injections as well?

THE WITNESS: After the injection, I am not taking any pain medication. But doctor said if you feel severe pain, then you can take one or two, not more.

THE COURT: And were there days when you felt like you needed some pain medication and took some.

THE WITNESS: Sometimes I took. Sometimes I took. When I feel more, when I cannot move, then I take, otherwise not, because there are so many side effects from the pain medication. That's why doctor advise me not to take more.

THE COURT: Advised you not to take more?

THE WITNESS: Uh-huh.

BY MR. BHURTEL:

Q Did you take another injection from Dr. Lattuga's

office?

A Yes, the third epidural, I took.

Q When was that, if you remember?

A It was after eight, ten weeks, at least like that.

THE COURT: After the second one.

THE WITNESS: After the second one.

Q And in the same place you took it?

A Same place, same doctor.

Q And the procedure was the same?

A Yes.

Q Okay. And the pain level when you were receiving, was the same, different?

A Almost same level. Pain was same.

Q And that injection helped you to relieve your pain?

A Again, 30, 40 days I was fine, fine, and the pain come back again slowly. The same thing.

Q When you say you were "fine," fine means your neck was okay?

A My neck, yes. I can work. I can move, I can -- I can work. Something like that.

Q And after this 30 and 40 days after your third epidural injection, your pain in the neck came back?

A Yes, it's come back.

Q And what was the level of the pain?

A It was six to eight, something like this.

Q Did you receive any other injection with the Dr. Lattuga's office?
A After Dr. Billy Ford, when I -- I told Dr. Billy Ford the pain come back slowly and I cannot twist my head left to right or right to left, I cannot move my head properly, then he advise me to took another injection, and I took the injection, too.
Q And when was you that took that injection?
A It was the same, after maybe after eight weeks like this. I cannot take another at that time but 10, 12 weeks, 13 weeks, 14 weeks, like that, it's approximate.
Q And do you know what injection you received that one?
A I don't remember the name of the injection. I don't know.
Q Now, did you receive any other injection after that?
A Same injection I took another one.
Q When did you receive that one?
A After six, eight weeks, like this. Same like that.
No. No. No. I believe three, four months ago I take.
Q If I tell you that you received in August 26th, 2016, does that refresh your recollection?
A Three, four months ago like I can say.
Q And what kind of injection -- what they did to you when they were giving -- when the doctor was giving you

injection?

A Same procedure, like epidural injection, but this is different type injection doctor told me.

It was post on the inside the disc, there's C6-7 or 5. They were conversing, they were talking -- with the doctor somehow they are talking and he just started. It was maybe 5, 6, 7, three discs at a time.

THE COURT: Three injections at a time?

THE WITNESS: Yes, three injections at a time.

Q And what was the level the pain when you were receiving?

A That pain was too much. That was too much.

Q And did that injection help you to reduce or relieve your neck pain?

A Yes, that injection helped me to move my head left/right or right/left.

Q Okay, how long that helped?

A At least month, month or plus.

Q And then what happens after a month and month plus?

A There's still the pain -- there's still stiffness of my neck is now is the problem. The stiffness of my neck is a problem now.

Q Did you receive any other injection after the last one you described?

A No, after last one, I have not taken anything.

Q Which is in August 2016?
A No, no, I haven't taken any.
But I have follow-up -- for that injection, I had follow-up.
Q When did you have a follow-up?
A I have next Friday, tomorrow. Tomorrow I have a date for a follow-up, but I cannot go tomorrow, I have to reschedule.
Q Did Dr. Lattuga advise you any other treatment with respect to your neck?
A Yes, Dr. Lattuga say -- Dr. Lattuga told me that if you want to be cured that you'll need to do surgery on your neck.
Q And when the Dr. Lattuga advise you to receive the neck surgery, what was your feeling?
A Surgery, I always scared of surgery. That was my feeling. I was always scared of surgery, any surgery. But, unfortunately, I have to do it twice.
Q Do you know what was the reason you do not have a surgery at this time in your neck?
MR. O'HARA: Objection to the form of that question.
THE COURT: Why don't you lead on this point, Mr. Bhurtel.
Q You could not have the surgery at this time, right?

A Yes.

Q And that was the reason because?

A Answer?

Q Yes.

A The reason because he asking me so many money that I don't have -- he's asking me -- his fee is too high and my -- the insurance doesn't cover that one.

MR. O'HARA: Objection. Objection, that's inappropriate.

THE COURT: Sustained. The jury will disregard the answer.

BY MR. BHURTEL:

Q When you went to see the Dr. Krishna, what was your complaint with respect to your head and brain?

A I went to Dr. Krishna 2014.

THE COURT: And when you went to see him --

THE WITNESS: I went to see him in 2014.

THE COURT: -- did you have any complaints about your brain?

THE WITNESS: Yes, I had complaint.

THE COURT: What was your complaint?

THE WITNESS: I had -- at that time I had headache. I had pain. I had headache, dizziness. I had blurry vision. And I also had double vision at that time.

THE COURT: Anything else?

THE WITNESS: Just this I can recall at this time.

THE COURT: That's what you can recall, okay.

Q And did Dr. Krishna provided you with any treatment with respect to your brain?

A Some medication he had prescribed, for what that I don't know.

Q And did you take those medications?

A I took that those medications.

Q And where did you buy those medications?

A Jamaica Pharmacy.

Q Did you come to know about the -- withdrawn.

Did Dr. Krishna told you anything about your head or brain what was the problem you having?

A After MRI when he did the report, when he got the report from MRI doctors, he told me there's a hygroma, a subdural hygroma in my head.

Q And did Dr. Krishna told you that what was the reason you have that subdural hygroma?

A No, Dr. Krishna didn't tell me, but it existed. He said it existed in my head, the subdural hygroma.

Q Did you come to know what was the reason you had a subdural hygroma in your head?

A Later I come to know. Dr. Krishna, Dr. Sinha and Dr. Guha, they told me that it ultrasound therapy some sudden hit or something like that.

Q And the doctor told you this one because you had it because of the accident after September 2nd, 2011?
A Yeah, doctor it happened after the accident. Doctor told me.
Q Do you have follow-up or another appointment with Dr. Krishna's office?
A Yes, I have.
Q Do you have a follow-up with Dr. Sinha's office?
A No.
Q Before the September 2nd, 2011, did you go to see the doctor with respect to your neck problem?
A September 2011?
Q Before.
A Before accident?
Q Yes.
A Yes, I went.
Q When was that? The first time?
A First time, 2008, '9 maybe. I believe it is 2008.
Q If I tell you March 26th, 2008?
A I told you 2008.
Q And which doctor did you go to see?
A Dr. Guha.
Q And what was your complaint there?
A That I had complaint of neck pain.
Q And did you receive any treatment?

A I received -- yes, I received one day therapy.

THE COURT: One day?

THE WITNESS: One day.

Q Okay. After one day physical therapy, what happened?

A Pain relieved.

Q And then did you go again to see Dr. Guha?

A For this pain? For this kind of complaint?

Q Yes, for the neck complaint.

A Yes, I went.

Q When was that?

A 2009.

Q If I tell you February 9, 2009, that refresh your recollection?

A So far I believe.

Q And what was your complaint at that time?

A Same complaint. I had same complaint, with shoulder pain, too.

Q And what was the treatment you received?

A Same. Physical therapy.

Q How many times you receive?

A Once. Only one day.

Q And after one physical therapy, what happened?

A I did that physical therapy and I never go to Dr. Guha with this complaint again.

Q Before that, you mean before --

A Before the accident. Before the accident, I never go to Dr. Guha with those complaints.
Q And that's between -- now, after the accident, September 2nd, 2011, then you went to see the Dr. Guha, right?
A Right.
Q And on August 4th, 2011, did you go to see Dr. Guha?
A Often I go to him because he's my PCP. Regularly I used to visit him.
Q And this is -- is August 4th, 2011, before the accident, did you have a head complaint with -- did you make a head complaint to Dr. Guha at that time?
A Yes. That time, yes, I did. Yes, I had a head complaint, neck complaint.
Q And how long you had the headache that time?
A That was for a month, like, maybe for a month, more or less.
Q You went to the Dr. Guha's office August 3rd, 2011, right?
A Right.
Q That's the only one time when you go to see him about the headache, or did you go other time also.
A I think this is the first time I go for headache.
Q No, that time I'm asking --
A That time, yes, I went to -- for this headache, that

time.
Q So what kind of medication or anything doctor prescribed you?
A He referred me for -- to see doctor -- eye doctor. He referred me for eye doctor.
Q And did you see any other doctor with respect to your neck before the September 2nd, 2011, other than doctor you told already?
A That was my -- I saw a doctor, which is Dr. Santiago.
Q That is the doctor in Queens Medical Center?
A Queens Medical Center, yes.
Q That is the doctor who --
A He's the doctor for pain medication. For pain management.
Q That is the place you went for the therapy?
A Yes, that's the place I went for therapy.
Q Other than that, any other doctor you saw with respect to your neck and left shoulder before the September 2nd, 2011?
A No.
Q Did you have any difficulties doing any activities or anything before the accident?
A No. Before the accident?
Q Yes, September 2nd, 2011.
A No, I was doing all the work by myself for home, it was

fine.

Q Can you tell what kind of personal activities you used to do before the accident, September 2nd, 2011?

A Personal means I want to mean that my wearing shoes, wearing clothes, taking showers, taking food, cooking, and -- cooking, other work.

I mean, that's what I mean personal work.

Q And how about the household activities you were doing before the accident, September 2nd, 2011?

A I was doing almost all; like my cooking, cleaning. Cooking, cleaning, shopping, groceries. I still doing mopping. Everything I used to do. Laundry.

Q And before the September 2, 2011 -- withdrawn that. Strike that.

When you were doing this personal activities before the September 2nd, 2011, did you have any difficulties doing it?

A Before the accident?

Q Yes.

A I don't have any difficulties doing this.

Q And did you have any difficulties doing this personal household activities, such as cooking, cleaning, laundry, grocery?

A Before the --

Q Before the accident.

A No.
Q Before the accident, did you do any other work -- other kind of activities?
A I used to do paintings. I used to do graphic design work as a graphic designer. I used to do painting for my hobby.
THE COURT: Graphic design for?
THE WITNESS: Graphic design for printing place or printer, like banner, signs, something like this. It's freelance work.
Q And did you like doing those kind of work?
A Yes, I enjoy it.
Q And did you have any social activities before the accident you used to do it, if anything?
A Social activities means? You have to explain me what is the social activity, what it mean.
Q Social means like you go out with the friends or families or in the communities?
A Yes, I used to do.
Q Can you describe what kind of activities you used to do it?
A Before the accident, still, love activities, still I love to hang out with the friends.
Q Let's just stay with before the accident right now.
A Before the accident, I love to hang out with my

friends. I used to go to friend's home and some small parties, family parties. And I used to make my friends some activities, community, that's their program I used to go there regularly.

(Continued on next page.)

BY MR. BHURTEL:

Q After the accident, September, 2nd, 2011, did you have any difficulty doing your personal activities?

A I have difficulties, I can do but with difficulties. After so many treatment, now I'm able to do but I can do with difficulties.

Q What kind of things you were doing with the difficulty, can you describe?

A I can cook the food difficulties. I can go out with -- I can paint with the right hand no difficulties I think so because I only use right hand when I do painting, that is not with difficulties.

Some graphic design I do at that time I need to use two hands, that I have difficulties. Some cooking, I do, I told you that already. Some grocery shopping I do with difficulties because it is little -- I can take little weigh with the right hand not left hand. I cannot use my left hand. I can use, but I cannot use for my paint.

Right hand I use, that I can do easily.

THE COURT: So I didn't follow everything you said. Did you say that when you paint --

THE WITNESS: Yes.

THE COURT: -- for your hobby?

THE WITNESS: Yes.

THE COURT: Are you right handed or --

THE WITNESS: I'm right handed.

THE COURT: -- a left handed person?

THE WITNESS: I'm right handed.

THE COURT: So when you paint you use your right hand.

THE WITNESS: Yes. Only one hand I need to paint. When I draw, paint only one I need to use, no other hand.

THE COURT: So that's okay?

MR. O'HARA: That's okay. Right hand is okay. I have no complaint on right hand.

THE COURT: But some of your graphic design work required two hands?

THE WITNESS: Then I need -- when I use the computer then I need two hands.

THE COURT: And that you have difficulty?

THE WITNESS: That I have difficulties.

THE COURT: When you do grocery shopping, you can lift like you used to with --

MR. O'HARA: Yes.

THE COURT: -- your right hand?

And with your left hand can you lift anything?

THE WITNESS: I can lift with difficulty a little weight.

THE COURT: So you could put a light bag of groceries in your left hand and a heavy bag of groceries in

the right hand?

THE WITNESS: Right hand. And left hand I don't use always. When I get pain then I don't use that hand. When I feel that I have no pain now, pain less, then I use, otherwise not.

THE COURT: And that varies from day-to-day?

THE WITNESS: Day to day, no.

THE COURT: The left hand pain, you said sometimes you use it and sometimes you don't, it depends on whether you have pain.

THE WITNESS: In the morning maybe I use it, in the morning I feel bad. Sometimes I feel less pain, sometime I feel more pain. That I decide when I can use that one.

THE COURT: Because the pain level changes a little bit from one --

THE WITNESS: Changes.

THE COURT: -- day is good and one day is bad?

THE WITNESS: Yes, yes, that it is.

BY MR. BHURTEL:

Q Can you tell to the jury that when you are using your left hand, what are your difficulties when you are doing your personal things?

A Wearing shorts, pants, wearing my clothes I cannot take my hand to my back. When I comb my hair I cannot take my

hand to the back properly. I take a little bit, but I'm not properly. When I take shower I cannot take my hand to the back fully.

Q When you say hand, left hand?

A Left hand. It's left hand. I can't take my left hand to the back fully. And when I wearing shorts, clothes, and pants that's also problem, but I have to do. I used to do with the difficulties.

Q Did you have any problem with the sleeping?

A Sleeping problem I have.

Q What is that?

A I cannot sleep in the night.

Q With respect to your left shoulder --

A Left shoulder I cannot sleep because --

Q Can you --

THE COURT REPORTER: Gentlemen, please, one at a time.

A When I sleep -- when I try to sleep, when I put my head on the pillow, that time the level of -- the level of my shoulder and pillow is not same at that time I feel pain. And the pillow goes down slowly and pain comes, pain begins more slowly. And I have to change my side on the right. If I feel that I -- at that time I can sleep. If I sleep on the left I cannot.

Is that complete answer?

THE COURT: Yes.

BY MR. BHURTEL:

Q You said you can do cooking with difficulties, can you describe what are the difficulties?

A Difficulties cutting something vegetables or meat or fish, that is do my wife and I cook. Because cooking also my hobby as well as regular routine time in my home before the accident. But it is hobby too. I love cooking.

Q But what is the difficulties you have after the accident?

A I cannot cut meat, I cannot cut vegetables properly because I have to use two hands together that's why.

Q You said that you have a difficulties with cleaning, can you describe what is the difficulties with the cleaning?

A Mopping is difficulties with two hands because I have to use two hands that is problem. When I use two hands that's the problem. If I use only right hand, I can say there's no problem or less problem.

I can -- I am not saying that I cannot move my left hand, I can move little. I can move my left hand little, but with difficulties.

Q Did any of your doctors advise you to do home therapy or other activities?

A Yes. My doctor advise me to do some work with my left hand to get cured of mobility, proper mobilities. I have to

move my hand. I can -- I should use lifting something, I should do some exercise with the left hand to get cured.

Q And you have been doing those kind of activities?

A I used to do those kind of activities. Sometimes I do try, I try to lift some, say, one pound, two-pound, three-pound I tried and sometimes I can, sometimes I cannot. Sometimes I can hold, sometimes I can't hold it.

Q So you said you usually do the graphic designing. When did you start doing the graphic design?

A I started my career maybe really I have started my life with graphic design in the year from since 1972. I used to do it by hand, draw, paints, ink, instrument, pencil and some brushes, inks, color. I was using those things before the computer come.

Q Did you have any problem doing those graphic design until September 2nd, 2011 accident?

A No, no, no.

Q Did you do any other activities beside the graphic design and painting?

A Here?

Q Anywhere before the accident?

A Before the accident in Bangladesh I did event management service, I had a company. Event management service company, advertising company and this too I used to run event company. I was used to run the company.

THE COURT: Event management company?

THE WITNESS: Yes.

THE COURT: You used to run the company?

THE WITNESS: Yes.

THE COURT: What was the second kind of company?

THE WITNESS: Advertising.

THE COURT: You had your own event management company and your own advertising company?

THE WITNESS: Yes, yes, yes, sir.

BY MR. BHURTEL:

Q And how did you like doing those kind of activities?

A Oh, I love it. I loved it so much. That's very real. That was my passion. For painting, is relative to the painting, designing and graphic designing, drawing and it is visual art, relative work I love, that's why.

Q Did you have any difficulties doing those activities now?

A Yes, I cannot do all these things now.

Q What difficulties do you have it?

A Difficulties when two hands used, some difficulties are there. Some days more. Little work I can do, very small work not heavy work. Graphic design when I do on the computer both hands we use, I can work 10, 15 minutes, 20 minutes, then I have to take a break for four, five, 10 minutes after and then I can go again for the work.

Q With respect your graphic design, did you try to do after the accident also?

A Yes, I tried.

Q When did you try?

A It was in 2013.

Q And how long did you try?

A I was trying -- I was trying with the company, I was trying to do something for me, I was trying with company. It was three, four months.

Q And when you were trying to do that one, it was with the difficulties or without difficulties?

A It was with the difficulties.

Q Did you try to do the event management also after the accident?

A After the accident, event, yes, I tried, I tried.

Q When did you try?

A This year, this year I tried, this 2016 only one event I tried to do, and I did it.

Q And you did it with difficulties or without difficulties?

A With the difficulties with the help of a son also.

Q When you were doing graphic design and worked with the difficulties, can you explain how long you were doing continuously or if you need --

A I am not doing continuously graphic design, it is

freelance, I told you earlier. I've been freelance. Sometimes I get job from my friends and when I got job then I do. Other than I do not do anything.

Q Did any doctor told you that you have a short-term memory problem?

A Yes, Dr. Krishna told me.

Q And did doctor explain to you what is that?

A He told me it is short time loss of memory, I have this problem.

Q Did you have that kind of problem?

A Yes, I do.

Q Did you have it before the accident?

A No. I have -- I don't have those problems before the accident.

Q And when did you have the start of this problem?

A After the accident. After the accident, I cannot say when, but after the accident happened. Slowly, over slowly not suddenly, it happened it's slowly after the accident.

Q Which pharmacy did you go to take pain medication with respect to your neck, head and shoulder?

A I have only one pharmacy Jamaica Pharmacy. I have only one pharmacy.

THE COURT: I have only one?

THE WITNESS: I have only one.

THE COURT: So you go there for everything?

THE WITNESS: I go from there everything.

THE COURT: You talked about seeing Dr. Sinha, Dr. Krishna --

THE WITNESS: Yes.

THE COURT: -- Dr. Jalal --

THE WITNESS: Yes.

THE COURT: -- and Dr. Lattuga --

THE WITNESS: Yes.

THE COURT: -- for pain and other problems you described as resulting from the accident on September 2nd, correct?

THE WITNESS: Yes, sir.

THE COURT: Did you see any of those doctors for any problems other than ones you say are caused by the September 2nd, 2011 accident?

THE WITNESS: Dr. Krishna stated only that I have some memory problem, short time loss of memory.

THE COURT: Yes. What I'm asking is a little bit different.

THE WITNESS: What is that?

THE COURT: When you say Sinha, Krishna, Jalal and Lattuga --

THE WITNESS: Yes.

THE COURT: -- was your treatment from them all for problems that you believe are from the accident?

THE WITNESS: Problem reduced?

THE INTERPRETER: No, can I try?

THE COURT: Sure. After September 2nd, 2011 you had certain problems that you've told the jury.

(Question translated.)

A No, I don't think I believe that other things, other things I went to Dr. Guha.

Q So if you were prescribed medication from Dr. Sinha, Dr. Krishna, Dr. Jalal or Dr. Lattuga, it was for the head, neck or shoulder problems you've been telling us about today?

A Yes, sir.

BY MR. BHURTEL:

Q You went to see Dr. Jalal Broadway Medical Care related to -- withdrawn that. To Dr. David who has sent you to the Dr. Jalal, right?

A Yes.

Q And it is one related to the head, your head, neck and shoulder, or something else?

A He is a neuro doctor, he is a neuro doctor. He is neurologist.

Q Dr. Guha?

A Yes. Dr. Jalal is a neurologist.

Q I think you testified already, but I want to clear the full name of the facility. Fidelity Physical Therapy and

Rehabilitation PTPC.

So in Fidelity Physical Therapy you also went to there?

A Yes, Dr. Jalal send me there.

Q And you went only for the which body part?

A The neck and shoulder part.

Q And they provided physical therapy there?

A They provide physical therapy.

Q You did not go for any other purpose there?

A No.

Q Do you remember that you had a surgery in New York Surgery Center, Queens, left shoulder?

A Yes.

Q And New York Surgery Center Queens located 464 --

A 31 Street.

Q -- Avenue, Long Island City?

A Yes.

Q There you went only for the purpose of your left shoulder there?

A Only left shoulder surgery.

MR. BHURTEL: Your Honor, the plaintiff offers trial, joint trial Exhibit 61, Bates number 2507.

MR. O'HARA: Your Honor, I will, as we talk off the record -- excuse me, prior to coming before the jury, I will stipulate as to the admissibility of all of the medical

bills that counsel is talking about that have been the subject of any testimony from Dr. Guha, Dr. Sinha, Dr. Lattuga, any of the medical providers as well as any of the facilities that provided care.

There is a wealth of documents he's trying to authenticate, I don't challenge their authenticity and he has now established all of that treatment relates to injuries that are alleged in this lawsuit.

THE COURT: And that's --

MR. O'HARA: There are of number of them, they're not in order.

THE COURT: They are not in numerical order?

MR. O'HARA: No.

THE COURT: So during the break we can stipulate that they can be admitted.

MR. O'HARA: Yes.

MR. BHURTEL: Yes.

THE COURT: Okay. Thank you.

And that's Exhibit 65?

MR. O'HARA: Yes.

THE COURT: Exhibit 65 is received in evidence. Counsel will work together either during the lunch recess or this evening to compose the documents.

(Joint Exhibit 65 was received in evidence.)

MR. O'HARA: Judge, I will also stipulate to the

records associated with the pharmacy charges that were incurred for the medicines that were prescribed for anything that is alleged to be related to the head, neck or shoulder.

Again, there are a number of Bates documents for medications that were prescribed to Mr. Ahsan that are not in numerical order, but again we'll work through it and I'll stipulate.

THE COURT: And we have sufficient record for counsel to discern which are which now?

MR. O'HARA: Yes.

THE COURT: Excellent.

Thank you. Go ahead, Mr. Bhurtel.

BY MR. BHURTEL:

Q Did you made a complaint with Dr. Krishna related to your head injury, headaches, dizziness, lightheadedness, difficulties focusing and some confusion?

A Yes, I did.

MR. BHURTEL: Your Honor, I complete the examination.

THE COURT: It's up to you, Mr. O'Hara, I can only give you 10, 15 minutes. If you want to get started, you may. If you want to wait until after the lunch recess, that's acceptable.

MR. O'HARA: As long as the jury is willing to wait another 15 minutes, I'll start.

THE COURT: Okay.

I will let you find your convenient breaking point between now and 12:30.

CROSS EXAMINATION

BY MR. O'HARA:

Q Good morning, Mr. Ahsan.

A Good morning.

Q You and I had a chance to speak yesterday in the hallway of the courthouse in the presence of your lawyer, right?

A Yes.

Q And one of the things that we talked about was, I was going to try to ask you questions in English, right?

A Yes.

Q And I told you that I would go very slow, I would use short sentences, and if I confused you at all, you would tell me and I would ask you another question, right?

A Right.

Q And we're going to try and do that. You and I are going to try and work through this in English and if you can't do it you are going to tell me, right?

A Right.

Q And there's a translator right next to you that if I ask you any question that has any word that confuses you, you're going to ask that translator, right?

A Yes, I can.

Q What is your full name, sir?

A Mostafa Raghib Ahsan.

Q You have used in your life different variations of your name, right?

A Different variation? Please clarify.

Q Sure. Sometimes you use Mostafa as your first name, right?

A Yes.

Q Sometimes you use Raghib as your first name? R-A-G-H-I-B?

A Yes.

Q Sometimes you use a name Vai V-A-I, correct?

A Why?

Q Vai. V as in victory, A as in apple, I as in intelligent.

A No. That is not the name.

Q Sometimes you use a name Ahsan A-H-S-A-N, correct?

A Yes.

Q Now Mr. Bhurtel just asked you questions about activities that you had trouble with and one of the things that you talked about was the computer, right?

A Yes.

Q You are very, very, very active on your computer, aren't you?

A I'm active?

Q Yes, sir. You are active on social media in a number of websites and social sites, yes?

A Yes.

Q And some of the screen names you use are Raghib Ahsan, yes?

A Yes.

Q Sometimes you use Raghib Ahsan with a number, yes?

A Yes.

Q Sometimes you use Mostafa Ahsan with a number, yes?

A Yes, it's computer advise me to use those numbers with my name, that's why I took this number from the computer.

Q I'm not questioning why, I'm just establishing that you do it, right?

A Yes.

Q And you do it on a number of what we know today are social media sites like Facebook?

A Uh-huh.

Q Yes?

A Yes.

Q And you are very, very active on Facebook, aren't you?

A Not very much.

Q You post photographs of yourself --

A Yes.

Q -- on Facebook? Yes?

A Yes.

Q You post updates about things in your life? Updates meaning if something happens that is of interest, you write down on the computer --

A Sometimes.

Q -- information, yes?

A Sometimes.

Q And you share information with different friends of yours on Facebook?

A Yes, sometimes.

Q A lot, don't you? Yes?

A A lot?

Q You do that a number of times each week, don't you?

A Yes, yes.

Q And not only do you post things that you put into the computer, but sometimes you take things that are sent to you and you put them on your Facebook page?

A Yes.

Q Yes?

A Yes.

Q And when you do that, so that everybody understands, you do it in a public setting. In other words, you allow people that have access to Facebook to see your pictures, yes?

A Yes.

Q And people that are friends with you that share pictures of you, in their Facebook pages that are public, that's for all of us to look at right now?
A Yes.
Q I'm going to come back to that after the lunch break because that's going to take us a while.
Let's talk a little bit about September 2nd, 2011. Okay?
A Yes.
Q You were asked questions about how the accident happened and where you were in aisle number 8. Do you remember those questions?
A Yes, yes.
Q And you talked about that, in using Exhibit 117B, that you were shopping on this picture -- I'll show you. You can stay there.
You were shopping on the left-hand side of this exhibit, yes?
A Yes.
Q And you were facing towards the paper products that were on the left-hand side of that aisle, yes?
A This side.
Q Watch the microphone.
A This side. This side was my behind.
Q When you say your behind, you're talking about you're

facing away from what is all on the right-hand side of this picture, yes?

A Yes.

Q And you were looking at products that were on the shelf that were on the one side and there was another aisle directly behind you, yes?

A Yes.

Q You can sit down.

And the aisle that we're talking about, just using counsel table and the jury box --

A Yes.

Q -- was about how wide, six feet, eight feet, 10 feet, what would you estimate it to be?

A Estimation is around six feet.

Q About six feet wide?

A Yes.

Q And when you were shopping on the left-hand side of this aisle, you were looking for, you said, computer products or paper products?

A No.

Q What were you looking for?

A I was looking for some like pen holders, pen cardholder, trays, something like that.

Q And items that were -- that you identified as were depicted -- strike that. The items that you said were on

the other side of the aisle, they're in the picture that you're talking about, 117B, which look like note pads and folders?

A Note pads.

Q Note pads?

A Note pads.

Q Let me show you that we will use later in the trial that are marked as Defendant's 1A and Defendant's 1B.

MR. BHURTEL: Your Honor, can I have side bar?

THE COURT: Not yet, no.

BY MR. O'HARA:

Q Okay. And I want you to read to yourself what this says. And if you need help with the translator, please help him.

A I can do it.

MR. O'HARA: He can read, he said he can read it. Let him read.

A Yes, I read. Yes.

Q And you know, now having read that, what those items are correct?

A Yes.

Q And I want you to tell me whether you remember in the picture that you've shown the jury that you took to make sure that you had a record, whether the types of items that are on display on the right-hand side of the picture are the

same types of items that are in the two packages that I've marked Defendant's 1A and the Defendant's 1B, you will agree with me that they are similar, aren't they?
A This box, this paper?
Q These two -- let's make it --
A These?
Q No. Let me just tell you the two-pocket translucent poly report covers are the type of items that were on display on the right-hand side of the picture, not what you were shopping for, but what was behind you. That's true, isn't it?
A Hmm.
Q Yes?
A This side.
Q You're --
A I was not shopping, I was looking at the products.
Q I understand. You were looking at the price --
A Yes. I said price, yes.
Q Say again?
A Products.
Q Products and price?
A Right.
Q The products and price that you were looking on was the on the /HR*PBDZ -hand side of the picture, yes?
A Yes.

Q And what I just want you to tell me, yes or no, the type of items that were on the shelf behind you that you weren't shopping for that you described were behind you, are the type of items that we've marked Defendant's 1A and Defendant's 1B, two-pocket translucent poly report covers, things like that. Yes?
A Where?
Q Yes?
A Behind me?
Q Yes?
A On the shelf?
Q On the displays, not on the shelf?
A On the displays?
Q Yes.
A I did not remember now.
Q You don't remember now?
A No. Because I have not seen properly this. I don't remember at that time if I have seen or not. I had the concentration on the products I used to buy.
Q And may I ask you a question about that. To come into that aisle you had -- had you been to the store before?
A Yes. I was there.
Q And you knew that there were certain types of products that were located in the store in different aisles, right?
A Yes.

Q And when you went to this aisle, had you been in that aisle before?

A That day I was, I went in the aisle. I was in that aisle.

Q You had been in that aisle before?

A Before also.

Q And so you knew what types of items were on display in that aisle, yes? Not everything but types of items.

A I know, I know, but they used to change time to time.

Q Sometimes from time to time they do change items.

A Yes.

Q My question is, when you went to the store just like now, you know the types of items that are in the aisle that you were going to, right?

A Today if I go, I can understand today. If I go yesterday maybe I do not remember yesterday.

Q Maybe not, but maybe you do, that's what I'm asking.

A Yesterday if they change, I cannot remember this.

Q If you assume they didn't change because, that's why you took the picture --

A No --

Q Wait a minute.

A -- this is not that picture. This is similar to the aisle and the top.

Q I'm sorry, are you finished?

A Yes.
Q I'm going to ask you questions, I'm not going to argue with you.

You took the picture because it was similar to the items that were on display the day that you were there, yes?
A The place is similar, the shelf is similar, the picture perhaps may not be similar, may be similar.
Q And you testified on direct examination at length that the boxes were similar, right?
A Boxes on the top.
Q And the items below the boxes, do you know what's on the shelves below the boxes in the aisle?

THE COURT: In the picture or in the aisle where the accident occurred?
Q Let's do both. In the picture do you know what's in the shelves on display under the boxes on the top shelf?
A Under the boxes?
Q Yes, sir. All of these things that you pointed out that were behind you, that you showed a picture that you said was similar to September 2nd, 2011, do you know what types of items are there?
A In the box? In the box?

MR. BHURTEL: Objection.
Q On the shelf, sir?
A On the shelf?

Q On the shelf?

THE COURT: There is an objection.

MR. BHURTEL: Objection. The question was similar. My question on the direct exam was similar only the top of the box, I did not ask the questions --

THE COURT: Ladies and gentlemen, have a nice lunch hour. I won't be able to be back with you until about 2:15. I'm sorry I have to give you such a long break.

JUROR: I didn't hear the time.

THE COURT: 2:15. I have a matter from one to two and if I don't eat something I'll be very grouchy this afternoon, even grouchier than I usually am.

Enjoy your lunch hour. We will see everybody again at 2:15.

(Jury exits.)

(In open court; jury not present.)

THE COURT: Mr. Bhurtel, why did you want a side bar? Is it still pertinent? Do you still want to raise the matter that you asked for a side bar about?

MR. BHURTEL: Yes, Your Honor.

THE COURT: What is it?

MR. BHURTEL: I asked the questions about the boxes are similar at the time of the direct examination and the counsel is now asking the witness the other items.

THE COURT: I understand.

MR. BHURTEL: So --

THE COURT: So it's up to the witness to explain, not you.

MR. O'HARA: If we're going to have an extensive discussion I would ask the witness to step out.

THE COURT: I am not.

MR. O'HARA: Thank you.

THE COURT: Is there something you wanted to say?

MR. O'HARA: No, sir.

THE COURT: You asked for side bar before those questions were asked, if I recall correctly, maybe I don't.

MR. BHURTEL: Yes.

THE COURT: Was there something else you wanted to bring up.

MR. BHURTEL: No.

THE COURT: Okay. Good-bye. Thank you, everybody.

MR. O'HARA: Thank you, Judge. You said 2:15?

THE COURT: I'll try to get here a little earlier but it's hard for me to predict exactly how long this is going to take.

(Luncheon recess: 12:30 p.m.)

(Continued on the next page.)

A F T E R N O O N  S E S S I O N

(2:20 p.m.)

(In open court; jury not present.)

THE COURT: I had a very emotional session over lunch. All right.

MR. BHURTEL: I apologize, Your Honor, I did have one issue to discuss with the Court earlier, I forgot.

THE COURT: Is it important that we do it now instead of after the jury leaves?

MR. BHURTEL: Those boxes, those sample boxes the defendant is using.

THE COURT: Yes.

MR. BHURTEL: These are the -- it was never disclosed during the discovery and I just saw it today. And I believe the Court made a ruling last time that the defendant has to produce by Friday and defendant notified me that they're not going to use it.

MR. O'HARA: Well, but I gave it to counsel before the questioning and he didn't tell me he had a problem with it. And I'm not offering it into evidence, I'm doing the exact same thing, which is it's an exemplar, and I can't undo what he allowed me to do for the 20 exam and I showed it to him when we first got here this morning.

THE COURT: Did you ever bring it up with defense counsel after last week? Because I thought what I had ruled

was that they had to make it available to you.

MR. BHURTEL: Right, yes.

THE COURT: Did you call them and ask to see it?

MR. BHURTEL: No, no -- yes, we scheduled to see it Friday and Ms. Laura she notified me saying that we decided not to use it. I think there is in the since also of leverage there, I don't know if they were ever filed with the Court but Friday -- there was a due date on Friday to give it, and then we were talking and she told me that we decided not to pursue --

THE COURT: Okay.

MR. BHURTEL: -- not to disclose. I think something is written saying that --

MR. O'HARA: I will stand by whatever my office has written about any topic in the case. These are exemplars.

MR. BHURTEL: That's why --

MR. O'HARA: There are CPC codes. We have been trying to get the actual box in which the actual items are shipped; could not be done. So I am going to use simply exemplars.

I brought them to counsel's attention, whether he saw them on Friday or this morning, if he had a problem with it all he had to do was tell me and I never would have gone down the path of showing -- I wouldn't have, that's why I

showed them to him.

THE COURT: I haven't seen you show him any boxes.

MR. O'HARA: I showed the witness the exemplar, folders.

THE COURT: That's what we're talking about?

MR. O'HARA: Yes.

THE COURT: I thought you were talking about a box.

MR. O'HARA: No.

THE COURT: Those have already been put before the jury.

MR. O'HARA: Exactly.

THE COURT: No, no, no. I'm overruling your objection, but, but if you feel unfairly surprised in any way, I will allow you to postpone your redirect or to save 15 or 20 minutes of redirect time until tomorrow so that if you want to talk to your client about anything that came out today in connection with those exemplars, and prepare your examination more thoroughly now that you've seen them and understand how Mr. O'Hara's used them, you can call Mr. Ahsan back to the stand tomorrow and supplement his testimony after seeing what's gone on and you don't have to address the subject of this material tonight.

MR. BHURTEL: And one more thing, Your Honor, and these boxes are not exactly the boxes which means --

THE COURT: You can certainly bring that out in your redirect, if you feel that it's left in any way unclear or even merits repeating, in your redirect.

MR. BHURTEL: And Mr. O'Hara he did not tell me that he's going to use these boxes to my client. My understanding was he was going to use to his witness, so that's why I was waiting, and then that's why I just -- before he was bringing to the witness.

THE COURT: I don't think he has a duty to tell you what he's going to show your client, but I will reiterate, that I will permit you, even though we anticipated finishing your client's testimony today, if you feel in any way unprepared to address Mr. O'Hara's line of questioning about these exemplars, you may work with your client tonight or tomorrow morning to prepare what you think is appropriate to ask him and investigate with him what his answers would be, the way a lawyer is perfectly not only entitled to but expected to do, and you can recall your client tomorrow morning to address the testimony.

Now with respect to the record, I just want to make it clear for the record that although we keep referring to these as boxes I would not use that word to describe them. They are, in fact, a folder of some kind that is wrapped in cellophane. It is not in a cardboard box. There appear to be what, five to 10 folders.

MR. O'HARA: So there are 25 two-pocket translucent poly report cover units. And what they are, these are the type of folders that students purchase in aisle number 8 for school supplies.

THE COURT: The exemplars are not in a cardboard box, they are in cellophane wrapping.

MR. O'HARA: Correct.

THE COURT: And the two are identical?

MR. O'HARA: Yes.

THE COURT: Are we ready for the jury?

MR. O'HARA: Yes, Your Honor.

Judge, should the witness go back to the stand?

THE COURT: Mr. Ahsan and the interpreter, please return to the witness stand.

THE WITNESS: Thank you.

THE COURT: Mr. Bhurtel, do you also intend to call Ms. Ahsan today?

MR. BHURTEL: I believe, Your Honor.

THE COURT: Is she here?

MR. BHURTEL: Yes, she's here.

MR. O'HARA: Carlos Urena is also here.

THE COURT: Okay, great.

(Jury enters.)

THE COURT: Good afternoon, everyone. I'm sorry I had to make you wait so long. I was not playing golf. I

was in court.

Mr. O'Hara, you may inquiry. Mr. Ahsan, Mr. Rahman.

THE INTERPRETER: Yes, Your Honor.

THE COURT: You are both under oath, I just remind you.

MR. O'HARA: Thank you, Your Honor.

CROSS EXAMINATION (Continued)

BY MR. O'HARA:

Q Mr. Ahsan, when you were talking to the jury this morning about the accident, you talked about both the aisle that you had been shopping in, which was aisle number 8 and you also talked about where the Staples employee that was working that day was located. Do you remember that?

A I remember that.

Q In the photograph that's marked 117A, that actually shows the ladder that you saw the employee working on after the incident, yes?

A Right.

Q In order for you to know that -- first, that was a different aisle than where you were shopping, right?

A Yes.

Q So if we use the numbers, you were shopping in aisle number 8, looking at the display, and in aisle number 9, which was on the other side, that's where you walked around

to find the ladder and the employee, yes?

A No.

Q How did you get to the employee where he was working? Did you have to walk out of aisle 8 or was he in aisle 8?

A No, nothing.

Q I don't understand.

A I have not gone to aisle 9 by walking or I have not done it. I was standing over there when it was done.

Q So did the employee walk over to you?

A No.

Q Okay. Now let's take a giant step back. That day when you came to the Staples store, how did you get there?

A Excuse me?

Q When you came to the Staples store that day to shop, how did you get there?

A By walk.

Q You walked?

A Yes.

Q And the distance from where you were coming to the store took you about 20 minutes to walk, yes?

A Yes.

Q And then after the incident happens --

A Yes.

Q -- after the boxes came off the shelves, there came -- you spoke to the employee who you had seen on a ladder, yes?

A I seen the employee on the ladder.
Q You talk to that person?
A No.
Q At some point you talked to the general manager of the store, yes?
A Yes.
Q He asked you questions about what had happened, yes?
A Yes.
Q He asked you how you were feeling, yes?
A Yes.
Q He asked you whether you needed a medical doctor, whether you wanted an ambulance called, yes?
A Yes.
Q And you answered every single one of his questions truthfully, yes?
A Yes.
Q And at the time that the boxes struck you, you were the only person that was shopping in the aisle, yes?
A Yes.
Q And we've been litigating this case for a number of years, you don't know of anybody else that actually saw those boxes hit you, do you? You don't know of anybody, yes?
A No, not true.
Q You think that there's someone that actually saw the

boxes hit you?
A Yes, I think so.
Q Okay. To your knowledge, in this case, has any witness said that they actually saw the box hit you?
A Excuse me?
Q I'll ask you a different question. I'll move to a different area.

In addition to answering questions that were asked you by the general manager -- strike that. When the boxes hit you did they knock you to the ground, yes or no?

(Question translated.)

A No.
Q When the boxes hit you, did they knock you unconscious? Did you lose consciousness, yes or no?
A I should explain.
Q I'm sorry?
A I should explain it.
Q No, you should answer, yes or no. Did the boxes knock you unconscious?

THE COURT: Can you give an honest answer by answering yes or no?

A I was not fully unconscious.

THE COURT: Not fully unconscious.

BY MR. O'HARA:
Q Did you lose consciousness on September 2nd, 2011, as a

result of the boxes hitting you, yes or no?

A No.

Q I'm sorry?

A No.

Q When the boxes hit you, wherever they hit you, did they cause any bumps, bruises or cuts, yes or no?

A No.

Q After the boxes were on the ground, you never picked them up, did you?

A No.

Q You never -- you did not touch them at all, did you?

A No.

MR. BHURTEL: Objection to the form, Your Honor.

THE COURT: Objection to the form?

MR. BHURTEL: Yes.

THE COURT: Overruled.

MR. BHURTEL: And one more thing, Your Honor, he did not mean the boxes touches him.

THE COURT: So he said after the boxes fell to the floor, was the question, correct?

MR. O'HARA: Correct.

THE COURT: You understood that the question was not did the boxes hit you on the way down, it was after the boxes were on the floor and you had already been hit, did you touch them at that point?

THE WITNESS: No, sir.

BY MR. O'HARA:

Q After the general manager asked you questions and you answered all of his questions, you walked out of the store, yes?

A I walked out of the store after saying to the -- after a discussion with the general manager.

Q Yes, sir. I just want -- we've talked about you spoke to the general manager, I just want to make sure everybody knows that in order to leave the store, you walked out?

A Yes.

Q And then to get to Dr. Guha's office you didn't drive there, did you?

A I don't drive.

Q You don't drive?

A Yes.

Q And you mentioned during your direct testimony that you actually had to call your daughter on a telephone, correct?

A Yes.

Q And the telephone that you called her on was it a touch tone phone? Do you understand what that means?

A Yes, touch phone.

Q And to dial her number you had to open the phone or whatever type of phone you had --

A No.

Q -- and dial in her number?
A No, just her name.
Q And so you had to recall her name, what her name was, look at your phone and then dial the phone to tell her that something had happened?
A Yes.
Q Yes?
A Yes.
Q You were able to do that, right, yes?
A Yes.
Q Now when you spoke to the general manager at the store and described the incident, you told him the truth about what happened, yes?
A Yes.
Q You told him that the boxes hit the back of your neck and that's what was hurting, yes?
A Boxes hit?
Q Yes. When you spoke to the general manager, did you tell him where the boxes hit you?
A Yes, I told him.
Q Where did you tell him that the boxes hit you?
A Like exactly I cannot recall, but I had said, you know, on the neck I believe.
Q Okay. Now where the boxes hit you has been a question that other people like lawyers and doctors have asked you,

yes?

A Yes.

Q And sometimes you have said the boxes hit you in the neck, other times that you've said the boxes hit you in your head, and other times you said the boxes have hit you in your left shoulder, yes?

A Yes.

Q Do you remember when you went to Dr. Lattuga, the doctor that testified yesterday, being asked to fill out forms that are now in evidence?

A Uh-huh.

Q Do you remember doing that?

A Yes.

MR. O'HARA: Judge may I?

THE COURT: You may approach.

MR. O'HARA: Thank you. These are in evidence so I'm going to ask that they be pulled up for the jury but before doing so I want to make sure that this is.

Q So we have two documents that we've been talking about. First look at this, the patient history form. Do you see that? Do you see what I'm talking about up top?

A Yes, I see.

Q It's marked 1985 and 1986. Do you see that?

A Yes.

Q And on the second page of this document it has your

name and your signature?

A Right.

Q Yes?

A Yes.

Q Okay.

MR. O'HARA: Can you pull this up now, please?

THE COURT: Everybody can see, right?

Mr. Bhurtel, these are in evidence?

MR. BHURTEL: Yes.

THE COURT: All right, everybody can see them as long as they are in evidence.

MS. KRAL: Bates number?

MR. O'HARA: Bates numbers are 1985, 1986 and then 1989. And that's my file copy, Judge. These are in multiple locations so I may be citing the wrong number, but I promise you these are in evidence.

Q For the first document let's read -- we can pull it up. Ali, can you highlight it, make it yellow?

THE COURT: Is this a comfortable angle for you?

THE WITNESS: Yes.

BY MR. O'HARA:

Q Can you tell the jury whether in writing down what happened exactly whether you said that the boxes struck you in the head, yes or no?

A No, I did not mention here.

Q You did not mention that the boxes struck you in the head there?

A Yes.

Q You did not mention that the boxes struck you in neck there either, did you?

A Yes. No, I did not.

THE COURT: Is that your handwriting?

THE WITNESS: It is my handwriting.

BY MR. O'HARA:

Q Let's go to the second page just so the jury can see it.

Do you see the top of the picture that has a circle? It's easier if you look right here, I will circle it for you?

A Yes.

Q And where did you color in the boxes striking you, the back of your neck?

A Yes.

Q And your shoulder area, yes?

A Yes, yes.

THE COURT: Is that your circle?

THE WITNESS: This is my circle.

BY MR. O'HARA:

Q You have to speak louder.

A That is my circle.

Q And then let's go down to the bottom of the page.

THE COURT: Everybody's screen is working? You can all see?

MR. O'HARA: I want you to see the notice of patient privacy and HIPAA, down the bottom is his signature.

THE COURT: That was not a question, that was a instruction to your aid, for the record.

MR. O'HARA: Yes.

Q The section that we pulled out on this document, that is your name and that is your signature, yes?

A Yes.

MR. O'HARA: May we move to what is identified as Pain Management Intake History and Physical form, which is Bates number 1989, at least in my work file.

Q In this document you went to see Dr. Lattuga's office later, about eight days later on September 19th, 2014, yes?

A It's a little off.

THE COURT: Say it again.

Q You went to Dr. Lattuga's office to see another person at New York Spine Specialists on September 19th, 2014, yes?

A Yes. Written there.

THE COURT: Yes, it's written there, is that what you said?

THE WITNESS: Yes.

THE COURT: Try to keep your voice up so everybody

can hear you.

THE WITNESS: Okay.

BY MR. O'HARA:

Q Again, there's -- do you see give details of occurrence.

Can you highlight and bold that, please?

A What is that please?

Q Right there, that's good.

A Yes.

Q Just wait, I haven't asked a question yet. Okay.

Do you see the section that's been bolded and yellowed it says, give details of occurrence. Where did you describe the box striking you when you wrote it on this second form?

A Yes.

Q You wrote your left shoulder is where the boxes struck you, yes?

A Yes.

Q You did not write on this second form that the box struck you in the head?

A Uh-huh.

Q Yes?

A Yes, but I --

Q I haven't asked a follow-up question. If you can't answer yes or no tell me and I will --

A Yes, I do.

Q And you did not write that it struck you in the head, yes?

A Yes.

Q And you did not write that it struck you in the neck, yes?

A Yes.

Q Now one of the things that you talked about in this case and testified about is that you have problems with short-term memory, meaning things that happen -- strike that. You have said you have problems with your ability to recall memory in the short-term, yes?

A Yes.

Q You were deposed, a lawyer asked you questions under oath two times in this case, yes?

A Two?

Q Yes, two depositions?

A Two depositions.

Q Yes?

A Yes.

Q I'm going to give you a copy of each one of your transcripts so that you have them in case you need them, okay?

The first transcript, your deposition was taken on February 3rd, 2015, yes?

A Yes.
Q The second deposition, your testimony was taken on June 5, 2015, yes?
A Yes.
Q After the first deposition you were given the chance to read it to make sure that you, to your memory, the transcript was right. That the answers in the transcript were right, yes?
A Transcript?
Q Let me ask it differently. After the questions were over, the book that's in front of you, the deposition, was given to you so you could read it, yes?
(Question translated)
A (Through interpreter) Yes.
Q And did you that. You sat down with the transcript, read all of the questions and all of the answers to make sure they were right, yes?
A Yes.
Q And for the first transcript you actually wrote out or somebody typed out for you, all of the different answers that you thought were wrong or needed to be changed, yes?
A Yes. This, when I did this, then I --
THE COURT REPORTER: I'm sorry, I didn't hear it.
THE COURT: "When I read this I thought the answer" --

THE WITNESS: When I did this --

THE COURT: Wait, wait, wait.

-- "was not correct and I did this." Is that what you said?

THE WITNESS: Yes.

BY MR. O'HARA:

Q And when you say when I thought it was not correct I did this, you created what we, as lawyers, call an errata sheet, you had typed out all of the mistakes in the transcript and you then signed the sheet, yes?

A Yes.

MR. O'HARA: And for Bates stamp number it's 34 in the transcript, Your Honor, if necessary -- it's his sworn testimony.

Q And you did this on March 24th, 2015, yes?

A Yes. This my initials.

Q Yes?

A Yes.

Q And that was five or six weeks after the February 3rd --

A Yes.

Q -- 2015 deposition, yes?

A Yes.

Q Short period of time, yes?

A Short period of time.

Q Yes?
A Yes.
Q Before other activities that you liked to do that were physical, did you participate in any sports?
A In Bangladesh I did.
Q Tell the jury what sports you participated in -- and when you say -- I'm sorry --
A In Bangladesh.
Q Bangladesh?
A Yes.
Q My mistake. Tell the jury what sports you participated in in Bangladesh?
A It was -- I used to do friendly games with friends badminton.
Q I'm sorry, I didn't understand.
A Not nothing tournament --
Q You played badminton?
A Nothing tournament. Just played badminton maybe once a week, twice a week. It's only in the winter not regular.
Q All I asked was what sports you played in Bangladesh.
You were a badminton player in Bangladesh, yes?
A I am.
Q You were a badminton player in Bangladesh?
A Not player it was just time passing game, not player.
Q I don't understand.

A I am not a player, but for time passing I did sometimes.

Q So it was a recreation, fun thing that you did?

A Yes, for fun.

Q You were not a professional?

A No.

Q But it was something that you played a number of times per week, yes?

A Number of times for week in the winter only, not round the year.

Q And it's something that you enjoyed doing, yes?

A I did it maybe one year, maybe once, one year maybe one season, I did it. Not second season.

THE COURT: Only one season.

A One season I did it, maybe not.

Q When you play badminton, you would play with your friends, yes?

A Yes, yes.

Q And you would play against other friends, yes?

A Not like that. It was just fun game. It's not tournament. It's not like win and loss game, that's tournament. It was just playing.

Q It was for fitness, to keep healthy, to stay active, yes?

A I'm not -- I did not play like for that. I just play

for fun.

Q You played for fun?

A Yes.

Q And badminton is a game that you swing a racket sometimes over your head, sometimes underneath, yes?

A Yes.

Q And sometimes you hit with your right hand and sometimes you hit with your left hand --

A No.

Q -- yes?

A No left hand.

Q You sure?

A No. Sure. No left hand. No left hand, never left hand.

Q Never?

A Never.

Q Now you testified on direct examination that your passion since childhood was painting, yes?

A Yes, painting.

Q It's something that you've continued to do up through the present, yes?

A Sorry?

Q You continue to do it up until today you still do it? Yes?

A Yes, today I still do.

Q And you're very talented, yes?
A Talented? I cannot say myself as talented. I can draw.
Q Other people have told you that you're a talented artist, yes?
A Definitely.
Q And you testified -- and I want to make sure I wrote this down correctly -- the way that you paint is you see something that is of interest to you, you memorize it, then you go back to your canvas and you paint it, yes?
A Yes. Sometimes, not all the times.
Q And that's something that you did before the accident, yes?
A Before the accident?
Q You did what I just said, you would see something, go through the process to get, think about what it was and you painted it before the accident, yes?
A Yes, I did.
Q And have done that after the accident too, yes?
A After the accident?
Q Yes.
A What?
Q You have looked at something --
A After the accident, I did painting.
Q Yes.

A Yes.
Q A lot of paintings, yes?
A Not lot, not lot.
Q How many?
A Hmm?
Q Enough to have an exhibition of all of your works, 32 works in November -- let me make sure I get this date right. From November 7, through November 20, 2015, there was a solo exhibition of your works --
A Yes.
Q -- in New York?
A Yes.
Q And many of the works that were on display you had just done, meaning they were new paintings, yes?
A Not all new paintings.
Q We can talk about the other things, let's first stay with the paintings.

There were a number of new paintings that you put on display in November 2015, yes?
A Yes, yes, some of them.
Q What else was on display that, as an artist, you created in that exhibition?
A Yes.
Q Tell the jury.
A What -- question again?

Q You said that there was not only paintings, there were other things on display, yes?
A No, only paintings.
Q I'm misheard you, my mistake.
THE COURT: I think the testimony was not only new paintings, Counsel, if that helps you formulate your next question.
MR. O'HARA: Thank you.
Q Now I talked before the break about your social activities on Facebook, yes? Do you remember that?
A Yes, I remember.
Q And you have a practice of putting pictures of yourselves -- pictures of you, either alone or with friends on your Facebook page periodically, yes?
A I'm not a practice, I'm not practice to post my pictures. Maybe once or twice in a year I can do that, not regular. It's not regular pictures.
Q I'm going to ask you some questions, see if I can refresh your memory about some of the things that you are posting on your Facebook page.
So do you remember posting photographs of yourself looking up at the skyline of Times Square on September 23rd, 2012?
A That is not by me.
Q Fair.

Are you aware of a photograph that shows you gazing up at the sky or the skyline in Times Square on September 23rd, 2012?

A Can I see the picture?

Q Sure.

First, before you say anything about this picture, do you recognize the photograph that is depicted in trial Exhibit 4668, yes?

A Yes.

Q And is this a photograph that was taken of you in Times Square?

A Uh-huh.

Q You have to say yes or no.

A Yes.

Q It shows you gazing up at the skyline, yes?

A This is I was looking at some signs not skyline.

Q Fair. With that change, you are looking up at the sky?

A Huh.

Q You're looking up at the signs?

A It's midnight. It was at midnight, I cannot see the sky. I was looking at the lights of Times Square.

Q Yes. And if we flip to the next page, there's another picture of you doing the same thing smoking a cigarette, yes?

A Yes.

Q And this picture is an accurate copy of what is on a Facebook page showing you gazing at signs, yes?
A Yes.

MR. O'HARA: Judge, in the defense case I'm going to offer this into evidence, and if the Court will allow me I would like to display it to the jury.

A I have to say something about this picture.

MR. O'HARA: I will let you do that. First I have to let the judge tell me what to do.

THE COURT: You can show it to the jury now. Any objection?

MR. BHURTEL: Yes, Your Honor, it was not disclosed before.

MR. O'HARA: It's an admission by the plaintiff, it's on his Facebook page today.

THE COURT: Objection overruled.

I take it it's only being offered for impeachment?

MR. O'HARA: Yes, sir.

THE COURT: Go ahead.

MR. O'HARA: Please pull up 4668 and 4669. Ali, make sure we know the first one.

Just so the record is clear, the jury is now being shown your face -- a Facebook picture of you in Times Square looking at the neon signs around September 23, 2012, yes?

A Yes.

THE COURT: Well, do you know when the picture was taken?

THE WITNESS: Yes, this is night.

THE COURT: I know it's nighttime, what year was the picture taken?

THE WITNESS: One of my friend took this picture.

THE COURT: Does that date sounds right to you, September 23rd, 2012?

THE WITNESS: This picture when took, no, maybe this time is not okay, but this posting went on by this gentleman 12th of September.

BY MR. O'HARA:

Q This picture was taken after the incident at Staples, yes?

A Yes, after the incident taken.

MR. O'HARA: Can you show the next picture, please.

Q This is a second picture, for the record 4669, which shows you in Times Square that same night, yes?

A Yes.

Q You're visiting the Poet's Kitchen around January 19, 2013 to meet with a poet by the name of Sohel Amitabh. I may be pronouncing that wrong.

A Yeah, okay.

Q Can you pronounce that for me?

A Amitabh.
Q S-O-H-E-L?
A Amitabh.
Q A-M?
A Sohel.
Q S-O-H-E-L A-M-I-T-A-B-H, yes?
A Yes.
Q And do you remember being there and the photographs that were taken showing you engaged in conversation with --
A With him.
Q With him?
A Yes, I remember.
Q Tell us about the Khuluna Prawn Fishing Factory. What is that?
A What's that?
Q Khuluna Prawn Fishing Factory K-H-U-L-U-N-A. Prawn, P-R-A-W-N, Fishing Factory that you visited with others around March of 2014. What is that first?
A That is fish factory.
Q And you were visiting there for purposes of meeting with or visiting with U.S. buyers, yes?
A Yes.
Q And what is your relationship with the fishing factory?
A No relation.
Q You were there to meet with buyers, but you have no

relation with the factory?

A No relation, just like contact him, contact them, then I go there for meeting.

Q And what was the purpose of the meeting?

A Somebody told me to buy, buy some shrimps from Bangladesh.

Q By some what?

A Buy some shrimps from Bangladesh, and that's why I went there.

Q So you went to Bangladesh --

A Yes.

Q -- for a meeting to help to put together --

A Not --

Q -- a buyer?

A Not for a meeting. I went as a visit.

Q You went to visit.

A Yes.

Q Let me get this question out. You went to visit Bangladesh --

A Uh-huh.

Q -- to help to put a U.S. buyer --

A No.

Q Just let me get the question out.

You went to Bangladesh to help to get a U.S. buyer and the Khuluna Prawn Fishing Factory together to see if

they might be able to do business together, yes?

(Question translated)

A (Through interpreter) No, I did not go to help the buyer, I just tried may be, you know, I can help.

THE COURT: What was the purpose?

THE WITNESS: Exactly the answer is I just -- I went to visit Bangladesh that time I tried to get them -- get to have some -- if I make some business, I can make some business with U.S. and Bangladesh, that's why I went to them. And some buyers here they wanted to buy some fish and I told them I can try for you. That's why I had a meeting with them.

Q Understood.

And on this web page there are photographs that actually show you in a number of settings in the warehouse.

A It's a factory.

Q Okay, the factory.

And all of the people that are in the factory, there are three people in the photographs, yes?

A Yes.

Q And one of the people -- and I'll just focus on these two pictures for now. One of the people in the photograph, which is 4677, and the other photograph 4678, that's you, yes? That's you, and that's you, yes?

A Yes.

Q And at least in photograph 4677, you are reaching out with your left arm behind this gentleman to do something with these boxes of excellent shrimp, yes?

MR. BHURTEL: Objection to the form, Your Honor.

THE COURT: To the form?

MR. BHURTEL: Yes.

THE COURT: Overruled.

A My left hand?

Q Yes. See this is your right hand and your left arm is behind that gentlemen, yes?

A This is dark I cannot see anything.

Q I'm sorry?

THE COURT: Repeat your answer, please, sir.

THE WITNESS: This is looking dark, I cannot see properly.

THE COURT: You cannot see what your left hand is doing?

THE WITNESS: Yes, I cannot see it. This is shade I think.

THE COURT: It's in the shade.

MR. O'HARA: Okay, let's move on to some more pictures then.

Q Do you remember visiting Alexandria, Virginia --

A Yes.

Q -- with some friends around August 9th, 2015?

A Yes.

Q And around that time you visit and you were on the patio or porch or deck of somebody's house and you actually took a selfie photograph that was posted on your Facebook page, yes?

A Uh-huh.

Q Yes?

A Yes.

Q And the document that's been marked 4681, that's you with your two friends in the picture, yes?

A Yes.

MR. O'HARA: I would offer that into evidence, Your Honor.

MR. BHURTEL: No objection except the date, Your Honor.

THE COURT: Except the date?

MR. BHURTEL: Yes.

THE COURT: What's the objection to the date.

MR. BHURTEL: Whether that particular date is the correct date or not, August 9, 2015.

MR. O'HARA: I'll modify the question.

Q On or around August 9, 2015.

A Yes. On or around.

MR. BHURTEL: No objection.

THE COURT: That is received in evidence, it may

be shown to the jury.

(Defense Exhibit 4681, was received in evidence.)

Q Just so we're clear, that's you taking a selfie picture of you and your two friends?

A Yes.

Q That's you writing the three stooges in Virginia?

A Yes.

Q I know we all write things about our friends.

THE COURT: Are we done with the exhibit?

MR. O'HARA: I'll move back. You can take that down. Yes, my apologies, sir.

Q Now we talked a little bit about your solo exhibition at the New York Art Council from November 7 through November 20, do you recall?

A Yes.

Q And that art exhibition required you to actually be there as the host talking to people about your artwork, yes?

A This is the first day, opening day. Opening day I need to go there.

THE COURT: I'm sorry, I didn't understand the answer.

A The opening day of the exhibition I need to be present there.

Q You were very proud of this day, yes?

A I was?

Q Yes. Were you very proud to have your artwork?
A I was very -- not prouded --
(Through interpreter) I was very happy.
Q Many of your pieces of art were on display from 10:00 o'clock in the morning until 9:00 o'clock at night from November 7th through November 20th, yes?
A Yes.
Q And part of what you did for that exhibition is you actually went to it to talk to people about what you were displaying, yes?
A It's only for the first day and last day and maybe in the middle of the exhibition is one day not every day.
Q Okay.
When you describe the artwork that you had on display on your Facebook page, was there a difference if you wrote new painting by me, my new painting, new painting by me for exhibition, or painting for exhibition? Did you mean something different or?
A New painting and exhibition painting, new painting and painting, new painting I mean -- just specify your question, please.
Q Sure. I only want to use paintings that you are comfortable you did after the accident for the exhibition as opposed to something that you did before the accident, okay?
A After the accident I did many paintings.

Q You did many paintings?
A Yes. That means maybe I did two, three, four, five, six, seven. When I get -- when I feel to do painting then I do. It's not that regular that I do every day or I do from morning to evening. It's not regular work. It a matter of mood. Just like writing a poem, writing a novel, it's a matter of mood. You can write a poem any time. You have to have right mood to write a poem, poetry, right?

It's like that. When I get the mood, if I feel that I need to do a painting that time I do. Maybe I can work for one hour, maybe I can work for 10 hours and I have feeling I should paint this and I should stop this. Sometimes all the paintings are not fine. If I feel that the painting are not good I throw this, that's the way I do.

THE COURT: If you feel the paintings are not good you throw them?

THE WITNESS: Throw them. I do again on that. That's I mean.

Q I'm going ask the question --
A And one more answer. One painting is not finished in one day, not in hour, not in five, 10 minutes, not in a day, not -- maybe not in six days, maybe not in six months, maybe not six years.

A painting may take one, 10 years too, may take 10 years, may 10 minutes, may 10 hours, it depends how the

painting is done, how the mood is there. That's artist character.

Q I'm going to ask you a question, but I want to make sure that the Judge determines that it's an appropriate question, so please wait to answer it until the Judge allows the lawyer to object because it may not be appropriate.

When you made these painting for this exhibition, did you offer them for sale?

MR. BHURTEL: Objection, Your Honor, can we.

THE COURT: Yes.

(Continued on the next page.)

(Sidebar conference.)

THE COURT: What is the relevance of asking that question?

MR. O'HARA: He has said he cannot do certain things for work and he cannot do certain things for enjoyment. He has said that he has certain work tasks and he's described painting as a joy task. I want to know whether or not his description of this as a joy task is true because I don't think it is, number one.

And number two, if he is in fact selling them, that undermines the credibility of his testimony in two separate ways. I'm not going to ask him about what he does with the income, I just want to know whether he offers them for sale.

MR. BHURTEL: First of all, he testified he does with difficulties, he clearly testified he does the painting, all of those kinds of things he testified.

Second, now if you're asking now the income matter, then I'm going have to direct or I'm allowed to ask the questions about how much money you're making, how much money you lost. Then it goes to the opening, your opening, not me. So then judge that's the one I want to make clear.

MR. O'HARA: All I asked was do you offer it for sale.

THE COURT: I understand. I'll give you very limited questions that is this part of what you do for money

as well as for fun. Once you establish that point, you will move on.

MR. O'HARA: Yes.

MR. BHURTEL: Am I allowed to ask him the money part on redirect?

THE COURT: Did you produce his tax returns?

MR. BHURTEL: No.

THE COURT: No, then you can't.

(End of sidebar conference.)

(Continued on the next page.)

(In open court.)

BY MR. O'HARA:

Q Do you remember the question, sir?

A No, I don't remember it.

Q These paintings that you had on display at the solo art exhibition, the new paintings, do you offer them for sale for people to buy, yes or no?

A Yes, it will offer to sell.

Q I'm going to show you some of the paintings that were on display at the exhibition.

A Yes.

Q Okay?

A Uh-huh.

Q But I need you to go slow.

The first painting is on Bates number 4689. Do you see that?

A Yes.

Q Is that a picture of a new painting that you did for the exhibition that we are talking about?

A New painting, I mean when it feels new painting, it may have been started three months before.

Q Okay.

A I finished at that time new painting. I have started maybe this painting three months before and when I finished that's new. Maybe I started it one year before, when I

finished that's new. When I finished it's called new, not the starting time of the painting.

Q Okay. This painting that you've described as new took a number of weeks or months when you made it something that the public could see, you did that around August 15th, 2015, yes?

A Yes, yes.

Q And this is a painting that you actually personally created, yes?

A Yes.

MR. O'HARA: Judge, I would offer this into evidence.

THE COURT: Any objection?

MR. BHURTEL: No, no objection, Your Honor.

THE COURT: 4689 is received in evidence.

MR. O'HARA: Would you allow me to publish it to the jury?

Please pull it up, Ali, 4689.

(Defense Exhibit 4689, was received in evidence.)

MR. O'HARA: Okay? You can take it down.

MR. BHURTEL: Is it 4680, is it same page. I didn't see if it was the same page.

THE COURT: 4689.

You with us now, Mr. Bhurtel? You need another minute?

MR. BHURTEL: Yes, please.

BY MR. O'HARA:

Q Next I want to show you a painting that was made available for the public to see on or about August 31, 2015 on your Facebook page that you described as a new painting.

A Yes.

Q Bates number 4690.

A Yes, I did it.

Q This is a painting that you personally painted and that is one of the paintings that was displayed at your exhibition?

A Yes.

MR. O'HARA: Judge, I would offer it into evidence.

THE COURT: Mr. Ahsan, did you do most of the work or all of the work on this painting after the accident at Staples?

THE WITNESS: Yes. Almost all, not all.

THE COURT: Almost all. Yes?

THE WITNESS: Yes, sir.

THE COURT: Any objection as to 4690?

MR. BHURTEL: No, Your Honor.

THE COURT: It's received in evidence.

MR. O'HARA: Would you please pull it up.

(Defense Exhibit 4690, was received in evidence.)

THE COURT: Has everybody had enough time to see it? Let's go, let's move on.

MR. O'HARA: Sure. We'll do it very quickly.

Q This painting is described differently. It's described painting for exhibition. Can you tell us whether this was something that you painted after the accident and then made available on November 4, 2015?

A When I did it I did not know it was in my store, I just picked it up and I just put it in exhibition.

Q But the Bates number 4691 where you've described it as new painting by me?

A Yes.

Q Same? This is something that you worked on for weeks or months, you made it available to the public as around October 31, 2015 --

A Yes, I did.

Q -- and you painted it?

A Yes, I did.

MR. O'HARA: Can you pull that one last painting up, please.

THE COURT: 4691.

MR. O'HARA: I have to offer it, I'm sorry, Judge?

THE COURT: 4691, any objection, Mr. Bhurtel?

MR. BHURTEL: No, Your Honor.

THE COURT: 4691 is received in evidence. You may

display it to the jury very briefly.

(Defense Exhibit 4691, was received in evidence.)

THE COURT: Thank you.

BY MR. O'HARA:

Q Now, at the art expo one of the things that you were asked to do when you were there, was to point out pictures to people that were coming to visit, yes?

(Question translated)

A (Through interpreter) No, not for sale. People come and see my art.

My intention -- I displayed this to see my works, people can see my works, what I do. If they interested to buy, they can buy.

Q I didn't ask about buying, sir.

A Okay.

Q I just wanted to know whether when you were there you pointed out things to them and talked to them about your work?

(Question translated)

A (Through interpreter) Yes, the opening day first time.

Q Okay.

(Continued on the next page.)

CROSS EXAMINATION

BY MR. O'HARA:

Q And Bates number 4695, this is from your Facebook page, one two three -- were five pictures, including a picture that shows you pointing with your left arm to show some of the paintings that are on display at the exhibition; yes?

A Yes.

MR. O'HARA: Judge, I'm going to offer it, but I don't need it pulled up. I'll offer it into evidence.

THE COURT: Any objection to 4695?

MR. BHURTEL: No objection, Your Honor.

THE COURT: It's received.

(Defendant Exhibit 4695, was received in evidence.)

BY MR. O'HARA:

Q Now, you've been involved in other exhibitions where it's not just a solo exhibition but you're one of the artists that is on display; yes?

A That is -- I have to explain this thing.

Q You have to say "yes" or "no," sir. I'll give you the chance to explain.

A Yes. Okay, yes.

Q Okay. And you did that for a New Year's show for the New York Art Connection, for a display January 23 through February 7, 2016; yes?

A But there was that -- there was -- there was

exhibition.

Q And your works were part of the works that were on display with other artists for that particular show; yes?

A Yes. My work was there.

Q And you said you wanted to explain something. Go ahead, tell us.

A No. I want to explain that to you, that dealer location, they have -- they kept so many works of me, my works, some many works, my artworks they have, it was just material. Sometimes when they add a location, sometimes they used to display my work, too. That time I needed to go there.

Q Now, you talked about your -- the different businesses that you were involved in before the accident and after the accident.

Do you remember talking about that this morning?

A Before the accident?

Q Yes. You mentioned that you had a business in Bangladesh in the 1970s, '80s, '90s, graphic design; yes?

A Yes. Yes.

Q And you've been an owner of a number of different businesses, both before the accident and after the accident; yes?

A Before the accident, I -- I only involved in Bangladesh.

Q And how about after the accident?
A After the accident?
Q Yes, sir.
A I tried to do business after the accident. I tried to do business. I tried.
Q And one of the businesses that you tried to do is the exporting of T-shirts and jackets in the European market; yes?
A No.
Q Are you identified as the chairman of the board, and the chief executive officer of a company named Rekhayon USA, Inc.?
A Yes, I was.
Q And that company was established in 2007; yes?
A Yes.
Q And the articles of corporation, the way you formed your company, were amended on September 17, 2013.
Do you remember that?
A I remember? What I remember?
Q You amended the corporate documents. The company that you are the chairman and CEO of, you amended the documents, the legal papers; yes?
A Yes, a little.
Q And you did that September 17th, 2013.
A That I can't recall, but I did.

Q I want to make sure that I can refresh your recollection.

Let me show you what's been Bates stamped as 4705, and tell me whether this refreshes your recollection --

MR. BHURTEL: I don't have that document.

MR. O'HARA: It's part of your packet.

Here, look at this (proffering.)

Q Tell me whether this refreshes your memory as to whether or not you're the chairman of the board and chief executive officer of Rekhayon USA, Inc., and the corporate documents were amended on September 17th, 2017.

Do you remember that?

A I don't exactly remember, but I see the document see if I can recollect.

Q This is an active and viable company as of 2013; yes?

A Yes.

Q Okay, you just don't remember -- you can take your time.

(Whereupon, the witness is reviewing the document.)

A This is, I thought -- this part I did actually, but I have not done anything with this part.

What I have seen, that part I did with the company, and also graphic design, but I have nothing with those products what I have seen from the attorney.

Q Okay.

THE COURT: You did graphic design, and you dealt with products, but not the products described in the document.

THE WITNESS: Yes.

THE COURT: Is that what you said?

THE WITNESS: Yes.

THE COURT: What products did you deal with?

THE WITNESS: I not -- still I'm dealing with the graphic design. Anything I report, I report accurately, I have not done.

THE COURT: So your only involvement with the company was in connection with graphic design?

THE WITNESS: Yes, sir.

THE COURT: Not with importing or exporting products.

THE WITNESS: Nothing.

MR. O'HARA: Okay. And then I just want to finish on one last work-related activity.

Q Tell the jury what Mattra is, M-A-T-T-R-A?

A It's a -- it's an advertising company.

THE COURT: It's a what company?

THE WITNESS: Advertising company.

THE COURT: Advertising.

Q And that's an advertising company that you told the public, on your Facebook page, that you were working there

as of January 24, 2014; yes?
A I was not working there. I was involved with the business in Bangladesh. I was involved with that business for a time being.
Q And I appreciate that.
You told -- however you want to describe it, you can describe it.
You told the public, through your Facebook page, that as of about January 2, 2014, you were working at Mattra; yes, no, or I don't remember?
A No.
I told you, I was working for a time being in Bangladesh. First, I was in Bangladesh 2014. That time for a certain limited time. I was work for them for some advise or maybe consulting like that.
Q Just let me show you a document that's been marked Ahsan 4709.
Take a look at it for a moment. Okay.
(Whereupon, the witness is reviewing the document.)
Q Is this a copy of a posting from your Facebook page; yes?
A Yes. Yes.
Q And this is a posting that was -- occurred on January 24, 2014; yes?
A Uh-huh.

Q Yes?
A Yes.
Q And the Facebook page that you maintain, you are the one that posts information on that page; yes?
A I don't know that.
Q You put the information into the computer that ends up on this Facebook page; yes?
A No. Not all. Not all. Not all.
This Mattra, I have not posted this Mattra. I have not posted that part.
Q Okay. So you're denying that on January 24, 2014, on your Facebook page, where there was a -- let me finish -- where there was a posting that said, "started working at Mattra," it is your testimony that you did not post that?
A I don't know how this happened. I don't remember any.
Q Do you remember one way or the other?
A I don't know. I don't know. I don't know this.
And 2008? 2014? 2004 -- 2014, no, that time I was in the United States.
Q Okay.
A At that time I was in the United States.
MR. O'HARA: I'm done, Judge, nothing further.
THE COURT: Redirect?

REDIRECT EXAMINATION

BY MR. BHURTEL:

MR. BHURTEL: 1989, number 1989.

THE COURT: Speak up, though, Mr. Bhurtel, you don't have the mic.

MR. BHURTEL: Oh. 1989.

BY MR. BHURTEL:

Q Mr. Ahsan, this is the page that you filled out in doctor's office, Dr. Lattuga's office.

So can you read this one, where is the pain you say there?

A On this document, I wrote here "pain on neck and shoulder left."

Q Okay. And this is the page -- so when you went to Dr. Lattuga's office, what was the purpose of your visit there?

A Dr. Lattuga's office, Dr. Krishna sent me to Dr. Lattuga to examine my neck, based on the finding.

Q And when you gave the history how the accident happened, did the doctor ask you or you just write that time?

A When I write that time, sometime maybe -- all the doctors, they have a special form when I -- when a new patient coming to the doctor's office, everybody -- I think, most of them, they have a form to fill it out.

And maybe, I don't remember, maybe that time they have given the form, I filled out that time because I

thought maybe just for information about me, I have to fill it out and I filled it out like that.

Q And when you fill out Dr. Lattuga's office --

A When I came to his office --

Q Hold on. There's no question. Just wait.

When you filled out in the form, what was the reason you wrote that the boxes fell on left shoulder and not in the head and the neck?

A That time maybe I forget everything. I have some certain loss of memory. Maybe I forgot. Or maybe that time I was feeling I thought -- maybe that time I was feeling extreme pain or pain on the shoulder that time I wrote that form. I forgot that thing.

Q Did your doctors, any of the doctors, they advise you to involve in the activities?

A All the doctors they say, especially Dr. Ajoy Sinha and my physical therapy doctor, pain management, he told me to do something with my left hand to activate properly in the future.

THE COURT: Do some things with my left hand to?

THE WITNESS: Activation. To activation of my left hand in future.

THE COURT: Activation of your left hand?

THE WITNESS: In future, yes.

THE COURT: In the future.

BY MR. BHURTEL:

Q And these various pictures was drawn -- strike that one.

The painting work you did it, that is the part of the doctor's advice that you have to involve and then you were doing it?

A No. I was -- first, I feel good, I feel sometime frustrated. Especially at that time I used to do painting. Still I do like that. When I feel bad, I feel frustration. I feel good, sometimes I don't go out that time, I painting.

Q And can you explain to the jury that with these paintings you are doing without pain or with difficulties?

A I do it with difficulties, some difficulties. But I can paint -- I cannot paint three, four hours at a time. Maybe half an hour, 30 minutes; 30 minutes, 40 minutes, then I have to take a break because of my neck pain, because of my shoulder pain, I have to take a break. And sometimes my headache started also, then I take a break. Then when I feel good, I come back to my painting again.

Q And before the accident, September 2nd, 2011, did you have to take a break?

A No, I could do 10, 12 -- I could work 10, 12 hours at a time before the accident.

Q When on the cross-examination you said some of the paintings were done before the September 2nd, 2011, right?

A Yes.
Q And can you describe -- strike that.
Can you tell the jury that when -- when do you started painting those other paintings?
A When I started those paintings that are on exhibit?
Q Right.
A Well, like I was saying before, it was long time before, you're talking. So I don't know when I started.
Q But you're saying it was started before the September 2nd, 2011?
A This is the character of an artist, that once painting is started, then I typically decide, maybe after six months I pulled that paintings and I start it again, maybe that paintings is not good, I leave it for other days, something like that. It's very -- maybe -- I definitely started those paintings before my accident.
Q When you were testifying about your exhibition and your painting exhibition in New York, can you tell us how that you started?
A Therapy. How is what?
Q Okay. Where this exhibition was held?
A What? When?
Q Where.
A It's New York Art Connection, Long Island.
Q And what kind of help the facility to display your

paintings?
A They have given regularly for 30 days to display my paintings. They have given a certain agreement. They have done a percent to -- to -- to be there for the 30 days' long. This they have given. They have done the opening ceremony. That's, I think, for my paintings.
THE COURT: So they gave you the gallery?
THE WITNESS: They gave the gallery.
THE COURT: They arranged for an opening reception?
THE WITNESS: They arranged for reception.
THE COURT: And they had a person present when the exhibition was going on --
THE WITNESS: Yes.
THE COURT: -- to let people in and welcome them.
THE WITNESS: Yes, sir.
BY MR. BHURTEL:
Q And what was your involvement on that exhibition?
A My involvement, I just as an artist, my involvement was I had to do the painting. That is my involvement.
Q In particular, you know, that exhibition?
A What do you mean? What do you mean, clarify?
Q What did you do, if anything, you know, in opening time at the gallery?
A Opening time, some many rich people, so many

distinguished people came to see my paintings. I explained to them what is the painting, how it is, like that. What is the paintings. What paintings say, I explained to them. They was asking me about the paintings.

Q Did you have to do any physical work, like with using, you know --

A There is no physical work for the painting display, but mouth work, not physical work.

Q How about -- withdrawn -- strike that.

This is page, Bates numbers 4676.

Can you tell why you were wearing these clothes here?

A Well, this clothes, this is a very sensitive place, this for shrimp processing factory in Bangladesh.

I went there to visit the factory, and I wear these clothes because I had maybe for outside some jumps on my body, something like that, they have their own way. And you put it at the gate of the factory, then I can enter.

And before I enter the factory, I have to wash my hand, my clothing and I have to put so many -- so many types of junk dealer, I have to wash my neck, I had to wear their shoes, I have to wear their caps, then I get into the factory.

Q Did you -- is this -- may I ask to put in front of the jury, that page?

THE COURT: 4676?

MR. BHURTEL: Yes.

MR. O'HARA: I have no objection to you displaying it.

THE COURT: Yes, I believe 4676 is already in evidence.

MR. BHURTEL: It is.

THE COURT: So it's just a question of --

MR. O'HARA: Oh, can you put it up.

THE COURT: -- asking Ms. Kral to put it up on the screen for us.

(Exhibit published.)

Q Were you working there at that time?

A No. I was talking to the owner of the company. This is the owner of the company and he was explaining me all these things, how they process.

Q So this is only for the purpose of visiting there and seeing --

A This is factory visiting and seeing exactly how the factory works. Nothing else, we was just talking there.

Q Did you do any physical work there?

A No. They have done everything, just I wear my clothes and everything there. And they have also with their suit everything.

THE COURT: They helped what?

Case 1:13-cv-05929-SMG Document 118-2 Filed 12/21/16 Page 744 of 958 PageID #: 1834

THE WITNESS: They have to wear their shoes, have to wear. They have to wear their caps, their dresses, everything.

MR. BHURTEL: Your Honor, I have nothing at this time, except the other thing the Court said.

THE COURT: Yes, I allowed you to reserve one area of your redirect until tomorrow, if you choose to, and I guess you're choosing to.

MR. BHURTEL: Yes.

THE COURT: All right, but you're finished with your redirect of Mr. Ahsan for tonight.

MR. BHURTEL: Yes.

THE COURT: Very well.

Mr. Ahsan, you may step down.

(Whereupon, the witness was excused.)

THE COURT: You know what, did you have any recross on any of the subject matter that's been coming so far, Mr. O'Hara?

MR. O'HARA: No.

THE COURT: All right. Ladies and gentlemen, why don't you take a recess and we'll talk with the lawyers about how to spend the rest of our afternoon.

(Jury exits.)

THE COURT: What I was thinking, counsel, was the following:

If we can finish with Ms. Ahsan tonight, that's great, but if we're going to start her and have her carry over 'til tomorrow any way, Mr. Urena is here, we can save Mr. Urena a second trip to the courthouse.

MR. O'HARA: I'm fine with that.

MR. BHURTEL: Okay.

MR. O'HARA: I'll take them out of the order.

THE COURT: Will it take the rest of the afternoon?

MR. O'HARA: I doubt it.

THE COURT: But I would like not to have a

nonparty witness come back to the court, if there's no good reason for it.

MR. O'HARA: My guess is 15, 20 minutes of direct.

MR. BHURTEL: Take a break, Your Honor?

THE COURT: Yes. Yes.

So Ms. Ahsan would be coming back tomorrow any way.

MR. BHURTEL: Right.

THE COURT: Okay. So we may start her tonight, depending upon how Urena goes, but if she has to come back tomorrow any way, you may as well let Mr. Urena get finished.

MR. BHURTEL: We may have a problem, Your Honor, because if counsel going to use those exhibits for Mr. Urena, then I need a time to cross him.

MR. O'HARA: I will represent, Judge, I intend to use them. I will further represent that there were questions asked in the deposition about the items that are now the exemplars I've presented. So I'm not sure that additional time is necessary to prepare for what was already in the deposition.

THE COURT: Were these something that looked like the exemplars made exhibits at the deposition?

MR. O'HARA: No, sir, we didn't have them.

THE COURT: Okay. Well --

MR. BHURTEL: I mean, basically, if I understand, this one is something supposed to be inside the brown box, right?

MR. O'HARA: It's an example of, on the incident report, which is identified as "two-pocket plastic folders," the model number and the skew number.

So it is an example of the items that were in the box that was on the shelf that you have shown that is the overstocked shelf.

We don't have any of those items in the box, so I am simply using to show the jury what is in a box that was on the shelf. No more, no less.

THE COURT: If you want to take five or ten minutes to look at them and to write out your cross-examination questions now, you may. If you want me to give you a second recess after the direct, I'll do that. I'll leave that up to you. But I don't think that this is so substantial a surprise as to warrant calling the witness back tomorrow.

MR. O'HARA: Are we done, Judge?

THE COURT: I want to wait for Mr. Bhurtel to be ready.

(Pause.)

MR. BHURTEL: Sorry.

THE COURT: Are you ready? Do you have something

for me?

MR. BHURTEL: Yes.

So one more thing, Your Honor. Once this boxes are in, or whatever the purpose he will use it, Mr. O'Hara will use it, so I need to read the deposition of Bart, another employee who was working there, so his deposition will show what looks like and the other thing.

THE COURT: The portions you designated before.

MR. BHURTEL: Right.

MR. O'HARA: I assume he's talking about rebuttal. I need to play this out to the end. I don't put witnesses or evidence on until the plaintiff rests. I'm being asked to do something out of order, which I'm willing to do.

THE COURT: I'm doing it for you.

MR. O'HARA: No, I appreciate that. But I'm willing to do it and, frankly, I appreciate the consideration.

But that step should not be taken as a waiver of the position that -- because the plaintiff hasn't rested yet, so as long as I can still argue about that particular point, because we haven't --

THE COURT: You know what, you can argue about it, but what Mr. Bhurtel is doing is alerting you that he views this as opening the door to his right, or even enhancing what he believes he already had the right to do, which was

to read some of that deposition testimony, and he's going to use this as a further argument in support of its admissibility, right?

MR. BHURTEL: Yes, sir.

THE COURT: Okay.

MR. O'HARA: Then timing doesn't matter. I'm good.

Can I get him now? Or should I get him now?

THE COURT: Are you ready, Mr. Bhurtel? Or do you need another minute?

MR. BHURTEL: I need another minute.

(Discussion was had off the record.)

(Pause.)

THE COURT: Mr. Bhurtel, are you ready?

MR. BHURTEL: Yes, Your Honor.

THE COURT: Okay, let's have the jurors back then. Thank you.

(Witness takes the witness stand.)

MR. O'HARA: 2761 and 7262.

(Jury enters.)

(Witness takes the witness stand.)

THE COURTROOM DEPUTY: Please stand and raise your right hand.

CARLOS URENA, called as a witness, by the Defendant, having been first duly sworn/affirmed, was examined and

testified as follows:

THE WITNESS: Yes.

THE COURT: Can you state and spell your name for us.

THE WITNESS: It's Carlos Urena. C-A-R-L-O-S. U-R-E-N-A.

THE COURT: You may be seated.

Now, ladies and gentlemen, we're doing something a little bit out of order, and I'd like to explain to you what's going on so you're not confused.

Ordinarily, as I told you in the opening instructions I gave you, the plaintiff, Mr. Ahsan's witnesses would be called and cross-examined, then the plaintiff's case would be over, and the defendant's witnesses would be called and cross-examined.

Well, we haven't quite reached the point where the plaintiff has finished calling his witnesses, but one of the defendant's witnesses is available this afternoon. In fact, we all agreed that the most efficient use of everyone's time might be to have this witness available today for scheduling purposes.

And rather than require Mr. Urena to return tomorrow, everyone has agreed that it would make sense to hear his testimony this evening, even though the plaintiff's case is not quite over.

So instead of the direct examination being conducted by Mr. Bhurtel on behalf of Mr. Ahsan, and then Mr. O'Hara cross-examining the witness on behalf of Staples, Mr. O'Hara will ask questions of Mr. Urena to develop evidence on behalf Staples, and then Mr. Bhurtel would have the opportunity to cross-examine.

I'm sure you all followed that, right? Thank you, everybody.

Mr. O'Hara, you may inquire.

MR. O'HARA: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. O'HARA:

Q Good afternoon, Mr. Urena.

A Good afternoon.

Q Can you tell the jury where you're current employed?

A Currently I work for Staples. I work at 24-41 31st Street, Astoria, New York.

Q Nervous?

A A little bit.

Q I need you to talk slow. That young lady sitting there, she needs to type it down, okay?

A Okay.

Q As of -- strike that.

As of September 2011, where did you work?

A September 2011? I used to work in Astoria in Woodside.

Q You were the general manager at the Staples store located at 51-10 Broadway in Woodside, New York?

A That's correct.

Q When did you first begin working for Staples?

A I began working for Staples in July of 2001.

Q And have you held various positions with the company?

A Yes, I have.

Q Can you tell the jury, generally, what positions you've held from 2001 up through 2011 while working with Staples?

A Manager in training. Operational manager. Assistant general manager. And general manager.

Q And as part of your duties and responsibilities in all of those positions, were you trained to participate in responding to incidents that had occurred in the store?

A Yes.

Q And as part of your training and experience over that ten-year period, were you asked to respond to incidents that occurred in various stores that you worked at?

A Yes.

Q And is there a general procedure that you always follow, when there is an incident that is brought to your attention, whether as a manager in training, an operations manager, an assistant general manager, or as a general manager?

A Yes.

Q I want to draw your attention to September 2, 2011.

Were you working in the Woodside store on that day?

A Yes, I was.

Q And at that time, were you the general manager of the store?

A Yes.

Q Did there come a point in time that day when something happened that was brought to your attention, in terms of a claim of an incident with a guest?

A Yes, there was.

Q How did that happen; tell us.

A My understanding, I was in my office. I had an associate come to me saying that there was a customer had a box fell on him.

Q And when that information was brought to you, what did you do?

A I immediately rushed to the location that the customer was to offer him assistance.

Q And in terms of the company procedure, do you do certain things when you get to an incident site as a matter of automatic routine?

A Yes.

Q And so tell the jury some of the things that you automatically do no matter what the information is, in terms

of an incident?

A As soon as I get there, the first thing I want to do is to make sure that the customer is okay.

Automatically we offer first aid, if he needs any kind of medical attention.

Q So if a customer's in the store and needs medical attention, that's the first priority, correct?

A Correct.

Q Do you do things after determining whether the customer needs medical attention, in terms of whatever the incident-causing event is?

A Immediately we also have to fill out an accident report.

Q And is that what you did in this case, did you follow that procedure?

A Yes, I did.

Q So you had a conversation with the plaintiff and asked him if he was okay?

A That's correct.

Q You asked him whether he needed medical attention?

A Yes.

Q And then you went through the process, once you determined that he didn't need medical attention, of preparing an incident report?

A Correct.

Q I have before you a two-page document that's been marked 2761 and 2762.

Do you see the document in front of you?

A Yes, I do.

Q And what is that?

A This is the incident report that I actually filed when the plaintiff was in my store.

Q And is that something that you're duty charged to do as a general manager?

A Yes.

Q And it's something that you do in the ordinary course of the business of Staples?

A Correct.

Q And you record information that's provided to you by various people?

A Yes.

Q And in this case, who provided you the information that's on page 2761, the first page of that incident report?

A The customer.

Q Okay. And then as you get down -- and let's work -- strike that.

On the second page of the document, there's additional information.

Do you see that?

A Yes.

Q And who provided that information to you?
A The customer.
MR. O'HARA: Judge, at this time Staples moves items 2761 and 2762 into evidence.
MR. BHURTEL: No objection.
THE COURT: They're received, 2761 and 2762.
(Defendant Exhibit 2761 received in evidence.)
(Defendant Exhibit 2762 received in evidence.)
MR. O'HARA: Judge, may I display the first page to the jury to allow further questioning?
THE COURT: Yes.
MR. O'HARA: 2761, please.
(Exhibit published.)
BY MR. O'HARA:
Q Okay. So when you first get to the scene, tell the jury what you do in terms of your interaction with Mr. Ahsan? Tell them about the discussion that you had with him.
A When I got to the aisle, the first thing I asked him, you know: What happened? He explained to me that a box fell and it hit him in his shoulder.
Q And when you talked with him to determine whether he needed medical attention, did you actually look at him physically?
A Yes, I did.

Q Did you see any bumps?
A No.
Q Any bruises?
A No.
Q Any cuts?
A No.
Q Any blood?
A No.
Q Was Mr. Ahsan able to answer your questions when you were talking to him?
A Yes.
Q Did he express any problem, or did he suggest that he was having any problem in answering the questions?
A No, he didn't.
Q Now, if you look at the incident report, there's information -- and let's work our way down through it.
You have the location being in an aisle.
Do you see that?
A Yes, I do.
Q And then you have a description of the incident that says, "manager's description of incident"; yes?
A Correct.
Q Can you read that to the jury first?
A Associate working in Aisle 9 overstock pulled a box and it triggered two folder boxes to fall into Aisle 8, and the

customer said that the two boxes fell on his left shoulder. He was in the aisle by himself and no one saw anything. Customer denied first aid from the store. He said that he was going to see his doctor.

Q Okay. Now, if I heard your testimony before you read this statement, you testified that when you came to the aisle, you saw a box on the floor; yes?

A Correct.

Q How many boxes are we talking about; one or two?

A From what I remember, it was one box.

Q And when you -- but your incident report indicates two boxes. Why does it say two boxes if you saw one?

A Actually, I do not remember.

Q Is that --

THE COURT: I'm sorry, I didn't hear the answer.

THE WITNESS: I do not remember.

BY MR. O'HARA:

Q Is that information that the customer told you, as opposed to what you actually observed?

A Yes.

Q Now, after you come to the scene and you ask him questions about what happened, is he standing or sitting?

A Standing.

Q And how long does this discussion take before you're finished getting information about the incident?

A I probably say less than five minutes.
Q How did he leave the aisle?
A He walked.
Q And did he ultimately, to your understanding, leave the store?
A Yes, he did.
Q And he left under his own power without any assistance?
A Yes.
THE COURT: Mr. O'Hara, background leading's fine, lead less, though.
MR. O'HARA: Sure.
BY MR. O'HARA:
Q Go down to the bottom of your report. Do you see where it talks about a product was involved?
A Yes.
Q Now, in your description of the incident, you des -- how do you describe the boxes; what are they called?
A It's a two-pocket plastic folder.
Q Okay. And in terms of the two-pocket plastic folder, tell the jury what that is?
A It's a regular plastic folder, poly folders, that kids would use at school.
Q I'm going to show you what has been identified as Defendant's 1A and 1B for identification.
Can you tell the jury what those items are

examples of?

A The two-pocket plastic folder.

Q Now, the box that was on the aisle floor when you came in response to the information that was brought to you about the incident, what did you do with that?

A The box actually went back up on the shelf.

Q Before it went back on the shelf, what did you do with it?

A Actually, I took the box to my office.

Q How did you take it to your office, did you pick it up?

A Yes, I did.

Q And when you picked it up, can you give us an estimate, a reasonable estimate, based on your recollection, as to how much that box actually weighed?

A Four-and-a-half pounds.

THE COURT: Say again?

THE WITNESS: Four-and-a-half pounds.

Q And in terms of what was in the box, are the items that are identified as D1A and D1B for identification, examples of the folders that would have been in a shipping box?

A Yes.

Q There's been testimony in this case, and I'm going to show you a photograph that's actually in evidence. It's been marked as 117B.

Do you see the picture that I'm holding up?

A Yes.

Q Okay. And on the right-hand side of this picture, is this where these two folder -- telling me what you call them?

THE COURT: Pocket plastic folders.

It's right up there, sir.

MR. O'HARA: Oh. Got it.

Q Is that where they're displayed in the aisle?

A Yes.

Q Now, when there are additional items that aren't actually on display for the customer to purchase, is there an overstock shelf?

A Yes, there is.

Q And where is that?

A All the way on the top.

Q Okay. Slow.

And when you're saying "all the way on the top," you're talking about these brown shipping boxes that are on the top shelf, correct?

A That's correct.

Q And after -- strike that.

There's been testimony that this aisle is Aisle 8 taken by the plaintiff at a later date.

Can you give the jury an estimate as to the distance between the one side of the aisle and the other

side of the aisle in terms of where customers walk to shop? Can you give us an estimate on the distance?

A Five feet.

Q And in terms of Aisle 9, is that a different aisle from where we're looking here in Aisle 8?

A Yes.

Q And where would that be located?

A It would be located to the other side.

Q So on the right-hand side of this picture on the back of it?

A Correct.

Q After you took the box into your office and prepared the incident report that's now in evidence, what did you do with it?

A The box went out back out on the floor.

Q And when you say "the box went back out on the floor," explain to the jury what that means?

A By then, most likely the box was back on the shelf.

Q Okay, let me ask it a little bit different.

Was there any damage to the box itself that affected the ability to sell the product that was in the box?

A No.

Q Was there any visible signs of any human material; hair, skin, or blood on the box before you put it back on

shelf?

A No.

Q Is there a procedure that you followed on September 2nd, 2011, in terms of giving information to Mr. Urena about him making contact with the store at a later date if he had been injured?

THE COURT: You just asked if this witness gave information to Mr. Urena. This is Mr. Urena.

MR. O'HARA: My mistake, 4:10.

Q Is there a procedure that as a general manager you follow, when a guest is injured and after an incident report is prepared, to allow that guest to make contact with the store if that guest is injured?

A When we prepare the report, actually the folks who handle the report are the ones that get in contact with the customer.

Q There's been testimony in this case by Mr. Ahsan that he gave you -- excuse me, you gave him your telephone number and the store's number to call, but he lost the paper.

Do you remember that one way or the other?

A No.

Q Assuming that is true, after September 2nd, 2011, did you ever hear anything from Mr. Ahsan about this incident or being injured?

A No.

Q Is the first time that you heard anything about this incident when we got sued?
A Yes.
MR. O'HARA: That's all I have, Judge.
CROSS EXAMINATION
BY MR. BHURTEL:
Q Good afternoon, Mr. Urena.
A Good afternoon.
Q How did you come to know that the boxes fell and hit Mr. Ahsan?
A One of my associates came to get me.
Q And what is his name?
A If I'm not mistaken, Bart.
Q Bart Rozpedowski?
A Excuse me, can you repeat the last name?
Q Bart, when you say, "Bart," is that Rozpedowski?
A I remember Bart. I don't remember the last name.
THE COURT: R-O-Z-P-E-D-O-W-S-K-I.
Q And that is the associate working on the Aisle 9?
A That's correct.
Q And that is the associate he was arranging the boxes on the top shelf?
THE COURT: Was that the employee who was arranging the boxes on the top shelf?
THE WITNESS: Yes.

Q And what did he say to you?

A He told me that customer in Aisle Number 8 said that a box fell on him.

Q Did you speak with a Danny, Danny Martinez?

A Danny Martinez was a supervisor.

THE COURT: Did you speak to him about the incident?

THE WITNESS: Most likely.

BY MR. BHURTEL:

Q So in your office, Bart came or Danny came; do you recall?

A My understanding it was Bart.

Q If I tell you that Bart testified that he did not come to you, that Danny took over, do you agree with me that?

A I don't remember.

Q Do you have independent recollection right as of now that September 2nd, 2011, how does the Aisle Number 8 looks like?

A Yes.

Q You have it, you remember that?

A How the aisle looks like?

Q And do you remember what kind of things or boxes were stocked on the over -- over -- strike that.

Do you remember what kind of merchandise was displayed on the display aisle?

A Yes.

Q Do you remember what kind of boxes were overstocked on the overstocked shelf?

A Yes.

MR. BHURTEL: This is Plaintiff's Exhibit 117B.

Q Do you recognize this picture?

A Yes, I do.

Q Is this picture has similar to the September 2nd, 2011, when the customer, which is the plaintiff, Mostafa Ahsan, who claims that the boxes fell on him? Do you recognize this picture?

A Yes, I do.

Q And those boxes were there on the September 2nd, 2011 on top aisle?

A Yes.

Q And do you know that the size of boxes were overstocked on that area?

A Yes.

Q And is the corner of the boxes, I know you -- sorry, withdraw that.

Did you actually see the boxes on the floor?

A I saw a box on the floor.

Q Okay. When you saw the boxes, is the boxes colored like these boxes?

A Yes.

Q And the boxes like this size?

A Yes.

(Continued on the following page.)

BY MR. BHURTEL:

MR. BHURTEL: Just a minute, Your Honor.

THE COURT: Go ahead, take your time.

(Brief pause.)

Q This is Bates number 2761, 2762.

You earlier testified that you prepared the report, right?

A Yes.

Q And is that report is complete?

A Yes.

Q And you prepare?

A Yes.

Q You were the manager at that time, September 2, 2011, with -- at the Woodside store?

A Yes.

Q Let's call Woodside store right now.

Did you sign that report?

A No.

Q And, oh, you have it in front of you, right. Okay.

What was the reason you did not sign?

A I don't recall us having to sign the report.

Q Did you follow all instruction given by this form? This is the Bate number 2761, 2762.

Did you follow that rule?

A Yes.

Q All, right?

A Yes.

Q There is nothing left out to follow according to that forms?

A No.

Q Earlier you testified that in this -- the incident how it happened, the manager's description of incident, you said that was given by the customer, right?

A Yes.

Q But you are experienced manager, right?

A Yes.

Q That's how the Staples be the manager there, right?

A Correct.

Q So they have two space, one for the manager's description of the incident and then another you have comments made by claimant.

So that means is the customer or somebody else?

A The customer.

Q Customer. So you are required to put two information in two place, one claim by the customer, one by the manager like you, right?

A Yes.

Q So with respect to the -- can you read for the jury the second page, what the claimant said?

A Customer said that he was walking the aisle and a box

fell on him.

Q And now go to the part that -- the first page, the manager's description of incident.

A Associate working in aisle 9 overstock pulled a box and a triggered two folder boxes to fall into aisle eight and the customer said the two boxes fell on his left shoulder. He was in the aisle by himself and no one saw anything. Customer denied first aid from the store. He said that he was going to see his doctor.

Q So, in other words, this is your description of the incident how it happened, right?

A Correct.

Q And this -- you made a -- you investigated or whatever the, you know, information you need to ask the customer or another employee or you saw yourself that's how you made it, right?

A That's after I asked the customer and the employee.

Q Okay. And which employee you ask?

A Bart.

Q Not the Danny Martinez?

A No.

Q Can you read for the jury on this part, the second page.

A What section?

Customer claims that he feels pain.

Q Can you read this part for the jury.
A Check here if you have the product. If so, do not discard or alter the product. Print the Certified Inventory of Evidence form and complete it. Attach the form to the product and see the instructions on sending this product to the secure location.
Q Did you do that one in case?
A No.
Q What was the reason you did not do it?

MR. BHURTEL: Well, withdrawn that question.

Q This report says two boxes, but you said earlier you testified one box. Which one is true, one box or two boxes?
A I remember a box.
Q But then that time when you were making the report it was not correct?
A I don't remember.
Q So your memory is good now than the same day, right?

THE COURT: I think you need to ask the question again.

MR. BHURTEL: Withdrawn, Judge. Sorry.

THE COURT: You can ask the question. I think you just misspoke when you asked it.

MR. BHURTEL: Oh, okay.

Q It's your memory with respect to the boxes it's good as of today or good as of September 2, 2011?

THE COURT: When did you remember the incident better, when you were filling out the form or today as you sit here testifying?

THE WITNESS: From my recollection would have to be September 2nd.

THE COURT: Of 2011?

THE WITNESS: Correct.

Q So that means it should be two boxes, right?

MR. O'HARA: Objection. Asked and answered and argumentive.

THE COURT: Sustained.

Q Did you send this report to operation office, headquarters of the Staples?

A Yes.

Q And did you receive any notification or instruction to protect or hold those boxes which fell and struck Mostafa Ahsan?

MR. O'HARA: Judge, objection. Relevance.

THE COURT: Overruled.

You can answer.

A No.

MR. BHURTEL: Your Honor, I would like to show or read to the witness about Bart Rozpedowski's deposition transcript, page 275.

MR. O'HARA: Go ahead. Just one page?

MR. BHURTEL: Yeah, just...

MR. O'HARA: Judge, maybe we should be heard at sidebar because when he starts to read, I'm not sure what he intends to do.

THE COURT: Show us lines blank through blank. Which lines are you going to read?

MR. BHURTEL: Okay.

MR. O'HARA: Okay. Judge, I need to be heard at sidebar.

THE COURT: Okay.

(Sidebar conference held.)

(Continued on the following page.)

MR. O'HARA: So the intent of, as I understand it, is he's going to read as quote -- would you like to see it?

My argument is you can't impeach this witness with testimony that's not this witness's testimony.

THE COURT: You can't impeach, but you can try to refresh his recollection. So if you read it to him and say does that refresh your recollection with respect to whether it happened a different way.

MR. O'HARA: Judge, this is neither --

THE COURT: What's wrong with that question?

MR. O'HARA: Because this is neither testimony from this witness or about this witness. This is testimony about two other people, Bart and Danny. Danny or Bart is not on the stand. Carlos is on the stand.

MR. BHURTEL: Your Honor, this one is the Bart who denies he went to his office. So it's a --

THE COURT: You can refresh a witness's recollection with anything. You can offer this in evidence right now. I'm not going to hear it in evidence, but you can ask him a question that says I'm going to read to you what I represent is the transcript of Bart Rozpedowski's testimony. If I tell you he said that, does that refresh your recollection with respect to how many boxes fell? You can do that.

MR. O'HARA: Okay.

SIDEBAR CONFERENCE 774

(Sidebar conference concluded.)

(Continued on the following page.)

*ANGELA GRANT, RPR, CRR*
*Official Court Reporter*

Q Sir, you testified that the Bart came to your office to tell that the boxes fell and hit Mostafa Ahsan, right?
A Yes.
Q If I represent you that the Bart under oath, he testified saying that some boxes fell and then I remember Danny came and then he took it over from there. Whatever happened. Does that refresh your recollection?
A No.
THE COURT: Refresh your recollection about what, Mr. Bhurtel?
Q Whether --
MR. BHURTEL: I'm sorry, Your Honor.
Q Does your recollection refresh -- withdrawn.
Does your refreshed your recollection whether Danny came to your office or Bart came to your office?
A My recollection is that Bart came to my office.
Q Did you see anybody with Mr. Ahsan in the Staples at the time of the incident?
A No.
Q Did you see his daughter there?
A No.
Q What was the process of pulling down the boxes from the overstock aisle?
THE COURT: I don't understand the question. And to the extent I do, I don't know what the relevance is.

MR. BHURTEL: I withdraw, Your Honor.

Q Do you have independent recollection that every question you asked Mr. Mostafa Ahsan as of today?

MR. O'HARA: Objection. I'm not sure what that was.

THE COURT: Are you saying does Mr. Urena remember every single question he ever asked of Mr. Ahsan?

MR. BHURTEL: Yes.

THE COURT: As he sits here today?

MR. BHURTEL: Yes.

THE COURT: Do you remember everything you asked him?

THE WITNESS: No.

MR. BHURTEL: I completed my cross, Your Honor.

THE COURT: All right.

MR. O'HARA: Very brief redirect.

REDIRECT EXAMINATION

BY MR. O'HARA:

Q Two very discrete topics.

Mr. Urena, you were asked questions about 117-B and whether the boxes --

THE COURT: Do you want me to help you with the chart?

MR. O'HARA: Thank you, Your Honor.

THE COURT: I can't be one sided about it.

Q Whether the boxes on the top shelf were similar to the boxes that were on display on September 2, 2011, do you remember that question?
A Yes.
Q And can you describe the boxes that are actually in this photograph. Are they the same size?
A No, they're not.
Q They're different sizes?
A Yes.
THE COURT: From each other you mean?
MR. O'HARA: Yes.
Q You understand that? There are different size boxes on that top shelf?
A Yes.
Q And the box that you picked up on September 2, 2011 contained two pocket translucent poly report covers packages, correct?
A Correct.
Q And they were in a box that were big enough to ship the two packages that were what dimensions?
A Of the box?
Q Yes, ballpark. Give us your estimate.
A I would probably say a height of probably like 11 inches, a depth of 4 inches, and a width of 7 inches.
THE COURT: I'm confused by something that just

happened.

Do you know how many -- well, pick up the two exhibits.

Thank you.

There are two of these here, right?

THE WITNESS: Yes.

THE COURT: Two packages.

Do you know how many packages were in the box that fell?

THE WITNESS: 50.

THE COURT: There were 50 of these?

THE WITNESS: 50 pieces.

MR. O'HARA: 50 pieces, Your Honor.

THE COURT: Excuse me.

There were 50 packages like this?

THE WITNESS: Oh, no, no. Sorry. Two packages.

THE COURT: There were two packages, each containing 25?

THE WITNESS: Correct.

THE COURT: How do you know that there were two packages inside box?

THE WITNESS: Those boxes, when they're shipped to us, that's how many pieces come inside each of those boxes.

THE COURT: Does anything other than the pockets, the two packages, come inside the box? Stuffing?

THE WITNESS: No.

THE COURT: No?

THE WITNESS: No.

THE COURT: Display materials?

THE WITNESS: No.

THE COURT: So there's no like hard cardboard to put the folders in when you take them out of the box and show them to the customers?

THE WITNESS: No. They go straight on the shelf.

MR. O'HARA: Just a followup question to that.

THE COURT: I got confused by your question because they are called two pocket translucent covers, and so when you said there were two pocket translucent covers in the box, I thought you meant two pocket translucent covers, not two, two pocket translucent covers.

MR. O'HARA: Got it. That's a tongue twister right there. So let's clear it up.

Q So when you're describing 21-A or 21-B, the items that are inside here are identified as two pocket, meaning there are two pockets on the folder, correct?

A Correct.

Q Translucent poly report covers?

A Correct.

Q And in each one of these cellophane wrapped or whatever you would call this plastic wrap, there are how many units?

A Twenty-five units.

Q So when you're talking about 50 units, you're talking about two 25 packets of the two pocket translucent poly report covers, correct?

A Yes.

Q And that's what was in the box that you took into your office, that you got the skew number to put on the report, and that's how you're able to identify these as the examples of those items, correct?

A Correct.

Q Last question.

You were asked about the procedure associated with keeping items. Why didn't you keep the box that you took to your office to record the information, any particular reason?

A No. I mean, it didn't seem -- at that specific time it didn't seem necessary because, I mean, the customer walked out on his own. He didn't require any first aid. We didn't even have to call the ambulance.

MR. O'HARA: Nothing further, Your Honor.

MR. BHURTEL: Briefly, Judge.

RECROSS EXAMINATION

BY MR. BHURTEL:

Q When you came at the location of the Mostafa Ahsan's place, did you have the different boxes or this box?

 THE COURT: I don't understand the question, Mr. Bhurtel.

Could you please ask it again.

MR. BHURTEL: Okay.

Q When --

MR. BHURTEL: I'll rephrase, Your Honor.

Q When you came to see Mostafa Ahsan at the location?

THE COURT: Where he got hit?

MR. BHURTEL: Right.

Q To where the accident happened and then he, he was hit by the two boxes, is this the same boxes or not?

THE COURT: The question is: Are those two packages of plastic folders, were they in the box that fell on Mr. Ahsan?

THE WITNESS: Yes.

THE COURT: These ones?

You took them out of the box and saved them for the trial?

THE WITNESS: No, I didn't.

THE COURT: I'm sorry?

THE WITNESS: No.

THE COURT: So these are different two pocket translucent folders than the ones that were in the box that fell off the shelf?

THE WITNESS: Same item number, just not the same

 ones that were in that box that specific date.

THE COURT: It's the same model, but it's a different specific folder, correct?

THE WITNESS: Exact same folder.

THE COURT: We're just having a word problem I think here.

These folders haven't been in your office since 2011?

THE WITNESS: No. No.

THE COURT: You didn't put the folders that fell that day aside in any way, correct?

THE WITNESS: No.

THE COURT: These are different folders than those, but they're the same type of folder?

THE WITNESS: Yes.

THE COURT: And you're telling us they're the exact same type of folder?

THE WITNESS: Yes.

THE COURT: And you're telling us that they were packaged the same way, and that the contents of the box were in two packages of these folders, and only two packages of these folders?

THE WITNESS: Yes.

THE COURT: But not these particular two ones?

THE WITNESS: Yes.

THE COURT: Okay.

BY MR. BHURTEL:

Q And this two packages, were they exactly like this way at the place of the accident or they were covered with something else?

A They were inside a box.

Q So what kind of box they were cover?

A The box that I described, 11 inches by 7 by 4 inches.

Q And still Staples does the supplies of those kind of boxes?

A Similar boxes, yes.

Q You did not take a weight of the boxes, right?

A The weight of the box, no.

Q If I represent you that Bart Rozpedowski testify that these are the similar boxes, similar size, similar boxes fell on Ahsan's body, does it refresh your recollection?

A There's different size boxes there.

Q But I'm asking if the Bart, he testified that the similar size of the boxes fell on him, does that refresh your recollection?

A No.

THE COURT: As to what?

MR. BHURTEL: As to the size of the boxes.

THE COURT: Does that help you remember?

THE WITNESS: No.

THE COURT: The size of the box?

MR. BHURTEL: Okay. I have nothing further.

MR. O'HARA: No further redirect, Your Honor.

THE COURT: Are you done, Mr. Bhurtel?

MR. BHURTEL: Yes, Your Honor.

THE COURT: Mr. Bhurtel, is there any point in starting another witness tonight or should we wait until the morning? I will let you start if it will help you.

MR. BHURTEL: Fifteen minutes, I don't know we can finish.

THE COURT: Do you think we can finish the direct of the next witness?

MR. BHURTEL: Maybe not possible.

THE COURT: Not possible?

MR. BHURTEL: Not possible.

THE COURT: All right. Ladies and gentlemen, I think given that we're at a convenient breaking point and it's a quarter to 5:00, we will call it a night.

Get home safe. Don't talk about the case. Don't think about the case. Don't be insulted in you run into people connected with the case. You know the drill by now.

We'll start at our usual time tomorrow. I usually don't end early just because it's Friday, so please don't count on that, and I'll see you tomorrow. Okay?

Have a good night.

(Jury exits the courtroom.)

THE COURT: Mr. Urena, you're excused.

Leave the packets here. Thank you.

(Witness excused.)

THE COURT: Counsel, what I'd like to do is have our charge conference at 5 o'clock.

MR. O'HARA: Yes, sir.

THE COURT: And I have a 6 o'clock matter, but I am willing to come back and work with you after if we need to because I want those exhibits from today added to the pile.

And I want to know -- well, why don't we talk about it right now while we're thinking about it.

Mr. Bhurtel, I guess tomorrow morning you'll have a very brief redirect, if any, of Mr. Ahsan, you'll have Mrs. Ahsan's testimony in cross and you have two doctors tomorrow, right?

MR. O'HARA: Yes, sir.

THE COURT: I will let you call the doctors when it's convenient for the professionals if there's no objection by Mr. Bhurtel.

MR. BHURTEL: No.

THE COURT: And we can use the additional testimony of Mr. Ahsan and Ms. Ahsan to fill the day if the doctors do not.

MR. O'HARA: May I, with permission, have Dr. Head come and be prepared to testify at 11:00 a.m. since we know he is going to have direct and cross of the plaintiff as well as potential redirect and cross?

THE COURT: You mean of the plaintiff's wife?

MR. O'HARA: Yes.

MR. BHURTEL: Yes.

THE COURT: Is 11 o'clock reasonable? We won't waist any jury time? You'll need about an hour and a half for the wife and from Mr. Ahsan?

MR. BHURTEL: It might take a little bit less.

THE COURT: So how about --

MR. BHURTEL: 9:30 to 11:30.

MR. O'HARA: I'll have Dr. Head here read to go at 11 o'clock. That give you 90 minutes. Is that good enough?

THE COURT: You'll fill that time? You need that much or do you think you need a little less?

MR. BHURTEL: Maybe a little less.

THE COURT: Can you have the doctor here at 10:30?

MR. O'HARA: Yeah. I'm just trying to beat the commute, because he's coming from New Jersey.

THE COURT: I'm not going to get upset if he's here at 10:40, 10:45, but let's shoot for 10:30.

MR. O'HARA: Got you.

THE COURT: You think you can get both doctors on

and off tomorrow?

MR. O'HARA: Yes.

THE COURT: And then you have one more on Monday morning?

MR. O'HARA: Yes, subject to how the examinations go tomorrow. If they go as I expect they will, I may pull Kolb. I talked to counsel about that. I need to make that judgment decision at the end of the day.

THE COURT: That's fair enough as long as you tell Mr. Bhurtel before you leave on Friday what your decision is.

MR. O'HARA: Yes. I also want the Court to know because we will be prepared to open first thing on Monday morning.

THE COURT: Yes. And you have to make a decision about summation and you have to make it by 5 o'clock. Okay?

See you at 5:00, folks.

(Recess taken.)

THE COURT: All right. Counsel, the record will reflect that on the first day of trial I provided counsel, after having reviewed their requests to charge, with a draft of the jury instruction and verdict sheet I intend to use. I've asked counsel to review it and be prepared this evening to provide me with their comments.

The way I like to do this is by starting with what

I think is the easy stuff and warming up to the harder. So I have general instructions on pages 1 through 12 or Part one. And we'll start with comments that counsel may have or objections they may have with respect to that Part One.

Mr. Bhurtel, I'll hear your comments or suggestions on Part One first, if any.

MR. BHURTEL: I have nothing, Your Honor, Part One.

THE COURT: And Mr. O'Hara?

MR. O'HARA: Yes, sir.

On page 7, which is under subsection V for witness credibility.

THE COURT: Yes, sir.

MR. O'HARA: The defense has two requests.

THE COURT: Right.

MR. O'HARA: First, if you look at the second full paragraph you will see a sentence "You may choose to disbelieve all or part of the witness testimony."

THE COURT: Right.

MR. O'HARA: And that's talking about being the judges of credibility.

THE COURT: Right.

MR. O'HARA: In this section, wherever the Court deems it appropriate, the defense is requesting the classic false in one, false in all charge. I've indicated the New

York Pattern Jury Instruction on that topic as PJI 1:22.

In light of the --

THE COURT: Have you considered the final sentence of that section and whether that suits what you're seeking?

MR. O'HARA: When you're saying that section, you're talking about --

THE COURT: Right above the expert witness.

MR. O'HARA: Oh.

THE COURT: On page 8, the last sentence.

MR. O'HARA: Yes, I think that this is a -- this is intended to identify what is historically a separate charge specific indicating that there is a concept called false in one and false in all.

And in this case, I think -- I believe the Court has to make an independent determination that it is an appropriate charge at all. And if it is an appropriate charge, then I would request that it be as outlined in the pattern instruction as opposed to simply the one sentence. Because this talks about just whether a statement is false in whole or in part. The false in one, false in all charge talks about willfully testifying falsely.

THE COURT: And this comes from the New York Pattern Jury Instructions?

MR. O'HARA: Yes, sir. PJI 1:22.

And I would say the Latin, but I will default.

THE COURT: Mr. Bhurtel.

MR. BHURTEL: Your Honor, well, the Court has already in the sentence in the last paragraph, and I agree with the Court so that should be not included.

THE COURT: They're really trying to say the same things I think, but I'll take a look at this tonight and I may just add some of the wording from 1.22 and make it a little more explicit.

I do think they really do say the same thing, it just dwells on it a little bit longer. I want to read it a little more closely and see if there's anything in here.

Mr. O'Hara, is there a conceptual difference or just an emphasis difference that you can identify for me?

MR. O'HARA: I think there is a conceptual difference.

In this passage, this is effectively talking about inconsistent statements and whether at trial or at deposition there is a difference that a jury determines that one time the person has testified falsely and they can disregard a part of that.

In this, in the false in one, false in all charge, this is actually evaluating the willful or intentional act of a witness. And, if so, that jury may disregard everything the witness says, even stuff that the jury believes. That's the essence of that charge.

THE COURT: Well, I understand that, I just don't think you're accurately characterizing the sentence on page 8.

Now, it's just a semantic difference. I would agree with you that page 8's statement is actually broader than what you're requiring because it doesn't limit the charge to willful misstatements, but it doesn't require a finding of inconsistency. I'll try to read it with the emphasis that I mean.

If you find that any statement made by a witness during this trial or at a pretrial deposition is false, in whole or in part, you may disregard just the particular part you find to be false or you may disregard his or her entire testimony as not worthy of your belief.

So I do think it has the if you lied about one thing, you can disregard everything concept. But I'll take a look. If you still think there's a conceptual difference that I'm not getting, tell me, but I think I get it.

MR. O'HARA: I would just ask that ultimately I make a request. If the Court determines that this is satisfactory, I've created the record.

THE COURT: Okay.

MR. O'HARA: There was one other part, Judge. There was a section in your inconsistent statement which I would suggest is that earlier list of factors.

THE COURT: Yes.

MR. O'HARA: And I think it is -- if the Court agrees with me on the false in one charge, then this becomes moot. But there's a specific passage in the federal jury practice and instructions. It's Section 105:04. That "If a witness has shown knowingly to have testified falsely about any material matter, you have a right to distrust such witness other testimony and you may reject all the testimony of that witness or give it such credibility as think it deserves."

And, again, I think that is from a judgment perspective I'm asking for both, but I could be persuaded that that's piling on.

THE COURT: Oh, it is, but I'm inclined to beef it up a little bit. I'll just figure out the wording and we'll talk about it tomorrow.

MR. O'HARA: Thank you, Judge.

THE COURT: But I'm certainly not going to say it multiple times.

Was there anything else in Part One from you, Mr. O'Hara?

MR. O'HARA: No, sir.

THE COURT: Let's look at Part Three which begins on page 18 and runs through 21.

Any comment on Part Three from you, Mr. Bhurtel?

MR. BHURTEL: Up to the page 23, Your Honor, right?

THE COURT: 18 through 23. Through 21.

MR. BHURTEL: 21.

THE COURT: 18 through 21.

MR. BHURTEL: No, Your Honor.

THE COURT: Defendant?

MR. O'HARA: No, Judge, I don't have anything on this. And I'm reading this quickly. One of the things that's in the routine instructions is that there's often an instruction that the judge tells the jury that during the course of the trial the judge may have spoken, and that is not to be interpreted one way or the other.

And this case I would, at least in my 25 years of trial practice, the Court has been as highly involved in interaction with witnesses as I have experienced in the past. In doing so, it was -- there were a number of occasions -- I actually wrote down at one point if you weren't the judge, I probably would have objected to a question as being leading because it was in the plaintiff's case.

So I think as long as it's -- one of the things the Court was doing was trying to move the case along, and I respect that and understand why. There were, however, occasions when there's factual testimony that was elicited

by the Court to either create a point, create a foundation or otherwise. So I think we just need to be sensitive to that in this charge.

THE COURT: So on page 4, I think what you're saying is that on page 4, as to the fourth item, you want me to modify that from anything I may have said or done is not evidence, except to the extent that I have asked questions of the witness -- except to the extent that I have asked questions of a witness and the witness -- in that event the witness's answer was evidence. Do not attach any special significance to the witness's answer simply because it was in response to a question that was posed by me rather than one of the attorneys.

MR. O'HARA: That satisfies my concern. Thank you, Your Honor.

THE COURT: Part Two, anything on proximate cause or the introductory paragraph.

Plaintiff?

MR. BHURTEL: Your Honor, I was requesting if the Court would tell the jury PJI 2.65, res ipsa loquitur charge that saying defendant Staples and Staples office store is admits that their negligence was the proximate cause to the fall two boxes and hit plaintiff. Therefore, you do not have to decide whether defendant were negligent or not to cause accident.

THE COURT: No. The point is that the defendant has stipulated that its negligence caused the boxes to fall. That's not an issue in the case.

MR. BHURTEL: Right.

THE COURT: So why would I give a res ipsa charge. That would be to help the jury decide.

I'm telling them Staples has admitted that if any of the boxes fell on the plaintiff, it was negligent. It, Staples, was negligent in allowing them to do so. Maybe that's a little clumsily worded and we can polish it a little bit. And it may properly be held legally responsible for those damages and injuries that its negligence proximately caused to Mr. Ahsan.

MR. BHURTEL: Yes, Your Honor.

Which line is Your Honor on?

THE COURT: I'm on the introductory paragraph of Part Two.

In this lawsuit Staples, the defendant, has admitted that if any boxes fell on plaintiff, it was negligent in allowing the boxes to fall. Instead of them to do so I think would be clearer.

MR. O'HARA: Judge, when you read that, you said Staples, the defendant, has admitted that, if, in fact.

THE COURT: Yes. I may not have caught it for this purpose, but that is the way it's worded.

Any boxes fell on plaintiff, it -- why don't we write Staples -- was negligent in allowing the boxes to fall and may properly be held legally responsible for those damages and injuries that this -- that its negligence proximately caused to Mr. Ahsan.

MR. BHURTEL: Your Honor, I'm lost. Which paragraph?

THE COURT: I'm on page 12, the middle paragraph under the heading Part Two, Substantive Law. And I'm going to reread how I have modified the second sentence of the paragraph.

It will now read, in this lawsuit Staples, the defendant, has admitted that if, in fact, any boxes fell on plaintiff, Staples was negligent in allowing the boxes to fall and may properly be held legally responsible for those damages and injuries that its negligence proximately caused to Mr. Ahsan.

Does that address your concern?

MR. BHURTEL: Yes, Your Honor.

THE COURT: Anything else with respect to pages 12 or 13 from you, Mr. Bhurtel?

MR. BHURTEL: I wanted to -- I don't know. I may have missed or something happened this, Your Honor. The charge PJI charge 2.227, damages general. The plaintiff is entitled to recover from the defendant, you must render the

verdict in sum of the money that will justly and fairly compensate the plaintiff for all losses resulting from the injuries and disability Mr. Ahsan Mostafa sustained.

THE COURT: As a general introduction to the topic.

MR. BHURTEL: Yes, Your Honor.

THE COURT: Well, if I added a sentence, it would be in the paragraph that begins at the bottom of 13 and spills on to the top of 14. And what you want is a sentence drawn from a particular pattern jury instruction that says that the damages must what?

MR. BHURTEL: Fairly and justly -- yeah, Your Honor, yeah, you have here. Yeah.

THE COURT: Don't I? What does it say in addition to that, if anything?

MR. BHURTEL: I -- my understanding is, Your Honor, in this one since the defendant admitted liability, the plaintiff is entitled the damages. So if how much is the fair and just damages they should get from the jury? So which means then the Court -- I'm requesting that the Court, that the Court should instruct if the Court -- to the jury -- the plaintiff is entitled to recover from the defendant, you must render the verdict in sum of the money that will justly and fairly compensate the plaintiff for all losses resulting from the jury and disabilities. Sorry.

Injuries and disabilities of Mr. Mostafa Ahsan sustained. And then continues to go to proximate cause and other things.

So, in other words, they may give $1 or they may give 2 -- million dollar. So the Court need to -- I believe the Court has to instruct the jury saying based on the negligence they admitted, you need to award the money, but whatever the number is, the number is just and fair is yours --

THE COURT: I understand the point, but it is not an accurate description, as I understand it, of the defendant's position in the case. That is to say, that the defendant has admitted that its negligence caused a box or boxes to fall off a shelf. It has not admitted that those boxes caused the plaintiff, proximately caused the plaintiff, any injury at all.

Do I understand the defendant's position?

MR. O'HARA: That's correct.

THE COURT: And so I can't instruct the jury that it is conceded that the defendant must award -- must pay the plaintiff any damages.

MR. BHURTEL: If I may, Your Honor. The IME report, Dr. Bazos, he gives the causal relation of the neck and shoulder injuries.

THE COURT: So you think you're entitled to

judgment as a matter of law? Well, you can make the motion after the close of the evidence.

MR. BHURTEL: Because the IME doctor clearly said in the deposition and his report, one little dispute is from the IME report is this injury is healed up three weeks or four weeks, should have been healed. And beyond that is unnecessary treatment or whatever the IME doctor is saying. But I don't think there is a dispute from that, even IME doctor that left shoulder and the neck injury was caused by those boxes falling on him.

THE COURT: Okay. Well, I'll hear the doctor and maybe I'll change my mind, but I don't think so. I think the defense that the injuries, even if they occurred, weren't from this trauma has been clearly preserved by the defendant.

What they've acknowledged is that this was a negligent act of their employee to push the box in such a way that it fell off the shelf, but not that it ever struck your client.

And I think that we already have any award of damages you make must fairly and justly compensate the plaintiff for his injuries. If you want to give me the language, I'll take a look at it overnight, and I'll let you know what I've decided before you sum up, but I'm not inclined to change what this says now.

What else do you have?

But make sure you give the language to my clerk before we leave for the night.

Do you have anything else on, one, proximate cause, or, two, damages? So anything on pages 12 through 18 I'll hear you on now.

MR. BHURTEL: No, Your Honor.

THE COURT: Nothing else?

Mr. O'Hara.

MR. O'HARA: Three references all on the same topic.

On pain and suffering on page 14, second, third sentence there's a description about the amount should reflect any pain, suffering and emotional distress. That sentence continues, as well as any physical consequences flowing from the emotional distress.

And then if you flip to top of page 16, first full paragraph. Nevertheless, the fact may have had a physical or mental condition. My position is there's no emotional distress claim in this case. There's been no expert that has identified any care and treatment. And so while there is physical injury, the loss of enjoyment of life claim is -- has been confirmed by the manner in which the plaintiff has testified, but that's separate and distinct from emotional distress.

The plaintiff has said I lost the enjoyment to work. I lost the enjoyment to do particular activities. The law on emotional distress, the emotional distress element of a personal injury claim requires some guarantee of genuineness as evidence to support it. And the New York State specifically recognizes that to recover on damages for pure emotional distress, the guarantee of genuineness standard cannot be satisfied simply by the plaintiff's testimony because it is far too speculative.

THE COURT: I believe. I'm sorry. Go ahead.

MR. O'HARA: And as I understand it, the awards must be supported by credible evidence that is adduced from medical doctors. That there's been some sort of care or treatment.

THE COURT: I think when that instruction talks about pure emotional distress, I think that instruction applies in a case where there's a claim for emotional distress unaccompanied by physical injury. I'm not sure, but I think so.

MR. BHURTEL: Yes, Your Honor.

THE COURT: But if you research it and tell me otherwise, I'll reconsider.

To me, my understanding has always been, that while emotional distress can sometimes be supported by treatment or a medical professional testimony, the

expression garden variety emotional distress that lawyers use to describe their claims refers to exactly this kind of case which is to say emotional distress that did not result in psychiatric or psychological treatment.

I think that the emotional distress of the plaintiff is clearly supported by the circumstantial evidence in the record. While Mr. Bhurtel did not ask the plaintiff questions about whether he is depressed or suffers other emotional damages, he clearly asked questions about how his life changed from which a jury could draw an inference of emotional pain and suffering. So I'm leaving it in.

MR. O'HARA: Thank you, Your Honor.

THE COURT: Anything else?

MR. O'HARA: No, Your Honor.

THE COURT: Let's talk about the verdict sheet.

Anything about the verdict sheet from plaintiff?

MR. BHURTEL: Your Honor, just one thing.

As I said previously, I think Court advised me previously, I'm going to withdraw the loss of enjoyment of life because it's not there anyway. And I would like to request to include, if possible, emotional distress as well if there is a possible.

THE COURT: We will add plaintiff's pain, suffering and emotional distress into the one heading.

MR. O'HARA: 2(a) is where we're talking about?

THE COURT: 2(a) and 3(a) because to me it's all part of the same. The suffering is really another way of saying the emotional distress although it captures physical suffering too. But to me it's all part of the same topic. Aim, suffering and emotional distress.

Anything else?

MR. BHURTEL: Nothing.

THE COURT: Are we the ones who looked up the life expectancy or did it come from counsel?

MR. BHURTEL: I think I also wrote it. It's 18.7. I just got it from the PJI. I just calculated from the year.

THE COURT: I assume it's right. If you want to double check it, I certainly have an open mind.

MR. BHURTEL: It's a seven-month back and forth, Your Honor. That the defendant put in seven month less. I'm putting the --

THE COURT: I didn't pick up that debate.

MR. O'HARA: I'll meet him in the middle. 18.3.

MR. BHURTEL: Because you put in there I think he age 62 something, but he's 61 something, so that's how they count that.

MR. O'HARA: Judge, whatever the Court determines, that's fine.

THE COURT: A couple of months is not going to be -- that's not what we're here about.

So we're going to look -- so our homework is to look at the falsus in uno language and see if we're going to enrich it and you're going to leave my clerks with your more general sentence about whether we've completely described the scope of damages, if there is to be an award. But I'm not going to redraft the charge to tell the jury that they must award damages. That aspect I'm denying.

All right?

MR. O'HARA: Thank you, Your Honor.

THE COURT: Have a good night. Enjoy your dinner.

MR. O'HARA: Thank you, sir.

MR. BHURTEL: Thank you, Your Honor.

THE COURT: Do you think we're going to get both of your doctors on and off even though we need some time for Mr. and Ms. Ahsan?

MR. O'HARA: So counsel and I spoke while you were out. Initially, I was going to bring Dr. Head at 11:00 and it was 10:30. He's coming at 8:30. He's going to be the first witness who testifies. We expect that he will be done before the lunch break.

THE COURT: Even without Mr. Ahsan's little fill in?

MR. O'HARA: Yes.

If he is done before the lunch break, it gives counsel the option of either calling the husband to do the whatever he's going to do, or starting with the wife.

THE COURT: Well, but the interpreter won't be here.

MR. O'HARA: I'm sorry. The husband. The interpreter came back to tell us he thinks he can get here during the lunch break. He will get here as quickly as he can because the deposition that he's attending is apparently very close to the courthouse. I will have Dr. Bazos here during the lunch break. So if the court reporter is here, then we have the flexibility of choosing with Mrs., but otherwise the doctor gets on and gets off.

THE COURT: And you think you can get the doctor done in less than a full afternoon?

MR. O'HARA: I do. My direct won't be that long.

THE COURT: So, please, you know, just make sure you're as prepared as possible, Mr. Bhurtel. I mean, you know, I don't mean to disparage you. I know it's hard to try a case. I think you're a solo practitioner and you have a well equipped law firm on the other side. There's a lot of documents, but, frankly, you know, the more time you take, it doesn't help your presentation with the jury either so.

MR. BHURTEL: I'll try.

THE COURT: So if you're more organized and your questions come out sharp and quick one after the other, it behoves you and your client as much as it does the Court and the scheduling of the case.

MR. O'HARA: One last thing.

He was to tell us whether he's going first or last in closing.

THE COURT: What do you want to do about the summations, do you want to go first and last or do you want to go last?

You don't know what to do?

MR. BHURTEL: Can I decide tomorrow, Your Honor?

THE COURT: No. What's going to happen between today and tomorrow that's going to make it easier to decide?

Is there something you need to find out that you don't know now or are you just delaying because you can't figure out what you want to do? I can tell, you're just delaying.

I'm going to put you out of your misery, you'll sum up first and last. Okay?

MR. BHURTEL: Yes, sir.

THE COURT: I'm putting you out of your misery. If you don't have a preference, you will follow my preference. You'll go first and you'll have a short rebuttal.

MR. O'HARA: Okay.

THE COURT: Good night, guys.

(Whereupon, the proceedings were adjourned at 5:49 p.m.)

INDEX

MOSTAFA AHSAN 598

DIRECT EXAMINATION 598

BY MR. BHURTEL

CROSS EXAMINATION 671

BY MR. O'HARA

CROSS EXAMINATION 689

BY MR. O'HARA

REDIRECT EXAMINATION 735

BY MR. BHURTEL

CARLOS URENA 748

DIRECT EXAMINATION 750

BY MR. O'HARA

CROSS EXAMINATION 763

BY MR. BHURTEL

REDIRECT EXAMINATION 776

BY MR. O'HARA

RECROSS EXAMINATION 780

BY MR. BHURTEL

Plaintiff Exhibit 117-B 603

Plaintiff Exhibit 117-A 603

Joint Exhibit 65 669

Defendant Exhibit 4695 729

Defendant Exhibit 2761 755

Defendant Exhibit 2762 755

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

----------------------------------x

13-CV-5929(SMG)

MOSTAFA R. AHSAN,

United States Courthouse
Brooklyn, New York

Plaintiff,

-against-

November 18, 2016
9:30 a.m.

STAPLES, INC. STAPLES THE OFFICE SUPERSTORE EAST INC.,

Defendants.

----------------------------------x

TRANSCRIPT OF CIVIL CAUSE FOR TRIAL
BEFORE THE HONORABLE STEVEN M. GOLD
UNITED STATES MAGISTRATE JUDGE
BEFORE A JURY

APPEARANCES

Attorney for Plaintiff: BHURTEL LAW FIRM PLLC
3749 75th Street
Jackson Heights, New York 11372
BY: DURGA P. BHURTEL, ESQ.

Attorney for Defendant: LeClairRyan
One Riverfront Plaza
1037 Raymond Boulevard 16th Floor
Newark, New Jersey 07102
BY: JEFFREY L. O'HARA, ESQ.
LAURA BREITENBACH, ESQ.

Court Reporter: Georgette K. Betts, RPR, CSR, OCR
Phone: (718)804-2777
Fax: (718)804-2795
Email: Georgetteb25@gmail.com

Proceedings recorded by mechanical stenography. Transcript produced by computer-aided transcription.

(In open court; jury not present.)

THE COURT: Anything to take up before we get started?

MR. BHURTEL: No.

MR. O'HARA: No, Your Honor.

THE COURT: Okay.

The witnesses are here and everybody is ready?

MR. O'HARA: We have, Dr. Head to start. Mr. Bhurtel indicated he's going to put the plaintiff back on for redirect. We confirmed with Dr. Bazos he will be here during the normal lunch break. I have asked him to get here as quickly as possible in the off chance we finish this morning early and we break for lunch early, so that rather than a 2:00 p.m. start we have a 1:00 p.m. start option.

THE COURT: Thank you. I'm sorry, I guess we're starting with Dr. Head even though Mr. Ahsan is going to be recalled?

MR. O'HARA: Yes, for purposes of getting him on and off during this morning session.

THE COURT: Okay.

MR. O'HARA: We have many options.

THE COURT: Mrs. Ahsan is around, too, Mr. Bhurtel, or will be?

MR. BHURTEL: Yes.

THE COURT: Ms. Ahsan. Are you calling the wife?

MR. BHURTEL: Yes.

THE COURT: Where is she?

MR. BHURTEL: She's going to come up after two.

THE COURT: After two?

MR. BHURTEL: Yes.

THE COURT: With the interpreter.

MR. BHURTEL: Yes.

THE COURT: Okay, hopefully we're good to go then. And you want the lights dimmed? Let me turn them on at least for when the jury enters and if you start to use the projector I'll turn them back down.

MR. O'HARA: Judge, may I get the witness?

THE COURT: Absolutely.

Is everybody here, do we know?

THE LAW CLERK: For the jury? Let me check.

THE COURT: Yes, don't bring them out until.

THE LAW CLERK: The witness is seated?

THE COURT: Yes.

MR. O'HARA: There is a woman in the Court, she's part of my office, she's not a witness.

THE COURT: Good morning.

One of my former clerks happens to be around the courthouse this morning and she may be entering at some point as well.

We can have the witness take the chair. The jurors

are here.

I assume we are ready to have the jury brought into the courtroom then?

MR. O'HARA: Yes, sir.

THE COURT: Great.

(Jury enters.)

THE COURT: Hi, everybody.

THE JURORS: Good morning.

THE COURT: How are you today?

So you will recall yesterday that, even though the plaintiff had not yet completed his case, we started hearing parts of the defense case because of the scheduling of the witnesses. We are continuing that practice today. The plaintiff's case remains open. I understand we will be hearing a little bit more testimony from Mr. Ahsan and from one additional witness at least, but this morning the defendant will be presenting the testimony of a new witness, Dr. Head.

Dr. Head, please be sworn.

WILLIAM BRIAN HEAD, M.D., called as a witness, by the Defense, having been first duly sworn/affirmed, was examined and testified as follows:

THE COURT: Can you please state and spell your name for us.

THE WITNESS: Yes. My name is Dr. William Brian

Case 1:13-cv-05929-SMG Document 118-2 Filed 12/21/16 Page 815 of 958 PageID #: 1905

Head, H-E-A-D.

THE COURT: Thank you. Please be seated.

You may inquiry.

MR. O'HARA: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. O'HARA:

Q Good morning, Dr. Head.

A Good morning.

Q Doctor, first would you give the jury the benefit of your educational background, please.

A I grew up in the Detroit public school system. I received a scholarship to Harvard. I was at Harvard College from 1962 to 1966. I then received a scholarship to the University of Southern California, School of Medicine USC and was there from 1966 until 1970.

Did a year of internship at the St. Vincent's Hospital in Staten Island in medicine and in psychiatry, and then I did three years of residency in psychiatry at Columbia Presbyterian Hospital at the Psychiatric Institute.

I then -- without -- I think I took two days off, a weekend, I immediately started a second residency in neurology at Mount Sinai Hospital under a famous neurologist at this time, Dr. Morris Bender. I was there from 1974 until 1976.

I then started private practice and I've been involved in private practice since then.

Q Thank you.

Just for purposes of the court reporter just slow down just a little bit.

A Okay.

Q After completion -- first, let's take a step back. After you completed medical school, just generally, can you describe to the jury the difference between an internship and a residency since you engaged in both?

A Well, the internship is the beginning of a medical career. It's a practical experience in treating patients. It's the very first experience. You're basically a second lieutenant, if you use a military analogy. You are the person who first comes out and starts to see your patients and it's in a somewhat supervised setting, and you're expected to use your skills that you learned in medical school to make diagnoses and to plan treatment courses.

In my particular case, I did a rotating internship in medicine and psychiatry, so I had an experience in, I think medicine was a four or five months and then I had the rest of the experience was in psychiatry. So it also counted as a year of psychiatric residency, although I didn't use it as such at the time.

THE COURT: How does that compare to a residency, was part of the question.

THE WITNESS: That is what you do before the

residency ordinarily. Before you do a residency you do the internship.

BY MR. O'HARA:

Q And then after you completed the internship you mentioned that you did two separate residencies. Can you explain to the jury why you are doing separate residencies in a particular field of medicine like psychiatry followed by the field of neurology?

A Well, I was always interested in doing both. I wanted to start off with psychiatry. I'd developed -- I really started off medical school with the idea of being a psychiatrist but I became fascinated by medicine and medical school. I said, well, I'm good at psychiatry, I could be good interviewing patients and treating patients, but I'm also good at medicine and I want to integrate my medicine experience with my psychiatry experience, so that's why I did the second residency in neurology. It was always part of the plan.

Q Then would it be fair to describe residency as a specialized focus in the area in which you're seeking the residency program?

A Yes, it is. It's exactly a specialized focus. Whereas, the internship is more of a general medicine experience with some overlay of the specific field you're going to go into.

The residency is basically a clerkship in the particular field that you're going into. It's where you're

Case 1:13-cv-05929-SMG Document 118-2 Filed 12/21/16 Page 818 of 958 PageID #: 1908

supervised by other professionals in the field, you learn the language, you learn the methods of interviewing, you learn the medications you're going to be using, the treatment approaches you're going to be using and that's basically what you do in each of those residencies. They are separate and independent. Most people don't do those two residences.

Q And upon completion of your education and training, you obtained a license to practice medicine in the State of New York?

A Well, actually I completed the requirements to become a licensed physician in the State of New York rather early on. That was I think in 1971 I became licensed in the State of New York. In 1972, I believe I was licenses in the State of New Jersey and later on the other licenses came in.

Q Just so the jury understands, you have licenses or in licensed in New York, New Jersey, California, Massachusetts and Florida, correct?

A That's right.

Q Now as part of your medical practice over the years, have you been affiliated with many medical institutions?

A Yes. I've been affiliated -- well, when I was in my training I was at Los Angeles County General at USC. And then later on, I was at St. Vincent's in my internship, then with Columbia Presbyterian Hospital, then finally with Mount Sinai. Then later on I became -- I went on the staff at Beth Israel

Medical Center in the City of New York, Department of Neurology and eventually back to St. Vincent's, which is now known as Richmond University Medical Center where I'm on the staff in psychiatry.

Q During the course of your career, have you obtained board certifications in any specialties?

A Yes, I have.

Q What board certifications do you hold?

A Well, I became -- I have five of them. I became certified in psychiatry first when I was still a psychiatry resident actually, because of that year training I had at St. Vincent's. Actually I became certified in psychiatry the first year of my neurology residency, excuse me. I became certified in psychiatry first in 1975.

Then I became certified in neurology in 1983. Then I became certified in neuropsychiatry in 2007 and in neuroimaging, the interpretation of MRIs and CAT scans of the nervous system, head, neck and back in 2011.

Then I finally became certified in brain injury medicine in December of 2014, just two years ago.

Q Now I want to talk a little bit about the brain injury medicine certification you have. First, that is a certification that actually just became a board -- a topic for board certification in 2014, correct?

A That's correct.

Q And that's the specialty focused on neuroscience specific to brain injury medicine, correct?

A That's right.

Q And the first people, physicians that were certified in October of 2014, the total number of people in the United States were approximately 300 physicians, correct?

A That's right. Actually we took the test in October, we passed it in -- we were certified in December.

Q And since that time, in terms of other physicians that have obtained that specialized certification in brain injury medicine, there are now less than 500 in the United States; is that correct?

A That's what I believe to be the case.

Q Now, Doctor, in terms of your practice, are you actively engaged in the practice of medicine?

A Yes, I am.

Q As part of that daily active practice, do you see patients that present with head or -- either symptoms of pain or disturbances associated with complaints of the head?

A Yes, I do.

Q Do you see patients with complaints associated with pain or difficulty with the neck?

A Yes, I do.

Q Do you see patients presenting with complaints associated with emotional items?

A Oh, yes.

MR. O'HARA: Judge, at this time the defense offers Dr. Head as an expert in the field of neurology, psychiatry, with a specific subspeciality in the area of brain injury medicine.

MR. BHURTEL: No objection, Your Honor.

THE COURT: Your proffer is accepted by the Court.

MR. O'HARA: Thank you, Your Honor.

Q Doctor, in connection with this case you were initially retained to serve as a defense consultant associated with the medical issues in this case; is that correct?

A That's correct.

Q In doing so, you were provided with written materials relating to the alleged incident and the care and treatment that was provided to Mr. Ahsan?

A I was.

Q In doing so, did you thereafter create a report that summarizes the opinions that you held in this case and the basis for those opinions?

A I did.

Q Since we've been through this with a number of experts I'm not going to walk you through all of the items. You've prepared a summary of the records that you reviewed, Bates stamp, Judge, 1646 through 1656.

You prepared a summary of all of the medical records

reports and discovery items that were presented to you to consider to evaluate for purposes of formulating an opinion, correct?

A Yes, I was.

Q After creation of that first report, which was on June 2, 2015, that process continued, correct?

A That's correct.

Q And you were provided with additional materials as the case continued, you then prepared an addendum to your report on August 4, 2015?

A Yes.

Q And thereafter same process, you were provided with materials that were being generated in the litigation, or through other sources, and you prepared a second addendum which is dated March 21, 2016, correct?

A That's correct.

Q And then even up through coming into the courtroom today, as the court reporter has been transcribing the trial testimony, you've been provided with the trial testimony of the experts that have testified in this case, correct?

A That's correct.

Q Doctor, did you, in addition to reviewing the actual hard documents, whether they be transcripts, medical records or other paper items, did you also review the actual diagnostic films that were generated in the case?

A I did indeed.
Q Did you review all of the films, as you understand it, from all of the providers that have conducted diagnostic evaluations of the plaintiff relating to his head and his neck?
A Yes, I have.
Q As a result of doing all that over the course of past number of years, have you formulated opinions that you are prepared to offer to this jury within reasonable medical certainty?
A Yes, I have.
Q Doctor, I want to instruct you, I only want you to tell this jury opinions that you hold to that standard.
Will you do that?
A I will do that.
Q So did you first meet Mr. Ahsan at a physical examination on June 2, 2015?
A I did.
THE COURT: No more leading, Mr. O'Hara.
MR. O'HARA: Yes, sir.
Q And in doing so, did you obtain a history from him?
A Yes, I did.
Q What did he give you by way of history relating to this event?
A If I may refresh my recollection. I can tell you just

offhandedly before I refresh my recollection. He told me that he had sustained injuries to his left shoulder, head and neck in an accident where two boxes had fallen off a shelf at Staples company and had fallen on him on the day of his injury, I think was September 2011.

Q In order to testify, Doctor, you're going to look at the reports you prepared over the past number of years?

A Yes.

Q When you do so just make sure that you identify for the record the date of the report that you're looking at so we know what you're using to refresh your memory, okay?

A Yes.

MR. O'HARA: Judge, we will not be offering any of the narrative reports, but they are all identified by way of Bates number. We can do it later with Mr. Bhurtel.

THE COURT: Okay.

A I didn't refer to that just now, but I do remember that I had taken the information from the report that I originally wrote earlier today and, in fact, yesterday also. And that report was dated June 2nd, 2015, the day of his evaluation.

Q Doctor, when you communicated with the plaintiff in the examination, what language did you speak to him?

A English.

Q What language did he speak back to you?

A English.

Case 1:13-cv-05929-SMG Document 118-2 Filed 12/21/16 Page 825 of 958 PageID #: 1915

Q Did he give you a history with respect to medications that he was taking as of June of 2015?

A He did.

Q What are the medications that he identified for you that he was taking at that time?

A Referring again to my report of June 2, 2015, he told me he was taking Simvastatin, which is a cholesterol lowering agent.

Tamsulosin, which is a prostate agent.

Losartan, which is a medication for hypertension.

Tramadol, he didn't know the dosage, that's for pain.

Vitamin D as a vitamin supplement and Naprosyn, 500 milligrams once or twice daily as needed.

Q Doctor, in terms of as a practicing physician you're familiar with the side effects that may arise from one or a combination of those medications?

A Yes.

Q Do those side effects include headaches?

A Yes.

Q Do those side effects include dizziness?

A Yes.

Q Do those side effects include for forgetfulness?

A Yes.

Q Do those side effects include insomnia?

A Yes.

Q What is insomnia for purposes of a medical description of it?

A Difficulty sleeping. The word literally means no sleep. But it means in actual terms, day-to-day terms, difficulty sleeping.

Q I want to go through the history that you elicited from Mr. Ahsan on examination.

Did he give you specific information about what happened to him as a result of the alleged incident?

A He told me that, yes.

Q What did he tell you, please.

A He told me he was struck by two boxes that fell from above and struck him on his left shoulder, head and neck. He said he did not lose consciousness. He did not fall to the floor. He recalled feeling immediate pain in his neck and left shoulder. And he spoke to an employee at the store. He was asked whether he wanted to be taken, I gather to the hospital. He then took a taxi from the store to his primary care physician, Dr. Guha, and there was examined by Dr. Guha and began treatment for his problem.

Q Did you ask him questions about the body parts that he was complaining of from the incident as to whether or not he had any past medical history with those body parts?

A Yes, I did.

Q What did he tell?

A If I may refresh my recollection by going to his neurological history. I believe he said he never had those things before. One second, please.

He did not have any past history of any prior complaints.

Q As part of the materials that were provided in this case, did you come to learn that that history was inaccurate?

A Yes.

Q Did he provide you with a history with respect to any social habits and in particular whether he was a smoker?

A Yes, he did. Let's see. I don't have anything here whether he was a smoker or not actually.

Q In terms of your review of the medical records relating to his past medical history, did you come to learn he suffered from any neurologic conditions?

A He had a history of neck pain in the past and that's understandable in reviewing subsequent films. But he had a history of neck pain in the past, he had a history of left shoulder pain in the past and I think he had some headaches also.

Q One of the references that we've heard during the course of this trial is cervicalgia. What is that?

A Neck pain. Cervic is the Latin word for -- cervix in the Latin word for the neck. Algia just means pain. So

cervicalgia is pain. Like cephalgia is headache pain.

Q Understood. As part of your evaluation, did you also conduct a neurological examination of Mr. Ahsan?

A I did.

Q What did that consist of?

A The examination consisted of a -- well, first of all, the examination involved taking a detailed history from him and going over the history with him, and observing his ability to respond to questions and concentrate on the questions and comprehend the questions and his ability to speak without hesitation. His fluency of language.

It also involved an assessment of his cranial nerves to see whether or not there was any impairment of his cranial nerves, the nerves of the head and face. An assessment of his general motor power. An assessment of his reflexes, an assessment of sensation, an assessment of coordination, and an assessment of whether or not there was any evidence of carpal tunnel syndrome in his wrists.

Q In addition to range of motion, neurologic tests, did you also conduct a mental status examination?

A I did.

Q Can you explain to the jury how you did that.

A Well, that was what I started to say before. I did that indirectly, I did the examine. I noted his ability to understand my questions, his ability to speak without

difficulty. I did test him directly on calculations and orientation. Aside from that, most of his mental status examination was done indirectly.

Q What were the findings of his mental status examination?

A He was alert, oriented, able to do calculations. He had a friendly affect, which is to say, he was a friendly person. He was pleasant. He was outgoing. He showed no word finding difficulty. He spoke English. No slurred speech was noted.

He was able to concentrate. He was able to process his thoughts quickly and he was able to render a fairly detailed history, and his immediate recall was intact. His overall memory was within normal.

There was no evidence of impairment of concentration, no evidence of impairment of comprehension. There was no evidence of any concentration difficulties, as I indicated, and that I concluded, therefore, that his mental status, neurologically mental status examination failed to reveal any evidence of any cognitive impairment.

Q Now, Doctor, we've heard Mr. Ahsan testify in this case in both English and in Bengali. What I want you to explain to the jury is the importance of that ability as it relates to a brain injury and the ability to process information.

Can you explain to the jury the significance of that ability to speak multiple languages?

A Well, it's a certainly a wonderful ability. It's -- you

know, the studies have shown that the areas are slightly different. They are more or less -- the language capabilities are in the same area but they are a little bit different locationwise in the brain. But the upshot of that is that someone who is able to do that, generally speaking, is able to handle the concepts very quickly and easily and shows no sign of any brain injury.

Q Now as a result of the review of the materials that were provided to you as well as the neurological examination that was conducted, as well as the materials having been provided up through the trial, have you come to any opinions within a reasonable medical certainty regarding his cervical condition?

A Yes.

Q First, can you tell the jury what that opinion is and then I will ask you specific questions about it.

A My opinion was that there was no evidence of cervical radiculopathy. In other words, there was no evidence of any nerve damage in his neck and that's what I gleaned from my examination, my neurologic examination of him.

I also reviewed his films. And I found evidence of -- his cervical x-rays of multi osteophytes, which is to say, an overgrowth of bone from arthritis in his neck.

I also reviewed various other films. But the bottom line was, that I diagnosed -- I said that he had a condition in his neck that was due to chronic arthritis but I found no

evidence of any acute neurological condition for his neck and I found no evidence of any nerve damage from his neck.

Q Again, we've heard these terms so I don't need you to go too deep in this, but can you explain to the jury the difference between acute, traumatically-induced disc herniation as compared to a chronic or degenerative disc herniation from a neurology or neuroscience perspective, please?

THE COURT: Before you answer that question, did you see any evidence disc herniation.

THE WITNESS: No. What I saw was multiple osteophytes, osteophyte bulging disc complexes. Where the osteophytes exceeded the dimensions of the disc, which is a sign of chronic illness, chronic deterioration, but I saw no evidence of any acute disc herniations.

Q So we're clear on this, so physicians in the field evaluating the cervical spine will use the term "bulge" and will use the term "disc."

This gentleman does have bulging discs in his cervical neck, correct?

A Yes, he does.

Q When you're explaining what you see on those diagnostic films, what is your opinion as to what has caused those bulging discs in his cervical spine?

A Well, this will take place over time because of the fact

that the osteophytes, the bone, has grown over the discs. This did not happen acutely, and it didn't happen in a couple of years from the time of his accident until the time he had his films. This had to have occurred over many years of time.

Q Did you see in the review of those films any acute changes that you can identify within reasonable medical certainty that were caused by or related to the September 2nd, 2011 event?

A No.

Q You conducted a physical examination of the cervical spine as well, correct?

A That's right.

Q What you did find with respect to the -- what significant findings, if any, did you attain from that examination?

A Well, for one thing he had a completely normal range of motion of his neck, which is rather surprising. There was no sign of any restriction of motion on flexion, extension or lateral rotation of the neck. His low back actually showed some impairment of extension, but his neck showed no impairments of extension or flexion or rotation.

Q Just for purposes of demonstration, when you are testing the range of motion of the patient's neck, you're having them turn left to right, correct?

A That's right.

Q Having them try and touch their ear to each shoulder,

correct?

A Yes.

Q Having them try and touch their chin to their chest, correct?

A Yes.

Q And then having them lean back as if they are looking up at something above them, correct?

A That's correct.

Q Based on your physical examination, did Mr. Ahsan exhibit any restrictions, within reasonable medical certainty, attributed to the September 2, 2011 event?

A No, he didn't. He didn't -- in fact, he didn't show any signs of restriction which was surprising considering his neck, his films of his MRI -- the MRI films of his neck.

Q We may have already covered this, if so, please tell me. Did you find any evidence of cognitive impairment?

A No.

Q And tell the jury when I use that phrase, what does that mean?

A Well, cognitive impairment actually covers a lot of territory, but in simple terms, did the patient have any trouble remembering the date? Did he have any trouble doing calculations? Did he have any trouble answering questions? Did he have any trouble understanding questions? Did he have any trouble concentrating on what you were saying? All those

things were normal.

Q Now your report makes reference to a syndrome that you found, based upon your interaction with Mr. Ahsan, as well as what you gleaned from the medical records reports and discovery in this case, you described it as functional exaggeration symptom magnification syndrome. What is that?

A That means -- when a neurologist writes that means that we found a number of findings that the patient had to have made up himself, he had to fabricate it. Those were not findings that would come from an actual injury or condition of the spine or head.

Q And, specifically, can you describe to the jury on physical examination the decreased sensation findings and their correlation to the nerve roots that you understood were affected?

A Well, he claimed decreased sensation to pinprick involving the right lower extremity diffusely --

THE COURT: Doctor, I'm sorry, start your answer again a little more slowly.

Q Slow down.

A I'm sorry. He said there was decreased sensation to pinprick, as I examined him with a pin, and decreased sensation to vibration and light touch throughout the lower extremity not corresponding to any nerve root. Ordinarily, when that occurs, you're looking for a nerve root

distribution. This also did not correspond to any brain region, because the reflex examination, which is another part -- one of the ways we cross check ourselves, is to see whether there was hyperreflexia. If it involved one part of the brain, there would have been hyperreflexia or, in other words, increased reflexes in the area; there were none.

So, the decreased sensation to pinprick and vibration and light touch in the right lower extremity was completely fabricated.

THE COURT: You said the right lower extremity.

THE WITNESS: That's right.

THE COURT: Is that what he described to you?

THE WITNESS: Yes.

THE COURT: That it was the right?

THE WITNESS: Well, no, this is what I found here, Your Honor.

THE COURT: I see.

THE WITNESS: He said something else, but this is what I found when I did the exam.

Q Now, Doctor --

THE WITNESS: There were other findings as well.

Q Please continue.

A There decreased sensation to pinprick, light touch and vibration involving the ventral surface of the left forearm. I am pointing to that now. The forearm is below the elbow.

The ventral surface, this entire lower part, portion of the right forearm. This is the dorsal, the top of the arm, forearm. And this is ventral, the bottom of the forearm.

He said there decreased sensation --

Q Slow, please.

A Sorry.

Q We know you know this --

A I know --

Q -- but we need you to go slow.

A -- I'm always too fast.

There was decreased sensation to pinprick, light touch and vibration involving the ventral surface of the left forearm. That was little beyond, in other words, it didn't correspond to any nerve root area either.

There was also said to be decreased sensation to pinprick in alternating distribution involving the lower extremities. In other words, I tested him one way and he'd say one thing and I'd test him again and he'd say something else. The findings were not internally consistent.

All of those findings were not anatomic and what we call functional. In other words, they weren't real.

Q I'm going to now move to the brain and in particular the diagnostic studies that you had a chance to evaluate. First, did you observe any changes in the brain that you could identify as being traumatic or -- strike that -- acute.

A First of all, there were no acute findings at all. As far as traumatic is concerned, I found no evidence of any trauma to the brain.

Q There's been discussion in this case that Mr. Ahsan suffers from a traumatically-induced hygroma.

First, what is a hygroma?

A Hygroma is a collection of fluid that generally occurs after there's been a subdural hematoma.

Q What's a subdural hematoma?

A A subdural hematoma is a collection of blood between the dura and the arachnoid. What you see is a semi-circular accumulation of the blood, I think it shows up as a very sharp image on CAT scan and eventually also on a MRI. And then it gradually goes away with time and you're left with a hygroma.

Now that ordinarily does not expand. It ordinarily gradually diminishes with time.

Q Just so breaking it down to non-medical terms, for there are to be a subdural hematoma, which is a bleed below the dura, or the sheathing around the brain, you would expect to see blunt force trauma followed by immediate bleeding in to the brain, correct?

A Pretty much, yes.

Q And when that happens, when that happens, is there a symptoms that is expected to be complained of or demonstrated by a patient that would result in a physician taking action

Case 1:13-cv-05929-SMG Document 118-2 Filed 12/21/16 Page 838 of 958 PageID #: 1928

immediately?
A Yes.
Q And, first, the types of symptoms, can you describe for the jury if there is in fact a subdural hematoma, what kind of symptoms you would expect to see.
A You'd expect to see the patient to be disoriented you'd -- in other words, they wouldn't know where they were or what they were doing and/or you'd expect to see some memory impairment. Then you would expect to see some difficulty with hemiparesis if the patient had a subdural on the left side of the head, in the left frontal region, you'd expect to see right-sided weakness on the whole right side of the body.
Q When you're saying left-sided hemiparesis, are you using the phrase "hemiparesis," you're talking about the entire side of the body being affected by an ongoing brain bleed?
A Yes.
Q Which is affecting the function from -- that is controlled by that aspect of the brain, correct?
A That's correct.
Q If a physician is presented with a patient immediately after an incident that has one, two, any amount of these symptoms, does the standard of care require that physician to do something?
A Yes.
Q What does the standard of care require them to do?

Case 1:13-cv-05929-SMG Document 118-2 Filed 12/21/16 Page 839 of 958 PageID #: 1929

A Immediate referral to a hospital emergency room where he's to see a neurologist and/or a neurosurgeon.

Q And when there is an immediate referral to an emergency room and an assessment to evaluate head trauma, are there a series of diagnostic tests that are immediately ordered to determine whether the person has a brain bleed?

A Yes.

Q If you do not address a subdural hematoma that is active, what happens to patients?

A It's somewhat variable. What happens much of the time is that since it's the subdural and not an epidural, it gradually goes away without having need of neurosurgical intervention. But if it's large and if it involves a number of different functions simultaneously, you have to have immediate removal of the blood from the subdural.

Q And just for purposes of understanding, small versus large. During testimony earlier in this case -- this is Exhibit 110H, I'll stand here for you, Doctor -- there was a description by one of the physicians in this case that Mr. Ahsan had a hygroma, a traumatically-caused hygroma that ran all along the left-hand side of his skull. And it was described as being from about the middle of the eyebrow all the way along the side of the head above the ear.

Do you see where I'm talking about on this diagnostic film?

A I do.

Q Would you describe that as a large area of the brain if there was, in fact, a subdural hematoma that resulted in the gap that was there after the basis for the development of a hygroma?

A Well, it would have been significant. Looking at those films you have to understand, they are not entirely clear that there's a hygroma there. There is evidence there of retraction of the brain from the cranium, which could be a sign of focal atrophy of the brain which is consistent with age. I'm not still not convinced there was a hygroma there.

Q I appreciate that, but what I'm saying is accept it as true for purposes of my question, if there is a bleed in the brain that goes from above the eyebrow to above the ear, that is 20 percent of the surface area of the head, give or take?

A Roughly, yes.

Q That would be described as a major portion of the brain --

THE COURT: Sir, you're leading again.

Q How would you describe that portion of the brain if in fact there was a subdural hematoma of that size?

A I would say significant, it's significant, and it would probably require immediate evaluation in the emergency room.

Q Doctor, in this case you, as well other physicians, have described this patient as having small vessel ischemic

disease.

A Yes.

Q What is that?

A It shows up on the MRI as little white dots. This is very uncomfortable to discuss because we all have them. As we get older we get more and more white dots. If you get enough white dots you become demented. It's a sign of vascular disease in our brains. When we start thinking about when we're 18 or 19 years old and they get gradually get more and more as we get older, they gradually become more frequent as we get older.

That's the way we tell that there is something called leukoaraiosis, which is to say, micro vascular disease in one spot or the other of the brain and they show up as little white dots.

Q And as a patient gets older, these natural changes in the brain that you just described from the small vessel ischemic disease continue to become more, correct.

A Exactly. It happens in every one of us.

Q You mentioned the phrase "dementia," are there medications prescribed to address the affects of these changes in the brain as a patient gets older?

A Yes.

Q And are you familiar with the medication called Aricept?

A Yes.

Q Is that prescribed to address dementia, or symptoms associated with dementia?

A It's prescribed to address anything having to do with memory impairment, as one gets older. It could be dementia, or it could simply be mild memory impairment.

Q And how about Namenda N-A-M-E-N-D-A, same thing?

A That is another medicine used for that same purpose, but it's not as benign as Aricept. People have to use that very sparingly. And the indication for it is that the brain memory loss is more severe than it ordinarily be with Aricept use.

Q You're familiar with the side effects from that particular medication?

A Yes.

Q And they include headaches?

A Yes.

Q Dizziness?

A Yes.

Q Confusion?

A Yes.

MR. BHURTEL: Leading, Your Honor.

THE COURT: Counsel.

BY MR. O'HARA:

Q Tell them what side effects.

A They include a series of cognitive impairments, which is strange because you're giving it to the person to help them --

to keep from being -- having a memory problem and they can cause the headaches, they can cause some degree of confusion themselves.

Q And in reviewing the medical records in this case, that prescription was rendered in 2016, correct?

A Right.

Q Now, Doctor, there has been testimony about the diagnostic studies that were performed of Mr. Ahsan's brain. We heard the phrase "diffusion tensor imaging" or DTI --

A Yes.

Q -- are you familiar with that technology?

A Yes, I am.

Q You had an opportunity to review the March 23, 2015 DTI study as well as the report, correct?

A That's right.

Q In your professional judgment, within reasonable medical certainty, did it show diffuse axonal injury in this patient?

A No.

Q What did it show?

A The problem with DTI is it's nonspecific. We know the patient had vascular disease throughout his white matter. The DTI being positive in his case could simply mean that this was a finding from the white matter leukoaraiosis. We cannot conclude on the basis of that one study that there was diffuse axonal shear in the history, as it's certainly not consistent

with diffuse axonal shear.

THE COURT: Can you --

THE COURT REPORTER: Diffuse axonal shear?

A Diffuse axonal shear.

Q When you're saying "shear," you're spelling -- that's the word S-H-E-E-R[sic], correct?

A Right.

Q Can you explain to the jury what's diffuse axonal injury and in particular when you're using the phrase "shear," what does that mean?

A It means that axons are being damaged throughout the brain and that there is evidence of a disconnection of axons from their primary target, and as a result of that a person starts having -- has a series of intellectual impairments.

And it was first diagnosed in the 1950s, I think, and it started -- as neuroimaging became more advanced, we started to see evidence of it on our films.

It is very a interesting syndrome. It generally involves a great deal of force however. You ordinarily see that when there is some severe injury to the head. You ordinarily would not see that with mild trauma to the head.

Q And I'm going to finish with this line, which is you just used the phrase great deal of force. First, for the condition of diffuse axonal injury to occur, we heard the phrase coup contrecoup movement or acceleration/deceleration.

Can you explain to the jury what that is first.

A If you're in an automobile accident or a high velocity collision and you stop suddenly, your brain keeps going for a microsecond and it hits the front of your head, then it bounces back.

Now sometimes the damage is a coup injury. In other words, it's right where it's hit, where it hit the head -- the skull rather. And sometimes it's also the other side, it's on the reverse side of the head or the reverse side of the brain where you have the damage, because you're hitting both sides of the head -- or the brain, rather, inside the head when you do that, a force to acceleration/deceleration.

That generally doesn't apply in anything other than a severe acceleration/deceleration injury.

Q I want you to assume for purposes of my question that there's been testimony in this case that in response to external stimuli, meaning being contacted by some items that were alleged to have fallen off a shelf, that the patient responded by turning his body away, in particular rotating his chin away from the contact point. In your opinion, within reasonable medical certainty, is it medically possible for that to have caused diffuse axonal injury?

A No.

Q In your professional experience over the past -- how many years have you been practicing?

Case 1:13-cv-05929-SMG Document 118-2 Filed 12/21/16 Page 846 of 958 PageID #: 1936

A I've been a neurologist since 1976. I've been practicing medicine since 1971.

Q Have you ever heard of a diagnosed case of diffuse axonal injury, traumatic brain injury that is resulted by a patient moving him or herself away from external stimuli?

A No, I've not.

MR. O'HARA: Thank you. I have nothing further, Your Honor.

CROSS-EXAMINATION

BY MR. BHURTEL:

Q Good morning, Dr. Head.

A Good morning.

Q With respect to his head injury, did he made any complaints with you?

A He said he had headaches. Let's see what else he said. One second, counselor.

Q I can help you if you want.

A No, that's okay, it's all right. I'll find it for myself.

His exact complaints were, he had headaches, he's had some dizziness. He said he had some memory and concentration impairment and difficulty talking and finding the right words with which to speak. He said he had difficulty with balance. And he had bilateral blurred and double vision. Those were his head complaints. And

concentration and memory impairment.

Q Did he say he's experiencing anxiety and depression with you?

A He did.

Q Did he say he's experiencing nightmares?

A He did.

Q And did he also said he's taking the medication with respect to his memory problem?

A Actually he didn't say that. He said there are some medicines he didn't know -- he didn't know what he was taking. He said he was taking another medicine, he didn't know what the name was. I understand subsequently he was taking Aricept.

Q Did he told you that he was taking Tramadol?

A Yes.

Q And what is the purpose of that medication?

A It's a medicine for pain.

Q Did he say he was taking Naprosyn?

A Yes, he did.

Q What is the purpose of that medication?

A That's an antiinflammatory that's used for treatment of pain.

Q So when you use the antiinflammatory pain, basically which part of the joints we are talking, shoulder joints, neck joints, kind of thing?

Case 1:13-cv-05929-SMG Document 118-2 Filed 12/21/16 Page 848 of 958 PageID #: 1938

A Actually it's good for virtually everything that's inflamed. You can use it for a sore tooth, you could use it for a sore nose, a sore ear. You could use it for joints or inflamed ribs. Ordinarily it's used for musculoskeletal pain.

Q And did he complain to you of left shoulder pain?

A He did.

Q And did he also complain that his left shoulder pain radiating to his arm?

A Yes, he did.

Q He did not complain of the lower back, right?

A I'm sorry?

Q He did not complain the lower back pain with you, right?

A No, he did not.

Q Doctor, you prepared this report dated June 2015, can you tell the jury who asked to you prepare this report?

A Sure. Hold on a second. I think it was the law firm of Simons Jannece & DeLuca, Hauppauge, New York.

Q And any medical records or documents or information was provided by that law firm?

A Yes, they were.

Q How much was your fee to prepare this medical report?

A My fees to prepare the neuropsychiatric evaluation report was $1500, that was for the exam and the report.

Q When you were doing the physical examination of Ahsan, is there any other people who were there?

Case 1:13-cv-05929-SMG Document 118-2 Filed 12/21/16 Page 849 of 958 PageID #: 1939

A Well, it depends. If the person comes with somebody they generally, like many people, like to have a family member with them, I understand that.

In this particular individual's case he had a private investigator I believe from his attorney's office with him. And he had -- who else did he have? He was accompanied by his wife and the investigator.

And in my office when I do the exam, a physical exam on a patient, I have my history taker, helper come in and write the results down as I dictate when I'm doing the exam.

Q And do you recall the name of that private investigator?

A The private investigator, I don't recall but it's my report. Jonathan Valderrama.

Q He was the entire time present when you were doing the examination?

THE COURT: I'm sorry, could you repeat the question.

Q He was the entire time present with you when you were doing the examination of Ahsan?

A You know, I don't have that information. I just have that he started off in the room with me when I was doing the examination. I assume he was there the whole time but I don't know that.

Q Doctor, is it fair to say you do 700 to 800 this kind of litigation -- medical examinations for the litigation purposes

per year?

A That's true.

Q And is it fair to say that you make 2 million-dollar gross from doing the medical examination for the litigation purpose?

A That's what my office makes, yes.

Q It is fair to say your practice involves about 90 percent of your practice is to do the physical examination for the litigation purpose?

A About 70 to 80 percent actually.

Q So 70 to 80 percent is your mostly --

A Yes.

Q -- you do the -- primarily you examine people and prepare the report for the litigation purpose?

A Yes, that's right.

Q Is it fair to say that you do not recognize any medical textbooks are authenticate for the purpose to practice in your area?

MR. O'HARA: Judge, I'm going to object to the form.

THE COURT: I don't think we're following your question, Mr. Bhurtel, I'm sorry. The way it came out was, is it fair to say that you don't recognize the authenticity of medical textbooks in your practice area.

Is that what you meant to say?

MR. BHURTEL: Yes, Your Honor.

THE COURT: Are there medical textbooks that you think are useful to your practice?

THE WITNESS: There are plenty of authenticate medical textbooks. Barnes & Noble is filled with authenticate medical textbooks. My office is too. They're authenticate, they are written by doctors, they're authenticate.

THE COURT: And you find some of them useful?

THE WITNESS: I find them all useful, almost all useful.

THE COURT: Mr. Bhurtel, is the gentleman in the back of the courtroom expected to testify.

VOICE: Yes.

MR. BHURTEL: Oh.

THE COURT: Is he expected to be a witness in the case? Mr. Bhurtel, I'm asking you a question, is that gentleman expected to be a witness for the plaintiff in this case?

MR. BHURTEL: I need to ask, Your Honor, name, I don't know. I don't recognize myself, that's why.

THE COURT: Okay. I see. Why don't you excuse yourself for a moment.

Please continue your examination.

MR. BHURTEL: Thank you, Your Honor.

Q Do you recall in testifying at a deposition saying that -- may I approach, Your Honor?

THE COURT: Sure.

MR. O'HARA: If he's going to approach can we have a page, line and Bates number.

THE COURT: Absolutely.

MR. BHURTEL: 1688. And line 9-2.

THE COURT: Line what?

MR. O'HARA: Page and line, please.

MR. BHURTEL: Page -- well, 1688.

MR. O'HARA: I know that's the Bates stamp. There are four pages of the transcript.

MR. BHURTEL: Okay. Page 17.

MR. O'HARA: Just show me where you're reading.

BY MR. BHURTEL:

Q Can you read from line 9 to 13.

A Right. Your question: "You are saying that you do not have any textbooks that you can say are authoritative for your practice?"

My answer: "Only the Bible."

"No medical books?

"Maybe the Koran and the Bible."

MR. BHURTEL: Thank you.

Q You did only one time physical examination of Mostafa, right?

A That's correct.

Q Do you consider that the EMG tests are objective tests?

A I think they're objective up to a point. There's some degree of subjectivity, professional subjectivity in terms of their interpretation.

Q My question, please answer yes or no.

A This is not really a yes or no answer. But it's partly true, they are partly objective.

THE COURT: Just to be clear, we're talking about EMG tests?

MR. BHURTEL: Yes, Your Honor.

THE COURT: And to understand your answer more clearly, frequently when we talk about subjective tests we talk about the patient being the source of the subjectivity. I think I understood your answer to suggest that the subjectivity you feel applies in the EMG testing context comes from the clinician, from the doctor.

THE WITNESS: That's right, Your Honor. There could be a difference of professional opinion in what the results mean. But -- and, therefore, I don't want to use the term subjective, let's say authoritative in terms of the people's background and influence -- or their backgrounds and education what do they consider important about that particular test and there might be a difference between the two professionals.

THE COURT: But the patient can't control the outcome of his EMG result?

THE WITNESS: That's right. The patient can't

Case 1:13-cv-05929-SMG Document 118-2 Filed 12/21/16 Page 854 of 958 PageID #: 1944
853
HEAD - CROSS - BHURTEL

control that.

(Continued on the next page.)

GEORGETTE K. BETTS, RPR, CSR
Official Court Reporter

CROSS-EXAMINATION

BY MR. BHURTEL:

Q And you reviewed the EMG test of Mostafa in this case, right?

A I did.

MR. BHURTEL: 829.

THE WITNESS: Page 3 of my medical record.

Q Do you know what was the finding of that EMG test?

A Dr. Morgenstern did that test on February 16th, 2013, and said he found evidence of a right C6-C7 radiculitis.

Q And did you have the EMG test of Dr. Krishna?

A Let's see. What's the date, counselor?

Q Let me help you. So I have a copy here.

A Sure. I just want to make sure.

Q Yes. (Proffering.)

THE COURT: Can you say the Bates number of the page you're showing the doctor.

MR. BHURTEL: 2399.

THE COURT: Thank you.

A This test date was 6/13/14.

Q And did you review that EMG test?

A Yes, I did.

Q And what was the finding after that EMG test?

A He said -- Dr. Krishna said that he found not damage at C6-7 or, rather, not a pathology at C6-7, but found evidence

of a left -- different side, actually, too -- left C5-C6 radiculopathy, not a right C6-C7 but -- first one as C6-C7 right was the other doctor. Dr. Krishna he said found a left C5-C6 radiculopathy. Didn't find anything at C5-6, C7.

Q Did you had an opportunity to review Dr. Krishna's January -- page 2491 -- Dr. Krishna's test dated 1/21/2016, EMG test?

A I don't think so. I don't believe I have seen it.

Q Doctor, is it fair to say most of the time when you do this medical examination litigation report, you do most of the time for the defendant's lawyers?

A Most of the time. I do some work for other organizations, but most of the time I do it for the defense.

MR. BHURTEL: Page 1735.

Q Doctor, this your report, right?

A That's right.

Q Can you read the last paragraph for the jury, please?

A Sure.

"Mr. Ahsan was examined with reference to specific complaints emanating from the original injury in accordance with the restrictive rules concerning an independent medical examination. It is, therefore, understood that no treatment was given or suggested and that no doctor/patient relationship exists."

Q Is it fair to say the purpose of that notice or statement

is the patient should follow their doctor for the purpose of treatment, not you?

A Basically, yes.

Q How much was paid you to make all this medical litigation report?

A Let's see. Well, for the first neuro psychiatric examination --

Q Hold on, Doctor.

I don't need the detail. In total, how much was paid to you, including today's testimony?

MR. O'HARA: Judge, I'm going to object because the question was about a report.

THE COURT: Sustained.

But you can certainly reframe the question if you wish to withdraw the earlier one and pose a new one.

MR. BHURTEL: Yes, I will do that.

BY MR. BHURTEL:

Q Doctor, could you tell the jury that how much was paid to you in doing this litigation work until now, from beginning to until now, including today's testimony?

A Well, not -- well, first of all, everything up 'til today was $7,650. Today I'm charging $7,500 for being here.

THE COURT: So a total of 15,100?

THE WITNESS: $15,010, Your Honor. No, 15,100, Your Honor.

THE COURT: Are you finished?

MR. BHURTEL: Yes.

THE COURT: Redirect?

MR. O'HARA: Yes. Just very brief.

REDIRECT EXAMINATION

BY MR. O'HARA:

Q Doctor, I'm just going to cover one very specific point.

You were asked initially the question, there was a term related to medical tax treatise and periodicals and you described of them as Barnes & Noble as being -- using the phrase "authentic". And then you were shown deposition testimony about authentic, where you were asked the question about medical publications, if you will, being authoritative.

A Right.

Q Can you explain to the jury the difference in those two terms?

A Sure. Let's start with "authoritative."

Authoritative means that you agree with every word in the textbook. That is all -- whether you agree or not, it's accepted as the Bible. It's accepted as absolutely the best of knowledge that there is to this date.

Now, all textbooks have a little problem here, right, because as technology evolves, perhaps between the time the thing is published and the time that you present it to your class to read, there have been changes, major changes, or

Case 1:13-cv-05929-SMG Document 118-2 Filed 12/21/16 Page 859 of 958 PageID #: 1949

there have been some changes. So nothing is so good as to be completely authoritative. There's -- I mean, so that's the answer I have to give.

Yes, I rely on textbooks. Yes, I enjoy reading textbooks. I think it's important to read textbooks. It's important to understand information from textbooks, but can you say that they're always perfect? No, you can't say that.

Now, authentic. Authentic just means that somebody read this book, yeah, it's authentic.

MR. O'HARA: That's all I have. Thanks.

THE COURT: Thank you, Doctor, you're excused.

THE WITNESS: Thank you.

(Whereupon, the witness was excused.)

THE COURT: Counsel, sidebar.

(Continued on the next page.)

(Sidebar conference.)

THE COURT: Mr. Bhurtel, I take it your next witness is here after lunch?

MR. O'HARA: Yes, sir.

THE COURT: What would you like to do with the remaining morning time? I don't know who that gentlemen was in the back of the room and whether you intend to call him or not?

MR. BHURTEL: I can talk --

THE COURT: This is not the time to prepare a witness.

MR. BHURTEL: No, I understand.

THE COURT: Do we want -- why don't we finish -- do what you want to do Mr. Ahsan first.

MR. BHURTEL: Okay.

THE COURT: All right? Because it's really not time, the jury has only been out here for an hour and a few minutes, so I'd like to at least take you to 11:00 before I give them a break.

MR. O'HARA: Can counsel represent who that is, because that person was in the courtroom for a fair amount of time with Dr. Head on the stand.

THE COURT: Who is it?

MR. BHURTEL: Let me check my records, sir.

THE COURT: Well, if you don't remember his name, what does he have to do with the case.

MR. BHURTEL: Oh, he's one of the --

THE COURT: Private investigators?

MR. BHURTEL: Yes.

THE COURT: Is he the one who attended the examination that Dr. Head performed or the examination that the other doctor performed?

MR. BHURTEL: I have to check with him.

THE COURT: Well, he certainly can't be called if he's the one who examined -- was present at the time of the other examination.

Did you even prepare the witness? Do you know if he has any inconsistent to say?

MR. BHURTEL: No.

THE COURT: Let's call Mr. Ahsan now, if you want to present more testimony from him, and then we'll take the mid-morning recess and you can figure out what you're going to do. All right?

MR. O'HARA: Yes. Thank you, Your Honor.

THE COURT: All right.

(End of sidebar conference.)

(Continued on the next page.)

(In open court; Jury present.)

THE COURT: So, ladies and gentlemen, I don't know if you'll remember this or, frankly, I don't remember if I said it in front of you or not, but there was a brief limited area of redirect of Mr. Ahsan that I allowed Mr. Bhurtel to reserve so that he would have a little bit of additional time to prepare for it, and we're going to continue Mr. Ahsan's redirect at this point in the trial.

Mr. Ahsan, please come forward.

THE PLAINTIFF: Thank you.

(Whereupon, the witness resumes the stand.)

THE COURT: Mr. Ahsan, do you remember taking an oath to tell the truth when you testified last?

THE WITNESS: Yes.

THE COURT: That oath applies to this testimony as well.

THE WITNESS: Yes, sir.

THE COURT: Thank you. Please be sealed.

MOSTAFA AHSAN, called as a witness, by the Plaintiff, having been previously first duly sworn/affirmed, was examined and testified further as follows:

THE COURT: And if you can keep the microphone close, I think everybody will understand you better. Thank you.

REDIRECT EXAMINATION (RESUMED)

BY MR. BHURTEL:

Q Good morning, Mr. Ahsan.

A Good morning.

Q What was your position at the time when the box fell on you?

A I don't understand your question. If you clarify the question, then it will be better for me.

Q When the boxes fell on you, at that time, at that time so you were standing or something else?

A I was standing. I was looking for some products to buy in front of me, and I was standing a little bit anglewise to the product.

Q Okay. When you say you were looking the product, you mean that you were looking the product in the aisle?

A Yes, I was in the aisle at that time.

Q So when you were looking the product in the aisle, you are looking straightforward or you were looking something else?

A No, I was not looking straight forward, I was looking at the left and the right.

THE COURT: A little bit left --

THE WITNESS: Anglewise.

THE COURT: Anglewise.

So would it be correct to say, then, that your feet

were not perpendicular to the aisle, when you would be looking straight at the product, your feet were somewhat straight down the aisle and you turned to the look at the product on your left?

THE WITNESS: Well that time I was -- can I show you that how was I?

THE COURT: Sure.

THE WITNESS: If you would allow me?

Can I show you?

THE COURT: Yes.

THE WITNESS: Say if this is the aisle, this is the product I see, I will see. I was just standing like this (indicating). I was looking here (indicating) not here directly (indicating). A little bit left and anglewise.

THE COURT: I see.

Did the jurors see?

And for the record, I think it would be accurate to say that the plaintiff positioned himself as if he were looking -- as if he were standing and facing a shelf of products and then angled about 10 or 15 degrees to his left to indicate that he was examining the products not directly ahead of him, but perhaps a couple of feet over to his left.

Mr. Ahsan, would that be accurate?

THE WITNESS: Yes, sir.

MR. O'HARA: That's consistent with what I observed,

Your Honor.

THE COURT: And, Mr. Bhurtel, you would agree with the description, too?

MR. BHURTEL: Yes, Your Honor.

Defendant's 1A and 1B.

BY MR. BHURTEL:

Q Mr. Ahsan, do you recognize this folders?

THE COURT: From the trial or from being in Staples?

MR. BHURTEL: Withdrawn.

Q Have you ever recall seeing these folders -- strike that one.

THE COURT: Before this trial began, did you ever see Defendant's 1 or 2?

THE WITNESS: No, sir. In the store or from outside or some other places where?

THE COURT: Well, did you ever see them in the Staples store?

THE WITNESS: The Staples store, this is when I go for buy something in Staples store, then I saw it in the rack, in the other time. Not in the day of this incident, I have not seen it.

THE COURT: On the date of the accident you didn't see that product?

THE WITNESS: I have not seen it.

BY MR. BHURTEL:

Q At the time when the boxes fell --
A Yes.
Q -- on you, did you see on the ground these two folders?
A No, I did not see any folder on the ground.
Q Did you see there was similar kind of this folder on the ground the day of the accident when the boxes hit you?
A I've not seen any folder on the ground.
Q What was the actual things hit you?
A I -- the two boxes hit me. The boxes.

I mentioned several times that two boxes, not folders.
Q And did anybody from the Staples store, employees, they showed you these folders to you that day or any other day except --
A No.
Q -- today or yesterday?
A No. Yesterday and today I seen this.
Q Not --
A No.
Q Not before?
A Not before.

THE COURT: When the boxes fell, did they break open?

THE WITNESS: Sorry? What?

THE COURT: When the boxes fell, did they break open

to reveal what was inside?

THE WITNESS: No.

MR. BHURTEL: I have nothing further, Your Honor.

THE COURT: Would you like any further questions of Mr. Ahsan, Mr. O'Hara?

MR. O'HARA: No, thank you.

THE COURT: You may step down.

THE WITNESS: Thank you, sir.

(Whereupon, the witness was excused.)

THE COURT: Ladies and gentlemen, we're going to take our morning recess, and I'll see you in about ten minutes, I hope. We have a little discussion to have out here.

(Jury exits the courtroom.)

THE COURT: Mr. Bhurtel.

MR. BHURTEL: Yes, Your Honor.

THE COURT: If you want to go talk to whoever that is that is out in the hallway, find out who it is and whether you have a good faith basis to call that person and present any testimony from him.

(Whereupon, a recess was taken at 10:50 a.m.)

THE COURT: Mr. Bhurtel, what is your intention?

MR. BHURTEL: At this time, I'm not calling the gentleman. This is the guy who the gentleman is where the private investigator the doctor with him had.

THE COURT: And you're not calling him?

MR. BHURTEL: Yes.

THE COURT: You said "at this time." It's either now or never. We understand that, correct?

MR. BHURTEL: Yes, Your Honor.

THE COURT: So you're not calling him at all.

MR. BHURTEL: Yes.

THE COURT: So it's 11:00, do you have a witness?

MR. BHURTEL: I have one more thing, Your Honor, and I'm not calling the wife also.

THE COURT: You're not calling the wife.

MR. BHURTEL: Yes.

THE COURT: So you are prepared to rest.

MR. BHURTEL: Except that I have a motion that I need to read Rozpedowski's deposition for the jury.

THE COURT: We'll entertain that.

Did you identify the portions of the deposition that you want to read?

MR. BHURTEL: I believe I did.

MR. O'HARA: I will work through the passages -- since he read it on the cross-examination of Dr. Urena [sic], I'm assuming that he's going to be identifying other passages that he hasn't already read, since they're already in.

THE COURT: Well, they're not in evidence because they were part of the question.

MR. O'HARA: Okay.

If it helps to streamline the process, I will stipulate that those reads that he accurately read to the jury, are, in fact, evidence off of which he can argue in closing.

THE COURT: Well, do you have the sections that you want to read and do they go beyond that? And if so, you know, show them to Mr. O'Hara and we'll see if there's an objection or not.

Other than that deposition testimony, is the plaintiff's case now complete?

MR. BHURTEL: Oh, couple of things which we need to put it on the record. Those exhibits we have not put on the record, Your Honor.

THE COURT: Okay, but in terms of the jury, otherwise everything is complete, except for maybe reading this.

MR. BHURTEL: Yes.

THE COURT: And you have as your witness the doctor who will be here in about two-and-a-half hours.

MR. O'HARA: Yes, sir.

THE COURT: All right. I really -- let's see how long this will take to go through this. If it looks like it's going to take more than another five or ten minutes, I'll send the jury out for a two-hour lunch break, and we'll do what we

can do.

(Pause.)

MR. O'HARA: Judge, do you want me to identify our position on the record as I work through these, or just do it at once?

THE COURT: Well, I don't want you to do it as you work through them if the position is general. I do want you to do it if the position is specific.

MR. O'HARA: Understood.

(Pause.)

THE COURT: Yes, sir.

MR. O'HARA: I don't have any objection to any of the passages, let him read them all.

THE COURT: That ends that. Well, let's call the jury out, you'll read that.

MR. BHURTEL: I need five minutes, Your Honor.

THE COURT: Why?

MR. BHURTEL: Just circling.

THE COURT: Okay, quickly.

How did you explain to Mr. O'Hara what you were offering if you didn't have it ready?

MR. BHURTEL: I do. I just motioned that page and line this way.

MR. O'HARA: If he'd like to trust me, I'll give him my copy, which are highlighted, and it's only the pages that

he identified.

THE COURT: It's up to you, Mr. Bhurtel. I don't want you to do anything that makes you uncomfortable.

MR. BHURTEL: I'll look at it with you and then either way.

THE COURT: Okay.

MR. O'HARA: He can use my copy, Judge. My only request is I don't have another copy that's highlighted, so if I can just follow along with him.

Before the jury is the brought out, is counsel simply going to read question and answer or put somebody in the box to replicate the answer?

MR. BHURTEL: Yes, yes.

MR. O'HARA: Are you going to read question and answer or are you going to have someone act as though they're the witness providing the answer?

MR. BHURTEL: That's how I want to do it. So I'm going to put somebody there.

THE COURT: Who?

MR. BHURTEL: I'll put her.

THE COURTROOM DEPUTY: Do you have an extra --

THE COURT: Can I have your associate -- your paraprofessional's name again?

MS. MAHAT: Oh, it's Prasanna, P-R-A-S-A-N-N-A.

THE COURT: P-R-A-S-A-N-A.

MS. MAHAT: N-N-A.

THE COURT: A-N-N-A.

MS. MAHAT: Last name, M-A-H-A-T.

THE COURT: Mahat?

MS. MAHAT: Yes.

THE COURT: All right, now here's my plan. I will tell the jury that the plaintiff has, in its case, that it has not yet presented some deposition testimony. I'll remind them what a deposition is. I'll give them an instruction to react to Ms. Mahat's playing the role of the witness, okay, then you may rest and --

MR. BHURTEL: How do I tell the jury that this is the deposition I'm reading which witness?

THE COURT: You tell them. Yes. Just tell them.

If you want me to tell them, I will.

Since there's only one copy, you'll have to stand at the witness chair with Ms. Mahat.

MR. BHURTEL: Okay.

THE COURT: Then you'll rest in front of the jury, correct?

MR. BHURTEL: Yes, except those exhibits we need to put it in.

THE COURT: Okay. They're not ready to be moved in; are they?

MR. BHURTEL: The counsel is reviewing.

MR. O'HARA: We're going through them now.

THE COURT: Okay.

MR. O'HARA: We expected the day to go a little longer.

THE COURT: All right. Then you can move them in when we return. I take it it's going to be without objection.

MR. O'HARA: Correct.

THE COURT: And then you'll rest.

We can assume he's rested. If you want to make any motions, Mr. O'Hara, to preserve the record. In this kind of case of case I don't anticipate it, but if you do, that's certainly your right, and I will then excuse them for a long lunch break.

1:30 is when you expect -- is the soonest you can be ready?

MR. O'HARA: Yes, Judge. We should be ready by 1:30, if you want to bring the jury back early.

THE COURT: All right. And we will use the long lunch hour to touch base again on the charge. And then we will all go to lunch ourselves.

Are you ready, Mr. Bhurtel?

MR. BHURTEL: Yes, sir.

MR. O'HARA: Judge, I want to make sure I understand this procedure.

So all three of us are going to the witness box?

THE COURT: Yes.

MR. O'HARA: Okay. I understand.

THE COURT: All right? We're going to get through this.

Let's bring out the jury.

(Discussion was had off the record.)

(Jury enters the courtroom.)

THE COURT: Hi, everybody. Well, as often happens as a case nears its end, the management of how to get to the finish line becomes a little bit more challenging in terms of efficient time use. So I forgive the long break and the fact that we way not be able to make the best use of all of your time today, but we're trying.

My understanding is that the plaintiff, Mr. Ahsan, does not intend to call, in his direct case, any additional live witnesses. He does, however, ask or need to read certain deposition testimony into the record as evidence. During the recess, we went over that deposition testimony and it is being offered without objection.

The deposition testimony is testimony of an individual whose name as come up before, Bart Rozpedowski. To present the deposition testimony, Mr. Bhurtel has requested, and I have permitted Ms. Mahat, his assistant, to play the role of Bart Rozpedowski in the sense of reading the answers so that it will be easier to distinguish which were the

questions that were asked of Mr. Rozpedowski and which were the answers that Mr. Rozpedowski gave.

When we do it this way, we have to keep in mind that when Ms. Mahat reads the answers, her demeanor, her intonation, what she stresses and what she deemphasizes are not what Bart Rozpedowski stressed, deemphasized, et cetera. So you really can only consider the words said as evidence, not the manner in which they're being articulated.

I see you're all nodding affirmatively, that's great.

Ms. Mahat, would you like to sit up in witness chair?

And I know we only have one copy of the transcript that's being read from that has the agreed-upon portions delineated, so I will invite counsel to come up as well so that we can follow along easily.

(Whereupon, Ms. Mahat took the stand.)

THE COURT: I take it there are references to those very exhibits in the deposition transcript and that's why you pulled them forward?

MR. BHURTEL: Yes, sir.

You're happy to be where you are?

MR. O'HARA: We'll follow along with another copy.

THE COURT: All right.

And, Mr. Bhurtel, you'll read out the page number

and line number that you're beginning with.

Everybody ready?

(Whereupon, the deposition transcript of Bart Rozpedowski was read in open court, with Mr. Bhurtel reading the questions and Ms. Mahat reading the answers.)

MR. BHURTEL: This is the deposition transcript of Bart Rozpedowski. The deposition was taken April 17, 2015, at 37-49 75th Street, Jackson Heights, New York.

And the witness was -- during this trial, we mentioned that this is the witness.

THE COURT: Whoa. Whoa. Whoa. You can read the deposition testimony, but you can't make an argument or put it into context for the jury until your closing, okay?

Tell us who was questioning the witness at the time of the excerpt that you're about to read.

MR. BHURTEL: At the time I was questioning, Durga Prasad Bhurtel.

THE COURT: Very well.

BY MR. BHURTEL:

"Q The plaintiff, Ahsan Mostafa, claims there was an accident, a box fell on him.

"A Yes.

"Q On September 2nd, 2011.

"A Yes.

"Q Do you recall that one?

"A Yes, I remember someone said boxes fell.

"Q Right, okay. So you remember that incident happened on September 2nd, 2011?

"A Well, I -- before I got the subpoena, I didn't remember the date that it happened on, but I just know it happened sometime back then."

"Q What" --

THE COURT: Whoa. Whoa. Whoa.

Page?

MR. BHURTEL: Oh.

THE COURT: Where are the pages --

MR. BHURTEL: Page 23rd.

THE COURT: Line 8.

MR. BHURTEL: I think I have to go first one also.

THE COURT: That's all right, we did it already.

Let's move on. Page 23, line 8.

MR. BHURTEL: Line 8 to 24.

"Q What were you doing at that time?

"A I was on a ladder. I believe I was putting up boxes or taking boxes and moving around the overstock, something like that. And I think I remember like, yeah, that's what I was doing.

"Q And then what do you remember when you are doing that?

"A I saw like a box or two. I only saw one or two. I don't remember how many exactly. I just saw them falling off, like, I am right here into the other aisle that was over there (indicating.)

"Q You actually saw the boxes fall?

"A I saw the boxes fall down. I didn't see where they fell down. I just saw them fall down."

MR. BHURTEL: Now to page 34, line 14 to 16.

"Q So when these two boxes fell, you saw it, right?

"A I saw them fall off the rack."

MR. BHURTEL: Page 41.

"Q Did Ahsan spoke -- speak with you?

"A Danny took the statement down. Yeah, he took down the statement, I believe, on what happened from what I remember. And all I remember hearing was some boxes fell. That's all I remember."

MR. BHURTEL: Page 46, line 18 to 25.

"Q Okay. Did anybody ask you on that day what happened?

"A Yes, Danny did. After it happened, he said what happened, and I told him some boxes

Case 1:13-cv-05929-SMG Document 118-2 Filed 12/21/16 Page 879 of 958 PageID #: 1969

fell.

"Q What did Danny ask?

"A He just took it from there basically. He spoke to the plaintiff."

MR. BHURTEL: Page 53, line 15 to 25.

"Q I'm going to show you Defendant's Exhibit 8 marked February 3rd, 2015. So you can take it look at it, sir. There are three pictures (handing.)

"A Okay."

THE COURT: Just a moment. I don't want there to be any confusion for the members of the jury.

The exhibit designations A, B, 1, 2, from the deposition are different from the numbers and letters we've been using at trial. So the reference to Defendant's Exhibit A is not a reference to a Defendant's Exhibit A from the trial, they're using a different sequence of labels.

Why don't you start that section again, Mr. Bhurtel.

MR. BHURTEL:

"Q I'm going to show you Defendant's Exhibit A marked February 3rd, 2015, so you can take a look at it, sir. There are three pictures (handing.)

"A Okay.

"Q Okay, do you recognize the pictures?

Case 1:13-cv-05929-SMG Document 118-2 Filed 12/21/16 Page 880 of 958 PageID #: 1970

"A Yes.

"Q And is this the -- can you describe what it is in the picture?

"A This is a ladder I was on.

Q Right. Okay. Indicating --"

Your Honor, can we have a sidebar?

THE COURT: A sidebar?

You can go -- if you know what Defendant's Exhibit A was, show it to Mr. O'Hara first. Make sure he agrees that that was Defendant's A, and then you can go ahead and show it to the jury.

MR. O'HARA: Go ahead.

THE COURT: I can't tell if your site line is good. If you want to stand up and move around, you know, feel free.

MR. BHURTEL: And I'm reading 22 to 25, same page.

And is this the -- sorry, from 20.

"Q Okay, do you recognize the picture?

"A Yes.

"Q And is this the -- can you describe what is it in the picture?

"A This is the ladder I was on.

"Q Right, okay. Indicating the picture, right?

"A Yes.

"Q And the second picture?

"A That's the aisle where the boxes fell on to.

THE COURT: Go ahead. It's fine. You can lean it against the box, and they'll get up if they can't see.

"Q Okay. So and then, the third picture.

"A Is this the picture of the shelf or?

"Q The whole picture, what it shows?

"A And what's the question?

"Q Do you recognize this is the area where the incident happened?

"A Do I recognize the location?

"Q Yes.

"A Yes."

MR. BHURTEL: And the page 54, line 22 to 25.

MR. O'HARA: Judge, I believe he needs to start reading where the question begins, which is 25.

THE COURT: Yes. This is where you're going to start, though, right?

MR. BHURTEL: Right, but should I put in the record also --

THE COURT: No, start with, "sir".

"Q Sir, I just showed you earlier the Plaintiff's Exhibit 2 and 4 marked today.

"A Okay.

"Q Did you have an opportunity to look at those pictures, right?

"A Yes.

MR. BHURTEL: Now, page 55. I'm reading from line 2 to 17.

"Q Is this boxes and this aisle looks like similar to the September 2nd, 2011?

"A Do the boxes look similar? Yes.

"Q This is the Exhibit 2. Is this the boxes and area looks like in Exhibit 3, Plaintiff's Exhibit 3 on September 2nd, 2011?

"A Yes.

"Q And Plaintiff's Exhibit 4, that's the picture of boxes, this looks like similar on September 2nd, 2011?

"A Yes."

THE COURT: And this, ladies and gentlemen, is marked as Plaintiff's Exhibit 4. You see in the lower right, it's from the deposition, and you can see Plaintiff's Exhibit 2.

"Q And Plaintiff's Exhibit 4, that's the picture of boxes, this looks like similar on September 2nd, 2011?

"A Yes."

MR. BHURTEL: Now, page 56, line 3 to 23.

"Q So, again, I'm asking exhibit, Plaintiff's Exhibit 2, sir, this structure, is this similar to the September 2nd 2011, when you were working there?

"A Yes."

MR. BHURTEL: Exhibit 2 is this one (indicating), ladies and gentlemen.

"Q When earlier you said you were working on this ladder, this is the same ladder?

"A It looks like it."

MR. BHURTEL: Again, Exhibit 2, indicating.

"Q And which stairs on this ladder were you on that day when you were working?

"A I would be on the top stair.

"Q This one?

"A Yes, (indicating.)

"Q From the top stairs --

I'm showing the witness Plaintiff's Exhibit 2.

So when you say indicating the top stairs, meaning this one, right?

"A Yes."

MR. BHURTEL: Again, Exhibit 2.

Now, the page 98, line 22, 23.

"Q Did they say anything to you?

"A Just some boxes fell and then I

remember Danny came and said -- and then he took it from there, whatever it happened."

MR. BHURTEL: Now to page 100.

THE COURT: Line 21.

MR. BHURTEL: To 23.

"Q Do you remember what was in that box that fell?

"A Folders."

MR. BHURTEL: Page 107, line 17 to 23.

"Q Mr. Rozpedowski, earlier you testified that those boxes which fell on Aisle 8, it was folder boxes, right?

"A Yes.

"Q Those are paper folder boxes?

"A Yes, I believe paper."

THE COURT: Completed?

MR. BHURTEL: Yes, Your Honor.

THE COURT: You may both return to counsel table.

Is there any application to read any other portion for sake of completeness?

MR. O'HARA: No, sir.

THE COURT: Ladies and gentlemen, for scheduling reasons that have to do both with my need to work with the lawyers for a bit, and because of the witnesses that are anticipated for this afternoon, we will reconvene at 1:30. Or

put differently, something happened this morning that almost never does, the lawyers took a little bit less time to get through something than they expected. So we're going to break early for lunch and we'll get started again at 1:30.

All right. Enjoy yourself. I think it's a nice day out, I'm not sure. If it is, I recommend the local parks to you highly. They are quite lovely, if you can get down to the waterfront.

Don't discuss the case. Don't think about the case. Don't do anything involving the case.

(Jury exits the courtroom.)

THE COURT: All right, for all functional purposes, the plaintiff is deemed to have rested. Correct, Mr. Bhurtel?

MR. BHURTEL: Yes, Your Honor.

THE COURT: With the exception of certain exhibits that the parties will identify and move in after the lunch break.

MR. BHURTEL: Yes, Your Honor.

THE COURT: Mr. O'Hara, is there anything you want to do at this point?

MR. O'HARA: Yes, Your Honor.

Based upon the evidence that's been presented, the defense would suggest that the plaintiff has failed to prove, by a preponderance of the evidence, that a claim can exist. He has to present a claim, through credible evidence to

establish each element of each component of the claims alleged.

The plaintiff himself has told multiple versions about the happening of this accident, where these boxes or box -- box or boxes are alleged to have struck him, which body part was struck, and how it affected various portions of his body. He has been inconsistent in describing that from day one.

And so while credibility is customarily a determination that must be left to the jury, and I concede that's the overwhelming majority of cases, the plaintiff still has to put forth a version of a defense and claim damages from the version of that event that more likely than not has been proven to allow the jury to do something other than guess. And in this case, if you accept as true everything that this man has said, you have to guess as to what happened.

We don't know whether this struck him in the front of the head, the side of the head, or the back of the head. We know it's anatomically impossible for something to strike someone in the front of the head and then in the neck. It is not possible.

We have an initial version during cross-examination where the plaintiff explained that he was facing the aisle and the items fell from behind him. Two days -- a day after the testimony, and I won't ask counsel to confirm what my

suspicion is, counsel now puts the exact same witness on the stand to testify about the exact same event, and the witness changes his testimony to rotate his body, as the Court points, out 10 or 15 degrees. That is diametrically different than what he said the day before under oath, both on direct examination and cross-examination.

So you now have a witness that has been provided multiple versions of the accident during the various events with medical providers. You have a witness that has testified in discovery and at trial differently about the same event, and then modified his trial testimony about the event.

I would submit that if there is ever a case where the Court should conclude that reasonable minds cannot differ, they cannot conclude whether the boxes hit this man, or if so where, this is the case.

Separate and apart from that, you have components of a damage claim, and without going too far, the key portions of this is we move to dismiss any aspect of the emotional distress claim. We have briefed it, and I would rely on the submission that we had submitted to the Court.

There simply is no testimony that this man, if he suffered any injury, based on a box that, in fact, hit him, it was anything other than transient, and the diminution in his loss of enjoyment of life is not emotional distress.

So we would move to dismiss the case and voluntarily

at this time.

MR. BHURTEL: Your Honor, first of all, the plaintiff credibly testified. In other words, the defendant admits that they caused the fall of the boxes. There is no dispute on that.

And then the second, there is no dispute the boxes hit the plaintiff because defendant does not have one witness coming and saying: Well, I saw the accident, and the boxes did not fall, or boxes did not hit him. So, therefore, those boxes hit him, there is no dispute.

The question comes where it hit him. So he clearly testified, plaintiff, consistently not only at trial, in deposition also, he testified clearly saying that the boxes hit his head, neck, and left shoulder. And the doctors also the -- treating doctors also testified clearly that that is what he said.

Yes, he does have, Your Honor, there is another part of the case he has uncertain memory following because of this accident, and which is the defendant is trying to get the benefits. At the beginning they are the one who caused this trauma and now they are trying to get the benefit of the background, because he cannot go from zero to 100 everywhere, every doctor, every place.

THE COURT: Thank you.

The motion is denied without prejudice to renew

post-verdict if you believe that it's still appropriate at that time.

MR. O'HARA: Thank you, Your Honor.

THE COURT: Couple of things. I want to go into the charge. Before I do, I want to remind folks that there is going to be that fire drill at 3:00. I forgot to tell the jury it's coming. We're not going to stop the trial for the fire drill but we are going to be distracted by a lot of noise. I want you to help you remember to alert the jury to that and not to be alarmed.

MR. O'HARA: If we are customarily planning an afternoon break and it's normally about the 90-minute mark, do we want to have a break at about 2:55?

THE COURT: That sounds like a good plan. Thank you for the suggestion and we can all look at the clock and try to keep track of that together.

Mr. Bhurtel, one of the reasons that I took your indecision about the opening -- about the closing statements from you and decided it for you, was to put you out of your agony in struggling with what to do, but also because of the case law that suggests that if you do want to suggest a dollar amount for pain and suffering to the jury, it must be done in an opening rebuttal argument -- in an opening closing argument -- I know that sounds oxymoronic -- in your first closing argument and not in any rebuttal. So I wanted to

Case 1:13-cv-05929-SMG Document 118-2 Filed 12/21/16 Page 890 of 958 PageID #: 1980

remind you of that, lest you have lost site of it in all of the hurly burly of the trial.

(Continued on next page.)

THE COURT: My clerk brought to you a revised jury charge. So, I'd like to focus on the areas that we discussed last night. You are invited to proof it over the weekend for a little minor word things, but I don't think we will find any.

I have a recollection that we may have just, in the very second paragraph on page 1, we may have just changed the wording a little bit because we felt we had too many pronouns, so if you want to just read those two sentences in that paragraph to make sure that they still have the meaning that we intend.

MR. BHURTEL: Is it page 8, Your Honor?

THE COURT: No, I'm talking right now about page 1, the second paragraph. I think we had a couple of "its," that replaced with "Staples," that's I think the only change we made there.

There was a concern about whether the comment about what the judge says is not evidence was too broad in the circumstances of this case, and so on page 4 under the bold paragraph, fourth, we added language to account for the fact that I asked questions of the witnesses.

Acceptable to plaintiff?

MR. BHURTEL: Yes, Your Honor.

THE COURT: Defendant?

MR. O'HARA: Yes, sir.

Case 1:13-cv-05929-SMG Document 118-2 Filed 12/21/16 Page 892 of 958 PageID #: 1982

THE COURT: On page 8, taking into account defendant's argument that are false in one false in all charge was too truncated and did not give the attention to the principle that many of the pattern jury instructions do, we clarified and expanded the language somewhat, but we did not incorporate the defendant's version wholesale.

This is in the first double-spaced paragraph on page 8.

Mr. Bhurtel, do you see it and do you have any objection to it?

MR. BHURTEL: Which line we are talking, Your Honor?

THE COURT: It's the "In deciding" paragraph. Do you see that, "In deciding whether or not to believe a witness" paragraph?

MR. BHURTEL: Yes.

THE COURT: We made a few changes to the way falsus in unum is articulated. The language in particular we added is the idea that if you conclude that a witness' false statement about one fact makes it likely that the witness has testified falsely about everything, you may disregard. That parenthetical clause there was not in our first draft and it explains the conceptual basis for the rejection of the testimony in its entirety and that's how I distilled the defendant's position.

Do you understand?

MR. BHURTEL: Yes.

THE COURT: Any objection?

MR. BHURTEL: No.

THE COURT: Defendant?

MR. O'HARA: No objection, Your Honor. There is on the draft we were given there is a line through "or at a pretrial deposition" I understand that's actually going to stay in the charge.

THE COURT: Yes, we were waiting to see if any deposition testimony came in and that was our place holder in chambers to keep track of that. We will undo that strike through before the final is published.

With respect to plaintiff's concern about damages and the way it's articulated, what we did was we did not change language, but we moved it. In other words, or more specifically, at the top of page 14, we moved the concept of any award of damages justly and fairly compensating Mr. Ahsan, into the first full paragraph. It had been part of the second sentence in the second full paragraph. And just as we agreed with defendant that the falsus in unum charge arguably understated or truncated the explanation of that principle, so too we agreed with the plaintiff that his right upon demonstrating injuries proximately caused by defendant's conceded negligence, entitles him to just and fair compensation may have been too truncated because it appeared

in the middle of a sentence articulating a larger concept. So we separated it out and moved it into the preceding paragraph.

Do you follow that, Mr. Bhurtel?

MR. BHURTEL: Which paragraph you are on?

THE COURT: I'm on page 14. I am the first full paragraph.

MR. BHURTEL: This one?

THE COURT: And we have added the second sentence of that paragraph.

MR. BHURTEL: Yes, Your Honor.

THE COURT: That's better for you.

MR. BHURTEL: Yes, Your Honor.

MR. O'HARA: No objection, Judge.

THE COURT: Thank you. I believe that the only other change we made was to add the "and emotional distress" to the language in 2A and 3A on the verdict sheet.

Is the charge now acceptable to plaintiff?

MR. BHURTEL: Yes, Your Honor.

THE COURT: Defendant?

MR. O'HARA: Subject to the reservation of our position on the emotional distress, yes.

THE COURT: Your objection is preserved and we will consider the charge in final form absent the development between now and the time it is provided to the jury.

MR. O'HARA: Thank you.

MR. BHURTEL: One more thing. Can I put -- sorry, Your Honor, on the record that the same thing I requested yesterday about that the plaintiff entitles the damages because the defendant conceded the negligence.

THE COURT: That's preserved as well.

MR. BHURTEL: Yes, sir.

THE COURT: Okay.

Have a good lunch, but before you go, can you agree and make sure those exhibits are in shape to offer when we resume?

MR. O'HARA: Yes, sir.

THE COURT: Okay. See you at 1:30.

MR. O'HARA: Before we release the court reporter, if you want it on the record now, we've been through these exhibits and we will have no objection to the exhibits subject to counsel redacting them the same way that the other medical bills have to be redacted with respect to collateral source and insurance information.

THE COURT: All right. So write out one or two sentences where you offer them in evidence before the jury when they come back. I'd like the jury to hear that they have come into evidence and know about it. All right?

MR. O'HARA: Judge, for purposes of ease, I have represented to counsel that if he were to create summaries of these that accurately reflect the wealth of information in the

documents, providing he represented that it was an accurate summary, I would stipulate that that would be admissible.

THE COURT: We're talking about -- these are medical bills?

MR. O'HARA: Yes, sir.

THE COURT: Got it. Thank you for the suggestion.

MR. O'HARA: Thank you, Your Honor.

MR. BHURTEL: Thank you, Your Honor.

(Luncheon Recess: 12:00 p.m.)

(Continued on the next page.)

(Time noted: 1:35 p.m.)

THE COURT: Hi, everybody.

We are where we were. Are we ready to go?

MR. O'HARA: Yes, sir.

I just want to bring to the Court's attention so that it's not a surprise. I haven't made the judgment decision yet. I will make it after Dr. Bazos is completed, but it's conceivable that I will rest subject to the introduction of certain items that I identified during direct and cross examination in the plaintiff's case, and in doing so I will not likely be calling a witness on Monday.

THE COURT: Understood. Appreciate the advance notice.

Doctor, would you like to come up and have a seat in the witness chair.

(Witness takes the stand.)

THE COURT: Let's see if the jury is ready.

Mr. Bhurtel, will it take you more than a minute to offer your exhibits? If it will, we'll do it after the doctor.

MR. BHURTEL: Okay.

THE COURT: You'd rather do it that way?

MR. BHURTEL: Yes.

THE COURT: Okay.

MR. BHURTEL: And one more thing, Your Honor.

MR. O'HARA: Do you want me -- okay.

MR. BHURTEL: During the -- when I read the deposition transcript, I think I forgot to mention the trial exhibit as well as exhibit of those pictures.

THE COURT: That's okay. Everybody knows what we were talking about. We can clean that up without the jury being present.

MR. O'HARA: Yes. You're talking about the two photographs. I stipulate that the A and B, the two and four, all that are -- the two photographs that are in evidence, 117-A and 117-B.

THE COURT: So noted.

MR. O'HARA: The other thing that counsel noted just for purposes of the record, we put into evidence the CDs of the various diagnostic films. Each one of these CDs was reproduced by my office.

There's a firm logo -- whoever put this -- did this, my firm logo is on the CD. And however the Court deems it appropriate to explain to the jury this was part of the preparation of the pretrial order. It's jointly done by the parties and there should be no significance attributed to -- I can't take our logo off these documents.

THE COURT: All right. Will they even be looking at that?

MR. O'HARA: I --

(Jury enters the courtroom.)

THE COURT: Hey, everybody. How are you doing?

So I have a little bit of news to give you. The court management, in its wisdom, has planned a fire drill for 3 o'clock this afternoon. Because of the schedule that we are under, I have successfully begged and pleaded for an exemption from having to leave the building during the drill. However, I cannot keep the alarms from going off. So at about 3 o'clock we're going to have a lot of noise. You don't have to leave the building. It is a drill, not a real fire.

And we will try to work through or take our afternoon recess when it begins so that the noise doesn't prevent us from moving forward, but I did not want to take the risk that a witness who was only available today would not be available to testify in the case for your benefit.

We have another witness called by the defendant Staples, and I'll ask my clerk to administer the oath to the witness now.

ANDREW BAZOS, called as a witness, having been duly sworn, was examined and testified as follows:

THE COURT: Please be seated and then tell us your full name and spell it.

THE WITNESS: Sure. It's Andrew Bazos, B-a-z-o-s.

THE COURT: You may inquire.

MR. O'HARA: Thank you, Your Honor.

                          DIRECT EXAMINATION

BY MR. O'HARA:

Q Good afternoon, Dr. Bazos.

A Good afternoon.

Q Doctor, would you do me -- would you give me -- that's that lunch.

Would you give the jury the benefit of your educational background, please.

A Sure. I graduated from a public high school in western Massachusetts in 1980. I then went and did my undergraduate degree at Harvard in Cambridge, Massachusetts. I graduated from Harvard in 1983. I then went to Connecticut to Yale University School of Medicine where I received my medical degree in 1987.

I then came down to the city to Columbia Presbyterian Hospital where I did a general surgery internship, finishing that in 1988. I then stayed at Columbia for four years of orthopedic surgery training, completing that in 1992. And then, finally, I went to NYU Hospital for Joint Diseases for a fellowship, one-year fellowship in knee and shoulder surgery which I completed in 1993.

Q We've heard the phrases "internship, residency," but we have not heard two terms on your rèsumé so I want to ask you about them.

First, in talking about your orthopedic residency at

Case 1:13-cv-05929-SMG Document 118-2 Filed 12/21/16 Page 901 of 958 PageID #: 1991

Columbia Presbyterian, you identify that you were a senior resident in 1991, 1992.

What does that mean?

A It's the last year of your residency program when you have the most responsibility and you're actually teaching junior residents.

Q So that's a selection process for which you're designated as the senior resident?

A Correct.

Q And you also mention that you thereafter did a fellowship in sports medicine and arthroscopy.

First, what is a fellowship?

A A fellowship is a specialty, a subspecialty program where you take one small part of your general specialty, which for me is orthopedic surgery. You take one small part and you spend and extra year learning from experts in that one small subdivision, so to speak, of your general orthopedics. In this case I did my fellowship in arthroscopy which is minimally invasive surgery through little holes. Specifically, arthroscopy of the shoulder and the knee. Although, we did some other smaller body parts, but the high frequency joints for that type of surgery are shoulder and knee.

Q And during the course of your medical education and training, did you obtain licensure in any states?

A I did, yes.

Q Where are you licensed, doctor?

A New York, Massachusetts and Connecticut.

Q Upon completion of your training in terms of your internship, your residency and your fellowship, were you thereafter affiliated with any medical practices or hospitals?

A Yes. I kept my affiliation at NYU Hospital for Joint Diseases as an assistant clinical professor of sports medicine and arthroscopy. And I then also obtained privileges at New Milford Hospital and Danbury Surgical Center and Sharon Hospital in Connecticut.

THE COURT: Doctor, I think if you're just an inch or two further away from the microphone it will be even easier to hear you.

Q In terms of the assistant professorship, does that include the teaching of residents in a residency or internship or fellowship program?

A It does. So we all learn from our professors, so to speak. And once you've graduated and become board certified and experienced, we try to pass that knowledge on to the next group of people going through the program.

Q And you mentioned board certification. Are you, in fact, board certified?

A Yes, sir.

Q And how many times have you been, after your original

certification, recertified?

A So we are required every ten years to maintain our competency and our education by going to courses and reading journals and taking tests and getting what are called continuing medical education credits. And then on the ten-year anniversary of your original board certification you have to sit for another three-hour test and pass that to keep your certification or become recertified. So my original board certification was my first year of eligibility in 1995, and since then I recertified in 2005 and most recently in 2015.

Q Now, I want to talk a little bit about some of the appointments that you have. Do you have any appointments in the sports industry?

A Yes. I cover a lot of large capacity sports and entertainment events. The big ones here in the city include Madison Square Garden, Yankee Stadium, the U.S. Tennis Open. I also serve as tournament director and physician for the Big East Basketball Tournament held here in New York in the spring.

Q In terms of the actual clinical practice that you partake in, are you called upon to treat patients with complaints of injury to the shoulders?

A Every day, yes.

Q Are you called to treat patients with complaints

associated with neck or back injuries?

A Every day, yes.

MR. O'HARA: Your Honor, at this time the defense offers Dr. Bazos as an expert in the field of orthopedic surgery.

MR. BHURTEL: No objection, Your Honor.

THE COURT: Your proffer is accepted.

MR. O'HARA: Thank you, Your Honor.

Q Doctor, I want to talk a little bit about your involvement in this case.

You were retained as a defense consultant to evaluate the medical claims that were advanced by Mr. Ahsan?

A Yes, sir.

Q And in doing so, you were contacted by a lawyer at a different firm before LeClairRyan became involved in this case, correct?

A Yes, sir.

Q How did you go about interacting with -- strike that.

How did you go about becoming familiar with the file to evaluate the medical issues in the case?

A They sent me a large volume of medical records surrounding the care of this patient.

Q And in doing so, you, as part of the process of reviewing the case, did you create a two-page list attached to your report that identifies the records that you were called upon

to review?

A I did.

Q In addition to reviewing medical records, as the case continued were you provided with materials that were generated relating to the litigation?

A Yes, sir.

Q Depositions, interrogatory answers, expert reports from different physicians?

A Yes. Lots more paper.

Q And in addition to paper, you were also provided with the actual diagnostic films that were secured throughout the course of Mr. Ahsan's care and treatment; is that right?

A Yes. I had many CDs that had literally hundreds of images on them.

Q We're not going to go through all of those today. But during the course of your involvement you prepared three reports in this case, correct?

A Yes, sir.

Q One is dated February 8, 2015?

A Yes.

Q One is dated August 8, 2015?

A Yes.

Q And one is dated March 17, 2015 or '16?

A '16.

Q Got it.

And in creating those reports, did you summarize the opinions that you have come to hold in this case within reasonable medical certainty?

A Yes, I did the best I could to do that.

Q What I'd like to do is walk through the information and the opinions that you hold and then we'll talk about the foundation, okay?

A Yes, sir.

Q So, first, how did you come to learn about the happening of this accident?

A Initially from the medical records and the first report where the patient went to seek medical care I believe the day of this incident.

Q And what history were you able to determine from the medical -- let's first deal with the medical records -- history relating to this incident, how was the plaintiff allegedly injured in this case?

A He told the provider that day that he was struck on the head by boxes at a Staples store.

Q And throughout the course of the medical record, did that history change or stay the same?

A No, actually, it changed.

Q Now, in connection with your evaluation of the plaintiff, did you actually physically examine him?

A Yes, I was able to conduct a physical examination in my

office.

Q And when was that done, doctor?

A February 5, 2015.

Q As a general matter, we've heard a lot about history, both just in the questions that I've asked as well as all of the physicians that have testified.

Why, as a treating physician, is history important to you as a doctor?

A Well, when you see a patient for the first time, it's important to have an area to focus on and to understand the baseline of a patient and what happened to them, sometimes it's trauma, sometimes they woke up with a pain. But by understanding mechanisms, you can focus your physical examination and your testing.

And it's also important to know where the patient started out, what kind of health was he in, his bones, muscles, ligaments in, you know, before a particular trauma or a particular event. So it's important for us and we teach all the residents this as well, establish the baseline and then listen to your patient to what happened so that you can do the proper examination.

Q And separately from clinical treatment, when you've been retained as a consultant in litigation, whether for a plaintiff or a defendant, why is the history important to you in evaluating the issues that you're called upon to offer

opinions in connection with a lawsuit such as this?

A Well, because in this situation you're not just being a doctor, but we're trying to help non-doctors understand whether a certain mechanism makes sense in causing some type of symptoms, some type of disruption in someone's health, in this case in there musculoskeletal health. So it's really important to have all the records and the records at the time of the injury because you're asked to do actually more than just be a doctor.

Q And in this case when you examined Mr. Ahsan, did you ask him questions about his prior medical history relating to the body parts that he claimed were injured in this lawsuit?

A Yes, sir.

Q And what did he tell you about whether or not he had any prior injury to his neck or his shoulder?

A He specifically told me he never had a prior injury or problem with his neck or his shoulder before the Staples episode.

Q And was that consistent with the information that you subsequently were able to review or during the time of your evaluation were able to review about the history in the records?

A No. I later found out that that fact was not true, that there had been problems in the neck and shoulder area before the Staples incident.

Q Specifically, what type of prior medical history did Mr. Ahsan have regarding his neck or shoulder?

A You mean what he told me or what I later found out?

Q No. What you were able to determine from review of the record since we know he told you he had none?

A I later found out that he had sought medical attention for neck and shoulder pain I think in years 2008 or 2009. I don't recall.

Q And the records indicate, and the jury has heard the phrase "left lower trapezius myofascial pain syndrome."

Can you tell the jury what that is.

A So the trapezius is a broad triangular muscle that connects the neck to the shoulder. It sweeps down on both sides. And it's sort of the bridging muscle between the neck and the shoulder. And it's used both to move the neck and to stabilize the shoulder.

Myofascial is myo, which means muscle. And the fascia is sort of the covering to the muscle. It's a general word for generalized pain of that structure. So it really involves the neck and the shoulder.

Q And just very briefly, can you point on my back where the trapezius muscle on the left is located?

A Sure. You have two, one here and one here (indicating).

Q Not located in the middle of the back, is it?

A No. It has an origin point on the midline of the neck

and it sweeps down over the shoulder.

Q Now, in this case you had occasion to evaluate the injury that is alleged to Mr. Ahsan's left shoulder, correct?

A Yes, sir.

Q Can you explain to the jury typically what you expect when there's a traumatic tear of some soft tissue structure in the shoulder?

A Sure. If you disrupt tissue traumatically meaning all of a sudden, all at once, it causes immediate pain, and the body's response to that pain is to not want to move that particular body part. So in a traumatic injury to the shoulder, the most common ones being the rotator cuff or the labrum, which is the rim of the socket, if you were to injure those structures, it hurts unmistakably and it hurts right away. There's no delayed onset. And you literally do not want to move your shoulder and you can't miss it.

Q And if a patient presents with that type of history and as well as those type of symptoms, is there a timetable within which you refer the patient for diagnostic studies to evaluate why that person is not moving their arm?

A Well, there is. That's a general question. It depends on the age of the patient. And if it's a professional athlete, we'll get an MRI in an hour and have a press conference that night.

If it's me or my dad, we'll wait for a few days and

see how it goes. And I look for progression of symptoms or if things are getting better, sometimes we do nothing and just start physical therapy.

Q Would assuming an alleged incident of September 2, 2011, you expect that it would be customary to refer the patient for a diagnostic study 14 months later?

A From an injury on --

Q I want you to assume for purposes of my question that the plaintiff alleges an incident on September 2, 2011. I want you to further assume that the MRI of the left shoulder was first obtained on November 3, 2002, (sic) 14 months later.

Is that typical with a -- the shoulder presentation that you've just described?

A Absolutely not, no.

THE COURT: You said November 3, 2002. I think you meant 2012.

MR. O'HARA: 2012. Excuse me.

Q So the record is clear. September 2, 2011, alleged incident. November 3, 2012 left MRI, shoulder -- left shoulder MRI.

A That would not be -- make sense, no.

Q Now, you had a chance to review the office records of Dr. Guha in connection with your evaluation of this case, correct?

A Yes, sir.

Q And in doing so, did you have occasion to see whether or not there were any notations of problems on those first office visits associated with the left shoulder?
A There was absolutely nothing mentioned, any problem with the left shoulder on the initial two visits.
Q After the -- did there come a point in time that this patient was diagnosed with left shoulder osteoarthritis?
A I did see that diagnosis later in the records.
Q And, again, we've heard this so you don't have to go in too great detail, but what is left shoulder osteoarthritis?
A Arthritis is just an inflammation in the joint. Osteoarthritis is usually associated with age related wear and tear.

There's two spots that break down in the shoulder, one is between the ball and socket, and one is at the end of the clavicle or the collarbone where it attaches to the shoulder blade bone and it occurs over years and years.
Q Now, as part of your review in this case you had occasion to look at the left shoulder MRI studies that were done, correct?
A I did, yes.
Q First, I'd like you to take us through the November 3, 2012 study in terms of what you saw by way of degenerative changes.
A Sure. Was that July 3rd of 2012?

MR. BHURTEL: What's the page?

Q I'll show you a copy of what we've marked which is in evidence which is 1764 and 1765 which is dated November 3, 2012 from Advanced Radiologic Imaging.

A Great. Thank you.

Q Sure. Now you reviewed the actual films from that diagnostic study, correct?

A I did.

Q Can you identify for the jury the degenerative or chronic changes that you saw on the -- that MRI study?

A Sure. The first part of the MRI looked at the rotator cuff, which is the group of four muscles that move the shoulder and it found tendinopathy. Tendinopathy is just wear and tear of a muscle, and virtually everybody that with any activity level over the age of 35 is going to have an MRI that shows tendinopathy.

In this case specifically there was no full thickness tear of the rotator cuff. And I always tell patients that this finding is what I call an incidental finding. You're going to see it on virtually everybody's shoulder MRI in this room, whether they have shoulder pain or not.

Similarly, the comment on the biceps tendon which was fine in this case and it showed bursitis inflammation over the muscle. Again, present on virtually every MRI. Not a

post traumatic or not a trauma induced kind of problem. And it showed a normal amount of joint fluid between the ball and the socket.

The one other finding was that there was a suspicion for a labral tear. The labrum is the lip that runs around the socket. And, again, with wear and tear, that can pull off. It's literally like a piece of rubber and rubber can denature over time and fragment and pull off either chronically or it can pull off all at once. When it pulls off all at once, it's like ripping a Band Aid off and it causes immediate pain and loss of motion.

So these were typical wear and tear findings.

Q And based on your review of the films, were there any traumatic or acute findings of injury as opposed to degenerative or chronic changes?

A Well, you have to be careful about reading acute and chronic just off the MRI without knowing the story with the patient. You could say that if there was a lot of pain at a significant trauma, you could say, well, that could have caused this or that. But unless you had immediate pain surrounding a trauma, there's absolutely nothing indicative of acute trauma on this.

Q In this case, do you have that history that you described, the immediate onset of severe pain in the left shoulder?

A Yeah, so in this case it's, it's very clearcut. There was no shoulder pain at the time or for weeks later. So, again, in this specific case, which is the easiest to talk about, there is nothing acute on this MRI.

Q You also had occasion to review the MRI studies that were done in September of 2014, correct?

A Yes, sir.

Q And I'm going to hand you Trial Exhibit 2073 through 2075.

Again, in the diagnostic films that were subsequently taken, were there chronic changes or degenerative changes that were visualized?

A Yes. Again, these were the typical wear and tear findings that occurred in the shoulder of somebody over 35. There's nothing to indicate an acute traumatic injury.

Q Now, the patient, Mr. Ahsan, ultimately had surgery, had arthroscopic surgery on his left shoulder, correct?

A Yes, sir.

Q And as a physician when you are actually operating on a patient through arthroscopy, in addition to having surgical items to fix whatever the problem is, you also have a camera that you can see, correct?

A Yes.

Q And in doing so, as a physician, when you're visualizing those particular anatomic structures in the shoulder, do you

have the ability to better identify traumatic changes as opposed to degenerative changes?

A Absolutely. Putting your eyes directly on the structures is much better than an MRI, which is really an indirect way of looking at the structures or an x-ray, for example.

Q Thank you. Now, in this case we have the benefit of arthroscopic photographs that were taken during Mr. Ahsan's surgery, correct?

A Yes, sir.

MR. O'HARA: And, Your Honor, there have been a series of photographs that have been marked into evidence 17-A. I'm going to ask, since this is in evidence, that one of the pictures be pulled up so that the doctor can explain a number of things coming in my subsequent questions.

THE COURT: In other words, you're taking one of the images on Exhibit 17-A in evidence --

MR. O'HARA: Yes.

THE COURT: -- and blowing you one up those squares?

MR. O'HARA: Yes. And I will identify, there are four -- this is hard to do for everybody to see -- there are four on the left-hand side. There's a second set of four on the left-hand side. We are going to be blowing up the second photograph from the bottom of that second row of four.

THE COURT: Go ahead.

MR. O'HARA: Can we pull that up.

THE COURT: Do you want to come up and do it? Do you know how to do it?

Q Doctor, if you could, since I know it's easier for you to show the jury on the big screen with this pointer as I'm asking you questions --

MR. O'HARA: Judge, may the doctor come down from the stand?

THE COURT: Yes.

MR. O'HARA: And, Judge, just so the jury understands, he's going to use the laser pointer on the large screen. That will not put the same red dot on their TV screens.

Can you pull it up.

MS. KRAL: Your Honor, can you clear the screen for me, please. Thank you.

THE WITNESS: Where would you like me to start?

Q First, doctor, what is this? What are we looking at?

A So this is a typical image taken from shoulder arthroscopy. That little triangular notch here tells you the direction of the arthroscope which is the optical components which looks inside. It's about the size of a pencil and it gives you a beautiful view of the inside of the shoulder.

In this case we're seeing the shoulder from the back. So if you can imagine the fiberoptics going in from the back of the patient. So this is the left shoulder. The

patient's head would be here. The right shoulder would be over here and their body would be here. So we're looking from the back of the left shoulder.

On the right you see this sort of arc shape structure here which is the glenoid or the socket of the shoulder. It's a very shallow structure which allows great range of motion in the shoulder and not always great stability so the ball can sometimes slip around.

What helps the ball stay in place is a structure called the labrum, and in this case this is the labrum. And that basically builds up the rim of the socket to afford the shoulder more stability.

Sometimes over time, and we see this in overhead athletes, baseball pitchers are notorious for it or if you dislocate your shoulder, you can knock off the labrum. And in this case, the labrum is, indeed, separated here from the socket. You see this elliptical shaped dark spot which represents a tear of the labrum off of the glenoid or the socket. So the lip of the socket has been torn off the bony portion.

THE COURT: So in a healthy shoulder, that portion that looks like a loose vertical column would be attached on the right?

THE WITNESS: Correct, Your Honor. That's absolutely correct.

So you would not see this dark area in here. It would be -- actually, the best way to show you is up here it's intact and down here it's intact and here it's gapped.

THE COURT: And the black triangle that looks like string, can you explain to us what that is.

THE WITNESS: He has passed some suture through that. Again, I'd have to go back and see.

Can I look at the other --

THE COURT: But that's added by the surgeon?

THE WITNESS: Yes.

THE COURT: That's not apart of the anatomy of the patient?

THE WITNESS: Yes. As far as I can tell, yes.

Q Now, doctor, you mentioned this is something that you see in "overhead athletes." What's an overhead athlete as you use that term?

A Anyone that uses their arm overhead. Probably the most common one is pitchers, throwers --

Q Tennis?

A Volleyball players, tennis players.

Q Badminton?

A In this country not so much, but certainly badminton is very much overhead. I've seen a few badminton players, but in our country it's not a popular sport. But the obvious big ones are racquet sports, I guess, is the best way to put it.

Q Now, on this photograph that was taken intraoperatively, do you see any traumatic changes?

A Well, this labrum is definitely pulled off of the socket. So there's two ways it can come off. Repetitive motion where -- the analogy I like to use is if you take a paper clip and you keep bending it back and forth, over a long period of time one day it goes.

And the other way it comes off is if you knock the ball out of the socket and knock the edge off. And that's really a shoulder dislocation which you've probably heard of or a subluxation where it goes partially out and partially back in. And that is a memorable event, causes major pain.

And to knock off the front of the socket here, you need a blow from behind to push the ball forward.

Q And with respect to the history in this case, is there any historical information about the alleged impact consistent with what you've just described to bring about that type of traumatic or acute change?

A Not even remotely. In this case, yeah, there was the trauma was from the top so it's impossible to do that.

Q That what you've just said is based upon the allegations that you've seen in the lawsuit, correct?

A Right. What has been talked about, yes.

Q Okay. Doctor, you can take the stand. Thank you.

A Thank you.

Q Now, separate from the opinions that you hold based upon your review of the medical records and what you've just shown us with respect to the intraoperative films, what findings did you make of significance relating to your examination of Mr. Ahsan when you saw him as part of your evaluation in this case?

A Well, what was most memorable and striking about the examination was that the patient's range of motion that they demonstrated was, regarding the left shoulder was inconsistent. So I would ask the patient to raise the shoulder, and in this case the first time he raised it, he raised it 90 degrees, which is about to here (indicating). And I always go back and forth to make sure that you're getting a consistent range, and I go to the other shoulder or sometimes I go to a different body part.

And then later when I came back and I had him alternate quickly, he raised it, all of a sudden, to 160 degrees, which is almost all the way up. So that was -- it stood for me because there's no medical way to explain why that would happen. There's no mechanical explanation for that.

Q And I want you to assume for purposes of my question that during this trial there was testimony in front of this jury with the litigant holding one of these two photographs with his left arm.

Would there be restrictions in his ability to move his arm up and down consistent with or inconsistent with what you found on physical examination with the degrees that you just described?

A Yeah. Well, when he first moved it just a little bit, that would not be consistent with the position you're describing. And then later he suddenly was able to move it all the way up practically. So he -- I guess one way of saying it is he's consistently inconsistent.

Q Would that also apply if someone were to hold out a phone to take a selfie picture of himself using his left arm?

A At what angle?

Q Correct. At whatever angle he choses. Actually, we'll make it easy. Let me show you the photograph 4681 which is marked into evidence.

At the angle that he is taking the picture for --

MR. BHURTEL: Bates number?

MR. O'HARA: 4681.

Q Where he's described it as three stooges in Virginia on or about August 9, 2015.

A Yes. So in this image he is above the horizontal, so above 90 degrees which is more than he moved for me the first time in the office.

MR. O'HARA: Thank you.

THE COURT: Do you need the number again,

Mr. Bhurtel?

MR. BHURTEL: Yes, Your Honor.

Is the 4681?

MR. O'HARA: 4681, yes.

Q Doctor, based upon your review of the medical records, reports, diagnostic studies as well as your physical examination, did you come to an opinion within reasonable medical certainty about the injuries, if any, that Mr. Ahsan sustained?

A Yes, sir.

Q And what is that opinion?

A Specifically to the shoulder or everything?

Q Let's do the shoulder. We'll move to the neck in a minute. Let's do the shoulder first.

A So I found nothing to indicate an injury to the right shoulder other than what was given in the history much later what he was telling people. But there was nothing in the medical records I reviewed to even remotely suggest an injury to the shoulder in this case.

THE COURT: I believe you made a reference to the right shoulder in the course of your answer.

THE WITNESS: I'm sorry, Your Honor. You're right. It's the left. You're correct, it's the left shoulder.

MR. O'HARA: It's okay.

Q Okay. Let's now move to the neck.

As part of your evaluation you had occasion to evaluate, in addition to his upper extremities, his cervical spine, correct?

A Yes, sir.

Q And in doing so, similar to the left shoulder, were you afforded the opportunity to review the actual diagnostic studies generated in this case?

A Yes, sir.

Q Did you find anything in review of those films first on February 4, 2014 that was significant in your opinion?

A You're referring to the MRI films, correct?

Q The first were the cervical x-rays that were conducted at Apollo Imaging on February 4, 2014.

A Yes.

Q Let me show you Ahsan 1767.

What significant findings, if any, did you make based upon a review of the diagnostic films?

A I would call this a neck that's showing the typical wear and tear for an active person over the age of 50. In this case, I can be more specific. There's some disc space narrowing which is the Jello shaped -- Jello cushion between all the bones. Over time the Jello sort of dries up and the discs get thinner. And we're also seeing the alignment not quite as perfect as those cushioning discs collapse. They sometimes move -- the bones move a little bit left and right.

So it's a worn out neck basically.
Q In addition to the cervical x-rays, you also had occasion to review the materials associated with the MRI of the cervical spine on June 14, 2014, correct?
A Yes, sir.
Q And Ahsan 2067 through 2069.
Upon review of those materials, what significant findings, if any, did you make regarding the cervical spine?
A The MRI is more sensitive than an x-ray and shows more of the soft tissues and everything in more detail. And it basically reaffirmed what the plain x-rayed showed, a longtime wear and tear in the neck, discs that were not as plump as they were when the patient was 20, and bulging that we typically see from the disc being pushed on by the bones above and below because the human -- humans are designed to -- originally we evolved from four-legged creatures so the spine used to be parallel to the ground. And then we evolved into two-legged creatures and everything went vertical. So all of our discs are asked to cushion the bone above, and they bulge at different levels over time so we saw that as well.
Q Now, there's been testimony in this case from a variety of medical experts about what is actually visualized on Mr. Ahsan's cervical MRI. And we've heard the phrase "bulge" versus "herniation."
First, can you explain to the jury what's the

difference?

A It's basically a way of describing a disc. And I spent a lot of time in the office telling patients not to be concerned about what the term is but to look at the big picture here. A bulge can be called a partial herniation. So a herniation that causes problems goes way out and pushes on nerves and causes terrible pain.

But a bulge is just the discs doing its job to cushion the two bones. So bulges are not abnormal. Herniations that occur over time are also not abnormal and a sign of trauma necessarily.

Q And, doctor, I have displayed -- I'd just like you to take a look at the blowup of what's already in evidence, 112-C. Can you explain to the jury, in looking at the cervical spine that's on this particular photocopy of the film, what you mean in describing this particular patient as to whether or not he has cervical disc bulge?

THE COURT: You're inviting the doctor to come down?

MR. O'HARA: I'm going to ask for your permission. May I just?

THE COURT: Of course.

A So this is --

MR. O'HARA: Keep your voice up, doctor.

A Sure. This is a sideways look, if you will, of the cervical spine or the neck. And you can see the brain up

here, the throat over here (indicating). So the patient is facing this way.

And these are the seven bones which comprise the neck or cervical spine. The dark space in between are the discs. And the whiter they are, the plumper and the more water filled they are. And you can see in this patient there's a few white ones in there, but they're starting to get pretty dark and gray. And as they get dark and gray they get thinner over time. And, not surprisingly, at the back edge here and a little bit at the front edge, they start to plump out a little bit. As they get thinner, it squeezes a little bit more out to the side.

What's important, however, is the spinal cord, which comes down off of the brain here, is getting by unimpeded, meaning there's no issue with the spinal cord. The body gives you a lot of room in here for that cord to get by.

When you get a herniated disc, the kind that you hear about, you know, causes massive pain and sometimes needs surgery, the disc goes out -- it's hard to show in two dimensions here -- but it goes out to the side and it pushes on the nerve roots, which are actually coming out of this plain here to go down the arm. And that causes excruciating pain, immediate pain, immediate loss of motion of the neck.

MR. O'HARA: Thank you. You can take the stand, doctor.

(Witness takes the stand.)

Q What you've just described in terms of a traumatic disc herniation that causes excruciating pain, based on your review of the medical records, reports and other information in this case, does that exist?

A Oh, there's no evidence of that in this case, no.

Q And in terms of the onset of that body reaction and that pain, would it be -- is there a period of time from the initial insult that you would expect the person to experience that sensation?

A From a disc injury?

Q Yes, sir.

A It would be immediate pain and it would last for days, weeks, sometimes forever unless it's addressed.

Q Now, doctor, we've heard this phrase "degeneration" and "chronic condition."

Are there particular factors, social factors, activities that increase the likelihood that someone will experience degeneration of the cervical spine?

A Yes, sir.

Q What are some of those things?

A Well, the number one is age, unfortunately. And any overhead activities that put pressure on shoulder muscles which all tie into the neck as well will make wear and tear occur more quickly in the neck.

Q And are there social activities such as smoking that advance the degenerative process for the average patient as compared to a patient that has never smoked?

A Certainly. Smoking decreases the caliber of the blood vessels and, unfortunately, robs the bone and the ligaments of the nutrition it needs as we age and, as such, makes it more vulnerable to degeneration.

Q And how about professional activities, so people that are engaged in heavy movement of their body, is that an activity over time that the repetitive movement increases the likelihood of breakdown or degeneration in the cervical spine?

A Certainly. I mean, they don't have to be an orthopedic surgeon to know that more activities moving the neck are stressing those neck joints. And just like any mechanical part, the more you drive it, the more it breaks down.

Q How about posture in terms of the usage of technology today. I took the subway today and saw a picture of an ape with -- describing that you should have proper posture in the way you use technology. I want to focus on that particular area.

Are people that use the computer as an activity that they spend a lot of time with poor posture at a greater likelihood for degeneration?

A Yes. Unfortunately, the body had a design -- there's a design in place to keep the stress off the back and the neck,

and that involves having a proper curve to help share the force.

Where now with technology and computer screens we are leaning forward more, your vision starts to go and you have to lean a little bit more forward and all of a sudden you start tipping the spine when you do that and you place the bones in the spine in a less favorable position. And it can certainly accelerate wear and tear. Just like if your tires are not aligned well, it wears out more quickly.

Q Now, with respect to your physical examination of the patient's cervical spine, can you tell the jury what items of significance you found when you examined this plaintiff.

A I found essentially a completely normal spine. The patient was able to flex, meaning move forward; extend, meaning move back; and rotate left and right fully. I found no tenderness in the muscles. No spasm.

Q And with respect to your neurologic exam on motor and sensor findings, what were your findings?

A So motor and sensory is designed to see how the nerves specifically are coming out of the neck. And in this case all of the sensation, meaning the skin sensation, served by the nerves that come out of the neck was intact and all the muscles that are served by the nerves that come out of the neck was also intact.

Q And I have two photographs that are in front of you that

have been marked into evidence. We'll just go with this one which is identified as 4669 which there's been testimony that it was taken on or about September 23, 2002. (Sic)

Do you see the photograph?

A I do.

Q Is the --

THE COURT: Did you say 2002?

MR. O'HARA: 2012. Sorry, Judge.

MR. BHURTEL: What was the page number?

THE WITNESS: 4669.

Q Is the photograph of Mr. Ahsan looking up to the sky consistent with your findings in terms of his ability to move his neck freely?

A Completely. It's actually really great motion for somebody over 40 or 50. He's able to extend his neck way back which a lot of people can't do which is great.

Q Doctor, similar to the shoulder question, I'm now going to ask you, based upon all of the information that was provided to you, as well as your physical examination, did you come to opinions within reasonable medical certainty as to the injuries that were sustained in his cervical spine as a result of the events of -- of the alleged events of September 2, 2011?

A Yes.

Q And what were your -- what are your opinions in that

regard?
A That based on what he was reporting, which is that neck soreness, he had a mild sprain or strain of the neck at that time.
Q And that particular opinion is based on the history of an event occurring at all, correct?
A Absolutely. Yes.
Q And if that history is inaccurate or if this jury doesn't believe it, what is your opinion with respect to any injury suffered by --
THE COURT: Well, what the jury believes or doesn't believe is not, I assume, relevant to the doctor's opinion so please rephrase your question.
MR. O'HARA: Sure.
Q If the history that he has given about having pain in his neck immediately after the alleged incident is untrue, in your opinion did he suffer any injury at all?
A No, sir. There's no what I would call objective evidence, nothing you can see with your own eyes to show an injury to the neck. Not on the x-ray, not on my physical examination and not on the MRI.
MR. O'HARA: Thank you, doctor.
I have nothing further, Your Honor.
CROSS EXAMINATION
BY MR. BHURTEL:

Q Good afternoon, Dr. Bazos.

A Hello.

Q Yes. Excuse me.

Did you prepare the report with respect to the -- withdrawn that.

You already testified that you prepared the report related to Mr. Mostafa Ahsan's neck and shoulder, right?

A Yes, sir.

Q And did you had opinion with respect to his neck injury in your report with respect to your report dated February 8, 2015?

A Yes, sir.

Q And what was your opinion with respect to his neck injury?

A That he, based on the history he gave, that he suffered, at most, a soft tissue injury or a sprain or a strain to the neck.

Q And how about the -- his injury with respect to the left shoulder?

A Again, based on his history of his having shoulder pain at the time, I said there could be a soft tissue injury to the shoulder. But given the fact there was no complaint at the time, it's not corroborated in the medical records.

MR. BHURTEL: May I, Your Honor?

THE COURT: Yes.

MR. BHURTEL: That's going to be page 1326.

THE COURT: 1326.

MR. O'HARA: Got it.

Q Doctor, could you please read your impression up to here.

A Up to where?

Q Here. From here.

A The period? From I?

Q Yes.

A "I have reviewed the medical records made available to me in this case and performed an examination on the claimant. It is my opinion that the claimant suffered nothing more than minor soft tissue strain injuries to the cervical spine and left shoulder as a result of the subject accident on September 2, 2011."

Q So when we're saying subject accident -- well, withdrawn that.

That was your first report, I believe, right, February 8, 2015?

A Correct.

Q And you wrote on the second report, right?

A I was given more medical records and wrote a second report on August 8, 2015.

Q August 8, 2015, right. Okay?

A Yes, sir.

Q Page 1337.

Can you read for the jury from here to here.

A "I have reviewed the additional medical records made available to me in this case and my initial opinion remains unchanged. The claimant suffered nothing more than minor self-limited soft tissue strain injuries to the cervical spine and left shoulder as a result of the subject incident."

THE COURT: What does self-limited mean in that context?

THE WITNESS: Your Honor, that's a way of saying that it goes away over time and has a finite end to it.

Q And you issued a third report, right?

A Yes, sir.

Q And did in third report did you change your opinion or your opinion remained the same?

A The latter, that my opinion remained the same.

Q And this all is your conclusion, findings of your own, right?

A Yes.

Q So this is the report, recent one, that's March 17, 2016, right?

A Yes.

Q Page 1343. Can you read for the jury from here to the here.

A Yes. "I have reviewed the additional medical records made available to me in this case and my initial opinion

remains unchanged. Mr. Mostafa experienced, at most, a minor self-limited soft tissue strain injury to the cervical spine and left shoulder as a direct result of the subject accident."

MR. BHURTEL: Thank you.

Q Doctor, is it fair to say that based on your report that Mostafa Ahsan, he suffered soft tissue injury in his neck from the accident September 2, 2011?

A That's based on the history of him having had pain at the time. So if he had pain at the time, it's reasonable to assume that he had a minor soft tissue injury to the areas where he complained of pain.

Q And it is fair to assume that he had soft tissue injury in his left shoulder, is it right, after the subject accident which is September 2, 2011?

A Well, there are no complaints of pain at the time, so that opinion is based on the history where he told me that he had pain at the time of the shoulder which we found out is not corroborated in the medical records.

Q If I tell you that -- okay. Strike that one.

So he, Mostafa Ahsan, he means Mostafa Ahsan, he told he had a left shoulder pain at the time of the accident in the Staples store, if I tell you that, does that helps to make your opinion one or another way?

A I think it's -- you just take it at face value. If he told somebody he had pain, I can't argue with that.

THE COURT: I think, doctor, the question is slightly different in that I think what Mr. Bhurtel is asking you is: If there were documentary corroboration of a complaint of shoulder pain immediately following the accident, would you conclude that there was at least a minor soft tissue injury to the plaintiff's shoulder?

THE WITNESS: Yes, Your Honor, I think that's reasonable.

THE COURT: Is that what you meant?

MR. BHURTEL: Yes, Your Honor.

Q And which is caused by the September 2, 2011 accident?

A If he had pain, again, which is subjective relying on what he said, it's reasonable to assume a minor soft tissue injury, yes.

Q Doctor, can you explain -- when you say soft tissue, can you explain in the joint like shoulder, what do you call the soft tissue and what do you call the other part of the body, the part of the shoulder?

A The bulk of the soft tissue surrounding the shoulder is made up of muscle. Certainly, the skin covering is part of soft tissue as well. But I think muscle is the best component of the soft tissue to talk about.

THE COURT: Is a labrum a muscle?

THE WITNESS: A labrum is not a muscle, but there is no -- definitely no labrum injury from this.

Q Is labrum is the soft tissue?
A Yes. But not -- in this case there was no labrum injury.
Q Doctor, when I ask, please, answer yes or no. And then if I need further I will ask you.
A Certainly. Yes.
Q Can you describe -- strike that one.
In cervical disc, is a disc itself is the soft tissue or something else?
A Can I explain what -- when I say soft tissue, it generally means the muscles or ligaments surrounding a joint. It does not mean discs and the labrum. But soft tissue injuries are a whiplash-type injuries that get stretched or bruised from a direct trauma. So I think, as I said earlier, to understood this best in this case it's really the muscle I'm talking about.
Q Doctor, I believe you examined one time Mostafa, right?
A Yes, sir.
Q And is it fair to say that you examined him, actual examination was five minute?
A The actual physical examination?
Q Yes.
A Yes, it just involved his -- essentially his neck, back and shoulder. The actual physical exam would be five minutes is about right.
Q Earlier you told -- withdrawn that.

So you prepared this narrative report called a litigation medical report, right?
A No. I call it, it's called an independent medical record review and examination.
Q But what we call here is the -- this report, and defense counsel and we agree, he also say that the doctor prepare medical record, medical -- sorry -- the narrative report for the litigation. So I'm going to refer you to the medical report you prepared for the purpose of litigation.
So that medical report, you prepare all three of them at the request of the defendant's lawyer, right?
A Yes, sir.
Q And all the record, whatever you received, that is from the defendant's law firm, right?
A Yes.
Q And, doctor, how, how often you provide your service to the defendant's lawyer?
A A few times a year perhaps.
Q And how long you have been providing?
A A few years I would say.
Q Maybe more than five years?
A Five is about right.
Q And when you prepared this kind of report, this kind of litigation -- withdrawn that. Strike that.
Doctor, when you prepare medical report for the

litigation purpose, do you do more to the defendants or -- strike that. Withdrawn that.

Is it fair to say that you prepare mostly for the defendants those kind of medical report for the litigation purpose?

A I'm not sure what you mean.

For the defendants I do them based on my orthopedic knowledge. I'm not for or against anybody.

THE COURT: When you're retained for litigation, is it more frequently by defendants than plaintiffs?

THE WITNESS: Yes, Your Honor. Yes, so I'm retained more frequently by defendants, yes.

MR. BHURTEL: Thank you, Your Honor.

Q And when you go in a court to testify, so you are retained by most of the time by the defendant to testify?

A Sometimes for my patients as well, but more often by the defendant, yes.

Q Is it fair to say that you do not have expertise or board certification to read the MRI report, but you rely on the radiologist's report?

MR. O'HARA: Object to the form of the question.

He's been qualified as an orthopedic surgeon.

THE COURT: Well, I will overrule the objection.

You can answer the question, but you can explain. You don't have to answer it yes or no.

A It's completely unfair to say that, with all due respect. If I could show you my board certification examinations, of which I've sat for three and one live one. I am bombarded with cervical spine MRIs, lumbar spine MRIs, other fancier diagnostic tests of all the musculoskeletal system. And, in fact, the board certification in orthopedics is 18 percent cervical and lumbar spine.

So with all due respect, I am superbly qualified, if I can be humble, at reading MRIs of the spine, the shoulder, the knee or ankle or whatever you'd like in the musculoskeletal system.

Q Do you have expertise in the -- for reading MRI yourself?

A I believe I tried to make that clear that I do, yes.

Q And in this matter, especially, the findings of the radiologist, neuroradiologist, there are part of his finding, do you disagree or do you agree?

A Can you just say that again. I didn't get that second to last phrase.

Q Neuroradiologist --

A Yes.

Q -- the Harold Parnes who did the MRI of the neck and shoulder, and he gave the opinion with respect to the his reading. Do you agree with his reading or do you disagree with his reading?

A I, in general, agree with the readings, yes.

Q Do you recall that testifying the Ahsan 1354?

THE COURT: 1354.

Q Can you read for the jury, please, this one.

MR. O'HARA: Page line, please.

MR. BHURTEL: 14 to 16.

MR. O'HARA: Which page? There's four pages on this sheet.

MR. BHURTEL: 37.

A I have no expertise in reading that MRI which is the brain MRI, but I have no reason to believe -- to disbelieve the radiologist.

Q Doctor, do you agree with the finding of the Dr. Ajoy Sinha -- well, withdrawn that.

Doctor, do you agree with the Dr. Ajoy Sinha's finding of the subacromial impingement?

THE COURT: Of the what?

MR. BHURTEL: Subacromial impingement.

A Can you just show me where. Certainly, that's an appropriate diagnosis, but just tell me what you're referring to so I can make sure I don't mislead anybody.

MR. BHURTEL: Page 37.

MR. O'HARA: I want to watch this time.

MR. BHURTEL: 37.

A That's my deposition.

No, I'm asking you where you -- what you're

referring to in the medical records.

Q Oh, no.

A I don't remember that, what we were talking about that day without reading the whole area.

Was it in the MRI report you're asking me?

Q No. This one is --

A Oh, in the operating report?

Q Right. Yes.

A Oh, I'm sorry.

Yes, I do agree with that.

Q You do agree with that?

A A hundred percent.

Q This is the finding of the Dr. Ajoy Sinha's operation report --

A Correct.

Q -- dated December 18, 2014.

A Correct.

Q How about the page intraoperative report findings of AC joint hypertrophy sublateral labral tear.

A I agree.

Q Doctor, is it fair to say some patient, they do not recover within three weeks or four weeks from their neck injury?

A Can you give me a specific neck injury, an age of a patient or?

Case 1:13-cv-05929-SMG Document 118-2 Filed 12/21/16 Page 944 of 958 PageID #: 2034

Q Such as like herniated disc.
A A herniated disc?
Q Yes.
A An acute herniated disc could take a long time to -- I said earlier, could take a long time to recover from and it may need surgery.
Q May need surgery.
And you agree with me, herniated disc is very painful?
A As I described earlier, when you have a traumatic herniated disc, it is mind-numbing pain that stops your motion. It's incapacitating.
Q Do you agree with me -- well withdrawn that.
So with respect to the neck injury, technically the patient, initially, they go for the physical therapy?
A I'm sorry. That's such a vague question. I can't give you a specific answer.
Q All right. I'll withdraw that question.
If the patient complains the pain in neck and doctor finds the clinical finding, treating doctor finds the clinically that he has a symptoms, is the necessary -- after therapy doesn't go away, next state, what is the next state, next treatment?
THE COURT: Next stage or treatment.
A Again, unfortunately, you're not giving me the details I

would need to come up with a treatment plan based on just saying neck symptoms and therapy, what's the next treatment? There could be a fracture, there could be a herniated disc, there could be an infection.

So I'm at a loss really to give you a good answer.

Q Okay. Let's talk about herniated disc.

A So an acute disc herniation traumatic?

Q Yes.

A So not in this case, but in the case of a herniated -- in an acute herniated disc, I would not do physical therapy because you could have nerve compromise. In a freshly torn disc you could run the risk of hurting the patient more so I would get immediate diagnostic testing before I move the neck. And certainly you also worry about stress fractures or other areas. So what I'm trying to say is that it's dependent on the patient's specific symptoms, physical examination.

Q Is it fair to say, doctor, that if the patient is taking pain medication, that may help them sometimes to do some activities with respect to the neck pain or shoulder pain?

A Again, it completely depends on the diagnosis. If you have an acute herniated disc or a fracture or a rotator cuff tear, there's no pain medication that's going to allow you to do activities likely. So I really -- I need a little more help in exact scenario.

Q Doctor, how much was -- how much was the pay to you for

the two days' testimony?

A I was first to replace a day's revenue at work which is $10,000 for skipping my day.

Q For today's testimony, right?

A For today's testimony, yes.

Q And how much you were paid for the purpose of the preparing those reports, the three report, including the examination?

A I don't remember exactly, but I would say, based on the length of the report, somewhere in the $3,000 range.

MR. BHURTEL: I complete my question, Your Honor.

MR. O'HARA: No redirect, Your Honor.

THE COURT: No redirect?

MR. O'HARA: No, sir.

THE COURT: Thank you. You're excused.

THE WITNESS: Thank you, Your Honor.

Your Honor, this was given to me during --

THE COURT: Yes. If you just leave them on the witness chair and take with you what you brought with you, we'll be fine.

(Witness excused.)

(Continued on the following page.)

Case 1:13-cv-05929-SMG Document 118-2 Filed 12/21/16 Page 947 of 958 PageID #: 2037

THE COURT: Counselor, are you in a position to offer the remaining exhibits that are part of plaintiff's case? Mr. Bhurtel?

MR. BHURTEL: I just want to make sure that this exhibit 382 -- .2, I believe it is already admitted. Just wanted to make sure that -- this is the CV, that we can just use it.

MR. O'HARA: So, Judge, I believe this is already part of the records that have been admitted. This is the advance radiologic images studies from November 3, 2012. If it's already in evidence, it's not an issue. If it's not, I stipulate that it's admissible.

THE COURT: All right, 38.2 either is in evidence or was in evidence --

MR. O'HARA: I believe it's already in.

THE COURT: -- but it is now.

(Plaintiff Exhibit 38.2, was received in evidence.)

MR. BHURTEL: And 38-1 also. I think 38-1 is the CV.

THE COURT: 38-1, I believe was already received in evidence, and if it was not, it is now without objection.

(Plaintiff Exhibit 38-1, was received in evidence.)

MR. BHURTEL: And Exhibit 40.

THE COURT: Exhibit 40.

MR. BHURTEL: Broadway Medical Cares medical

records.

THE COURT: Exhibit 40 is received in evidence without objection.

MR. O'HARA: Subject to removal of the items.

THE COURT: Subject to redaction.

(Plaintiff Exhibit 40, was received in evidence.)

THE COURT: And the understanding is that plaintiff will be responsible for making redactions and showing them to plaintiff's counsel after making -- to defendant's counsel after they do so.

MR. BHURTEL: Yes, Your Honor.

MR. O'HARA: Yes, sir.

THE COURT: I corrected you enough times, you can certainly correct me as well.

MR. BHURTEL: Trial Exhibit 42, Fidelity Physical Therapy & Rehabilitation, PTPC, same, with the subject to some pages, fax number and other things, we will take it out.

THE COURT: Okay. And just tell me the name of the facility, again, I missed the first word?

MR. BHURTEL: Fidelity.

THE COURT: Fidelity.

MR. BHURTEL: F-I-D-E-L-I-T-Y.

THE COURT: Thank you. Those are received in evidence without objection.

(Plaintiff Exhibit 42, was received in evidence.)

MR. O'HARA: Subject to.

THE COURT: Redaction.

MR. O'HARA: Yes.

MR. BHURTEL: And Exhibit 44 it is the medication record from the Jamaica Pharmacy, and, again, we will work out and then subject to redaction.

MR. O'HARA: No objection.

THE COURT: In evidence.

(Plaintiff Exhibit 44, was received in evidence.)

MR. BHURTEL: Trial Exhibit 64.

This is bill for the MRI from Middle Village Diagnostic Imaging, but the name is this one, Your Honor, but this bill is actually for the epidural imaging.

MR. O'HARA: Subject to us talking about this, if that is, in fact, accurate, I will have no objection.

THE COURT: In evidence without prejudice to a motion for reconsideration.

(Plaintiff Exhibit 64, was received in evidence.)

MR. BHURTEL: And Exhibit 62, Fidelity Physical Therapy & Rehabilitation, PTPC bills. And this bill will subject to the redaction.

THE COURT: Thank you. In evidence, pursuant to counsel's agreement without objection.

MR. O'HARA: Yes.

(Plaintiff Exhibit 62, was received in evidence.)

MR. BHURTEL: Exhibit 53. Again, subject to some redactions, medical record from New York Surgery Center, Queens.

THE COURT: In evidence without objection, subject to redaction.

MR. O'HARA: Yes, sir.

(Plaintiff Exhibit 53, was received in evidence.)

THE COURT: All right. Mr. Bhurtel?

MR. BHURTEL: Yes, Your Honor.

THE COURT: What happens now? Does the plaintiff rest?

MR. BHURTEL: Your Honor, with respect to one of the exhibits, I may have to go one more time the other days and give you list of the exhibits. All are --

THE COURT: Well, if you don't have them now to offer, I'm going to direct that you rest, and if you find something that you inadvertently failed to have put into evidence, you can make a motion to open your case. All right?

MR. BHURTEL: All right.

MR. O'HARA: Judge, at this time, subject to the ability to identify and offer records that were used during the plaintiff's case, which we will do over the weekend, Staples rests.

THE COURT: So the parties have rested, ladies and gentlemen, the evidence -- do you have you a rebuttal case,

you wish to offer?

MR. BHURTEL: Yes.

THE COURT: You do? You may proceed.

MR. BHURTEL: Your Honor, but today I don't have the witness.

(Fire drill interruption.)

THE COURT: Come up to the sidebar.

(Continued on the next page.)

(Sidebar conference.)

THE COURT: Who else do you have?

MR. BHURTEL: The imaging.

THE COURT: You're going to call him? Why isn't he here now then?

MR. BHURTEL: He left the job from the company that hired him and he is not there and we tried.

(Fire drill interruption.)

THE COURT: I'm sorry, ladies and gentlemen.

Mr. Bhurtel, if you want to call a rebuttal witness, I want a proffer of what you expect to develop that is inconsistent with what we heard today.

MR. BHURTEL: Your Honor, I expect that the rebuttal witness will testify during the medical examination conducted by Dr. Bazos what the present inconsistencies.

THE COURT: I understand that. But to have a rebuttal, it has to be inconsistent with what the doctor said.

MR. BHURTEL: Right.

THE COURT: So what is inconsistent?

MR. BHURTEL: So with respect to the hand, the shaking hand and the range of motion, those kind of things he will -- he will testify.

THE COURT: And why can't he be here this afternoon?

MR. BHURTEL: The reason, first, the company I hired, the PM Investigations, that's the company which I was using and he left the job, and I gave them to find out and

they tracked him and then now today he's out of town. He's coming Monday here only for this purpose, and it may take 20 minutes or 15 to 20 minutes, that's all we want.

MR. O'HARA: But my position is very clear. I agreed to take witnesses in particular order. The Court gave me permission to do so. I made a judgment decision to take witnesses out of order with the express understanding that Dr. Head would testify this morning, that the investigator, if there was some inconsistency would be called immediately thereafter. Dr. Bazos would testify this afternoon and if there were some inconsistency, he would be able to testify thereafter.

The first time I am now hearing about the unavailability of this witness is after I have rested.

So the determination to make a strategic change and allow my case to go in at all until the completion of plaintiff's case was based on, among other things, his representation. So I object to it, but I can't tell you --

THE COURT: I'm overruling the objection, because this would be admissible only in a rebuttal case and not part of the direct case in any event. And so the reliance was not detrimental.

Accordingly, you can call this witness. You must be brief. You must be very well prepared, and if the defendant wants Dr. Bazos to listen to the testimony and be available as

a rebuttal witness, it may do so telephonically.

MR. O'HARA: I appreciate that. That's an accommodation that is attempting to eliminate any potential shortcoming for the defense, but had that witness been here now, I paid for that doctor to be here for the full day, this witness would be almost finished, and the doctor could be sitting in the courtroom.

And so if I'm going to do that, I can't see that being an expense that should be foisted upon the defense. If that is now required because this litigant is not prepared to go forward, that expense should be borne by the party that created the circumstance, the plaintiff.

Cost me $10,000 to bring that man back, assuming with his schedule, keeping in mind we scheduled this trial three months ago, assuming that I can even get him here.

THE COURT: Okay? Are you calling the other doctor on Monday.

MR. O'HARA: No, I just rested.

THE COURT: Well you rested. Of course, you did.

Thank you. All right.

(End of sidebar conference.)

(Continued on the next page.)

(In open court; Jury present.)

THE COURT: As you've heard, both sides have rested.

The reason for our sidebar included a discussion of the possibility which remains alive that the plaintiff will present a short rebuttal case on Monday morning.

If there is such a case, it will be brief, and so you can expect to hear the closing arguments of counsel, my instructions on the law and to begin your deliberations on Monday, if all goes according to plan, as I expect it will.

Please don't discuss the case with anyone. Please have a great weekend. Please be back here 9:30 Monday morning, and we'll see you then.

(Jury exits the courtroom.)

THE COURT: Now, Mr. Bhurtel, you know, just to be aware, once this witness testifies, we don't take a long recess to write the summation at that point, your summation is ready to go beforehand.

MR. BHURTEL: Yes.

THE COURT: And I'll give you five minutes, ten minutes to incorporate anything that may have happened, but after that, I'll expect counsel to be ready to sum up.

MR. O'HARA: Question. Based on the nature of what's been proposed as the rebuttal case, and the fact that whomever is coming to testify about the trial testimony of Dr. Bazos, in order for that person to have firsthand factual

knowledge to offer any testimony, are we going to require the plaintiff to make an offer of proof as to the general nature of the testimony?

My concern is if he talks to this witness and this witness takes the stand, he has taken -- he's effectively made himself a witness. Because if the witness testifies based on something that counsel has told him, that is --

THE COURT: That's not what I expect to happen, Mr. Bhurtel. Do you intend to provide factual information to the witness over the weekend?

MR. BHURTEL: No.

THE COURT: I assume that the witness' recollections of the examination will be inquired about, and it either will or will not be consistent with what the doctor said, but he will not be told what the doctor testified to, correct?

MR. BHURTEL: Yes.

THE COURT: So, you know, his own independent recollection is something that Mr. Bhurtel is in a position to represent is inconsistent with what the doctor testified to, then he can call him based upon his recollection and Mr. Bhurtel will have the opportunity to the identify the inconsistencies.

MR. O'HARA: Understood.

THE COURT: Okay. Is there anything further for my attention from either side?

MR. O'HARA: No, Your Honor.

THE COURT: All right. You can, of course, leave things in the courtroom over the weekend, as you have during the week. I don't know what kind of cleaning crew is coming in to vacuum or whatever, but I wouldn't worry about it. Don't leave any valuables and rest up and be ready to go.

MR. O'HARA: Thank you, Your Honor.

MR. BHURTEL: Thank you, Your Honor.

(Proceedings adjourned at 3:15 p.m. to resume on November 21, 2016 at 9:30 a.m.)

INDEX

| WITNESS | | PAGE |
|---|---|---|
| WILLIAM BRIAN HEAD, M.D. | | |
| DIRECT EXAMINATION | BY MR. O'HARA | 813 |
| CROSS-EXAMINATION | BY MR. BHURTEL | 845 |
| REDIRECT EXAMINATION | BY MR. O'HARA | 857 |
| MOSTAFA AHSAN | | |
| REDIRECT EXAMINATION | BY MR. BHURTEL | 862 |
| DEPOSITION OF BART ROZPEDOWSKI READ | | 875 |
| ANDREW BAZOS, M.D. | | |
| DIRECT EXAMINATION | BY MR. O'HARA | 898 |
| CROSS-EXAMINATION | BY MR. BHURTEL | 931 |

EXHIBITS

| PLAINTIFF | PAGE |
|---|---|
| 38.2 | 946 |
| 38-1 | 946 |
| 40 | 947 |
| 42 | 947 |
| 44 | 948 |
| 64 | 948 |
| 62 | 948 |
| 53 | 949 |