UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------ x
MOSTAFA R. AHSAN,

                Plaintiff,

    -against-

STAPLES, INC., and STAPLES THE OFFICE
SUPERSTORE EAST, INC.,

                Defendants.
------------------------------------------------------------------ x

<u>MEMORANDUM
& ORDER</u>
13-CV-5929 (SMG)

STEVEN M. GOLD. U.S. Magistrate Judge:

Presently before the Court is plaintiff's motion for a new trial pursuant to Federal Rule of Civil Procedure 59(a)(1)(A). *See* Docket Entry 118. For the reasons set forth in this Memorandum and Order, plaintiff's motion is denied.

## BACKGROUND

This personal injury action arises out of events that took place on September 2, 2011, in a store operated by defendant Staples The Office Superstore East, Inc. ("Staples").[1] *See* Compl., Docket Entry 1. Plaintiff Mostafa R. Ahsan ("Ahsan") claims that, while shopping in the Staples store, he was hit by boxes that fell from a shelf, causing him to sustain a traumatic brain injury ("TBI"), as well as neck and shoulder injuries. Declaration of Durga P. Bhurtel at 16-17, dated December 21, 2016, Docket Entry 118-1; Tr. 17-20.[2] Staples concedes that its negligence caused one or two boxes to fall from a shelf on the date of plaintiff's accident, but it disputes the nature and extent of plaintiff's alleged injuries and whether its negligence proximately caused plaintiff

---

[1] Although Staples, Inc. was named in the complaint as a co-defendant, the parties have since stipulated that all claims against that defendant be dismissed without prejudice. *See* Docket Entry 33.

[2] "Tr." refers to the trial transcript, Docket Entries 118-2, 122-3, and 122-4.

to sustain any injuries at all.[3]  Defendant's Memorandum in Opposition ("Def.'s Mem.") at 1, Docket Entry 122; *see also* Stipulation, dated April 14, 2016, Docket Entry 80.  After a six-day jury trial, the jury returned a verdict for Staples, finding that its negligence did not proximately cause any injury to plaintiff.  *See* Docket Entry 113.

Plaintiff now moves for a new trial pursuant to Federal Rule of Civil Procedure 59, claiming that the verdict was "contrary to the weight of the credible evidence."  Plaintiff's Memorandum in Support ("Pl.'s Mem.") at 4, Docket Entry 118-3.  Plaintiff also asserts for the first time in his reply that an exemplar of the plastic file folders contained within the type of boxes that fell on plaintiff was improperly received in evidence.[4]  Plaintiff's Reply Memorandum ("Reply Mem.") at 7-8, Docket Entry 125.  For the reasons that follow, plaintiff's motion is denied.

---

[3]  As discussed below, the evidence at trial was somewhat inconsistent with respect to whether one or two boxes fell from the shelf in the Staples store.  For purposes of convenience only, I refer to boxes in the plural, without making any finding that two boxes rather than one fell on plaintiff in the store.

[4]  Defendant's opposition responds to an additional claim that the Court does not discern from plaintiff's papers: that the Court erred in failing to instruct the jury (i) on res ipsa loquitor, and (ii) that it had to award plaintiff some measure of damages because defendant conceded liability.  Def.'s Mem. at 13-15.  As an initial matter, it is not entirely clear that plaintiff even raises these claims.  The only reference to them is in plaintiff's reply memorandum of law, wherein he simply states that "there is no merit to the argument raised by defendant . . . regarding our failure to preserve and object [to] the jury charge issue because it is belied by the record."  Reply Mem. at 8.  Plaintiff notes further that "[i]n the end, the jury may have been misled or confused because this Court denied our request to charge."  *Id.* at 9.

To the extent plaintiff does seek to challenge the jury charge, his contention lacks merit.  First, as the Court explained during the charge conference, a res ipsa charge was not warranted simply because defendant stipulated that, if any boxes fell on plaintiff, it was negligent in allowing them to do so.  Tr. 795.  After this was explained to plaintiff, he agreed that a res ipsa charge was not necessary.  Tr. 796.  Second, plaintiff's assertion at the charge conference that "since the defendant admitted liability, the plaintiff is entitled [to] damages" reflected a misunderstanding of defendant's position in the case.  Tr. 797.  The stipulation entered into by the parties provides that "defendants are liable for the happening of the September 2, 2011 accident at issue only.  Defendants will continue to defend the disputed issues related to damages, including whether and to what extent the accident at issue caused the injuries claimed."  Stipulation, dated April 14, 2016.  As I explained during the charge conference, pursuant to this stipulation, "the defendant has admitted that its negligence caused a box or boxes to fall off a shelf.  It has not admitted that those boxes . . . proximately caused the plaintiff[] any injury at all."  Tr. 798.  Accordingly, a charge instructing the jury that it must award some measure of damages would have been improper; the jury first had to decide whether plaintiff sustained any injuries that were proximately caused by defendant's conceded negligence.  By answering this question "no," the jury determined that plaintiff was not entitled to recover any damages at all.

**DISCUSSION**

I. LEGAL STANDARDS

A court may grant a new trial where the "jury's verdict is against the weight of the evidence." Fed. R. Civ. P. 59(a)(1)(A); *Crews v. County of Nassau*, 149 F. Supp. 3d 287, 292 (E.D.N.Y. 2015) (quoting *DLC Mgmt. Corp. v. Town of Hyde Park*, 163 F.3d 124, 133 (2d Cir. 1998)). While a court may grant a motion for a new trial "even if there is substantial evidence supporting the jury's verdict," the Second Circuit has made it clear that such a motion may be granted only "when the jury's verdict is egregious." *DLC Mgmt.*, 163 F.3d at 134 (citation omitted). Accordingly, a motion for a new trial should be denied "unless the trial court is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice." *Munafo v. Metro. Transp. Auth.*, 381 F.3d 99, 105 (2d Cir. 2004) (citations omitted); *Depascale v. Sylvania Elec. Prods., Inc.*, 710 F. Supp. 2d 275, 285 (E.D.N.Y. 2010).

In contrast to the standard applicable to a motion for judgment as a matter of law, a court deciding whether to grant a motion for a new trial "is free to weigh the evidence [itself] and need not view it in the light most favorable to the verdict winner." *Song v. Ives Labs., Inc.*, 957 F.2d 1041, 1047 (2d Cir. 1992) (quoting *Bevevino v. Saydjari*, 574 F.3d 676, 684 (2d Cir. 1978)). Nevertheless, "[w]here the resolution of the issues depended on assessment of the credibility of the witnesses, it is proper for the court to refrain from setting aside the verdict and granting a new trial." *Metromedia Co. v. Fugazy*, 983 F.2d 350, 363 (2d Cir. 1992), *abrogated on other grounds as noted in Yung v. Lee*, 432 F.3d 142 (2d Cir. 2005); *see also DLC Mgmt.*, 163 F.3d at 134 ("[A] court should rarely disturb a jury's evaluation of a witness's credibility."); *Dunlap-McCuller v. Riese Org.*, 980 F.2d 153, 158 (2d Cir. 1992) ("[W]e caution that the jury is

empowered and capable of evaluating a witness's credibility, and this evaluation should rarely be disturbed.").

Where, as here, a party seeks a new trial based in part upon an evidentiary ruling, Federal Rule of Civil Procedure 61 provides the applicable standard. *See Kogut v. County of Nassau*, 2013 WL 3820826, at *2 (E.D.N.Y. July 22, 2013). Under Rule 61,

> [u]nless justice requires otherwise, no error in admitting or excluding evidence—or any other error by the court or a party—is ground for granting a new trial, for setting aside a verdict, or for vacating, modifying, or otherwise disturbing a judgment or order. At every stage of the proceeding, the court must disregard all errors and defects that do not affect any party's substantial rights.

Fed. R. Civ. P. 61. Thus, even if evidence has been admitted in error, a new trial may not be granted unless the error affected a litigant's "substantial rights." *Stowe v. Nat'l R.R. Passenger Corp.*, 793 F. Supp. 2d 549, 568 (E.D.N.Y. 2011). "[A] substantial right has been affected only where a jury's judgment was likely to have been 'swayed by the error.'" *Parrish v. Sollecito*, 280 F. Supp. 2d 145, 165 (S.D.N.Y. 2003) (quoting *Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 150 (2d Cir. 1997)). Relevant to the analysis is "whether or not the evidence bears on an issue that is plainly critical to the jury's decision" and "whether or not the evidence was emphasized in arguments to the jury." *Hynes v. Coughlin*, 79 F.3d 285, 291 (2d Cir. 1996) (citations omitted).

II. ANALYSIS

A. Weight of the Evidence

As noted above, Staples stipulated prior to trial that it was negligent in allowing boxes to fall from a shelf. It remained for the jury to decide, though, whether defendant's conceded negligence proximately caused any of the injuries claimed by plaintiff. Ultimately, the jury found that plaintiff did not sustain any injuries that were caused by the boxes that fell in the Staples store. Jury Verdict, Court Ex. 1, Docket Entry 113. Plaintiff claims that, in reaching that

verdict, the jury disregarded the "overwhelming proof of causation" presented at trial. Pl.'s Mem. at 3. On plaintiff's Rule 59 motion, the only question before the Court is whether the jury's verdict was "so against the weight of the evidence as to constitute a seriously erroneous result, or a miscarriage of justice." *Depascale*, 710 F. Supp. 2d at 285 (citation and quotation marks omitted). Having presided over the trial, and having carefully reviewed the evidence presented, I conclude that it was not.

As described in greater detail below, the jury was presented with conflicting evidence at trial. Plaintiff and the treating doctors he called to testify described a variety of injuries suffered by plaintiff and attributed them to the accident in the Staples store. Plaintiff's claims of injury were impeached, however, with his own inconsistent statements about how the accident occurred, his repeated failures to provide treating physicians with complete and accurate accounts of his pre-existing conditions, and evidence of his post-accident activities that seemed inconsistent with the injuries and limitations he described. The doctors who treated plaintiff and testified on his behalf at trial were cross-examined about plaintiff's prior injuries and complaints and ultimately acknowledged at least some uncertainty about the degree to which plaintiff's injuries were caused by the accident in the Staples store. Finally, defendant's medical experts testified that plaintiff's medical records did not include any objective findings indicating that plaintiff suffered traumatic, as opposed to degenerative or age-related, injuries. Defendant's experts also called into serious question the theory proposed by plaintiff's expert to explain how plaintiff sustained a brain injury as a result of the falling boxes. The jury apparently chose to credit the testimony and other evidence indicating that any injuries plaintiff sustained or symptoms he suffered were caused by circumstances other than the falling Staples boxes, and it was reasonable and within its province to do so.

5

*1. Plaintiff's Case*

Plaintiff claimed in his trial testimony that he sustained injuries to his head, neck, and left shoulder as a result of the accident at the Staples store on September 2, 2011. Plaintiff was 56 years old at the time of the accident. Tr. 22, 291-92. Plaintiff testified that, after the accident, he experienced "constant pain" in these areas and that he was prescribed pain medication as a result. Tr. 610-13, 619-23, 630, 633-34. Plaintiff also described attending physical therapy, taking medication, and receiving multiple injections to relieve pain in his cervical spine and left shoulder. Tr. 611-12, 614-15, 619-21, 634-37, 640-46. In December 2014, plaintiff underwent surgery to repair a partial tear in his left shoulder revealed by an MRI. Tr. 623-24. After the surgery, plaintiff testified, he "had so many pains" that he could not work or perform basic functions like taking a shower. Tr. 629. Around the same time, plaintiff testified, he experienced "headache[s], dizziness[,] . . . blurry vision[,] [a]nd . . . double vision," as well as short-term memory loss. Tr. 648, 665. In 2015, while receiving epidural injections, plaintiff testified that he could not "twist [his] head left to right or right to left." Tr. 645.

Finally, plaintiff testified that, as early as 2008, well before the accident in the Staples store, he experienced neck and shoulder pain and a months-long headache, but that the neck pain was usually relieved with physical therapy. Tr. 651-53. Plaintiff also acknowledged seeing a pain management doctor because of the discomfort he felt in his neck even before the Staples accident. Tr. 653. With respect to the impact of the accident on his ability to engage in various activities, plaintiff described being an avid painter and working as a graphic designer and testified that, while he was able to continue painting and working at graphic design after the Staples accident, he could do so only with some difficulty. Tr. 655-58.

A somewhat different picture of the extent of plaintiff's injuries emerged, however, on cross-examination. Among other things, counsel for Staples introduced and published to the jury one picture from plaintiff's Facebook page taken at some point after the accident but before September 2012, showing plaintiff gazing upwards at signs in Times Square, and a second taken in August 2015 showing plaintiff with his arm raised and taking a "selfie" picture with some friends in Alexandria, Virginia, both of which cast at least some doubt on plaintiff's claims of limited range of motion of his neck and left shoulder. Tr. 709-12, 716-18. Plaintiff also acknowledged on cross-examination that, since the Staples accident, he has engaged in various business dealings requiring focus, attention to detail, and long-distance travel, such as amending his company's corporate documents in September 2013, and traveling to Bangladesh in March 2014, where he met with a seafood vendor "to make some business." Tr. 713-15, 731. A picture from plaintiff's Facebook page, which was entered into evidence and published to the jury, showed plaintiff visiting a fish factory in Bangladesh in March 2014. Tr. 715-16.

Plaintiff also acknowledged on cross-examination that, since the accident, he has painted elaborate works of art and presented his work at several exhibitions, including one in New York in November 2015 where 32 of his paintings were featured. Tr. 708-09, 719-21, 724-30. A picture from plaintiff's Facebook page showed plaintiff at one of the art exhibitions using his left arm to point at some of his paintings that were on display. Tr. 729. Plaintiff also testified on direct examination that when he paints, he relies on his memory, explaining that "[w]henever I see something good, I just kind of memorize it and come home and do it." Tr. 566. This evidence may have led the jury to doubt plaintiff's claim that he suffered from short-term memory loss and limited range of motion in his left shoulder after the accident.

7

Further questions about whether plaintiff sustained cognizable injuries as a result of the Staples accident were raised during the testimony of the various treating doctors he called to testify on his behalf. Plaintiff first called Dr. Ranga Krishna, a board-certified neurologist who serves as the chief of neurology at New York Presbyterian Community Hospital in Brooklyn. Tr. 41-42. Dr. Krishna testified that he began seeing plaintiff in June 2014 and continued to treat him until November 2016. Tr. 45. Referring to a report of a visit in February 2015, Dr. Krishna testified that plaintiff presented with complaints of headaches and pain in his neck, shoulder, arm, and leg. Tr. 46. Dr. Krishna also testified that plaintiff complained of difficulty focusing, concentrating, and performing repetitive tasks such as "bending, pushing[,] and pulling." Tr. 47. Dr. Krishna performed a neurological exam and made a number of findings including that plaintiff was suffering from short-term memory loss, muscle weakness and limited range of motion in his neck, and diminished reflexes and sensitivity in his upper left arm, as well as a diminished sense of smell. Tr. 47-49. Dr. Krishna also conducted an electromyogram that revealed nerve damage in plaintiff's cervical spine causing neck pain, and an MRI of plaintiff's head that revealed "findings of a subdural hygroma, and signs of a traumatic brain injury." Tr. 56-57, 70. Dr. Krishna described a subdural hygroma as "a collection of fluid between the brain and the skull." Tr. 70.

Dr. Krishna concluded from the history plaintiff provided to him that "the neck injury was related to the accident in question." Tr. 69. Dr. Krishna also attributed the apparent brain injury to the accident in the Staples store. Tr. 73. During his visits with Dr. Krishna, plaintiff reported that the boxes that fell on him in the Staples store struck him on the shoulder and never told Dr. Krishna that he thought the boxes hit him in the head. Tr. 86-88. Dr. Krishna nevertheless concluded that the falling boxes caused plaintiff to sustain a brain injury, opining

8

that the injury resulted from whiplash rather than a direct blow to plaintiff's head. Tr. 71-73, 109-10, 112. He explained:

> Any time a sudden activity occurs, such as in this case when a box falls on top of your head or neck or one side of your body, the natural response for us is to move fast and furious to the other side to try to evade the problem with our head. . . . And that movement is usually a forward and backward movement. So it moves to one side and, unfortunately, it also moves backwards. That movement results in the brain, which is encased by the skull, to move in the exact opposite direction. So that if you move your head to the right, the brain moves to the left against the skull, and then when the head moves back, the brain moves to the opposite direction because it's sort of free-floating in a bag of water. That . . . process is, essentially, a whiplash or a coup/contrecoup-type of injury to the head.

Tr. 71-72.

On cross-examination, Dr. Krishna acknowledged that the medical history plaintiff provided to him was inaccurate in several respects. Indeed, counsel for Staples brought out that plaintiff never informed Dr. Krishna about his pre-accident history of headaches and shoulder and neck pain, which, it turned out, was quite extensive. Tr. 91-92. Dr. Krishna further acknowledged that the diagnostic reports relating to plaintiff's cervical spine revealed many degenerative changes unrelated to trauma, and that the particular part of the cervical spine where plaintiff's discs were herniated was the area that is most commonly associated with degenerative changes. *Id.* As noted above, plaintiff was 56 years old on the date of his accident, and was thus approaching 60 years of age by the time of his first visit with Dr. Krishna in 2014. Tr. 22.

With respect to plaintiff's claimed brain injury, Dr. Krishna noted on cross-examination that the "most common" recovery period for a mild or moderate traumatic brain injury is two years from the date of the injury, and that when he saw plaintiff for the first time in June 2014—almost three years after the accident in the Staples store—his neurological mental status was normal. Tr. 93-94. Indeed, during multiple office visits from June 2014 through February

9

2015, Dr. Krishna repeatedly assessed plaintiff's neurological mental status as normal. Tr. 94-96. Only in February 2015—three and a half years post-accident and after approximately eight office visits—did plaintiff first complain to Dr. Krishna about dizziness and cognition problems. Tr. 93-96. The repeated normal assessments and the lapse of time between the accident and when plaintiff first complained of dizziness and cognition problems were not the only facts elicited on cross-examination raising questions about whether plaintiff actually sustained a brain injury as a result of the accident in the Staples store. Dr. Krishna also acknowledged that, since at least June 2014, plaintiff has been taking multiple medications prescribed to him for high blood pressure, high cholesterol, rhinitis, acid reflux and osteoarthritis, and that the combined side effects of these medications include dizziness, forgetfulness, and headaches. Tr. 96-100.

Plaintiff also called as an expert Dr. Harold Parnes, a board-certified neuroradiologist who conducted MRI studies of plaintiff's brain, cervical spine, and left shoulder between June 2014 and May 2015. Tr. 134-136, 140-41, 147. Dr. Parnes opined that an initial MRI of plaintiff's brain revealed a left frontal subdural hygroma, while a follow up MRI using diffusion tensor imaging ("DTI") technology revealed "some impairment" on the left frontal portion of plaintiff's brain. Tr. 150, 154-58. But when asked whether the impairment revealed on the DTI scan was caused by the subdural hygroma, Dr. Parnes responded that "[i]t's hard to tell." Tr. 159. Dr. Parnes was also asked to opine on the cause of the subdural hygroma, to which he responded "[i]t would appear to be trauma," although he conceded later that the hygroma may have existed prior to the accident in the Staples store on September 2, 2011. Tr. 180-81, 264-65. Dr. Parnes further stated that "it would be very difficult to tell" whether the hygroma was caused by a recent or long past trauma. Tr. 185. Later, during cross-examination, Dr. Parnes again

conceded that "[i]t's possible" the findings on the DTI scan may have predated the September 2, 2011 accident. Tr. 255.

In addition to describing his own radiological studies, Dr. Parnes testified that plaintiff had a brain MRI that was performed by Apollo Imaging Diagnostic Radiology ("Apollo") in February 2014. Tr. 189-93. Parnes acknowledged on cross-examination that, according to the doctor who performed the Apollo tests, "every single finding [was] normal." Tr. 235-36. Dr. Parnes later added, though, that he considers most films and radiological reports from other imaging facilities "garbage." Tr. 243. Dr. Parnes wrote in his own reports that his findings were consistent with a "direct impact, traumatic event . . . to the head," Tr. 236-37, apparently contradicting Dr. Krishna's earlier testimony that plaintiff's brain injury resulted from a whiplash-like back-and-forth movement with no direct impact to plaintiff's head.

Dr. Parnes testified further that the MRI he took of plaintiff's cervical spine revealed a number of herniated discs. Tr. 199, 209-10. But when asked if he could identify the cause of the herniations, Dr. Parnes testified that "if it was acute, then we would be concerned about some type of traumatic event. I mean he does have some degenerative changes, so depending on when the trauma was, these could be resulting from whatever happened to him previously. . . . I can't tell you if it's caused by trauma. It would be difficult to say." Tr. 199-200. Ultimately, Dr. Parnes acknowledged that many of the findings revealed by the MRI studies of plaintiff's neck and spine could be attributable to degeneration and the normal aging process rather than trauma. Tr. 268-74.

Dr. Parnes also testified that an MRI of plaintiff's shoulder revealed a "partial tear of the glenoid [labrum]," which he attributed to a "significant . . . traumatic event." Tr. 205-07. But on cross-examination, Dr. Parnes was asked about a November 2012 test, referenced in his reports,

11

performed on plaintiff's left shoulder by Dr. Choy, another radiologist. Tr. 242-246. Where Dr. Parnes found a partial tear in plaintiff's shoulder, Dr. Choy found only "mild tendinopathy," which Dr. Parnes described as a "degenerative finding." Tr. 247-48. To explain the apparent inconsistency, Dr. Parnes offered that "sometimes it may be difficult to distinguish between those two[,]" Tr. 248, casting doubt on his earlier testimony about the extent of injury to plaintiff's left shoulder.

Plaintiff also called Drs. Ajoy Sinha, an orthopedic surgeon, and Sebastian Lattuga, a board-certified orthopedic spinal surgeon. Tr. 288, 363-64. Dr. Sinha performed arthroscopic surgery on plaintiff's shoulder in December 2014 to repair a labral tear, resulting from what he described as a "traumatic injury." Tr. 294-95, 310-11. Dr. Sinha explained that his opinion was based, at least in part, on the medical history provided to him by plaintiff. Tr. 310. On cross-examination, however, it was elicited that, as with Dr. Krishna, plaintiff did not reveal his pre-accident history of left shoulder pain to Dr. Sinha. Tr. 328. It was also elicited on cross-examination that plaintiff told Dr. Sinha that the Staples boxes hit him in the *head*, neck, and shoulder. Tr. 329-30. This description of the accident was inconsistent with plaintiff's report to Dr. Krishna, discussed above, that the boxes struck him only in his shoulder and not his head. Finally, Dr. Sinha conceded that labral tears can result from degeneration and the normal aging process. Tr. 337-38.

Dr. Lattuga, who first saw plaintiff in September 2014 and observed a similarly limited range of cervical spine motion as described by Dr. Krishna, recommended that plaintiff be treated with physical therapy and epidural injections for herniated discs and radiculopathy. Tr. 367, 371-72, 377. When asked to comment on the cause of plaintiff's injury, Dr. Lattuga opined "if the history given to me is accurate and I believe it to be accurate . . . it related to [a] box

12

falling on [plaintiff's] shoulder back in 2011." Tr. 418. It was elicited on cross-examination, however, that plaintiff initially reported that he was struck by the falling boxes on his left shoulder, but that on subsequent visits, he stated that the boxes struck him on his head. Tr. 439-40. When asked on cross-examination whether plaintiff's complaints can be attributed to degenerative changes rather than a traumatic incident, Dr. Lattuga offered "it can be very difficult to make a distinction between an age-related change and a herniated disc" caused by trauma. Tr. 432-33. He agreed further that it is "fair" to say that, in plaintiff's case, "there's nothing that you can look at and say this is specifically related to the trauma as opposed to the natural degeneration that's ongoing in [plaintiff's] spine." Tr. 433. In addition, it was elicited on cross-examination that plaintiff is a smoker and that smoking can accelerate the pace of degenerative changes to the soft tissues and bony structures of the body. Tr. 435.

Plaintiff's final expert witness was Dr. Guha, an internist who was plaintiff's primary care physician. Tr. 451, 453. Dr. Guha saw plaintiff on September 2, 2011, shortly after the accident in the Staples store. Tr. 453. According to Dr. Guha, plaintiff indicated that boxes fell on his head—which, as noted above, is not what he later reported to Drs. Krishna and Lattuga—and that he had a headache and felt pain in his neck and shoulder. Tr. 453-54. After plaintiff's condition had not improved following several physical therapy sessions, Dr. Guha referred plaintiff to Drs. Sinha, Krishna, and Lattuga. Tr. 464-65. Dr. Guha also testified that, despite plaintiff having had complaints of neck and left shoulder pain in March 2008 and then again in February 2009, he attributes plaintiff's current complaints to the accident in the Staples store. Tr. 477, 489, 498.

On cross-examination, Dr. Guha stated that, when he saw plaintiff in 2009 for complaints about his neck and left shoulder, he observed that plaintiff's range of neck motion was limited.

13

Tr. 499-501. Dr. Guha further acknowledged that he saw plaintiff in August 2010—about one year before the Staples accident—and that plaintiff was complaining at that time of a headache that had persisted for two months. Dr. Guha diagnosed plaintiff as suffering from hypertension. Tr. 505. Plaintiff visited Dr. Guha's office again in August 2011—a month before the accident in the Staples store—and again registered complaints of a persistent headache. Tr. 507-08. According to Dr. Guha's office records, plaintiff conceded at that visit that he had not been taking the blood pressure medication Dr. Guha prescribed for him a year earlier. Tr. 508, 515. Dr. Guha further acknowledged on cross-examination that, according to his office records, plaintiff complained of persistent left shoulder pain that was "severe in intensity" as early as January 2011—eight months prior to the Staples accident. Tr. 533-35.

   2. *Defendant's Case*

  The defendant's case consisted primarily of testimony from its experts, Drs. William Brian Head and Andrew Bazos. Tr. 813, 899. Dr. Head is board-certified in psychiatry, neurology, neuropsychiatry, neuroimaging, and most recently, brain injury medicine—one of less than 500 people in the United States to hold that certification. Tr. 818-19. Dr. Head testified that he reviewed all the medical records and reports in the case, including the various diagnostic films, as well as transcripts of testimony from earlier in the trial. Tr. 820-22. He also conducted a physical, neurological, and mental status examination of plaintiff in June 2015. Tr. 822, 827. While examining him, Dr. Head asked plaintiff whether he had any pre-accident medical history with respect to his head, neck, or left shoulder; plaintiff responded that he did not. Tr. 825-26. Dr. Head also opined that, when he reviewed plaintiff's medical records, he saw "no evidence of cervical radiculopathy . . . [or] nerve damage in [plaintiff's] neck." Tr. 829. When he reviewed the various radiological studies of plaintiff's cervical spine, Dr. Head did not

14

observe any acute disc herniations, but instead saw bulging discs, which he explained were "a sign of chronic illness, [or] chronic deterioration." Tr. 830-31. Dr. Head also observed "a completely normal range of motion" in plaintiff's neck. Tr. 831.

Dr. Head also offered expert testimony in response to plaintiff's claim that he sustained a brain injury. Dr. Head described his findings with respect to plaintiff's mental status as follows:

> He was alert, oriented, able to do calculations. He had a friendly affect, which is to say, he was a friendly person. He was pleasant. He was outgoing. He showed no word finding difficulty. He spoke English. No slurred speech was noted. He was able to concentrate. He was able to process his thoughts quickly and he was able to render a fairly detailed history, and his immediate recall was intact. His overall memory was within normal. There was no evidence of impairment of concentration, no evidence of impairment of comprehension. There was no evidence of any concentration difficulties, as I indicated, and that I concluded, therefore, that his mental status, neurologically mental status examination failed to reveal any evidence of any cognitive impairment.

Tr. 828. Dr. Head testified further that he found "no evidence of any trauma" to plaintiff's brain. Tr. 836. He questioned the finding made by plaintiff's experts that plaintiff had a subdural hygroma, and suggested that the irregularities in plaintiff's MRI results relied upon by plaintiff's experts could reflect atrophy due to plaintiff's age. Tr. 839. Finally, Dr. Head testified that it is not medically possible for a whiplash injury of the sort described by Dr. Krishna to produce a TBI. Tr. 844. Dr. Head testified that, since beginning to practice medicine in 1971, he has never once seen or heard of a diagnosed TBI caused by the back-and-forth motion described by Dr. Krishna. Tr. 845.

Dr. Bazos, a board-certified orthopedic surgeon, obtained his medical degree from Yale University School of Medicine, completed an internship and four years of orthopedic surgery training at Columbia Presbyterian Hospital, and a one-year fellowship in knee and shoulder surgery at New York University Hospital for Joint Diseases. Tr. 899-902. Dr. Bazos, who also reviewed all of plaintiff's relevant medical records, conducted a physical examination of plaintiff

15

in February 2015. Tr. 903-06. At that time, according to Dr. Bazos, plaintiff reported that he "never had a prior injury or problem with his neck or his shoulder before the Staples episode." Tr. 907. Dr. Bazos also testified that, during his physical examination of plaintiff, the range of motion demonstrated in his left shoulder was "inconsistent." For example, once when Dr. Bazos asked plaintiff to raise his left shoulder, he raised it to 90 degrees, but later, he was able to raise it to 160 degrees, or "almost all the way up." Tr. 920. Dr. Bazos testified that there was no mechanical explanation for why that would happen. *Id.*

Dr. Bazos opined that the MRIs of plaintiff's shoulder revealed "tendinopathy," which he described as "wear and tear of a muscle" that "virtually everybody with any activity level over the age of 35 is going to have." Tr. 912-14. He further explained that, according to plaintiff's medical records, plaintiff first complained of shoulder pain weeks after the Staples accident, and that, absent immediate pain at the time of the trauma, "there's absolutely nothing indicative of acute trauma" in the MRI of plaintiff's shoulder. Tr. 913-14. Dr. Bazos also opined that the dislocation observed when plaintiff had shoulder surgery could not have been caused by an impact from above, such as from a falling object, but could only have been caused by repetitive motion or a blow from behind. Tr. 919.

Finally, with respect to plaintiff's neck, Dr. Bazos opined that the MRI he reviewed revealed "longtime wear and tear." Tr. 924. He also concurred with Dr. Head's opinion that the tests performed on plaintiff's neck did not reveal any cervical disc herniations. Tr. 927. Dr. Bazos concluded his testimony by stating that he saw no objective evidence to corroborate plaintiff's claims of a neck injury in plaintiff's medical records. Tr. 931.

### 3. *The Verdict Was Not Against the Weight of the Evidence*

Based on the evidence presented at trial, the jury may have reasonably concluded that the injuries complained of by plaintiff were the result of pre-existing conditions that had worsened over time, perhaps compounded by medication plaintiff had been prescribed to treat high blood pressure and cholesterol. The jury may have chosen to credit the testimony of the defense experts who opined that it was medically "impossible," given the mechanics of how and where the boxes fell on plaintiff, for them to have caused the injuries plaintiff claimed he sustained. It may have also chosen to credit the testimony of the expert witnesses—on both sides—that the findings in the diagnostic tests of plaintiff's head, neck, and left shoulder reflected degenerative changes attributable to the natural aging process rather than the results of a traumatic event. The jury's evaluation of plaintiff's claimed brain injury may also have taken into account plaintiff's business trips and the intricate paintings he produced even after the September 2, 2011 accident, as well as the manner in which plaintiff testified, which revealed him as someone able to comprehend and answer complex questions in a clear and coherent manner. Finally, the jury may have chosen not to credit much or any of plaintiff's testimony, in light of the testimony of his own doctors that he repeatedly failed to provide them with accurate information about his pre-accident symptoms and complaints, and provided inconsistent information about whether the boxes struck him on his head when they fell.

Although the jury deliberated for only a short period of time, that fact alone does not lead to the conclusion that it failed to dutifully consider the evidence presented. *See Wilburn v. Eastman Kodak Co.*, 180 F.3d 475, 476 (2d Cir. 1999) ("A jury is not required to deliberate for any set length of time. Brief deliberation, by itself, does not show that the jury failed to give full, conscientious[,] or impartial consideration to the evidence.").

Finally, while the jury might have credited plaintiff's version of events and accepted the opinions of the expert treating physicians he called as witnesses, it certainly was not required to do so. The verdict reflected the jury's assessment of the credibility of the witnesses, and was not against the weight of the evidence, egregious, or a miscarriage of justice. Plaintiff's motion for a new trial based upon his contention that the verdict was against the weight of the evidence is accordingly denied.

    B. <u>The File Folder Exemplars</u>

Plaintiff, in an argument raised for the first time in his reply papers, asserts that two packages of plastic file folders of the type that were inside the boxes that fell in the Staples store were improperly received in evidence. Plaintiff argues that these exemplar exhibits were not disclosed to plaintiff "in a timely fashion in accordance with this Court's express instructions." Reply Mem. at 7. Plaintiff's argument is without merit.

At trial, defendant presented two exemplar packages of plastic file folders that it claimed were similar to the contents of the boxes that fell in the Staples store. Tr. 677-78, 745-46, 758-59. Defendant first made use of the exemplars while cross-examining plaintiff. Tr. 677. Plaintiff objected to defendant's use of the plastic file folders during cross-examination on the ground that they were not disclosed in discovery. Tr. 684. Defense counsel responded that he showed the exemplars to plaintiff's counsel earlier in the day before using them and that plaintiff's counsel did not object at that time. Tr. 684. Although I overruled plaintiff's objection, I also offered plaintiff's counsel the opportunity to examine the exemplars and prepare responsive testimony overnight, and to conduct a re-direct examination of the plaintiff on the following day. Tr. 686.

Later, defendant moved the exemplars into evidence, and plaintiff's counsel objected, arguing that receiving the file folders in evidence could confuse the jury. Tr. 960-61, 964. I overruled plaintiff's objection, noting that a proper foundation had been laid through a Staples employee,[5] and that any possible confusion could be avoided with a proper limiting instruction. Tr. 965. I gave the jury such an instruction, explaining that the exemplar exhibits "are not the folders that were inside any box that may have fallen on September 2, 2011 while the plaintiff was in a Staples[] aisle" and that they were received in evidence "because there is some indication in the record that the box that fell contained folders like that, not because those are the folders that were recovered on September 2nd, 2011." Tr. 971.

The exemplars were not improperly admitted into evidence. The testimony of Carlos Urena, the general manager of the Staples store where plaintiff's accident took place, provided an adequate foundation for receiving the exemplars. Tr. 749-51. Urena testified that he responded to the scene of plaintiff's accident and observed one or two boxes on the floor. Tr. 755-57. He also determined that the boxes contained the same type of folders as those comprising defendant's exemplar exhibits. Tr. 758-59.

It is well-settled that the admissibility of demonstrative evidence rests within the discretion of the trial judge. *See, e.g.*, *Veliz v. Crown Lift Trucks*, 714 F. Supp. 49, 51 (E.D.N.Y. 1989). Perfect identity between the actual item involved in the case and the demonstrative evidence is not required. *Id*. Here, assuming Urena's testimony was accurate, the contents of the boxes involved in plaintiff's accident were virtually identical to the exemplars offered at trial. The exemplars were relevant because they could help the jury evaluate plaintiff's testimony by providing a sense of the size and weight of the boxes that may have fallen on him. Moreover,

---

[5] S*ee* Tr. 758-59.

19

any prejudice from defendant's failure to produce the exemplars to plaintiff's counsel earlier in the case was addressed by allowing plaintiff overnight to examine the exemplars and prepare responsive testimony.

Even if receiving the exemplars in evidence had been error, no adverse effect on plaintiff's "substantial rights" ensued. Fed. R. Civ. P. 61. The exemplars were not used, for example, to conduct a demonstration, and the expert witnesses were not asked to consider them when rendering their opinions. Finally, an appropriate limiting instruction was given to the jury. *See United States v. Downing*, 297 F.3d 52, 59 (2d Cir. 2002) (noting that juries are presumed to understand and abide by limiting instructions); *Stowe*, 793 F. Supp. 2d at 574 (denying motion for new trial where limiting instructions were given "since jurors are presumed to follow the court's instructions"). Therefore, plaintiff's motion for a new trial on this ground is denied as well.

## CONCLUSION

For the foregoing reasons, plaintiff's motion for a new trial pursuant to Federal Rule of Civil Procedure 59 is denied.

SO ORDERED.

/s/
STEVEN M. GOLD
United States Magistrate Judge

Brooklyn, New York
March 21, 2017

U:\#ZAK 2016-2017\Ahsan v. Staples, Inc. (13cv5929) (SMG)\Motion for New Trial - FINAL.docx